Christopher R. Bush CS SBN 243471
The Law Office of Chris Bush
2727 Camino del Rio South, Suite 135
San Diego, CA  92108
Tel. (619) 678-1134
chris@chrisbushlaw.com

Attorney for Debtor


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br>CESAR MEDINA<br>KRYSTAL ANNE MEDINA | Case No.  17-05276-LT<br>Chapter 7 |
| KRYSTAL ANNE MEDINA<br>         Plaintiff,<br>         vs.<br>NATIONAL COLLEGIATE STUDENT<br>LOAN TRUST 2006-3;<br>                 Defendant. | Adversary No. 19-90065-LT<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I.    STATEMENT OF THE CASE……………………………………………1

II.    BACKGROUND……………………………………………………………2

    A. Early Years: Nonprofits, The Higher Education Act, and the *Quid Pro Quo*……………………………………………………………2

    B. Alternative Loans, Multi-Party Agreements, and TERI……………12

    C. FMC, Direct-to-Consumer Loans, and the National Collegiate Trust……………………………………………………..……..15

III.    ARGUMENT AND POINTS OF AUTHORITY………………………18

    A. Summary of Argument…………………………………………..18

    B. Section 523(a)(8)(A)(i) does not except from discharge high-interest commercial loans made and held by for-profit entities……………..18

    C. TERI Was Not A *Bona Fide* Nonprofit under Section 523(a)(8)…...20

    D. There Is No Evidence That TERI Guaranteed The NCSLT Loan…………………………………………………………24

IV.    CONCLUSION……………………………………………………...25

# TABLE OF AUTHORITIES

**Cases**

*Becirevic v. Navient Solutions, LLC*, 2019 WL 4046770 (E.D. Tex. 2019)………5

*First Marblehead Corp. v. House*, 541 F.3d 36 (1st Cir. 2008)…………….…..22

*Bates v. United States,* 522 U.S. 23 (1997)…………………………………………19

*Crowley v. TVSM, Inc.*, 1991 WL 267868 (S.D.N.Y. 1991) …………….….…..25

*Est of Hawaii v. C.I.R.*, 71 T.C. 1067 (Tax Court 1979), *aff'd* 647 F.2d 170 (9th Cir. 1981) ……………………………………………………..…………..21

*Frank Lloyd Wright Foundation v. Kroeter,* 697 F.Supp.2d 1118 (D. Ariz. 2010)……………………………………………………………………………..21

*In re Adamo*, 619 F.2d 216  (2nd Cir.  1980) …………………………..…………..21

*In re Bolen*, 287 B.R. 127 (D. Vt. 2002) ……………………….………...……….13

*In re Brunner*, 46 B.R. 752, 755 (S.D.N.Y. 1985), *aff'd* 831 F.2d 395 (2nd Cir.) …6

*In re Campbell*, 547 B.R. 49 (Bkrtcy.E.D.N.Y. 2016) ………………...…………19

*In re Dube,* 169 B.R. 886 (Bkrtcy. N.D. Ill. 1994) …………………………….…21

*In re Hammarstrom,* 95 B.R. 160 (Bkrtcy.N.D.Cal. 1989) ………………1,14-15

*In re Golden,* 596 B.R. 239 (Bkrtcy. E.D.N.Y.  2019) ……………………………..2

*In re Goldstein*, 2012 WL 7009707 (Bkrtcy.N.D.Ga. 2012) …………….….…..11

*In re O'Brien*, 318 B.R. 258 (S.D.N.Y. 2004) ……………………………………20

*In re O'Brien*, 419 F.3d 104 (2nd Cir. 2005). …………………………………….21

*In re Murphy*, 282 F.3d 868 (5th Cir. 2002) ……………………….……………..2

*In re Pilcher,* 149 B.R. 595 (9th Cir.BAP1993). ……………………………1,15

In re Stein, 218 B.R. 281 (Bkrtcy. D. Conn. 1998) ………………………………16

*In re The Education Resources Institute, Inc.,* 442 B.R. 20 (Bkrtcy. D. Mass. 2010)……………………………………………………………………..…..17

*In re The First Marblehead Corp. Securities Litigation*, 639 F.Supp.2d 145 (D. Mass.2009) …………………………………………………………….…17

*Living Faith, Inc. v. C.I.R.*, 950 F.2d 365 (7th Cir. 1991) …………………..…..23

*Shinde v. Nithyananda Foundation*, 2015 WL 12732434 (C.D. Cal. 2015)…....…21

*Lowry Hospital Association v. C.I.R.*, 66 T.C. 850 (Tax Court 1976)……..….…..21

*Matter of Williamson*, 25 B.R. 49 (Bkrtcy. Ga. 1982). ………………..….………5

*Matter of Bruce*, 3 B.R. 77 (Bankr. Ill. 1980) …………………………..………5

*McClure v. U.S.*, 95 F.2d 744 (9th Cir. 1938) …………………………………11

*Matter of Roberson,* 999 F.2d 1132 (7th Cir. 1993) ……………………..………19

*New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Bd. of Higher Educ.,* 654 F.2d 868 (3rd Cir.  1981) ………..…..……10

*Oliver Schools, Inc. v. Foley*, 881 F.Supp. 847 (W.D.N.Y. 1994) ………..……...…4

*P.L.L. Scholarship Fund v. C.I.R.*, 82 T.C. 196 (Tax Court 1984) ……………..…7

*Redlands Surgical Services v. C.I.R.,* 242 F.3d 904 (9th Cir. 2001) ……....……...22

*Student Loan Marketing Ass'n v. Riley,* 104 F.3d 397 (D.C. Cir. 1997) …………12

*Town of Brookline v. Gorsuch*, 667 F.2d 215 (1st Cir. 1981) ………………..…..21

*Texas Trade School v. C.I.R.*, 30 T.C. 642 (Tax Court 1958) ……………………23

*Zimmerman v. Cambridge Credit Counseling Corp*., 409 F.3d 473(1st Cir. 2005) 21

**Statutes and Regulations**

11 U.S.C. §523 (a)(8) …………………………………………………………stet

11 U.S.C. § 541(f) …………………………………………………..…………20

14 U.S.C. § 2772……………………………………………………………...…8

20 USC § 1141 ……………………………………………………………..……20

20 U.S.C. § 1071…………………………………………………………..…..…4

20 U.S.C. 1087gg. ………………………………………………………..……..5

34 CFR 682.100 ……………………………………………………..……..……6

34 CFR s 668.1 (1984) …………………………………………………….…7,11

34 CFR s 668.1 (1987) ………………………………………….………………11

34 CFR 674.1 …………………………………………..……………...……10,20

34 C.F.R. § 675.2 …………………………………………..……………...……20

**Legislative Records**

H.R. Rep. 95-595, 1978 U.S.C.C.A.N. 5963 …………………………………5-6

P.L. 95-598, Nov. 6, 1978, 92 Stat 2549………………………………..…….……7

P.L. 96-56. Aug 14, 1979, 93 Stat 387…………………………….…...…………7

P.L. 101–239, December 19, 1989, 103 Stat 2106 ……………………………..…..8

P.L. 96–374, Oct 3, 1980, 94 Stat 1367…………………………………..……..7-9

S. REP. 96-230, 1979 U.S.C.C.A.N. 936 ……………………………..……..7-9

Pub. L. 99–498, 100 Stat 1268……………………………………………..……..9

Bankruptcy Improvement Act: Hearing on P.L. 98-353 Before the S. Comm. on Judiciary, at 328 (April 6, 1983) (Comments on Subtitle I of S. 445). ……..……11

