> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) | Case No. 08-12540 (HJB) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
|  | ) |  |

## DISCLOSURE STATEMENT FOR FOURTH AMENDED
## JOINT PLAN OF REORGANIZATION OF
## THE EDUCATION RESOURCES INSTITUTE, INC. AND THE
## OFFICIAL COMMITTEE OF UNSECURED CREDITORS

GOODWIN PROCTER LLP
Daniel M. Glosband
Gina Lynn Martin
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

DUANE MORRIS LLP
Jeffrey D. Sternklar
470 Atlantic Avenue
Boston, MA 02210
(857) 488-4216

Dated: February 25, 2010
      Boston, Massachusetts

LIBC/3667825.11

## DISCLAIMER

**THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF THE EDUCATION RESOURCES INSTITUTE, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "PLAN"). THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").**

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ADVISED AND ENCOURAGED TO READ ALL OF THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. A COPY OF THE PLAN IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT (AS DEFINED BELOW).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR-IN-POSSESSION IN THIS CASE.**

i

## TABLE OF CONTENTS

**Page**

**I.**    **INTRODUCTION AND SUMMARY OF THE PLAN**................................................**1**
     A.    THE PLAN OF REORGANIZATION..................................................................1
         **1.**    Introduction.................................................................... 1
         **2.**    Restructuring Transactions ...................................... 2
         **3.**    Plan Overview................................................................ 3
         **4.**    Key Components of the Plan ................................... 21
     B.    OVERVIEW OF CHAPTER 11.................................................................32
     C.    SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN .................33
     D.    PURPOSE, LIMITATIONS, AND STRUCTURE OF THIS
         DISCLOSURE STATEMENT ..................................................................36
     E.    VOTING ON THE PLAN ........................................................................38
         **1.**    Classes Entitled to Vote ........................................ 38
         **2.**    Voting Instructions .................................................. 39
         **3.**    Tabulation of Votes................................................. 40
     F.    CONFIRMATION HEARING ..................................................................41
         **1.**    Confirmation Hearing Date.................................... 41
         **2.**    Plan Objection Deadline ........................................ 41

**II.**    **BACKGROUND TO THIS CHAPTER 11 CASE**.................................................**42**
     A.    THE DEBTOR'S BUSINESS ..................................................................42
         **1.**    College Access Programs ...................................... 42
         **2.**    Student Loan Guarantees ...................................... 43
         **3.**    Employees................................................................... 44
         **4.**    Charitable Gifts and Other Restricted Funds ... 44
     B.    SUMMARY OF SIGNIFICANT PREPETITION LIABILITIES ......................47
         **1.**    Guaranty Obligations .............................................. 47
         **2.**    The Debtor's Pension Plan..................................... 47
         **3.**    FMC Contracts .......................................................... 48
     C.    EVENTS LEADING TO THIS CHAPTER 11 CASE...................................49

**III.**    **THE CHAPTER 11 CASE** ...................................................................................**49**
     A.    **FILING AND FIRST DAY ORDERS**.......................................................49
         **1.**    Certain First Day Orders......................................... 49
         **2.**    Retention of Debtor's Professionals ................... 50
         **3.**    The Creditors' Committee ...................................... 50
         **4.**    Claims Bar Date......................................................... 50
     B.    **OTHER DEVELOPMENTS**....................................................................50
         **1.**    Rejection of FMC Contracts................................... 50
         **2.**    Stipulations With Certain Creditors..................... 51
         **3.**    The Nellie Mae Adversary Proceeding................. 53
         **4.**    Plan Proponents' Negotiations.............................. 54

LIBC/3667825.11

**IV.  SUMMARY OF THE PLAN** ...................................................................................**54**
   A.   ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS .........................54
      **1.**   Administrative Claims ................................................................. 54
      **2.**   Pre-Effective Date Professional Fees and Expenses.................... 55
      **3.**   United States Trustee Quarterly Fees and Other Statutory Fees............... 55
      **4.**   Priority Tax Claims...................................................................... 55
   B.   CLASSIFICATION AND TREATMENT OF CLAIMS .........................55
      **1.**   Summary of Classification and Treatment of Claims............................. 55
      **2.**   Classification and Treatment of Claims and Interests ............................ 56
   C.   PROVISIONS REGARDING VOTING AND DISTRIBUTION UNDER
      THE PLAN ...........................................................................................58
      **1.**   Voting of Claims......................................................................... 58
      **2.**   Acceptance by Impaired Class..................................................... 59
      **3.**   Presumed Acceptances of the Plan .............................................. 59
      **4.**   Nonconsensual Confirmation....................................................... 59
      **5.**   Method of Distributions Under the Plan ...................................... 59
   D.   MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN ........62
      **1.**   Reorganized TERI ...................................................................... 62
      **2.**   Compromise and Settlement........................................................ 62
      **3.**   Plan Trust ................................................................................... 71
      **4.**   Closing of the Chapter 11 Case ................................................... 76
   E.   PROCEDURES FOR RESOLVING AND TREATING DISPUTED
      CLAIMS ...............................................................................................76
      **1.**   No Distribution Pending Allowance............................................. 76
      **2.**   Resolution of Disputed Claims .................................................... 76
      **3.**   Estimation .................................................................................. 77
      **4.**   Allowance of Disputed Claims .................................................... 77
      **5.**   Disallowance of Claims Without Further Order of the Bankruptcy
          Court ........................................................................................... 77
      **6.**   No Distribution in Respect of Disallowed Claims....................... 77
   F.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES ...............................................................................................77
      **1.**   Assumption or Rejection of Executory Contracts and Unexpired
          Leases......................................................................................... 77
      **2.**   Approval of Assumption or Rejection of Executory Contracts and
          Unexpired Leases........................................................................ 78
      **3.**   Inclusiveness .............................................................................. 78
      **4.**   Return of Guaranty Fees ............................................................. 79
      **5.**   Bar Date for Filing Proofs of Claim Relating to Executory
          Contracts and Unexpired Leases Rejected Pursuant to the Plan............... 79
      **6.**   Insurance Policies ....................................................................... 80
      **7.**   Compensation and Benefit Programs........................................... 80
      **8.**   Retiree Benefits.......................................................................... 80
   G.   CONDITIONS PRECEDENT TO THE ENTRY OF THE
      CONFIRMATION ORDER ..................................................................81
   H.   EFFECTIVENESS OF THE PLAN .....................................................81

LIBC/3667825.11

|  |  | 1. | Conditions Precedent to the Effective Date | 81 |
|  |  | 2. | Waiver of Conditions | 82 |
|  |  | 3. | Reduction in Retained Cash | 82 |
|  | I. |  | EFFECTS OF CONFIRMATION | 82 |
|  |  | 1. | Vesting of Assets. | 82 |
|  |  | 2. | Binding Effect | 82 |
|  |  | 3. | Discharge | 83 |
|  |  | 4. | Releases | 83 |
|  |  | 5. | Release of Assets | 85 |
|  | J. |  | RETENTION OF JURISDICTION | 85 |
|  |  | 1. | Jurisdiction of Bankruptcy Court | 85 |
|  | K. |  | MISCELLANEOUS PROVISIONS | 86 |
|  |  | 1. | Post-Confirmation Date Fees and Expenses | 86 |
|  |  | 2. | Dissolution of the Creditors' Committee | 87 |
|  |  | 3. | Plan Supplement | 87 |
|  |  | 4. | Plan Controls Disclosure Statement; Confirmation Order Controls Plan | 87 |
|  |  | 5. | Modification of the Plan. | 87 |
| V. |  |  | CONFIRMATION PROCEDURES | 88 |
|  | A. |  | VOTING PROCEDURES AND SOLICITATION OF VOTES | 88 |
|  | B. |  | CONFIRMATION HEARING | 88 |
|  | C. |  | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | 88 |
|  |  | 1. | Best Interests of Creditors/Liquidation Analysis | 90 |
|  |  | 2. | Feasibility | 91 |
|  |  | 3. | Acceptance by Impaired Classes | 93 |
|  |  | 4. | Confirmation Without Acceptance by All Impaired Classes | 93 |
| VI. |  |  | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES | 95 |
|  | A. |  | CONSEQUENCES TO THE DEBTOR AND REORGANIZED TERI | 97 |
|  | B. |  | CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASSES 1, 2a – 2p, 3a – 3q, 4a-4k, 5 AND 6 | 97 |
|  | C. |  | CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASS 5 | 97 |
|  |  | 1. | The Plan Trust | 97 |
|  | D. |  | INFORMATION REPORTING AND WITHHOLDING | 101 |
| VII. |  |  | RISK FACTORS | 101 |
|  | A. |  | CERTAIN BANKRUPTCY CONSIDERATIONS | 101 |
|  | B. |  | MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS | 102 |
|  | C. |  | RISK THAT CLAIMS WILL BE HIGHER THAN ESTIMATED | 102 |
|  | D. |  | RISK THAT THE CLAIMS OF FMC AND ITS SUBSIDIARIES WILL NOT BE SUBSTANTIALLY REDUCED BY THE COURT | 102 |
|  | E. |  | RISK THAT THE PLAN TRUSTEE WILL NOT ACHIEVE PROJECTED RECOVERIES IN RESPECT OF DEFAULTED LOANS | 102 |

  F.  LITIGATION RISKS ...................................................................................103

**VIII. CONCLUSION AND RECOMMENDATION** ........................................................**103**

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Plan |
| EXHIBIT B | Decoder |
| EXHIBIT C | Best Interest Test |
| EXHIBIT D | Reorganized TERI Financial Statements |

LIBC/3667825.11

## I.    INTRODUCTION AND SUMMARY OF THE PLAN

The Education Resources Institute, Inc. ("TERI"[1] or the "Debtor") and the Official Committee of Unsecured Creditors (the "Creditors' Committee," and together with the Debtor, the "Plan Proponents") jointly submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtor.[2] The Plan Proponents have prepared this Disclosure Statement in connection with the solicitation of votes to accept or reject the Second Amended Joint Plan of Reorganization of The Education Resources Institute, Inc. and the Official Committee of Unsecured Creditors (as the same may be amended from time to time, the "Plan"), which was filed by the Plan Proponents with the United States Bankruptcy Court for the District of Massachusetts, Eastern Division (the "Bankruptcy Court") on February 25, 2010. A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.

For the reasons described in greater detail below, the Debtor filed a petition under Chapter 11 of the Bankruptcy Code on April 7, 2008 (the "Commencement Date"). The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case. On April 30, 2008, the United States Trustee for the District of Massachusetts appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.

### A.    THE PLAN OF REORGANIZATION

#### 1.    Introduction

A principal goal of a chapter 11 bankruptcy is to reorganize a debtor's business for the benefit of itself and its creditors. The plan of reorganization is the blueprint by which these goals are accomplished. It provides the rules and procedures pursuant to which a debtor's creditors will be paid and lists the steps a debtor will take to reorganize.

As described in greater detail below, prior to the Chapter 11 Case, the Debtor was (1) a guarantor of private student loans and (2) a not for profit corporation focused on providing college access services to underserved or first generation to college students through a variety of outreach and other services. After substantial review of the Debtor's business and, in consultation with the Creditors' Committee, the Debtor focused on formulating a plan of reorganization that would enable it to make distributions to holders of Allowed Claims as soon as practicable, terminate its existing guaranty business and emerge focused on its not for profit, college access mission and ancillary student loan-related services. The Plan accomplishes this objective by providing for: (i) a compromise and settlement of guaranty Claims; (ii) rejection of

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition in the Plan shall control.

[2]    There are no holders of equity interests in TERI for bankruptcy purposes. TERI is a nonprofit corporation organized under the laws of the State of Massachusetts, and no one owns its residual economic interest above liabilities.

LIBC/3667825.11

most executory contracts to which the Debtor is a party; (iii) creation of a Plan Trust that will receive most of the assets of the Debtor and will effectuate distributions due under the Plan; and (iv) retention of certain Restricted Funds and other assets on behalf of Reorganized TERI so that it can continue its college access and loan servicing activities.

The Plan compromises and settles the Debtor's various Claims by dividing the Creditors into six separate Classes (and sub-classes within the Classes of Secured Claims) and distributing assets and interests in assets to creditors within these Classes. When a debtor lacks sufficient funds to pay all its creditors in full, it must provide for the rights of secured creditors in specific assets and distribute its unencumbered assets pursuant to the priority scheme set forth in the Bankruptcy Code. Thus, Classes of Secured Claims will be paid in full, while the Class of General Unsecured Claims will likely receive only a portion of their Allowed Claims. A description of each class and the expected recovery for each class is set forth below.

In addition, the Debtor will reject all executory contracts and unexpired leases upon confirmation of the Plan, with certain minor exceptions. A list of the executory contracts the Debtor will seek to assume pursuant to Section 365 of the Bankruptcy Code will be set forth in the Plan Supplement to be submitted to the Bankruptcy Court prior to the Confirmation Hearing in accordance with the terms of the Plan.

The majority of the Debtor's assets and liabilities will be transferred to the Plan Trust and the Plan Trustee will take control of the process of liquidating and winding up the Debtor's estate and distributing assets to Creditors.

The Plan also provides that any Causes of Actions will be assigned to the Plan Trust. Under the Plan, all Causes of Action, whether known or unknown, are preserved, except that the Trust Adversary Proceeding commenced by the Creditors' Committee against the "National Collegiate Trusts" will be dismissed with prejudice and all other claims and Causes of Action released as to any Securitization Trust that accepts the Securitization Trust Settlement if the Plan is confirmed and becomes effective. A description of the Securitization Trust Settlement is described further below.

2.      **Restructuring Transactions**

The Plan provides for the reorganization of the Debtor upon consummation of the Plan and the resolution of outstanding Claims against the Debtor pursuant to sections 1123, 1129, and 1141 of the Bankruptcy Code. Of the approximately 200 Claims filed against the Debtor, nearly 150 consist of contingent Claims resulting from TERI's activities as a guarantor of student loans. Such Claims must be estimated using a methodology that takes into account various factors described in greater detail below. The Plan offers the Make and Wait Lenders, Make and Hold Lenders, holders of Securitization Trust Claims and holders of KeyCorp Trust claims a compromise and settlement of the amount of such contingent Claims based on a methodology developed by the Creditors' Committee and acceptable to the Debtor as part of a comprehensive compromise and settlement. In addition, the Plan offers to certain affected Secured Creditors a compromise and settlement of issues relating to the validity, perfection and post Commencement Date effect of their security interests. Each Creditor that is offered a compromise and settlement has two options: (1) the Creditor can accept the Plan, and thereby accept the amount, allowance,

priority, and treatment of such Creditor's Claim under the compromise and settlement; or (2) the Creditor can reject the Plan, and thereby elect to litigate the amount of such Creditor's Claim at an evidentiary hearing to be held after entry of the Confirmation Order.

### 3.    Plan Overview

To understand the treatment of Claims and the compromise and settlement of contingent Claims arising from the Debtor's guaranty of student loans, it is important to understand, generally, the Debtor's pre-petition operations and its relationship with The First Marblehead Corporation. The following provides certain useful background information and summarizes the Plan's major features regarding the Debtor's various creditor groups:

### a)    *Background Regarding The Collateral Accounts*

The Debtor was a processor and guarantor of private student loans. Through a series of contracts with The First Marblehead Corporation and one or more of its corporate affiliates, including First Marblehead Education Resources, Inc. (collectively, "FMC"), the Debtor processed student loan applications, administered student loans, and provided guarantees in respect of such loans. When a lender funded a student loan, the lender deposited the funds into one of the Debtor's loan origination accounts and FMC, acting as TERI's agent, issued the check or initiated the appropriate transfer to the borrower or the applicable educational institution at which the borrower was enrolled.

At the time that the student loan was funded (and in some instances, thereafter as well), the Debtor was paid a Guaranty Fee in consideration for issuing a guaranty of the loan. Prior to the Commencement Date, most (but not all) lenders were parties to Note Purchase Agreements with FMC which gave FMC the right to purchase TERI-guaranteed loans through special purpose entities ("SPEs") that, in turn, would sell certificates evidencing obligations of the SPEs that would be paid with proceeds of the loans. This process is known as securitization. Those lenders that made loans in anticipation of securitization required that a significant portion of the Guaranty Fees in respect of those loans be placed in a segregated collateral account (the "Segregated Fees") to secure TERI's guaranty payment obligations. When loans that had been funded were awaiting securitization, the Segregated Fees related to those loans were placed in a so-called Pool Account. When the loans were securitized, TERI's guaranty continued to guaranty the loans as now owned by the SPE and the Segregated Fees were transferred from the Pool Account to a Pledged Account pledged to the SPE to secure TERI's guaranty obligations.

Prior to January 1, 2008, FMC, acting on behalf of TERI, administered the Pool Accounts and Pledged Accounts, including tracking amounts held in such accounts and investments made in respect of such accounts. On January 1, 2008, the administration of the accounts was transferred to TERI.

Historically, each of the lenders had its own Pool Account subject to a deposit and security agreement among TERI, FMC, the lender and U.S. Bank, N.A. (including its predecessor in interest State Street Bank and Trust Company, the "Bank") under which TERI granted the lender a security interest in the Pool Account held at the Bank (the "DSA Security Documents"). The DSA Security Documents were intended to provide the lenders with control

3

over the Pool Accounts for purposes of perfection of the security interest in the account. Historically, the Pool Accounts were held at the Bank, which was designated as the "bank" or "agent" of the Lender pursuant to the DSA Security Documents. Either TERI (or its agent) or the particular lenders also filed UCC-1 financing statements with the Massachusetts Secretary of State in respect of the Pool Accounts and additional collateral described in the DSA Security Documents.

As of the Commencement Date, each of the following lenders had its own Pool Account at the Bank: (1) J.P. Morgan Chase Bank, N.A. ("Chase"); (2) Bank of America, N.A. ("Bank of America"); (3) Sun Trust Bank; (4) HSBC Bank USA, N.A. ("HSBC Bank"); (5) First National Bank Northeast; (6) Ally Bank (f/k/a GMAC Bank ("GMAC")); (7) National City Bank; (8) Manufacturers & Traders Trust Company (formerly All First-MedBest Program ("M&T Bank")) and (9) The Huntington Bank ("Huntington Bank").

For reasons unknown to the Debtor, but apparently for ease of administration, some lenders became part of a Joint Pool Account into which their Segregated Fees were deposited and in which they had a *pari passu* interest. As of the Commencement Date, the following lenders shared in the Joint Pool Account: (1) Comerica Bank, N.A.; (2) Insurbanc; (3) KeyBank National Association ("KeyBank"); (4) M&T Bank; (5) PNC Bank, N.A. ("PNC Bank"); (6) Sovereign Bank; (7) TCF National Bank ("TCF") and (8) U.S. Bank. Each of these lenders was party to a Security Agreement with TERI and a Control Agreement with the Bank and FMC (the "Joint Security Documents"). The Joint Security Documents were intended to provide the lenders with control over the Joint Pool Account for purposes of perfection of the security interest in the account. Either TERI (or its agent), or the particular lenders also filed UCC-1 financing statements with the Massachusetts Secretary of State in respect of the Pool Accounts and additional collateral described in the Security Agreements.

RBS Citizens, N.A. ("Citizens Bank") and Union Federal Savings Bank, N.A. ("UFSB") had been parties to the Joint Pool Account but on or about March 31, 2008 directed the Debtor and U.S. Bank, N.A. to transfer each lender's pro rata portion of the Joint Pool Account's Collateral to a new Pool Account held at each of such lender's respective financial institution.

b)      *Secured Creditors*

The Debtor's Secured Creditors fall into three categories.[3] The first category of Secured Creditors consists of the Make and Wait Lenders, which are lenders that made student loans that were to be sold to and securitized by FMC, but which instead have been retained by the Make and Wait Lenders due to the disruption of the securitization markets. Depending on whether the lender had its own Pool Account or shared the Joint Pool Account, a portion of the Guaranty Fees paid to TERI for guaranteeing such loans were deposited in either (1) the Pool Accounts which are specific to each Make and Wait Lender and in which each Make and Wait Lender holds a security interest or (2) held in the Joint Pool Account, in which several lenders have a *pari passu* security interest.

---

[3]    Section 506 of the Bankruptcy Code provides that a Claim is treated as a Secured Claim to the extent of the value of the Collateral and a General Unsecured Claim to the extent that it is a Deficiency Claim.

The second category of holders of Secured Claims consists of certain Securitization Trusts administered by First Marblehead Data Services ("FMDS") and sometimes referred to as "The National Collegiate Trusts." These National Collegiate Trusts hold loans guaranteed by TERI. TERI's guarantee obligations to the Securitization Trusts are secured by, among other things, Pledged Accounts.

The third category of holders of Secured Claims consists of KeyBank (other than in its capacity as a Make and Wait Lender) and certain securitization trusts administered by KeyBank. Key Corp Trusts hold loans guaranteed by TERI. TERI's guarantee obligations to KeyBank (other than in its capacity as a Make and Wait Lender) and the Key Corp Trusts are secured by KeyBank's and such Trust's allocable share of the funds as of the Commencement Date in the Victory Fund maintained by KeyBank.

c) <u>*Determination of Make and Wait Lenders' Claims*</u>

During the Chapter 11 Case, both the Debtor and the Creditors' Committee performed a thorough analysis of contingent guaranty Claims, engaged in extensive negotiations regarding the Debtor's potential liability to each Secured Creditor and came to an agreement regarding the estimates to utilize in offering a compromise and settlement of each Secured Creditor's Claim.

The Debtor and Creditors' Committee have agreed to offer the Make and Wait Settlement to each Make and Wait Lender based on the Creditors' Committee's Claim estimation assumptions and methodology, which the Creditors' Committee has denominated the "Decoder." A summary of the Decoder is discussed in Section I.A.4.b.1 below. If Make and Wait Lenders elect to accept the compromise and settlement amount, they will have an Allowed Secured Claim equal to the amount set forth in the column labeled "Payment to Accepting Make and Wait Lender from Collateral Account" and an Allowed – Unsecured Claim in the amount, if any, set forth in the "Make and Wait Lender Decoder Deficiency Claim (If Any)" Column of <u>Schedule A</u> attached to the Plan.

(1)    Make and Wait Lender's Treatment Under Plan[4]

If, under the Decoder, the estimate of potential liability (the "Liability Estimate") to a certain Make and Wait Lender exceeds the funds in the Collateral Account in which it holds a security interest, such Make and Wait Lender, if it accepts the Plan, will be paid the entire amount of the funds in the Collateral Account in which it holds a security interest, and will receive a Deficiency Claim to be treated in accordance with the Plan's treatment of General Unsecured Claims.

If the Liability Estimate to a certain Make and Wait Lender does not exceed the funds in the Collateral Account in which it holds a security interest, then such Make and Wait Lender, if it accepts the Plan, will be paid the funds from the Collateral Account equal to the Liability Estimate, and will not receive a Deficiency Claim. In that case, the remaining funds in the

---

[4]    Subject to further adjustment under the Plan (as discussed in Section A(3)(c)(2) below) with respect to certain Make and Wait Lenders that may have defects in security documents.

LIBC/3667825.11

Collateral Account will be retained by the Debtor for distribution to the Plan Trust for the benefit of Creditors who hold General Unsecured Claims.

If a Make and Wait Lender rejects the Plan but the Plan is ultimately confirmed, then the Make and Wait Lender will litigate the amount of its Secured Claim and its Deficiency Claim (if any) in the Bankruptcy Court after the entry of the Confirmation Order. Such Make and Wait Lender will be paid funds from its Collateral Account to the extent of the Allowed amount of its Secured Claim as determined by the Bankruptcy Court in a Final Order. In the same Final Order, the Bankruptcy Court will set the Allowed amount of such Creditor's Deficiency Claim, if any, which will be treated in accordance with the Plan's treatment of General Unsecured Creditors. In the event a Make and Wait Lender rejects the Plan, the Plan Trustee will request Allowance of such Make and Wait Lender's Claim on any appropriate basis as determined by the Plan Trustee, including the "Base Case". A summary of the Base Case is discussed in greater detail in Section I.A.4.b.2. Using the Debtor's Base Case, no Make and Wait Lender holds a General Unsecured Deficiency Claim.

(2)    Treatment Under Plan of Make and Wait Lenders That May Have Defects in Security Documents Granting Such Creditor A Security Interest In the Joint Pool Account

Certain Make and Wait Lenders that are or were just prior to the Commencement Date, secured by the Joint Pool Account, including Citizens Bank, InsurBanc, M&T Bank and PNC Bank, had a Control Agreement and Security Agreement that the Debtor and the Creditors' Committee believe did not properly identify the Joint Pool Account as Collateral.[5] It is unclear whether this deficiency would ultimately deprive such Secured Creditors of their security interest in the Joint Pool Account or, in the case of Citizens Bank, which transferred its account within ninety (90) days of the Commencement Date, whether such transfer would be deemed a preferential transfer pursuant to Section 547 of the Bankruptcy Code. As a result of the potential challenge to the security interests, the Plan Proponents propose to settle this Make and Wait Lien Dispute, as well as the underlying Secured Claim Amount by agreeing to a settlement and compromise that provides that 5% of such Make and Wait Lender's Collateral in the Joint Pool Account (or, in the case of Citizens Bank, its Collateral Account) be transferred to the Plan Trustee, free and clear of all liens, claims and encumbrances. No other adjustment will be made to the Allowed Secured Claims or Allowed Deficiency Claims of the Secured Creditors affected by the Make and Wait Lien Dispute if they accept the settlement proposal.

Specifically, the holders of Make and Wait Claims that also have a Make and Wait Lien Dispute will be offered the following compromise and settlement pursuant to Bankruptcy Rule 9019:

---

[5]    UFSB was similarly situated but was party to a compromise approved by the Bankruptcy Court that resolved this and other issues.

| MAKE AND WAIT LENDERS WITH MAKE AND WAIT LIEN DISPUTE | | |
|---|---|---|
| LENDER | COLLATERAL ACCOUNT (AS OF 12/31/08) | 5% REDUCTION |
| Citizens Bank | $48,488,139 | $2,424,407 |
| Insurbanc | $16,233 | $812 |
| M&T Bank | $678,383 | $33,919 |
| PNC Bank | $8,025,823 | $401,291 |

      If a Make and Wait Lender with a Make and Wait Lien Dispute rejects the Plan but the Plan is ultimately confirmed, then such Make and Wait Lender will litigate the amount of its Secured Claim and its Deficiency Claim, if any, in Bankruptcy Court after entry of the Confirmation Order.  The Plan Proponents, and the Plan Trustee, also reserve the right to assert any other ground or objection to such Lender's Claim.  In the Final Order with respect to any such dispute, the Bankruptcy Court will set the Allowed amount of such Creditor's Claim and determine whether the Make and Wait Lender has a valid security interest in such lender's Collateral Account.  In the event a Make and Wait Lender rejects the Plan, the Plan Trustee will request Allowance of such Make and Wait Lender's Claim at such amount as determined by the Plan Trustee, including the Debtor's Base Case.  No release of Collateral will be made to a Make and Wait Lender that has rejected the Plan until there is a Final Order regarding the determination of the Allowed amount of such Make and Wait Lender's Secured Claim and Deficiency Claim and the Make and Wait Lien Dispute.

