UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re | ) |
| | ) |
| | )     **Chapter 11** |
| **THE EDUCATION RESOURCES INSTITUTE, INC.,**   )     **Case No. 08-_____** |
| | ) |
| Debtor. | ) |
| | ) |

# AFFIDAVIT OF WILLIS J. HULINGS III
# IN SUPPORT OF FIRST DAY MOTIONS

Willis J. Hulings III, being duly sworn, deposes and says:

1.  On the date hereof (the "Petition Date"), The Education Resources Institute, Inc. (the "Debtor" or "TERI") commenced a case under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court. I am the President and Chief Executive Officer of the Debtor and in that capacity, I am familiar with the operations, business affairs, financial records, and other books and records of the Debtor. I have held such positions since February 2005.

2.  To enable the Debtor to operate effectively and minimize the potential adverse effects of its Chapter 11 case, the Debtor has requested various types of relief in motions and applications filed with the Court concurrently herewith (the "First Day Motions"). I submit this affidavit in support of these First Day Motions.[1] Except as otherwise indicated, all facts set forth in this affidavit are based on my personal knowledge, my review of relevant documents or

---

[1] Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First-Day Motion.

LIBC/3256856.10

my opinion based upon my experience, knowledge and information concerning the operations and financial affairs of the Debtor. If I were called upon to testify, I would testify competently to the facts set forth in this affidavit. I am authorized to submit this affidavit.

## BACKGROUND

### A. BUSINESS OPERATIONS

3.  Founded in 1985, The Education Resources Institute, Inc. is a nonprofit organization incorporated under Massachusetts General Laws, chapter 180, located in Boston, Massachusetts. TERI promotes access to education for students of all ages and incomes with two primary programs. Through its College Access programs, TERI assists low-income, first-generation-to-college and other underserved students pursue higher education. TERI is a nationally recognized leader in college access through support and promotion of research-based policies and practices. Locally it provides innovative direct service programs in Massachusetts. Through its loan guarantee programs, TERI has guaranteed more than two million private student loans.

### B. COLLEGE ACCESS

4.  Through a variety of programs and partnerships, TERI works primarily with Boston and Brockton low-income students and adult learners, as well as those who are first in their families to plan to attend college. TERI's delivery model includes multiple middle and high school-based programs, nine TERI College Planning Centers and a variety of outreach services.

5.  TERI's school-based programs provide college awareness activities and postsecondary planning assistance for young people from low-income backgrounds in Boston and Brockton public schools. TERI school-based Education Advisors' and Coach Mentors

organize and lead various activities to increase students' awareness of the importance of postsecondary education in today's economy, the types of postsecondary opportunities available, the steps involved in preparing and applying for college, and financial aid awareness. They also provide one-on-one assistance with the college application and financial aid processes.

      6.      TERI's principal College Planning Center is located at the main Boston Public Library in Copley Square, Boston. Satellite Centers are located at four Boston library branches, four Greater Boston community sites and one community site in Brockton. At the College Planning Centers, Education Advisors provide free, individual advice and resources to make planning and paying for college a less intimidating process for students, families and adults.

      7.      As the Director of Pathways to College Network, a national alliance of more than 30 organizations, TERI has committed resources to using research-based knowledge and data to improve postsecondary education access and success for the nation's underserved students. Pathways to College has focused its efforts in four areas: (1) encouraging schools and school districts to enhance the academic rigor of the secondary school curriculum; (2) informing and improving college access marketing efforts; (3) evaluating the impact and effectiveness of early financial aid commitments; and (4) encouraging higher education leaders to invest in the success of underserved students on their campuses.

**C.    EMPLOYMENT**

      8.      TERI has 65 full-time staff members and 22 part-time staff members; of these, 48 work in the TERI Local College Access Programs division. The College Access Committee of the Board has four members and was established in 2003 to focus specifically on and support TERI's college access work. TERI's Local College Access Programs division also

has a College Access Advisory Committee, established in 1987, which has 14 members and meets three times a year. The College Access Advisory Committee members represent institutions of higher education, community-based organizations, Boston Public Schools and other organizations that support college access work.

