UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

---

In re                                              )
                                                   )
                                                   )   Chapter 11
THE EDUCATION RESOURCES INSTITUTE, INC.,           )   Case No. 08-12540(HJB)
                                                   )
Debtor.                                            )
                                                   )

---

AFFIDAVIT OF WILLIS J. HULINGS III
IN SUPPORT OF MOTION OF DEBTOR FOR ORDER (A) PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTOR TO REJECT CERTAIN CONTRACTS WITH THE FIRST MARBLEHEAD CORPORATION AND (B) PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTOR TO ENTER INTO A TRANSITION SERVICES AGREEMENT

Willis J. Hulings III, being duly sworn, deposes and says:

1. I am the President and Chief Executive Officer of The Education Resources Institute, Inc. ("TERI" or the "Debtor"). I have held such positions since February 2005. In my capacity as President and Chief Executive Officer, I am familiar with the operations, business affairs, financial records, and other books and records of the Debtor, including the Debtor's relationship with The First Marblehead Corporation ("FMC"), First Marblehead Education Resources, Inc. ("FMER") and/or TERI Marketing Services, Inc. ("TMSI" and together with FMC and FMER, referred to herein collectively as "FMC Entities").

2. I submit this Affidavit in support of the Motion of Debtor for Order (A) Pursuant to Section 365 of the Bankruptcy Code Authorizing the Debtor to Reject Certain Contracts With The First Marblehead Corporation and (B) Pursuant to Section 363 of the Bankruptcy Code

LIBC/3320231.5

Authorizing the Debtor to Enter Into a Transition Services Agreement (the "FMC Rejection Motion").

**The FMC Contracts**

3.  The Debtor is a party to several contracts with one or more of the FMC Entities, including (i) the Master Servicing Agreement, dated as of July 1, 2001 (the "MSA"), (ii) the Master Loan Guaranty Agreement dated as of February 2, 2001 (the "Guaranty Agreement"), (iii) the Database Sale and Supplemental Agreement dated as of June 20, 2001 (the "Database Agreement"), and (iv) the Marketing Services Agreement, dated as of July 1, 2001(the "Marketing Agreement" and together with the MSA, the Guaranty Agreement, and Database Agreement, the "FMC Contracts").

4.  Prior to the filing of this Motion, pursuant to the FMC Contracts, the Debtor was obligated to pay FMC Entities for the cost of certain services which were outsourced by TERI to FMC Entities. Pursuant to the MSA, TERI was required to pay the costs associated with origination services, including underwriting, document preparation, and lender support and collection services, including management of collection of defaulted loans and default prevention. Those costs included expenses attributable to customer service, , human resources, office management, finance and other departments and services.

5.  Each year, FMER presented a proposed budget to TERI. TERI then had 30 days to approve or deny all or part of FMER's budget request. During the course of a given year, FMER had the right to apply to TERI's Chief Executive Officer for budget adjustments based upon increased volume of services being performed as compared to the assumptions used in the then-current budget. Generally, adjustments were not to exceed 5%, individually or in the aggregate,

2

of the annual budget per budget year unless presented to and approved by TERI's Budget Committee.[1] The agreed upon budgeting costs were not variable based upon loan volume.

6. In its first full year of operation after entering into the FMC Contracts (fiscal year ending June 30, 2002), TERI guaranteed $623 million of loans. By 2007, that loan volume swelled to $4.2 billion. As the loan volume grew, the cost of services provided by FMC also increased. In 2002, the costs paid by TERI to FMC were $14.2 million, by 2007, the costs were $134.8 million.

7. Pursuant to its various agreements, TERI had three major sources of funds to cover FMC costs: origination fees, guaranty fees and amounts derived from securitizations.

8. For fiscal years 2002-2007, TERI's various revenue sources exceeded the amount of the costs owed to FMC. After September 2007, however, the securitization market evaporated and problems arose in the credit markets. As a result, loan volumes decreased and TERI's ability to obtain fees and cash flow diminished.

