# Deloitte & Touche LLP

125 Summer Street
Boston, Massachusetts 02110-1617

Telephone: (617) 261-8000
Facsimile: (617) 261-8111

June 30, 1995

RECEIVED
JUL - 6 1995
TECHNICAL BRANCH 5
~~vemnt Organizations Di~~

Internal Revenue Service National Office
111 Constitution Avenue, N.W.
Washington, D.C. 20224
Attn: Mr. Richard Downs
    CP: E: EO: T-5
    Room 6539

Re:    Application for Recognition of Exemption for
       TERI Financial Services, Inc.

Dear Mr. Downs:

This letter is in response to your request for additional information regarding the Application for Recognition of Exempt Status for TERI Financial Services, Inc. ("TFSI"). Your request was memorialized in a letter dated March 24, 1995, a copy of which is attached. Additionally, we attached a copy of the letter dated October 11, 1994, requesting expeditious processing of this application from Senator Edward M. Kennedy.

1a.    **Question:**    How does TFSI meet the requirement of GCM 39685 requiring that private benefit to the financial institutions is qualitatively and quantitatively incidental to overall public benefit? Describe the competition TFSI would face. Explain whether the banks would be required to use the income for more student loans.

   **Response:**

   TFSI recognizes the requirements of GCM 39685 that private benefit to financial institutions must be qualitatively and quantitatively incidental to the overall public benefit. TFSI believes that it fully meets those requirements.

   Further, TFSI also recognizes that, if the banks selling the student loans are required to devote the proceeds of the loan sales only to additional student loans, the "qualitative and quantitative incidental benefit" test will be basically satisfied without substantial additional detail. See, GCM 39685, PLR 9048046, and GCM 39633. Thus, if reinvestment is required, any resulting private benefit is presumed to be de minimis.

Deloitte Touche
Tohmatsu
International

Page 2

Finally, TFSI recognizes that, even if there is no such flat requirement for the re-use of the sales proceeds by the banks, the "qualitative and quantitative incidental benefit" requirement can be otherwise satisfied by a demonstration of appropriate facts, which show that overall public benefit substantially outweighs the incidental private benefits. See, GCM 37789, PLR 9321087, and, in part, PLR 9403022.

For a series of reasons discussed in detail below, TFSI firmly believes that the very substantial overall public benefit arising from its proposed secondary market purchasing activities would clearly outweigh a quite incidental private benefit to the banks. TFSI's activities would very meaningfully "advance education."

### A.    General Reasons.

TFSI's creation of a liquid secondary market in student education loans will significantly benefit students, parents, and educational institutions in providing educational opportunities. The secondary market benefits the universe of student borrowers both by increasing the availability and overall volume of student loans and by reducing student borrowing costs.

First, as to the availability of student loans, lenders, in addition to providing student loans, use portions of their portfolios for other types of loans, such as mortgages, small business loans and home improvement loans. A bank's portfolio designated for student loans fills up quickly because of the relatively slow turnover of student loans. As a result, despite the relatively lower risk associated with student loans, lenders will not make additional loans if the additional loans will cause them to exceed the portion of their portfolio designated for student loans. If secondary markets are created and expanded, participating banks can sell the loans and are able to use the proceeds from the sale of the loans to make new student loans.

Second, as to the cost of student loans, the establishment of a new secondary market will permit participating banks to reduce the interest rates charged on student education loans because TFSI will agree to purchase loans from the lending institutions on more favorable terms than are available from other secondary market purchasers. The lenders can charge a lower rate of interest because they will only hold the loans for a short period of time. TFSI will be able to buy and hold the loans at the lower interest rate because TFSI will assemble the student education loans in a portfolio of loans rated 'investment grade." Because a portfolio of many student education loans has less risk than any single student loan, TFSI will, in essence, be converting higher interest rate paying individual-loan "consumer debt" (the student education loans) into lower interest rate paying "packaged" wholesale "investment grade" debt which is marketable and will be sold in the secondary market. In addition, competition in the secondary market benefits borrowers by encouraging lower interest rates and more favorable terms to borrowers.

