SCOTT S. WELTMAN, ESQ.
(State Bar No. 145215)
colcaecf@weltman.com
**Weltman, Weinberg & Reis Co., L.P.A.**
323 W. Lakeside Avenue, Suite 200
Cleveland, OH 44113
Telephone: (216) 685-1032
Facsimile: (216) 363-4086
WWR# 040284515
Attorney for Defendants,
National Collegiate Student Loan Trust 2006-3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF CALIFORNIA (SAN DIEGO)**

| | |
|---|---|
| In re<br><br>Cesar Medina and Krystal Anne Medina,<br><br>Debtors.<br>_____<br><br>Krystal Anne Medina,<br><br>Plaintiff.<br><br>vs.<br><br>National Collegiate Student Loan Trust 2006-3,<br><br>Defendant. | Bankruptcy Case No. 17-05276-LT<br>Chapter 7<br>Honorable Chief Judge Laura S. Taylor<br><br><br>Adversary Proceeding No. 19-90065-LT<br><br>**DEFENDANT NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3'S REPLY TO PLAINTIFF'S RESPONSE TO ITS MOTION FOR SUMMARY JUDGMENT** |

Now Comes Defendant National Collegiate Student Loan Trust 2006-3 ("NCSLT") by counsel, and for its Reply to Plaintiff's Response to its Motion for Summary Judgment, states as follows.

**I. INTRODUCTION**

In its Motion for Summary Judgment, NCSLT established each element necessary to show Plaintiff's Loan ("Loan") is nondischargeable under 11 U.S.C. §523(a)(8)(A)(i). It was made under a program guaranteed by a nonprofit institution, The Education Resources Institute,

1

Inc. ("TERI). NCSLT provided ample case law where TERI's Guaranty or another nonprofit's guaranty was found to be funding under the statute. Plaintiff cannot dispute these facts. Rather, Plaintiff engages in some twisted legal reasoning to conclude that instead of "nonprofit institution" in §523(a)(8)(A)(i), Congress really meant "scholastic institution." Plaintiff assembled certain documents relating to TERI and the First Marblehead Corporation ("FMC") and claim they prove TERI was actually not a nonprofit organization. However, the "facts" and argument are based on cherry-picked passages, innuendo and misdirection. Finally, Plaintiff presents a slanted history of the student loan industry in an apparent attempt to obtain a declaratory judgment that the industry's practices were so egregious that Plaintiff's Loan should be discharged.

"[W]hen the nonmoving party has the burden of proof at trial, as Plaintiffs do here, the party moving for summary judgment … need only point out that there is an absence of evidence to support the nonmoving party's case."[1] There is no evidence or law to support Plaintiff's positions. NCSLT is entitled to Summary Judgment as a matter of law.

## II. THE COURT NEED LOOK NO FURTHER THAN THE PLAIN LANGUAGE OF 11 U.S.C. §523(a)(8) TO ASCERTAIN ITS MEANING AND DETERMINE PLAINTIFF'S LOAN IS NONDISCHARGEABLE

Since 11 U.S.C. §523(a)(8)(A)(i) was amended in 1984 to delete "nonprofit institution of higher education" and substitute "nonprofit institution," courts have uniformly held that a "nonprofit institution" means any nonprofit organization. Plaintiff argues that the change was "modest" and Congress really meant "scholastic institution" instead of nonprofit. Should the

---

[1] Farrakhan v. Gregoire, 590 F.3d 989, 1003 (9th Cir. 2010) (cite omitted).

plain language of the statute be disregarded and decades of case law be overturned to substitute "scholastic" for "nonprofit" in the statute?

NCSLT's Motion for Summary Judgement is brought under §523(a)(8)(A)(i), which states in pertinent part:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title [11 USCS § 727, 1141, 1228(a), 1228(b), or 1328(b)] does not discharge an individual debtor from any debt-- unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>
> > **(A) (i)** an educational … loan …made under any program funded in whole or in part by a … nonprofit institution….

