1

2
Austin Smith (NY Bar No. 5377254) (*Pro Hac Vice*)
Smith Law Group LLP
3
3 Mitchell Place
New York, NY 10017
4
917-992-2121
5
austin@acsmithlawgroup.com

6

7
Christopher R. Bush CASB 243471
Law Office of Chris Bush
8
2727 Camino del Rio S., Ste 135
San Diego, CA 92108
9
619-678-1134
10
chris@chrisbushlaw.com

11

12
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
13

14
IN RE:                                              ) Case No.  17-05276-LT
CESAR MEDINA                              ) Chapter 7
15
KRYSTAL ANNE MEDINA                )
                                                        )
16
_____       )
17
KRYSTAL ANNE MEDINA               ) Adversary No. 19-90065-LT
        Plaintiff,                                    )
18
        vs.                                              )
19
NATIONAL COLLEGIATE STUDENT )
LOAN TRUST 2006-3;                       )
20
                Defendant.                        )
21
                                                        )
22
                                                        )
23
                                                        )
24
                                                        )

25

26
**PLAINTIFF'S AMENDED SUPPLEMENTAL**
**MEMORANDUM OF LAW**
27

28

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**STATEMENT OF CASE**……………………………………………..5

**ARGUMENT AND POINTS OF AUTHORITIES**……………………5

**Defendant Has Failed To Prove That TERI Is A Nonprofit** …..………6

**Defendant Has Failed To Prove TERI Funded The Loan**……………………………………………………….……..…10

**CONCLUSION**……………………………………………….…16

# TABLE OF AUTHORITIES

*150 Broadway N.Y. Assocs., L.P. v. Bodner*,
14 A.D.3d 1 (N.Y. App. Div. 2004)…………………………………………14-15

*Berg v. Access Grp., Inc*,
2015 WL 246338 (E.D. Pa. Jan. 16, 2015)………………………………………14

*In re Bonner*,
13 F. App'x 517, 519 (9th Cir. 2001) …………………….…………………..7

*Conference of N.A.A.C.P. v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ………………….…..……………….12

*Doe v. United States*,
58 F.3d 494, 498 (9th Cir. 1995) ………………….…..……………….6

*Eul v. Transworld Sys.*,
2017 WL 1178537 (N.D. Ill. Mar. 30, 2017). ………………….…..…………..15

*Lawrence Bus. Coll. v. Bussing*,
117 Kan. 436 (1925) …………………………………………………7

*In re Greer-Allen*,
602 B.R. 831,839 (Bkrtcy. D. Mass. 2019) ………………….…………5,9-10

*In re Dube*,
169 B.R. 886 (Bankr. N.D. Ill. 1994) ………………….………………7

*In re Delbonis*
169 B.R. 1, 3–4 (Bkrtcy.D.Mass.1994) ………………….……….....7, 9

*In re Drumm*,
329 B.R. 23, 35 (Bankr. W.D. Pa. 2005) ………………….………………15

*O'Brien v. First Marblehead Education Resources f/k/a TERI*,
299 B.R. 725, 730 (Bankr. S.D.N.Y. 2003) ………………….…………11-13

*In re Renshaw*,
222 F.3d 82, 89 (2d Cir. 2000) ………………….…..……………….15

*In re Taratuska*,
374 B.R. 24 (Bankr. D. Mass. 2007) …………………...………………12-13

*In re Vill. Concepts, Inc.*,
2015 WL 1258621 (E.D. Cal. 2015)…………………………………..15

*Jackson v. Firestone Tire & Rubber Co.*, …………………………….……11
 779 F.2d 1047 (5th Cir.),

*People v. Watkins*,
 438 Mich. 627 (1991) …………………………………………………...11

*In re Rodriguez*,
319 B.R. 894 (Bankr. M.D. Fla. 2005).  …………………….……………5-6

*Shannon-Vail Five Inc. v. Bunch*,
270 F.3d 1207 (9th Cir. 2001) ……………………………...…………………15

*TI Federal Credit Union v. Delbonis*,
183 B.R. 1 (D.Mass.,1995) ………………………….…………………………7

*United States v. Graham*,
391 F.2d 439, 447 (6th Cir. 1968)………………………………………..11

*Woods v. City of Chicago*,
234 F.3d 979 (7th Cir. 2000)………………………………………………11

*Zimmerman v. Cambridge Credit Counseling Corp.*,
529 F. Supp. 2d 254 (D. Mass. 2008) ………………………………………7-8

