Austin Smith
(NY Bar No. 5377254)(Pro Hac Vice)
Smith Law Group LLP
3 Mitchell Place
New York, NY 10017
917-992-2121
austin@acsmithlawgroup.com

Christopher R. Bush CASB 243471
Law Office of Chris Bush
2727 Camino del Rio S., Ste 135
San Diego, CA 92108
619-678-1134
chris@chrisbushlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br>CESAR MEDINA<br>KRYSTAL ANNE MEDINA | Case No. 17-05276-LT<br>Chapter 7 |
| KRYSTAL ANNE MEDINA<br>     Plaintiff,<br>     vs.<br>NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; | Adversary No. 19-90065-LT |

**DECLARATION OF PROFESSOR JOHN BROOKS II**

1

I, John R. Brooks II, mindful of the penalties of perjury, do declare and state:

1. I am over the age of 18 years and competent to make this declaration. I make this declaration based on my own personal knowledge and without drawing upon any specialized methods or processes.
1. I am a full-time, tenured Professor of Law at Georgetown University Law Center, in Washington, D.C. My primary fields of expertise are federal tax law and federal student loan law. I teach courses on federal income tax law, corporate tax law, and tax policy. I have published academic research on both tax law and student loan law in law journals including the *Tax Law Review*, the *Georgetown Law Journal*, the *Utah Law Review*, the *Journal of Legal Education*, and *Tax Notes*. I have also published op-eds on student loans in the *New York Times* and the *L.A. Times*. I have been quoted by or interviewed for stories related to tax or student loans in outlets such as National Public Radio, *USA Today*, *Politico*, *Inside Higher Ed*, *Newsweek*, *Buzzfeed*, Marketplace, and more. I have consulted on both tax and student loan legislation with Congressional offices and have aided in drafting pending legislation related to student loans.
2. Prior to teaching, I was a tax attorney for Ropes & Gray LLP and a judicial clerk for Judge Norman H. Stahl on the U.S. Court of Appeals for the First Circuit.
3. I have been compensated by Plaintiff's counsel for my time spent at my average hourly rate of $500 but I understand that Plaintiff's counsel has agreed to cover this sum personally and Ms. Medina has not been charged in any way for this opinion.
4. I have reviewed the documents relied upon by the moving party ("Movant'") along with other publicly available records that are too voluminous for convenient examination in Court.

5. Massachusetts public charities are required to make substantive financial and operational filings with the Attorney General's Office of Public Charities, *available at:* http://www.charities.ago.state.ma.us/charities/.
6. If one searches for "education resources institute" (without a "the"), it shows all the filings that TERI made through the Office of Public Charities ("OPC").
7. Between 2000 and 2013, TERI annual filed with the OPC, *inter alia*, its audited financials, IRS Form 990s, Articles of Incorporation ("AOI"), and bylaws.
8. In 2001, TERI disclosed that it had entered into a a purchase and sale agreement with the First Marblehead Corporation ("FMC") whereby:
    a. TERI sold its assets and transferred the majority of its employees to FMC for $8.9 million (Ex. 3 at 209);
    b. FMC placed these assets and persons into a new for-profit subsidiary called the First Marblehead Education Resources ("FEMR") (Ex. 2 at 38);
    c. FMC and TERI entered into Master Servicing Agreement under which FMER would perform the loan origination, customer service, default prevention, default processing and administrative origination and servicing duties required of TERI under the Loan Origination Agreements ("LOA") (Ex. 3 at 208-210 and Ex. 2 at 28);
    d. FMER and TERI thereafter shared a board member (Exhibit 2 at 27, 48) and both TERI and FMC described one another as related parties in financial disclosures (Ex. 2 at 48 and Ex. 3 at 226);
    e. TERI did not, however, report or disclose that FMER was a related organization to the IRS (Exhibit 5 at 321, 341, 370);
9. In 2003, TERI amended its bylaws, including significant changes from the original 1985 bylaws:

     a. The new bylaws exempted officers and directors from liability for voting on or otherwise engaging in contracts in which they had a personal interest (Exhibit 4 at 276-277);

     b. TERI checked "no" on line 77 of Form 990 which asked whether during that year "changes made in the organizing or governing documents but not reported to the IRS?" (Exhibit 3 at 341);

     a. Each year from 2002 through 2012, TERI filed audited financials with the OPC, which disclosed that between 2002 and 2008:

     b. TERI earned approximately $147 million for loan origination services under the LOAs (See "Origination Fees" at Exhibit 2 at 36, 56, 78, 100 and 126; also at Ex 5 at 361, 398, 430, 461, 496 and 524);

     c. TERI paid FMER approximately $532 million for loan origination processing and other services under the MSA (*id*.);

     d. In 2008, the balance of student loans outstanding guaranteed by TERI totaled approximately $16.9 billion, and TERI reserved approximately 2% of that balance, or $326 million, in cash, cash equivalents, and marketable securities to cover defaults (Exhibit 2 at 145);

     e. FMC's officers and directors liquidated equity worth several hundred million dollars; (Exhibit 6), including $94 million to Ralph James, Vice Chairman and President of FMC, who is the sender of the email introduced by the Movant dated May 9, 2002 asking Lisa McNeely and "Paul McCarty (as agent for TERI)" to confirm the parameters of TERI's loan origination contract with Bank One (Ex. 9; *see also* Movant's Evidentiary Objections at 21, ECF No. 37-2);

