UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA

IN RE:
CESAR MEDINA
KRYSTAL ANNE MEDINA

KRYSTAL ANNE MEDINA
          Plaintiff,
          vs.
NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-3;
          Defendant.

Case No.  17-05276-LT
Chapter 7

Adversary No. 19-90065-LT

**PLAINITFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

i

# **<u>TABLE OF CONTENTS</u>**

I. PRELIMINARY STATEMENT……………………………………..…………..1

II. ARGUMENT AND POINTS AND AUTHORITIES……………………..……2

A.    Plaintiff Is Entitled To Trial On The Merits…………………………………2

B.    The Defendant's Motion Must Fail…………………………………………..3

    1.    Defendant did not "Fund" a loan or program…………………….……3

    2.    TERI was not a "Nonprofit" institution………………..…………......12

    3.    TERI was not an "Institution"……………………………………….14

    4.    The loan was not made under a "Program"…………..……….…...18

    5.    The loan instrument can not establish nondischargeability………..…19

III. CONCLUSION……………………………………………………..…..20

# **TABLE OF AUTHORITIES**

**Cases**

*Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104 (4th Cir. 2006)…………………….....15

*Bates v. United States*, 522 U.S. 23 (1997) …………………………………….....18

*Boudette v. Barnette*, 923 F.2d 754 (9th Cir. 1991) ……………………………………….. 5

*Com. ex rel. Kane v. UPMC*, 634 Pa. 97 (2015). ……………………………………….. 7

*Consumer Fin. Prot. Bureau v. Cash Call, Inc.*, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016)…7

*Easter v. Am. W. Fin.*, 381 F.3d 948  (9th Cir. 2004) …………………………………….…7

*Eul v. Transworld Sys.*, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017) …………………………..8

*Frank Lloyd Wright Foundation v. Kroeter,* 697 F.Supp.2d 1118, 1136 (D. Ariz. 2010) ……....12

*Grojean v. Comm'r*, 248 F.3d 572 (7th Cir. 2001). …………………………………………..5

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ……………………………3

*In re California Trade Tech. Sch., Inc.*, 923 F.2d 641, 644 (9th Cir. 1991) …………………...19

*In re Christoff*, 527 B.R. 624, 634 (B.A.P. 9th Cir. 2015). ……………………....…4, 5, 16

*In re Corbin*, 506 B.R. 287, 295–96 (Bkrtcy. W. D. Wash. 2014). …………………….…..5-6

*In re Delbonis,* 169 B.R. 1, 3–4 (Bkrtcy.D.Mass.1994) …………………………….....…14

*In re Dube,* 169 B.R. 886, 892 (Bkrtcy. N.D. Ill. 1994) …………………………….…. 12

*In re Greer-Allen*, 602 B.R. 831, 836 (Bankr. D. Mass. 2019) ………………………..…15, 19

*In re Hammarstrom*, 95 B.R. 160, 161 (Bankr. N.D. Cal. 1989) ……………..…………7, *passim*

*In re Holguin*, 2019 WL 6880081 (Bkrtcy. D.N.M. 2019) ……………………………………..1

*In re Jean-Baptiste*, 584 B.R. 574  (Bankr. E.D.N.Y. 2018). ………………..…………………19

*In re Johnson*, 218 B.R. 449 (B.A.P. 8th Cir. 1998). …………………………………….....8

*In re Marcano*, 288 B.R. 324, (Bankr. S.D.N.Y. 2003) …………………………………..…15

*In re Murphy*, 282 F.3d 868, (5th Cir. 2002) …………………………………………….17

*in re Nite Lite Inns*, 13 B.R. 900, (Bankr. S.D. Cal. 1981) ………………………………….7

*In re O'Brien*, 318 B.R. 258, 263 (S.D.N.Y. 2004) ……………………….……………10-11

*In re Page*, 592 B.R. 334, (B.A.P. 8th Cir. 2018) ……………………………..…………2, 9

*In re Pilcher*, 149 B.R. 595, (B.A.P. 9th Cir. 1993) ……………………………4, 15, *passim*

*In re Renshaw*, 229 B.R. 552, 560 (B.A.P. 2d Cir. 1999). …………………………………..8

*In re Rodriguez*, 319 B.R. 894, 898 (Bankr. M.D. Fla. 2005)……………………………….14

*In re Rosen*, 179 B.R. 935, (Bankr. D. Or. 1995). …………………………….………6, *passim*

*In re Sears*, 393 B.R. 678, (Bankr. W.D. Mo. 2008) ……………………………….……………4

*In re Stewart*, 592 B.R. 414, (B.A.P. 1st Cir. 2018) ……………………………..…………3

*In re Taratuska*, 374 B.R. 24, 30 (Bankr. D. Mass. 2007) ……………………………………5

*In re Transact, Inc.,* 2014 WL 3888230, (C. D. Cal. 2014) ……………..………………10

*In re Wiley*, 579 B.R. 1, 6 (Bankr. D. Me. 2017) ……………………………………………6

*Jackson v. Firestone Tire & Rubber Co.*, 779 F.2d 1047, 1063 (5th Cir.) ………………...…1-2

*Jay Bharat Developers, Inc. v. Minidis*, 84 Cal.Rptr.3d 267, 272 (Cal. App. 2 Dist. 2008)…….10

*Massachusetts School of Law. v. American Bar Ass'n*, 914 F.Supp. 688, (D.Mass. 1996)…14, 18

*Matter of Roberson*, 999 F.2d 1132, (7th Cir. 1993) ……………………………………..……9

*McCabe v. Bailey*, 2008 WL 1818527, (N.D. Iowa Apr. 4, 2008) …………….………………1

*McClure v. U.S.,* 95 F.2d 744, (9th Cir. 1938) ……………………………………………18

*Middlegate Development, LLP v. Beede*, 2011 WL 3475474, (S.D. Ala. Aug. 9, 2011)…………1

*Mission Product Holdings, Inc. v. Tempnology, LLC,* 139 S.Ct. 1652, (U.S. 2019). ……..……10

*Probert v. Family Centered Servs. of Alaska, Inc.*, 651 F.3d 1007 (9th Cir. 2011)...16, 19, *passim*

*S & R Corp. v. Jiffy Lube Intern., Inc.,* 968 F.2d 371, (3rd Cir. 1992) ……………………10

*Shadbolt v. Dep't of Revenue*, 2019 WL 6249449, (Or. T.C. Nov. 22, 2019) …………………6

*Shinde v. Nithyananda Foundation*, 2015 WL 12732434, (C.D. Cal. 2015) ……………………12

*Student Loan Servicing All. v. D.C.*, 351 F. Supp. 3d 26, (D.D.C. 2018) …………..……………7

*TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 936 (1st Cir. 1995) …………..……………8, 9

*Town of Brookline v. Gorsuch*, 667 F.2d 215, (1st Cir. 1981) ………………………12, 14

*United States v. Coates*, 692 F.2d 629, 633 (9th Cir. 1982) …………………………..……6

*United States v. Evans*, 572 F.2d 455, (5th Cir. 1978) ……………………………..……7

*United States v. Gibson*, 770 F.2d 306 (2d Cir. 1985) …………………………………………5

*Woods v. City of Chicago*, 234 F.3d 979, (7th Cir. 2000) ………………………………...…1

*World Trading, LLC v. Next Up Funding, Inc.*, 2012 WL 601073 (S.D.N.Y. Feb. 23, 2012)…….4

*Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, (1st Cir. 2005)……..…12, 14

**Other Authorities**

Thad Collins, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy,* 75 Iowa L. Rev. 733, 738 (1990)…………………………………………………………………..…..8

85 FR 33530-01…………………………………………………………………………..7

34 C.F.R. § 668.1………………………………………………………………….………17

Hearings Before the Subcomm. on Civil and Constitutional Rights, Educ. of the House Comm. on Judiciary, 94th Cong., Part 2 633, 1100 (1976) (statement of Rep. Edwin Eshelman)………..9

Hearing on P.L. 98-353 Before the S. Comm. On Judiciary, at 328 (April 6, 1983) (Comments of Prof. Frank Kennedy on Subtitle I of S. 445)……………………………………………...17

P.L. 94-482, Oct. 12 1976…………………………………………………………………….9

P.L. 96-56, Aug. 14, 1979…………………………………………………………………....9

P.L. 95-598, Nov. 6, 1978 …………………………………………………………………...9

P.L. 96-56, Aug. 14, 1979 …………………………………………………………………...9

# I.    PRELIMINARY STATEMENT

This is the third time Plaintiff has had to respond to summary judgment papers. *cf. McCabe v. Bailey*, 2008 WL 1818527, *1 (N.D. Iowa Apr. 4, 2008) (enforcing "one-summary-judgment-motion-per-party [rule] to forestall potental abuse"). The Defendant has now sworn, either under oath or under Rule 11, that TERI guaranteed the loan(ECF No. 36 at 14), or TERI funded the loan(ECF No.46 at 4 ), or else TERI certainly guaranteed another loan(ECF No.66 at 19). Parties are not generally allowed to "treat their initial summary judgment motions as a 'dry run' which they would have an opportunity to redo or supplement – at considerable additional cost to opposing parties[.]" *Middlegate Development, LLP v. Beede*, 2011 WL 3475474, *11 n. 26 (S.D. Ala. Aug. 9, 2011). Defendant has now assured the Court that its prior argument "was wrong and based on an unfortunate assumption made by NCSLT's counsel without consultation with the client. Nothing more or less." (ECF No.66 at n. 25) Whether it was done with or without malice is not the point: Defendant twice sought pre-discovery to obtain a judgment on a $30,000 debt at 12% interest based on a statement of fact and law that it swore was true after a careful study, and now it is saying it had not performed sufficiently careful study and had not even bothered to check with the client; but "just assumed" (id.) and there is nothing to get upset about. Apart from the chilling fact that this "assumption" very nearly succeeded (Tentative at ECF 60), it still appears that NCSLT continues to think that it can be granted summary judgment based upon assumptions. Bradley Luke's testimony has not changed—he has no personal knowledge of any of these facts. *In re Holguin*, 2019 WL 6880081, at *6 (Bkrtcy. D.N.M. 2019)("The Luke Affidavit's self-serving statement that he has 'personal knowledge' that TERI paid out on some of its guarantees, without any supporting documentation, is ineffective to establish on summary judgment that TERI committed any monetary resources to fund the Loan Program . . . unless the affiant was present to witness a payout on the guaranty, the witness cannot have 'personal knowledge."). As Plaintiff argued in her supplemental opposition, this is the reason hearsay is inadmissible. *Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000)(stating court agreed with appellant's principle that "statements made by third parties in an otherwise admissible business record cannot properly be admitted for their truth unless they can be shown independently to fall within a recognized hearsay exception."). *See also Jackson v. Firestone Tire & Rubber Co.*, 779 F.2d 1047, 1063 (5th

1

Cir.), *vacated,* 788 F.2d 1070 (5th Cir. 1986)("It seems to me that the business-records exception will swallow the hearsay rule if I can allow someone to put in any opinion they have by putting it down on paper and putting it in a file somewhere."). Bradley Luke is simply regurgitating what he's reading from what appears to be a sloppy and incomplete selection of Plaintiff's loan documents – and sometimes, it appears, from conclusions he has drawn from those documents that do not appear in the documents themselves. Defendant has submitted well over 500 pages of declarations and exhibits just on the instant motion[1] – its second (or third) "bite at the apple" – and has utterly failed to meaningfully "connect the dots" and clearly meet its evidentiary burden.

The Court should deny the motion. This may only be one of 800,000 entries for the defendant, but it is Krystal Medina's life. The ~$100,000 NCSLT (including accrued interest) is demanding is probably the difference between being able to own a home one day or sending her own children to college.

## II.    ARGUMENT AND POINTS AND AUTHORITIES

Defendant has not met their evidentiary burden to establish that the loan at issue is "an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution" (11 USC 523(a)(8)(A)(i)). The statutory interpretation urged by Defendant asks the Court to disregard the well-established canon that, "[E]xceptions to discharge be narrowly construed against the creditor and liberally in favor of the debtor . . . [t]his principle applies equally to student loan exceptions to discharge." *In re Page*, 592 B.R. 334, 338 (B.A.P. 8th Cir. 2018), and asks the court to draw inferences that are unsupported by the evidence provided.

### A.  Plaintiff Is Entitled To Trial On The Merits

Pursuant to Rule 56(d), and the Declarations of John Brooks and Austin C. Smith, Plaintiff submits that these matters are not suitable for summary judgment. The Defendant has no employees, and no records beyond what is publicly available on the SEC's website. Plaintiff submits that a trial is required, and Plaintiff intends to subpoena Richard Neely, the former CFO

---

[1] Some of this evidence is of unclear relevance. What, for example, is the relevance of ECF 64-8, a "Pool Supplement" regarding "Transferred Chase Extra Loans"? Is Defendant asserting that Plaintiff's loan is a "Transferred Chase Extra Loan"? Plaintiff has been unable to locate any reference to any "Chase Extra Loan" in any of Defendant's other filings.

of TERI and CFO of First Marblehead Education Resources as a witness. Plaintiff's counsel has deposed Mr. Neely in the past, but the materials are sealed and cannot be used in other litigation. First Marblehead's counsel has also told Plaintiff's counsel that it will not continue to cooperate with informal discovery requests. The cost of litigating discovery issues with a non-party exceeds the scope of this action. Plaintiff is confident and comfortable with soliciting live testimony from adverse witnesses without prior preparation.

### B.  The Defendant's Motion Must Fail

The Defendant's motion must fail as both a matter of law and because it has failed to meet its burden of production. First, the Defendant has failed to prove as a matter of law that it "funded" the Plaintiff's loan program.  Second, Defendant has failed to prove as a matter of law that TERI was a nonprofit.  Third, Defendant has failed to prove as a matter of law that TERI was an institution.  Fourth, Defendant has failed to prove that the Education One loan was a statutory program as intended by Congress. Finally, Defendant in truth is relying on nothing more than the boilerplate terms in the Plaintiff's loan agreement, which this Court already stated was insufficient.