**Administrative Reports and Rulings**

CFPB, PRIVATE STUDENT LOANS, *2012* …………………………….………16

REVENUE RULING, 63-220, 1963 WL 13199 (IRS 1963) …………………….……2-4

REVENUE RULING 61-87, 1961 WL 12644 (1961) …………………..…………4

GENERAL COUNSEL MEMORANDUM, 1987 WL 430206 ……………………….……13

PRIVATE LETTER RULING 9237027, 1992 WL 223684 (IRS 1992) …………….13

PRIVATE LETTER RULING 9740004, 1997 WL 607382 (IRS 1997) …………….13

**Secondary Sources**

Bradley, Tobin, *Nonprofit Student Lenders and Risk Retention*, 64 Baylor L. Rev. 158 (2012) ……………………………………………………….………3-4

Brown, Tom, *FBR's Latest First Marblehead Downgrade Makes No Sense*, Seeking Alpha (Nov. 28, 2007) ……………………………….………17

Dash, Eric, *Reeling In the College Bound*, N.Y. Times (Sept. 2, 2007) …………16

Reuters, *Moody's Downgrades First Marblehead Student Loan Notes*, (Mar. 26, 2008) …………………………………………………......…………17

Rossman, Mathew, *Evaluating Trickle Down Charity*, 79 Brook. L. Rev. 1455, 1495 (2104) ……………………………………….………….…………..2

Stempel, Jonathan, *First Marblehead Sinks, Guarantor is Bankrupt* (Apr. 9, 2008) ……………………………………………….………17

# I.   STATEMENT OF THE CASE

Defendant argues that the debt incurred by Plaintiff ("NCSLT Loan") was guaranteed by TERI, a defunct 501(c), and is therefore non-dischargeable under section 523(a)(8)(A)(i) as an "educational loan . . . made under any program funded in whole or in part . . .by a nonprofit institution."  Defendant claims that TERI guaranteed the loan, and that Congress intended the term "funded" to capture any 501(c) that plays "any meaningful part" in making a loan. Defendant's argument rests on a misapplication of the statute and is otherwise unsupported by its evidence.

First, the clause "made under any program funded in whole or in part by a nonprofit institution" refers to loans made under the National Direct Student Loan Program.  It protects government funded loans, and loans funded directly by nonprofits colleges and universities. The cases cited by Defendant that have interpreted 523(a)(8)(A)(i) so broadly are, respectfully, in error. These decisions have disregarded basic canons of statutory interpretation and found that the word "funded" means "played any meaningful part," the word "program" means a marketing platform, and the term "nonprofit institution" means any 501(c) corporation. [1]   Congress should not be assumed to have been this careless in its selection of words.  The words "program," "funded," and "nonprofit institution" are the building blocks that Congress used to construct the lending programs under Title

---

[1] *In re Hammarstrom,* 95 B.R. 160, 165 (Bkrtcy.N.D.Cal. 1989); *In re Pilcher,* 149 B.R. 595, 600 (9th Cir.BAP1993).

IV of the HEA.  Congress knew why it was using those terms and not others. *In re Murphy*, 282 F.3d 868, 872 (5ᵗʰ Cir. 2002) (stating that § 523(a)(8) should be harmonized with the Higher Educational Act).  Once properly read in conformity with the HEA, it is clear that the NCSLT Loan cannot fit within the statute.

Second, even if Defendant's statutory construction were sound, its evidence fails to support its claims for at least two reasons: (1) there is insufficient evidence that TERI was a legitimate nonprofit; (2) there is no evidence TERI guaranteed the NCSLT Loan. First, where a statute employs the word "nonprofit," courts inquire into the entity's character to determine whether was operated for charitable or commercial purposes. *In re Golden,* 596 B.R. 239, 266–67 (Bkrtcy. E.D.N.Y. 2019) (categorizing as a question of fact whether TERI was "a *bona fide* nonprofit institution" or a division of "the First Marblehead Corporation."). Tellingly, the IRS prohibits tax-exempt entities from making loans with characteristics like the NCSLT Loan,[2] and public financial records suggest that TERI was being used as a commercial mechanism to enhance the profitability of the First Marblehead Corporation. *P.L.L. Scholarship Fund v. C.I.R.*, 82 T.C. 196, 200 (Tax Court 1984) (nonprofit operated "to enhance the profitability" of for-profit entity).  Second, even if "guaranteeing" a loan could be construed as funding, there is no evidence TERI

---

[2]  *See* REVENUE RULING, 63-220, 1963 WL 13199 (IRS 1963). This would seem to be mostly an honor system. *See* Rossman, Mathew, *Evaluating Trickle Down Charity*, 79 Brook. L. Rev. 1455, 1495 (2104) ("Due to limited staffing, the IRS Tax Exempt Division typically reviews less than two percent of the 990s it receives.")

2

actually guaranteed the NCSLT Loan or that that Guaranty Agreement was even legally operative when Plaintiff entered into the transaction at issue.

## II.    <u>BACKGROUND</u>

Admittedly, there is significant case law in the Defendant's favor. This case law has been built up and expanded over the last thirty years, and now allows for-profit commercial lenders to share in an exception from discharge that Congress reserved for public and nonprofit entities that participated in the HEA.    Section 523(a)(8)(A)(i) was never intended to apply to commercial transactions. A brief review of the developments that led to section 523(a)(8) will demonstrate this.

### A. Nonprofits, the Higher Education Act, and the Quid Pro Quo

Massachusetts is credited with pioneering the guaranteed student lending model when it created the Massachusetts Higher Education Assistance Authority ("MHEAA") in 1957.[3]    Until that time, student loans could generally only be obtained from banks on commercial terms.[4] The MHEAA proposed to guarantee the loans against default in exchange for banks agreeing to make low-interest, unsecured loans to students. The MHEAA was successful, and other states created similar state

---

[3] Tobin, Bradley *Nonprofit Student Lenders and Risk Retention*, 64 Baylor L. Rev. 158, 178–79 (2012) ("The first guaranteed student loans were issued in Massachusetts in 1957.") (hereinafter "Tobin").