      The following chart sets forth the claims of the Make and Wait Lender, including the "Payment to Accepting Make and Wait Lender from Collateral Account" and "Make and Wait Lender Decoder Deficiency Claim (If Any)" as provided for in the Plan.

LIBC/3667825.11

| Class | Make and Wait Collateral Account Funds (as of 12/31/08) A | Make and Wait Lien Dispute Amount (5% of Collateral Account Funds) A *5%=B | Make and Wait Lender Base Case Equity (If Any) C | Make and Wait Lender Decoder Equity (If Any) [1] D | Make and Wait Lender Payment Amount (If Any) B+D=E | Payment to Accepting Make and Wait Lender from Collateral Account [2] A-E=F | Make and Wait Lender Decoder Deficiency Claim (If Any) [3] G |
|---|---|---|---|---|---|---|---|
| Class 2a Citibank | $0 | $0 | $0 | NA | NA | NA | NA |
| Class 2b Comerica Bank | $379,951 | $0 | $164,345 | $41,582 | $41,582 | $338,368 | $0 |
| Class 2c First National Bank Northeast | $790 | $0 | $0 | NA | NA | NA | NA |
| Class 2d GMAC Bank | $5,906,949 | $0 | $782,057 | $0 | $0 | $5,906,949 | $941,904 |
| Class 2e HSBC Bank USA, N.A. | $861,764 | $0 | $627,147 | $320,702 | $320,702 | $541,061 | $0 |
| Class 2f Huntington National Bank | $831,333 | $0 | $325,854 | $0 | $0 | $831,333 | $2,126 |
| Class 2g Insurbanc | $16,233 | $812 | $8,650 | $2,098 | $2,910 | $13,323 | $0 |
| Class 2h KeyBank National Association | $856,777 | $0 | $92,883 | $0 | $0 | $856,777 | $159,860 |
| Class 2i Manufacturers and Traders Trust Company | $678,383 | $33,919 | $524,891 | $215,499 | $249,418 | $428,965 | $0 |
| Class 2j National City Bank | $3,973,170 | $0 | $1,140,016 | $0 | $0 | $3,973,170 | $206,358 |
| Class 2k PNC Bank, N.A. | $8,025,823 | $401,291 | $3,026,789 | $0 | $401,291 | $7,624,532 | $448,989 |
| Class 2l RBS Citizens, N.A. | $48,488,139 | $2,424,407 | $8,857,767 | $0 | $2,424,407 | $46,063,732 | $7,803,433 |
| Class 2m Sovereign Bank | $537,888 | $0 | $265,002 | $64,848 | $64,848 | $473,040 | $0 |
| Class 2n SunTrust Bank | $437,566 | $0 | $250,542 | $110,277 | $110,277 | $327,289 | $0 |
| Class 2o TCF National Bank | $129,172 | $0 | $76,941 | $23,996 | $23,996 | $105,177 | $0 |
| Class 2p U.S. Bank, N.A. | $2,795,334 | $0 | $1,143,599 | $88,198 | $88,198 | $2,707,136 | $0 |

[1] This is the sum of the "Make and Wait Lien Dispute Amount" and "Make and Wait Lender Decoder Equity (if any)". The balance of the funds in the Collateral Account, including accrued interest, shall be payable to the applicable Accepting Make and Wait Lender.

[2] For purposes of the Plan, payment to accepting Make and Wait lender from collateral account is net of any equity calculated with the Decoder methodology described in the Plan Supplement. Amounts in the collateral account will be adjusted on the date of transfer.

[3] Under the Base Case, no Make and Wait Lender holds a Deficiency Claim

8

### d)    *The Securitization Trusts*

First Marblehead Data Services ("FMDS"), a wholly-owned subsidiary of FMC, structured and administered the securitization of student loans into Securitization Trusts that are special purpose entities created to hold a pool of student loans.  The Securitization Trusts issued bonds collateralized by the student loans.  Since 2001, FMDS has structured approximately 17 securitizations of pooled student loans, where a majority of such underlying loans are guaranteed by TERI.  U.S. Bank National Association, is the Indenture Trustee or successor Indenture Trustee of each of the Indentures under which the bonds were issued.

Specifically, the following securitization trusts were created:

National Collegiate Master Student Loan Trust I
National Collegiate Student Loan Trust 2001-CP1
National Collegiate Student Loan Trust 2002-CP1
National Collegiate Student Loan Trust 2003-1
National Collegiate Student Loan Trust 2004-1
National Collegiate Student Loan Trust 2004-2
National Collegiate Student Loan Trust 2005-1
National Collegiate Student Loan Trust 2005-2
National Collegiate Student Loan Trust 2005-3
National Collegiate Student Loan Trust 2006-1
National Collegiate Student Loan Trust 2006-2
National Collegiate Student Loan Trust 2006-3
National Collegiate Student Loan Trust 2006-4
National Collegiate Student Loan Trust 2007-1
National Collegiate Student Loan Trust 2007-2
National Collegiate Student Loan Trust 2007-3
National Collegiate Student Loan Trust 2007-4

U.S. Bank is also the Indenture Trustee of bond issuances that securitized "TERI-Guaranteed" student loans that were either not structured or administered by FMDS or did not have an associated Collateral Account.  All of such Trusts (referred to in the Plan as "Other Trusts") are not included in the Securitization Trust Settlement described below but rather the Claims of such Other Trusts are treated as General Unsecured Claims.

Pursuant to the terms of the Solicitation Procedures Order, the holders of Notes issued pursuant to the applicable Indentures (other than Indentures that have a "Control Party" or "Credit Provider" and such Control Party or Credit Provider elects to exercise Voting Authority on behalf of such Trust) will have the right to cause the holders of the Trust's Claims to vote to accept or reject the Plan.  If the noteholders in respect of a Securitization Trust cause a Trust to be deemed to vote to accept the Plan, then that Trust will be deemed to have voted to accept the Plan and the "Securitization Trust Settlement"  The Securitization Trust Settlement, described in detail later in this Disclosure Statement, resolves all issues related to the amount of each Trust's Claims and issues related to the perfection of liens claimed by each Trust.

The Settlement With NCSLT 2001-CP1 and NCSLT 2002-CP1.

9

The Plan Proponents have agreed to a settlement in principle with NCSLT 2001-CP1 and NCSLT 2002-CP1 and expect to submit a motion seeking approval of such settlement pursuant to Rule 9019 of the Bankruptcy Rules in the near term. The Plan Proponents expect that settlement with NCSLT 2001-CP1 and NCSLT 2002-1 will include the following terms:

1.    On the Effective Date, all defaulted loans (whether purchased prior to or following the Commencement Date), will be transferred to the Plan Trustee;

2.    NCSLT 2001-CP1 will have an Allowed General Unsecured Claim of $300,000;

3.    NCSLT 2002- CP1 may continue to direct the Debtor to purchase defaulted loans from its Pledged Account until the funds in such account are exhausted; and

4.    On the Effective Date, the Trust Adversary Proceeding will be deemed dismissed, with prejudice as to NCSLT 2001-CP1 and NCSLT 2002- CP1.

The Securitization Trust Settlement for each of the other "National Collegiate Trusts" is summarized as follows:

(1)    Each Securitization Trust that accepts Plan, and, thereby, the Securitization Trust Settlement will have an Allowed Secured Claim in the amount of the Securitization Trust Collateral, which generally includes the amount held in such Securitization Trust's Collateral Account. However, pursuant to the Decoder NCSLT 2007-3 and NCSLT 2007-4 and are oversecured and therefore their Collateral Account will be returned to the Applicable Securitization Trust less $1,600,000 and $700,000, respectively that shall be paid to the Plan Trustee.

As of December 31, 2008, the balances of the Securitization Trust Collateral Accounts were as follows:

| National Collegiate Trust | Balance of Collateral Account (as of December 31, 2008) |
| --- | --- |
| National Collegiate Student Loan Trust 2003-1 | $540,788 |
| National Collegiate Student Loan Trust 2004-1 | $505,430 |
| National Collegiate Student Loan Trust 2004-2 | $788,078 |
| National Collegiate Student Loan Trust 2005-1 | $632,914 |
| National Collegiate Student Loan Trust 2005-2 | $395,825 |
| National Collegiate Student Loan Trust 2005-3 | $1,809,447 |

LIBC/3667825.11

| | |
|---|---|
| National Collegiate Student Loan Trust 2006-1 | $472,236 |
| National Collegiate Student Loan Trust 2006-2 | $225,021 |
| National Collegiate Student Loan Trust 2006-3 | $51,161,652 |
| National Collegiate Student Loan Trust 2006-4 | $20,967,919 |
| National Collegiate Student Loan Trust 2007-1 | $31,632,569 |
| National Collegiate Student Loan Trust 2007-2 | $38,018,657 |
| National Collegiate Student Loan Trust Master Trust | $906,902 |
| National Collegiate Student Loan Trust 2007-3 | $65,493,625 |
| National Collegiate Student Loan Trust 2007-4 | $64,615,864 |
| National Collegiate Student Loan Trust 2001-CP1* | $404 |
| National Collegiate Student Loan Trust 2002-CP1* | $906,902 |

(2)     According to the Creditors' Committee Decoder, if a
Securitization Trust's Collateral excluded defaulted loans
purchased by TERI post-petition, but included prepetition
defaulted loans and funds in its Collateral Account then its
Deficiency Claim would be as set forth below:[6]

| | |
|---|---|
| NCSLT 2003-1 | $13,500,000 |
| NCSLT 2004-1 | $12,300,000 |
| NCSLT 2004-2 | $21,200,000 |
| NCSLT 2005-1 | $13,900,000 |
| NCSLT 2005-2 | $12,700,000 |
| NCSLT 2005-3 | $32,800,000 |
| NCSLT 2006-1 | $24,500,000 |
| NCSLT 2006-2 | $24,600,000 |
| NCSLT 2006-3 | $15,700,000 |
| NCSLT 2006-4 | $22,000,000 |
| NCSLT 2007-1 | $14,200,000 |
| NCSLT 2007-2 | $10,400,000 |
| NCSLT Master Trust | $16,200,000 |
| NCSLT 2007-3 | $0 |
| NCSLT 2007-4 | $0 |

(3)     In full and final settlement of the Trust Adversary
Proceeding (described in Section 4(a) below) with respect
to each Securitization Trust that accepts the Plan, and,

---

[6]     These Deficiency Claims are subject to further reduction as described in subparagraph (3).

11

thereby, the Securitization Trust Settlement, such Trusts will (a) waive any claim to security interests in loans purchased by TERI on or after the Commencement Date and on recoveries on such loans, including recoveries received prior to the date hereof and (b) in full and final settlement of the Trust Adversary Proceeding[7] with respect to each Securitization Trust that accepts the Plan and, thereby, the Securitization Trust Settlement, the Trusts will agree to reduce the amount of their Allowed Deficiency Claim as part of the Securitization Trust Settlement. The resulting Allowed Deficiency Claim, after applying such reduction for each Securitization Trust is equal to the following amounts (each a "Securitization Trust Settlement Claim"):

| | |
|---|---|
| NCSLT 2003-1 | $6,600,000 |
| NCSLT 2004-1 | $5,600,000 |
| NCSLT 2004-2 | $14,200,000 |
| NCSLT 2005-1 | $8,700,000 |
| NCSLT 2005-2 | $9,300,000 |
| NCSLT 2005-3 | $27,600,000 |
| NCSLT 2006-1 | $21,800,000 |
| NCSLT 2006-2 | $22,900,000 |
| NCSLT 2006-3 | $14,000,000 |
| NCSLT 2006-4 | $21,100,000 |
| NCSLT 2007-1 | $13,900,000 |
| NCSLT 2007-2 | $10,200,000 |
| NCSLT Master Trust | $5,900,000 |
| NCSLT 2007-3 | $0 |
| NCSLT 2007-4 | $0 |

(4)    On the Effective Date, the Trust Adversary Proceeding will be deemed dismissed, with prejudice as to (i) each Securitization Trust receiving the treatment provided by the Securitization Trust Settlement, (ii) the administrator with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, (iii) the owner trustee of each such Securitization Trust accepting the Plan and the Securitization Trust Settlement and (iv) U.S. Bank National Association in any capacity in which it was named as a defendant in the Trust Adversary Proceeding, including as indenture trustee under any indenture pursuant to which such Securitization Trust issued notes and

---

[7]    The Trust Adversary Proceeding is described in greater detail in Section IV.D.2.C.

LIBC/3667825.11

accepted the Plan and Securitization Trust Settlement, each of the foregoing administrators, owner trustees and indenture trustees, in their respective capacities only.

(5)    On the Effective Date, for each Securitization Trust that accepts the Plan and, thereby, the Securitization Trust Settlement, the Debtor will transfer or cause to be transferred, free and clear of all liens, claims and encumbrances, to the indenture trustee (or such other party as directed by the indenture trustee) under the indentures with the respective Securitization Trust (a) all funds, monies, and other assets in the applicable Collateral Account created and maintained for the applicable Securitization Trust (except that NCSLT 2007-3 and NCSLT 2007-4 will be required to remit $1,600,000 and $700,000, respectively, of the balance of each of their Collateral Accounts to the Plan Trustee as a result of the Securitization Trust Settlement providing, in part, that their Collateral Accounts are oversecured by that amount), (b) all defaulted loans that were purchased by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust prior to the Commencement Date, and (c) all recoveries collected (and the right to collect such recoveries earned but not paid) and all future recoveries with respect to prepetition defaulted loans and (d) the proceeds from the sale by the Debtor of such prepetition defaulted loans to a Securitization Trust at any time following rehabilitation.

(6)    All defaulted loans that were purchased by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust after the Commencement Date shall be transferred free and clear of all liens, claims and encumbrances to the Plan Trust and the applicable Securitization Trust shall have no security interest in, or Claim to such defaulted loans or recoveries obtained in respect thereof.    The following chart shows the approximate face amount of defaulted loans purchased by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization  Trust both prior to and after the Commencement Date.

13

| Applicable Trust | Purchased Pre-Petition | Purchased Post-Petition |
|---|---|---|
| NCSLT 2003-1 | $50,100,000 | $800,000 |
| NCSLT 2004-1 | $49,700,000 | $1,300,000 |
| NCSLT 2004-2 | $47,700,000 | $10,000,000 |
| NCSLT 2005-1 | $35,100,000 | $14,800,000 |
| NCSLT 2005-2 | $21,200,000 | $10,700,000 |
| NCSLT 2005-3 | $34,500,000 | $43,300,000 |
| NCSLT 2006-1 | $17,700,000 | $26,000,000 |
| NCSLT 2006-2 | $11,100,000 | $19,000,000 |
| NCSLT 2006-3 | $10,700,000 | $37,600,000 |
| NCSLT 2006-4 | $5,500,000 | $24,400,000 |
| NCSLT 2007-1 | $2,000,000 | $18,300,000 |
| NCSLT 2007-2 | $1,400,000 | $12,400,000 |
| NCSLT Master Trust | $77,200,000 | $1,800,000 |
| NCSLT 2007-3 | $500,000 | $5,000,000 |
| NCSLT 2007-4 | $500,000 | $5,800,000 |

(7)     The Plan Proponents, using a recovery rate of 48% of paid defaults and using a 5% discount rate over an 11 year period, have ascribed the following net present value to the loans purchased by or on behalf of the Debtor after the Commencement Date:

| | |
|---|---|
| NCSLT 2003-1 | $300,000 |
| NCSLT 2004-1 | $500,000 |
| NCSLT 2004-2 | $4,000,000 |
| NCSLT 2005-1 | $5,900,000 |
| NCSLT 2005-2 | $4,200,000 |
| NCSLT 2005-3 | $17,100,000 |
| NCSLT 2006-1 | $10,300,000 |
| NCSLT 2006-2 | $7,500,000 |
| NCSLT 2006-3 | $14,900,000 |
| NCSLT 2006-4 | $9,700,000 |
| NCSLT 2007-1 | $7,300,000 |
| NCSLT 2007-2 | $4,900,000 |
| NCSLT Master Trust | $700,000 |
| NCSLT 2007-3 | $2,000,000 |
| NCSLT 2007-4 | $2,300,000 |

14

(8)    The Securitization Trust Settlement is not a waiver or release of the rights, if any, of the Debtor or any other party to receive a portion (if any) of the Residuals with respect to any and all of the Securitization Trusts.[8]

In the event that any Securitization Trust rejects the Plan or is deemed to reject the Plan, such Securitization Trust shall be deemed to opt out of the Securitization Trust Settlement, and as to Claims in such rejecting Classes (A) the Allowed amount of the Secured Claim (if any) of the Claims in such rejecting Class will be determined by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code, and the Plan Trustee will seek to have such Secured Claim (if any) determined on any appropriate basis determined by the Plan Trustee, including the Base Case, (B) the Trust Adversary Proceeding against the holders of Claims in such rejecting classes will proceed in the Bankruptcy Court, (C) the Collateral Accounts allegedly securing the Claims in such rejecting Classes will not be released to the Indenture Trustee (or its servicers or any other representative) on behalf of the holder of such claim in such rejecting Class (or such other party as Indenture Trustee may designate) unless the Court determines pursuant to one or more Final Orders that such holders hold Allowed Secured Claims, in which event, such holder's Collateral Account, if any, shall be released to such holder to the extent of available funds and to the extent necessary to satisfy such Allowed Claim, with the excess, if any, released to the Plan Trustee and (D) such Securitization Trust reserves the right in the Trust Adversary Proceeding to contest the Debtor's assertion that it acquired title to defaulted loans sold or transferred to the Debtor or its agent as a result of such sale or transfer.

On the Effective Date (or as soon thereafter as reasonably practicable) with respect to a Securitization Trust that rejects or is deemed to reject this Plan and is thereby deemed to opt out of the Securitization Trust Settlement, the funds in the Pledged Account (whether earned or accrued) as of the Effective Date shall be transferred to U.S. Bank National Association ("U.S. Bank") and held by U.S. Bank in escrow pursuant to the terms of one or more escrow agreements among U.S. Bank, the administrator of the Securitization Trust and the Plan Trustee. The escrow agreement(s) shall be mutually acceptable to U.S. Bank, the administrator of the Securitization Trust and the Plan Trustee and shall provide that (i) the funds shall be held by U.S. Bank in the applicable escrow account to be released upon the earlier of (1) one or more Final Orders of the Bankruptcy Court (as applicable to such Trust), or (2) pursuant to joint written instruction of the Plan Trustee, the applicable Securitization Trust and indenture trustee for such Trust, (ii) the funds shall be invested by U.S. Bank in accordance with such written instructions, and that investment earnings on such funds shall be added to the fund and released as provided above, and (iii) such other matters as shall be agreed to by the parties to such agreement (including payment of customary fees and other bank charges).  Notwithstanding such transfer of funds to the escrow account or accounts, each of the Plan Trustee, Securitization Trustee and indenture trustee reserve all rights, and such transfer(s) to the escrow account or accounts are subject to the rights of the Plan Trustee, Securitization Trustee and indenture trustee, with respect to recoveries and other funds transferred by the Debtor to the applicable Pledged Account on or after the Commencement Date, together with any interest or other earnings thereon, including,

---

[8]    The Residuals are discussed in greater detail in Sections I.A.4e and VII.E. hereof.

without limitation, the rights of the parties with respect to the extent, priority, validity or existence of any alleged security interest in such recoveries and funds.

In the event that any Securitization Trust rejects the Plan, the Plan Trustee reserves the right to seek to have the amount of the claims of such Securitization Trust determined at any amount the Plan Trustee determines is reasonable, including the Debtor's Base Case. The Debtor's Base Case (if applied by the Court) with respect to the Securitization Trusts would yield the following Claim amounts:

| Securitization Trust | Securitization Trust Base Case Equity | Securitization Trust Base Case Claim |
|---|---|---|
| NCSLT 2003-1 | - | $12,214,990 |
| NCSLT 2004-1 | - | $10,696,106 |
| NCSLT 2004-2 | - | $12,884,635 |
| NCSLT 2005-1 | - | $5,219,602 |
| NCSLT 2005-2 | - | $5,575,091 |
| NCSLT 2005-3 | - | $6,015,971 |
| NCSLT 2006-1 | - | $6,761,746 |
| NCSLT 2006-2 | - | $11,186,298 |
| NCSLT 2006-3 | $14,690,347 | $0 |
| NCSLT 2006-4 | - | $2,175,723 |
| NCSLT 2007-1 | $2,680,796 | $0 |
| NCSLT 2007-2 | $4,331,492 | $0 |
| NCSLT Master Trust | - | $14,954,201 |
| NCSLT 2007-3 | $20,234,263 | $0 |
| NCSLT 2007-4 | $19,264,504 | $0 |
| NCSLT 2001-CP1 | $0 | $0 |
| NCSLT 2002-CP1 | $0 | $0 |

e)     *Key Corp Trusts*

KeyBank structured and administered the securitization of student loans into trusts that are special purpose entities created to hold a pool of student loans. KeyBank (excluding in its capacity as a Make and Wait Lender) also continues to hold loans that were not securitized. The trusts issued bonds collateralized by student loans. Specifically, KeyBank created the following trusts:

16

LIBC/3667825.11

| | |
|---|---|
| Key Corp Student Loan Trust | 1999-A |
| Key Corp Student Loan Trust | 1999-B |
| Key Corp Student Loan Trust | 2000-A |
| Key Corp Student Loan Trust | 2000-B |
| Key Corp Student Loan Trust | 2000-B |
| Key Corp Student Loan Trust | 2001-A |
| Key Corp Student Loan Trust | 2002-A |
| Key Corp Student Loan Trust | 2003-A |
| Key Corp Student Loan Trust | 2004-A |
| Key Corp Student Loan Trust | 2005-A |
| Key Corp Student Loan Trust | 2006-A |

Pursuant to the terms of the Plan, if the Key Corp Trusts and KeyBank (excluding in its capacity as a Make and Wait Lender) accept the Plan, then they will be paid their allocable share of the Victory Fund Collateral Account as of the Commencement Date held by KeyBank and will receive a Deficiency Claim to be treated in accordance with the Plan's treatment of General Unsecured Claims, and they shall cause their allocable share of the postpetition deposits into the Victory Fund to be transferred to the Plan Trustee free and clear of any liens or claims of KeyBank or the KeyCorp Trusts. If KeyBank and the Key Corp Trusts elect to accept the Key Access Program Settlement, the Debtor and Creditors' Committee have agreed to offer the Key Access Program Settlement based on the Committee's Decoder. If any of the Key Corp Trusts or KeyBank (other than in its capacity as a Make and Wait Lender) elects the Key Access Program Election and thereby rejects the Plan, then the Plan Trustee will seek to allow such Key Corp Trust Claim or the Claim of KeyBank (other than in its capacity as a Make and Wait Lender) at any appropriate basis determined by the Plan Trustee, including the Base Case.

The Key Access Program Settlement Amount and Base Case are set forth below:

| Key Corp Trust | Allocable Share of Victory Fund | Program Decoder Settlement Claim | Base Case |
|---|---|---|---|
| KeyBank National Association | $17,572 | $4,183,461 | $2,990,666 |
| KCSLT 1999-A | $5,304 | $1,182,942 | $845,309 |
| KCSLT 1999-B | $4,426 | $1,227,168 | $1,025,614 |
| KCSLT 2000-A | $2,777 | $482,156 | $365,040 |
| KCSLT 2000-B | $4,989 | $1,477,086 | $1,266,274 |

17

| KCSLT 2001-A | $3,055 | $1,168,802 | $951,496 |
| KCSLT 2002-A | $3,278 | $1,352,056 | $1,158,829 |
| KCSLT 2003-A | $1,122 | $623,586 | $492,155 |
| KCSLT 2004-A | $2,053 | $803,372 | $586,767 |
| KCSLT 2005-A | $1,358 | $377,533 | $263,483 |
| KCSLT 2006-A | $65 | $362,215 | $301,180 |

      If a KeyCorp Trust or KeyBank (other than in its capacity as a Make and Wait Lender) rejects the Plan and is thereby deemed to opt out of the Key Access Program Settlement, then such KeyCorp Trust or KeyBank (other than in its capacity as a Make and Wait Lender) will have (i) the Allowed amount of its Claim determined by the Bankruptcy Court by Final Order, following appropriate notice and an opportunity to be heard, in accordance with the Key Access Program Election; (ii) the funds in the Victory Fund as of the Commencement Date shall be paid to KeyBank and held in escrow until the Bankruptcy Court has determined by Final Order, following appropriate notice and an opportunity to be heard, the proper method for distributing such funds; and (iii) the recoveries and other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon, shall be transferred to the Plan Trustee but shall not be distributed to any Creditor until the Bankruptcy Court has determined by Final Order, following appropriate notice and an opportunity to be heard, whether any KeyCorp Trust or KeyBank has a first priority perfected security interest in all or any part of such funds and, to the extent necessary, whether the Key Access Program Deficiency Claims must be adjusted to reflect the distributions of the funds in the Victory Fund required pursuant to the Bankruptcy Court's Order.[9]

      f)    *General Unsecured Creditors*

      Holders of unsecured Claims against the Debtor fall into four categories. The first category of holders of General Unsecured Claims are the Convenience Class Claims. Convenience Class Claims consist of General Unsecured Claims that are greater than $0 and less than or equal to $1,500 in Allowed amounts, or General Unsecured Claims for which the holder of such claim elects to reduce its Claim to an amount equal to or less than $1,500. Such Allowed Claims will be paid in full from Available Cash. However, pursuant to the terms of the Plan, in the event that the aggregate amount of Convenience Class Claims exceeds $250,000, the Plan Trustee and/or the Plan Proponents, as appropriate, in its or their sole discretion, can reject an election made by a creditor to reduce its Allowed General Unsecured Claim to $1,500. In the event that the Plan Trustee and/or the Plan Proponents, as appropriate, reject any such election, then such Creditor's Claim will be treated as a General Unsecured Claim.

---

[9]    The Debtor believes that the approximately $1,000,000 in funds transferred by the Debtor to the Victory Fund on or after the Commencement Date was in error and that pursuant to Section 542 of the Bankruptcy Code such funds should be returned to the Debtor's estate.

LIBC/3667825.11

(1)    Make and Hold Lender's and Non-Collateralized Trusts
Claims

The second category of holders of General Unsecured Claims consists of the Make and Hold Lenders which are lenders that made student loans that are held by each lender on its balance sheet without having been held for planned securitization or securitized with no collateral account, as well as the claims of certain unsecured trust structures like TFSI, Knowledgeworks and National Collegiate Student Loan Trust 2006-A. Such loans, unlike the loans made by Make and Wait Lenders, are not secured by Collateral Accounts. Under the Plan, each Make and Hold Lender is offered a Make and Hold Settlement of the Allowed amount of its General Unsecured Claim based on the Decoder methodology agreed to between the Debtor and the Creditors' Committee. If the Make and Hold Lender accepts the Plan, the Make and Hold Lender will receive the General Unsecured Claim Distribution based on the Make and Hold Settlement amount.

The Debtor and the Creditors' Committee have agreed to offer the Make and Hold Settlement based on the Committee's Decoder or the Debtor's Base Case (whichever is higher). Specifically, pursuant to the Decoder, the Make and Holder Lenders, if they elect to accept the Make and Hold Settlement amount, will have Allowed Claims in the amounts set forth on the chart below in the column "Make and Hold Lender Settlement Claim".