9. Each member of TERI's senior management has twenty or more years' experience working at some of the largest financial institutions in the country, including Bank of America, Capital One and Nellie Mae. TERI's Board of Directors includes past presidents of large banks as well as a former chancellor and president of a prominent university.

### D. STUDENT LOAN GUARANTEES

10. Since 1985, TERI has guaranteed over two million loans totaling more than $20 billion. TERI has never defaulted on any guaranteed student loan obligations. TERI's guarantees obligate it to purchase defaulted loans from lenders or securitization trusts. The funds used for loan purchases come from segregated reserve accounts or from its general reserves, as discussed below. Prior to 2001, TERI worked directly with banks to process and guarantee private education loans that were originated by the banks as lenders. After a loan application was processed by TERI and the loan was originated by a bank, TERI would receive an origination fee for its services in assisting in the origination of the loan and a loan guarantee fee. Certain of the banks required TERI to segregate a portion of the guarantee fees in an account in the event that the student loan defaulted. TERI was required to purchase the defaulted loan on account of its guaranty and applied such segregated funds to the extent available. Certain other bank lenders did not require that TERI segregate these funds. Guarantee fees for loans made by those banks that did not require segregation were either deposited in the Debtor's general operating account or deposited in a "pooled" account that held the fees paid by several of the

banks that had originated the student loans. TERI used these funds to purchase defaulted loans for which there were no (or inadequate) segregated reserves.

11.    In the late 1990's, TERI experienced financial difficulties and explored strategic transactions that would strengthen its financial position and enable it to continue to provide loan guarantees and college access services. After evaluating alternatives, the Board of Directors of TERI approved a series of transactions with The First Marblehead Corporation ("First Marblehead").

12.    In 2001, First Marblehead purchased the loan processing operations of TERI and entered into a series of agreements with TERI to undertake risk management, administrative and support functions as well as origination services and future securitizations of TERI-guaranteed loans. In accordance with the agreements, First Marblehead acts as TERI's exclusive agent in designing loan programs and processing private education loans for various bank lenders throughout the United States. First Marblehead's costs for the origination and other services it provides are reimbursed by TERI to First Marblehead at cost. Although TERI receives a loan origination fee in connection with the loans, it is obligated to reimburse First Marblehead for the cost of the services First Marblehead provides relating to loan origination. Currently, the cost of those origination services exceeds the fees received. Previously, TERI was able to cover this shortfall from post-origination revenues, especially those arising from the securitization of loans by First Marblehead.

13.    Generally, First Marblehead structures and administers the securitization of the student loans into trusts that are special purpose entities created to hold a pool of student loans (each a "Trust" or, collectively, the "Trusts"). The Trusts issue bonds collateralized by the student loans. The student loans are then serviced by another entity, such as PHEAA d/b/a

American Education Services or Great Lakes Higher Education Corporation. Since 2001, First Marblehead has structured and administered approximately 15 securitizations of pooled student loans, where a majority of the underlying loans are guaranteed by TERI.

14. In connection with the structuring and administration of the securitization transactions by First Marblehead, TERI transfers a certain percentage of the fees received in respect of TERI-guaranteed loans to a segregated account that is subject to a deposit and security agreement or similar agreement for the benefit of the Trust. The amounts that TERI deposits into segregated accounts were initially calculated to exceed the estimated amounts of defaulted loans, net of recoveries. Although the Trusts have recently experienced an increase in default rates, TERI currently believes that, in the majority of cases, the balance of the segregated accounts should be sufficient to cover the payment of defaults. At any point in time, however, a segregated reserve may have insufficient funds to purchase a defaulted loan, pending receipt of recoveries.