9. Because the annual budget was not tied to volume, in the months following the credit crisis, the Debtor remained obligated to pay FMC's costs, many of which were fixed, despite the fact that TERI's revenue and cash flow had decreased. The Debtor paid FMC $13.8 million for services rendered by FMC in January 2008 and $11.6 million for services in February 2008. FMC billed TERI $10.7 million for services rendered in March 2008. TERI paid FMC $7.9 million for post-petition services provided in April (for the period from April 8, 2008 through and including April 30, 2008). FMC has billed the Debtor $9.8 million for services rendered in May 2008. When compared with the levels from January 2008, by May 2008 TERI's loan volume had declined 91%, while its expenses had declined only 29%.

---

[1] The Debtor's Board of Directors served as the Budget Committee.

**The Decision to Reject the FMC Contracts**

10. As loan volumes declined sharply in the weeks following the Petition Date, it became clear that even though FMC had taken some steps to reduce its operating costs, the costs of the FMC Contracts were still too high for the Debtor's significantly reduced loan volumes.

11. Since the Petition Date and for the next several months, most of TERI's operations have been and will be limited to (a) processing loans based on applications pending on the Petition Date or submitted between the Petition Date and the suspension of lending by the respective lenders; (b) managing collection activities; (c) conducting various activities to effect terminations or transitional activities with lenders; and (d) continuing its college access activities.

12. After deliberations with its advisors and Board of Directors, the Debtor determined that rejection of the FMC Contracts pursuant to Section 365 of the Bankruptcy Code was necessary to its survival. After advising FMC of its possible rejection of the FMC Contracts, the Debtor and FMC held several intense and lengthy negotiations to determine whether the separation could be consensual. Ultimately the parties agreed that to best ensure that there would be minimal disruption in services to lenders and borrowers, the Debtor and FMC should enter into a Transition Services Agreement (the "TSA"). If the Motion to Reject FMC Contracts is approved, the TSA will govern the relationship of the parties as of June 1, 2008.

**The Transition Services Agreement**

13. Pursuant to the TSA, the rejection of the FMC Contracts will be effective as of May 31, 2008.

14. The TSA has a term of 60 days with two (2) extensions, each for an additional 30 day period. The first extension can occur at the unilateral election of the Debtor. The second

extension requires FMC's consent, which consent can not be unreasonably withheld. During the pendency of the TSA, TERI will complete arrangements to perform, on its own and in the aggregate at reduced expense, those services formerly performed by FMC.

15. There are certain conditions precedent to the TSA, including that (1) TERI will have paid FMER all post-petition amounts due under the TSA through May 31, 2008 on or before June 23, 2008; and (2) the Debtor will have obtained from the Bankruptcy Court no later than 3 business days following the hearing date set by the Court and in no event later than June 30, 2008, a final order, in form and substance satisfactory to FMC, authorizing the Debtor to honor its guaranty obligations under the "National Collegiate Student Loan Trusts"; and (3) the Bankruptcy Court will have approved the FMC Rejection Motion pursuant to an Order in form and substance reasonably satisfactory to FMC.

16. Pursuant to the terms of the TSA, FMC will (1) process all loans remaining in the "pipeline", (2) process any required additional disbursements on existing or pipeline loans, (3) provide claims review and collection services to the Debtor and (4) provide certain IT support and other services that historically were provided by FMC but will over the term of the TSA be transitioned back to TERI (e.g., payroll, phone and computer systems). The TSA also provides that certain TERI-owned data that was stored, maintained or held by FMER will be provided to TERI on or before July 31, 2008. More specifically, the TSA provides that FMC Entities will provide the following services:

(A) **Loan Origination Services:** FMER will continue to collect, evaluate, administer, approve or deny and fund any approved loan applications until the earlier of (i) the termination of the TSA and (ii) 60 days from the date all lenders suspend or terminate loan programs with TERI. FMER shall charge TERI a fee equal to the amount of the origination fee

that TERI is entitled to receive under the pertinent loan program for providing these services. Because FMER is charging TERI the same amount TERI will receive from the lender, this service is essentially cash flow neutral to TERI.