It is true that TFSI does not expect to be able to contractually obligate banks to use all of the proceeds of student loans for additional student loans. Such a "reinvestment" requirement might have been feasible in prior years when various of the earlier IRS rulings were

Page 3

issued, before the recent developments, such as the impact of the Federal direct lending program, discussed below.  Under present circumstances, even to attempt to contractually obligate banks to re-use all of the proceeds of student loans for additional student loans would be detrimental to TFSI's fundamental mission of increasing the availability and overall volume of student loans and reducing student borrowing costs.  Lenders would be reluctant to sell their original loans if such a requirement were imposed.  Additionally, such an express requirement would result in additional record-keeping requirements, and attendant costs, such as tracing the sales and the reinvestment of the proceeds.

From conversations to date with banks, TFSI does, however, expect that participating banks would re-use a major portion of the sales proceeds to make further student loans.  Banks will be prompted to participate in student lending, and continue to make fresh loans from the proceeds of sales, because of the provisions of the Federal Community Reinvestment Act of 1977, which, as a condition for bank acquisitions, require banks to engage in various types of "overall public benefit" activities.

B.    **Specific Reasons**.

(1)    First, it is important to recognize that TFSI would purchase both (a) Federal guaranteed student loans, made pursuant to Title IV of the Federal Higher Education Act of 1965, as amended, (commonly referred to as "Federal credit student loans"), and (b) non-Federal credit student loans (commonly referred to as "supplemental" or "alternative" student loans).  TERI does not guarantee Federal credit student loans.  For supplemental loans, both those made by banks and guaranteed by TERI, and those guaranteed by others than TERI, would be purchased.  In the field of supplemental loans, TFSI would enter what (as developed further below) has become, and is increasingly becoming, a basically very limited and over-priced market.   Through increased competition, students would gain additional benefits through lower costs.

(2)    More specifically with respect to Federal credit student loans, banks, for several reasons, are, and will be more so in the future, less likely to make such loans at all.

First, pursuant to 1993 legislation, the Federal government is now engaged in "direct student lending" to a substantial extent (60% of all new Federal credit student loans are targeted for direct student lending by Federal fiscal year 1996/1997, and the Federal government (Department of Education) intends to move to 100% direct student lending by fiscal year 1999/2000.)  The Title IV federal guarantee program would, effectively, over time be displaced by direct lending.  With direct student lending, neither the banks nor the loan guarantors are involved.  In effect, competition will be eliminated.  Services performed by banks and guarantors will be performed by the Federal government.  Consequently, even now, as a matter of resource allocation, banks are becoming increasingly reluctant to continue to make Federal credit loans at all under the existing Federal guaranteed student loan programs unless assured of available purchasers for their loans.

Page 4

Second, at the same time, the several principal present purchasers of Federal credit student loans are seeking aggressively to reorganize themselves in such a fashion as will ultimately make their purchases of loans more, rather than less, expensive. The increased costs will simply be passed along to the borrowers. Thus, both the Student Loan Marketing Association ("Sallie Mae") (referred to favorably in GCM 39685 as an "alternative to local secondary markets"), and the other major tax-exempt Federal credit student loan secondary market organization, which obtained tax exempt status in about 1983, will be increasingly less attractive to banks as student loan purchasers.

(3)    With respect to supplemental student loans, there is even less present competition and no prospect of additional competition.

Nationally, there is only one present secondary market organization, which is itself tax-exempt, which purchases non-Federal credit or supplemental loans. For-profit organizations have not found this to be an attractive market. Until approximately a year ago, another organization also purchased supplemental loans, but has now ceased to do so. Sallie Mae does not purchase non-Federal credit or supplemental student loans. Therefore, TFSI would be providing an alternative in a market which at present has only one other participant.

The present sole secondary market organization cannot be regarded (in the language of GCM 39685) as a provider of "similar funding or services . . . available commercially on similar terms."

First, that organization only purchases loans issued at, or automatically adjustable to, a specific customer interest rate, i.e., 2% over prime, due to the lack of competition. Banks currently make supplemental student loans at rates lower than the rate acceptable to the one current secondary market purchaser. Because the banks cannot effectively sell the loans issued at the lower rates to the current secondary market purchaser, the banks are required to hold these loans until maturity. Thus, the banks are unable to "re-cycle" the funds originally internally allocated to their student lending activities. TFSI would offer an alternative and would purchase loans issued at a lower rate than currently accepted by the existing secondary market organization. As the attached letter dated June 18, 1995, from the Bank of Boston (Enclosure 1) clearly indicates, not only is there only one secondary market purchaser for supplemental loans, but that purchaser actually increases student borrowing costs by, as indicated above, "routinely" increasing (at the time of purchase of the loan) the customer's interest rate to 2% over prime. The increased borrowing costs are the direct result of the absence of more than one purchasing entity.