Plaintiff goes to great lengths to try to show that the words of §523(a)(8)(A)(i) have hidden meanings that can only be discerned by studying the history of the statute and the Higher Education Act. Plaintiff's history of the statute is incomplete, self-serving and downplays the impact of the 1984 amendment. That amendment deleted the requirement that a loan be made from a program funded by "nonprofit institution of higher education" and broadened the statute to include programs funded by any nonprofit institution. "In 1984, the Bankruptcy Amendment Act of 1984 struck the phrase "of higher education," from Section (a)(8). P.L. 98-353, section 454(a)(2). This extended the provisions of that section to all nonprofit loan programs, not merely those associated with an institution of higher education."[2]

An accurate and complete history of the statute can be found in *Nunez v. Key Educ. Res./GLESI (In re Nunez)*, 527 B.R. 410, 413-15 (Bankr. D. Or. 2015). *Nunez* analyzed Judge Perris' decision in *Plumbers Joint Apprenticeship & Journeyman Training Comm. v. Rosen (In*

---

[2] *Tex. Instruments Fed. Credit Union v. DelBonis*, 72 F.3d 921, 936-37 (1st Cir. 1995).

*re Rosen)*, 179 B.R. 935 (Bankr. D. Or. 1995).  Judge Perris refused to read back into the statute what had been deleted in the 1984 amendment: a requirement that the program be funded by an "institution of *higher education*."

> The language of section 523(a)(8) refers to educational obligations. It is not limited to obligations pertaining to education received at institutions of higher or post-secondary education. The Higher Education Act, the nondischargeability provisions added to the Higher Education Act and the nondischargeability provisions originally enacted as part of the Bankruptcy Reform Act of 1978 may have been so limited. Subsequent amendments to section 523(a)(8), however, have significantly broadened its scope. Most significantly, prior to 1984, section 523(a)(8) barred the discharge, inter alia, of certain loans made under any program funded in whole or in part by a governmental unit or "nonprofit institution of higher education." The Bankruptcy Amendments and Federal Judgeship Act of 1984, however, deleted the term "of higher education." The debtor would basically have me read the term back into section 523(a)(8) by imposing a post-secondary or higher education requirement. The language of the statute is not so limited.

*Id.*, at 938

However, there is no need to look to the history of the statute to determine its meaning. The United States Supreme Court gives us a simple rule for statutory construction. Start with the plain meaning of the statute.  "In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished."[3]  If the "statute's language is plain, "the sole function of the courts is to enforce it according to its terms."[4]

---

[3] *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S. Ct. 2589, 2594 (1992).
[4] *United States v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S. Ct. 1026, 1030 (1989), Citing *Caminetti v. United States*, 242 U.S. 470, 485 (1917).

4

Here, the plain language of the statute states that educational loans made under programs funded by *nonprofit institutions* are nondischargeable absent a showing of undue hardship. Plainly, "nonprofit institution" means what it says. The Oxford English Dictionary defines an institution as "[a]n establishment, organization, or association, instituted for the promotion of some object, esp. one of public or general utility, religious, charitable, educational, etc.[5] The word "institution" has broad meaning and can refer to a multitude of entities, including those organized for charitable and educational purposes, like TERI.  The court must find that Congress intended the words of the statute and enforce those words: Congress meant to say "nonprofit institutions" and not scholastic institutions.[6]  Loans arising from loan programs funded by nonprofit institutions are nondischargeable.  Plaintiff's Loan program, the Education One Continuing Education Loan Program, was funded by TERI, a nonprofit institution, through TERI's Guaranty and so her Loan is nondischargeable.

### III. TERI WAS A NONPROFIT INSTITUTION

TERI was a nonprofit corporation under Massachusetts law, and courts have without exception deemed it a nonprofit under §523(a)(8)(A)(i).[7] The IRS deemed it tax exempt.[8] Plaintiff extraordinarily argues that TERI was not a legitimate nonprofit by pointing to excerpts in public filings and other documents, but when the curtain is pulled back, the "facts" and argument are completely unsupported.  This court should not rely on Plaintiff's characterization of TERI and FMC and find TERI was not a legitimate nonprofit.

---

[5] "Institution, n.". OED Online. December 2019. Oxford University Press. https://www-oed-com.gatekeeper.chipublib.org/view/Entry/97110?redirectedFrom=institution (accessed February 06, 2020).
[6] *United States v. Ron Pair Enters.*, 489 U.S. at 241.
7 See Exhibit A:  TERI's Articles of Incorporation.
8 See Exhibit B:  IRS letter granting TERI tax exempt status.

5

Even if this court should decide, and it should not, that TERI was not operating as a "legitimate" nonprofit institution, TERI would not lose its nonprofit and tax exempt status. That is a decision that only the IRS can make.