**Statutes and Rules**
11 U.S.C. § 523(a)(8)…………………………………………………...passim
11 U.S.C. § 101………………………………………………………….6
26 U.S.C. § 501………………………………………………………….7,9
Fed. R. Evidence 1006………………..………………………………………5

**Other Authorities**
*SLM Holdings To Buy Nellie Mae*, Washington Post (May 27, 1999)…………..9

## I.    STATEMENT OF THE CASE

Defendant moved for summary judgment on the basis that as a matter of law, the Plaintiff's Bank One Loan had been guaranteed by TERI and that this TERI guaranty must be construed as a form of constructive funding under the case law. This Court asked the Defendant to provide admissible evidence and stated that if Defendant met its evidentiary burden, it would likely prevail under *Greer-Allen* and *Rodriguez*. Tentative at 12. Defendant was unable to offer any admissible evidence. Instead, Defendant now insists that as a matter of law, TERI actually funded the Bank One Loan and asks this Court to expand the case law yet further and conclude that where TERI funds a single loan, it must be found to have funded the entire loan program.

## II.    ARGUMENT AND POINTS OF AUTHORITIES

Defendant's argument must fail. First, Defendant has not proven TERI was operated as a nonprofit under the common law as a matter of law and has not even provided the most accurate or recent governing documents for TERI, which are kept with the Attorney General—not the Secretary of State.  Moreover, Professor Brooks here submits a declaration summarizing the contents of TERI's public financials under FRE 1006 and stating what records need to be produced before any conclusions can be reached.  Second, Defendant has once again offered generalized business records and its key piece of evidence is a copy of a check that contains three names: Bank One, Bank of America, and TERI, and it is beyond peradventure to cherry pick the only non-national bank among the three and conclude that TERI provided the funds for the Bank One Loan despite Defendant having explicitly disclaimed that when it moved for judgment.

## A. <u>Defendant Has Failed To Prove That TERI Is A Nonprofit Institution</u>

The *Rodriguez* court stated it would not go beyond the "plain meaning" of the term "nonprofit institution" in section 523(a)(8). "Institution' is defined in the dictionary as 'an established organization or corporation (as a college or university) especially of a public nature." 319 B.R. 894, 897–98 (Bankr. M.D. Fla. 2005). Although the dictionary definition stated that the word "institution" had a scholastic connotation, the court stated that "[b]ecause section 523(a)(8) was expanded in 1984 to remove the words 'of higher education'. . . . the Court concludes that a corporation is included in the term 'institution." *Id.* This was plain error. Congressional amendments to statute do not alter the dictionary definitions of words used in the statute. The court next changed the term being defined, and recited the definition of "nonprofit corporation."[1] "According to Black's Law Dictionary, a 'nonprofit corporation' is a "corporation organized for some purpose other than making a profit, and usually afforded special tax treatment." *Id.* (citing *Black's Law Dictionary*).[2]

The *Rodriguez* Court concluded TERI clearly fit this definition, and criticized the debtor's request to conduct a "totality of the circumstances" test, which would require the court to "venture into uncharted waters [such as] corporate governance, subsidiary ownership, whether corporate salaries were reasonable at the time the loans were granted, and whether the salaries are currently reasonable." *In re Rodriguez*, 319 B.R. 894, 897–98 (Bankr. M.D. Fla. 2005).

Plaintiff submits that is what Congress intended. Congress could have used the term "nonprofit organization," which is already defined in the Code, or it could

---

[1] The Bankruptcy Code uses the term "nonprofit organization' a nonprofit organization that is exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986." 11 U.S.C.A. § 101 (West). Treating the term "nonprofit institution" identically reads the word "institution" out of the statute.

[2] As the Ninth Circuit observed of the term "governmental unit" in *Doe*. "The definitional provisions of the bankruptcy code are not helpful. A governmental unit is defined as, "United States; State; Commonwealth; District . . [.] The definition merely restates the problem." *Doe v. United States*, 58 F.3d 494, 498 (9th Cir. 1995)

6

have used "501(c)" as it did in other places in the Code.  When Congress uses the word "nonprofit" without defining it as a 501(c), courts conduct an independent inquiry into the entity's character to determine whether it "actually operates as a nonprofit, irrespective of its tax-exempt status." *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 475–76 (1st Cir. 2005).