10. In 2008, TERI sought relief in bankruptcy by filing a petition, which the Movant highlighted identified TERI as a nonprofit and was filed under penalty of perjury (Ex. 8). That petition also states:

    a. TERI at times used the name "Boston Systems Resources Inc"(Ex. 8 at 206), which TERI previously disclosed was a for-profit subsidiary that it absorbed in 2001 (Exhibit 2 at 15);

    b. TERI at times used the name TERI Marketing Services, Inc ("TMSI") (Ex. 8 at 206), which was a for-profit subsidiary of FMC (Ex. 3 at 212);

    c. In TERI's statement of financial affairs filed two months the initial petition, TERI's General Counsel Amy Bizar stated that she was unable to "independently verify the accuracy" of TERI's financials and that TERI had relied on FMC to provide accurate information because "FMC manages many of [TERI's] contractual relationships with third parties, including its litigation and collection efforts." (Exhibit 8 at 579);

11. Between 2011 and 2012, TERI finalized its own liquidation, and during those years:

    a. paid its officers and employees $5.2 and $6.4 million, which exceeded its annual revenue in both years (Exhibit 2 at 159, 178);

    b. In connection with the sale of its remaining assets to the Massachusetts Higher Education Assistance Corporation, TERI disclosed that,

        a. "except as set forth on Schedule 2.9(c) of the Disclosure Schedules, there is no dispute or Claim concerning any Tax Liability of TERI either (i) claimed or raised by any Governmental Entity in writing or (ii) as to which the directors and officers (and employees responsible for Tax matters) of TERI have actual Knowledge" (Ex. 7 at 550);

        b. "except as set forth in Schedule 2.8 of the Disclosure Schedules, there is no investigation by any Governmental

      Entity with respect to TERI pending or, to the Knowledge of TERI, threatened" (Ex. 7 at 549-50);

  c. "TERI has been exempt from federal income taxation pursuant to Section 501(c)(3) of the Code at all times during its existence. Except as set forth on Schedule 2.9(d) of the Disclosure Schedules, no circumstances exist, to the Knowledge of TERI, and no transaction or activity is presently contemplated or under consideration, that is reasonably likely to cause such Tax exemption to be revoked" (*id.*);

  a. TERI's auditors could not verify that TERI was in compliance with federal grant programs under the OMB standards (Exhibit 2 at 176).

**TERI's Corporate Character**

12. Before the IRS will grant an applicant's tax exemption, an applicant must file IRS Form 1023, the Application for Recognition of Exemption Under Section 501(c)(3), which asks, in addition to basic financial and operational information, about an organization's mission or purpose, its policies on conflicts of interest and private benefit transactions, and its relationships with for-profit entities.

13. Form 990 requires organizations to alert the IRS to any activities that might raise questions about its exempt status and whether it continues to serve public, rather than private, interests.

14. While the standards for exemption are the same for both new and existing organizations, revocations of exempt status are rare due to the difficulties of practical enforcement and the availability of so-called "intermediate" sanctions for violations.

15. I understand that the Movant has concluded that "there is utterly no evidence that TERI was at any time a for profit corporation."

16. I do not believe this is a responsible conclusion to draw from the current record, which contains a number of troubling inconsistencies, irregularities, and contradictions regarding TERI's activities between 2001 and 2012.

17. However, it would be equally premature to conclude at this stage that TERI was not operating within the scope of its charitable and tax-exempt mission.

18. Rather than engage in speculation or hypotheticals, I would recommend that at a minimum, the following must be addressed:

    (i) whether the $8.9 million FMER paid for TERI's assets and employees was at or near fair-market value and how that purchase price compares with similar transactions in the industry at that time;

    (ii) whether TERI maintained sufficient control over the loan programs under the terms of the Master Servicing Agreement and why TERI paid FMER $531 million for subcontracting work it was only paid $141 to perform;

    (iii) whether TERI ever disclosed its relationship with FMER and the changes made to its governing documents to the IRS, and records evidencing the allegations, scope, and outcome of the regulatory investigations disclosed by TERI on the Disclosure Schedules in Exhibit 7;.

19. If and/or when the Movant produces these records, I would then be in a position to offer a formal opinion on TERI's corporate character and whether it was being operated for private benefit based upon my specialized training and expertise.

*[signature]*

John R. Brooks II

**Signature:** *[signature]*

**Email:** john.brooks@law.georgetown.edu