#### 1.  Defendant did not "Fund" a loan or program

The word "funded" does not mean "played any meaningful part". The term "funded" means "provided funds for." *In re Stewart*, 592 B.R. 414, 438 (B.A.P. 1st Cir. 2018) ("The bankruptcy court appears to have ignored the plain meaning of the word, 'fund,' which, in its verb form, means 'to allocate or provide funds for ... a project[.]'").  This Court stated at oral argument that if Plaintiff's arguments were sound, Congress would have corrected the language in subsequent amendments. See Declaration of Austin Smith, Exhibit 5 at 37.  *But see Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 300 (2014) (*stare decisis* "does not permit us to 'place on the shoulders of Congress the burden of the Court's own error.'"). Respectfully, none of the cases cited by the Defendant are precedential in this Circuit.  To give the bankruptcy courts in Kentucky and Florida the power to bind this Court can only come at the direct expense of the authority of Supreme Court or Ninth Circuit.  Until the Ninth Circuit rules, the debtor should in all fairness be allowed to litigate this on a clean slate; adverse authorities should be adopted only because of their persuasiveness—not their mere existence.

1    There are two theories underpinning the broad interpretation of "funded."  First, that

2  "funded" means any material assistance provided to a student lender. *Pilcher,* for example,

3  concluded that since it was the program that needed to be funded, that included anyone who paid

4  or performed the various tasks that make up the program (*e.g.,* marketing, processing costs, labor,

5  etc.,). *See generally World Trading, LLC v. Next Up Funding, Inc.*, 2012 WL 601073, at *2

6  (S.D.N.Y. Feb. 23, 2012) (stating that one definition of "funded" was "the provision of financial

7  resources to finance a particular activity or project, such as a research study."). The second basis

8  holds that "funded" should be interpreted to include a guarantor or assignee who performs on a

9  guaranty or sales contract and thus indirectly funds the loan. This is found in *Hammarstrom id.*

10  (stating another definition of "funded" is "the refinancing of a debt before its maturity—also

11  termed *refunding.").* But the case law has continued to expand since *Pilcher* and *Hammarstrom*,

12  and now candidly has no limiting principle. "The Court does not need to put a fine point on the

13  directness of the funding or the degree of involvement required of a nonprofit institution to

14  determine whether a loan qualifies as one 'made under a program funded by a nonprofit

15  institution.'" *In re Sears*, 393 B.R. 678, 681 (Bankr. W.D. Mo. 2008).

16    The Defendant's argument is based on the *Hammarstrom* interpretation: TERI allegedly

17  guaranteed the loan, the loan would not have been made "but for" this guaranty, and thus the loan

18  must be found non-dischargeable. [2]  This interpretation is invalid for at least four reasons. First, it

19  conflicts with the plain language of the statute. "[I]n interpreting a statute a court should always

20  turn first to one, cardinal canon before all others. We have stated time and again that courts must

21

22          [2] Of course, under a consequentialist theory of causation, anything that was part of the program can be made

23  a "but for" cause. This is simply the butterfly effect. *Compare In re Pilcher*, 149 B.R. 595, 600 (B.A.P. 9th Cir. 1993)
    ("In an affidavit before the bankruptcy court, Jon A. Veenis, Vice President of Norwest, stated that: Norwest's

24  participation in the Law Access Loan Program required the participation of a nonprofit guarantee agency such as
    HEAF.") *with Grojean v. Comm'r*, 248 F.3d 572, 574 (7th Cir. 2001)("The bank's request for that guaranty was just

25  the opening bid in a negotiation, and there is nothing in the record to indicate whether the bank would have held out
    for such a guaranty."). Furthermore, it seems pretty clear that Jon Veenis perjured himself. In *Pilcher*, the court

26  concluded, *inter alia*, that LSAS was a nonprofit institution and had funded the debtor's loan. "Law Access is
    coordinated by the Law School Admission Council/Law School Admission Service (SLAC/LSAS). SLAC/LSAS

27  works with a number of government and financial organizations to deliver the loan program. These organizations are
    responsible for insuring loans and providing capital." *In re Pilcher*, 149 B.R. 595, 599 (B.A.P. 9th Cir. 1993).

28  However, LSAS had withdrawn from the LAWLOANS Multiparty Agreement ("MPA") by the time the Pilcher case
    was heard but the creditors submitted the 1986 MPA to the BAP instead of the updated 1989 MPA. *See* Declaration
    of Austin C. Smith at Exhibit 3.  *In re Pilcher*, 149 B.R. 595, 599 (B.A.P. 9th Cir. 1993) (MPA was "provided to the
    bankruptcy court and to the members of this Panel under seal.").

1  presume that a legislature says in a statute what it means and means in a statute what it says there."

2  *In re Christoff*, 527 B.R. 624, 634 (B.A.P. 9th Cir. 2015). The plain meaning of the word "funded"

3  does not include a guarantor "[T]here really is a substantive and not merely a formal difference

4  between lending and guaranteeing." *Grojean v. Comm'r*, 248 F.3d 572, 574 (7th Cir. 2001). The

5  two terms are *complementary* rather than coextensive. Said another way, they are not related as a

6  lion and a tiger are related (i.e., common genus); they are related as a lion and a gazelle are related

7  (i.e., one eats the other). *See United States v. Gibson*, 770 F.2d 306, 308 (2d Cir. 1985) (stating

8  that an educational debt cannot be both insured under Part B and funded under Part E of the HEA).

9  *See also In re Taratuska*, 374 B.R. 24, 30 (Bankr. D. Mass. 2007)("Notably, the statute employs

10  both terms, plainly indicating that they have different meanings; otherwise, one or the other would

11  be unnecessary. Hence, the giving of the Guaranty does not constitute the program funding

12  contemplated by Section 523(a)(8) on account of the Loan."), *rev'd*, 2008 WL 4826279 (D. Mass.

13  Aug. 25, 2008), and *Boudette v. Barnette*, 923 F.2d 754, 756–57 (9th Cir. 1991) (describing the

14  rule of statutory interpretation of *expressio unius est exclusio alterius* as creating "a presumption

15  that when a statute designates certain persons, things, or manners of operation, all omissions should

16  be understood as exclusions"). Indeed, when Congress needed a term for the secondary parties that

17  facilitated the making of loans (*i.e.,* the creditors in *Pilcher*) under the antidiscrimination provision

18  in section 525, it did not lump these entities together with the funders or lenders; instead, it

19  identified them as "***a person engaged in a business that includes the making of loans guaranteed***

20  ***or insured*** under a student loan program." Bankruptcy Reform Act Of 1994, P.L. 103–394

21  (emphasis added).

22      The Ninth Circuit BAP has held that "fund" does not include related financial concepts.

23  "Meridian argues that we should read § 523(a)(8)(A)(ii) to say 'loans received' as opposed to

24  'funds received.' But this we must not do." *In re Christoff*, 527 B.R. 624, 634 (B.A.P. 9th Cir.