[4] REVENUE RULING, 63-220, 1963 WL 13199, at *1 (IRS 1963) ("Loans from commercial lending agencies in the area are available to students, but only on a secured basis and at commercial or conventional rates of interest, which vary depending upon the size of the loan.").

agencies and nonprofits.[5]  The IRS was soon called upon to examine this somewhat unorthodox practice (charities did not historically lend money at interest). In 1961, the IRS approved this lending model, and concluded that public interest and nonprofit groups could make or guarantee interest-bearing loans to students provided the interest rate was below market terms, the loans were made in a non-commercial manner, and were only made to students of genuine need ("Nonprofit Student Loans").[6]  Congress expanded on these state-programs through the passage of the Higher Education Act of 1965 ("HEA").

The HEA authorized two major lending programs: the Guaranteed Student Loan Program ("GSL") and the National Direct Student Loan Program ("NDSL") (collectively the "Title IV Programs").  The mechanics of these programs are important to understand because Congress used the same language in codifying both the HEA and section 523(a)(8).  The GSL provided guarantees, insurance, and interest subsidies to participants in the existing state lending network.[7]  GSLs were administered by commercial lenders, educational institutions, state agencies or nonprofits, and the federal government. The commercial lender funded the loan in

---

[5] See Tobin at 179.

[6] See REVENUE RULING 61-87, 1961 WL 12644 (1961) and 63-220, 1963 WL 13199 (1963). The federal government had also begun smaller lending programs geared towards veterans, and those pursuing careers in math and science under the National Defense Education Act.

[7] 20 U.S.C. § 1071("The purpose of this part is to enable the Secretary . . .to guarantee a portion of each loan insured under a program of a State."). The GSL was actually an umbrella term for four different programs whose loans were either guaranteed by the government, or else reinsured. See Oliver Schools, Inc. v. Foley, 881 F.Supp. 847, 850 (W.D.N.Y. 1994)

an amount permitted by the educational institution, which was either guaranteed by a state agency or nonprofit and reinsured by the government. If a student defaulted, the state agency or nonprofit would purchase the loan from the lender and try to rehabilitate the borrower. If the agency was unsuccessful, it would assign and obtain reimbursement on the note from the federal government.[8] NDSLs, which were a continuation of earlier "direct lending" programs under the National Defense Education Act, were made directly by educational institutions from a revolving trust of capital that was 90% funded by the federal government and 10% funded by the school itself.[9] As with the GSL, the institution serviced the loan. If the borrower defaulted, the loan was then assigned to the government. [10]

When the media began reporting stories of graduate students discharging their Title IV Loans shortly after graduation, the reaction was swift and furious.[11] This anger led Congress to codify the non-dischargeability of GSLs as part of the HEA itself in 1977. This came to be known as the *quid pro quo*: Congress would offer low-interest educational loans on non-commercial terms,[12] and in exchange, students

[8] *Becirevic v. Navient Solutions, LLC*, 2019 WL 4046770, at *1 (E.D. Tex. 2019) (describing the interplay between the various agencies under the GSL).

[9] The NDSL began as the National Defense Student Loan, and ultimately became the Perkins Loan. See *Matter of Williamson*, 25 B.R. 49, 51 (Bkrtcy.Ga. 1982).

[10] See 20 U.S.C. 1087gg.

[11] *Matter of Bruce*, 3 B.R. 77, 82 (Bankr. Ill. 1980) (contrasting the "arrogance of former students" with those who "lived through the Depression" and paid taxes for the "student loans.")

[12] *See* H.R. Rep. 95-595, 136, 1978 U.S.C.C.A.N. 5963, 6097 ("In contrast, other federal and commercial loans are usually made based on a financial analysis of the borrower . . .[t]hese differences . . . make the GSL Programs unique.").

would surrender the ability to discharge these loans during the first five years of repayment. *In re Brunner*, 46 B.R. 752, 755 (S.D.N.Y. 1985), *aff'd* 831 F.2d 395 (2nd Cir.) ("Those who might obtain loans only at exorbitant rates are similarly able to obtain low cost, deferred loans. In return for this largesse [] the government exacts a *quid pro quo*.").[13]  Congress thereafter enacted 439A of the Higher Education Act:

> A debt which is a loan insured or guaranteed under the authority of this part. // 20 USC 1087–3. // Sept. 30, 1977 ("1977 Version")

The 1977 Version notably applied only to "this part," which was the GSL.[14] Significant debate followed, as some Members worried that 439A had been an overreaction, while others thought it had not gone far enough. Around the same time, the Senate was preparing a draft of the new Bankruptcy Code, and proposed a broader provision that would proscribe discharge not just for the GSL, but for "any educational loan."[15]  Competing House and Senate bills were resolved through committee in 1978, and it was agreed that the new discharge exception would cover

---

[13] *See also In re Merchant,* 958 F.2d 738, 740 (6th Cir. 1992) ("[U]nlike commercial transactions where credit is extended based on the debtor's collateral, income, and credit rating, student loans are generally unsecured."); *In re Courtney*, 79 B.R. 1004, 1011 (Bkrtcy.N.D.Ind. 1987) ("The legislation creating the various student loan programs bars loan-granting institutions from applying more traditional standards for evaluating of credit-worthiness; it also locks lenders into fixed and relatively low interest rates.").

[14] The phrase "insured or guaranteed" reflected the twin financing mechanisms under the GSL: secondary guarantees made through existing state agencies, and direct insurance for lenders in states without guarantor agencies, a subset of the GSL known as the FISLP.  See 34 CFR 682.100(describing GSL and FISLP).

[15] Some members of the House agreed with the Senate. See H.R. REP. 95-595, 538 ("In addition to loans insured or guaranteed by the Higher Education Act, my amendment would include any loan designated for any educational purpose.").

both the GSL, the NDSL, and any other educational loan made under state programs or by nonprofits colleges.  In 1978, Congress codified this compromise into the new Bankruptcy Code:

> "to a governmental unit, or a nonprofit institution of higher education, for an educational loan"[16] ("1978 Version")

Although this was close, the wording was deceptively narrower than had been agreed.[17] Congress had agreed that the exception would cover all GSLs, NDSLs, and loans made by state governments and educational institutions.  As written, the 1978 Version would only except from discharge those GSLs and NDSLs owed directly to governmental units, or nonprofit institutions of higher education.  As discussed above, GSLs were most often held by commercial banks.  Thus, borrowers could discharge their GSLs by declaring bankruptcy before they had defaulted, and before the GSL had been assigned to a governmental unit.[18]  In addition, NDSLs were made by four types of "institutions" (1) nonprofit institutions of higher education (*i.e.,* nonprofit colleges); (2) proprietary institutions of higher education (*i.e.,* for-profit colleges); (3) postsecondary vocational institutions; (4) vocational schools (*i.e.,*

---

[16] P.L. 95-598, Nov. 6, 1978, 92 Stat 2549.