If a Make and Hold Lender rejects the Plan, then the Plan Trustee will seek to allow such Make and Hold Lender's Claim at any appropriate basis determined by the Plan Trustee, including the Base Case. The Make and Hold Base Case for Make and Holder Lenders is set forth on the chart below in the column "Make and Hold Lender Base Case".

19

| Make and Hold Lender | Base Case Claim | Decoder Claim | Settlement Claim |
|---|---|---|---|
| Brazos Student Finance Corporation | See Star Bank Claim | See Star Bank Claim | See Star Bank Claim |
| California Bank & Trust | $ 864 | $ 866 | $ 866 |
| CHELA Financial USA/Inc. (n/k/a Nelnet) | $ 63,612 | $ 54,890 | $ 63,612 |
| Citibank | $ 48,946 | $ 42,538 | $ 48,946 |
| Comerica Bank | $ 407,313 | $ 430,720 | $ 430,720 |
| Corus Bank, N.A. | $ 9,207 | $ 9,509 | $ 9,509 |
| Deutsche Bank | $ 420,994 | $ 355,277 | $ 420,994 |
| HealthMarkets, Inc. (f/k/a UICI) | $ 2,526,339 | $ 2,404,978 | $ 2,526,339 |
| HSBC Bank USA | $ 1,079 | $ 1,824 | $ 1,824 |
| Keystone (Pheaa) | $ 1,148,081 | $ 1,052,911 | $ 1,148,081 |
| Maine Education Services (f/k/a MELA) | $ 6,466 | $ - | $ 6,466 |
| Manufacturers and Traders Trust Company | $ 98,304 | $ 117,110 | $ 117,110 |
| Members 1st Federal Credit Union | $ 134,120 | $ 166,089 | $ 166,089 |
| National City Bank | $ 101,766 | $ 256,320 | $ 256,320 |
| Nellie Mae Education Foundation | $ 191,419 | $ 193,249 | $ 193,249 |
| NelNet, Inc. | See CHELA Claim | See CHELA Claim | See CHELA Claim |
| Penn Security Bank and Trust | $ 171,099 | $ 212,035 | $ 212,035 |
| PNC Bank, N.A. | $ 235,207 | $ 289,677 | $ 289,677 |
| RBS Citizens, N.A. | $ 12,480,953 | $ 14,664,444 | $ 14,664,444 |
| Rhode Island Student Loan Authority | $ 167 | $ - | $ 167 |
| Richland State Bank | $ 3,463 | $ 2,471 | $ 3,463 |
| Sallie Mae ECFC | $ 490,918 | $ 477,360 | $ 490,918 |
| Sallie Mae Academic Management Services | $ 348,074 | $ 338,461 | $ 348,074 |
| Southwest Student Services Corp. | $ - | $ - | $ - |
| Star Bank | $ 1,375,226 | $ 1,851,476 | $ 1,851,476 |
| Student Loan Funding Corp (KnowledgeWorks) | $ 17,630 | $ 43,352 | $ 43,352 |
| TFSI | $ 80,067 | $ 116,805 | $ 116,805 |
| Wachovia Bank of Delaware, N.A. | $ 37,391,156 | $ 48,849,269 | $ 48,849,269 |
| Zions First National Bank | $ 714 | $ 750 | $ 750 |

(1) Base Case is provided for illustrative purposes.  The Base Case Claim amounts were determined in accordance with the Debtor Base Case methodology described in the Disclosure Statement. If any Make and Hold Lender rejects the Plan, the Plan Trustee reserves the right to seek to have the amount of the claim for such Make and Hold Lender determined at any amount the Plan Trustee determines is reasonable, including the Debtor's Base Case.

(2) The Decoder Case Claim amounts were determined in accordance with the Decoder methodology described in the Plan Supplement. Decoder Case Claim reflects Allowed General Unsecured Claim for Accepting Make and Hold Lenders.

(3) Greater of Base Case and Decoder Claim

LIBC/3667825.11

A Make and Hold Lender that rejects the Plan will litigate the Allowed amount of its Claim (if any) in the Bankruptcy Court after entry of the Confirmation Order. Such Make and Hold Lender will receive the General Unsecured Claim Distribution based on the Allowed amount of its unsecured Claim as set by the Bankruptcy Court in a Final Order.

### (2) Other General Unsecured Creditors

The third category of holders of General Unsecured Claims consist of holders of Other General Unsecured Claims, which includes the Allowed Deficiency Claims of Make and Wait Lenders, KeyBank (other than in its capacity as a Make and Wait Lender), KeyCorp Trusts and Securitization Trusts. Such creditors will receive the General Unsecured Claim Distribution.

The fourth category of holders of General Unsecured Claims consist of Claims of trade creditors, parties to rejected executory contracts and other miscellaneous Creditors. Such creditors holding Allowed Claims will receive the General Unsecured Claim Distribution.

### (3) Distribution to General Unsecured Creditors

The General Unsecured Claim Distribution consists of a Pro Rata share of the beneficial interests in the Plan Trust. The Plan Trust will be funded with the Plan Trust Assets, as described in further detail below. The Plan Proponents expect that the General Unsecured Claim Distribution will result in a recovery of approximately 40% to 60% to holders of Allowed General Unsecured Claims. No holder of an Allowed General Unsecured Claim will be able to collect on its Claim other than from the Plan Trust, pursuant to the Plan.

### 4. Key Components of the Plan

The Plan, if accepted by the various classes (and subclasses) will resolve certain pending litigation against the Securitization Trusts as well as establish a methodology regarding the valuation of contingent guaranty claims. Below is a description of the Trust Adversary Proceeding and reasons why the settlement is in the best interest of the Debtor, its estate and its creditors. This section also describes the competing valuation methodologies, as well as the "Most Favored Nations" provision contained in the Plan.

#### a) *The Trust Adversary Proceeding*

On January 30, 2009, the Creditors' Committee, on behalf of itself and derivatively on behalf of the Debtor and the bankruptcy estate, commenced an adversary proceeding against the aforementioned 17 Trusts (Adversary No. 09-01040). The named defendants include the 17 Trusts, Wilmington Trust Company, as owner-trustee, U.S. Bank National Association, as indenture trustee, U.S. Bank National Association as custodian and First Marblehead Data Services, Inc., as Administrator. The Trusts Adversary Proceeding challenges the Trusts' asserted liens with respect to two broad categories of assets.

(1) Prepetition Defaulted Loans. One category encompasses the so-called "prepetition defaulted loans". These would be the defaulted loans purchased by TERI from the Trusts prior to the Commencement Date using money in the

Pledged Accounts and which TERI still owned as of the Commencement Date.[10]  The assets under this category include the defaulted loans themselves, the agreements evidencing the student loan borrowers' indebtedness, the money paid and to be paid by the borrowers on account of the loans and the proceeds from the resale of such loans back to the Trusts when they become "rehabilitated".  Money paid by the student loan borrowers and cash proceeds from the resale of such loans are referred to as "Recoveries" in the governing contract documents.  As of the Commencement Date, these prepetition defaulted loans (cumulatively for all of the Securitization Trusts) had an aggregate face value of approximately $322 million.  The Plan Proponents estimate that the present value of the prepetition defaulted loans (net of costs of collection) is $144 million.

(2)    <u>Postpetition Defaulted Loans</u>.    The second category encompasses the so-called "postpetition defaulted loans."  These are defaulted loans purchased by TERI from the Trusts postpetition using money in the Pledged Accounts pursuant to an order entered by the Court on June 23, 2008.  Similar to the prepetition defaulted loans, the postpetition defaulted loans include the loans themselves, the agreement evidencing the borrowers' indebtedness, and the so-called "Recoveries" (as defined in the governing contract documents).  As of the time the Trusts stopped selling defaulted loans to the Debtor (in or around January, 2009), the postpetition defaulted loans owned by TERI had an aggregate face value of approximately $230 million, with an estimated present value of $92 million.

*Nature of Underlying Dispute.*

(1)    <u>Position of the Creditors Committee</u>.    The Creditors' Committee contends that the Trusts have no valid lien on any of the assets in either the prepetition or postpetition category.    More specifically, the Creditors' Committee contends the applicable Deposit and Security Agreements expressly disclaim the grant of a security interest in the defaulted loans.  The Deposit and Security Agreements do

---

[10]    The issue of whether the loans were "purchased" by TERI or "transferred" to TERI may be a litigated issue in the Trust Adversary Proceeding.  Nothing in this Disclosure Statement shall affect the rights of the defendants to the Trust Adversary Proceeding to contest the Plan Proponents' assertion that TERI acquired title to defaulted loans sold or transferred to the Debtor or its agent as a result of such sale or transfer.

purport to grant the Trusts liens on the Recoveries. The Creditors' Committee contends, however, that the Trusts failed to properly perfect their liens due to the omission in the financing statements of reference to Recoveries before they are deposited in a Pledged Account. In addition, the Creditors' Committee contends that Recoveries are after-acquired property that are excluded from the Trusts' liens pursuant to Section 552(a) of the Bankruptcy Code. Because Recoveries are not "proceeds" of anything the Trusts had a security interest in as of the Commencement Date, the Creditors' Committee contends Recoveries do not fall within the Section 552(b) exception to the general exclusion of after-acquired property. Accordingly, even if the Trusts' purported security interests in Recoveries were properly perfected, the Recoveries are excluded as after-acquired property.

(2)    <u>Position of Trusts</u>. The Trusts contend that the defaulted loans are not property of the estate, that TERI does not own the defaulted loans but holds them "for collection purposes only." If TERI does own the defaulted loans, the Trusts contend that they have a security interest in the defaulted loans, or at least in the Recoveries, and that such interests have been duly perfected by filing financing statements. If there is a mistake in the description of the collateral in the financing statements, the Trusts contend such mistake is not fatal because the financing statements should not be read so literally as to exclude Recoveries not yet deposited in a Pledged Account. The Trusts also contend that they are perfected without the financing statements by the so-called "automatic perfection" rules of the Uniform Commercial Code, Art. 9-309(2). Further, the Trusts contend that Recoveries are proceeds of defaulted loans, or at least proceeds of "the right to receive Recoveries" which the Trusts contend they had a security interest in as of the Commencement Date. Therefore, at least with respect to the prepetition defaulted loans, the Trusts contend that the Recoveries fall within the Section 552(b) exception to the general rule of Section 552(a) excluding after-acquired property. The Trusts also contend that "post-petition loans were perfected pursuant to the Trust Order and that the Trusts have an administrative claim for violation of the Trusts Order."

23

*Status of Adversary Proceeding*.  The Trusts and other defendants filed motions to dismiss on certain procedural grounds and objected to the standing of the Creditors' Committee.  On September 29, 2009, a hearing was held to consider the Motions to Dismiss filed by the various defendants.  The Bankruptcy Court denied the Motions to Dismiss.  The issue on whether the Creditors' Committee has standing to bring the Adversary Proceeding was appealed to the Bankruptcy Appellate Panel by the Trusts and other defendants to the Trust Adversary Proceeding. The Bankruptcy Appellate Panel affirmed the Bankruptcy's Court's Order denying the Motions to Dismiss.  There has been no formal discovery or other formal briefing of the merits.  The Trusts and other defendants filed answers to the Trust Adversary Proceeding complaint on October 19, 2009.

*Valuation of Adversary Proceeding*.  The Plan Proponents have undertaken a valuation of the claims asserted in the Trusts Adversary Proceeding.  As noted above, the Plan Proponents estimate that the postpetition defaulted loans have a present value of $92 million and the prepetition defaulted loans have an estimated present value of $144 million.  If the Creditors' Committee were to prevail, $236 million would be added to the estate.  Pursuant to the Decoder, most of the Trusts are undersecured,  As a result, in the event the Trusts lost the Adversary Proceeding, there would be an increase in the Securitization Trusts' Deficiency Claims of an amount equal to the $236 million value.  Consequently, a substantial portion of the $236 million that might be won in the litigation, and other assets otherwise available to pay general unsecured claims, will be paid over to the Trusts in the form of a dividend on account of their increased general unsecured claims.  Viewing the Trusts in the aggregate, the "true" value of winning the litigation to the non-Trust general unsecured creditors, on behalf of whom the litigation is brought, is the amount by which the estate would be enhanced for the benefit of such creditors – that is – the additional present value dollars available to pay to non-Trust creditors on account of their general unsecured claims.  This value is estimated based upon the following assumptions: (i) all guaranty claims are determined according to the so-called Decoder and allowed trade claims do not exceed $40 million; (ii) the present value of cash proceeds available for distribution to general unsecured creditors (without regard to the Trusts' disputed Collateral) is approximately $88 million; and (iii) the defaulted loans at issue have the values ascribed above.  From these assumptions, the Plan Proponents have calculated that the present value to the Non-Securitization Trust General Unsecured Creditors of winning the dispute over the

24

postpetition defaulted loans is approximately $22 million, and the incremental present value of winning the prepetition defaulted loan dispute is approximately $20 million. Thus, the total present value of the Trusts Adversary Proceeding to the portion of the estate represented by the Non-Securitization Trust General Unsecured Creditors is approximately $42 million.

*Economics of the Securitization Trust Settlement*. If one assumes, among other things, a distribution of 50%, the Securitization Trust Settlement produces the economic equivalent of the estate winning the postpetition lien dispute and splitting 50/50 the prepetition lien dispute. More specifically, the estate retains (i) 100% of the postpetition defaulted loans and Recoveries thereon free and clear of the liens and other claims of the Trusts, plus (ii) the economic equivalent of half the value of winning the dispute over the prepetition defaulted loans, or $10 million (based on assumptions regarding value). The former is accomplished by a simple declaration of the ownership status of the defaulted loans purchased from such Trust since the Commencement Date (*i.e.*, the Plan Trust will own the postpetition defaulted loans and Recoveries in respect thereof free of the liens of the Trusts). The latter has been achieved by reducing the Allowed Deficiency Claims of each of the Securitization Trusts by 36.5% of the net present value of the prepetition defaulted loans applicable to such Trust. The prepetition defaulted loans will be returned to the Trusts free of the claims of TERI and the estate in exchange for reduction in the Allowed General Unsecured Claims of the Trusts. The "Securitization Trust Settlement Claim" is shown on Schedule B to the Plan.

*Position of the Debtor*. The Debtor believes the proposed Securitization Trust Settlement is fair and reasonable and in the best interest of its estate. The Debtor believes that Securitization Trusts should accept the settlement for several reasons, including that the Securitization Trust Settlement: (1) provides for the release to each Securitization Trust the Securitization Trust's Collateral Account (subject to transfer of certain amounts to the Plan Trustee from the Collateral Account for NCSLT 2007-3, NCSLT 2007-4, NCSLT 2001-CP1 and NCSLT 2002-CP1), (2) returns to the Securitization Trusts recoveries and the rights to recovery in respect of loans that defaulted and were purchased by or on behalf of the Debtor pre-petition, (3) provides the opportunity for each Securitization Trusts to use Recoveries from pre-petition defaulted loans to pay for future defaulted loans and (4) will save a significant amount in cost, expense and delay by avoiding having the Trust Adversary Proceeding decided on the

merits. Moreover, by accepting the Securitization Trust Settlement and, thereby the "Decoder" to determine the amount of such Securitization Trust's Claim, each Trust and the Debtor's estate will avoid substantial litigation cost and delay regarding the appropriate methodology that should be used to determine the guaranty claims of the Securitization Trusts. These costs include costs of the estate to prosecute the Trust Adversary Proceeding, since the costs of the estate's professionals including the Creditors' Committee professionals are borne by the estate.

b)    *Determination of Contingent Guaranty Claims*

Because most of the claims asserted against the Debtor are contingent obligations that are not easily valued or estimated, the Debtor and the Creditor's Committee have spent a considerable amount of time determining how to value the Debtor's Contingent Guaranty Claims. Rather than engaging in a lengthy and costly estimation process, the Plan Proponents have elected to use the "Decoder" as the basis for estimating Guaranty Claims. While the Debtor may not necessarily agree with the Claim amounts that result from the Decoder it is willing to use it to form the basis of a global compromise and settlement with its Creditors. As a result, the proposed settlement for the Make and Wait Lenders, Make and Hold Lenders, Securitization Trusts, KeyBank (other than in its capacity as a Make and Wait Lender) and KeyCorp Trusts use the "Decoder" to determine claims. However, pursuant to the terms of the Plan, if a Creditor does not accept the settlement, the Plan Trustee has the right to assert the Base Case methodology or such other methodology as the Plan Trustee deems appropriate. If the Debtor's Base Case were adopted, as a general matter, claims of Make and Wait Lenders, Make and Hold Lenders, Securitization Trusts, KeyBank (other than in its capacity as a Make and Wait Lender) and KeyCorp Trusts would be lower. The following is a description of the "Decoder" developed by the Creditors' Committee as well as the Debtor's Base Case.

(1)    The Decoder

In order to determine the claims of the Securitization Trusts, Make and Wait Lenders, KeyBank (other than in its capacity as a Make and Wait Lender), KeyCorp Trusts and Make & Hold Lenders (collectively the "Creditors"), a claims estimation methodology (the "Decoder") was developed by the Creditors' Committee. The Decoder was designed to take into account key aspects of the Creditors' student loan portfolios such as age, portfolio composition and actual default and recovery experience on the loans.

The Decoder uses the Commencement Date (or April 7, 2008) as the claims estimation date and adjusts for actual results through December 31, 2008. Claims are calculated using loan origination amounts and the anticipated repayment dates.

In order to refine the predicted defaults of the Creditors' portfolios, the portfolios are divided into a matrix of seventy three (73) composition categories within two (2) origination channels – School-Based-Channel ("SBC") loans and Direct-to-Consumer ("DTC") loans. Within each origination channel, the loans are divided into sub-groups of credit types such as Credit Worthy Co-signer ("CWC"), Credit Worthy Student ("CWS"), Credit Ready ("CR"), and

Pre-College student loans made to parents ("K-12"). The sub-groups are further subdivided into nine (9) credit tiers based on FICO scores.

Cumulative default rates ("CDR") are calculated for each of the 73 categories of loans within each origination channel. Vintage default reports, which show actual default experience by vintage, for each of the 73 categories of loans were analyzed and used as a basis for the CDRs calculated for each loan category. The CDRs were derived using a twelve year default timing curve, which is based upon the expected rate at which loans default over time. The default timing curve assumes that the maximum CDR is experienced by the twelfth (12) year of repayment for a student loan.

The Decoder provides for a net recovery rate on defaulted loans of 48%, which reflects both cash recoveries and rehab recoveries. These recoveries are assumed to be realized over ten (10) years commencing on the default date. Estimated annual recovery amounts for defaulted loans after the Claims Estimation Date are assumed over ten (10) years commencing on the first month in which there is an estimated default amount.

The Decoder provides for adjustments to the calculated claims. Adjustments include: contractual obligations for each lender; the cost of collections for each lender to collect recoveries on defaulted loans; and actual results through December 31, 2008. Based on the loan documentation for each lender, certain unpaid fees due to TERI ("Fees Receivable") will be used to offset the net present value of future defaults and recoveries. The following four (4) types of fees are considered: Fees due at Securitization; Basis Point Fees; Supplemental Fees and Origination Fees.

For the purposes of calculating the present value of future cash, a 5% discount rate ("Discount Rate") is used. For the purposes of calculating the annual interest income on segregated reserve balance, a 2.5% interest income rate ("Interest Income Rate") is used until the balance is depleted by defaults.

A memorandum describing the methodology of the Decoder in greater detail is attached as Exhibit B.

(2)    The Debtor's Base Case

The value of each lender's contingent claim based on the Debtor's guaranty depends in large part on the assumed default rate for student loans in the relevant portfolio and the timing of the defaults over the life of the portfolio. Given that it is impossible to know what will happen in the future, such default rates and timing curves can only be estimated based on historical information.

Historically, the Debtor has largely relied upon its database of private student loans to estimate future default rates. The Debtor's database includes records for over 2 million loans in excess of $20 billion which the Debtor has guaranteed. The database includes historical information dating back over 20 years. The database and historical experience related to default and recovery timing were the foundation for developing the "Base Case".

LIBC/3667825.11

The current economic environment provides a basis to argue for modifications to the default rate and timing assumptions used in the Debtor's estimation. However, no one can accurately determine the length of the current economic downturn, its impact on defaults for a particular FICO score or type of student loan originated, or where default rates will settle once the recession is over. Using historical data to determine default rates and timing of defaults is appropriate, especially since the Debtor's data takes into account previous economic recessions.

The methodology used to calculate the Debtor's Base Case relies upon historical experience. Each lender's portfolio was segmented by anticipated year in which payment on the loan commences ("repay year"), channel (school certified or direct to consumer), FICO[11] score ranges and credit type. Cash flows based on projected default and recovery rates are spread over a timing curve beginning in the anticipated repay year. Certain adjustments are made to account for fraud on deferred loans, which have the effect of bringing a small portion of defaults earlier in the life of the loan. The net cash flow for each period is calculated by taking the difference between default and recovery cash flows. These cash flows plus the interest on reserve balances, if applicable, are discounted to calculate a Net Present Value ("NPV").

The Debtor's Base Case methodology then captures actual experience through December 31, 2008 by factoring, if applicable, the reserve balance as of December 31, 2008 and the NPV of certain adjustments for: net fees receivable, liquidated claims through December 31, 2008, variance in recoveries projected vs. recoveries received through December 31, 2008 and actual defaults through December 31, 2008 including any recovery adjustments to account for the differences between projected and actual defaults. The Debtor believes this methodology offers the best combination of projecting claims based on historical data, historical trends and capturing actual performance through the latest year. Contingent claims across all classes were calculated using the same methodology.

c) *Most Favored Nations Provision*

The Plan contemplates the creation and establishment of a "most favored nations" provision in the event that the holder of a Make and Wait Claim, Make and Hold Claim, Securitization Trust Claim, KeyBank (other than in its capacity as a Make and Wait Lender), KeyCorp Trust or other Trust Claim elects to reject the Plan's proposed compromise and litigate the amount of its Claim (a "Litigating Creditor") and pursuant to a Final Order of the Bankruptcy Claim, such Litigating Creditor's Allowed Claim is determined to be at least 10% greater than the amount of such Litigating Creditor's Claim as determined pursuant to the Decoder.

In the event that a Litigating Creditor obtains an Order of the Bankruptcy Court allowing such Creditor's Deficiency Claim in an amount at least 10% greater than the amount of such Deficiency Claim as determined by the Decoder (and set forth on the applicable schedule of the Plan), the Plan Trustee will be obligated to re-calculate the amount the Guaranty Claims of the Make and Wait Lenders, KeyBank (other than in its capacity as a Make and Wait Lender, KeyCorp Trusts, Make and Hold Lenders (including Other Trusts) and each Securitization Trust

---

[11] FICO is a publicly-traded corporation that created the most widely used credit score model in the United States, The FICO score is calculated statistically with information from the consumer's credit files.

using the findings of the Bankruptcy Court regarding the proper calculation of such Claims (the "Revised Calculation"). Pursuant to the terms of the Plan, the Plan Trustee may seek further or other orders of the Bankruptcy Court as the Plan Trustee desires to facilitate the proper determination of the Revised Calculation with respect to any and all claims. To the extent that there are multiple evidentiary hearings to determine the amount of an Allowed Deficiency Claim, the Revised Calculation shall be completed using the Final Order of the Bankruptcy Court that would yield the greatest claim amounts.

However, notwithstanding anything contrary contained in the Plan, no Allowed Claim shall be reduced as a result of any Revised Calculation and the Plan Trustee will not implement any Revised Calculation without prior approval of the Bankruptcy Court following notice to all Creditors and an opportunity for Creditors to be heard.[12]

The Plan Proponents believe that the Most Favored Nations provision is the most fair mechanism by which to maintain proportionality among similarly situated creditors. Moreover, any Revised Calculation remains subject to Bankruptcy Court supervision to ensure that the manner in which the Revised Calculation is being imposed is fair to the general unsecured creditors, as a whole.

> d)    *Reorganized TERI*

On and after the Effective Date, Reorganized TERI will retain all rights, title, and interest in the Reorganized TERI Assets. The Plan Proponents believe that Reorganized TERI's retention of such assets will allow for the reorganization and successful emergence of the Debtor from chapter 11. Reorganized TERI will adopt Reorganized Articles of Incorporation and Reorganized By-laws that will be included in the Plan Supplement. In addition, the members of the Initial Board of Directors and the initial officers of Reorganized TERI will be disclosed in the Plan Supplement. On and after the Effective Date, Reorganized TERI shall remain a Massachusetts not-for-profit corporation.

> e)    *Reorganized TERI Assets.*

The Reorganized TERI Assets are: (a) the Retained Cash; (b) the Restricted Charitable Funds; (c) the Restricted Grant Funds; (d) the right to receive payment of the TERI Net Recovery; (e) the Retained Contracts; (f) Reorganized TERI's right under the Collection Contract; (g) the Remaining Plan Trust Assets, if any; (h) the Residuals; and (i) all furniture, fixtures, equipment, Data, and all other assets necessary to support Reorganized TERI's business, all as determined substantially consistently with the Pro Forma Statement of Reorganized TERI assets to be included in the Plan Supplement. The Plan Supplement will contain a Pro Forma statement of Reorganized TERI Assets.

---

[12]    Further, for the avoidance of doubt, only Claims of entities holding guaranty Claims would be recalculated.

LIBC/3667825.11

f)      *Retained Cash*

Reorganized TERI shall be permitted to retain $3,400,000 of Unrestricted Cash, subject to reduction as set forth in the Plan.

g)      *Restricted Charitable Funds*

Restricted Charitable Funds means Cash or other assets held by the Debtor pursuant to a charitable deed of gift, the use of which is restricted by applicable state law or other non-bankruptcy law to the furtherance of a specific purpose or purposes in accordance with the express or implied intent of the party that transferred or donated such assets to the Debtor. As described in Section II.A.4, the Debtor currently holds $14,000,000 in principal amount of Restricted Charitable Funds that its asserts can only be used for limited purposes. The restriction on these funds is more fully described below. As part of a compromise and settlement between the Creditors' Committee and the Debtor, the parties have agreed to a Restricted Charitable Gift Funds Carve-Out of $6,000,000. This Restricted Charitable Gift Funds Carve-Out will be transferred to the Plan Trustee on the Effective Date.

h)      *Restricted Grant Funds*

Restricted Grant Funds means Cash or other assets held by the Debtor pursuant to private or government grants, the use of which is restricted to specific activities by the terms of the grants. The Debtor holds such funds from time to time in an amount not more than approximately $1 million. The Plan Supplement will reflect the amount of Restricted Grant Funds held by the Debtor at the time of the filing of the Plan Supplement.

i)      *TERI Net Recovery*

Pursuant to the Plan, Reorganized TERI will enter into the Collection Contract with the Plan Trustee, pursuant to which Reorganized TERI will be entitled to collect the proceeds of certain TERI Owned Loans previously owned by the Debtor but which will be transferred to the Plan Trustee for the benefit of unsecured creditors. Reorganized TERI will be entitled to be paid a certain amount of such proceeds, calculated as follows for a period of two years beginning on the Effective Date:

(a)     For the first year of the Term, the first $1,000,000 of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets. For the first year of the Term, the TERI First Year Share will comprise 20% of each dollar of TERI Loan Net Proceeds in excess of $1 million, but the TERI First Year Share will not exceed $1,000,000. For purposes of illustration only, if TERI collects $6,000,000 in net collections in the first year of the TERM, then the First Year Eligible Collections shall equal $5,000,000, and the TERI Share in the first year of the TERM shall be $1,000,000 ($6m-$1m = $5m, 20% x $5m = $1m).