## THE NEED TO FILE FOR CHAPTER 11

15. As stated previously, First Marblehead acts as TERI's exclusive loan processing agent. TERI receives the bulk of its guarantee fees at the time of origination and may receive subsequent payments at the time the loans are securitized. Because of the recent turmoil in the financial markets, demand for bonds backed by student loans has evaporated and as a result, First Marblehead has not been able to arrange securitizations. As a result, TERI has experienced a significant decline in revenues just as the slowing economy has led to an increase in the default rate of student loans. Thus, TERI's revenues declined and its obligations to purchase loans increased.

6

16.          In response to the reduction in revenues, the Debtor reduced its operating budget for 2008 by 20%. Although the Debtor was able to accomplish this reduction without terminating any employees, it recently made further reductions by terminating 25 employees, representing 22% of its staff.

17.          On March 26, 2008, Moody's Investors Service downgraded TERI's issuer rating, citing concerns about TERI's asset quality, liquidity position and adequacy of capital and reserves. As a result of the downgrade by Moody's, a bank made a demand, pursuant to its guaranty agreement with TERI, that TERI establish a segregated reserve to support TERI's guarantees to that lender. Establishment of such a reserve would have a negative effect on TERI's cash position and liquidity, possibly to the detriment of other parties in interest. TERI believes that the filing of the Chapter 11 Case will enable it to avoid a near-term liquidity crunch that, without the protections afforded by Chapter 11, would threaten its viability. The Chapter 11 Case will also provide it with the breathing room it needs to develop a long-term business plan so that it can continue its College Access Programs as well as its guarantee activities.

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

18.          Concurrently with the filing of its Chapter 11 petition, the Debtor has filed its First Day Motions that it believes are essential to enable it to operate in Chapter 11 with a minimum of disruption and loss of productivity. The Debtor requests that each of the First Day Motions described below be approved as each of them constitutes a critical element in achieving the successful reorganization of the Debtor for the benefit of all parties in interest.

## APPLICATION AUTHORIZING DEBTOR TO EMPLOY GOODWIN PROCTER LLP

19.          The Debtor has selected Goodwin Procter LLP as its attorneys because of its extensive experience and knowledge in the field of debtors' and creditors' rights and business

reorganizations under the Bankruptcy Code. Goodwin Procter LLP has represented TERI for several years, and its restructuring professionals have become familiar with the business and affairs of the Debtor during the course of prepetition preparation. Goodwin Procter LLP has the necessary background to deal effectively with many of the potential legal issues and problems which may arise in the context of this Chapter 11 case. I believe that Goodwin Procter LLP is both well qualified and uniquely able to represent the Debtor in its Chapter 11 case in a most efficient and timely manner.

20. For purposes of the hearing to consider the First Day Motions, the Application to employ Goodwin Procter is requested on an interim basis. The Debtor believes that if the Debtor is not able to retain Goodwin Procter at the very least on an interim basis it will suffer irreparable harm.

21. I believe that employment of Goodwin Procter is necessary, essential and in the best interests of case administration and should be approved.

### APPLICATION AUTHORIZING DEBTOR TO EMPLOY CRAIG AND MACAULEY PC AS SPECIAL CONFLICT COUNSEL

22. The Debtor has selected Craig and Macauley PC as its special conflict counsel because of the firm's knowledge of bankruptcy law and its ability to represent the Debtor free from the appearance of any conflict that may arise during the course of this Chapter 11 case. I believe that Craig and Macauley is both well qualified and uniquely able to represent the Debtor as its special conflict counsel in its Chapter 11 case in a most efficient and timely manner.

23. The Application to employ Craig and Macauley as its special conflicts counsel is requested on an interim basis. The Debtor believes that if the Debtor is not able to retain Craig and Macauley on an interim basis it may suffer irreparable harm.

24.      I believe that the employment of Craig and Macauley is necessary, essential and in the best interests of case administration and should be approved.