(A) **Multiple Loan Disbursements:** A portion of certain student loans is disbursed in multiple segments (e.g., at the start of each semester or at the start of each school year). Tracking and ensuring that multiple disbursements are made is critical to the student borrowers of such loans. TERI does not currently have the capability to track the multiple disbursements and make the disbursements from its own accounts. FMER has agreed to provide this service with respect to (i) any loan which had its first disbursement prior to May 31, 2008 and (ii) any loan with an application received after May 31, 2008 for which FMER receives the fee described in the previous paragraph of this Motion. FMER will provide such services to TERI at no cost.

(B) **Collection Efforts:** Pursuant to the terms of the MSA, FMER has served as TERI's primary contact with all collection agencies engaged by TERI to pursue collections of student loans that have either missed a payment or for which TERI has purchased the loan pursuant to the applicable Guaranty Agreement.

1. **Claims Processing and Review:** As part of the services provided, when a Guaranty Event occurs, thereby triggering TERI's obligation to purchase a defaulted student loan, FMER reviews the claims package to verify that a Guaranty Event has occurred, that there are no available defenses and that the applicable lender has complied with all of its obligations with regard to the servicing and origination of the loan. After that review, TERI would, prior to the Petition Date, purchase the loan and then seek to collect on the loan through various collection strategies. FMER has agreed to provide claims review services on a per claim basis.

6

2.  **Default Prevention:** Under the MSA, TERI reimbursed FMER for costs of administration regarding the default prevention work plus the cost charged by the Collection Agency if it was able to "cure" the default. Pursuant to the TSA, TERI has agreed to pay FMER a fixed dollar amount per cure for administering this function for loans other than Securitized Loans and TERI will continue to pay the costs charged by third party collection agents. This represents a substantial savings to TERI because it will only be required to pay FMER the costs associated with those loans that actually begin repayment in contrast to the existing relationship which has TERI paying all default prevention costs regardless of whether such efforts were successful.

3.  **Post-Default Collections:** Pursuant to the TSA, TERI has agreed to pay FMER a fixed percentage of the gross amount of the dollars recovered with respect to loans that are not Securitized Loans. This arrangement allows TERI to pay only for services to the extent they are successful on a unit cost basis in contrast to the existing arrangement pursuant to which TERI pays for all costs associated with FMER collections (e.g., salary, benefits, space, etc.).

(D)  **Infrastructure:** FMC has agreed to provide TERI with certain support to enable TERI to improve its infrastructure. Examples of the services to be provided by FMC include, but are not limited to: (1) continued availability of current internal and external network connectivity, (2) continued availability of current Window's domain, services and server applications supporting user authentication, printing, file storage, intranet, email, backups and electronic fax, (3) continued availability of existing user workstations (and/or laptops), (4) continued availability, including maintenance of existing interfaces for, finance and accounting software for transactions, reporting and budgeting, (5) continued availability, including maintenance of existing interfaces for, Human Resources and payroll transactions, (6)

agreements for Human Resources and payroll services, finance and accounting software, sales contract management software, and (7) delivery in machine readable format of all file-server based TERI end-user electronic files and all SharePoint based TERI end-user electronic files.

**The TSA Represents Significant Cost Savings to the Debtor**

17.     The Debtor believes that under the TSA, it will pay FMC Entities a total of approximately $545,043.00 for the month of June. Similar monthly payments will be due in July and, if the TSA is extended August and September. The cost reduction is, in my view, incredibly significant and will make the Debtor, essentially, cash flow neutral on an operating basis. By entering into agreements with lenders to (a) manage collections for a fee and (b) to design loan programs to be supported by a non-recourse (except to collateral) TERI guaranty, TERI expects to become cash flow positive.

18.     The TSA represents a reduction in operating expenses of millions of dollars per month. There is no doubt that rejecting the FMC Contract and entering into the TSA is in the best interest of the Debtor, its creditors and its estate.

## CONCLUSION

I respectfully request that the FMC Rejection Motion be approved and the Debtor be permitted to enter into the TSA with the FMC Entities party thereto.

By: _____
Willis J. Hulings III
President and Chief Executive Officer

Dated: June 13, 2008