Second, TFSI would also purchase supplemental loans at one (1) or one and a half (1 1/2) points over par whereas the one existing purchaser purchases only at par. Once again, TFSI's market activities would result in lower costs charged by lenders to borrowers.

Based again on information from its financial advisers, TFSI reasonably expects that its secondary market activities could lead to increased volume of supplemental loans of at least 20%. Again, more students would benefit.

Page 5

        It is especially important that secondary markets in supplemental student loans be encouraged because, for many students and families, certain terms of supplemental loans are much more feasible from a family financial planning or cash flow standpoint, than the terms available under Federal credit student loans. For example, supplemental loans provide for a 25-year period of repayment, whereas only a 10-year repayment is allowed with Federal credit undergraduate loans. Additionally, Federal credit student loans in many cases will not cover the entire cost of education per year. Supplemental loans are available up to the cost of the education, less other financial aid received.

        (4)    As an additional public benefit, TFSI would provide a secondary market in such a fashion that the banks will not need to "split" the different types of student loans of their borrowers. For instance, the same bank quite often will make Federal credit student loans, and supplemental loans, such as loans guaranteed by TERI, to the same borrower. Each separate type of loan typically has totally separate servicing arrangements resulting in two sets of procedures, paperwork, and payment coupon books -- all extra burdens for both the banks and the borrowers. Both banks and borrowers would far prefer to avoid confusing and expensive multiple servicing arrangements. TFSI would arrange for a single servicer for all of a borrower's loans and purchase the entire loan package, both Federal credit and supplemental loans. Thus, both banks and borrowers would deal with one entity servicing the entire loan package, and costs to both the banks and to the borrowers would be reduced and convenience greatly increased.

        (5)    TFSI believes that its proposed activities fall squarely within the analysis of the IRS's most recent favorable ruling on student loan secondary markets. In PLR 9403022, selling lenders were required to re-use the proceeds of sales for further student loans. However, the ruling turned on a "balancing" test of public versus private benefit. The "public" benefit, directly analogous to the benefits which TFSI would provide, was derived from the fact that the larger bank establishing the secondary market would enable students in rural locations, dependent upon small local banks, which otherwise could not afford to be in the student loan business, to attend local colleges, including vocational, technical, and trade schools. Of great weight was the fact that the secondary market would offer default counseling programs and pre-acquisition (credit analysis) services at lower cost than the local banks could possibly have done "in house." TFSI too will, as outlined above, effectively be meeting a loan availability need which will otherwise not be met. Further, as detailed below, TFSI will also be offering very extensive and comprehensive loan information and counseling services of the same types offered by the TERI itself.

        See the attached letter dated June 9, 1995, from Charlene M. Ngo Viscarra of Loma Linda University (Enclosure 2) endorsing the programs and benefits to students offered by the secondary market activities proposed by TFSI.

1b.    **Question:**    What is the basis of TERI's exemption?

    **Response:**    TERI was formed fundamentally to foster and support educational programs which aid and assist students, parents, and educational institutions in seeking or providing higher educational opportunities.

Page 6

The primary emphasis of TERI's activities is on providing student financial aid services.

TERI, through its Higher Education Information Center ("HEIC"), has become a national model for providing information and counseling for higher education. TERI's HEIC offers free counseling and information to students and parents of all ages who are interested in seeking post-secondary training. The Center conducts outreach programs in the public schools starting as early as the 5th grade to encourage students and their parents to think about what is needed to prepare for college. These outreach programs include a Career and Learning line, a toll-free hotline providing information about education and training programs, GED (high school equivalency diploma) and ESL (English as a Second Language) programs, and financial aid and application forms. TERI also runs a statewide youth educational awareness program in twenty Massachusetts cities to help middle and high school students and their parents plan for higher education.

TERI operates a Federally-funded talent search program targeting students at five Boston high schools and one middle school. Counselors provide ongoing advice and support to 500 hundred students each year. There is also a peer advisor program helping students in the 9th and 10th grade think about going to college.