> Whether an entity is entitled to federal tax-exempt status is a determination that is committed, in the first instance, to the IRS. See *Bob Jones Univ. v. United States*, 461 U.S. 574, 596-97, 76 L. Ed. 2d 157, 103 S. Ct. 2017 (1982). True, a determination under the CROA that a credit repair organization is not operating as a nonprofit will likely catch the attention of the IRS. But there are already processes for alerting the IRS to improvident grants of tax-exempt status. There is a procedure for the IRS to field complaints about an entity's abuse of its tax-exempt status. See www.irs.gov/compliance/enforcement (last visited May 5, 2005). Moreover, Congress itself occasionally holds hearings on the matter. Thus, a finding that a credit repair organization is not operating as a nonprofit for purposes of the CROA will be just another source of information from which the IRS can decide to target a particular credit repair organization for review. But such a finding will not mean that a credit repair organization loses its tax-exempt status without further action by the IRS.[9]

Tellingly, Plaintiff does not cite to one case or situation where TERI's nonprofit status was questioned. Plaintiff produces no evidence that the IRS ever investigated TERI's nonprofit or tax exempt status. Plaintiff's Exhibit 7 is some of TERI's tax returns, which presumably, the IRS reviewed without finding reason to question TERI's nonprofit or tax exempt status.

Plaintiff attempts to make it appear that a court should properly consider whether TERI is "a *bona fide* nonprofit institution" or a division of "the First Marblehead Corporation."[10] However, it was the plaintiff that raised those issues in response to a 12(b)(6) motion to dismiss.

---

[9] *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 477-78 (1st Cir. 2005).
[10] *Golden v. JP Morgan Chase Bank (In re Golden)*, 596 B.R. 239, 266-67 (Bankr. E.D.N.Y. 2019)

6

The court, while having to consider the plaintiff's allegations as true in the context of the motion, repeatedly stated that it "is far from clear whether Ms. Golden can prove her allegations."[11]

Plaintiff cites to a case for the proposition that there "no clear test for "determining when a nonprofit institution is -- or is not -- a nonprofit institution under section 523 (a)(8) of the Bankruptcy Code" has been formulated."[12] However, the question in that case was whether a federal credit union was a nonprofit under the statute, not a 501(c)(3) corporation. "Nonprofit" should be given its plain meaning under the statute and TERI, a nonprofit institution, qualifies as a nonprofit under the statute.

Plaintiff makes much of TERI's sale of some of its operations to FMC and suggests the sale somehow should provoke a finding that TERI was not operating as a nonprofit. Contrary to Plaintiff's assertion that FMC "took control over TERI's lending programs,"[13] FMC actually purchased TERI's loan processing operations, database and assimilated some of its workforce, which explains TERI's reduction of employees in 2001.[14] Plaintiff's Exhibit 6 clearly states that "TERI remains, however, an independent, private not-for-profit organization with its own management and board of directors."[15]

Plaintiff suggests that the sale to FMC was "ced[ing] control"[16] of TERI's missions and operations. Yes, when part of a corporation's operations are sold, the selling corporation no longer has control. The entity that purchased them assumes control. A sale is not "ceding

---

[11] *Id*., at 265, 267 and 271.
[12] *Tex. Instruments Fed. Credit Union v. DelBonis,* 72 F.3d 921, 927 (1st Cir. 1995). And see Plaintiff's Response, p. 26.
[13] See Plaintiff's Response, p. 21.
[14] See Plaintiff's Ex. 6, pgs. 12 & 62.
[15] See Plaintiff's Ex. 6, p. 12.
[16] See Plaintiff's Response, p. 26.

7

control." This argument is merely an effort to fit the sale into another tax court case with a complex set of facts, that revoked a nonprofit surgery center's tax exempt status because it "ceded effective control" of its activities to a for-profit organization and benefitted private parties.[17] The Plaintiff points to testimony in another case where FMC's CEO testified that FMC "was in a precarious financial situation until the successful acquisition of TERI." It sounds like the purchase was a sound business decision for FMC, but it in no way affected TERI's nonprofit status.

Plaintiff alleges, without any facts, that "TERI's [sic] engaged in a number "suspect commercial transactions with FMC, and their activities were in many places indistinguishable."[18] Plaintiff then cites to two tax court cases. In one, the court denied a business tax exempt status because a for-profit business exercised almost total control over the nonprofit applicant.[19] In the other, a hospital lost its tax-exempt status because it made payments that benefitted a private individual, its founding physician.[20] Plaintiff offers no evidence either of these scenarios existed between FMC and TERI.