The Tentative stated that Plaintiff's citations to tax cases were not helpful. Tentative at 11.  Plaintiff would like to try again. Plaintiff did not cite the tax cases in expectation that this Court would strip TERI of its 501(c).  The cited tax cases are more like law review articles or secondary sources than precedent in this context, as they contain the basic common law doctrines governing the nonprofit.  Plaintiff thus cited them for the same reason courts often borrow from other legal disciplines when addressing a new problem that has an analogue in other laws. *See, e.g. In re Bonner*, 13 F. App'x 517, 519 (9th Cir. 2001) (making determination of discharge by using the badges of fraud under *Bradford v. Commissione*r, 796 F.2d 303, 307 (9th Cir.1986)); *In re Dube*, 169 B.R. 886, 892 (Bankr. N.D. Ill. 1994) ("[A]lthough not binding on this Court, the analytical criteria developed by the IRS aids this Court's analysis.")(*citing Chapman v. Commissioner of Internal Revenue* and *American Guidance Foundation, Inc. v. U.S.*).[3] Although nonprofit and the 501(c) are distinct legal doctrines, there is significant overlap in the Venn diagram.

In *Zimmerman*, the First Circuit reversed the district court's dismissal and remanded for a determination regarding the alleged nonprofit.[4] The district court

---

[3] The common law had nonprofits long before there even was a federal income tax to avoid and there it has a substantial jurisprudence. *See, e.g., Lawrence Bus. Coll. v. Bussing*, 117 Kan. 436 (1925) ("A business devoted to giving instruction in driving automobiles or piloting air craft does not seem to fit into the ordinary conception of an educational activity, although it may not be easy to say exactly why, or just where the line should be drawn.").

[4] Notably, the First. Circuit bypassed the "nonprofit institution" analysis in *Delbonis.* Instead, the circuit chose to affirm on alternate grounds, and determined that the credit union, which the lower courts had concluded at first was a nonprofit, and then was not a nonprofit, was in fact a governmental unit.  That is, the circuit thought it was easier to do a quasi-sovereign immunity analysis on an issue of first impression rather than determine whether a credit union was technically a nonprofit institution. *TI Federal Credit Union v. Delbonis,* 183 B.R. 1, 4

then granted summary judgment *against* the sham nonprofit based upon after five findings of fact which the court analyzed under the doctrines in a number of leading tax cases including *United Cancer Council v. Comm'r, Harding Hosp., Inc. v. U.S.* and *Restland Memorial Park v. United States*. First, citing *Church of Scientology v. Comm'r*, the district court found that "the Puccios arranged in a non-arms-length transaction for CCCC to pay over $14 million for the dubious intangible assets of BCC and CCC." Second, "CCCC in substantial part took over the activities of for-profits BCC and CCC, hiring their employees and admittedly merely continuing their business but as a registered nonprofit." *Third,* "CCCC funds were expended on equipment for the Puccios' for-profit businesses and even on personal purchases for the Puccios themselves," citing *Graboske v. Comm'r,* T.C.M. (CCH) 262 (1987)(holding that entity was not a nonprofit where its funds were used for the benefit of outside individuals). Fourth, "CCCC also made payments to Puccio-owned businesses where there is no evidence that those companies provided any goods or services to CCCC." Lastly, the "Defendants communicated the representation that CCCC was a nonprofit entity. This was a material matter since this factor could reasonably sway a consumer in the decision whether to retain a company." *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 277–78 (D. Mass. 2008), *aff'd sub nom. Zimmerman v. Puccio*, 613 F.3d 60 (1st Cir. 2010).[5]

Plaintiff made (or attempted to make) similar arguments about TERI's relationship with FMC, including that: (i) FMC took over TERI's assets and employees; (ii) TERI paid FMC more than $500 million in fees for labor that by all accounts had a fair-market value of only around $140 million; (iii) TERI ceded control over its operations to FMC, who TERI's ability to originate non-

---

(D.Mass.,1995) (stating that after the 1984 amendment does not *in se* reveal, however, whether credit unions were meant to be included as nonprofit institutions).