25  2015). "[I]n organizing the provisions of § 523(a)(8) as it did in BAPCPA, Congress intended

26  each subsection to have a distinct function and to target different kinds of debts." *id*. Likewise,

27  Judge Overstreet—in a post BAPCPA case, unlike *Hammarstrom, Rosen,* or *Pilcher*— concluded

28  that Ninth Circuit precedent *forbid* treating guarantors the same as lenders under 523(a)(8)(A)(i).

In *Corbin*, the debtor borrowed a loan from Sallie Mae that was guaranteed by a third party. When

the debtor defaulted, the guarantor paid off the debt and sought to enforce section 523(a)(8)(A)(i) against the debtor on the grounds that it stood in the shoes of the lender. Judge Overstreet rejected this "because policy considerations favor discharge of the debt over protecting the rights of a subrogated party*." In re Corbin*, 506 B.R. 287, 295–96 (Bkrtcy. W. D. Wash. 2014). *See also In re Wiley*, 579 B.R. 1, 6 (Bankr. D. Me. 2017) ("Wells Fargo has not established that the Loans were made under a program funded by a nonprofit institution. It has simply asserted that the Loans themselves were guaranteed by the nonprofit institution, TERI."). Judge Perris also refused to gloss over the distinction between the actual and constructive provision of" funds; that is, between the guarantor and the funder: "this obligation *is not one to repay funds received* as an educational benefit, scholarship or stipend because the *debtor never received any funds* from the plaintiff." *In re Rosen*, 179 B.R. 935, 939 (Bankr. D. Or. 1995)

This distinction between guaranteeing and funding is known as "economic outlay," a doctrine most frequently invoked in tax law. *See generally United States v. Coates*, 692 F.2d 629, 633 (9th Cir. 1982) ("This court will adopt an interpretation that results in the statute's construction in harmony with the general scheme of the Internal Revenue Code."). Attempting to reclassify a guarantee as an outlay of funds is a classic tax avoidance scheme. *Shadbolt v. Dep't of Revenue*, 2019 WL 6249449, at *5 (Or. T.C. Nov. 22, 2019) (stating that at common law and under current statue, every circuit to have considered the issue has concluded that the "economic outlay doctrine" precludes treating a guarantor as a lender for tax purposes)*. The principle was most famously analyzed by Judge Posner in 2001. In *Grojean*, a debtor had borrowed $10 million for one of his portfolio companies and claimed a deduction of $1.2 million (the portion on which he was personally liable). The IRS rejected the claim, and concluded the $1.2 million liability was not a loan but instead only a guarantee. On appeal, the Seventh Circuit announced that a guarantee and not a loan were different and the "difference [is] not trivial or nominal." *id.* Judge Posner conceded that at a high enough level of abstraction, guaranteeing and funding looked the same, but "at the operational level, because of various frictions that some economic models disregard, such as transaction and liquidity costs, there really is a substantive and not merely a formal difference between lending and guaranteeing." *Grojean v. Comm'r*, 248 F.3d 572, 574 (7th Cir. 2001). Notably, Judge Posner also observed the impurity of the debtor's intentions in the event the

company went into bankruptcy: "Grojean hoped a bankruptcy court would not see through [this] pure smokescreen [that was an] endeavor to conceal his insider status by having his loan to Schanno laundered by American National." *Grojean v. Comm'r*, 248 F.3d 572, 575 (7th Cir. 2001). Accordingly, this Court should refuse to collapse the distinction between guaranteeing and funding.

Second, a broad interpretation of "funded" conflicts with the canon prohibiting the, "interpretation of a contract which would render it illegal." *Com. ex rel. Kane v. UPMC*, 634 Pa. 97, 141 (2015). In *Hammarstrom*, the court explained why Nellie Mae could not have actually funded the loan. "Nellie Mae did not loan the funds directly because it was prohibited by law from doing so." *In re Hammarstrom*, 95 B.R. 160, 161 (Bankr. N.D. Cal. 1989). But in order to evade the law, "Nellie Mae requested Baybank to draft a promissory note payable to Baybank and, upon receipt of the signed note, to distribute the loan proceeds to Brown University. Pursuant to the prior agreement with Baybank, Nellie Mae then immediately purchased the note from Baybank. Nellie Mae in every practical sense performed the role of supplying funds for the loan program [and] reduced the functional role of Baybank to acting as a mere agent for Nellie Mae. *In re Hammarstrom*, 95 B.R. 160, 161 (Bankr. N.D. Cal. 1989). What the court is describing is called a "rent-a-charter" in consumer lending. *Easter v. Am. W. Fin.*, 381 F.3d 948, 955 (9th Cir. 2004)("the originator closes the loan in its own name, but is acting as an intermediary for the true lender, which assumes the financial risk of the transaction."). And where the facts demonstrate that the bank was operating as a "mere agent" for the non-bank, courts conclude that the non-bank is the "true lender." But the consequence is that the loan is void, not that it is non-dischargeable. "CashCall was the 'true lender' [and thus] the CFPB has established that the Western Sky loans are void or uncollectible under the laws of most of the Subject States." *Consumer Fin. Prot. Bureau v. Cash Call, Inc.*, 2016 WL 4820635, at *6-9 (C.D. Cal. Aug. 31, 2016). *See also in re Nite Lite Inns*, 13 B.R. 900, 907–08 (Bankr. S.D. Cal. 1981).[3] The Court should not adopt an interpretation

---

[3] The OCC last month reiterated its opposition to the "rent-a-charter" model. 85 FR 33530-01(the agency has consistently opposed "facilitation of predatory lending through rent-a-charter relationships" predatory lending, including through relationships between banks and third parties. Nothing in this rulemaking in any way alters the OCC's strong position on this issue."). Furthermore, government funded loans are treated differently than government guaranteed loans for purposes of sovereign immunity and intergovernmental immunity, *Student Loan Servicing All. v. D.C.*, 351 F. Supp. 3d 26, 74 (D.D.C. 2018) (holding that while government funded student loans are entitled to

of the law that transforms an illegal transaction under Title 12 into a non-dischargeable debt under Title 11. *Eul v. Transworld Sys.*, 2017 WL 1178537, at *6 (N.D. Ill. Mar. 30, 2017) (NCSLT's agents arguing that Bank One had not engaged in a rent-a-charter with First Marblehead).