[17] There was also a timing problem with P.L 95-598, which immediately struck 439 of the HEA, but its authorization of the Bankruptcy Code was not scheduled to take effect until October 1979, creating a fifteen-month gap in coverage. To prevent this accident, Congress enacted a stopgap provision: "for a loan insured or guaranteed under the authority of part B of title IV of the Higher Education Act of 1965." (P.L. 96-56. Aug 14, 1979).

[18] For a more comprehensive history of this debate and amendments, *see In re Adamo*, 619 F.2d 216, 220 (2nd Cir.  1980) and the Congressional record at S. REP. 96-230.

trade schools).[19]   Thus, borrowers who attended for-profit colleges, or vocational institutions could discharge their NDSLs prior to default because they were not then owed to a "governmental unit" or "nonprofit institution of higher education." Congress rewrote the statute to reframe the focus on the character of the loan:

> for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit, or nonprofit institution of higher education.[20] ("1979 Version")

The 1979 Version tracked the mechanics of the GSL and the NDSL. Congress took that language directly from Title IV.   The phrase "loan made, insured or guaranteed" was frequently used to describe the GSL in other statutes..[21]   This language would also capture educational loans made, insured or guaranteed by state and local governments. [22]   The NDSL, codified in Part E of Title IV, contained a number of ready-made characterizations:  "made under a program,"[23] "any program

---

[19] *St. George's University School of Medicine v. Bell*, 514 F.Supp. 205, 206 (D.C.D.C. 1981) ("The definition of a 'institution for higher education' requires among other things, that the institution 'is accredited by a nationally recognized accrediting agency or association', and 'is a public or other nonprofit institution.'")(citations omitted).

[20] See P.L. 96-56, Aug. 14, 1979, 93 Stat 387.

[21] *See, e.g.,* 14 U.S.C. § 2772("[A]ny loan made, insured, or guaranteed under part B of title IV of the Higher Education Act of 1965.").

[22] S. REP. 96-230, 2 ("The bill would not alter the protection from discharge which the present version of [523(a)(8)] affords to educational loans made outside the auspices of federal programs by nonprofit institutions of higher education, states and local governments.")

[23] P.L. 101–239, December 19, 1989, 103 Stat 2106 ("loans made, insured, or guaranteed under part B and loans made under part E.") Education loan repayment program, 14 U.S.C. § 2772 ("any loan made under part E of [Title IV] (20 U.S.C. 1087aa et seq.)").

under this title,"[24]  "made or funded in whole or in part,"[25] "any program funded in whole or in part."[26] The trouble was how to ensure that all NDSLs would be protected without also giving protection to other loans made by for-profit educational institutions.  If Congress replaced the term "nonprofit institution of higher education" with the more general term "institution," that would ensure all NDSLs would be protected.  But it would also allow capture loans "funded in whole" by for-profits. Instead, Congress employed both of the potential NDSL holders, "nonprofit institution of higher education" and "governmental unit" to define this type of loan. This wording ensured that the statute was neither over or under-inclusive and would except from discharge the three and only three loan types that had been agreed upon in Committee.  First, NDSLs made by for-profit colleges would be non-dischargeable as loans "funded in . . . part by a governmental unit." Second, NDSLs made by nonprofit colleges would be non-dischargeable as loans "funded in . . . part by a governmental unit or nonprofit institution of higher

---

[24] PL 96–374, Oct 3, 1980,  94 Stat 1367 ("Sec. 487 (a) In order to be an eligible institution for the purposes of any program authorized under this title . . .[t]he institution will use funds received by it *for any program under this title* solely for the purposes specified in, and in accordance with, the provisions of that program.")

[25] S. REP. 96-230, 3, 1979 U.S.C.C.A.N. 936, 938 ("[M]ade or funded in whole or in part by a governmental unit or a nonprofit institution of higher education.")

[26] See P. L. 99–498, 100 Stat. 1268, 20 U.S.C. 1087uu ("Student financial assistance *received from any program funded in whole or part under Title IV of the Higher Education Act of 1965*, including the Pell Grant, Supplemental Educational Opportunity Grant, State Student Incentive Grants, National Direct Student Loan, PLUS, College Work Study [] programs.")(emphasis added).

education." And lastly, other loans made by nonprofit colleges would be non-dischargeable as loans "funded in whole by a nonprofit institution of higher education."[27]

Those were the last major structural changes done to what is today section 523(a)(8)(A)(i). One other minor change occurred in 1984 that had an outsized consequence to student debtors. During the early 1980s, the circuit courts wrestled with the question of whether a seminary fell within the scope of "higher education."[28] Congress thought this merited a change in section 523(a)(8):

> "[D]eleting 'of higher education' enlarges the scope of the nondischargeability exception and is therefore substantive to that extent. It is a modest enlargement, however, in that the claimant must be a nonprofit institution and the loan must be one for an educational loan. The change eliminates litigation over the question whether a seminary, for example, is an institution of higher education. The amendment is thus to some extent at least clarifying."[29]

Contrary to what later case law would conclude,[30] this was only a "modest enlargement." And the plain language supports that statement. Congress deleted the phrase "of higher education," but this did not change the meaning of the term

---

[27] 34 CFR § 674.1 ("The National Direct Student Loan Program (NDSL) provides low-interest loans in institutions of higher education to help financially needy students.")

[28] *See Equal Employment Opportunity Commission v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 279 (5 Cir. 1981) ("This case requires us to balance the interest of the federal government in enforcing Title VII against the first amendment rights of a religious institution of higher learning."); *New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Bd. of Higher Educ.,* 654 F.2d 868, 885 (3rd Cir. 1981).

[29] *See* Plaintiff's **Exhibit 11**, Bankruptcy Improvement Act: Hearing on P.L. 98-353 Before the S. Comm. on Judiciary, at 328 (April 6, 1983) (Comments on Subtitle I of S. 445).

[30] *In re Goldstein*, 2012 WL 7009707, at *3 (Bkrtcy.N.D.Ga. 2012)

"nonprofit institution." *See McClure v. U.S.*, 95 F.2d 744, 750 (9th Cir. 1938) ("Where an amendment leaves certain portions of the original act unchanged, such portions are continued in force with the same meaning and effect they had before amendment."). The term "institution" means a "scholastic institution" rather than any organization or corporation.[31] The HEA statutes and regulations consistently use the term "institution" as a shorthand for college, university of vocational school.[32]

Congress would continue to amend 523(a)(8) over the next three decades. Notwithstanding certain smaller alterations, and larger changes for the "undue hardship" timeline, the language in the 1984 version of 523(a)(8) is essentially the current version of 523(a)(8)(A)(i). In 2010, Congress ended the GSL, and all federal loans are now made through the Direct Program. The Direct Program, like the NDSL, is directly funded by the government, and because of the precision employed by Congress in drafting this statute (which on first glance does seem confusing and disjointed), these loans remain protected under 523(a)(8)(A)(i).