(b)     For the second year of the Term, the first $1,000,000 of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's

30

administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets.   For the Second Year of the Term, The TERI Second Year Share will comprise 20% of each dollar of TERI Loan Net Proceeds collected in excess of $1 million but the TERI Share will not exceed $1,000,000.  For purposes of illustration only, if TERI collects $6,000,000 in net collections in the second year of the Term, then the Second Year Eligible Collections shall equal $5,000,000, and the TERI Share in the second year of the TERM shall be $1,000,000 ($6m-$1m = $5m, 20% x $5m = $1m).

(c)     If, and only if, as of the end of the Term: (a) the Collection Contract has not been terminated for cause; (b) the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share is less than $2,000,000; (c) the sum of (i) the First Year Eligible Collections plus (ii) the Second Year Eligible Collections is at least $10,000,000; and (d) the Plan Trust has received $2,000,000 of TERI Loan Net Proceeds Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets during the Term, Reorganized TERI shall be entitled to the Additional Share.  The Additional Share is the amount by which $2,000,000 exceeds the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share.

j)     *Retained Contracts*

Retained Contracts consist of any executory contracts or unexpired leases entered into by the Debtor prior to the Commencement Date that are assumed by the Debtor pursuant to section 365 of the Bankruptcy Code, or that are not rejected by the Debtor pursuant to section 365 of the Bankruptcy Code and therefore "ride through," as well as any contracts entered into by the Debtor during the pendency of this Chapter 11 Case.  Retained Contracts will include, any retirement, pension and similar plans, and will be listed in the Plan Supplement.

k)     *Collection Contract*

As noted in section (i) above, the Plan Trustee shall enter into a Collection Contract with Reorganized TERI, pursuant to which contract Reorganized TERI will be entitled to collect TERI Loan Proceeds.  The form of the Collection Contract will be set forth in the Plan Supplement, and will include certain customary and reasonable fees payable to Reorganized TERI for its collection services.

l)     *Remaining Plan Trust Assets*

Reorganized TERI shall be entitled to payment of any Plan Trust Assets remaining in the Plan Trust in the event that the Plan Trustee has distributed Plan Trust Assets to the holders of Allowed General Unsecured Claims equal to 100% of the aggregate amount of all Allowed General Unsecured Claims, plus any statutory interest payable to the holders of Allowed General Unsecured Claims necessary to pay such Claims "in full."

m)      *The Residuals*

TERI owns approximately 25% of the equity interest in the "National Collegiate Student Loan Trusts". These equity interests are called "Residuals." The value of the Residuals is uncertain. Pursuant to the terms of the Plan, Reorganized TERI shall retain ownership of the Residuals but following the Effective Date, the Plan Trustee and TERI shall attempt in good faith to reach an agreement regarding the proper treatment of the Residuals, in a manner that will not impose obligations upon the Plan Trustee or the beneficiaries of the Plan Trust to recognize and/or pay taxes relating to Reorganized TERI's ownership of the Residuals. The Plan provides that nothing in the Plan shall obligate the Plan Trustee, the Plan Trust or the beneficiaries of the Plan Trust to assume any obligation or liability with respect to federal or state taxes in any way attributable or arising as a result of ownership of the Residual, or payable on account of income or accretion of value earned by, allocated to or attributable to the owner(s) of the Residual.

n)      *Other Assets*

Reorganized TERI will be entitled to retain all furniture, fixtures, equipment, Data, and all other assets necessary to support the Debtor's business. Such assets shall be detailed in the Plan Supplement.

The Debtor has prepared the Reorganized TERI Financial Statements, attached as Exhibit D, in support of its assertion that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Reorganized TERI. (See Section V.C.2 of the Disclosure Statement).

## B.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the debtor's legal and equitable interests in property as of the commencement of the chapter 11 case. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of Claims in accordance with the terms of the confirmed plan and discharges a debtor from its prepetition obligations.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a

kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

### C.    SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN

The Plan Proponents anticipate that various factors may influence the amounts of each Class of Claims. Based upon (1) a review of the Claims Register maintained by the Debtor's claims agent, (2) an estimate of guaranty claims using the Committee's Decoder, and (c) a review of the Debtor's books and records, the Plan Proponents estimate that total amounts related to Administrative and Priority Claims may range from approximately $4 to $6 million, Secured Claims may range from approximately $350 to $400 million, General Unsecured Claims may range from approximately $300 million to $375 million and Convenience Class Claims may range from approximately $25,000 to $150,000.

**THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN. THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS. THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES AND ARE THEREFORE SUBJECT TO CHANGE. THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THESE ESTIMATED AMOUNTS.**

| Class | Type of Claim | Treatment of Claim | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Cash | 100% |

LIBC/3667825.11

| 2a – 2p | Secured Claims of Make and Wait Lenders | Each holder of an Allowed Secured Claim, classified in separate subclasses within Class 2 (Classes 2a through 2p) will receive a transfer of the Collateral Account funds securing such Allowed Secured Claim, net of any Make and Wait Lender Decoder Equity.<br><br>(If the holder of an Allowed Make and Wait Claim is also entitled to a Deficiency Claim, such Deficiency Claim will be treated as a General Unsecured Claim).<br><br>The Allowed Secured Claim and Deficiency Claim of any Make and Wait Lender that accepts the Plan will be based on the amounts listed on <u>Schedule A</u> to the Plan.  Any Make and Wait Lender that rejects the Plan, will litigate the Allowance and amount of its Claim in Bankruptcy Court after the Effective Date. | 100% of Allowed Secured Claim |
| 3a – 3l | Secured Claims of Securitization Trusts<br><br>(other than NCSLT Master Trust, NCSLT 2007-3, NCSLT 2007-4, NCSLT 2001-CP1, NCSLT 2002-CP1) | If the Plan is confirmed and the Securitization Trust Settlement is approved, Securitization Trust Claims classified in separate subclasses within Class 3 (Classes 3a – 3l) will receive (1) a transfer of the Securitization Trust Collateral and (2) a Securitization Trust Settlement Claim (which will be treated as a General Unsecured Claim) which represents a reduced Deficiency Claim as part of the Securitization Trust Settlement. | 100% of Allowed Secured Claim |

LIBC/3667825.11

| 3m – 3q | Secured Claims of Securitization Trusts<br><br>NCSLT Master Trust<br>NCSLT 2007-3<br>NCSLT 2007-4<br>NCSLT 2001-CP1<br>NCSLT 2002-CP1 | If the Plan is confirmed and the Securitization Trust Settlement is approved, Securitization Trust Claims classified in separate subclasses within Class 3 (Classes 3m – 3q) will receive (1) a transfer of the Securitization Trust Collateral, except that NCSLT 2007-3 shall be required to remit $1,600,000 of the balance to the Plan Trustee, NCSLT 2007-4 shall be required to remit $700,000 of the balance to the Plan Trustee, NCSLT 2001-CP1 shall be required to remit $405, and NCSLT 2002-CP1 shall be required to remit $752,347 to the Plan Trustee and (2) the NCSLT Master Trust will receive a Securitization Trust Settlement Claim (which will be treated as a General Unsecured Claim), which represents a reduced Deficiency Claim as part of the Securitization Trust Settlement.<br><br>NCSLT 2007-3, NCSLT 2007-4, NCSLT 2001-CP1 and NCSLT 2002-CP1 shall have no Allowed General Unsecured Claim. | 100% of Allowed Secured Claim |
| --- | --- | --- | --- |
| 4a-k | Secured Claims of KeyBank (other than in its capacity as a Make and Wait Lender) and Key Corp Student Loan Trusts | Each holder of an Allowed Key Corp Trust Claim and KeyBank (other than in its capacity as Make and Wait Lender), classified in separate subclasses within Class 4 (Classes 4a through 4k) will receive their allocable portion of the Victory Fund Account as of the Commencement Date securing such Allowed Secured Claim.<br><br>(Each holder of an Allowed Key Corp Trust and KeyBank (other than in its capacity as a Make and Wait Lender) will also be entitled to a Deficiency Claim, which Deficiency Claim will be treated as a General Unsecured Claim).<br><br>The Allowed Secured Claim (i.e., allocable portion of the Victory Fund Account as of the Commencement Date) and Deficiency Claim of any KeyCorp Trust that accepts the Plan or of KeyBank (other than in its capacity as a Make and Wait Lender), if it accepts the Plan, will be based on the amounts listed on <u>Schedule C</u> to the Plan.  Any KeyCorp Trust that rejects the Plan, or KeyBank (other than in its capacity as a Make and Wait Lender), if it rejects the Plan, will litigate the Allowance and amount of its Claim | 100% Allowed Secured Claim |

35

| | | in the Bankruptcy Court after the Effective Date. | |
|---|---|---|---|
| 5 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim will receive the General Unsecured Claim Distribution. The amount of the General Unsecured Claim of a Make and Hold Lender that accepts the Plan will be based on the settlement amount listed on Schedule D to the Plan.  Any Make an Hold Lender that rejects the Plan will litigate the Allowance and amount of its Claim in the Bankruptcy Court after the entry of the Confirmation Order. Includes:  (i) Make and Hold Lender's Claims, (ii) Other General Unsecured Creditors and Deficiency Claims. | 40% to 60% (estimate only) |
| 6 | Convenience Claims | Paid in full in Cash | 100% |

## D.    PURPOSE, LIMITATIONS, AND STRUCTURE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the holders of Claims against the Debtor with adequate information to make an informed decision as to whether to accept or reject the Plan.  This Disclosure Statement may not be relied upon for any other purpose, and nothing contained in this Disclosure Statement shall constitute an admission of any fact or liability by any party, or be admissible in any other case or any bankruptcy or non-bankruptcy proceeding involving the Debtor or any other party, or be deemed conclusive advice on the tax or other legal effects of the Plan.

On _____, 2010, after notice and a hearing, the Bankruptcy Court issued an order (the "Approval Order") approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtor's Creditors to make an informed judgment whether to accept or reject the Plan.

LIBC/3667825.11

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A
DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS
OF THE PLAN.

The statements contained in this Disclosure Statement generally are made as of the date
hereof, unless another time is specified, and delivery of this Disclosure Statement after that date
does not mean that the information set forth in this Disclosure Statement remains unchanged
since the date of this Disclosure Statement or the date of the materials relied upon in preparation
of this Disclosure Statement. The Plan Proponents have prepared the information contained in
this Disclosure Statement in good faith, based upon the information available to them. No audit
of the financial information contained in this Disclosure Statement has been conducted.
Moreover, certain of the statements contained in this Disclosure Statement, by their nature, are
forward-looking and contain estimates, assumptions and projections, and there can be no
assurance that these forward-looking statements will turn out to be true.

The description of the Plan contained in this Disclosure Statement is intended as a
summary only and is qualified in its entirety by reference to the Plan itself. If any inconsistency
exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The
Plan is a legally binding arrangement and should be read in its entirety. No one should rely on a
summary of the Plan in determining whether to accept or reject the Plan. Each holder of an
Impaired Claim or entity permitted to vote to accept or reject the Plan should read, consider and
carefully analyze the terms and provisions of the Plan as well as the information contained in this
Disclosure Statement and the other documents provided herewith.

The Disclosure Statement describes:

- background information on the Debtor, its prepetition business and finances, and the
  events leading to its Chapter 11 Case (Section II);

- significant developments during this case (Section III);

- the proposed Plan (Section IV);

- the procedures and requirements for confirming the Plan (Section V);

- certain federal income tax consequences of the Plan (Section VI);

- certain risk factors to consider before voting on the Plan (Section VII); and

- the Plan Proponents' recommendation that holders of Impaired Claims vote to accept
  the Plan (Section VIII).

In addition, attached as Exhibits A through C to this Disclosure Statement are copies of
the following documents:

| | |
|---|---|
| Exhibit A | Plan |
| Exhibit B | Decoder |
| Exhibit C | Best Interest Test |

37

Exhibit D    Reorganized TERI Financial Statements

All of the exhibits listed should be attached to this Disclosure Statement and should have been served on you with this Disclosure Statement. In addition, there are certain documents and other materials identified in this Disclosure Statement and/or the Plan that are not attached to the Disclosure Statement or the Plan. These documents or other materials will be contained in the Plan Supplement. The Plan Supplement will be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the deadline to vote to accept or reject the Plan. The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. If any of the exhibits identified above were not attached to the Disclosure Statement served on you, or if you want to obtain a copy of the Plan Supplement, once filed, you may do so by reviewing the website of the Debtor's claims agent (http://chapter11.epiqsystems.com) or by sending a written request to the Plan Proponents at the following addresses:

> Goodwin Procter LLP
> Exchange Place
> 53 State Street
> Boston, MA 02109
> (617) 570-1000
> Attorneys for the Debtor and
> Debtor in Possession
> Attn:   Daniel M. Glosband, Esq.
>         Gina Lynn Martin, Esq.
>
> Duane Morris LLP
> 470 Atlantic Avenue
> Boston, MA  02110
> (857) 488-4216
> Attorneys to the Creditors' Committee
> Attn:   Jeffrey D. Sternklar

Furthermore, if you have any questions about the packet of materials that you have received, you may contact the attorneys listed above by mail or by phone.

## E.    VOTING ON THE PLAN

### 1.    Classes Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests that are members of a class that is (a) impaired under section 1124 of the Bankruptcy Code (an "Impaired Class") and (b) not deemed to have rejected a plan under section 1126(g) of the Bankruptcy Code, are entitled to vote to accept or reject a plan. Classes of claims or equity interests that are unimpaired under section 1124 of the Bankruptcy Code are deemed to have accepted the plan and are not entitled to vote. Classes of claims or equity interests in which the holders of claims or equity interests will receive no recovery under a plan are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the plan.

38

Under the Plan, for purposes of Bankruptcy Code sections 1122 (classification), 1123 (treatment of classes), 1126 (acceptance of a plan), and 1129 (confirmation) Classes 2a–2p are treated as separate Classes, Classes 3a – 3q are treated as separate Classes, Classes 4a-4k are treated as separate Classes, while Class 5 and Class 6 are a single Class. Classes 2a-2p, Class 3a-3q, Classes 4a-4k and Class 5 are each Impaired and, to the extent Claims in those Classes are Allowed, the holders of those Claims will receive distributions under the Plan. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan. In contrast, Classes 1 and 6 of the Plan are unimpaired. Consequently, holders of Claims in those Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

The Bankruptcy Court has entered the Order (A) Temporarily Allowing Claims, (B) Establishing Solicitation and Voting Procedures and (C) Approving forms of notices and ballots (the "Solicitation Procedures Order"). Pursuant to the Solicitation Procedures Order, [●], 2010 has been set as the Voting Record Date. That means any entity entitled to vote to accept or reject the Plan must have held a Claim against the Debtor or held a note issued by a Securitization Trust or KeyCorp Trust as of such date. A Ballot which may be used to vote for the acceptance or rejection of the Plan has been sent to all entities that are entitled to vote to accept or reject the Plan with this Disclosure Statement.

If you are a holder of a Claim entitled to vote or believe you have a right to vote on the Plan pursuant to the Solicitation Procedures Order and you did not receive a Ballot with this Disclosure Statement, you received a damaged Ballot or lost your Ballot, or you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact Epiq Bankruptcy Solutions, LLC at (646) 282-2500.

### 2. Voting Instructions

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement. Please refer to the Solicitation Procedure Order, which is enclosed with this Disclosure Statement if you are entitled to vote, for more specific instructions on voting on the Plan.

The Debtor, with the approval of the Bankruptcy Court, has engaged Epiq Bankruptcy Solutions, LLC as the Voting Agent to assist in the solicitation process. The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process. The Voting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file a report on such tabulation (the "Voting Report") as soon as practicable before the Confirmation Hearing.

BALLOTS RECEIVED BY FACSIMILE, E-MAIL OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED.

TO BE COUNTED, YOUR BALLOT (OR A MASTER BALLOT) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN 4:30 P.M., PREVAILING EASTERN TIME, ON _____, 2010 (the "VOTING DEADLINE").

LIBC/3667825.11

EACH HOLDER OF A CLAIM MUST VOTE ALL OF THEIR CLAIMS WITHIN A PARTICULAR PLAN CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT THEIR VOTES. BY SIGNING AND RETURNING A BALLOT, EACH ENTITY ENTITLED TO VOTE ON THE PLAN WILL CERTIFY TO THE BANKRUPTCY COURT AND THE PLAN PROPONENTS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

By signing and returning a Ballot, each entity to vote under the Plan will be certifying to the Bankruptcy Court and the Plan Proponents that, among other things,

- the holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the holder has cast the same vote with respect to all Claims in a single Class; and

- no other Ballots with respect to the amount of the Claims have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are thereby revoked.

### 3.    Tabulation of Votes

To ensure that a vote is counted, each entity entitled to vote pursuant to the Solicitation Procedures Order should: (a) complete a Ballot; (b) indicate the holder's decision either to accept or reject the Plan in the boxes provided in the Ballot; and (c) sign and timely return the Ballot to the address set forth above by the Voting Deadline.

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim.

Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Voting Agent actually receives the original executed Ballot. Delivery of a Ballot to the Voting Agent by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to the Debtor, the Debtor's agents (other than the Voting Agent), or the Debtor's financial or legal advisors. The Bankruptcy Code requires the Debtor to disseminate additional solicitation materials if the Debtor makes material changes to the terms of the Plan or if the Debtor waives a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Holders must vote all of their Claims within a particular Plan Class either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the Debtor may, in its

discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Neither the Plan Proponents nor any other Person will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

The Plan Proponents will file the Voting Report with the Bankruptcy Court as soon as practicable after the Voting Deadline. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions above or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or damaged. The Voting Report also shall indicate the Plan Proponents intentions with regard to such Irregular Ballots.

## F.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

### 1.    Confirmation Hearing Date

The Confirmation Hearing will commence on _____, 2010 at _____ prevailing Eastern Time, before the Honorable Henry J. Boroff, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Massachusetts, ___ Floor, Courtroom __, **[ADDRESS]**. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on all Persons who have requested notice in this Chapter 11 Case, and the Persons who have filed objections to the Plan ("Plan Objections"), without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.

### 2.    Plan Objection Deadline

The Plan Objection Deadline is _____, 2010, at _____ prevailing Eastern Time. All Plan Objections must be filed with the Bankruptcy Court and served on the Plan Proponents and certain other parties in accordance with the Approval Order on or before the Plan Objection Deadline. Plan Objections or requests for modification of the Plan, if any must:

- be in writing;

- conform to the Bankruptcy Rules and the Local Bankruptcy Rules;

- state the name and address of the objecting Person and the amount and nature of the Claim of such Person;

- state with particularity the basis and nature of the Plan Objection and, if practicable, a proposed modification of the Plan that would resolve such Plan Objection; and

- be filed, contemporaneously with proof of service, with the Bankruptcy Court and served so that it is **actually received** by the Plan Proponents on or prior to Plan Objection Deadline.

The Plan Proponents believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Plan Proponents, and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

## II.    BACKGROUND TO THIS CHAPTER 11 CASE

### A.    THE DEBTOR'S BUSINESS

Founded in 1985, The Education Resources Institute, Inc. is a nonprofit organization incorporated under Massachusetts General Laws, chapter 180, located in Boston, Massachusetts. TERI promotes access to education for students of all ages and incomes with two primary programs. Through its College Access programs, TERI assists low-income, first-generation-to-college and other underserved students in pursuing higher education. TERI is a nationally recognized leader in college access through support and promotion of research-based policies and practices. Locally it provides innovative direct service programs in Massachusetts. Through its loan guarantee programs, TERI has guaranteed more than two million private student loans.

### 1.    College Access Programs

Through a variety of programs and partnerships, TERI works primarily with Boston and Brockton low-income students and adult learners, as well as those who are first in their families to plan to attend college. TERI's delivery model includes multiple middle and high school-based programs and a variety of outreach services.

TERI's school-based programs provide college awareness activities and postsecondary planning assistance for young people from low-income backgrounds in Boston and Brockton public schools. TERI school-based Education Advisors and Coach Mentors organize and lead various activities to increase students' awareness of the importance of postsecondary education in today's economy, the types of postsecondary opportunities available, the steps involved in preparing and applying for college, and financial aid awareness. They also provide one-on-one assistance with the college application and financial aid processes.

TERI's principal College Planning Center is located at the main Boston Public Library in Copley Square, Boston. Satellite Centers are located at four Boston library branches, four

Greater Boston community sites and one community site in Brockton. At the College Planning Centers, Education Advisors provide free, individual advice and resources to make planning and paying for college a less intimidating process for students, families and adults.

### 2.    Student Loan Guarantees

Since 1985, TERI has guaranteed over two million loans totaling more than $20 billion. Prior to its Chapter 11 Case, TERI had never defaulted on any guaranteed student loan obligations. TERI's guarantees obligate it to purchase defaulted loans from lenders or securitization trusts. The funds used for loan purchases come from segregated reserve accounts (the Pledged Accounts or Joint Pool Account) or from its general reserves. Prior to 2001, TERI worked directly with banks to process and guarantee private education loans that were originated by the banks as lenders. After a loan application was processed by TERI and the loan was originated by a bank, TERI would receive an origination fee for its services in assisting in the origination of the loan and a loan guarantee fee. Certain of the banks required TERI to segregate a portion of the guarantee fees in an account in the event that the student loan defaulted. TERI was required to purchase the defaulted loan on account of its guarantee and applied such segregated funds to the extent available. Certain other bank lenders did not require that TERI segregate these funds. Guarantee fees for loans made by those banks that did not require segregation were deposited in the Debtor's general operating account.

In the late 1990's, TERI experienced financial difficulties and explored strategic transactions that would strengthen its financial position and enable it to continue to provide loan guarantees and college access services. After evaluating alternatives, the Board of Directors of TERI approved a series of transactions with FMC and certain affiliates of FMC.

In 2001, FMC purchased the loan processing operations of TERI and entered into a series of agreements with TERI to undertake risk management, administrative and support functions as well as origination services and future securitizations of TERI-guaranteed loans. In accordance with the agreements, FMC acted as TERI's exclusive agent in designing loan programs and processing private education loans for various bank lenders throughout the United States. FMC's costs for the origination and other services it provided were reimbursed by TERI to FMC at cost. Although TERI received a loan origination fee in connection with the loans, it was obligated to reimburse FMC for the cost of the services FMC provided relating to loan origination. At the time of rejection of the FMC Contracts, the cost of the origination services exceeds the fees received. Prior to the fall of 2007, TERI was able to cover the shortfall from post-origination revenues, especially those arising from the securitization of loans by FMC.

Generally, FMC structured and administered the securitization of the student loans into Securitization Trusts that were special purpose entities created to hold a pool of student loans. The Securitization Trusts issued bonds collateralized by the student loans. The student loans were then serviced by another entity, such as PHEAA d/b/a American Education Services or Great Lakes Higher Education Corporation. Since 2001, FMC structured and administered approximately 20 securitizations of pooled student loans, where a majority of the underlying loans were guaranteed by TERI.

43

In connection with the structuring and administration of the securitization transactions by FMC, to secure its guaranty obligations TERI transferred a certain percentage of the fees received in respect of TERI Guaranteed Loans to a segregated Pledged Account that is subject to a deposit and security agreement or similar agreement for the benefit of the Securitization Trust. The amounts that TERI deposits into segregated Pledged Accounts were initially calculated to exceed the estimated amounts of defaulted loans, net of recoveries.

### 3.    Employees

TERI has 63 employees; of these, 37 (30 full-time and 7 part-time) work in College Access. The College Access Committee of the Board has four members and was established in 2003 to focus specifically on and support TERI's college access work. TERI's Local College Access Programs division also has a College Access Advisory Committee, established in 1987, which has 14 members and meets three times a year. The College Access Advisory Committee members represent institutions of higher education, community-based organizations, Boston Public Schools and other organizations that support college access work.

Each member of TERI's senior management has twenty or more years' experience working at some of the largest financial institutions in the country, including Bank of America, Capital One and Nellie Mae. TERI's Board of Directors includes past presidents of large banks as well as a former chancellor and president of a prominent university.

Alan Blair, the Debtor's Director of Collections, has over eight years experience managing the collection of recoveries of defaulted student loans, including four years at FMC as Senior Vice President and 2 years at TERI. He also supervised collections of a hospital for two years.

### 4.    Charitable Gifts and Other Restricted Funds

The Debtor holds three charitable gifts. Each of the three gifts is subject to restrictions on the use of both gift corpus and income. Due to these restrictions, the Debtor believes that none of the gifts are available to satisfy creditor claims in the Debtor's Chapter 11 Case. However, the Creditors' Committee disputes this assertion. Reorganized TERI shall retain the gifts (subject to the Restricted Charitable Gift Carve-Out in compromise of this dispute) pursuant to the terms of the Plan. The three charitable gifts are:

1.    A Deed of Gift dated September 30, 1986 in favor of TERI from Massachusetts Higher Education Assistance Corporation ("MHEAC") of $1,000,000 to create a fund for state wide education counseling services (the "Counseling Gift").

2.    A Deed of Gift dated September 30, 1986 in favor of TERI from MHEAC of $1,000,000 to create a fund for a higher education information center (the "HEIC Gift," and together with the Counseling Gift, the "Small Gifts")

3.    A Deed of Gift dated September 30, 1986 in favor of TERI from MHEAC of $12,000,000 to create a fund for furthering higher education through improvements in the administration of and access to financial aid, as amended by the Further Stipulation to the Deed

44

of Gift dated October 8, 1986 and the Further Stipulation to the Deed of Gift dated December 16, 1986 (the "Financial Aid Gift," and together with the Small Gifts the "Gifts" and each individually a "Gift").

## Financial Aid Gift

On September 30, 1986, TERI and MHEAC agreed to the terms of the Financial Aid Gift by executing a Deed of Gift (the "Financial Aid Deed of Gift"). Pursuant to Section 1 of the Financial Aid Deed of Gift, TERI agreed that it "will not use or apply the [f]und for any purpose other than the furtherance of higher education." TERI also agreed in the Further Stipulation to the Deed of Gift dated October 8, 1986 (the "First Further Stipulation") that:

> "[t]he [f]und shall be used for the purpose of furthering higher education, including without limitation averting loan defaults, promoting awareness of education loan and financing opportunities, professional improvement of financial aid administrators, using technology to streamline loan processing, and assisting educational, or other public service institutions to provide educational training or other developmental programs."

Pursuant to the Further Stipulation to the Deed of Gift dated December 16, 1986 (the "Second Further Stipulation" and together with the First Further Stipulation the "Further Stipulations"), the second section of the Second Further Stipulation provides that the TERI Board will have final approval of all disbursements made from the Gift. The two stipulations are consistent in requiring that TERI comply with the use restrictions in order to use the Financial Aid Gift. Indeed, the description of the restrictions on use is identical in each of the Further Stipulations.