### APPLICATION AUTHORIZING DEBTOR TO EMPLOY GRANT THORNTON LLP AS FINANCIAL ADVISOR

25.      The Debtor seeks to retain Grant Thornton LLP as its financial advisor under a general retainer to provide restructuring and turn around advice in its Chapter 11 case. The Debtor has selected Grant Thornton LLP because of its reputation as well as its familiarity with the Debtor's books, records and financial affairs and the business and financial circumstances surrounding the commencement of this Chapter 11 case.

26.      For purposes of the hearing to consider the First Day Motions, the Application to retain Grant Thornton is requested on an interim basis. The Debtor believes that if the Debtor is not able to retain Grant Thornton on an interim basis it will suffer irreparable harm.

27.      I believe that employment of Grant Thornton is necessary, essential and in the best interests of case administration and should be approved.

### APPLICATION AUTHORIZING DEBTOR TO APPOINT EPIQ BANKRUPTCY SOLUTIONS, LLC AS CLAIMS, NOTICING AND BALLOTING AGENT FOR DEBTOR

28.      The Debtor seeks to retain and employ Epiq Bankruptcy Solutions, LLC (the "Notice Agent") as its claims, noticing and balloting agent. The Notice Agent will (i) transmit certain motions and notices filed in this Chapter 11 case; (ii) assist the Debtor with the preparation of its Schedules and Statement of Financial Affairs; (iii) receive, docket, scan, maintain and photocopy claims filed against the Debtor; and (iv) assist the Debtor with certain administrative functions relating to the Plan filed in this Chapter 11 Case.

29.     The Debtor submits that if the Notice Agent is not engaged, the Debtor will be required to divert substantial manpower from its efforts to manage its business and maximize the value of its estate. As a result, I believe employment of the Notice Agent is necessary and in the best interest of case administration and should be approved.

## MOTION FOR ORDER AUTHORIZING USE OF EXISTING BANK ACCOUNTS, CASH MANAGEMENT SYSTEM AND BUSINESS FORMS

30.     The Debtor seeks authorization to continue to use its existing bank accounts, cash management systems and business forms. The relief requested in this Motion will ensure the orderly entry into Chapter 11 and avoid many of the possible disruptions and distractions that could divert management's attention from more pressing matters during the initial days of this case.

31.     At present, and in the ordinary course of its business, the Debtor maintains bank accounts at various financial institutions, as more particularly described on Exhibit A to the Debtor's Motion for Order Authorizing Use of Existing Bank Accounts, Cash Management System and Business Forms. The Debtor seeks to maintain its two types of unrestricted accounts -- one type to assist with general operations and another type to assist with loan processing matters. It proposes to maintain its cash management system in accordance with past practice. The Debtor also requests a limited waiver of section 345(b) of the Bankruptcy Code to maintain Bank Accounts that exceed $100,000 (the maximum amount insured by the FDIC).

32.     I believe that, unless the Debtor is permitted to maintain and use its Bank Accounts, Cash Management System and continue to use its existing stationery and business forms, including, but not limited to, invoices, purchase orders, multi-copy checks, letterhead, envelopes, promotional material, order forms and other business forms, there would likely be a

significant delay in the administration of the estate and an additional cost to the detriment of all parties in interest.

## MOTION FOR AUTHORITY TO PAY PREPETITION COMPENSATION, PAYROLL TAXES, EMPLOYEE BENEFITS AND RELATED EXPENSES

33.    In the ordinary course of its business, the Debtor pays its employees in arrears on the fifteenth of each month (or previous business day if the fifteenth falls on a weekend or holiday) and the last business day of the month for exempt (salaried) employees; and on each Friday for the previous week (Sunday through Saturday) for non-exempt (hourly) employees. Exempt (salaried) employees were paid most recently on March 31, 2008 for March 16-31, 2008 and are due to be paid next on April 15, 2008 for April 1-15, 2008. Non-exempt (hourly) employees were paid most recently on April 4, 2008 for March 23-29, 2008. The Debtor is due to pay those employees for work performed for the week ending April 5, 2008 next Friday, April 11, 2008.