In addition, TERI sponsors college bus tours for high school students considering college, a career school expo to bring career school representatives together with high school students, and a series of other outreach activities throughout the city of Boston and the Commonwealth of Massachusetts. These include outreach programs specifically targeted at minority youth and youth who will be the first in their families to go to college. A fundamental part of this activity is TERI's operation, through the HEIC, of Boston's Federally-funded Equal Opportunity Center facilitating access to higher education for low-income adults.

Recently, TERI was funded by The Plan for Social Excellence, a foundation in Mt. Kisco, N.Y., to produce a monograph describing how the HEIC works so that other cities throughout the United States can replicate it. Subsequently, the Lilley Endowment and the Pew Charitable Trusts awarded grants to TERI to convene a national conference so that community leaders from across the country could learn about how to establish similar higher education information centers. TERI has also received grants from such organizations as the College Board, the DeWitt Wallace Reader's Digest Fund, The Edna McConnell Clark Foundation, The Jessie B. Cox Charitable Trust, and numerous corporate contributors. In addition, TERI has received funding for its center from the TRIO programs of the U.S. Department of Education and the Fund for the Improvement of Post-Secondary Education. TERI has also received funds from the U.S. Department of Labor for the HEIC's activities concerning school-to-work transition. Materials are enclosed describing all of these activities in greater detail. (Enclosure 3).

All of these activities are directly analogous to the default counseling programs cited favorably in PLR 9403022. They are also similar to the very favorably regarded "parent" entity activities described in GCM 38497. A substantial number of these TERI programs will also be made available by, and through, TFSI.

Page 7

TERI also conducts its supplemental or alternative loan guaranty program. The goal of this program is to increase the availability of funds for loans to students to enable and assist students to attend institutions of higher education.

2.    **Question**:    Why is TERI guaranteeing only "some" of the loans, rather than all of the loans?

**Response**:    In the detailed narrative description of activities provided in the Form 1023, TFSI stated that "certain" loans purchased by TFSI would be guaranteed by TERI. In fact, TFSI's mission statement allows it to purchase and sell both student loans guaranteed by TERI and loans guaranteed by others. As stated above, TFSI would purchase both (a) Federally guaranteed student loans, made pursuant to Title IV of the Federal Higher Education Act of 1965, and, (b) non-Federal credit student loans ("supplemental" or "alternative" student loans). Of the supplemental student loans, both those made by banks and guaranteed by TERI, and those guaranteed by others than TERI would be purchased by TFSI. Thus, "certain" loans purchased by TFSI would be those guaranteed by TERI.

We trust that our answers are responsive to your questions, and will expedite the approval of the Application for Recognition of Exemption for TERI Financial Services, Inc.

If you have any questions, please call me at (617) 261-8735.

We would welcome the opportunity for a conference with you and your colleagues should this letter not answer all of your questions.

Sincerely yours,

Francis J. Bedard

Enclosures

1.    Bank of Boston letter dated June 18, 1995.
2.    Loma Linda University letter dated June 9, 1995.
3.    Materials describing Higher Education Information Center Activities.

cc:    Ernest T. Freeman
Thomas Parker
Richard A. Wiley, Hill & Barlow
Wayne E. Smith

ENCLOSURE 1

 **BANK OF BOSTON**

June 18, 1995

Mr. Ernest T. Freeman
President and Chief Executive Officer
The Education Resources Institute
330 Stuart St.
Boston, MA  02116

Dear Ted:

As you know, banks, at times, sell federal and private education loans.  At present, many outlets exist for federal student loans while TERI secondary markets are limited to one organization.  To make matters worse, the existing TERI secondary market increases the customer interest rate upon purchase.  By way of background, Bank of Boston is able to originate TERI loans at the <u>Wall Street Journal</u> prime plus 1.5%.  The secondary market routinely increases the customer rate to 2% above the applicable prime.

Speaking for Bank of Boston, we would welcome additional players to the TERI secondary market business.  I believe all program participants, including the student borrower, would benefit from a more competitive TERI secondary market.

If you would like to discuss this matter please give me a call at (401) 278-7952.