Plaintiff claims TERI "sought 501(c) in order to facilitate the origination of more low-interest student loans"[21] and "obtained 501(c) status representing to the IRS, inter alia, that its lending program would bring interest rates on student loans down from Prime +2.0% to Prime +1.5%."[22] However, the letter submitted in support of this allegation (Plaintiff's Exhibit 8) is not TERI's representation. It is the representation of TERI Financial Services, Inc., a different organization. These allegations are unsupported and should be disregarded.

---

[17] *Redlands Surgical Servs. v. Commissioner*, 113 T.C. 47 (1999)
[18] See Plaintiff's Response, p. 26.
[19] *Est of Haw. v. Commissioner*, 71 T.C. 1067 (1979)
[20] *Lowry Hosp. Ass'n v. Commissioner*, 66 T.C. 850 (1976)
[21] See Plaintiff's Response, p. 18.
[22] See Plaintiff's Response, p. 27.

Plaintiff claims that TERI was nothing but a debt collector because its Bankruptcy Disclosure Statement stated that the various trusts "contend that …TERI does not own the defaulted loans buts holds them "for collection purposes only"."[23] This is misleading. The statement was made in the context of whether or not the loans were property of TERI's bankruptcy estate, and is only one-half of the trusts' position. They pose another position should TERI be found to own the loans and they be property of the estate. Plaintiff only discloses one of the two alternative positions the trusts took as to whether the loans were property of the estate. Argument is not a fact and is proof of nothing.

Plaintiff takes a line from a case to argue TERI should lose its nonprofit status and cites to a tax court case without any further argument or comparison. Because a court stated in *dicta* that "[a]n important component of First Marblehead's profitability was First Marblehead's relationship with The Education Resources Institute, Inc.,"[24] the apparent argument is that this court should jump to the conclusion that TERI operated impermissibly to "enhance the profitability" of a for-profit entity. There is no evidence to support such a finding.

Plaintiff makes the claim that "FMC promoted its ability to make non-dischargeable debt through TERI as a competitive advantage over Sallie Mae and Wells Fargo,"[25] but this statement is at best misleading. This was not made in the context of promoting a competitive advantage and there are no references to Sallie Mae or Wells Fargo. The statement was made to disclose a business risk. The full text is as follows:

> TERI is a not-for-profit organization and, as a result, borrowers have been deemed unable to discharge in bankruptcy proceedings loans that TERI guarantees. If TERI loses its not-for-profit status, and TERI-

---

[23] See Plaintiff's Response, p. 27, footnote 65.
[24] In re First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145, 148-49 (D. Mass. 2009)
[25] See Plaintiff's Response, p. 28.

9

    guaranteed student loans become dischargeable in bankruptcy, recovery rates on these loans could decline. In such event, our business could be adversely affected....[26]

TERI was a nonprofit. It never lost its not-for-profit status and Plaintiff's Loan is nondischargeable.

  Plaintiff alleges that "TERI appears to have paid FMC nearly $400 million above fair-market value for services under the MSA"[27] and points to an affidavit in TERI's bankruptcy in support.[28] The affidavit does not say this. It is an affidavit rejecting contracts with FMC and states the reason for rejection was the collapse of the securitization market and reduced loan volume, which then reduced TERI's income so it could not pay FMC the contractually agreed fee amounts. TERI did outsource services to FMC, but FMC did not profit on the fees because they charged TERI only the costs of their services.[29]

  Plaintiff's whisper campaign against TERI produces no evidence to support a finding that it was not a legitimate nonprofit institution. For purposes of 523(a)(8)(A)(i), TERI is a nonprofit institution.

### IV. PLAINTIFF'S LOAN IS AN EDUCATIONAL LOAN

  The Complaint did not allege that the Loan is not an educational loan and in fact admits it was taken out to attend a school, but the Response in footnote 53 argues the Loan may not be an educational loan. It characterizes the Loan as "an arm's length consumer credit transaction made under the UCC at 12% interest and required a $3,149 origination fee and a cosigner." It then cites to a case that describes education loans as "Educational loans are different from most

---

[26] See Plaintiff's Exhibit 5, FMC Annual report, 2004 at 53
[27] See Plaintiff's Response, p. 28.
[28] See Plaintiff's Exhibit 4
[29] See Plaintiff's Ex. 6, p. 6.

loans. They are made without business considerations, without security, without cosigners."[30] Yes, but the court is describing characteristics of a state student loan program in 1983. This is not like Plaintiff's Loan.