[5] Plaintiff cited reports on Senator Grassley's investigations into Educap. *Cf. Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 478 (1st Cir. 2005) ("Indeed, Congress has held hearings on the abuse of tax-exempt status by credit counseling and repair organizations.").

1   dischargeable debt as credit enhancement in the securitizations. Plaintiff's
2   Opposition at 19-22.

3         On the basis of Professor Brook's summary, Plaintiff can now put a finer point
4   on it: FMC used TERI as a shell into which it dumped the toxic liabilities created by
5   its loan programs in order to buy enough time for FMC's directors to harvest the
6   inflated market gains before the entire thing came crashing down. Professor Brooks
7   testified that before any formal conclusions could be reached, the parties and the
8   court must have access to certain records, including, *inter alia*, (i) the Master
9   Servicing Agreement between FMER and TERI; (ii) reports on the scope and results
10  of the regulatory investigations into TERI as disclosed by TERI in 2012; (iii)
11  accounting records showing TERI's fair-market value in 2001 prior to its purchase
12  by FMC for $8.9 million ($7.9 of which was seller financed).[6]  Declaration of John
13  R. Brooks.  Plaintiff respectfully contends that these facts are more germane and
14  material to the outcome of this case than any of the Defendant's generalized SEC
15  filings filled consisting mostly of hearsay and legal conclusions and untethered to
16  anything concrete about the Plaintiff's loan. *In re Delbonis,* 169 B.R. 1, 3–4
17  (Bkrtcy.D.Mass.1994) (reversed)("A mere declaration in its certificate of
18  incorporation that it was organized not for profit, [would not] be sufficient to stamp
19  upon it a nonprofit character. In each case, when the corporation is examined, the
20  true facts must be ascertained and the corporation judged accordingly, no matter
21  what its scheme of operation or its pretensions may be.").

22
23
24
25

26  _____
    [6] Navient, for example, purchased a competing student loan guaranty nonprofit 501(c) called Nellie
27  Mae in 1999 for $320 million.  The funds were used to create a new charity called the Nellie Mae
    Foundation, and the corporate Nellie Mae was absorbed into Navient, and thereafter ceased
28  representing itself as a nonprofit. See SLM Holdings To Buy Nellie Mae, Washington Post (May
    27, 1999), *available at:* https://www.washingtonpost.com/archive/business/1999/05/27/slm-
    holding-to-buy-nellie-mae/700936df-4bbe-4a50-8e2e-7af146ece8cd/

**B. <u>Defendant Haas Failed To Prove TERI Funded The Loan</u>**

In *Greer-Allen*, the Defendant's sister trusts sought summary judgment with an affidavit of Bradley Luke, the loan and trust agreements, and the guaranty agreement between Bank One and TERI executed April 18, 2002, the *Greer-Allen* Court granted summary judgment against the debtor:

> "TERI promised to guaranty all loans made under the Education One Undergraduate Loan Program. Section 2.1 of the guaranty states that 'TERI hereby guarantees to Bank One, unconditionally . . .the payment of 100% of the principal of and accrued interest on every Loan as to which a Guaranty Event has occurred . . .the agreement makes clear that TERI guaranteed all loans made under the Program . . .[t]he sweeping breadth of the guaranty makes clear that TERI helped fund the Program." *In re Greer-Allen*, 602 B.R. 831,839 (Bkrtcy. D. Mass. 2019) (internal spacing omitted)

That is the same Bank One guaranty agreement that Defendant claimed governed this action as a matter of law. But that is not the complete statement.  The Bank One guaranty actually reads: "TERI hereby guarantees to Bank One, unconditionally ***except as set forth in Section 2.2*** below, the payment of 100% of the principal of and accrued interest on every Loan as to which a Guaranty Event has occurred." Defendant's Supplemental Exhibit K at 2 (emphasis added). Section 2.2 states that "TERI's guaranty is conditioned upon the following," and then lists nearly an entire page of requirements that had to be met before TERI would honor a loan guaranty. *Id*. at 3. The difference between an unconditional and conditional guaranty is not immaterial. It was plain error for the court to state that on the basis of that guaranty agreement, "the sweeping breadth of the guaranty makes clear that TERI helped fund the Program." *In re Greer-Allen*, at 839.