Third, the broad interpretation conflicts with the legislative history. "There were originally two principal federal student loan programs: the National Direct Student Loan (NDSL) program and the Guaranteed Student Loan (GSL) program." Thad Collins, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy,* 75 Iowa L. Rev. 733, 738 (1990). "Under the NDSL, the federal government furnishes 90% of the loan, the university provides the remaining 10%, and the university is charged with collection." *Lee v. Bd. of Higher Ed. in City of New York*, 1 B.R. 781, 782–83 (S.D.N.Y. 1979) (Haight, J.). "Under the GSL program, the student borrows money from a qualifying lender, and the guarantee agency, either the Federal government, a state agency or a private nonprofit organization, endorses the loan." *In re Yee*, 7 B.R. 747, 751 (Bkrtcy. N.Y. 1980). The first iteration of 523(a)(8)—codified as section 439A in the Higher Education Act—only excepted debts made under the GSL from discharge. *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 936 (1st Cir. 1995) ("Section 439A, which limited the dischargeability of only guaranteed or insured educational loans."). Congress thereafter moved the exception directly into the Code and expanded 523(a)(8) to include both GSL and NDSL through the language: *See* U.S. Dep't of Ed. Federal Student Loan Programs Data Book, Appendix II ("This Act amended the Bankruptcy Act. . . to apply these provisions to a larger group of student loans, including all GSLs, NDSLs, and Health Education Assistance Loan ("HEAL").). *See also In re Renshaw*, 229 B.R. 552, 560 (B.A.P. 2d Cir. 1999). However, that language created anomalies. It put the focus on the person holding the debt instead of on the character of the debt. "[F]or example, National Direct Student Loan (NDSL) funds are administered by both nonprofit and profit-making institutions of higher education [but all are 90% funded by the government.] Under the new law, a student who obtained an NDSL loan from a profit-making institution of higher education would be free to have that loan discharged in bankruptcy. In contrast, a student who obtained

_____

sovereign immunity, government guaranteed student loans do not even qualify as federal property), and under the criminal code. *United States v. Evans*, 572 F.2d 455, 474 (5th Cir. 1978) (government insured student loans are not government property in same way as government funded student loans).

an NDSL loan from a nonprofit institution of higher education would be subject to the prohibitions contained in the new law." *In re Johnson*, 218 B.R. 449, 453–54 (B.A.P. 8th Cir. 1998). Thereafter section 523(a)(8)(A)(i) came into near final form, which the Department of Education still today states:*"did not apply to loans held by commercial lenders, Sallie Mae, proprietary schools, or private non-profit guaranty agencies." id.*

Finally, the broad interpretation conflicts with the fundamental policy of the statute: to protect the *federal* student loan trust fund. *TI Fed. Credit Union v. DelBonis*, 72 F.3d at 936 (quoting Rep. Ertel's warning that without section 523(a)(8) "these bankruptcies could easily destroy the federal student loan programs."). Defendant's interpretation requires this Court to believe that Congress passed *four* iterations of 523(a)(8) over the course of just three years, [4] producing hundreds of pages of legislative history during dozens of committee hearings to ensure the provision was narrowly tailored to preserve government guaranteed and funded loans that were "made without business considerations." *Matter of Roberson,* 999 F.2d 1132, 1135–36 (7th Cir. 1993) ("E]ducational loans are different from most loans. They are made without business considerations, without security, without cosigners."). "[A] simple distinction exists between loans made by for-profit institution for profit and loans made by the Federal and State Governments to achieve a national educational goal. It puzzles me how any commercial loan can be equated [with] those made under the Federal Insured Student Loan program." Hearings Before the Subcomm. on Civil and Constitutional Rights, Educ. of the House Comm. on Judiciary, 94th Cong., Part 2 633, 1100 (1976) (statement of Rep. Edwin Eshelman).  And then, without a word to anyone, and without a single hearing, in 1984, Congress extended non-dischargeability to any and all for-profit lenders so long as a 501(c) handled the loan processing. Respectfully, that is not a rational interpretation of the 1984 amendments or a narrow construction as required under Title 11.  *Page*, 592 B.R. at 338 ("[A]ny evidence presented in connection with § 523(a)(8) must be viewed with the Congressional intent that exceptions to discharge be narrowly construed against

---

[4] P.L. 94-482, Oct. 12 1976 ("debt which is a loan insured or guaranteed under the authority of this part."); P.L. 96-56, Aug. 14, 1979 ("a loan insured or guaranteed under the authority of part B of title IV of the Higher Education Act of 1965."); P.L. 95-598, Nov. 6, 1978 ("to a governmental unit, or a nonprofit institution of higher education, for an educational loan"); P.L. 96-56, Aug. 14, 1979 ("for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit, or nonprofit institution of higher education.").

9

the creditor and liberally in favor of the debtor . . . [t]his principle applies equally to student loan exceptions to discharge."). *See also, infra, Trahan* and *Corbin*

Even if this court should accept that the act of performing under a guaranty agreement constitutes "funding", the evidence that Defendant has proffered as to the TERI guarantee is inconclusive and self-contradictory: it funded the loan; it didn't fund the loan; it guaranteed the loan; it guaranteed another loan.  The fact that Defendant has been so inconsistent on what it is actually arguing is reason alone to find a dispute of material fact.  Moreover, there is no TERI guarantee any longer.  It was rejected and voided in TERI's bankruptcy. See Dec. of Austin Smith at Exhibit 2. Defendant received tens of millions of dollars in refunded guarantee fees. *id.*  When a debtor rejects an executory contract in bankruptcy, the rejection operates as a breach. *See Mission Product Holdings, Inc. v. Tempnology, LLC,* 139 S.Ct. 1652, 1662 (U.S. 2019). Thus, like in any breach of contract situation, the counterparty may either continue performance and maintain the benefit of the contract (while suing for future damages related to mitigating the debtor's breach), or else end performance, surrender the benefit of the bargain, and sue the debtor for full compensatory and consequential damages. If the nonbreaching party opts to cancel the entire arrangement, it cannot also continue to demand the benefits of the contract.  *Jay Bharat Developers, Inc. v. Minidis*, 84 Cal.Rptr.3d 267, 272, 167 Cal.App.4th 437, 443 (Cal. App. 2 Dist. 2008) ("Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits.").  The Defendant then had a choice: it could have continued the guarantee program by finding another non-profit institution to step into the shoes of TERI while suing to recover only the difference in cost between TERI's performance and another party's performance.  Or, it could choose to call off the whole deal, and seek to recoup all its losses. Defendant chose the latter.  Having made that choice to abandon the guarantee agreements and recover all the guarantee fees paid, Defendant cannot now seek to avoid the consequence of that decision and enforce the rejected contract against the Plaintiff.  *S & R Corp. v. Jiffy Lube Intern., Inc.,* 968 F.2d 371, 376 (3ʳᵈ Cir. 1992) ("Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages.  Under no circumstances may the non-breaching party stop

10

performance *and* continue to take advantage of the contract's benefits.").[5] In *O'Brien*, TERI's performance on the guarantee was material to the Court's conclusion that TERI funded the loans in question. *In re O'Brien*, 318 B.R. 258, 263 (S.D.N.Y. 2004) ("[I]n the case at bar, [TERI] actually did 'fund' money when the Appellant defaulted on her obligation to repay the Loan. Following that default, [TERI] advanced money to Key Bank in accordance with its obligations under the Program and its guarantee thereof."). Not only did TERI not perform on the guarantees in this action, but Defendant's recovery of damages in TERI's bankruptcy relieved TERI of any duty to perform, *i.e.,* to "fund" the loans by performing on the guarantees. It would be inequitable to allow TERI, Bank One and the Defendant to void and undo their agreements, while at the same time holding Plaintiff to the legal effects of these voided agreements.[6] Defendant would thereby effectively be entitled to double recovery: reaping the benefits of the voided contracts and refund of guarantee fees in TERI's bankruptcy, while at the same time enforcing the obligations of the pre-petition contracts with TERI on the debtors. Plaintiff submits that this is an unfair manipulation of the Bankruptcy Code. *See In re Santos*, 561 B.R. 825, 832 (Bkrtcy.C. D. Cal. 2017) (retaining the benefits of the bankruptcy process, without fulfilling corresponding duties, constitutes an unfair manipulation of the Code).