---

[31] 34 C.F.R. § 668.1("[T]his part establishes general rules that apply to an institution that participates in any student financial assistance program authorized by Title IV of the Higher Education Act of 1965. . .[a]s used in this part, *an 'institution' includes*—(1) An institution of higher education as defined in 34 CFR 600.4 (2) A proprietary institution of higher education as defined in 34 CFR 600.5; and (3) A postsecondary vocational institution as defined in 34 CFR 600.6.") (emphasis added).

[32] 34 C.F.R. § 668.14, Program Participation Agreement ("An institution may participate in any Title IV, HEA program, other than the LEAP and NEISP programs, only if the institution enters into a written program participation agreement with the Secretary, on a form approved by the Secretary."). *See also* 34 C.F.R. § 668.26, End of an Institution's Participation in the Title IV.

## B. Alternative Loans, Multi-Party Agreements, and TERI

The creation of the GSL in 1965, and the Student Loan Marketing Company in 1972, had brought dozens of new actors into the lending marketplace: commercial banks, bond traders, state agencies and quasi-state agencies.[33] As the cost of higher education continued to increase, these entities began to develop new loan programs. Between 1983 and 1997, lenders and nonprofits sought approval from the IRS for a variety of new programs made through increasingly complex organizational structures such as the Alternative Loan Program,[34] and Supplemental Loan Program,[35] and other loans made through "multi-party agreements."[36] The IRS approved these programs on condition that the fundamental character of the loans conform to the Revenue Rulings from 1961 and 1963.[37] The nonprofits assured the IRS that their involvement would act as a "watchdog" to prevent the ALP and SLP from becoming purely commercial operations.[38]

---

[33] *Student Loan Marketing Ass'n v. Riley,* 104 F.3d 397, 400 (D.C. Cir. 1997) ("Sallie Mae was established in 1972 to provide lender banks with greater liquidity.").

[34] *See* PLR 9740004, 1997 WL 607382 (IRS 1997) ("The ALP loans will have lower interest rates, lower origination fees, lower guaranty fees, and less restrictive credit criteria than would be required by conventional lenders.").

[35] *In re Bolen*, 287 B.R. 127, 128–29 (D. Vt. 2002) ("The first two types of loans are federally subsidized, but the third is not.")

[36] PLR 9237027, 1992 WL 223684 (IRS 1992) (multi-party coordination agreement).

[37] REVENUE RULING 61-87 (nonprofits can make or guarantee, "unsecured loans to students at low rates of interest.").

[38] See PLR 9237027 (characterizing nonprofit's "role in this process as watchdog for the students" who "and ensures that the commercial providers do not unilaterally dictate the availability of credit or its terms."). The IRS did refuse some of these proposals. See General Counsel Memorandum, 1987 WL 430206, at *9 (concluding that nonprofit's proposed

12

TERI was one of these new entities, which was created in 1985 with a grant from the Massachusetts Higher Education Assistance Authority ("MHEAA"). The MHEAA wanted to create a sister nonprofit to increase the availability of Nonprofit Student Loans. TERI sought 501(c) in order to facilitate the origination of more low-interest student loans.[39] TERI's stated mission was to ensure "every Boston student who wishes to pursue postsecondary education will secure sufficient financial aid to make this possible."[40] TERI received a 501(c) exemption, and spent the next decade persuading schools and banks to participate in its guaranteed student lending program under which TERI would guarantee student loans made by commercial banks. TERI also began preforming the lenders' application processing and disbursement duties and thereby developed significant relationships in the lending community, and expertise in the back-office of loan origination. These relationships, along TERI's ability to make non-dischargeable debt, would soon command attention from a more commercial minded enterprise.

These ALPs and SLPs and other multi-party loans began to work their way through the bankruptcy courts. To the extent these were genuine Nonprofit Loans,

---

arrangement with commercial lenders to provide student loan processing services was not consistent with charitable mission and would mostly help the banks).

[39] TERI cited a number of the IRS's Revenue Rulings & Private Letter Rulings that limit the loans a nonprofit can make as evidence of its tax-exempt suitability. See **Exhibit 8**, at page 4.

[40] *id.*

they may have had an equitable entitlement to discharge exception.[41] But it was mot statutory. The ALPs and SLPs were not "made, insured, or guaranteed by governmental unit," nor were they "funded in whole or in part by a nonprofit institution." They were, at most, guaranteed or else facilitated by a 501(c) corporation.    Those distinctions were quickly rejected by the courts. In *Hammarstrom*, the court concluded that if a commercial bank had a multi-party arrangement to sell student loans to a 501(c), then any student  loan made by that bank under that arrangement, whether or not the loan was actually sold to the 501(c) under the arrangement, should be found held non-dischargeable as a loan funded in part by a "nonprofit institution."  This would further Congress' intent because the term "funded" meant where a nonprofit had "meaningfully participated."[42]    In *Pilcher*, the court concluded that if a commercial student loan was offered in the same brochure as federally insured loans, and a nonprofit corporation assisted in facilitating all three loans, then the commercial loan is just as non-dischargeable as the federally insured loans because all three were made under the same "program."

---

[41] Before 1976, courts did refuse to discharge student loans largely on equitable grounds. .The loans were deemed unprovable because of their repayment plans and forgiveness options. The NY Courts of Appeals summarized them in much the same terms as Congress, "this loan agreement is not a commercial transaction." *State v Wilkes*, 41 N.Y.2d 655, 659 (N.Y. 1977) (applying pre-1976 Bankruptcy Act).

[42] *In re Hammarstrom,* at 165 ("Congress intended to include within section 523(a)(8) all loans made under a program in which a nonprofit institution plays any meaningful part in providing funds."). *Hammarstrom* assumed that a corporation and institution were coterminous.

And it was this "program" that the nonprofit had indirectly "funded" with administrative, financial and marketing services.[43]

## C. FMC, Direct-to-Consumer Loans, and the National Collegiate Trust

The First Marblehead Corporation was founded in 1991 as a sort of student loan middle-man.  It acted as a broker between commercial lenders and the bond markets and also designed ALPs for commercial banks. FMC pioneered (or helped pioneer) a new lending channel that would bypass the financial aid office and market loans directly to the students.[44] This method eliminated bureaucratic red-tape under the HEA, and stopped schools from reducing loan amounts that exceeded a student's actual financial need ("DCT Loans").  DTC Loans had higher interest rates, higher default rates, and in many ways were more similar to personal loans than student loans.[45]  At some point in the late 1990s, FMC embarked on a mission to create a new type of student loan that combined the profit margins of DTC Loans with the public good will and non-dischargeability of Nonprofit Loans.