## Counseling Gift

On September 30, 1986, TERI and MHEAC agreed to the terms of the Counseling Gift by executing a Deed of Gift (the "Counseling Deed of Gift"). Pursuant to Section 1 of the Counseling Deed of Gift, TERI agreed that it "will not use or apply the [f]und for any purpose other than the furtherance of higher education." The Counseling Deed of Gift described the Counseling Gift in Section 2 of the Counseling Deed of Gift as:

> "[o]ne million dollars for counseling concerning financial aid and education loan programs to other metropolitan areas or sections of the state of Massachusetts to such centers as may attract corporate, philanthropic or public support on a dollar for dollar matching basis, according to guidelines adopted by the TERI board."

45

**HEIC Gift**

On September 30, 1986, TERI and MHEAC agreed to the terms of the HEIC Gift by executing a Deed of Gift (the "HEIC Deed of Gift"). Pursuant to Section 1 of the HEIC Deed of Gift, TERI agreed that it "will not use or apply the [f]und for any purpose other than the furtherance of higher education." The HEIC Deed of Gift described the HEIC Gift in Section 2 of the HEIC Deed of Gift as:

> "[o]ne million dollars for the Higher Education Information Center for counseling concerning financial aid and education loan programs in the Boston area, to match, on a dollar for dollar basis, those contributions made by colleges and universities each year."

Section 2 of the HEIC Deed of Gift also requires that the interest income from the HEIC Gift be used to support the Higher Education Information Center. Pursuant to Section 4 of the HEIC Deed of Gift, TERI shall maintain the HEIC Gift in a segregated fund on its books and TERI will maintain a fidelity bond with respect to the HEIC Gift. If the Higher Education Information Center is not in existence or does not operate in furtherance of higher education, then the HEIC Gift shall be used for "the furtherance of higher education, or those who aspire to higher education" in accordance with Section 1 of the HEIC Deed of Gift.

The Debtor has not spent the principal of any of the Gifts. The Debtor maintains the HEIC Gift and Counseling Gift in a segregated account in accordance with the terms of each Deed of Gift. Further, while the Financial Aid Gift was not segregated, a review of the Debtor's books and records reveals that the Debtor has not spent the principal of any of the Gifts.

The Debtor believes that pursuant to Massachusetts states law (which determines the Debtor's property rights pursuant to Section 541 of the Bankruptcy Code) and applicable case law, the Restricted Charitable Funds are not available to satisfy creditor claims but rather, pursuant to the terms of their conveyance, must be used for the charitable purpose for which such gift was intended.

The Creditors Committee disagrees with the conclusion reached by the Debtor regarding the Gifts. The Creditors' Committee believes that some portion of the Financial Aid Gift is available for all of the Debtor's creditors. Pursuant to the terms of the Plan, the Debtor and Creditors' Committee have agreed to resolve their dispute regarding the Financial Aid Gift by creating a carve-out. Thus, if the Plan is confirmed and becomes effective, the Debtor will receive the HEIC Gift, the Counseling Gift and the Financial Aid Gift less $6,000,000.

The HEIC Gift and the Counseling Gift will remain in segregated accounts and be used according to their restrictions solely for purposes of furthering higher education. The Financial Aid Gift will be administered in accordance with the Deed of Gift dated September 30, 1996 and Further Stipulations dated October 8, 1986 and December 16, 1986 and its uses will be restricted to purposes of furthering higher education. TERI's Board of Directors has confirmed, and Reorganized TERI's board of directors will confirm, that from and after the Effective Date, the Financial Aid Gift (less the $6,000,000 retained by the Plan Trust), will be used only as permitted by the Deed of Gift and Further Stipulations for paying the costs of, and general

46

overhead expenses reasonably attributable to, Reorganized TERI's "College Access" outreach programs. The Financial Aid Gift retained by Reorganized TERI will not be used in connection with its portfolio management or collection management services.

## B.    SUMMARY OF SIGNIFICANT PREPETITION LIABILITIES

### 1.    Guaranty Obligations

The primary source of TERI's prepetition liabilities involve TERI's activities as a guarantor of student loans. As of the Commencement Date, TERI owed guaranty obligations to: (a) Securitization Trusts; (b) Make and Wait Lenders, which own student loans that were to be sold to and securitized by FMC, but which instead have been retained by the Make and Wait Lenders due to the inability of FMC to purchase and securitize such loans; (c) KeyCorp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) and (d) Make and Hold Lenders, which own student loans and which intended that the loans would be carried on their own balance sheets. The Securitization Trusts, KeyCorp Trusts, KeyBank (other than in its capacity as Make and Wait Lender) and Make and Wait Lenders are secured by Pledged Accounts. Certain of the Make and Wait Lenders have a Joint Pool Account rather than an account in their own name, in which such Make and Wait Lenders have a *pari passu* security interest in the Joint Pool Account.

TERI's obligation to purchase any student loan is contingent upon, among other things, the occurrence of a default by the borrower of such student loan. As of the Commencement Date, the principal amount of TERI Guaranteed Loans was approximately $12 billion. However, because not all of the borrowers of TERI Guaranteed Loans will default on their obligations, the actual amount of TERI's liability to student loan lenders, Securitization Trusts or KeyCorp Trusts must be estimated using, among other factors, forecasts of future default rates. In determining the appropriate estimation model, the Debtor developed the Base Case, and various "Stress Cases" (which hypothesize a greater occurrence of defaults) and the Creditor's Committee developed its Decoder. Although the Debtor believes its Base Case accurately predicts the amount of such lenders' claims it has agreed to use the Decoder as a compromise and settlement. The Debtor believes that the settlement amounts offered reflect projected default rates that are higher than default rates that will actually occur, and thus overstate the amount of the Allowed Claim owed to Creditors.

### 2.    The Debtor's Pension Plan

The Debtor maintains a defined benefit pension plan (the "Pension Plan") for its employees. The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1301 et seq. An employee begins to participate in the Pension Plan on the January 1 or July 1 coincident with or next following the first date that he has both (i) attained age 21 and (ii) completed at least one year of service (as defined in the Pension Plan). The Pension Plan provides benefits to vested participants calculated under formulae in the plan which take into account the participant's credited service, compensation over specified periods, age at benefit commencement, and form of payment. A participant becomes vested in his Pension Plan benefit upon completion of five years of service

or employment at or after normal retirement age (age 65). In certain cases, the Pension Plan provides benefits to a participant's beneficiary upon the participant's death.

TERI has adopted an amendment to the Pension Plan to "freeze" the Pension Plan, effective December 31, 2009. This means that after December 31, 2009, no additional employees will be permitted to join the Pension Plan and no Pension Plan participants will accrue additional benefits. After the Plan becomes Effective, Reorganized TERI will continue to contribute to the Pension Plan consistent with federal law to fund the benefits that accrued prior to the freeze.

Reorganized TERI will remain obligated to contribute to the Pension Plan the amount necessary to satisfy ERISA's minimum funding standards, ERISA § 302; Internal Revenue Code § 412. The Pension Plan may be terminated only if the statutory requirements of either ERISA § 4041, 29 U.S.C. § 1341, or ERISA § 4042, 29 U.S.C. § 1342, are met. If the Pension Plan terminates Reorganized TERI and all members of its controlled group will be jointly and severally liable for the unpaid minimum funding contributions, premiums, and unfunded benefit liabilities of the Pension Plan. See 29 U.S.C. § 1362(a).

The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. PBGC has filed in the bankruptcy proceedings estimated claims for unfunded benefit liabilities, contingent on plan termination, and claims for unpaid minimum funding contributions and premiums. PBGC asserts administrative priority for certain amounts of its claims under 11 U.S.C. §§ 507(a)(2), 507(a)(5) and 507(a)(8). No determination in respect of PBGC's claims has been made in TERI's Chapter 11 Case and TERI expects that, given its decisions not to terminate the Pension Plan (and to freeze the Pension Plan instead) and to satisfy the minimum funding standards, the PBGC's claims will, ultimately, be withdrawn in TERI's Chapter 11 Case.

Nothing in this Plan of Reorganization will release or discharge any fiduciary of the Pension Plan, within the meaning of 29 U.S.C. § 1002(21), from any liability arising as a result of such fiduciary's breach of fiduciary duty under ERISA with respect to the Pension Plan.

Confirmation of the Plan shall operate as a judicial determination, binding on all Entities, that neither the Plan Trustee nor any Creditor that is not an insider of the Debtor (i) is a member of the controlled group of Reorganized TERI or the Debtor for any purpose, and (ii) shall incur any liability whatsoever to any Entity (including, without limitation, to the United States of America, any of its administrative agencies or political subdivisions, the United States Internal Revenue Service or the United States Pension Benefit Guaranty Administration) on account of or related to the Pension Plan.

3.    **FMC Contracts**

The Debtor had significant contractual obligations with FMC. These are discussed in Section III.B.1. below.

48

## C.    EVENTS LEADING TO THIS CHAPTER 11 CASE

As stated previously, FMC acted as TERI's exclusive loan processing agent.  TERI received the bulk of its guarantee fees at the time of origination and received subsequent payments at the time the loans were securitized.  In late 2007, the turmoil in the financial markets began and demand for bonds backed by student loans evaporated.  FMC has not been able to arrange a securitization since late 2007.  As a result, TERI experienced a significant decline in revenues just as the slowing economy led to an increase in the default rate of student loans.  Thus, TERI's revenues declined and its obligations to purchase loans increased.

In response to the reduction in revenues, the Debtor reduced its operating budget for 2008 by 20%.  Although the Debtor was able to accomplish this reduction without terminating any employees, immediately prior to the Commencement Date, it made further reductions by terminating 25 employees, representing 22% of its staff.

On March 26, 2008, Moody's Investors Service downgraded TERI's issuer rating, citing concerns about TERI's asset quality, liquidity position and adequacy of capital and reserves.  As a result of the downgrade by Moody's, a bank made a demand, pursuant to its guaranty agreement with TERI, that TERI establish a segregated reserve to support TERI's guarantees to that lender.  Establishment of such a reserve would have had a negative effect on TERI's cash position and liquidity, possibly to the detriment of other parties in interest.  TERI believed that the filing of the Chapter 11 Case enabled it to avoid a liquidity crunch that, without the protections afforded by Chapter 11, may have resulted in TERI's demise.  The Chapter 11 Case also has provided TERI with the breathing room it needs to develop a long-term business plan so that it can continue its College Access Programs and pursue other related activities to fund its College Access pursuits.

## III.    THE CHAPTER 11 CASE

### A.    FILING AND FIRST DAY ORDERS

On the Commencement Date, the Debtor filed its petition under chapter 11 of the Bankruptcy Code. The Debtor has continued to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

#### 1.    Certain First Day Orders

Early in this case, the Court entered a number of orders requested by the Debtor that were designed to minimize disruption to the Debtor's business operations as a result of the chapter 11 filing.  Among other things, these orders authorized the Debtor (a) to maintain its existing bank accounts, cash management systems, and use of existing checks and business forms and (b) to pay prepetition wages, payroll taxes, employee benefits and related expenses.

The Court also entered orders intended to facilitate the administration of this case. Among other things, these orders (a) authorized specific case management procedures; (b) extended the time for the Debtor to file schedules and statements of financial affairs; and (c) established procedures for compensation and reimbursement of professionals.

LIBC/3667825.11

### 2.    Retention of Debtor's Professionals

To assist the Debtor in carrying out its duties as a debtor-in-possession and to otherwise represent the Debtor's interests in the Chapter 11 Cases, the Bankruptcy Court authorized the Debtor to retain and employ the following advisors: (a) Epiq Bankruptcy Solutions, LLC, as claims, noticing, and balloting agent to the Debtor; (b) Grant Thornton LLP, as financial advisor to the Debtor; (c) Goodwin Procter LLP, as counsel to the Debtor; and (d) Craig and Macauley PC, as special conflicts counsel to the Debtor. The Bankruptcy Court also entered an order approving certain procedures for the interim compensation and reimbursement of professionals and Creditors' Committee members in the Chapter 11 Case.

### 3.    The Creditors' Committee

On April 30, 2008, the United States Trustee appointed a five-member Creditors' Committee to represent the interests of unsecured creditors of the Debtor pursuant to section 1102 of the Bankruptcy Code. The original members of the Creditors' Committee included the following: (a) Bank of America, One Federal Street, 5th Floor, Boston, MA 02110; (b) U.S. Bank, 800 Boylston Street, Boston, MA 02199-8004; (c) M & T Bank, One M & T Plaza, Buffalo, NY 14203; (d) Nellie Mae, 1250 Hancock Street, Suite 205 N, Quincy, MA 02169-4331; (e) Wachovia Securities, Wachovia Capital Markets, LLC, 301 South College Street, NC0537, Charlotte, NC 28288. KeyBank, 127 Public Square, Cleveland, OH, 44114, was appointed to the Creditors' Committee in May, 2008.

In April 2009, Bank of America withdrew as a member of the Creditors' Committee. In January 2010, Nellie Mae withdrew as a member of the Creditors' Committee.

The Creditors' Committee retained (a) Duane Morris LLP as counsel; (b) Posternak Blankstein & Lund LLP as special conflicts counsel; and (c) FTI Consulting, Inc. as financial advisors.

### 4.    Claims Bar Date

The Bankruptcy Court approved October 17, 2008 as the deadline for filing proofs of claim against the Debtor (the "Claims Bar Date"), and approved the form and manner of notice of the Claims Bar Date.

## B.    OTHER DEVELOPMENTS

### 1.    Rejection of FMC Contracts

Prior to the Commencement Date, the Debtor was party to several contracts with FMC, First Marblehead Education Resources, Inc., and TERI Marketing Services, Inc., which contracts included a Master Servicing Agreement, a Guarantee Agreement, a Database Agreement, and a Marketing Agreement (the "FMC Contracts"). The Debtor, in its business judgment, determined that performance of its obligations under such contracts was either cost prohibitive given the shutdown of the securitization markets or of no utility to the estate. Early in this Chapter 11 Case, the Debtor requested that the Bankruptcy Court approve the rejection of the FMC Contracts under section 365 of the Bankruptcy Code.

Because the Debtor's operations had been largely outsourced to FMC and its affiliates, the Debtor needed time to transition its operations away from the FMC and its affiliates to provide those services in house or through third party service providers. To facilitate this process, the Debtor and FMC entered into a Transition Services Agreement pursuant to which FMC and/or FMER would provide certain services for a limited time period to the Debtor following the rejection of the FMC Contracts, including loan origination services, multiple loan disbursement services, services in connection with collection efforts, and support services to improve the Debtor's infrastructure. The services provided by FMC and FMER pursuant to the Transition Services Agreement were to be provided at reduced costs from the costs under the FMC Contracts.

On June 23, 2008, the Bankruptcy Court approved the rejection of the FMC Contracts and the Debtor's entry into the Transition Services Agreement. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in the Plan or in the Confirmation Order shall affect the terms of the Transaction Services Agreement dated May 30, 2008, as approved by the Bankruptcy Court on June 23, 2008.

## 2. Stipulations With Certain Creditors

### a) *Stipulations Previously Approved*

At various times during the Chapter 11 Case, the Debtor negotiated stipulations with Bank of America, N.A., Chase, UFSB, Union Federal Savings Bank and UFSB Private Loan SPV ("UFSB SPV," and together with Bank of America, Chase, and UFSB, the "Settling Creditors"). Pursuant to each of these stipulations, the Debtor and each Settling Creditor agreed to terminate the contracts underlying the loan programs through which student loans were made by the Settling Creditor and guaranteed by the Debtor. The stipulations settled disputes over, among other things, amounts owed by the Debtor to each Settling Creditor based on assumptions about default rates. In exchange for a waiver of Claims against the Debtor, including Claims based on the Debtor's prepetition obligations to guarantee defaulted student loans, Administrative Expense Claims based on the Settling Creditors' postpetition funding of certain loans (the "Pipeline Loans"), and claims for interest as a consequence of delays in receipt of funds due to interruptions in the Debtor's cash management systems caused by the chapter 11 filing (the "Interest Claims"), the Debtor agreed to transfer certain amounts to the Settling Creditors outside the context of a Plan. The specific terms of each stipulation are summarized as follows:

**Chase**

- The Debtor transferred to Chase all of the funds in the Chase Pledged Account, totaling approximately $40.2 million as of April 31, 2008.

- Chase waived all Claims and Administrative Expense Claims based on the Debtor's guarantee obligations, and its Interest Claim up to the aggregate amount of $20,000.

- The Debtor waived any existing or future claim to guarantee fees.

51

- Chase and the Debtor did not waive other claims, defenses, and obligations.

- Rights and obligations that by the terms of the underlying agreement survive termination remain in force.

- Chase and the Debtor agreed to perform certain transitional activities.

**Bank of America**

- The Debtor transferred all funds in the Bank of America Pledged Account, totaling $25,556,081 as of November 30, 2008, to Bank of America except for $1,460,000 which was transferred to the Debtor's operating account free and clear of all liens, claims, and encumbrances.

- The Debtor retained all postpetition recoveries on TERI Owned Loans.

- The Debtor transferred to Bank of America all guaranty fees, totaling approximately $1,003,000, received in respect of Bank of America's Pipeline Loans, held in the Debtor's operating account.

- Bank of America waived all Claims, including certain Administrative Expense Claims, and its Interest Claim.

- The Debtor waived any existing or future claim to guaranty fees.

- The Debtor and Bank of America agreed to release each other from all claims, defenses, and obligations other than certain identified exceptions, including with respect to certain confidentiality agreements and certain ongoing deposit accounts and lease obligations.

- The Debtor agreed to provide certain transition services to Bank of America.

**UFSB and UFSB SPV**

- The Debtor transferred to UFSB and UFSB SPV (collectively, the "UFSB Entities") the full amount of funds in the UFSB Pledged Account, totaling $31,623,103, except for $1,586,204, which was transferred to the Debtor's operating account free and clear of all liens, claims, and encumbrances.

- The Debtor retained all TERI Owned Loans and all postpetition recoveries on TERI Owned Loans.

- The Debtor waived any existing or future claim to guaranty fees.

- The Debtor and UFSB Entities released each other from all claims, defenses, and obligations other than limited exceptions.

52

- All proofs of claim filed by the UFSB Entities were expunged and the
  UFSB entities were precluded from filing any further proofs of claim
  against the Debtor.

Each of the stipulations between the Debtor and the Settling Creditors has been approved
by the Bankruptcy Court.

### 3.    The Nellie Mae Adversary Proceeding

On February 4, 2010, Nellie Mae Education Foundation, Inc. ("Nellie Mae") filed an
adversary complaint against the Debtor, seeking, inter alia, a declaratory judgment that certain
loans in TERI's possession, in the principal amount of approximately $22.3 million, are property
of Nellie Mae. Nellie Mae also asserts that the Debtor has been improperly accounting for, and
therefore, misappropriating, collections on a portion of those so-called "Non-Cash Loans", which
are property of Nellie Mae. Nellie Mae asserts that the total amount of cash held by TERI that in
fact belongs to Nellie Mae is at least $1.0 million.

The Debtor has not had any meaningful opportunity to review each of the allegations
made by Nellie Mae in its Complaint and will file an answer or other responsive pleading as
required pursuant to the Federal Rules of Bankruptcy Procedure or the Bankruptcy Court, as
applicable. Upon a preliminary review of the Nellie Mae Complaint, the Debtor believes that
any recoveries received by the Debtor in respect of "Non-Cash Loans" prior to the
Commencement Date are, at best, a pre-petition claim against the Debtor. The Debtor also
believes that the Nellie Mae Complaint will largely turn on whether the defaulted loans in
question were "purchased" by TERI.

The Plan provides that all student loans identified by the Debtor (if any) that are the
subject of the Nellie Mae Adversary Proceeding, shall be held in escrow by Reorganized TERI
after the Effective Date pending determination by the Bankruptcy Court of the Nellie Mae
Adversary Proceeding, and shall be distributed in accordance with such Final Orders the
Bankruptcy Court may enter in the Nellie Mae Adversary Proceeding.

Assuming that Nellie Mae were successful in its Complaint against TERI, the Debtor
does not believe that the transfer of the student loans to Nellie Mae or the payment of $1 million
would materially change (1) the anticipated recovery to general unsecured creditors or
(2) Reorganized TERI's ability to operate. Specifically (1) none of the Nellie Mae loans were
included in the "Receivables recoverable on claim payments" column of the Liquidation
Analysis, in recognition of the dispute with Nellie Mae regarding the ownership of the so-called
"Non-Cash Loans" and (2) any cash payments to be made to Nellie Mae would be within the
$2.3 million of the "accrued expenses" column of the Liquidation Analysis. Moreover, although
a complete investigation of the facts underlying Nellie Mae's Complaint has not been completed
at this juncture, the Debtor anticipates that it will vigorously dispute many of the allegations
contained in such Complaint.

The Plan Proponents anticipate that, following the Effective Date, the defendants to the
Nellie Mae Adversary Proceeding will be both Reorganized TERI and the Plan Trustee.

### 4. Plan Proponents' Negotiations

Since late July, 2008, the Debtor and Creditors' Committee have been working towards a consensual and successful resolution of this Chapter 11 Case.  On July 24, 2008, the Bankruptcy Court approved a stipulation by and among the Debtor and Creditors' Committee that provided certain milestones for the Debtor to satisfy, including providing a claims analysis, liquidation analysis and business plan to the Creditors' Committee by certain dates.

The Debtor met each milestone and such documents became the building blocks of the Plan.  In November 2008, the Debtor and the Creditors' Committee entered into a further stipulation that provided that each party had the right to file a plan of reorganization provided that the other party consented, in writing, to such filing.  That agreement among the parties remained in place until August 5, 2009, the date on which the exclusive right to file a plan of reorganization expired.

In November 2008, the Debtor and Creditors' Committee began negotiating a term sheet regarding the principle terms of a Plan.  That term sheet formed the framework of the Plan.

## IV. SUMMARY OF THE PLAN

**THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  IT IS NOT INTENDED TO REPLACE A CAREFUL REVIEW AND ANALYSIS OF THE PLAN, BUT ONLY TO AID AND SUPPLEMENT SUCH REVIEW.  YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ THIS ENTIRE DISCLOSURE STATEMENT BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.**

### A. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

#### 1. Administrative Claims

Except to the extent the holder of an Allowed Administrative Expense Claim agrees otherwise, each holder of an Allowed Administrative Expense Claim will be paid (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms between the holder of such claim and the Debtor, or (b) such lesser amount as the holder of an Allowed Administrative Expense Claim and the Debtor might otherwise agree; *provided, however* that expenses of operation accrued and unpaid as of the Effective Date arising in the ordinary course of the Debtor's business and payable in such ordinary course (including any and all Claims and Expenses directly or indirectly arising from or related to the Pension Plan) will be paid solely by Reorganized TERI from Reorganized TERI Assets in the ordinary course after the Effective Date.

54

### 2.    Pre-Effective Date Professional Fees and Expenses

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for fees and/or expenses prior to and including the Effective Date under section 330 or 503(b) of the Bankruptcy Code will file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court. Objections to any such final application must be filed on or before a date to be set by the Bankruptcy Court in the Confirmation Order. Any entity granted such an award by the Bankruptcy Court must be paid in full by the Plan Trustee, in such amounts as are Allowed, within ten (10) days after the order granting such award is a Final Order.

### 3.    United States Trustee Quarterly Fees and Other Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, will be paid by the Debtor on the Effective Date. Following the Effective Date, the Plan Trustee shall file all post-confirmation reports and pay all fees (solely from and to the extent of available Plan Trust Assets) payable pursuant to 28 U.S.C. §1930(a)(6) until the Chapter 11 Case is closed pursuant to a Final Order.

### 4.    Priority Tax Claims

Except to the extent the holder of an Allowed Priority Tax Claim agrees otherwise, each holder of an Allowed Priority Tax Claim, will be paid from Available Cash in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or (b) such lesser amount as the holder of an Allowed Priority Tax Claim and the Debtor or the Plan Trustee agree. Any Allowed Priority Tax Claim paid after the Effective Date shall accrue interest at the rate calculated in accordance with 28 U.S.C. §1961 until such Allowed Priority Tax Claim is paid in full.

## B.    CLASSIFICATION AND TREATMENT OF CLAIMS

### 1.    Summary of Classification and Treatment of Claims

The following table designates the Classes of Claims, other than Administrative Expense Claims and Priority Tax Claims, and specifies which of those classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan:

| CLASS | STATUS |
| --- | --- |
| Class 1 – Priority Non-Tax Claims | Unimpaired/Deemed to Accept |
| Classes 2a – 2p – Secured Claims of Make and Wait Lenders | Impaired/Entitled to Vote |

55

| Classes 3a – 3q – Secured Claims of Securitization Trusts | Impaired/Entitled to Vote |
|---|---|
| Classes 4a-4k – Secured Claims of Key Corp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) | Impaired/Entitled to Vote |
| Class 5 – General Unsecured Claims | Impaired/Entitled to Vote |
| Class 6 – Convenience Claims | Unimpaired/Deemed to Accept |

### 2.   Classification and Treatment of Claims and Interests

a)   *Class 1 — Priority Non-Tax Claims*

*Classification*: Class 1 consists of Priority Non-Tax Claims against the Debtor.

*Impairment and Voting*: Class 1 is Unimpaired by the Plan.  For purposes of the Plan, each holder of an Allowed Claim in Class 1 is conclusively deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Distributions:* In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims, each holder of an Allowed Priority Non-Tax Claim against the Debtor shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.  Such Claims shall be paid from Available Cash.

b)   *Classes 2a – 2p – Secured Claims of Make and Wait Lenders*

Class 2 consists of the Secured Claims of the Make and Wait Lenders.  Each Allowed Secured Claim in Class 2 shall be considered to be a separate subclass within Class 2, and each such subclass shall be deemed to be a separate class for purposes of the Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129.  Each subclass in class 2 is Impaired by the Plan and is entitled to vote to accept or reject the Plan.  Issues affecting Secured Claims of the Make and Wait Lenders are discussed in Section I.A.3.c. of this Disclosure Statement.

c)   *Classes 3a – 3q – Secured Claims of Securitization Trusts.*

Classes 3a-3q consist of the Secured Claims of the Securitization Trusts.  Each Allowed Secured Claim in Classes 3a-3q shall be considered to be a separate subclass within Class 3, and each such subclass shall be deemed to be a separate class for purposes of the Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129.  Classes 3a-3q are Impaired by the Plan

LIBC/3667825.11

and each is entitled to vote to accept or reject the Plan.  Issues affecting Secured Claims of Securitization Trusts are discussed in Section I.A.3.d. of this Disclosure Statement.

      d)    *Classes 4a – 4k Secured Claims of Key Corp Trusts.*

      Class 4 consists of the Secured Claims of KeyCorp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender).  Each Allowed Secured Claim in Class 4 will be considered a separate subclass within Class 4, and each subclass will be deemed to be a separate class for purposes of the Plan and of Bankruptcy Code, Sections 1122, 1123, 1126 and 1129.  Each subclass in Class 4 is Impaired by the Plan is entitled to vote to accept or reject the Plan.  Issues affecting Key Corp Trust Claims and the Claim of KeyBank (other than in its capacity as a Make and Wait Lender) are discussed in Section I.A.3.d. of this Disclosure Statement.

      e)    *Class 5 – General Unsecured Claims.*  Class 5 consists of all General Unsecured Claims, including the Make and Hold Claims.  Issues affecting General Unsecured Claims are discussed in Section I.A.3.g. of this Disclosure Statement.  Class 5 is Impaired by the Plan and is entitled to vote to accept or reject the Plan.