34.    The Debtor seeks authority to pay wages and salaries accrued by the Debtor's employees prior to the Petition Date and to pay the full amount of unpaid reimbursable expenses and benefits, and to pay in full vacation claims only to the extent employees seek payment in the normal course of employment.

35.    As a result of the commencement of the Chapter 11 Case, and in the absence of an order of the Court providing otherwise, the checks, wire transfers, and direct deposit transfers in respect of the above matters will be dishonored or rejected.

36.    Because the majority of the employee-related compensation obligations constitute priority claims that must be paid in full in any event under a plan of reorganization, payment of such obligations at this time is appropriate, and this Court is authorized to grant the relief requested. The Debtor believes that no employee is owed greater than $10,950 per

11

individual, payable in the ordinary course of business, in respect of the compensation obligations earned within 90 days prior to the Petition Date.

37. Granting the Motion would have no substantial effect on the relative distribution of the estate assets and, in fact, is the best way to assure that the Debtor will emerge from Chapter 11 with its employee base intact.

## MOTION TO EXTEND TIME FOR FILING SCHEDULES AND STATEMENTS

38. The Debtor seeks an extension of sixty (60) days from the Petition Date of the time by which it must file its schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statement of financial affairs (collectively, the "Schedules and Statement").

39. In order to prepare the Schedules and Statement, the Debtor must gather information from books, records, and documents relating to a multitude of transactions. Consequently, collection of the information necessary to complete the Schedules and Statement will require an expenditure of substantial time and effort on the part of the Debtor's employees.

40. The Debtor will mobilize its employees to work diligently on the preparation of the Schedules and Statement. In view of the amount of work entailed in the project, however, as well as the size and complexity of the Debtor's case and the competing demands upon its limited employees to assist in efforts to stabilize business operations during the initial postpetition period, it does not appear likely that the Debtor will be able to complete the Schedules and Statement properly and accurately within fifteen (15) days after the Petition Date as required by the Bankruptcy Rules. A sixty (60) day extension will provide the Debtor with sufficient time to complete that task.

## MOTION FOR AN ORDER PROVIDING THAT THE CREDITORS' COMMITTEE IS NOT AUTHORIZED OR REQUIRED TO PROVIDE ACCESS TO CONFIDENTIAL INFORMATION OF THE DEBTOR OR TO PRIVILEGED INFORMATION

41.      The Debtor seeks entry of an order of the Court confirming that Section 1102(b)(3)(A) does not authorize or require any of the members or representatives of the Creditors' Committee appointed in this case to provide access to the Debtor's Confidential Information to anyone other than the Creditors' Committee and its members, counsel and advisors. I understand that it is typical for a debtor to share certain confidential and other non-public proprietary information with its creditors' committee. A creditors' committee uses this information to assess, among other things, a debtor's capital structure, opportunities for the restructuring of the debtor's business in chapter 11, the results of any proposed operational changes to the debtor in the bankruptcy case, and the debtor's overall prospects for reorganization under a chapter 11 plan. In addition, a creditors' committee often executes confidentiality agreements or enters into other similar arrangements with a debtor. Through these agreements and other arrangements, a debtor can ensure that a creditors' committee's members will keep its information confidential and will not use a debtor's confidential information except in connection with its chapter 11 case and on terms acceptable to the debtor.

42.      The Debtor operates in a highly-competitive and, under current market conditions, a deeply-distressed space. Because the Debtor is still formulating its business plan, the dissemination of the Debtor's Confidential Information to parties that are not bound by any confidentiality agreement with the Debtor could be disastrous for the Debtor and its creditors. If the Debtor's creditors could require the Creditors' Committee to give them access to Confidential Information in its possession, such information could become public immediately thereafter.