Sincerely yours,

David R. Kelly
Senior Product Manager
Education Loans

ENCLOSURE 2



*Loma Linda University*

*Office of Financial Aid*

*Loma Linda, California 9235*
*(909) 824-450*

9 June 1995

Mr. Ernest P. Freeman, President and CEO          FAX: 617-350-6013
The Education Resources Institute
330 Stuart Street, Suite 500
Boston, MA 02116

Dear Mr. Freeman:

I would like to take this opportunity to thank you for providing our students with access to funds that allow them to pursue higher education. Without the TERI Alternative Loan Program which provides the difference between the cost of education and limited federal funds, many students would not be able to attend school.

Thank you also for your efforts to keep your interest rates as low as possible. I believe that lower rates are controlled, in large part, by the pricing offered by secondary markets. I strongly support your efforts to find competitive rates. While access to funds is vital, students can not borrow from loans that are so expensive that repayment is impossible.

Yours truly,

Charlene M. Ngo Vizcarra
Director - Office of Financial Aid

*A SEVENTH-DAY ADVENTIST HEALTH SCIENCES INSTITUTION*

Form **8734**
(Aug 1996 ALS)

Department of the Treasury — Internal Revenue Service

# Support Schedule For Advance Ruling Period

[ ] Check here if address change and indicate new address

| | |
|---|---|
| Name of Organization and Address | Employer Identification Number |
| TERI FINANCIAL SERVICES, INC. | 04-3247228 |
| 330 STUART STREET | DLN: |
| BOSTON, MA 02116-5229 | |

For information on completing this support schedule, please see the instructions for Part IV of Schedule A (Form 990), Organization Exempt under 501(c)(3)

| | Year 1 (a) 19 94 | Year 2 (b) 19 95 | Year 3 (c) 19 96 | Year 4 (d) 19 97 | Year 5 (e) 19 98 | Year 6 (f) 19 — | Total (g) |
|---|---|---|---|---|---|---|---|
| 1. Gifts, grants... include unusual grants. See line 12a ...... | 0 | 0 | 0 | 554,823 | 3,316,294 | | 3,871,117 |
| 2. Membership fees received ...... | 0 | 0 | 0 | 0 | 0 | | 0 |
| 3. Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is not a business unrelated to the organization's charitable, etc. purpose ...... | 0 | 0 | 0 | 0 | 0 | | 0 |
| 4. Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, and unrelated business taxable income (less section 511 taxes) from business acquired by the organization after June 30, 1975 ...... | 0 | 0 | 10,502 | 56,166 | 93,444 | | 160,112 |
| 5. Net income from unrelated business activities not included in line 4 ...... | 0 | 0 | 0 | 0 | 0 | | 0 |
| 6. Tax revenues levied for your benefit and either paid to you or expended on your behalf. ...... | 0 | 0 | 0 | 0 | 0 | | 0 |
| 7. The value of services or facilities furnished to you by a governmental unit without charge. Do not include the value of services or facilities generally furnished to the public without charge ...... | | | | | | | |
| 8. Other income. Attach schedule. Do not include gain (or loss) from sale of capital assets ...... | 0 | 0 | 0 | 0 | 0 | | 0 |
| 9. Total of lines 1 through 8 ...... | 0 | 0 | 10,502 | 610,989 | 3,409,738 | | 4,031,229 |
| 10. Line 9 minus line 3 ...... | 0 | 0 | 10,502 | 56,166 | 93,444 | | 160,112 |
| 11. Enter 1% of line 9 ...... | 0 | 0 | 105 | 6,110 | 34,097 | | 40,312 |
| 12. Organizations described in section 170(b)(1)(A)(vi) | | | | | | | |
| a. Enter 2% of amount in column g, line 10 ...... | | | | | | | NONE |
| b. Attach a list showing the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for all years exceeded the amount shown in 12a. Enter the EIN for all organizations listed. | | | | | | | |

* Beginning with the date of formation unless otherwise specified in the exemption letter.