Plaintiff's reliance on a second case is completely misplaced.[31] Plaintiff claims a "student debt"[32] was discharged because it was described in similar terms as Plaintiff describes her own Loan. The loan was a bar examination loan and defendants filed a motion to dismiss the complaint alleging loan was "an educational benefit" under §523(a)(8)(A)(ii) and so nondischargeable. Plaintiff confuses this section of the statute with §523(a)(8)(A)(i). The court denied the motion to dismiss because it refused to give an otherwise dischargeable private loan the status of an "educational benefit," rendering it nondischargeable. NCSLT is not arguing its Loan conferred an educational benefit under §523(a)(8)(A)(ii).

Because Plaintiff only alleged in the Complaint that her Loan was dischargeable because it was not a "qualified education loan," this argument should be disregarded. It should also be disregarded because there is no support given for Plaintiff's alleged facts.

### V. PLAINTIFF'S HISTORY OF THE STUDENT LOAN INDUSTRY DOES NOT ALTER THE FACTS THAT PLAINTIFF'S LOAN WAS MADE UNDER A PROGRAM FUNDED IN PARTY BY A NONPROFIT INSTITUTION

Much of the Response is devoted to a largely unsupported and self-serving history of the student loan industry and various players, including TERI, FMC and National Collegiate Trust (NCT). Again, a closer look shows many allegations are unsupported. The general tone is that the industry and in particular, these parties, were preying on students. However, even if all of what is said is true, and it is not, it does not change the fact that Plaintiff's Loan is

---

[30] *In re Roberson*, 999 F.2d 1132, 1135-36 (7th Cir. 1993).
[31] *Campbell v. Citibank, N.A. (In re Campbell)*, 547 B.R. 49, 54 (Bankr. E.D.N.Y. 2016)
[32] See Plaintiff's Response, p. 23, footnote 53.

11

nondischargeable because it was made under a program funded in part by a nonprofit institution, TERI.

Again, what the Response says is often not supported by the referenced cite. For example, in an apparent attempt to cast dispersion on FMC's default rate and loans. Plaintiff claims that the CFPB describes Direct to Consumer (DTC) loans as more like personal loans than student loans, but it does not. Rather, it describes them as student loans "typically not certified by a school's financial aid office."[33] Plaintiff's footnote 45 makes it appear that the CFPB was critical of FMC's default rates, but its quote is taken from a footnote used to illustrate default rates of student loans made between 2005 and 2008 from nine different lenders.[34] The defaults were also occurring during the Great Recession. In fact, the CFPB thanked FMC and the other lenders for providing data for the report.[35]

Another example is that Plaintiff cites to several PLRs (IRS Private Letter Rulings) in footnotes 34, 26 and 38 to claim loans associated with nonprofits have certain characteristics. The entities that requested the PLRs are not named, and they cannot be linked to TERI. Further, each one states "This document may not be used or cited as precedent. Section 6110(j)(3) of the Internal Revenue Code." The court should disregard these references.

NCSLT could point out more issues with the history and characterizations, but essentially, Plaintiff is asking the court to find the student lending industry caused egregious harm and find as a result, that Plaintiff's Loan is dischargeable. That is not the law. Plaintiff's Loan must be found nondischargeable because it was made under a program funded in part by TERI, a nonprofit institution.

---

[33] https://files.consumerfinance.gov/f/201207_cfpb_Reports_Private-Student-Loans.pdf, p. 105.
[34] *Id*., at p. 25 and 117.
[35] *Id*., at p. 109.

12

## VI. TERI GUARANTEED PLAINTIFF'S LOAN PROGRAM

Plaintiff states there is no evidence that TERI guaranteed her Loan. This indicates a misunderstanding of the statute. It is the program that must be guaranteed, not the loan itself.