Plaintiff is not here making any sort of "show me the note" defense. This is not a mere collection suit—this is a dischargeability proceeding.  The Defendant cannot label a document a "business record" and thereby immunize it from scrutiny under the rules of evidence.  Even if the statement "TERI is a nonprofit corporation" were not a legal conclusion (which it is), not every fact or statement in a business record is admissible to prove the truth of the matter asserted. The fact itself—not just

1  the document--must be either shown to have been part of a regularly conducted

2  activity, *United States v. Graham*, 391 F.2d 439, 447 (6th Cir. 1968)(stating that

3  business record exception to hearsay "should derive from an efficient clerical system

4  and should be of such a nature that it would be competent evidence if testified to by

5  its maker."),[7] a statement against pecuniary interest, *People v. Watkins*, 438 Mich.

6  627, 638–39 (1991)(noting the distinction in bookkeeping between "a

7  merchant's *credit entry* of payment received (thus against his interest) which at the

8  same stroke has included (thus in favor of his interest) the *debit entry* of his claim

9  leading to the payment."), or fall within some other exception.  *Woods v. City of*

10  *Chicago*, 234 F.3d 979, 986 (7th Cir. 2000)(stating court agreed with appellant's

11  principle that "statements made by third parties in an otherwise

12  admissible business record cannot properly be admitted for their truth unless they

13  can be shown independently to fall within a recognized hearsay exception.").  The

14  Defendant's evidence is a hall of mirrors.  *See also Jackson v. Firestone Tire &*

15  *Rubber Co.*, 779 F.2d 1047, 1063 (5th Cir.) ("It seems to me that the business-

16  records exception will swallow the hearsay rule if I can allow someone to put in any

17  opinion they have by putting it down on paper and putting it in a file

18  somewhere."), *vacated,* 788 F.2d 1070 (5th Cir. 1986).

19      The Tentative also cited favorably to *O'Brien v. First Marblehead Education*

20  *Resources f/k/a TERI.*   In that case, the bankruptcy court concurred with

21  *Hanmarstrom*/*Pilche*r and construed "funded" broadly to encompass any loan where

22  a nonprofit "meaningfully participated." *In re O'Brien*, 299 B.R. 725, 729–30

23  (Bankr. S.D.N.Y. 2003). The debtor, Kelli O'Brien, argued that this expansive

24  interpretation of "funded" rendered the word "guaranteed" superfluous. "Debtor's

25  statutory construction argument completely fails to account for 11 U.S.C. § 102(5)

26  [which states that] 'or' is not exclusive. Thus, the term 'guaranteed' cannot be

27  assumed to have been intentionally omitted [because] the first and second clauses of

28

---

[7] *See generally People v. Watkins*, 438 Mich. 627, 638–39 (1991).

§ 523(a)(8) are not mutually exclusive under § 102(5)." *id.* "The second clause has a broader and different focus since it encompasses governmental units and nonprofit institutions and focuses on loan programs and not on particular loans [demonstrating that] Congress intended to include within section 523(a)(8) all loans made under a program in which a nonprofit institute plays *any meaningful part in providing funds.*" *In re O'Brien*, 299 B.R. 725, 730 (Bankr. S.D.N.Y. 2003) (quoting *Klein*).

There are two problems here. The first is that a using the word "or" in a nonexclusive manner is different from the cannon against superfluity.[8] Just because a debt can fit in either the first or the second clause does not make the court's construction any less violative of the cannon. Second, this interpretation not only made the word "guaranteed" superfluous—it made the entire first clause of 523(a)(8) superfluous. That is, any loan made, insured or guaranteed by a governmental unit could also be described as having been made under a loan program in which the governmental unit played a meaningful part. If Congress intended that definition, it only needed to codify the second clause. *See* Plaintiff's Opposition at 18.

During the hearing on the Defendant's motion, this Court asked Plaintiff's counsel if there were any cases that supported the narrow construction. While Plaintiff's counsel did not cite *Taratuksa* originally because it was reversed by the district court, the analysis is sound and does support the narrow construction. "These cases [*Pilcher*, *O'Brien*] are well-reasoned but do not seem to take into account the outcome I find objectionable—the conversion of a dischargeable commercial student loan into a non-dischargeable commercial student loan for reasons having little to do with the loan itself." The *Taratuska* Court continued:

---

[8] *Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1169–70 (11th Cir. 2008)("This utterly misapplies the familiar canon of construction that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." . . .If courts were to adopt plaintiffs' interpretive method, then every federal statute that is consistent and parallel with a state statute would, paradoxically, have the opposite effect of preempting the state statute since the state statute would otherwise make the federal statute superfluous.")