Here, Defendant asserts, "On or about June 28, 2006, after Plaintiff entered into her Loan, but prior to Plaintiff's last payment on the Loan, TERI, First Marblehead Data Services, Inc. and National Collegiate Student Loan Trust 2006-3 entered into a Deposit and Security Agreement. Under the Agreement, NCSLT agrees to purchase all loans in the Education One Loan Programs on the condition, in part, that TERI guarantees the loans… ." (ECF 66. P. 8, Para 20) This Agreement was entered into after Plaintiff's loan was disbursed on June 20, 2020 and accordingly her loan was not made under a program "guaranteed" under this subsequent agreement. Defendant

---

[5] *In re Transact, Inc.,* 2014 WL 3888230, at *10 (C. D. Cal. 2014) (When one party to a contract commits a material breach, the other party 'can either elect to allege a total breach, terminate the contract and bring an action or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach.'").

[6] Note here that any loan held by the Defendants might still be non-dischargeable provided it is a qualified education loan under section 523(a)(8)(B).

further asserts[7] that a claim based on a delinquency date of July 14, 2007 (over a year *after* Plaintiff's loan) constitutes "funding" the program. It strains credulity that an agreement between third parties, executed and performed after Plaintiff's loan, could render plaintiff's loan nondischargeable.

### 2. TERI was not a "Nonprofit" Institution

Where a statute employs the word "nonprofit," courts conduct an independent inquiry into the entity's character to determine whether it "actually operates as a nonprofit, irrespective of its tax-exempt status." *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 475–76 (1st Cir. 2005). To make this determination, courts analyze whether the entity was generating any private benefit or inurement, engaging in excessive commercial activity, or other types of "suspect transactions."[8] In the March Tentative, this Court stated that it would adopt the definition of "nonprofit" as found in Zimmerman. Tentative at 8 ("Tax exempt status does not on its own establish nonprofit for the purposes of § 523(a)(8)(i). See Zimmerman v. Cambridge Credit Counseling Corp., 409 F.3d 473 (1st Cir. 2005).").

The Defendant has not met its evidentiary burden in its attempt to establish that TERI was a "nonprofit" entity at the time of Plaintiff's loan. First, Defendant once again failed to acknowledge the 2003 changes to TERI's Articles of Organization. See Declaration of John Brooks at ¶ 9(" In 2003, TERI amended its bylaws, including significant changes from the original 1985 bylaws.") Defendant incorrectly states, "TERI's Articles of Organization were amended once and restated once. They were amended on or about September 12, 1990 only to add a limitation

---

[7] Plaintiff does not believe the proffered documents cited in support of the assertion evidence any payment or funding; rather, they appear to evidence that a claim was made and the court is being invited to infer that TERI paid on that claim despite the record evidencing that TERI was not obligated to pay every claim uncritically.

[8] *See Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981) ("[W]e look at the nature of the institution to determine whether it is nonprofit."). *See, also In re Dube,* 169 B.R. 886, 892 (Bkrtcy. N.D. Ill. 1994) (bankruptcy non-dischargeability proceeding); *Shinde v. Nithyananda Foundation*, 2015 WL 12732434, at *12 (C.D. Cal. 2015) (nonprofit as an element of a RICO claim); *Frank Lloyd Wright Foundation v. Kroeter,* 697 F.Supp.2d 1118, 1136 (D. Ariz. 2010) (nonprofit as element of common law claim and DJA).

on the personal liability of the Officers and Directors to the corporation for breach of fiduciary duty. They were restated on or about November 19, 2010 to reiterate that TERI is a nonprofit corporation operating in part to assist students in attaining an education." (ECF No. 66 at 10). TERI made substantial changes to its Articles after its acquisition by FMC in 2003 *and these 2003 amendments have already been placed in and discussed on the record*. See ECF 48-2 pg 3-4 and ECF 47-2 pg 270.

Second, Defendant has failed to acknowledge that TERI merged with a for-profit company. "TERI is undeniably a nonprofit corporation under Massachusetts law, and there is no evidence it ever was anything but a nonprofit. TERI merged with two other corporations during its corporate life, The Education Fund, Inc. and TERI Financial Services, Inc. 11 Both of these corporations were nonprofit corporations and the mergers were done under Massachusetts' nonprofit statute." ECF No. 66 at 11. Plaintiff unequivocally denies it and TERI itself admitted it merged with **three** companies, *one of which was a for-profit*. See Declaration of John Brooks at ¶ 10(a) ("TERI at times used the name 'Boston Systems Resources Inc' which TERI previously disclosed was a for-profit subsidiary that it absorbed in 2001.").

Third, the bankruptcy court did not ratify TERI's nonprofit status under Massachusetts law. TERI and FMC tried to do this, but the United States Pension Benefit Guaranty Administration intervened and opposed this. See Declaration of Austin C. Smith at Exhibit 4, p 3 ("these provisions would seek to contravene ERISA by . . .releasing non-debtors from potential liability in violation of ERISA's prohibition against exculpation of fiduciary liability, and improperly shielding non-debtor controlled group members from statutory liability under ERISA."). The ratifying language was thereafter removed. *id*. p 2 ("[c]onfirmation of the Plan shall operate as a judicial determination, binding on all Entities, that neither the Plan Trustee nor any Creditor that is not an insider of the Debtor . . . [and that TERI] shall [not] incur any liability whatsoever to any Entity (including, without limitation, to the United States of America, any of its administrative

13

agencies or political subdivisions, the United States Internal Revenue Service or the United States Pension Benefit Guaranty Administration) on account of or related to the Pension Plan.").

Fourth, contrary to Defendant's insistence that there is "no evidence TERI operated as a for-profit," (ECF No. 66 at 15)  there is evidence that TERI was being operated as a for-profit alter ego of FMC. In TERI's bankruptcy, the creditors' committee forced TERI and FMC to enter into a tolling agreement to preserve TERI's causes of action for breach of fiduciary duty and alter ego under Massachusetts law.  See Declaration of Austin Smith, Exhibit 1 at 25 ("MR. STERNKLAR: You know, there are potential claims that are reserved through the plan against First Marblehead, things like claims for alter-ego, claims that they breached their fiduciary duty, claims for negligence, claims for contract breach.").  TERI also disclosed a regulatory investigation into its tax-exempt status during its sale to the Massachusetts Higher Education Authority. Dec. of John Brooks at ¶ 11.