---

[43] *In re Pilcher,* at 600 (holding that a nonprofit may be said to "fund" a loan program if it assists with the marketing, production of application materials, processing, servicing, and guaranteeing of loans). *Pilcher* seems to at least suggest that a creditor can commingle federal and private resources.

[44] *See also* Dash, Eric, *Reeling In the College Bound*, NY Times, (Sept. 2, 2007) *available at*: https://www.nytimes.com/2007/09/02/business/02jabba.html

[45] *See* CFPB, REPORT: PRIVATE STUDENT LOANS, 2012 ("First Marblehead estimated that loans in its legacy portfolio in its best credit segment would default at a lifetime rate of 10.4% while its lowest credit quality loans (predominantly DTC) would default at a lifetime rate of 52.3%."), *available at:* https://www.consumerfinance.gov/data-research/research-reports/private-student-loans-report/.

To execute this goal, FMC entered into a "strategic partnership" with TERI in 2001. This partnership was memorialized in a confidential Master Servicing Agreement ("MSA") that consolidated most of TERI's employees and assets into a new FMC subsidiary called the First Marblehead Education Resources ("FMER").[46] FMER took control over TERI's lending programs, changed it into a DTC model, restructured them on commercial terms, and expanded them to more banks.[47] Although TERI remained formally contracted to perform the loan processing and disbursement for the lenders, FMC assumed these duties under the MSA.[48] FMC also arranged to purchase these loans from the lenders and securitize them for resale on the secondary market through the National Collegiate Student Loan Trusts. FMC became a publicly traded corporation in 2003 and over the next five years FMC would originate nearly $20 billion in NCSLT Loans under increasingly subprime conditions.[49] These credit characteristics led to a massive defaults, but FMC's

---

[46] See **Exhibit 6**, First Marblehead Corporation, 2006 Annual Report, at F-9 (stating that "First Marblehead Education Resources, Inc. (FMER)," provided "outsourced loan origination, customer service, default prevention, default processing and administrative services to TERI.").

[47] Compare Plaintiff's **Exhibit 8** (TERI's statements to IRS) with Defendant's **Exhibit A** (NCSLT TILA Form). Before 2001, TERI made loans through the schools. *See In re Stein*, 218 B.R. 281, 284 (Bkrtcy. D. Conn. 1998) (stating that the subject debt was guaranteed by "The Education Resources Institute, Inc. (TERI)" and that the 'proceeds of the loan were paid directly to the University of Chicago in the form of tuition.'").

[48] *In re The Education Resources Institute, Inc.,* 442 B.R. 20, 21 (Bkrtcy. D. Mass. 2010) ("TERI, in 2001, outsourced substantially all of its loan-related and administrative services to First Marblehead.").

[49] *In re The First Marblehead Corp. Securities Litigation*, 639 F.Supp.2d 145, 149(D. Mass. 2009) ("First Marblehead's credit guidelines were being 'bent' and applicants were authorized to take out excessive loans with terms beyond [FMC's] historical criteria. According

apologists reassured investors there was nothing to worry about, "Remember, the loans are not dischargeable in bankruptcy, so there's *never* a time when it's not worth the lender's time and effort to keep dunning."[50]  When Moody's downgraded TERI's credit-rating in 2008, the NCSLTs were effectively exposed as consumer-credit junk bonds masquerading as investment grade securities.[51] TERI declared bankruptcy, and disclaimed personal knowledge of its own financial disclosures because it was reliant on FMC to provide accurate information.[52] The NCSLTs continued taking judgments from debtors who, unlike the bond traders and ratings analysts, remained unaware that their "nonprofit education loans" were in fact just subprime consumer credit.

### III.    ARGUMENTS AND POINTS OF AUTHORITY

#### A. Summary of Argument

Section 523(a)(8)(A)(i) was codified by Congress to protect the GSLs, NDSLs and certain other government and nonprofit loans. Although the statute and student

---

to the Former VP of Applications, the risk management department's 'alarm at First Marblehead's new approach to credit guidelines 'was generally overlooked by [FMC's] management.'")

[50] *FBR's Latest First Marblehead Downgrade Makes No Sense*, Seeking Alpha, 2007, available at: https://seekingalpha.com/article/55549-fbrs-latest-first-marblehead-downgrade-makes-no-sense

[51] *Moody's Downgrades First Marblehead Student Loan Notes*, (Mar. 26, 2008), *available at*: https://www.moodys.com/research/Moodys-downgrades-First-Marblehead-student-loan-notes--PR_151806

[52] See **Exhibit 10**, TERI's Statement of Financial Affairs at 142 ("FMC manages many of the Debtor's contractual relationships with third parties . . . TERI has relied on the information provided to it by FMC and TERI has not independently verified the accuracy.").

17

lending have evolved, the "made under any program funded" should not be expanded to meet the changing marketplace. That language has adequately protected every new federal program since 1978 but it cannot be expanded to assist Defendant. The NCSLT Loan does and never has fit within that language for three reasons. First, section 523(a)(8)(A)(i) does protect strictly for-profit entities. Second, Defendant has failed to demonstrate that TERI was a "nonprofit" as that term is used in section523(a)(8). Third, there is no evidence that TERI actually guaranteed the NCSLT Loan.

**B. Section 523(a)(8)(A)(i) does not except from discharge high-interest commercial loans made and held by for-profit entities**

Defendant argues that the NCSLT Loan is an educational loan because it is a credit-tested commercial loan that was guaranteed by TERI.[53] But section 523(a)(8)(A)(i) only applies to low-interest loans made under the HEA, by state governments, or directly by nonprofit scholastic institutions. This is most easily shown by examining two of the statutory terms that Defendant relies upon. First, the term "funded" is not synonymous with "guaranteed." The statute itself refers to a "loan made, insured or guaranteed by a governmental unit" in one clause,

---

[53] There is also a question as to whether the NCSLT Loan can even be classified as an "educational loan." The NCSLT Loan was an arm's length consumer credit transaction made under the UCC at 12% interest and required a $3,149 origination fee and a cosigner. *See, e.g. Matter of Roberson,* 999 F.2d 1132, 1135–36 (7th Cir. 1993) ("[E]ducational loans are different from most loans. They are made without business considerations, without security, without cosigners."); *In re Campbell*, 547 B.R. 49, 60 (Bkrtcy.E.D.N.Y. 2016)(discharging student debt because it was "a consumer loan extended by a for-profit actor" made at "arm's length" and "evaluated through a credit-scoring model."). See also *supra* note 13.

immediately followed by, "or made under any program funded in whole or in part by a governmental unit or nonprofit institution" is alone, evidence that "made, insured or guaranteed" has a separate and distinct meaning from "funded." *Bates v. United States,* 522 U.S. 23, 29–30 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). The term "funded" refers to the direct funding mechanism under the NDSL that was designed for the NDSL and now covers the DLP. Congress excepted from discharge any loan either made, insured, guaranteed or funded by a governmental unit. But a nonprofit institution had to fund the loan (in whole or part).[54] Second, the term "nonprofit institution" is not synonymous with a 501(c) corporation. In fact, Congress defined other entities in the Code with respect to 501(c) status.[55] The term "institution" in section 523(a)(8)(A)(i) means a scholastic institution such as a college or university."[56] TERI might have qualified as a "philanthropic organization" under the HEA, which is defined as a 501(c) that

---

[54] In *O'Brien*, the court concluded TERI had funded the loan in part because TERI had performed on the guarantee and bought the loan. *In re O'Brien*, 419 F.3d 104 (2nd Cir. 2005). That is not the fact pattern in this case.