      The following make up the General Unsecured Claims in this Chapter 11 Case:

      (i)    **Make and Hold Claims**.  The Allowed amount of the Make and Hold Claim of an Accepting Make and Hold Lender will be the amount of the "Make and Hold Lender Settlement Claim" for such Make and Hold Lender as listed on <u>Schedule D</u> to the Plan.  The Allowance or disallowance of the Claim of a Make and Hold Lender that rejects the Plan, shall be determined after the Effective Date by the Bankruptcy Court pursuant to 11 U.S.C. §502.  To the extent the Court determines pursuant to 11 U.S.C. §502 that such Make and Hold Claim should be allowed, then such Allowed Make and Hold Claim shall be treated and classified as an Allowed Claim in Class 5.

      (ii)    **Make and Wait Deficiency Claims**.  Each Make and Wait Lender that accepts the Plan (i) shall be deemed to have authorized the transfer to the Plan Trustee the amount, if any, listed with respect to such Make and Wait Lender in the "Make and Wait Lender Payment Amount (If Any)" column of <u>Schedule A</u> to the Plan and (ii) shall have an Allowed Deficiency Claim in the amount, if any, listed with respect to such "Make and Wait Lender Decoder Deficiency Claim (If Any)" column of the attached <u>Schedule A</u>.  Each Make and Wait Lender that rejects the Plan shall have the Allowed amount of its Secured Claim (if any) and Deficiency Claim (if any) determined by the Bankruptcy Court pursuant to 11 U.S.C. §502.

      (iii)    **Securitization Trust Deficiency Claims**.  Each Securitization Trust that accepts the Plan and, thereby, the Securitization Trust Settlement will have an Allowed Claim (if any) in the amount listed in the "Securitization Trust Settlement Claim" column of <u>Schedule B</u> attached to the Plan.  Each Securitization Trust that rejects the Plan, and thereby, the Securitization Trust

LIBC/3667825.11

Settlement, shall have its Allowed Claim (if any) determined in accordance with Section 4.2 of the Plan.

(iv) **KeyBank (other than in its capacity as a Make and Wait Lender) and KeyCorp Trust Deficiency Claims.** Each KeyCorp Trust that accepts the Plan and KeyBank (other than in its capacity as a Make and Wait Lender), if it accepts the Plan, and, thereby, the Key Access Program Settlement, will have an Allowed Claim in the amount listed in the "Program Decoder Settlement Claim" column of Schedule C attached to the Plan. Each KeyCorp Trust that rejects and, KeyBank (other than in its capacity as a Make and Wait Lender) if it rejects the Plan, and thereby, the Key Access Program Settlement, shall have its Deficiency Claim (if any) determined in accordance with Section 4.3 of the Plan.

(v) **Other General Unsecured Claims**. Unless otherwise provided in the Plan, the Allowed amount of Other General Unsecured Claims will be determined by the Bankruptcy Court in accordance with section 502 of the Bankruptcy Code.

f) *Class 6 – Convenience Class Claims*

*Classification*: Class 6 consists of Convenience Class Claims.

*Impairment and Voting*: Class 6 is Unimpaired by the Plan. Each holder of an Allowed Claim in Class 6 is deemed to have accepted the Plan.

*Distributions*. In full and complete satisfaction, settlement and release of and in exchange for the Convenience Class Claims, each holder of an Allowed Convenience Class Claim will be paid in full from Unrestricted Cash, except to the extent such holder of an Allowed Convenience Class Claim agrees to less favorable treatment, on the later of the Effective Date and the date such Convenience Class Claim becomes an Allowed Convenience Class Claim.

## C. PROVISIONS REGARDING VOTING AND DISTRIBUTION UNDER THE PLAN

### 1. Voting of Claims

Each holder of an Allowed Claim as of the Record Date in Classes 2a – 2p, Classes 3a – 3q, Classes 4a-4k or Class 5 will be entitled to vote to accept or reject the Plan. For voting purposes, and consistent with the provisions of the Solicitation Procedures Order, the amount of Claim that a holder of a Claim in Classes 2a – 2p, Classes 3a – 3q and Classes 4a – 4k may vote in respect of its General Unsecured Claim in Class 5 (if any) will be the amount of the Claim (as filed or as otherwise temporarily allowed by the Bankruptcy Court for voting purposes) less the amount held in the Collateral Account. For voting purposes, and consistent with the provisions of the Solicitation Procedures Order, the amount of Make and Hold Claims in Class 5 will be

58

deemed to be the amount stated on such Creditor's Proof of Claim or as otherwise temporarily
allowed by the Bankruptcy Court for voting purposes.

### 2.    Acceptance by Impaired Class

Consistent with section 1126(c) of the Bankruptcy Code, and except as provided for in
section 1126(e) of the Bankruptcy Code, a Class of creditors will have accepted the Plan if it is
accepted by at least two-thirds in dollar amount and more than one-half in number of the holders
of Allowed Claims of such Class or holders of Claims permitted to vote pursuant to the
provisions of the Solicitation Procedures Order that have timely and properly voted to accept or
reject the Plan.  The Solicitation Procedures Order governs the voting by the Securitization
Trusts, the Other Trusts and the Key Corp. Trusts and the Plan Proponents urge you to read such
order in its entirety for a more complete understanding regarding which entities are entitled to
vote and the mechanics by which a Class may be deemed to accept or reject the Plan.

### 3.    Presumed Acceptances of the Plan

Classes 1 and 6 are not Impaired under the Plan and, therefore, are conclusively
presumed to have accepted the Plan.

### 4.    Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote shall not accept the Plan by the requisite
statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Debtor will
request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the
Bankruptcy Code.

### 5.    Method of Distributions Under the Plan

a)    *Distributions Generally*

(1)    Reorganized TERI will make all distributions required by
the Plan other than those to be made by the Plan Trustee.

(2)    The Plan Trustee will make all other distributions from the
Plan Trust to holders of Claims in accordance with the Plan
and the terms and conditions set forth in the Plan Trust
Agreement.

b)    *Distributions of Cash*

Any payment of Cash made by Reorganized TERI or the Plan Trustee pursuant to the
Plan may be made at the option of such party either by check drawn on a domestic bank or by
wire transfer from a domestic bank.

LIBC/3667825.11

c)    *Distributions Free and Clear*

Except as otherwise provided in the Plan, any distributions or transfers by or on behalf of the Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, will be free and clear of any liens, claims, and encumbrances, and no other entity will have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to the Plan.

d)    *Timing of Performance*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

e)    *Delivery of Distributions*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor. The holder must notify Reorganized TERI or the Plan Trustee, as applicable, in writing of a change of address, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different from the address of such holder as set forth in the Schedules. Neither Reorganized TERI nor the Plan Trustee will be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided in the Plan. Notwithstanding the foregoing, with respect to each Securitization Trust, Other Trust and KeyCorp Trust, distributions in respect of an Allowed Claim of such Trust including defaulted loans (if any), shall be made to the Trust, subject to the lien and security interest of the applicable indenture trustee for such Trust, and shall be delivered to the trustee or indenture trustee for such Trust (as appropriate) or to such other person as may be designated by the indenture trustee or trustee in writing delivered to Reorganized TERI or the Plan Trustee, as applicable, provided that loan documents, including the related student loan note in respect of a defaulted loan, shall be delivered by the entity that has possession of such loan documents, to the applicable servicer as custodian and agent for the indenture trustee or trustee, to be held under the applicable custody agreement among such servicer as custodian for the indenture trustee or trustee and the Trust.

f)    *Distributions to Holders as of Record Date*

As of the close of business on the Record Date, the claims register for the Debtor will be closed and there will be no further changes made to the identity of the record holder of any Claim. Neither Reorganized TERI nor the Plan Trustee will have any obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized TERI and the Plan Trustee will instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the applicable claims register at the close of business on the Record Date.

LIBC/3667825.11

g)   *Undeliverable and Unclaimed Distributions*

If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the holder notifies Reorganized TERI or the Plan Trustee, as appropriate, in writing of such holder's then-current address, at which time all missed distributions will, subject to the last sentence of this paragraph, be made as soon as is practicable to such holder, without interest.  Checks issued by Reorganized TERI or the Plan Trustee in respect of Allowed Claims will be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Requests for re-issuance of any check will be made in accordance with the notice provisions of the Plan to Reorganized TERI or the Plan Trustee, as appropriate, by the holder of the Allowed Claim to whom such check originally was issued.  All claims for undeliverable distributions or voided checks will be made on or before one hundred and twenty (120) days after the date such undeliverable distribution was initially made.  After such dates, all such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will become unencumbered Cash of Reorganized TERI, or the Plan Trust, as appropriate pursuant to the Plan.  The holder of any Claim for which any undeliverable distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy Code will not be entitled to any other or further distribution under the Plan on account of such Claim.

h)   *Setoffs*

Except with respect to an Allowed Claim that is Allowed as part of a compromise and settlement approved pursuant to a Final Order (including settlements set forth in Section 6.2 of the Plan), to the extent permitted under the Bankruptcy Code or other applicable law, Reorganized TERI, or the Plan Trustee, as applicable, may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and Causes of Action of any nature that the Debtor has against the holder of such Allowed Claim.

i)   *Application of Distributions*

Distributions to any holder of an Allowed Claim will be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Allowed Claim and thereafter to the remaining portion of such Allowed Claim, if any unless the application is governed by an indenture or other governing document in which case the terms of such document shall govern.  No provision of the Plan or Confirmation Order shall modify any charging lien or other right of the indenture trustee, trustee or other entity in another representative capacity to reimburse itself for fees, expenses and disbursements against any distribution.

j)   *Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtor or the Plan Trustee, as applicable, will comply with all applicable withholding and reporting requirements imposed by any federal, state or local  taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting

61

requirements. *__The Debtor and the Plan Trustee will have the right to withhold distributions to any holder of a Claim, and any such Claim shall not become an Allowed Claim, notwithstanding any other provision of the Plan, unless and until such holder of a Claim executes and delivers to the Plan Trustee an Internal Revenue Service Form W-9.__* Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including income, withholding, and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### D.  MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

#### 1.  Reorganized TERI

##### a)  *Reorganized Articles of Incorporation and Reorganized By-Laws*

Reorganized TERI will adopt Reorganized Articles of Incorporation and Reorganized By-laws prior to, but effective as of, the Effective Date, which will be included in the Plan Supplement. Prior to the closing of TERI's Chapter 11 case, any amendments to Reorganized TERI's Articles of Incorporation and Reorganized By-laws will be filed with the Bankruptcy Court.

##### b)  *Boards of Directors and Officers*

The identities of the members of the initial Board of Directors and the initial officers of Reorganized TERI will be disclosed in the Plan Supplement and will be in effect as of the Effective Date.

##### c)  *Reorganized TERI (Not-For-Profit)*

Reorganized TERI will, as of the Effective Date, remain a not-for-profit corporation.

##### d)  *Retention of Reorganized TERI Assets*

On and after the Effective Date, Reorganized TERI will retain its rights, title, and interests in the Reorganized TERI Assets.

#### 2.  Compromise and Settlement

The Plan is the product of months of negotiations between many interested parties, including the Debtor, the Creditors' Committee, FMDS, as Administrator to the Securitization Trusts and U.S. Bank, N.A., in its capacity as Indenture Trustee to the Securitization Trusts and KeyBank. The following is an outline of the terms of the proposed compromise and settlements for the Make and Wait Lenders, Make and Hold Lenders, KeyBank (other than in its capacity as a Make and Wait Lender), Key Corp Trusts and Securitization Trusts.

62

a)    *Make and Wait Lender Settlement*

(1)    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of the Plan by an Accepting Make and Wait Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting Make and Wait Lender, including the amounts, allowance, relative priority and treatment of the Secured Claim and the Deficiency Claim (if any) of such Accepting Make and Wait Lender.

(2)    **Claims of An Accepting Make and Wait Lender**.  Each Make and Wait Lender in Classes 2a – 2p that accepts the Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement  (1) will have an Allowed Secured Claim in the applicable subclass of Class 2 in the amount set forth in the column labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on Schedule A attached to the Plan, and will have an Allowed Unsecured Claim that will be treated as a Class 5 Claim in the amount, if any, set forth in the "Make and Wait Lender Decoder Deficiency Claim (If Any)" column of Schedule A attached to the Plan.

(3)    **Release of Make and Wait Lender Equity and Make and Wait Lien Dispute Amount to Plan Trustee by Accepting Make and Wait Lender.**  Each Make and Wait Lender in Classes 2a – 2p that accepts the Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement, will release its interest in the amount, if any and as applicable, in the column labeled "Make and Wait Lender Payment Amount (If Any)" on Schedule A attached to the Plan and shall be deemed to have authorized and instructed the Debtor to transfer such amount to the Plan Trustee on the Effective Date free and clear of any and all claims, interests, liens and encumbrances.

(4)    **Disbursement of Remainder of Collateral Account to Accepting Make and Wait Lender.**   On the Effective Date, the Debtor shall be deemed to release from the applicable Collateral Account, and such amount shall be remitted, to each Accepting Make and Wait Lender, in full satisfaction of such Accepting Make and Wait Lender's Allowed Secured Class 2 Claim, the applicable amount for such Accepting Make and Wait Lender in the column

63

labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on <u>Schedule A</u> attached to the Plan, plus all interest and other earnings (if any) paid and deposited into such Pledged Account as of the Effective Date.

(5) **<u>Retention by Accepting Make and Wait Lender of Loans Not Purchased by the Debtor</u>**. Each Accepting Make and Wait Lender will retain all loans that were not purchased by the Debtor as of the Effective Date.

(6) **<u>Bankruptcy Court Approval of Make and Wait Lender Settlement</u>**. For each Accepting Make and Wait Lender, entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Wait Lender Settlement and the Bankruptcy Court's finding that such settlement is fair, equitable and reasonable and in the best interests of the Debtor, the Plan Proponents, Reorganized TERI and all Creditors.

(7) **<u>Release of Claims against the Debtor and the Estate</u>**. On the Effective Date, the Claims against the Debtor and the Estate of each Accepting Make and Wait Lender receiving the treatment provided by the Make and Wait Lender Settlement, subject to and upon implementation of the Make and Wait Lender Settlement, will be deemed satisfied and no further recovery shall be permitted in respect of such Claims.

(8) **<u>Rejection of Executory Contracts</u>**. On the Effective Date, all Guaranty Agreements executed in favor of the Make and Wait Lenders and the related Deposit and Security Agreements and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Wait Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Wait Lenders will be deemed waived.

b) *<u>Make and Hold Settlement</u>*

(1) Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of the Plan by an Accepting Make and Hold Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting

64

Make and Hold Lender, including the amounts, allowance, relative priority and treatment of the Make and Hold Claims of such Accepting Make and Hold Lender

(2)    **Claims of An Accepting Make and Hold Lender**.  An Accepting Make and Hold Lender shall have an Allowed Claim calculated as the larger of the Claim calculated by the Decoder and the Claim calculated by the Debtor's Base Case, as set forth in the column labeled "Make and Hold Lender Settlement Claim" on <u>Schedule D</u> attached to the Plan.  All such claims will be treated as Allowed Class 5 Claims.

(3)    **Distributions to Accepting Make and Hold Lenders and Effectiveness of Make and Hold Settlement**.  All distributions to Accepting Make and Hold Lenders pursuant to the Plan will be made on account of and in consideration of the Make and Hold Lender Settlement, which, upon the Effective Date, will be binding on all Accepting Make and Hold Lenders, the Plan Proponents, and Reorganized TERI.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Hold Lender Settlement and the Bankruptcy Court's finding that such Make and Hold Lender Settlement is fair, reasonable, equitable and in the best interests of the Accepting Make and Hold Lenders, the Plan Proponents and Reorganized TERI.

(4)    **Rejection of Make and Hold Guaranty Agreements**.  On the Effective Date, all Guaranty Agreements executed in favor of the Make and Hold Lenders and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Hold Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Hold Lenders will be deemed waived.

c)    *Securitization Trust Settlement*

(1)    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 the acceptance of the Plan by a Securitization Trust Settlement will constitute a good faith compromise and settlement of all Claims, Causes of Action and controversies between the Debtor and each Securitization Trust receiving the treatment provided by the

65

Securitization Trust Settlement, including, without
limitation, the amounts, allowance, relative priority and
treatment of the Secured Claim and Deficiency Claim of
each Securitization Trust and any other claim, whether a
general unsecured claim, priority claim or administrative
expenses claim that each such Securitization Trust, the
Indenture Trustee under the Indenture for such
Securitization Trust, or the administrator for such
Securitization Trust (in such capacity) has asserted or might
assert against the Debtor or its estate.  Notwithstanding the
foregoing, nothing in the Plan shall bar any entity from
seeking Allowance of an Administrative Expense Claim
arising under 11 U.S.C. §503(b)(3)(D) and (4) ("Substantial
Contribution Claim"), and as to any such Substantial
Contribution Claim, the parties reserve all their respective
rights, claims and defenses.

(2)   **Claims of An Accepting Securitization Trust**.  Each
Securitization Trust in Classes 3a – 3q that accepts the Plan
or is deemed to accept the Plan, and, thereby, the
Securitization Trust Settlement  (A) will have an Allowed
Secured Claim in the applicable subclass of Class 3 in the
amount set forth in the column labeled "Payment to
Accepting Securitization Trust from Collateral Account" on
Schedule B attached to the Plan, and (B) will have an
Allowed Unsecured Claim that will be treated as a Class 5
Claim in the amount, if any, set forth in the "Securitization
Trust Settlement Claim (If Any)" column of Schedule B
attached to the Plan.

(3)   **Release of Securitization Trust Equity by Accepting
Securitization Trust**.  Each Securitization Trust in
Classes 3a – 3q that accepts the Plan or is deemed to accept
the Plan, and, thereby, the Securitization Trust Settlement,
will release its interest in the amount, if any and as
applicable, in the column labeled "Securitization Trust
Payment Amount" on Schedule B attached to the Plan and
shall be deemed to have authorized and instructed the
Debtor to transfer such amount to the Plan Trustee on the
Effective Date free and clear of any and all claims,
interests, liens and encumbrances.

(4)   **Disbursement of Remainder of Pledged Account to
Accepting Securitization Trust**.  On the Effective Date,
the Debtor shall be deemed to release from the applicable
Pledged Account, and such amount shall be remitted, to
each Securitization Trust in Classes 3a – 3q that accepts the

66

Plan or is deemed to accept the Plan, and, thereby, the
Securitization Trust Settlement, in full satisfaction of the
Allowed Secured Claim of such Accepting Securitization
Trust, the applicable amount for such Accepting
Securitization Trust in the column labeled "Payment to
Accepting Securitization Trust from Pledged Account" on
Schedule B attached to the Plan, plus all interest paid and
deposited into such Pledged Account as of the Effective
Date.

(5)     **Disbursement of Remainder of Securitization Trust
Collateral to Accepting Securitization Trust**.  On the
Effective Date, the Debtor shall cause to be transferred to
each Accepting Securitization Trust such Securitization
Trust's Securitization Trust Collateral remaining after
payment by such Securitization Trust of the Securitization
Trust Payment Amount.

(6)     **Securitization Trusts Release With Respect to
Postpetition Defaulted Loans**.  In full and final settlement
of the Trust Adversary Proceeding with respect to each
Securitization Trust that accepts the Plan or is deemed to
accept the Plan, and, thereby, the Securitization Trust
Settlement, (A) each such Securitization Trust will have no
claim to any loans purchased by or on behalf of the Debtor
(or its agent) or otherwise transferred to or for the benefit
of the Debtor on or after the Commencement Date or to any
recoveries on such loans, including recoveries received
prior to the date hereof, (B) all such defaulted postpetition
loans and postpetition recoveries shall be transferred free
and clear of all liens, claims, interests and encumbrances to
the Plan Trust, and (C) neither the applicable Securitization
Trusts nor their indenture trustees shall have any security
interest in, or Claim to, such defaulted loans or recoveries
obtained in respect thereof (but otherwise reserving rights
under the Plan as the holder of a Claim in Class 5).  Any
defaulted loan on account of which (i) the Debtor made
payment, (ii) payment was made from funds in a Pledged
Account, or (iii) a Securitization Trust received payment,
shall be considered a defaulted loan purchased by the
Debtor.

(7)     **Retention by Accepting Securitization Trust of Loans
Not Purchased by the Debtor**.  Each Securitization Trust
will retain all loans that were not purchased by the Debtor
as of the Effective Date.  Each Securitization Trust will
also retain (a) all defaulted loans that were purchased by or

67

on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust prior to the Commencement Date, (b) all recoveries collected (and the right to collect such recoveries earned but not paid) and all future recoveries with respect to prepetition defaulted loans and (c) the proceeds from the sale by the Debtor of such prepetition defaulted loans to a Securitization Trust at any time following rehabilitation.

(8)    **Bankruptcy Court Approval of Securitization Trust Settlement**.  For each Securitization Trust that accepts the Plan, and thereby the Securitization Trust Settlement, entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Securitization Trust Settlement and the Bankruptcy Court's finding that such settlement is fair, equitable and reasonable and in the best interests of the Debtor, the Plan, Reorganized TERI and each Securitization Trust (including the Indenture Trustee and other secured parties under the related Indenture pursuant to which such Trust issued its notes), receiving the treatment provided by the Securitization Trust Settlement.

(9)    **Dismissal of Trust Adversary Proceeding**.  On the Effective Date, the Trust Adversary Proceeding will be deemed dismissed with prejudice, and judgment of dismissal may enter pursuant to Fed.R.Civ.P. 54, made applicable to the Trust Adversary Proceeding pursuant to Fed.R.Bankr.P. 7054, as to (a) each Securitization Trust that accepts or is deemed to accept the Plan, thereby receiving the treatment provided by the Securitization Trust Settlement, (b) the administrator with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, (c) the owner trustee of each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, (d) U.S. Bank, National Association, in any capacity in which it was named as a defendant in the Trust Adversary Proceeding with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, and (e) the indenture trustee under any indenture pursuant to which such Securitization Trust issued notes and accepted the Plan and Securitization Trust Settlement with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, each of the foregoing administrators, owner trustees and indenture trustees, in their respective capacities, and not individually.

LIBC/3667825.11

(10) **Release of Claims against the Debtor and The Estate**. On the Effective Date, the Claims against the Debtor and the Estate of the Securitization Trusts, the Indenture Trustees under the Indenture for such Securitization Trusts and the administrators for such Securitization Trust (in such capacity) receiving the treatment provided by the Securitization Trust Settlement, subject to and upon implementation of the Securitization Trusts Settlement, will be deemed satisfied and no further recovery shall be permitted in respect of such Claims.

(11) **Rejection of Executory Contracts**. On the Effective Date, all Guaranty Agreements executed in favor of the Securitization Trusts and the related Deposit and Security Agreements and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Securitization Trusts accepting the Plan or that are deemed to accept the Plan, thereby receiving the treatment provided by the Securitization Trust Settlement, all Debtor's claims or rights to set off any Guaranty fees, basis point fees and other interests in loans held by such Securitization Trusts will be deemed waived.

(12) **Estate's Retention of Rights With Respect to Residuals**. Nothing herein shall be deemed a waiver or release of the rights, if any, that the Debtor or any other party may have to receive a portion (if any) of the Residual with respect to any and all of the Securitization Trusts.

d)   *KeyBank National Association and KeyCorp Trusts Settlement*

(1) Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of the Plan by KeyBank National Association (excluding in its capacity as a Make and Wait Lender) and acceptance of the Plan by each KeyCorp Trust will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and KeyBank National Association and each Accepting KeyCorp Trust, including the amounts, allowance, relative priority and treatment of the Claims of KeyBank National Association and each Accepting KeyCorp Trust.

(2) Unless KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) or a KeyCorp Trust rejects the Plan, KeyBank

69

National Association and each KeyCorp Trust, as
applicable, shall receive the following treatment on the
Effective Date of the Plan or as soon thereafter as is
practicable:  (a) it shall be paid its allocable share in the
Victory Fund as of the Commencement Date (as appears in
column on <u>Schedule C</u> of the Plan labeled "Allocation of
Victory Fund"), (b) it shall have an Allowed Key Access
Program Deficiency Claim as set forth in the column
labeled "Key Access Program Decoder Settlement Claim"
on <u>Schedule C</u> of the Plan; and (c) it shall cause to be paid
to the Plan Trustee free and clear of all interests, liens,
claims and encumbrances, its allocable share of all
recoveries or other funds transferred by the Debtor to the
Victory Fund on or after the Commencement Date, together
with any interest or other earnings thereon not previously
transferred to the Debtor.

(3)      Notwithstanding the preceding paragraph, if KeyBank
National Association (excluding KeyBank National
Association in its capacity as a Make and Wait Lender) or a
KeyCorp Trust rejects the Plan and is thereby deemed to
opt out of the Key Access Program Settlement, the
following treatment shall be applied:  (a) each KeyCorp
Trust that rejects the Plan, and KeyBank National
Association if it rejects the Plan, shall have the Allowed
amount of its Claim determined by the Bankruptcy Court
by Final Order, following appropriate notice and an
opportunity to be heard, in accordance with the Key Access
Program Election; (b) the funds in the Victory Fund as of
the Commencement Date shall be paid to KeyBank
National Association and held in escrow until the
Bankruptcy Court has determined by Final Order,
following appropriate notice and an opportunity to be
heard, the proper method for distributing such funds; and
(c) the parties reserve all rights with respect to recoveries
and other funds transferred by the Debtor to the Victory
Fund on or after the Commencement Date, together with
any interest or other earnings thereon, including, without
limitation, the rights of the parties with respect to the
extent, priority, validity or existence of any alleged security
interest in such recoveries and funds.

(4)      Any distributions to KeyBank National Association
(excluding KeyBank National Association in its capacity as
a Make and Wait Lender), if it accepts the Plan, or to an
Accepting KeyCorp Trust pursuant to the Plan will be
made on account and in consideration of the Key Access

70

Program Settlement, which, upon the Effective Date, will
be binding on KeyBank National Association, the
Accepting KeyCorp Trusts, the Debtor, and Reorganized
TERI. Entry of the Confirmation Order will constitute the
Bankruptcy Court's approval, as of the Effective Date, of
the Key Access Program Settlement and the Bankruptcy
Court's finding that such Key Access Program Settlement
is in the best interests of KeyBank National Association,
the Accepting KeyCorp Trusts, the Debtor, and
Reorganized TERI, and is fair, equitable and reasonable.