43. The public dissemination of the Debtor's Confidential Information will cause serious harm to the Debtor's estate. Among other things, the Debtor's business operation and strategic initiatives would become known to the Debtor's competitors, thereby allowing such competitors to take actions to reduce or eliminate the value of the estate. In addition, other Confidential Information of the Debtor, such as compensation levels or other employee information, is of a sensitive nature, and public disclosure of such information would cause morale and similar problems for the Debtor, as well as potentially violate federal and state privacy laws.

44. Similarly, the Debtor seeks entry of an order clarifying that the Creditors' Committee is not authorized or required to provide access to Privileged Information to anyone other than the Creditors' Committee and its members, counsel, and advisors. The risk to the Debtor and the Creditors' Committee of the Creditors' Committee having to provide access to Privileged Information to the creditors it represents creates obvious and serious problems. If the Debtor and the Creditors' Committee believed that there could be a risk that Privileged Information would need to be turned over to such creditors, with the possible loss of the relevant privilege at that time, the entire purpose of such privilege would be eviscerated, and both the Debtor and the Creditors' Committee likely would be unable to obtain the independent and unfettered advice and consultation that such privileges are designed to foster. Indeed, unless it is made clear that the risk of dissemination of Privileged Information does not exist, the estate representation structure envisioned by the Bankruptcy Code would become immediately dysfunctional.

45. The Debtor would like to begin discussions with the Creditors' Committee as soon as one is appointed in this Chapter 11 Case. I believe that the relief requested in this

Motion will not only enable the Debtor to begin these discussions, but will also help ensure that confidential, privileged, proprietary, and/or material non-public information will not be disseminated to the detriment of the Debtor's estate and will aid the Creditors' Committee in performing its statutory function.

### MOTION FOR AN ORDER APPROVING CERTAIN CASE MANAGEMENT PROCEDURES

46.    The Debtor also requests that the Court enter an order approving certain case management procedures providing for, among other things, omnibus hearing dates and relief from the administrative burdens that would otherwise weigh on the Court if such Motion were not in place.  In addition to seeking to establish monthly Omnibus Hearing Dates and procedures for filing Notices of Agenda with the Court, this Motion also seeks to allow service on parties filing a notice of appearance in this Chapter 11 Case by electronic mail.  Specifically, the Debtor is seeking to add the following provision to the standard Case Management Order utilized in this Court:

> **Motions, objections and other pleadings may be served on the appropriate parties via electronic mail.  Every party that files a notice of appearance consents to receipt of notice via electronic mail and shall include an electronic mail address (to the extent such party has an address).  The subject line of any electronic mail sent in accordance with this provision will read "TERI: Service copy of [name of relevant motion objection or pleading]."  The text of any electronic mail sent in accordance with this provision will contain the information set forth in the docket entry for such pleading, including the relevant docket number.  Service of all motions, objections and other pleadings must also be made upon the Debtor, counsel for the Debtor, the office of the Attorney General of the Commonwealth of Massachusetts, the office of the United States Trustee, counsel for any official committee appointed in this Chapter 11 Case and on any other party that may be ordered by the Court must also be effectuated by serving such parties with a hard copy of any motion, objection or other pleading that has been filed.**

47.    I have been advised by the Notice Agent that the ability for all parties to serve pleadings by e-mail will assist in the efficient administration of this Chapter 11 Case, as it will reduce mailing costs and allow parties access for information immediately. Additionally, as it is sometimes necessary to file pleadings on an expedited schedule, service by electronic mail can maximize the amount of time that a party has to respond. Parties that do not list an e-mail address on their notice of appearance will continue to receive hard copies of all documents served by the Debtor.

48.    I believe that the relief requested in this Motion is reasonable and necessary for the efficient administration of the Debtor's estate. Thus, I believe it is in the best interests of the Debtor and its creditors.

## CONCLUSION

I respectfully request that all of the First Day orders be granted.

By: _____
Willis J. Hulings III
President and Chief Executive Officer

Dated: April 7, 2008

*Signature Page to the Application to First Day Affidavit*