(Continued on next page)

**8734** (Page 1 of 2)

MAR 30 '99

MAR 31 '99

ISA
STF FED701IF.1

Form **8734**
Aug 1998 ALS

(page 2 of 2)

13. Organizations described in section 509(a)(2):

a. Attach a list, from amounts shown on lines 1, 2, and 3 showing the name of, and total amounts received in each year from each "disqualified person," and enter the sum of such amounts for each year:

Year 1 _____ NONE_ Year 2 _____ NONE_ Year 3 _____ NONE_ Year 4 _____ NONE_ Year 5 _____ NONE

Year 6 _____ NONE

b. Attach a list showing, for each year, the name and amount included in line 3 for each person (other than "disqualified persons") from whom the organization received more, during that year, than the larger of the amount on line 11 for the year or $5,000. Include organizations as well as individuals. Enter the sum of these excess amounts for each year:

Year 1 _____ NONE_ Year 2 _____ NONE_ Year 3 _____ NONE_ Year 4 _____ NONE_ Year 5 _____ NONE

Year 6 _____ NONE

14. If you received any unusual grants during your advance ruling period, attach a list for each year showing the contributor, the date and amount of the grant, and a brief description of the nature of the grant. Do not include these in line 1 above.

15. List current officers, titles, addresses and telephone numbers.

| Current Officer Name (please print or type) | Title | Street Address | City | State Code | Zip Code | Telephone Number |
|---|---|---|---|---|---|---|
| ERNEST T. FREEMAN | CHAIRMAN & C.E.O. | 330 STUART STREET | BOSTON | MA | 02116 | 617-426-0681 |
| RICHARD B. NEELY | PRESIDENT | 330 STUART STREET | BOSTON | MA | 02116 | 617-426-0681 |
| JEFFREY J. LAPOINTE | TREASURER | 330 STUART STREET | BOSTON | MA | 02116 | 617-426-0681 |
| FRED E. WILLIAMS | CLERK | 330 STUART STREET | BOSTON | MA | 02116 | 617-426-0681 |
| | | | | | | |
| | | | | | | |

Attach sheet if more space is needed.

16. ☐ Check block if any of your funds are received from gaming (bingo, pulltabs, Las Vegas Nights, Monte Carlo raffles, etc.) activities.

Under penalties of perjury, I declare that I am authorized to sign this schedule on behalf of this organization and that I have examined this schedule, including accompanying statements, and to the best of my knowledge and belief it is true, correct, and complete.

Richard B. Neely — Type or Print Name

_(signature)_ Richard B. Neely — Signature

President — (Title or authority of signer)

March 29, 1999 — (Date)

617-426-0681 — (Telephone No.)

Note: We cannot accept N/A as a response. If the correct response is -0- or -none-, please state -0- or -none-.

Be sure to enclose financial data for each of the five years in your advance ruling period. If you did not receive any support for any given year, please be sure to show financial data for that year by indicating -0- or -none-.

MAIL COMPLETED FORM TO:

Internal Revenue Service
P.O. Box 192
Covington, KY 41012-0192

STF FED7101F 2

# THE EDUCATION RESOURCES INSTITUTE, INC. AND SUBSIDIARIES

CONSOLIDATING STATEMENT OF REVENUE AND EXPENSES INFORMATION
YEAR ENDED DECEMBER 31, 1996

| | The Education Resources Institute, Inc. | Boston Systems Resources Inc. | TERI Financial Services, Inc. | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| REVENUE: | | | | | |
| Fees | $ 33,053,327 | $ - | $ - | $ - | $ 33,053,327 |
| Investment income | 3,602,005 | - | - | (136,413) | 3,465,592 |
| Computer services | - | 4,269,910 | - | (927,144) | 3,342,766 |
| Grants and contracts | 791,966 | - | - | - | 791,966 |
| Other fees | 792,390 | - | - | - | 792,390 |
| IEIC membership fees | 129,527 | - | - | - | 129,527 |
| Interest income | 400,791 | - | 10,502 | (400,791) | 10,502 |
| Other | 1,147 | 200 | - | - | 1,347 |
| Total revenue | 38,771,153 | 4,270,110 | 10,502 | (1,464,348) | 41,587,417 |
| EXPENSES: | | | | | |
| Compensation and employee fringe benefits | 5,407,761 | 876,950 | - | - | 6,284,711 |
| Office expenses | 998,671 | 125,138 | - | - | 1,123,809 |
| Rent | 374,460 | 70,800 | - | - | 445,260 |
| Professional fees | 1,325,276 | 1,223,101 | 1,325 | - | 2,549,702 |
| Computer access fees | 985,330 | 1,181,543 | - | (927,144) | 1,239,729 |
| Collection costs | 1,044,070 | - | - | - | 1,044,070 |
| Printing and promotion | 322,455 | 3,367 | - | - | 325,822 |
| Loan loss provision | 15,804,136 | - | - | - | 15,804,136 |
| Depreciation and amortization | 679,253 | 67,362 | - | - | 746,615 |
| Grants | 94,080 | - | - | - | 94,080 |
| Other expenses | 832,267 | 585,258 | 9,355 | (400,791) | 1,026,089 |
| Total expenses | 27,867,759 | 4,133,519 | 10,680 | (1,327,935) | 30,684,023 |
| EXCESS (DEFICIENCY) OF REVENUE OVER EXPENSES | $ 10,903,394 | $ 136,591 | $ (178) | $ (136,413) | 10,903,394 |
| NET ASSETS, DECEMBER 31, 1995 | | | | | 51,610,971 |
| NET ASSETS, DECEMBER 31, 1996 | | | | | $ 62,514,365 |