> Section 523(a)(8) does not require that TERI fund O'Brien's loan in order for that section to be applicable. Rather, § 523(a)(8) requires only that O'Brien's loan was "made under any program funded in whole or in part by" TERI. While it may be true that TERI merely guaranteed, without funding, O'Brien's particular loan, it is an entirely different question whether TERI funded the loan <u>program</u> under which O'Brien's loan was made.[36]

Plaintiff argues that NCSLT failed to show the conditions in the Guaranty were met and so fails to prove the Guaranty, but Plaintiff is obligated to provide facts showing the conditions were not met, and has not done so.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[37]

Plaintiff claims that the Deposit and Security Agreement[38] somehow annuls the Guaranty by creating an "accounting circuity" between TERI and NCSLT. This is a misunderstanding of the Agreement. TERI gave NCSLT a security interest in the Pledged Account where the guaranty fees and collection recoveries were held to ensure it honored its Guaranty to purchase defaulted loans from NCSLT.[39] In fact, one of Plaintiff's own exhibits states TERI's Guaranties survive loan securitization:

---

[36] *O'Brien v. First Marblehead Educ. Res., Inc. (In re O'Brien)*, 419 F.3d 104, 106 (2d Cir. 2005).
[37] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (cites omitted).
[38] NCSLT'S Ex F to Motion for Summary Judgment
[39] *Id*. At p. 5, para. 5 and p. 6, para 6.

13

> One of the key components of our private label programs is the opportunity for our lender clients to mitigate their credit risk through a loan repayment guarantee by TERI. TERI guarantees repayment of the borrowers' loan principal, together with capitalized and/or accrued interest on defaulted loans. For additional information on TERI, see "— Strategic Relationship with The Education Resources Institute." If the lender disposes of the loan in a securitization, this guarantee remains in place and serves to enhance the terms on which asset-backed securities are offered to investors.[40]

Lastly, Plaintiff argues that TERI is somehow required to provide evidence it honored or paid on the Guaranty by citing to the *Holguin*[41] case. That case was unique in that the Guaranty in evidence expired before the loan was made. Although there was a provision that the Guaranty could be extended, the court had no evidence of the extension or that TERI paid on its Guaranty after the expiration date and after the loan was made.[42] Unlike the Guaranty in *Holguin*, Plaintiff's Guaranty did not expire by its own terms. The statute only requires funding, not payment. TERI funded the Plaintiff's program by setting aside guaranty fees and collections from defaulted loans to purchase defaulted loans under the Guaranty.[43]

There is ample evidence that TERI guaranteed Plaintiff's Loan Program and Plaintiff produces none to show it did not. Plaintiff's Loan program, the Education One Continuing Education Loan Program, was funded by TERI, a nonprofit institution, through TERI's Guaranty. Plaintiff's Loan is nondischargeable under 523(a)(8)(A)(i).

---

[40] See Plaintiff's Ex. 6, First Marblehead Annual Report 2006, p.6, 3rd para.
[41] *Holguin v. Nat'l Collegiate Student Loan Tr. 2006-2 (In re Holguin)*, 609 B.R. 878 (Bankr. D.N.M. 2019)
[42] *Id.*, at 887-88.
[43] [43] NCSLT'S Ex F to Motion for Summary Judgment, at p. 5, para. 5 and p. 6, para 6, and NCSLT's Ex B to to Motion for Summary Judgment, p. 5, Section 2.

## VII. CONCLUSION

To overcome a motion for summary judgment, a non-moving party must show that there is a fact or there are facts that create a genuine issue for trial.[44] Plaintiff provides no credible evidence that TERI was not operating as a nonprofit organization. The court should disregard Plaintiff's history of the student loan industry because it is not reliable and because it is not a material fact in deciding whether Plaintiff's Loan is nondischargeable under §523(a)(8)(A)(i). "A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit."[45]  Plaintiff's arguments about TERI's Guaranty create no genuine issues of material fact. Plaintiff's claim that the Loan may not be an educational loan are not based on facts in the record, but on Plaintiff's characterization of the Loan, so again, no issues are raised for trial.  NCSLT is entitled to summary judgment.

Wherefore, for the reasons stated above, Defendant National Collegiate Student Loan Trust 2006-3 requests it be granted summary judgment, or in the alternative, a partial summary judgment to narrow the issues for trial or further briefing.

Respectfully submitted,

Dated: February 24, 2020            /s/ Scott S. Weltman
                                    Scott Weltman (SBN 145215)
                                    **Weltman, Weinberg & Reis, Co. L.P.A.**
                                    Attorney for Defendant,
                                    National Collegiate Student Loan Trust 2006-3

---

[44] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 and 2511 (1986).