The Court disagrees and holds that the giving of a guaranty does not constitute funding within the meaning of Section 523(a)(8). A guaranty is generally understood to mean a promise to pay the debt of another who is liable in the first instance yet fails to pay the debt when due. Funding is generally understood to mean the advance of money to an individual, entity or venture for a specific purpose. See Black's Law Dictionary (8th ed.2004). These are very different undertakings . . .[n]otably, the statute employs both terms, plainly indicating that they have different meanings; otherwise, one or the other would be unnecessary. Hence, the giving of the Guaranty does not constitute the program funding contemplated by Section 523(a)(8) on account of the Loan.

*Second,* even if [The Access Group] *is* a student loan program, TERI's claim for TAG's status as the funded program for the Loan fails because TAG indiscriminately groups commercial and nonprofit student loans in a single, unitary classification, disregarding the disparate terms and attributes of such different loans. TERI's reading of the statute—that the indiscriminate inclusion of commercial and nonprofit loans in a single classification constitutes a student loan program funded in part by a nonprofit institution—ensures inequitable outcomes: it converts dischargeable commercial student loans into non-dischargeable commercial student loans solely as a consequence of TAG's classification system, a system that ignores loan attributes altogether. Under that reading, *no* TAG-related commercial loan would ever be dischargeable as long as *one* TAG-related nonprofit loan remained unpaid. This seems both illogical and unfair." *In re Taratuska*, 374 B.R. 24, 30 (Bankr. D. Mass. 2007), *rev'd,* 2008 WL 4826279 (D. Mass. Aug. 25, 2008).

*O'Brien* and *Taratuska*, *Pilcher*, *Hammarstrom*, and dozens of other cases involved some combination of TERI guarantees and Access Group administration, which courts have characterized using language (e.g., "exercising near plenary control" and "sweeping breadth") that is seldom applied to loan processing agents. The cases are largely devoid of any hard evidentiary analysis, which is either a cause or effect of the "meaningful participation" standard. Notably, Professor Brooks observed that in the year 2000, TERI disclosed that it was notified that the Access Group, "intends to discontinue its lending guarantee relationship with TERI effective May 1, 2000. TERI will, however, continue to retain its guarantee obligation and its right to

receive guarantee fees for loans originated prior to May 1, 2000." Brooks' Ex. 2 at 22.  Although most of the published decisions involved the TERI/Access Program concern loans originated before 2000, many of them do not list the dates of the loans and occurred up until this year. But that is not the end. TERI later disclosed that, "On November 15, 2001, TERI and the Access Group agreed to and executed a plan that would remove TERI's guarantee from approximately $340 million of Access Group loans originated after May 1, 1998. TERI's Loan Loss Reserve balance was reduced by $22.9M in connection with this transfer. TERI has not guaranteed any new borrower volume under the Access Group loan program since the year 2000." Brooks' Ex. 2 at 45. It not possible to know what happened and whether TERI or its affiliates have continued to press their claim for non-discharge based on guarantees that were stripped from the loans in 2001. But it seems very unlikely that any of the persons whose loans were in that $320 million were given notice and are still walking around with promissory notes that say the debts cannot be discharged. The sheer size and scale of the FMC loan programs mean that amongst all the interrelated parties, the left hand rarely knows what the right hand has done or is doing.  It would not need to be malicious to be devasting. And this certainly lends more credibility to Berg's allegations. In *Berg v. Access Group*, Access sued the debtor after bankruptcy on a TERI student loan.  The debtor obtained a lawyer, and during a deposition, Access allegedly admitted that there was no TERI guarantee and it was simply a pricing scheme.  The plaintiff counterclaimed for fraud, Access demurred and insisted whether that was true or not, it was immaterial because Access's business with TERI was none of the debtor's concern. The court denied Access' motion to dismiss, *Berg v. Access Grp., Inc*, 2015 WL 246338, at *8 (E.D. Pa. Jan. 16, 2015), but the case settled shortly thereafter.