In order to determine whether TERI was a "nonprofit" under *Zimmerman*, the Court should analyze whether the entity was generating any private benefit or inurement, engaging in excessive commercial activity, or other types of "suspect transactions." *Zimmerman*, 409 F.3d at 475–76. Plaintiff respectfully contends that the facts contained in the declaration of John Brooks are more germane and material to the outcome of this case than any of the Defendant's generalized SEC filings filled consisting mostly of hearsay and legal conclusions and untethered to anything concrete about the Plaintiff's loan. *In re Delbonis,* 169 B.R. 1, 3–4 (Bkrtcy.D.Mass.1994) (reversed)("A mere declaration in its certificate of incorporation that it was organized not for profit, [would not] be sufficient to stamp upon it a nonprofit character. In each case, when the corporation is examined, the true facts must be ascertained and the corporation judged accordingly, no matter what its scheme of operation or its pretensions may be.").

### 3.  TERI was not an "Institution"

The term "nonprofit institution" means a "nonprofit *educational* institution". *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 914 F.Supp. 688, 690 (D.Mass. 1996) ("Institution of higher education ***or institution*** means an educational institution."). The Defendant's authorities interpret the term "institution" as synonymous with a tax-exempt entity. *In re Rodriguez*, 319 B.R. 894, 898 (Bankr. M.D. Fla. 2005). The problem with this is that tax-

exemption is also *necessary* condition of governmental unit. *In re Marcano*, 288 B.R. 324, 337 (Bankr. S.D.N.Y. 2003) ("A multitude of organizations maintain a tax-exempt status—churches, institutes, educational foundations, scientific organizations—but none of these has been deemed a state actor based purely on its tax-exempt status."). Thus, under *Hammarstrom, Rosen, et. al.*, the federal government is merely a species of the genus "nonprofit institution,"[9] thereby rendering the term "governmental unit" superfluous (*i.e.,* where a characteristic is a sufficient condition of A and a necessary condition of B, B is a subset of A). This problem has gone unobserved because courts have only analyzed the term "funded" through the lens of the "nonprofit institution." Under that analysis, courts have observed some incongruence with Congress' use of the word "guaranteed" in the first clause. See March 2020 Tentative at 5 ("The Court acknowledges that the focus on the plain language of the statute leads to a disconnect – funding is not necessarily synonymous with guaranteeing that obligation's repayment."). This minor irregularity becomes more problematic when analyzed through the "governmental unit." In fact, *the entire first clause* of 523(a)(8)(A)(i) is rendered superfluous. This is because all federally insured and guaranteed loans could be characterized as a loan "made under a program in which a governmental unit played a meaningful part."[10] Thus, any debt excepted as an "educational loan insured, or guaranteed by a governmental unit" would also be excepted under the second clause. And the oft made distinction between a loan and a program only exacerbates the problem. *In re Pilcher*, 149 B.R. 595, 598 (B.A.P. 9th Cir. 1993) ("the plain language of § 523(a)(8) indicates that it is the *program* that need be funded."). If a government unit is merely a subset of nonprofit institution, Congress could have codified the exception as "an educational loan made under any program funded in part by a

---

[9] This interpretation therefore also seems to violate the rule against construing an ambiguous provision to encroach on the power of the purse. These courts have effectively stated that the United States funds every loan made under a program in which it might have only nominally supported. *Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 110–11 (4th Cir. 2006) ("resolv[ing] the ambiguity against the Treasury of the United States without a congressional appropriation . . . is in direct violation of both statutory command and constitutional principle. The purportedly ambiguous statute must be construed narrowly so as to not to encroach on Congress's power of the purse.") (dissenting opinion) (citations omitted).

[10] Moreover, courts freely concede they have no working definition of the term upon which this distinction is based. "The Court is unaware of any case defining the parameters of a 'program.'" *In re Greer-Allen*, 602 B.R. 831, 836 (Bankr. D. Mass. 2019). The only program that we know for certain Congress intended was the NDSL, which the government and institutions fund individual loans directly. *Lee v. Bd. of Higher Ed. in City of New York*, 1 B.R. 781, 782 (S.D.N.Y. 1979) ("Under NDSL, the federal government furnishes 90% of the loan, the university provides the remaining 10%, and the university is charged with collection.") (Haight, J.).

nonprofit institution." *Cf. In re Christoff,* 527 B.R. 624, 634 (B.A.P. 9th Cir. 2015) ("Congress intended each subsection to have a distinct function and to target different kinds of debts."). This cannot be correct.

In the March Tentative, this Court stated in that, "Plaintiff has provided no authority requiring the Court to read 'educational' into the statute when Congress did not write it in (and in fact wrote it out)." Respectfully, the authorities the Court is relying on give no meaning to the word institution; Pilcher, *Rosen et. al.* treat the word "institution" as a vestigial and thereby violate the fundamental tenet of statutory construction: "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *In re Christoff,* 527 B.R. 624, 634 (B.A.P. 9th Cir. 2015). The terms "organization," "institution," and "corporation" are not interchangeable: there are 111 provisions of the United States Code use the term "nonprofit institution;" 728 use the term "nonprofit organization;" 156 use the term "nonprofit corporation"; and 225 use the term the term "nonprofit entity." There are differences between these words that none of the Defendant's authorities have considered or explained. And the Ninth Circuit has rejected such an overly broad interpretation of the term "institution." In *Probert*, the district court—much like *Pilcher* and *Rosen*—concluded that "institution" should be read to include any physical structure that housed people needing care. The Ninth reversed for three reasons. First, it found that under the definition of "institution" in a related Medicaid statute, the district court's definition created surplusage. "We are to avoid interpreting a statute in that manner." *Probert v. Family Centered Servs. of Alaska, Inc.,* 651 F.3d 1007, 1011 (9th Cir. 2011). Second, the OED defined an "institution" as "[a]n establishment, organization, or association, instituted for the promotion of some object, esp. one of public or general utility, religious, charitable, educational, etc., e.g. a church, school, college, hospital, asylum, reformatory, mission, or the like." *Probert at* 1011. "[O]ur interpretation of 'institution' should be informed by the other establishments listed in that statute, namely hospitals and schools." *id.* Under the canon of *nosctiur a sociis,* the plaintiff's, "[h]omes, run by two house parents and housing no more than five children each, seem by comparison out of place." *Probert at* 1011. Third, the Court stated that the legislative history demonstrated that the Senate used the term "institution" as a shorthand for hospitals and other similarly large and managed operations. *Probert* at1011–12. Thus, the Ninth Circuit

concluded that Congress could not have meant the term "institution" to apply so broadly to include single family homes.