[55] *See, e.g.* 11 U.S.C. § 541(f) ("[P]roperty that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986.")

[56] *See e.g.,* 34 CFR 668.1 ("This part establishes general rules that apply to an institution that participates in any student financial assistance program authorized by Title IV."); 34 C.F.R. § 675.2 ("Institution of higher education (institution)."); 34 CFR 674.8 ("To participate in the NDSL program, an institution must enter into an agreement with the Secretary.").

19

is *not* an eligible educational institution.  But there is no discharge exception for loans guaranteed by "philanthropic organizations."[57]

## C. TERI Was Not A *Bona Fide* Nonprofit under Section 523(a)(8)

Defendant has failed to demonstrate that TERI was a "nonprofit." The mere fact that TERI was at one time a 501(c) is not relevant, or at least not dispositive. Congress knows how to use the term "501(c)" and has done so in a number of statutes, including the Bankruptcy Code.   Where a statute employs the word "nonprofit" without defining it as a 501(c), courts conduct an independent inquiry into the entity's character to determine whether it "actually operates as a nonprofit, irrespective of its tax-exempt status." *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 475–76 (1st Cir. 2005).[58] To make this determination, courts analyze whether the entity provided any private benefit or inurement to commercial entities, engaged in more than insubstantial commercial activity, or otherwise conducted  "suspect transactions."[59] *See TI Federal Credit Union v. DelBonis*, 72

---

[57] 20 USC § 1141(defining "philanthropic organization" as a non-profit organization that is not an educational institution under Title IV but is a 501(C) that helps students pay for college).

[58] In *Zimmerman*, the district court dismissed a CROA lawsuit because the Defendant was 501(C). The First Circuit reversed and instructed the trial court to examine the entity to determine whether it was in fact operated as a nonprofit. The trial court concluded that the defendant had engaged in a number of "suspect transactions" that enriched commercial entities, and held it was <u>not a</u> nonprofit despite its 501(c) status. The First Circuit then affirmed.

[59] *See also Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981). Courts have made these inquiries in a variety of contexts where the term "nonprofit" forms part of a claim. *See,In re Dube,* 169 B.R. 886, 892 (Bkrtcy. N.D. Ill. 1994) (bankruptcy non-dischargeability proceeding); *Shinde v. Nithyananda Foundation*, 2015 WL 12732434, at *12 (C.D. Cal. 2015) (nonprofit as an element of a RICO claim); *Frank Lloyd Wright Foundation v. Kroeter,* 697 F.Supp.2d 1118, 1136 (D. Ariz. 2010) (nonprofit as element of common law claim and DJA).

20

F.3d at 927 (1ˢᵗ Cir. 1995) ("[N]o clear test for 'determining when a nonprofit institution is—or is not—a nonprofit institution under section 523(a)(8) of the Bankruptcy Code' has been formulated."). TERI's engaged in a number "suspect commercial transactions with FMC, and their activities were in many places indistinguishable.[60] Indeed, in a case cited by Defendant, the Southern District of New York believed or otherwise had concluded that TERI had legally merged into FMER.[61] *Est of Hawaii v. C.I.R.*, 71 T.C. 1067, 1082 (Tax Court 1979), *aff'd* 647 F.2d 170 (9ᵗʰ Cir. 1981) (revoking 501(c) where nonprofit "was simply the instrument to subsidize for-profit corporations.").

FMC testified that it was "in a precarious financial situation until the successful acquisition of TERI in 2001."[62] Under this acquisition, memorialized in the MSA, TERI ceded control of its operations and mission to FMC. *See Redlands Surgical Services v. C.I.R.,* 242 F.3d 904 (9ᵗʰ Cir. 2001) (affirming revocation of 501(c) status where the nonprofit had "ceded effective control over the operations . . . to private

---

[60] *Lowry Hospital Association v. Commissioner of Internal Revenue*, 66 T.C. 850, 859 (Tax Court 1976) ("The two operations were so integrally interwoven in their daily operation that only the faintest outlines of a separable operating charity may be perceived.").

[61] *In re O'Brien*, 318 B.R. 258, 259 (S.D.N.Y. 2004) ("The Loan to the Appellant was guaranteed by First Marblehead Education Resources, Inc. f/k/a The Education Resources Institute, Inc.").

[62] *First Marblehead Corp. v. House*, 541 F.3d 36, 40 (1st Cir. 2008) (stating the FMC's CEO had testified that FMC "was in a precarious financial situation until the successful acquisition of TERI in 2001.").

parties."). TERI transferred nearly its assets the majority of its staff over to FMC.[63]

FMC assumed control over TERI's loan processing, origination duties, and default

claims processing.[64] In fact, TERI was so completely subsumed by FMC that the

NCSLTs *(Defendant included)* would argue that TERI's role in these lending

programs had been reduced to that of a mere debt collector.[65] TERI obtained 501(c)

status by representing to the IRS, *inter alia*, that its lending program would bring

interest rates on student loans down from Prime +2.0% to Prime +1.5%.[66] The

interest rates on the Plaintiff's NCSLTs is 12.06% and included an origination fee

of $3,149.[67] TERI never disclosed any of these changes to the IRS, and affirmatively

denied that it had reorganized itself or was engaged in any joint venture.[68] After the

acquisition, FMC described TERI as "an important component of First Marblehead's

---

[63] TERI disclosed that it had 177 employees in 2001. See **Exhibit 7,** at 6 of 292, Line 90b. FMC disclosed that it absorbed 161 of TERI's employees in 2001. See **Exhibit 6,** FMC, 2006 Annual Report, at 54. TERI reported that it had 49 employees in 2002. **Exhibit 7,** at 42. That would mean TERI went from 177 employees, down to 16, and then back up to 49 within 12 months while representing to the IRS. that it had not "experienced liquidation, dissolution, termination or substantial contraction" in 2001 or 2002. *id* at 42, Line. 79.