**3.    Plan Trust**

   a)    *General*

On or before the Effective Date, the Plan Trust Agreement, in a form reasonably
acceptable to the Plan Proponents, shall be executed, and all other necessary steps shall be taken
to establish the Plan Trust and the beneficial interests therein, which shall be for the benefit of
the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective
Date.  In the event of any conflict between the terms of the Plan and the terms of the Plan Trust
Agreement, the terms of the Plan Trust Agreement shall govern.  The Plan Trust Agreement may
provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only
to the extent that such powers, duties, and authorities do not affect the status of the Plan Trust as
a liquidating trust for United States federal income tax purposes, or otherwise have material
adverse effect on the recovery of holders of Allowed General Unsecured Claims.  This Section
6.3 is qualified in its entirety by the terms of the Plan Trust Agreement.  If there is any
inconsistency between the terms of the Plan and the terms of the Plan Trust Agreement, the
terms of the Plan Trust agreement shall control.

   b)    *Purpose of Plan Trust*

The Plan Trust shall be established for the sole purpose of liquidating and distributing its
assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to
continue or engage in the conduct of a trade or business, except to the extent reasonably
necessary to achieve, and consistent with, the liquidating purpose of the Plan Trust.

   c)    *Costs and Expenses of Plan Trust*

The costs and expenses of the Plan Trust, including the fees and expenses of the Plan
Trustee and its retained professionals, shall be paid out of the Plan Trust Assets, and
Reorganized TERI shall not be responsible for any fees, expenses, or costs of the Plan Trust.
The Litigation Claims Costs incurred by the Plan Trustee and the fees and expenses incurred in
connection with the prosecution and settlement of any Claims are costs and expenses of the Plan
Trust.

   d)    *Plan Trust Assets*

LIBC/3667825.11

As of and as soon as practicable after the Effective Date, Debtor shall assign and transfer to the Plan Trust all of its rights, title and interests in and to the Plan Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, whether such Claims are Allowed on or after the Effective Date. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, and subject to clause (c) of Section 6.2(d)(iii) of the Plan or as otherwise specifically set forth therein shall be free and clear of any liens, claims and encumbrances, and no other entity (other than Creditors receiving rights under the Plan), including the Debtor or Reorganized TERI, will have any interest, legal, beneficial, or otherwise, in the Plan Trust or the Plan Trust Assets upon their assignment and transfer to the Plan Trust (other than as provided in the Plan or in the Plan Trust Agreement). Upon delivery of the Plan Trust Assets to the Plan Trust, Reorganized TERI will be released of all liability with respect to the delivery of distributions to holders of Allowed General Unsecured Claims, and, except as provided in the Collection Contract, shall have no further monetary obligations to the Plan Trust or the Plan Trustee.

The Plan Proponents expect that the Plan Trust Assets will consist of (1) approximately $46 million in Cash (including $4.0 million in Cash obtained as a result of various settlements with Make and Wait Lenders set forth in the Plan), (2) $36.1 million in book value of projected recoveries of defaulted loans, and (3) $85.9 million in book value of projected recoveries of defaulted loans transferred to the Plan Trustee in the event the Securitization Trust Settlement is accepted by each Securitization Trust. The Plan Proponents currently estimate that the value of assets transferred to the Plan Trustee (assuming the parties accept the various settlements set forth in the Plan) is approximately $168 million. However, there can be no assurance that such value will actually be achieved. (See Section VII. Risk Factors -- Risk that Plan Trustee Will Not Achieve the Projected Recoveries in Respect of Defaulted Loans).

e)    *Governance of Plan Trust*

The Plan Trust will be governed by the Plan Trust Agreement and administered by the Plan Trustee.

f)    *Appointment of a Plan Trustee*

Prior to the Effective Date, the Creditors' Committee shall select the Plan Trustee. The identity of the Plan Trustee will be disclosed by the Creditors' Committee no later than the date of the hearing to consider confirmation of the Plan. The salient terms of the Plan Trustee's employment, including the Plan Trustee's duties and compensation, shall be set forth in the Plan Trust Agreement. The Plan Trustee will not be the Debtor, an affiliate of the Debtor or former agent of the Debtor. The Plan Trustee, in the reasonable discretion of the Creditors' Committee, will have the qualifications and experience necessary to satisfy the responsibilities and obligations of the Plan Trustee as outlined in the Plan and the Plan Trust Agreement

g)    *The Plan Trustee Advisory Committee*

The Plan Trustee Advisory Committee shall advise the Plan Trustee with respect to the liquidation and distribution of Plan Trust Assets in accordance with the Plan Trust

LIBC/3667825.11

Agreement.  The Plan Trust Agreement shall specify the procedures for replacing any member of the Plan Trustee Advisory Committee.

h)      *Transferability of Plan Trust Interests*

The beneficial interests of the Plan Trust shall not be transferable, unless otherwise provided for in the Plan Trust Agreement.  To the extent such beneficial interests are deemed securities under applicable non-bankruptcy law, then such securities shall be exempt from the requirements of applicable non-bankruptcy law to the maximum extent permitted by 11 U.S.C. §1145.

i)      *Investment of Cash*

The Plan Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.  The Plan Trustee shall be authorized to manage any transferred Collateral Accounts pending resolution of the disposition of such Collateral Account pursuant to the terms of the Plan or a Final Order.

j)      *Retention of Professionals by the Plan Trustee*

The Plan Trustee may retain and reasonably compensate counsel and other professionals, as applicable, to assist in its duties as Plan Trustee on such terms as the Plan Trustee deems appropriate, without Bankruptcy Court approval; *provided however* that such counsel and other professionals shall be subject to the prior approval of the Plan Trustee Advisory Committee or, if such approval is not obtained, then such counsel and other professionals may be retained only upon Bankruptcy Court approval.  All costs of compensation and expenses of professionals retained by the Plan Trustee are costs and expenses of the Plan Trust and shall be paid out of the Plan Trust Assets.

k)      *Compensation of the Plan Trustee*

The Plan Trustee will be entitled to reasonable compensation (which shall be negotiated by the Plan Trustee with the Creditors' Committee) in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

l)      *Cooperation of Reorganized TERI*

Reorganized TERI will provide information, including Data needed for Claim administration and asset monetization, to the Plan Trustee.  Such information will include, but will not be limited to, information regarding the status and amount of General Unsecured Claims to enable the Plan Trustee to perform its duties.  Reorganized TERI will cooperate with the reasonable requests of the Plan Trustee and its professionals in the administration of the Plan Trust, including, in providing Data, documentation, witness testimony and other evidence in support of the prosecution of the Litigation Claims.  The Plan Trust will reasonably reimburse

LIBC/3667825.11

Reorganized TERI, pursuant to the terms of a reimbursement agreement to be negotiated, for any extraordinary costs incurred to comply with requests for cooperation made by the Plan Trustee.

m)    *Distribution of Plan Trust Assets*

The Plan Trust Assets shall be distributed in accordance with the Plan Trust Agreement without the need for further order of the Bankruptcy Court or notice to any entities.

n)    *Federal Income Tax Treatment of Plan Trust*

(1)    Plan Trust Assets Treated as Owned by Creditors

For all federal income tax purposes, all parties (including, without limitation, the Debtor, Reorganized TERI, the Plan Trustee, and the holders of Allowed General Unsecured Claims) shall treat the transfer of the Plan Trust Assets to the Plan Trust including any amounts or other assets subsequently transferred to the Plan Trust (but only at such time as actually transferred) for the benefit of the holders of General Unsecured Claims, whether Allowed on or after the Effective Date, as (A) a transfer of the Plan Trust Assets directly to the holders of Allowed General Unsecured Claims, followed by (B) the transfer by such Persons to the Plan Trust of such Plan Trust Assets in exchange for beneficial interests in the Plan Trust. Accordingly, the holders of Allowed General Unsecured Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the applicable Plan Trust Assets.

(2)    Tax Reporting

(a)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), all parties shall treat the Plan Trust as a "liquidating trust" in accordance with Treasury Regulation section 301.7701-4(d), of which the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, are the grantors and beneficiaries. In the event an alternative treatment of the Plan Trust is required for federal income tax purposes, the Plan Trustee shall promptly notify in writing (or by comparable means) all holders of beneficial interests in the Plan Trust, and anyone who subsequently becomes a holder, of such alternative treatment.  The Plan Trustee shall file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 1 of the Plan.  The Plan Trustee also shall annually send to each record holder of a beneficial interest in the Plan Trust a separate statement setting forth such holder's share of items of income, gain, loss, deduction, or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Plan Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Trust that are required by any governmental unit. Subject to

74

Section 6.3(o)(ii)(C) of the Plan, the Plan Trust's taxable income, gain, loss, deduction or credit shall be allocated by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Plan Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Plan Trust Agreement, up to the tax book value of the Plan Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.

(b)    As soon as possible after the Effective Date, the Plan Trustee shall make a good faith valuation of the value of the Plan Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all federal income tax purposes.

(c)    Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Plan Trustee), the Plan Trustee shall (1) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section; (2) treat as taxable income or loss of the Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Plan Trust that would have been allocated to the holders of Disputed General Unsecured Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (3) treat as a distribution from the Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims as and when, and to the extent, such claims are subsequently resolved (following which time such assets shall no longer be held in the Disputed Claims Reserve) and (4) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes (including making any appropriate elections). The holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, shall report, for tax purposes, consistent with the foregoing.

(d)    The Plan Trustee shall be responsible for payments, out of the Plan Trust Assets, of any taxes imposed on the Plan Trust or the Plan Trust Assets, including the Disputed Claims Reserve.

(e)    The Plan Trustee may request an expedited determination of taxes of the Plan Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code, for all returns filed for, or on behalf of, the Plan Trust for all taxable periods through the dissolution of the Plan Trust (including the Disputed Claims Reserve).

LIBC/3667825.11

o)      *Dissolution of Plan Trust*

The Plan Trustee and the Plan Trust shall be discharged or dissolved, as the case may be as set forth in the Plan Trust Agreement.

p)      *Transition of Servicing and Collections of Defaulted Loans*

For a period of at least 30 days following the Effective Date, the Plan Trustee and First Marblehead Education Resources, Inc. ("FMER") shall attempt in good faith to negotiate the terms of a mutually acceptable transition agreement with respect to the servicing and collection of defaulted loans subject to the Trust Adversary Proceeding or otherwise subject to any Securitization Trust Settlement. For a period of no less than 90 days following the Effective Date, FMER shall continue to perform the services it has been providing during the Chapter 11 Case with respect to servicing and collecting defaulted loans subject to the Trust Adversary Proceeding pursuant to the Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the Benefit of the Trusts, entered on June 23, 2008, and FMER shall be entitled to payment from the Plan Trustee pursuant to such order; provided, however, FMER shall have no obligation to provide such services after the 90th day following the Effective Date.

### 4.      Closing of the Chapter 11 Case

The Plan Trustee will seek authority from the Bankruptcy Court to close the Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### E.      PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

#### 1.      No Distribution Pending Allowance

Notwithstanding any other provision of the Plan the Plan Trustee will not be compelled or required to distribute any Cash or other property on account of any Disputed Claim or any portion thereof, unless and until such Claim becomes an Allowed Claim, and distribution on account of such Allowed Claim is required pursuant to the terms of the Plan. In the event that a Make and Wait Lender or Make and Hold Lender purchased or sold loans guaranteed by the Debtor on the secondary market and the Debtor's records do not reflect such purchase or sale, the Plan Trustee shall be entitled to withhold distributions to such Creditors pending determination of the rightful owner of such loans.

#### 2.      Resolution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtor, and following the Effective Date, only the Plan Trustee, will have the right to the exclusion of all others to make, file, and prosecute objections to Claims, and will serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable. Objections to Claims must, subject to the Local Rules for the United States Bankruptcy Court—District of Massachusetts, be filed with the Bankruptcy Court and served upon each affected creditor. From

76

and after the Confirmation Date, all objections will be litigated to a Final Order except to the extent that the Plan Trustee elects to withdraw any such objection or the Plan Trustee and the holder of the Disputed Claim elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

### 3.    Estimation

In the event that the Plan Proponents seek entry of an order estimating claims, such estimation order shall not prejudice or otherwise affect the ability of the Plan Proponents or Plan Trustee, as the case may be, to object to the allowance of any Claim on any basis and the Bankruptcy Court will retain jurisdiction with respect to all Claims, including any Claim estimated pursuant to an estimation order.

### 4.    Allowance of Disputed Claims

If, on or after the Effective Date, any Disputed Claim in a Class that is entitled to receive a distribution under the Plan becomes an Allowed Claim, the Debtor, Reorganized TERI, or the Plan Trustee, as applicable, must, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, distribute to the holder of such Allowed Claim an amount sufficient to pay to such holder of a Disputed Claim the amount that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date.

### 5.    Disallowance of Claims Without Further Order of the Bankruptcy Court

As of the Confirmation Date, any Disputed Claim for which a proof of Claim has not been filed, will be deemed disallowed and expunged, without further act or deed.

### 6.    No Distribution in Respect of Disallowed Claims

To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim will not receive any distribution on account of the portion of such Claim that is disallowed.

### F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption or Rejection of Executory Contracts and Unexpired Leases

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity prior to the Commencement Date will be deemed rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (c) that is specifically designated as a contract or lease to be assumed

on schedules 8.1(A)(executory contracts) or 8.1(B) (unexpired leases), which schedules will be contained in the Plan Supplement; provided, however, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, either rejected or assumed as of the Effective Date.  The Debtor will provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on schedules 8.1(A) or (B) will not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

Reorganized TERI will pay from Reorganized TERI Assets all Cure Amounts, if any, to the non-Debtor parties to the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan by the earlier to occur of (i) the first Effective Date Anniversary or (ii) ten (10) days after resolution of the Cure Amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties.

If a non-Debtor party to an executory contract or unexpired lease assumed pursuant to Section 8.1 of the Plan timely objects to the assumption or the proposed Cure Amount for that agreement, the Debtor and the objecting party may settle, compromise, or otherwise resolve the proper Cure Amount without further order of the Court or, at the Debtor's sole discretion, may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount.

The Retained Cash of the Debtor shall be reduced by an amount equal to one-half of any Allowed General Unsecured Claims minus $50,000 arising from the rejection by the Debtor of the aggregate of all executory contracts rejected by the Plan (excluding Claims arising from the Debtor's rejection of Guaranty Agreements or other program documents or Claims filed against the Debtor prior to the filing of the Plan regardless of whether the underlying contract to which the claim relates was previously rejected pursuant to an Order of the Bankruptcy Court.

### 2.      Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to Section 8.1 of the Plan and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

### 3.      Inclusiveness

Unless otherwise specified on Schedules 8.1(A) and 8.1(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.1(A) and 8.1(B) will include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or

LIBC/3667825.11

unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.1(A) and 8.1(B).

### 4.    Return of Guaranty Fees

As soon as practicable following the Effective Date, the Plan Trustee (or the Debtor in cooperation with the Plan Trustee) will return any Guaranty Fees received in respect of Pipeline Loans to holders of Make and Wait and Make and Hold Claims that accept the Secured Creditor Settlement or Make and Hold Settlement.

| AMOUNT OF GUARANTY FEES TO BE RETURNED | |
|---|---|
| **BANK** | **AMOUNT** |
| PNC Bank | $959,136.00 |
| National City | $76,358.00 |
| HSBC | $30,000.00 |
| Comerica Bank | $40,541.04 |
| HSBC Bank | $30,717.63 |
| Sun Trust Bank | $28,363.91 |
| U.S. Bank | $26,619.45 |
| M&T Bank | $21,027.44 |
| Huntington Bank | $18,364.62 |
| Members 1st Federal Credit | $13,131.12 |
| KeyBank | $11,718.70 |
| Sovereign Bank | $3,627.77 |
| Penn Security Bank and Trust | $3,623.58 |
| UICI/CFLD | $3,440.44 |
| TCF Bank | $2,791.36 |
| AES (Keystone) | $1,406.11 |
| GMAC Bank | $1,379.55 |
| InsurBanc | $573.21 |
| M&T Bank (Keystone) | $151.65 |

### 5.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Sections 8.1 or 8.4 of the Plan must be filed with the Claims Agent on or before the Rejection Bar Date. All such Claims not filed within such time will be forever barred from assertion against the Debtor, its Estate or Reorganized TERI and its property.

LIBC/3667825.11

### 6.    Insurance Policies

All of the Debtor's insurance policies (which policies are maintained by the Debtor in the ordinary course of business and the premiums for which have been prepaid) will remain in full force and effect with regard to Reorganized TERI, and are not required to be assumed by the Debtor. Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the Debtor may hold against any entity to the extent of available insurance, including, without limitation, the insurer under any of the Debtor's policies of insurance. Under all circumstances, Reorganized TERI, and not the Plan Trustee or the Plan Trust Assets, shall be responsible for and available to pay all premiums and other insurance related expenses and liabilities.

### 7.    Compensation and Benefit Programs

From and after the Effective Date, Reorganized TERI shall make any and all payments due (for Cure Costs, contributions, Administrative Expense Claims, Claims or otherwise) solely from Reorganized TERI Assets for any and all savings plans, retirement plans (including without limitation the Pension Plan), health care plans, performance-based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability, other insurance plans and management contracts. Reorganized TERI's obligations under this section shall apply regardless whether the Debtor assumes, rejects or neither assumes nor rejects such plans and contracts as of the Effective Date.

### 8.    Retiree Benefits

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized TERI will continue to pay all retiree benefits of the Debtor (within the meaning of section 1114 of the Bankruptcy Code) and all amounts due or to become due in any way related to the Pension Plan, if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtor had obligated itself to provide such benefits, *provided*, *however*, nothing herein will alter Reorganized TERI's right to amend or modify retiree benefits in accordance with applicable law. Reorganized TERI will remain obligated (to the exclusion of the Plan Trustee or any Creditor) to contribute to the Pension Plan the amount necessary to satisfy ERISA's minimum funding standards, ERISA §302; Internal Revenue Code §412. The Pension Plan may be terminated only if the statutory requirements of either ERISA §4041, 29 U.S.C. §1341, or ERISA §4042, 29 U.S.C. §1342, are met. If the Pension Plan terminates, Reorganized TERI and all members of its controlled group will be jointly and severally liable for unpaid minimum funding contributions, premiums, and unfunded benefit liabilities of the Pension Plan. See 29 U.S.C. §1362(a).

Confirmation of the Plan shall operate as a judicial determination, binding on all Entities, that neither the Plan Trustee nor any Creditor that is not an insider of the Debtor (i) is a member of the controlled group of Reorganized TERI or the Debtor for any purpose, including as set forth in the immediately preceding sentence, and (ii) shall incur any liability whatsoever to any Entity (including, without limitation, to the United States of America, any of its administrative

agencies or political subdivisions, the United States Internal Revenue Service or the United States Pension Benefit Guaranty Administration) on account of or related to the Pension Plan.

### G. CONDITIONS PRECEDENT TO THE ENTRY OF THE CONFIRMATION ORDER

The following are conditions to the entry of the Confirmation Order by the Bankruptcy Court:

(a)     The Bankruptcy Court has found and determined that all of the applicable requirements of 11 U.S.C. §1129 have been satisfied, have been performed or have occurred;

(b)     The Creditors' Committee has not reasonably determined that the Debtor and the Creditors' Committee are unable or will be unable to agree upon the form and substance of any document included in the Plan Supplement;

(c)     The Confirmation Order shall be entered no later than June 15, 2010; and

(d)     The Debtor has disbursed Cash prior to the Confirmation Hearing substantially in accordance with its cash projections provided to the Creditors' Committee and Final Orders of the Bankruptcy Court, and for no other purposes.

### H. EFFECTIVENESS OF THE PLAN

#### 1. Conditions Precedent to the Effective Date

The following are conditions precedent to the occurrence of the Effective Date of the Plan which shall occur on or before June 30, 2010 unless the Creditors' Committee consents to an extension beyond June 30, 2010.

(a)     The Bankruptcy Court shall have entered the Confirmation Order, which shall approve the Plan on substantially the same terms and conditions set forth in the Plan, which shall be in form and substance satisfactory to the Plan Proponents;

(b)     No stay of the Confirmation Order shall then be in effect at the time the other conditions set forth in Section 9.1 or 10.1 of the Plan are satisfied or waived;

(c)     The Available Cash transferred to the Plan Trustee on the Effective Date shall not be less than $36,000,000 (inclusive of the aggregate Cash the Debtor deposited into the KeyBank Victory Fund after the Commencement Date) and exclusive of any Ambac Trust payments to the Debtor by the Cash (or other property transferred to released) to the Debtor or Plan Trustee from any Collateral Account;

(d)     The Creditors' Committee shall have filed with the Court a "Notice Establishing the Date for the Effective Date," and

(e)    All documents, instruments and agreements, in form and substance satisfactory to the Plan Proponents, provided for under or necessary to implement the Plan, including but not limited to the Plan Trust Agreement, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties thereto.

### 2.    Waiver of Conditions

Each of the conditions precedent in section 10.1 of the Plan may be waived, in whole or in part, by the Plan Proponents. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court or any formal action.

### 3.    Reduction in Retained Cash

If Available Cash is not at least equal to $36,000,000 (inclusive of the amounts held in the KeyBank Victory Fund), then, at the election of the Creditors' Committee, in its sole discretion, the Effective Date of the Plan may occur and the Retained Cash will be reduced by an amount equal to the difference between $36,000,000 and the Available Cash.

## I.    EFFECTS OF CONFIRMATION

### 1.    Vesting of Assets.

(a)    As of the Effective Date, the property of the Estate, including all claims and Causes of Action against third parties that arose prior to or after the Commencement Date, will vest in Reorganized TERI or the Plan Trust as provided in the Plan.

(b)    From and after the Effective Date, Reorganized TERI and the Plan Trust may dispose of its respective assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan.

(c)    Pursuant to Section 1141(c) of the Bankruptcy Code, as of the Effective Date, all assets of Reorganized TERI and the Plan Trust (including, without limitation, all funds in all Collateral Account established for the benefit of Entities who have not filed timely a proof of claim) will be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.

(d)    Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall affect the terms of the Transition Services Agreement dated May 30, 2008, as approved by order of the Bankruptcy Court dated June 23, 2008, or the parties' respective rights thereunder or with respect thereto.

### 2.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against the Debtor and its respective successors and assigns, whether or not the Claim of such holder is

Impaired under the Plan and whether or not such holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan whose actions may be required to effectuate the term of the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtor under chapters 7 or 11 of the Bankruptcy Code).

### 3.    Discharge

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor and Reorganized TERI, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and liabilities that arose prior to the Confirmation Date. Upon the Effective Date, all such Persons or Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor or Reorganized TERI.

### 4.    Releases

#### a)    *Satisfaction of Claims Against the Debtor*

*Except as otherwise provided for in section 12.4(b) and (c) of the Plan, the treatment to be provided for respective Allowed Claims against the Debtor pursuant to the Plan shall be in full satisfaction, settlement and release of such respective Claims against the Debtor.*

#### b)    *Releases by Debtor Releasors*

*Except as otherwise specifically provided in section 12.4(b) of the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the implementation of the Plan, the Released Parties, on and after the Effective Date, are released by the Debtor Releasors from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, or any Person or Entity claiming derivatively through or on behalf of the Debtor would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date other than for claims based upon gross negligence or willful misconduct; provided, however, that for the avoidance of doubt, the foregoing release does not include a release of any objection or defense that the Debtor Releasors may have with respect to Allowance of any Claim, provided, further, that nothing in this paragraph shall be deemed to be a release by any of the Debtor Releasors of any Person or Entity of any Causes of Action or of any obligations imposed on any of them pursuant to the Plan.*

#### c)    *Injunction*

LIBC/3667825.11

*As of the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Persons or Entities who, directly or indirectly, have held, hold or may hold Claims against the Debtor or, as to Claims which are derivative of the Debtor and released pursuant to Section 12.4(b), the Released Parties, are permanently enjoined from taking any of the following actions on account of any such Claims, debts, interests or liabilities, other than actions brought to enforce any rights or obligations under this Plan: (i) commencing or continuing in any manner any action or other proceeding against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor, the Plan Trustee, the Released Parties or their respective properties, (v) commencing or continuing, in any manner or any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall be deemed to (a) be a release by any of the Debtor Releasors, or any Person or Entity other than Released Parties, of any Causes of Action; (b) enjoin the prosecution by the Plan Trustee of the Causes of Action (other than to the limited extent provided for in the Plan against the Released Parties), and (c) subject to section 5.5(h) above, enjoin any Person or Entity from asserting any defense or claims as a defense in any civil action, including, without limitation, in the Trust Adversary Proceeding. Notwithstanding any language to the contrary herein or in any other document, as to any Entity (including the Released Parties), nothing herein shall impair or enjoin the Plan Trustee from seeking to enforce, or to assert rights and recover damages with respect to any breach of the terms of this Plan.*

### d)  *Exculpation*

*The Debtor, the Released Parties, KeyBank National Association, as Administrator and Master Servicer of the KeyCorp Trusts, The Bank of New York Mellon Trust Co., N.A., as Eligible Lender Trustee and as Indenture Trustee for certain KeyCorp Trusts, The Bank of New York (Delaware), as Owner Trustee for certain KeyCorp Trusts, Deutsche Bank Trust Company Americas, as Indenture Trustee and Owner Trustee for certain KeyCorp Trusts, FMDS, solely in its capacity as Administrator to the Securitization Trusts, U.S. Bank, National Association, solely in its capacity as Indenture Trustee, trustee and eligible lender trustee to the Securitization Trusts and Other Trusts, and in any capacity in which it was named as a defendant in the Trust Adversary Proceeding, and as bank or agent with respect to the Collateral Accounts, and MBIA Insurance Corporation, and Ambac Assurance Corporation and their respective members and professionals (acting in such capacity) (the foregoing, excluding the Debtor, the "Plan Exculpation Parties"), shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, or any act taken or omitted to be taken in connection with, in contemplation of, during or in any way related to the Chapter 11 Case (all of the foregoing being collectively referred to as the "Exculpated Acts"), except for transactions, acts or omissions (i) as a result of willful misconduct or gross negligence, (ii) with respect to*

84

transactions occurring pursuant to the "Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the benefit of the Trusts" entered by the Bankruptcy Court on June 23, 2008, (iii) occurring pursuant to the Transition Services Agreement between FMER and the Debtor approved by the Bankruptcy Court on June 23, 2008, or (iv) pursuant to any contracts between or among the Debtor and any entity entered into prior to the commencement of this Bankruptcy Case. This provision does not exculpate the foregoing Persons, including the Debtor, from performing their duties under the Plan and effectuating the Plan. Nothing in this section 12.4(i) exculpates the Debtor or Reorganized TERI from performing its obligations under any contract or agreement not rejected under the Plan pursuant to 11 U.S.C. §365 or (ii) exculpates any Person from obligations unrelated to the Exculpated Acts it may owe to any other Person under any contract.

### 5.    Release of Assets

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtor, its assets and properties and the Estate.  Thereafter, jurisdiction of the Bankruptcy Court shall be limited as set forth in Article XI of the Plan.