- 21 -

## AND SUBSIDIARIES
## CONSOLIDATING STATEMENT OF REVENUE AND EXPENSES
### For Twelve Months Ending December 31, 1998

| | The Education Resources Institute | Boston Systems Resources, Inc. | TERI Financial Services, Inc. | Consolidating Entries | 1998 Consolidated Profit/Loss | 1997 Consolidated Profit/Loss |
|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | |
| Fees | | | | | | |
| Investment Income | $34,630,035 | | | | $34,630,035 | $20,937,792 |
| Computer Services | 3,818,15c | | 78,539 | | 3,896,682 | 4,653,161 |
| Grants and Contracts | | 4,033,856 | | (1,512,669) | 2,521,197 | 3,211,238 |
| Other Fees | 1,306,392 | | | | 1,306,392 | 1,265,569 |
| HEIC Membership Fees | 1,502,880 | | | | 1,502,880 | 926,854 |
| Interest Income – Net of premium amortization | 74,234 | | | | 74,234 | 75,760 |
| Other | 452,420 | | 3,177,561 | (449,740) | 3,180,241 | 554,823 |
| Interest Income | 286,311 | | 14,916 | (238,370) | 309,740 | 107,426 |
| Investment in Subsidiary | 715,160 | 246,884 | | (715,160) | | |
| **Total Revenues** | $42,785,786 | $4,280,739 | $3,271,016 | ($2,916,139) | $47,421,401 | $41,733,023 |
| **EXPENSES** | | | | | | |
| Compensation and Employee Fringes | $6,923,996 | $940,240 | | $178,436 | $8,042,671 | $7,235,345 |
| Office Expenses | 1,228,403 | 97,487 | | | 1,325,890 | 1,095,186 |
| Rent | 420,853 | 70,800 | | | 491,653 | 466,624 |
| Professional Fees | 1,635,961 | 741,663 | 4,687 | | 2,382,311 | 2,225,040 |
| Computer Access Fees | 1,536,575 | 1,153,579 | 276,869 | (1,512,659) | 1,454,364 | 1,149,806 |
| Collection Costs | 2,606,921 | | | | 2,606,921 | 1,643,108 |
| Credit Bureau Costs | 187,196 | | | | 187,196 | 96,363 |
| Printing and Promotion | 410,476 | 205 | | | 410,681 | 398,002 |
| Loan Loss Provision (See Note) | 20,993,603 | | | | 20,993,603 | 18,138,846 |
| Depreciation and Amortization | 792,820 | 35,543 | 285,554 | | 1,113,919 | 799,742 |
| Grants | 247,337 | | 2,451,324 | | 247,337 | 521,784 |
| Interest Expense | 3,834 | 306,295 | 195,688 | (449,740) | 2,311,714 | 429,703 |
| Other Expenses | 882,590 | 276,450 | | (415,806) | 937,722 | 1,579,374 |
| **Total Expenses** | $37,870,563 | $3,622,263 | $3,214,123 | ($2,200,769) | $42,505,979 | $35,778,823 |
| **EXCESS/(DEFICIENCY) OF REVENUES OVER EXPENSES** | $4,915,422 | $658,477 | $56,883 | ($715,360) | $4,915,422 | $5,953,800 |

**NOTE:**

| | | 1998 | 1997 |
|---|---|---|---|
| Loan Loss Provision | | $41,856,040 | $34,553,385 |
| Recovery Income | | (20,862,437) | (16,414,559) |
| Net Loan Loss Provision | | $20,993,603 | $18,138,846 |