Defendant's new narrative is starting to have a similar feel.  Moreover, Defendant seems unaware that by arguing that TERI funded this loan, it must disclaim its earlier argument that TERI guaranteed this loan. This is necessarily true because one cannot be the guarantor of one's own debt. *150 Broadway N.Y. Assocs.,*

*L.P. v. Bodner*, 14 A.D.3d 1 (N.Y. App. Div. 2004) ("[A]n interpretation of an instrument that would result in making a person or entity the guarantor of his, her or its own debt must be rejected.").  And if TERI funded the loan, then there is an even bigger problem: the debt is a usurious transaction unless TERI had a national banking charter. And for this, the Plaintiff does have case law.  *In Renshaw*, the Second Circuit had to determine where a debt at 16% interest which the creditor labeled a "student loan" fit within section 523(a)(8). The Second Circuit approved of the BAP's analysis that found the debt could not be a student loan under the Code otherwise it would become a usurious transaction because the creditor was not a national bank.  *In re Renshaw*, 222 F.3d 82, 89 (2d Cir. 2000).[9]  The interest rate on the Plaintiff's note is 12.06%, which exceeds the California usury limit and TERI is not exempt from usury laws (as far as Plaintiff knows). *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1209 (9th Cir. 2001) ("California prohibits interest rates in excess of 10%. *See* Cal. Const. art. XV, § 1.").  And while the California Supreme Court is of at least two minds on whether usury remains a valid principle of public policy,[10] the Defendant has previously sought to dismiss allegations of usury by arguing ***these exact same Bank One promissory notes*** proved as a matter of law that Bank One funded the loans. "[A]ll of Plaintiffs' loans were originated by JP Morgan Chase, a national bank." *Eul v. Transworld Sys.*, 2017 WL 1178537, at *5 (N.D. Ill. Mar. 30, 2017).  In *Eul*, the plaintiffs alleged that National Collegiate Student Loan Trusts loans were not exempt from Illinois usury laws because First Marblehead, rather than JP Morgan, was the true lender, and FMC had in effect "rented" Bank One's federal charter for the purpose of making usurious loans. The Defendant

---

[9] Some of the decision cited by Defendant seem to almost approve of commingling federal funds with commercial funds. *See, e.g., In re Drumm*, 329 B.R. 23, 35 (Bankr. W.D. Pa. 2005) ("The parties stipulated that New England had available in its 'program' loans that were funded by both private for-profit entities as well as loans funded by governmental units.").

[10] *In re Vill. Concepts, Inc.*, 2015 WL 1258621, at *7 (E.D. Cal. 2015)("The arguments made here illustrate the California Supreme Court's observation, made two decades ago, that "the usury law is complex and riddled with so many exceptions that the law's application itself seems to be the exception rather than the rule.")

15

denied this, and argued "the Court cannot credit Plaintiffs' so-called 'rent-a-charter' scheme as plausible, [because the] loan documents themselves—attached to and referenced in the complaint—list Chase or its subsidiary, Bank One, as the lender." *Eul v. Transworld Sys.*, 2017 WL 1178537, at *6 (N.D. Ill. Mar. 30, 2017).

The National Collegiate Student Loans Trusts was never an intended beneficiary of section 523(a)(8). Congress was explicit that 523(a)(8) was codified to preserve the integrity of the federal student loan trust fund, protect the taxpayer, and prevent students from gaming the system. The circuit courts rehearse these goals whenever beginning a decision on section 523(a)(8) and the *quid pro quo*: student got access to subsidized loans, and in exchange, surrendered their bankruptcy rights. Plaintiff's Opposition at 5-6 (ECF No. 29). *Pilcher* stated it was only about preventing opportunistic students from taking advantage of the system and assumed that by 1984, Congress had already abandoned this plan and were perfectly fine with the commercial lenders being on the same footing as the taxpayers.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff prays this Court DENY the motion, and let this matter proceed into discovery and trial.

April 28, 2020                                          */s Christopher R. Bush*

Christopher R. Bush CASB 243471
Law Office of Chris Bush
2727 Camino del Rio S., Ste 135
San Diego, CA 92108
619-678-1134
chris@chrisbushlaw.com

Austin Smith (NY Bar No. 5377254)(Pro Hac Vice)
Smith Law Group LLP
3 Mitchell Place
New York, NY 10017
917-992-2121
austin@acsmithlawgroup.com

16