The term "institution" is likewise not defined under Title 11. And the Ninth Circuit's analysis in *Probert* provides a near perfect template. First, as argued above, the Defendant's authorities create surplusage first clause of the provision. But the surplusage can be avoided by interpreting it to mean a scholastic institution. And in fact, that is how the term is defined in the HEA regulations. 34 C.F.R. § 668.1*(*an "institution" includes: "(1) an institution of higher education as defined in 34 CFR 600.4 (2) a proprietary institution of higher education as defined in 34 CFR 600.5; and (3) a postsecondary vocational institution as defined in 34 CFR 600.6."). *Greenwood Trust Co. v. Com. of Mass.*, 971 F.2d 818, 827 (1st Cir. 1992) ("What is more, when borrowing of this sort occurs, the borrowed phrases do not shed their skins like so many reinvigorated reptiles."). *See also In re Murphy*, 282 F.3d 868, 872 (5th Cir. 2002)("§ 523(a)(8) has a direct link to the Higher Educational Act, because Congress originally included it in the educational act and only later moved it to the Bankruptcy Code [and] we should attempt to give horizontal coherence to the United States Code and ensure that different statutes interact coherently and harmoniously."). Second, the Ninth Circuit's (and Defendant's) definition from the OED: "An establishment, organization, or association, instituted for the promotion of some object, esp. one of public or general utility, religious, charitable, educational, etc., e.g. a church, school, college, hospital, asylum, reformatory, mission, or the like." *Probert at* 1011. As the Ninth Circuit concluded the houses run by plaintiffs were not similar to a church, school, hospital; likewise a bankrupted private student loan processing agent is not similar to a church, school, hospital. A college or university are schools. Third, the legislative history supports this reading. In 1984, when Congress removed "of higher education" from the statute, it was observed that "deleting 'of higher education' enlarges the scope of the non-dischargeability exception and is therefore substantive to that extent. It is a modest enlargement, however, in that the claimant must be a nonprofit institution and the loan must be one for an educational loan. The change eliminates litigation over the question whether a seminary, for example, is an institution of higher education. The amendment is thus to some extent at least clarifying." Hearing on P.L. 98-353 Before the S. Comm. On Judiciary, at 328 (April 6, 1983) (Comments of Prof. Frank Kennedy on Subtitle I of S. 445). The term "nonprofit

institution" means a college, university, or vocational school that is organized as a nonprofit and participates in one or more of the loan programs under Title IV. *See Massachusetts* at 690 (D.Mass. 1996) ("Institution of higher education *or institution* means an educational institution.").

This Court stated during oral argument that it disagreed with plaintiff and instead agreed with the analysis in *Rosen,* where Judge Perris held that the term "institution" should not be limited to educational institution because Congress had removed that limitation. *In re Rosen*, 179 B.R. 935, 938 (Bankr. D. Or. 1995). Respectfully, the court in *Rosen* not only read "of higher education" out of the statute; it also read "institution" out of the statute. The *Rosen* court's interpretation of "nonprofit institution" is indistinguishable from the definition of "nonprofit." Moreover, the addition or subtraction of qualifying adjectives does not change the meaning of anchor words. Consider only how the word "school" should be interpreted if the modifier "of fish" was removed from an EPA regulation in order to ensure that families of marine *mammals* received the same protection as *fishes*. *Bates v. United States*, 522 U.S. 23, 32 (1997 (rejecting argument that three-word clarifying amendment altered meaning of provision under the Higher Education Act); *McClure v. U.S.,* 95 F.2d 744, 750 (9th Cir. 1938) ("Where an amendment leaves certain portions of the original act unchanged, such portions are continued in force with the same meaning and effect they had before amendment.").

Defendant has offered no evidence whatsoever that TERI ever was an "institution" within the meaning of the statute.

### 4.  *The loan was not made under a "Program"*

With that understanding of the terms "funded," "nonprofit institution," and "governmental unit," term "program" clearly refers to one of the Title IV Programs or a similar program operated under state law. In fact, the Code uses that term in section 525: "student loan program' means any program operated under title IV of the Higher Education Act of 1965 or a similar program operated under State or local law." 11 U.S.C. § 525.  Similar means similar in kind—a lending program operated "without business considerations" and at subsidized rates. Equating the lending programs under Title IV with the NCSLT loan programs just because both make loans to students is like equating payday loans with Social Security simply because they both sends money to people with checks.  The legislative history is filled with references to "program," a word that is clearly being

used as a shorthand for the "the title IV programs" under the HEA. *Probert v. Family Centered Servs. of Alaska, Inc.*, 651 F.3d at 1011–12 (relying on the legislative history use of terminology as a "shorthand."). *See, e.g.,* PL 99–498, October 17, 1986, 100 Stat 1268("student financial assistance received by an individual from any program funded in whole or in part under title IV of this Act which is used by that individual for costs described in section 472(1) and (2) of this title, shall be considered as income or resources in determining eligibility for assistance under any other program funded in whole or in part with Federal funds."). And hundreds of cases within and outside this circuit employ the words for the same purpose. *In re California Trade Tech. Sch., Inc.*, 923 F.2d 641, 644 (9th Cir. 1991) ("Federal student assistance programs authorized under Title IV of the Higher Education Act of 1965 ("title IV"). Funds disbursed under title IV programs are held by the participating institution in trust for the intended student beneficiaries, and the institution may not use or hypothecate such funds for any other purpose.").

Against this proffered definition, nearly thirty years after *Pilcher* first insisted on the distinction between a loan and a loan program, the courts freely concede they have no working definition. "The Court is unaware of any case defining the parameters of a 'program.'" *In re Greer-Allen*, 602 B.R. 831, 836 (Bankr. D. Mass. 2019). Thus, in the absence, a "program" has come to mean any marketing platform any lender wants to create. That is not a narrow construction and it allows for-profit lenders to usurp the prerogative Congress extended only to governmental units and nonprofit colleges and universities. And allowing creditors to transform any marketing platform into a "statutory" program" has led to significant abuse. For example, *Jean-Baptiste* recently extolled the pedigree of the TERI/Access Loan Program. "Courts have generally found that loans associated with the Access Loan Program, including loans that are ultimately purchased or guaranteed by Access or other non-profit institutions, to be excepted from discharge under § 523(a)(8)(A)." *In re Jean-Baptiste*, 584 B.R. 574, 584 (Bankr. E.D.N.Y. 2018). However, TERI disclosed in its audited financials that Access canceled the guarantee program in 2001, and claw *backed back $320 million in guarantees going back to 1998*. None of this was ever disclosed to any of the courts cited in *Jean-Baptiste* and at least one of the cases concerned a loan made during this time period. See Declaration of John Brooks, Exhibit 2 at 22, 45 of 622. The marketing label

"Education One(c) Loan Program" does not establish that the loan at issue was made under a "Program" within the meaning of the statute and Defendant has provided no other evidence.

### 5. *The loan document can not establish nondischargeability*

Defendant claims that recitations in the loan document itself are sufficient to establish nondischargeability. (ECF 66 Pg 24). Such assertion flies in the face of the well-established principle that prepetition waivers of discharge are unenforceable. See e.g. *Hayhoe v. Cole*, 226 B.R. 647, 651-54 (B.A.P. 1998). If Defendant's position were tenable, one must ask why it is not also asserting that the subject loan is a qualified education loan as defined in the Internal Revenue Code? Waivers of discharge are expressly described by Sections 524(c) and 727(a)(10). The loan document does not meet the standards of the code and is not a waiver of discharge.

### III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court deny the motion.

Respectfully submitted,


By:      _/s/ Austin C. Smith_
         Austin C. Smith
         SMITH LAW GROUP
         3 Mitchell Place
         New York, NY 10017


         _/s/ Christopher R. Bush_
         Christopher R. Bush
         Law Office of Chris Bush
         2727 Camino del Rio S., Ste 135
         San Diego, CA 92108

20