[64] See **Exhibit 5,** First Marblehead Corporation, 2004 Annual Report at 12-14.

[65] See **Exhibit 2,** Disclosure Statement for the Fourth Amended Plan of TERI's Reorganization at 29 ("The [NCSLTs] contend that . . .TERI does not own the defaulted loans but holds them 'for collection purposes only.'").

[66] See **Exhibit 8,** at page 4.

[67] See Defendant's **Exhibit A.**

[68] See Plaintiff's **Exhibit 7, TERI's 990 Filings.** TERI never disclosed this "strategic partnership" to the IRS and between 2001-2003, denied that it had: "engaged in any activity not previously reported to the IRS," or made "any changes made in the organizing or governing documents." *id.* at 6, 42 and 74.

profitability."[69] *P.L.L. Scholarship Fund v. Commissioner of Internal Revenue*, 82 T.C. 196, 200 (Tax Court 1984) (nonprofit was impermissibly operated "to enhance the profitability" of for-profit entity).  FMC promoted its ability to make non-dischargeable debt through TERI as a competitive advantage over Sallie Mae and Wells Fargo.[70] *Living Faith, Inc. v. C.I.R.*, 950 F.2d 365, 373 (7th Cir. 1991) ("Competition with commercial firms is strong evidence of the predominance of non-exempt commercial purposes.").  TERI appears to have paid FMC nearly $400 million above fair-market value for services under the MSA.[71] FMC's financial success and failure were inextricably linked to TERI.  As TERI passed from insolvency and into bankruptcy, FMC's stock lost 91% of its value, including 36% on the day TERI sought relief under Title 11.[72] TERI disclaimed any responsibility for errors in its financial disclosures because FMC had given them the information,

---

[69] *In re The First Marblehead Corp. Securities Litigation*, 639 F.Supp.2d 145, 159 (D.Mass. 2009).  ("An important component of First Marblehead's profitability was First Marblehead's relationship with The Education Resources Institute, Inc.")

[70] **Exhibit 5,** FMC, Annual Report, 2004 at 53. ("TERI is a not-for-profit organization and, as a result, borrowers have been deemed unable to discharge in bankruptcy proceedings loans that TERI guarantees. If TERI loses its not-for-profit status . . .our business could be adversely affected.").

[71] See **Exhibit 7**, IRS 990s Filings from 2002-2008. FMC charged TERI $532 million in subcontracting fees that TERI was only paid $147.5 million. See **Exhibit 4**,  Affidavit of Willis J. Hulings at 3 (Jun. 13, 2008) (describing how TERI was only paid to process loans on a per application by the lenders but that it had to pay FMC on a fixed annual basis which caused significant financial strain and was a precipitating case of TERI's bankruptcy). *See Texas Trade School v. C.I.R.*, 30 T.C. 642, 647 (Tax Court 1958) (nonprofit impermissibly paid above FMV to for-profit).

[72]*First Marblehead Sinks, Guarantor is Bankrupt* (Apr. 9, 2008), *available at:* https://www.reuters.com/article/us-firstmarblehead/first-marblehead-sinks-guarantor-is-bankrupt-idUSN0833823520080409

which TERI could not or would not verify.[73]   All of this evidences that regardless of whether it was true at the time of its initial establishment as a 501(c) that its activities provided merely a "quite incidental private benefit to the banks," that was patently no longer the state of affairs during this time.[74]

**D. There Is No Evidence That TERI Guaranteed the NCSLT Loan**

Defendant has failed to prove that TERI guaranteed the NCSLT Loan. First, any purported guaranty provided for in the Guaranty Agreement was conditional, and the Guaranty Agreement recites a number of conditions that had to be met before TERI would agree to guaranty a loan in Section 2.2.[75]   Defendant has offered no evidence that any of these conditions were met. Second, Defendant has produced a Deposit and Security Agreement that appears to have annulled the Guaranty Agreement. The Guaranty Agreement states that upon default, TERI would pay the loan's outstanding balance to the holder, who would "endorse . . .to TERI in such manner as to transfer to TERI all rights in and title to such Promissory Note and Loan."[76]   However, under the Deposit and Security Agreement, TERI assigned any right to retain the money collected under its subrogation rights or even the right to

---

[73] See **Exhibit 10**, TERI's Statement of Financial Affairs at 142 ("FMC manages many of the Debtor's contractual relationships with third parties, including its litigation and collection efforts. TERI has relied on the information provided to it by FMC and TERI has not independently verified the accuracy of such information.").

[74] Plaintiff's **Exhibit 8**, at 2.

[75] Defendant's **Exhibit B** at 6 ("Bank One must have complied with . . .Program Guidelines . . .paid to TERI the Initial  Guaranty Fee.")

[76] See Defendant's **Exhibit B** at 6.

collect back to the NCSLTs or their agents.[77] That transformed what may have been a valid guarantee agreement into a mere accounting circuity between TERI and the Defendant.  If Defendant avoided its performance on the Guaranty Agreement, it cannot enforce its effect on Plaintiff. *Crowley v. TVSM, Inc.*, 1991 WL 267868, at *3 (S.D.N.Y. 1991) ("A party to a series of interrelated contracts cannot selectively avoid those obligations it chooses to avoid, while keeping for itself the benefit of those contracts it wishes to honor."). This may explain why Defendant has failed to provide any evidence that TERI honored or paid on the this supposed guaranty.[78]

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff requests that the Defendant's motion be denied.

Dated: January 23, 2020          /s/ Christopher R. Bush
                                 Christopher R. Bush
                                 Attorney for Plaintiff

---

[77] See Defendant's **Exhibit F** at 5("TERI hereby pledges, assigns, and sets over to the Owner . . .all of TERI's rights, title, and interest in . . .all Recoveries . . .all contract and other rights of TERI . . .to receive payment of Guarantee Fees . . .TERI hereby appoints the Administrator . . . its true and lawful attorney . . .to ask for, demand . . .all moneys due or to become due to TERI."). Defendant's **Exhibit F**. *See also Berg v. Access Group, Inc*., 2015 WL 246338, at *8 (E.D. Pa. 2015) (denying motion to dismiss verified complaint concerning lender's misrepresentation that TERI would guarantee a loan for a fee when in fact lender simply used the TERI guaranty fee as "pricing mechanism" and kept the proceeds).

[78] Defendant's only evidence consists of blank claim forms, but Defendant has not submitted a form filled out by TERI or NCSLT. Defendant's **Exhibit F** at 29-33. *In re Holguin,* 2019 WL 6880081, at *7 (Bkrtcy. D.N.M  2019) ("The Court will not infer the continuing effectiveness of TERI's guaranty . . .[i]f the Guaranty Agreement was not in effect at the time Plaintiff obtained her Loan, NCSLT cannot established that the Loan was part of a loan program funded in part by a nonprofit institution.")