## J.    RETENTION OF JURISDICTION

### 1.    Jurisdiction of Bankruptcy Court

The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

    (a)    To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of any Claims resulting therefrom;

    (b)    To determine any and all pending adversary proceedings, applications and contested matters relating to the Chapter 11 Case;

    (c)    To hear and determine any objection to any Claims;

    (d)    To hear and determine the Causes of Action;

    (e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

    (f)    To issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

(g)     To consider any modifications of the Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(i)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(j)     To hear and determine any actions brought against the Plan Trustee or Reorganized TERI;

(k)     To recover all assets of the Debtor, property of the Estate and assets of the Plan Trustee, wherever located;

(l)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods ending after the Commencement Date through the closing of the Chapter 11 Case);

(m)     To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

(n)     To hear any other matter consistent with the provisions of the Bankruptcy Code; and

(o)     To enter a final decree closing the Chapter 11 Case.

## K.    MISCELLANEOUS PROVISIONS

### 1.    Post-Confirmation Date Fees and Expenses

After the Effective Date, Reorganized TERI will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses, incurred after the Effective Date, of the professional persons employed by Reorganized TERI in connection with the implementation and consummation of the Plan and any other matters as to which such professionals may be engaged.  The fees and expenses of such professionals will be paid within ten (10) Business Days after submission of a detailed invoice therefor.  If Reorganized TERI disputes the reasonableness of any such invoice, Reorganized TERI will timely pay the undisputed portion of such invoice, and Reorganized TERI or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of such portion of the disputed invoice.

LIBC/3667825.11

### 2.    Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Case, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents will terminate; *provided, however*, that immediately prior to the dissolution of the Creditors' Committee, any and all analyses or work product prepared by and/or information obtained by the Creditors' Committee or its attorneys, accountants and other agents related to the Causes of Action must be transferred to the Plan Trust and will be deemed an asset of the Plan Trust for purposes of the Plan; *provided further, however*, the Creditors' Committee will continue to exist after such date solely with respect to all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any professional retained by the Creditors' Committee.  On and after the Effective Date, the Plan Trustee Advisory Committee will have the same standing to participate in proceedings before the Bankruptcy Court as the Creditors' Committee had prior to the Effective Date.

### 3.    Plan Supplement

The documents comprising the Plan Supplement will be filed with the clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject the Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours. Holders of Claims may obtain a copy of the Plan Supplement upon written request to the Debtor's bankruptcy counsel or on the website of the Voting Agent (www.epiqsystems.com). All exhibits and schedules contained in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 4.    Plan Controls Disclosure Statement; Confirmation Order Controls Plan

To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan will be controlling. To the extent the Confirmation Order is inconsistent with the Plan, the provisions of the Confirmation Order will be controlling.

### 5.    Modification of the Plan.

The Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order, subject to the consent of the Creditors' Committee. After the entry of the Confirmation Order but prior to the Effective Date, the Plan Proponents may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim that is deemed to have accepted the Plan will be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

LIBC/3667825.11

Prior to the Effective Date, the Creditors' Committee, in its sole and absolute discretion, shall have the right not to accept any portion of the Plan Trust Assets. Any such Plan Trust Assets that the Creditors' Committee declines to accept as Plan Trust Assets shall instead be deemed to be Reorganized TERI Assets under the Plan.

## V.   CONFIRMATION PROCEDURES

### A.   VOTING PROCEDURES AND SOLICITATION OF VOTES

The voting procedures and the procedures governing the solicitation of votes are described above in Section I, and in the Solicitation Procedures Order, which has been sent to you simultaneously with this Disclosure Statement if you are entitled to vote on the Plan.

### B.   CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing will commence on _____, 2010 at _____ prevailing Eastern Time, before the Honorable Henry J. Boroff, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Massachusetts, ___ Floor, Courtroom __, **[ADDRESS]**.

### C.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Plan Proponents believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

Specifically, the Plan Proponents believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Plan proponents will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Plan Proponents under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been approved or is subject to approval by the Bankruptcy Court.

- The Plan Proponents have disclosed the identity and affiliations of the individuals proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of Reorganized TERI and the appointment to or continuance in office of such individuals is consistent with the interest of Creditors and with public policy.

LIBC/3667825.11

- The requirement that any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan does not apply.

- Either each holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Claims deemed to reject the Plan.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan. The Plan contemplates the liquidation of the Plan Trust Assets by the Plan Trustee.

- The Debtor has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtor will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed during the Debtor's Chapter 11 Case for each quarter (including any fraction thereof), to the Office of the United States Trustee. Subsequent to the Effective Date, the Plan Trustee will pay such fees until the case is closed.

89

## 1.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the debtor's chapter 11 case was converted to a chapter 7 case and the assets of the debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In a chapter 7 case, unsecured creditors of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

As described in more detail in the Liquidation Analysis, the Plan Proponents believe that the value of any distributions if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code would be less than the value of distributions under the Plan because conversion of the Chapter 11 Case would likely result in additional costs. There could also be higher general unsecured claims, including claims of the Pension Benefit Guaranty Corporation (estimated to be at least $1.5 million) and claims by senior management for claims under such officer's employment contracts. The Plan Proponents estimate that General Unsecured Creditors will receive a distribution of approximately 40-60% of their total Allowed Claims pursuant to the terms of the Plan and approximately 15%-17% if the case were converted to Chapter 7. However, such estimation includes a number of assumptions and significant economic uncertainties so there can be no assurance that the estimates provided herein and in the Best Interest Analysis will actually be achieved.

As set forth in the Liquidation Analysis, the Plan Proponents have assumed that the contingent guaranty claims would be the same in Chapter 7 as Chapter 11. However, as set forth in this Disclosure Statement, the value of the guaranty claims using the Creditors' Committee's "Decoder" is the product of months of negotiations. There is no assurance that Chapter 7 Trustee would adopt the "Decoder" or that creditors would continue to agree to a claim based upon such Decoder. Therefore, guaranty claims in a Chapter 7 could be substantially higher.

The Plan Proponents also believe that the value of any distributions to each Class of Allowed Claims in a hypothetical Chapter 7 case would be less than the value of distributions under the Plan because the distributions in a hypothetical Chapter 7 case likely would be delayed for a substantial period of time due to litigation regarding security interests and claim amounts. There is a risk that distribution of the proceeds of a hypothetical Chapter 7 liquidation might not

occur for one or more years after the completion of such liquidation in order to resolve Claims and prepare for distributions. Incorporating the time value of distributions to the liquidation analysis attached as Exhibit 3, would further lower the estimated recoveries as presented.

In addition, the Plan Proponents believe that if the case were converted to a Chapter 7, the estate would lose its tax exempt status and would incur "phantom income tax" as a result of the Debtor's ownership interest in the Residuals. While the amount of such tax is uncertain, the Plan Proponents currently estimate that such phantom income tax could cause the Chapter 7 estate to incur millions of dollars of tax liability, per annum.

Finally, the Plan Proponents believe that a Chapter 7 Trustee who has no specific familiarity with the Debtor's business or Causes of Action, and no agreement with the Debtor's personnel to cooperate, may not be able to maximize the value of the estate's assets. The Plan Proponents believe that the structure of the Plan, including utilizing the expertise of the Debtor, the Creditors' Committee and their respective professionals, and allowing Reorganized TERI to collect the TERI Owned Loans, will provide additional recoveries for creditors that could not be obtained by outside trustees and professionals who are not familiar with this Chapter 11 Case.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of Reorganized TERI to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

Reorganized TERI expects to have approximately 60 employees -- 40 of whom will work almost exclusively in the "College Access" outreach programs. The remaining employees will be Reorganized TERI's senior management, collection management and accounting staff. Reorganized TERI expects to generate revenues by providing loan related services, including portfolio management and collection management services.

The Debtor has prepared Exhibit D to this Disclosure Statement, entitled Reorganized TERI Financial Statement and comprised of financial projections and pro forma balance sheets ("Projections") for the three years ended April 30, 2011, 2012, and 2013. The Projections are based upon a variety of assumptions subject to significant business, economic and competitive uncertainties, contingencies and risks, many of which are beyond the control of the Debtor. Consequently, the Projections should not be regarded as a representation or warranty by the Debtor that the Projections will be realized. Actual results may vary materially from those presented and the variations may be adverse..

The Projections indicate that Reorganized TERI will have sufficient cash to operate its business and collect the TERI Owned Loans pursuant to the Collections Contract. The Projections assume that Reorganized TERI will be able to generate revenue in addition to the revenue generated by the Collections Contract by providing various portfolio management and collection management services. However, in the event that such new business does not

91

materialize within 12 months of the Effective Date, Reorganized TERI intends to further reduce costs by further reducing headcount and implementing additional cost-saving measures. Regardless of whether Reorganized TERI is able to generate new business, the Debtor believes that it will have sufficient cash, resources and time to implement operational changes, reduce overhead and continue to operate its business and perform under the Collections Contract. Pursuant to internal projections prepared by the Debtor (and set forth below), even in a "worst-case" scenario in which Reorganized TERI is unable to generate any revenue other than the Collections Contract and existing collection management contracts, and without use of any the funds from the Restricted Charitable Gifts or Restricted Grant Funds, Reorganized TERI will be able to reduce costs (but maintain its collection staff) and still have nearly $1,400,000 of the $3,400,000 of Retained Cash as of April 30, 2012.

**The Education Resources Institute, Inc.**

Income Statement – TERI "Conservative Case" Scenario

| ($ in whole amounts) | Projected 12 Months Ended 4/30/2011 | Projected 12 Months Ended 4/30/2012 |
|---|---|---|
| **Revenue** | | |
| Collections revenue | 814,870 | 638,488 |
| Risk management revenue | - | - |
| Shared recoveries | 1,000,000 | 1,000,000 |
| Other revenue | - | - |
| **Total Revenue** | **1,814,870** | **1,638,488** |
| Expenses | | |
| Depreciation | (69,351) | (73,351) |
| Employee costs* | (2,231,733) | (883,939) |
| Professional services | (286,000) | (235,750) |
| SG&A | (793,699) | (758,735) |
| TERI other income (expense) | (52,268) | (52,406) |
| **Total Expenses** | **(3,433,021)** | **(2,004,181)** |
| **Operating Income** | (1,618,150) | (365,694) |
| Interest Income (expense) | 10,007 | 7,501 |
| **Net Increase in Assets** | **$  (1,608,143)** | **$   (358,192)** |

* May increase if Board elects to award severence

92

In addition, because the overwhelming majority of the Debtor's assets, will be transferred to the Plan Trust, the ability of the Plan Trustee to make the distributions contemplated by the Plan is independent of future earnings of Reorganized TERI. Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1 and 6 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. The Claims in Classes 2a-2p, Classes 3a - 3q, Classes 4a-4k and Class 5 are Impaired under the Plan. These voting Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

#### a)    *Unfair Discrimination*

The "unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that

LIBC/3667825.11

the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Plan Proponents believe that the Plan does not unfairly discriminate against any holders of Claims against the Debtor.

b)    *Fair and Equitable*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class of claims, the test sets different standards depending on the type of claims in such class.

(1)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (I) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(2)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property. This second requirement is sometimes referred to as the "absolute priority rule".

The Plan Proponents believe that the Plan is fair and equitable to all Classes, and that the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

The Plan Proponents believe that pursuant to existing case law, the absolute priority rule is not applicable in a chapter 11 of a not for profit corporation.

94

Non-profit entities typically have no equity holders.[13] Courts have ruled that, as a result of the lack of equity holders, the absolute priority rule is not applicable to a non-profit Chapter 11 plan. The *Teamsters* Bankruptcy Court stated that "the [a]bsolute [p]riority rule does not provide that a debtor entity may not receive or retain property unless all creditors have been paid in full."[14] Rather, the Bankruptcy Court held that "the [a]bsolute [p]riority rule does not, by its terms, prohibit a debtor entity from retaining its own assets, and cannot, by its terms, apply to a situation such as this where the debtor has no equity security holders."[15] The Ninth Circuit upheld the Bankruptcy Court's ruling while explaining the rationale for its holding. The Ninth Circuit stated that the rationale for the absolute priority rule in the for profit context is that equity owners should be forced to choose between liquidating their interest in the debtor or contributing value to the debtor, because the equity owners only concern is the profitability of the corporation, making their decision one of pure economics.[16] Implied in this statement is the justification for the courts ruling that the absolute priority rule does not apply in nonprofit contexts because there is no equity holder whose sole motivation is profit. Under our facts, there is no equity holder, and the assets to be retained by the debtor are retained to facilitate the debtor's charitable mission. Profit is not the primary motivation.

Courts applying *Teamsters* and *Wabash* look at the question of whether there are equity interests in a non-profit Chapter 11 case, and will not apply the absolute priority rule if no equity interest exists. Thus, the fundamental question for courts is simply whether there is any ownership interest analogous to an equity interest being retained by the debtor in the proposed plan.[17] The absolute priority rule did not prevent plan confirmation in a non-profit hospital's bankruptcy because the debtor did not have a "favored position" over the hospital's largest unsecured creditor.[18]

## VI.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and Reorganized TERI and holders of certain Allowed Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder (the "Regulations"), and administrative and judicial interpretations thereof available on or before such date. Changes in such roles or new interpretations thereof may have retroactive effect and could significantly

---

[13]   *In re Save Our Springs (S.O.S) Alliance, Inc.*, 388 B.R. 202, 245 (W.D.Tex. 2008).

[14]   *In re General Teamsters, Warehouseman and Helpers Union, Local 890*, 225 B.R. 719, 735-736 (Bankr.N.D.Cal. 1998).

[15]   *Id. at 737.*

[16]   *Teamsters* at 874.

[17]   *In re Corcoran Hosp. Dist.*, 233 B.R.449, 458 (Bankr.E.D.Cal 1999) (holding that the absolute priority rule did not apply to a non-profit hospital district because the "residents" of the district had no ownership interest akin to that of shareholders of a corporation or partners in a partnership.).

[18]   *In re Whittaker Memorial Hosp. Ass'n, Inc.*, 149 B.R. 812, 816 (Bkrtcy.E.D.Va. 1993); *See also, Independence Village*, 52 B.R. 715, 726 (stating that where a non profit had no shareholders, no interest existed that was inferior to the unsecured creditors interest).

95

affect the federal income tax consequences described below.  The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtor has not requested and will not request a ruling from the Internal Revenue Service ("IRS") or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.

The following discussion does not address any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law or United States tax laws other than income taxation.  This discussion does not apply to holders of Allowed Claims who are not United States Persons (as described by Section 7701(a)(30) of the Code), nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtor within the meaning of the Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, holders liable for the alternative minimum tax, holders whose functional currency is not the US dollar, regulated investment companies, tax-exempt organizations, pass-through entities such as partnerships and holders through such pass-through entities and holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that holders of Claims hold only Claims in a single Class. Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

If a partnership holds a Claim, the tax treatment of a partner of such partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding Claims against the Debtor, you should consult your tax advisors.

The following assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out.  This discussion further assumes that the various debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS AND SCHEDULES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR PROMOTION OF THE**

TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A.    CONSEQUENCES TO THE DEBTOR AND REORGANIZED TERI

The Debtor is a not-for-profit corporation that is exempt from federal income taxation under section 501(c)(3) of the Title 26 of the United States Code (the "Tax Code"). After the Effective Date, Reorganized TERI will remain a not-for-profit. It is intended that nothing in the Plan shall adversely affect, or be interpreted inconsistently with, the tax exempt status of the Debtor or Reorganized TERI. Accordingly, the Debtor does not expect the implementation of the Plan to have any adverse federal income tax consequences to it or Reorganized TERI.

### B.    CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASSES 1, 2a – 2p, 3a – 3q, 4a-4k, 5 AND 6

Pursuant to the Plan, holders of Allowed Priority Non-Tax Claims (Class 1), Secured Claims of Make and Wait Lenders (Classes 2a through 2p), Secured Claims of Certain Securitization Trusts (Classes 3a through 3q), Secured Claims of Key Corp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) (Classes 4a-4k) and Convenience Class Claims (Class 6) will receive Cash in full payment of their Allowed Claims. A holder of a Claim who receives Cash in exchange for such Claim pursuant to the Plan generally will recognize income, gain, or loss for federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim and (b) the holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.

### C.    CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASS 5

Pursuant to the Plan, holders of General Unsecured Claims (Class 5) will receive a Pro Rata share of the beneficial interests in the Plan Trust. In general, each holder of a General Unsecured Claim will recognize gain or loss equal to the difference between (a) "amount realized" which is equal to the fair market value of the undivided interest in the Plan Trust received by such holder and (b) the holder's adjusted tax basis in its Claim.

#### 1.    The Plan Trust

The Plan Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through entity), such that the holders of its beneficial interests are treated as owning an undivided interest in the underlying assets of the trust. However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Plan Trust has been structured

97

with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, Reorganized TERI, the Plan Trustee and the holders of Allowed General Unsecured Claims against the Debtor) are required to treat, for federal income tax purposes, the Plan Trust as a grantor trust of which the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, are the owners and grantors. However, no ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Plan Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge the trust classification, the federal income tax consequences to the Plan Trust, the holders of Claims against the Debtor, and Reorganized TERI may vary from those discussed herein.

*Holders of Allowed General Unsecured Claims are urged to consult with their tax advisors regarding potential alternative characterizations.*

a)   *General Tax Reporting by the Plan Trust Trustee and Beneficiaries*

For all federal income tax purposes, all parties (including, without limitation, Reorganized TERI, the Plan Trustee, and the holders of Allowed General Unsecured Claims against the Debtor) must treat the transfer of assets to the Plan Trust, and any amounts or other assets subsequently transferred to the Plan Trust in accordance with the terms of the Plan (but only at such time as actually transferred), as a transfer of an undivided interest in the Plan Trust Assets to the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, followed by the transfer of the entire interest in the Plan Trust Assets by the beneficiaries of the Plan Trust to the Plan Trust (absent being notified by the Plan Trustee, as discussed below, or the IRS that an alternative treatment is required). Consistent therewith, all parties must treat the Plan Trust as a grantor trust of which the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, are the owners and grantors. Thus, the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, will be treated as the direct owners of an undivided interest in the assets of the Plan Trust for all federal income tax purposes (which assets will have a tax basis equal to their fair market value on the date transferred to the Plan Trust).

Pursuant to the Plan, the Plan Trustee shall make a good faith valuation of the value of the Plan Trust Assets and shall provide such valuation to the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date. Under the Plan, such holders (and all other parties, including Reorganized TERI) are required to report the value of such assets in a manner consistent with the valuations provided by the Plan Trustee for federal income tax purposes. There can be no assurance that the IRS will agree with the valuations provided by the Plan Trustee, and a different valuation of the assets transferred to the Plan Trust could subject the holders of Allowed General Unsecured Claims against the Debtor to additional income taxes.

Subject to the treatment of the Disputed Claims Reserve (discussed in the next section), the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, will be required to report on their federal income tax return their allocable share of any taxable income, gain, loss, deduction or credit recognized or incurred by

98

the Plan Trust. Allocations of taxable income and gain will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Plan Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Plan Trust Agreement, up to the tax book value of the Plan Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The character of items of income, gain, loss and credit to any holder, and the ability of such holder to benefit from any deduction or losses, may depend on the particular situation of each holder.

The federal income tax obligations of a holder of an Allowed General Unsecured Claim against the Debtor that will result from holding an interest in the Plan Trust are not dependent upon the Plan Trust distributing any Cash or other proceeds. Therefore, any such holder may incur a federal income tax liability with respect to its allocable share of the income of the Plan Trust regardless of the fact that the Plan Trust has not made any concurrent distribution to the holder. In general, other than in respect of assets treated as held in the Disputed Claims Reserve and distributions resulting from unclaimed distributions, a distribution of Cash or property by the Plan Trust will not be taxable to the holder as such holder would already be regarded for federal income tax purposes as owning the underlying assets (and would already have realized associated income, if any).

Subject to definitive guidance that an alternative treatment of the Plan Trust is required, the Plan Trustee will file with the IRS returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Plan Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct each holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.

Pursuant to the Plan, all parties are required to treat the Plan Trust as a "grantor trust" subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee). In the event an alternative treatment of the Plan Trust is required for federal income tax purposes, the Plan Trustee will promptly notify in writing (or by comparable means) all holders of beneficial interests in the Plan Trust, and anyone who subsequently becomes a holder, of such alternative treatment.

b)      *Tax Treatment of Disputed Claims Reserve*

Pursuant to the Plan, the Plan Trustee will hold the assets of the Plan Trust allocable to, or retained on account of, Disputed General Unsecured Claims against the Debtor, as determined from time to time, separately from other assets of the Plan Trust in the Disputed Claims Reserve.

99

Such assets shall be subject to an allocable share of all expenses and obligations of the Plan Trust. Distributions from the Disputed Claims Reserve will be made, in accordance with the Plan, as Disputed General Unsecured Claims against the Debtor are subsequently resolved.

Under section 468B(g) of the Tax Code, amounts earned in an escrow account, settlement fund or similar fund are subject to tax on a current basis, as the amounts are earned. The Plan provides that the Plan Trustee will, to the extent permitted under applicable law, make an election to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9, and report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties must report consistently with such treatment.

A disputed ownership fund is subject to a separate entity level tax, in a manner similar to either a corporation or a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1 *et seq.*, depending upon the nature of the assets transferred to the fund. In the present case, it is expected that the Disputed Claims Reserve will be taxable similar to a corporation. So treated, the Disputed Claims Reserve will be subject to a separate entity tax (maximum federal income tax rate, currently 35%).

In determining the taxable income of the Disputed Claims Reserve, (a) any amounts transferred by the Debtor to the reserve will be excluded from the reserve's income; (b) any sale or exchanges of property by the Disputed Claims Reserve (including recoveries on Plan assets, to the extent allocable to the Disputed Claims Reserve) will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis that the Disputed Claims Reserve has in such property; (c) any interest income or other earnings with respect to the Disputed Claims Reserve's assets will be included in the Disputed Claims Reserve's income; and (d) any administrative costs (including state and local taxes) incurred by the Disputed Claims Reserve will be deductible by the Disputed Claims Reserve.

Pursuant to the Plan, the Plan Trustee will take into account in determining the taxable income or loss of the Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Plan Trust that would have been allocated to the holders of Disputed General Unsecured Claims against the Debtor had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), and as a distribution from the Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims against the Debtor as and when, and to the extent, such Claims are subsequently resolved (following which time such assets shall no longer be held in the Disputed Claims Reserve).

Although not entirely certain, it appears that distributions from the Disputed Claims Reserve to holders of Allowed General Unsecured Claims against the Debtor should be taxed to such holders in the same manner as if such amounts were received directly from the Debtor. Although not expected, if upon the termination of the Disputed Claims Reserve, the reserve has any unused tax loss or credit carryforwards, the Treasury Regulations would allocate the carryforwards among all or part of the holders of the Allowed General Unsecured Claims against the Debtor.

LIBC/3667825.11

### D.    INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding obligations (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate (currently 28%). Backup withholding generally applies if the holder: (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is such holder's correct number and that such holder is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, applicable Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among others, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holders' federal income tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.*

## VII.    RISK FACTORS

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A.    CERTAIN BANKRUPTCY CONSIDERATIONS

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate a resolicitation of votes. Finally, there can be no assurance that any or all of the conditions to the Effective Date of the Plan will be met (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

LIBC/3667825.11

B.    **MATERIAL UNITED STATES FEDERAL INCOME TAX
CONSIDERATIONS**

THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL INCOME
TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH
CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ
CAREFULLY THE DISCUSSION SET FORTH IN SECTION VI OF THE DISCLOSURE
STATEMENT, ENTITLED "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES"
FOR A DISCUSSION OF THE MATERIAL UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES AND RISKS FOR THE DEBTOR AND FOR HOLDERS OF CLAIMS
THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING
FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.

C.    **RISK THAT CLAIMS WILL BE HIGHER THAN ESTIMATED**

The projected distributions and recoveries set forth in this Disclosure Statement and the
analysis attached as Exhibit C are based on the Plan Proponents' estimates of contingent claims
as well as an estimate of other Allowed Claims. The Plan Proponents project that the Claims
asserted against them will be resolved in and reduced to an amount that approximates their
estimates. There can be no assurance, however, that the Plan Proponents' estimates will prove
accurate. If the estimate is low, for example, the Plan Trust Assets may not be sufficient to reach
the projected 55% recovery to General Unsecured Creditors.

D.    **RISK THAT THE CLAIMS OF FMC AND ITS SUBSIDIARIES WILL
NOT BE SUBSTANTIALLY REDUCED BY THE COURT**

As disclosed previously, prior to the Commencement Date, TERI outsourced its front
office and back office services to FMC, including loan processing, human resources and
accounting. On October 16, 2008, FMC and its subsidiaries, FMER and FMDS filed separate
proofs of claim against the Debtor alleging rejection damages and other claims in excess of
$87,000,000. The Debtor believes that the Claims asserted by the FMC entities are substantially
inflated and seeks damages that are not compensable under state law. The Debtor believes that
the amount of FMC's aggregate claims are no more than $14,000,000 and potentially
significantly less than that amount. The Debtor intends to file an objection to FMC's claim.
However, there can be no assurance that the Debtor will prevail in its objection. If the FMC
claims are not reduced, the recovery to holders of General Unsecured Claims will be diluted.

E.    **RISK THAT THE PLAN TRUSTEE WILL NOT ACHIEVE PROJECTED
RECOVERIES IN RESPECT OF DEFAULTED LOANS**

A significant portion of the value ascribed to the Plan Trust is comprised of defaulted
student loans that must be collected through various collection methods and agencies. The book
value represents the present value of future recoveries of defaulted loans using a 48% net
recovery rate (which is consistent with the Debtor's historical experience). The value of these
loans is subject to a variety of factors -- including the timing of recoveries, the net recovery rate
and the discount rate. However, there can be no assurance that such amount will actually be
achieved. Moreover, often it takes years to recover defaulted loans and given the life of these

102

assets, there is the possibility that the Plan Trustee will seek to monetize the defaulted loan portfolios at a future date, thereby, in all likelihood, reducing the value received in respect of the defaulted loan portfolios.

### F.    LITIGATION RISKS

The Plan provides, among other things that the Debtor's interest in Causes of Action will be transferred to the Plan Trust to be prosecuted by the Plan Trustee for the benefit of the holders of General Unsecured Claims.  Although the Plan Proponents anticipate that the Causes of Action will, in time, be resolved in a manner that provides a net benefit to the holders of General Unsecured Claims, there can be no guarantee that the result will be favorable.

Other than the Trust Adversary Proceeding and the Make and Wait Lien Dispute, the Plan Proponents are not aware of any Significant Causes of Action that may exist or might be asserted by the Plan Trustee.

### VIII.  CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  The Plan Proponents urge holders of impaired Claims that are entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than [time], Prevailing Eastern Time, on [Date, 2010].

LIBC/3667825.11

Dated: Boston, Massachusetts
       February 25, 2010

Respectfully submitted,

THE EDUCATION RESOURCES
INSTITUTE, INC.

By their attorneys,


Daniel M. Glosband
Daniel M. Glosband, P.C. (BBO# 195620)
Gina Lynn Martin, Esq. (BBO# 643801)
Goodwin Procter  LLP
Exchange Place
Boston, Massachusetts  02109
(617) 570-1000


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS


Jeffrey D. Sternklar
Jeffrey D. Sternklar (BBO# 549561)
Duane Morris LLP
470 Atlantic Avenue
Boston, Massachusetts  02110
(857) 488-4216