# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS - SPRINGFIELD

```
==============================
IN THE MATTER OF:              .   Case #08-12540
                               .
THE EDUCATION RESOURCES         .   Springfield, Massachusetts
   INSTITUTE, INC.              .   July 12, 2010
                    Debtor.     .   1:14:31 p.m. O'clock
==============================
```

### TRANSCRIPT OF TELEPHONIC HEARING ON:
### STATUS CONFERENCE;
**(#1103)  JOINT MOTION OF DEBTOR AND CREDITORS' COMMITTEE TO MODIFY FOURTH AMENDED PLAN OF REORGANIZATION;**
**(#1106)   MOTION OF TCF NATIONAL BANK TO APPROVE STIPULATION OF ACCEPTANCE OF PLAN;**
**(#1120)   JOINT MOTION FOR ORDER AUTHORIZING DEBTOR, RBS CITIZENS, N.A., AND CREDITORS' COMMITTEE TO ENTER INTO AND PERFORM AMENDED STIPULATION FOR THE SETTLEMENT OF GUARANTY CLAIMS RELATING TO THE TERMINATION OF CERTAIN LOAN GUARANTEES;**
**BEFORE THE HONORABLE HENRY J. BOROFF, J.U.S.B.C.**

**APPEARANCES**:

For The Debtor:                          DANIEL GLOSBAND, ESQ.
                                         GINA L. MARTIN, ESQ.
                                         Goodwin Procter, LLP
                                         Exchange Place
                                         Boston, MA  02109
                                              --------continued-------->

Electronic Sound Recording Operator:    Laura L. Chambers

*Proceedings Recorded by Electronic Sound Recording*
*Transcript Produced by Certified Transcription Service*

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

EXHIBIT 1

Page 2 Cover
#08-12540
7-12-2010

**APPEARANCES: (continued)**

For the  Official Committee
of Unsecured Creditors:

JEFFREY D. STERNKLAR, ESQ.
Duane Morris
470 Atlantic Avenue
Boston, MA  02210


For First Marblehead Corp. and First:
Marblehead Data Services, Inc., Trust
Administrator:

DENNIS L. JENKINS, ESQ.
JOHN D. SIGEL, ESQ.
Wilmer Cutler Pickering Hale & Dorr, LLP
60 State Street
Boston, MA  02109


For U.S. Bank, N.A.:
Indenture Trustee for Student Loan Trusts:

RICHARD C. PEDONE, ESQ.
Nixon Peabody, LLP
100 Summer Street
Boston, MA   02110


For Nellie Mae Education Foundation:

D. ROSS MARTIN, ESQ.
Ropes & Gray, LLP
One International Place
Boston, MA  02110


For Official Committee of Unsecured Creditors:

DAVID J. REIER, ESQ.
Posternak, Blankstein & Lund, LLP
800 Boylston Street
Boston, MA  01299
-----------continued----------->


Electronic Sound Recording Operator:   Laura L. Chambers

*Proceedings Recorded by Electronic Sound Recording*
*Transcript Produced by Certified Transcription Service*

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 3 Cover
#08-12540
7-12-2010

**APPEARANCES: (continued)**

<u>For Pension Benefit Guaranty Corporation</u> :          SAMUEL C. BATSELL, ESQ.
                                                          U.S. Government Agency
                                                          1200 K Street N.W.   Suite 340
                                                          Washington, D.C.  20005

<u>For Ambac Assurance Co.</u>:                            JAMES W. KAPP, III, ESQ.
                                                          McDermott, Will & Emery
                                                          227 West Monroe Street
                                                          Chicago, IL   60606

<u>For RBS Citizens, N.A.</u>:                             PAUL S. SAMSON, ESQ.
                                                          Riemer & Braunstein, LLP
                                                          Three Center Plaza
                                                          Boston, MA  02108

<u>For the U.S. Trustee</u>:                               ERIC K. BRADFORD, AUST *(Phone)*
                                                          Office of the U.S. Trustee
                                                          J.W. McCormack Post Office, Court House
                                                          5 Post Office Square   Suite 1000
                                                          Boston, MA  02109

<u>For GMAC Bank</u>:                                      VANESSA PECK, ESQ.
                                                          Goulston & Storrs
                                                          400 Atlantic Avenue
                                                          Boston, MA  02110

<u>Electronic Sound Recording Operator</u>:   Laura L. Chambers

*Proceedings Recorded by Electronic Sound Recording*
*Transcript Produced by Certified Transcription Service*

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

1          MR. REYNOLDS:   All rise.

2          THE COURT:   Good afternoon.  Please be seated.

3          MR. REYNOLDS:   Case #08-12540, The Education

4   Resources Institute.  A status conference on the case, as well

5   as hearings on the joint motion of the debtor and the

6   Creditors' Committee to modify the fourth amended plan of

7   reorganization; a joint motion for an order authorizing the

8   debtor, RBS Citizens, and Creditors' Committee to enter into

9   and perform an amended stipulation; and a motion of TCF

10  National Bank to approve the stipulation.

11          Beginning with Mr. Glosband, could I ask counsel

12  present to please identify themselves for the record as well

13  as who they represent.

14          MR. GLOSBAND:   Good afternoon, Your Honor.  Daniel

15  Glosband from Goodwin Procter representing TERI.

16          MS. MARTIN:   Good afternoon, Your Honor.  Gina

17  Martin from Goodwin Procter representing the debtor, TERI.

18          MR. STERNKLAR:   Good afternoon, Your Honor.  Jeffrey

19  Sternklar on behalf of the Unsecured Creditors' Committee.

20          MR. REIER:   Good afternoon, Your Honor.  David

21  Reier, Posternak, Blankstein & Rome (low volume, not near a

22  microphone, unclear.).

23          MR. PEDONE:   Good afternoon, Your Honor.  Richard

24  Pedone representing U.S. Bank as Indenture Trustee.

25          MR. KAPP:  Good afternoon, Your Honor.  Jay Kapp

1  representing Ambac Assurance Corporation.

2          MR. JENKINS:  Good afternoon, Your Honor.  Dennis

3  Jenkins and John Sigel for the First Marblehead.

4          MS. PECK:  Good afternoon, Your Honor.  Vanessa Peck

5  representing GMAC.

6          MR. BATSELL:  Good afternoon, Your Honor.  Sam

7  Batsell representing Pension Benefit Guaranty Corporation.

8          MR. SAMSON:  Good afternoon, Your Honor.  Paul

9  Samson representing RBS Citizens, NA.

10          MR. MARTIN:  Your Honor, Ross Martin, Ropes & Gray.

11  (unclear, not near microphone, cannot hear him) and (unclear

12  name) is representing the Nellie Mae Education Foundation.

13          THE CLERK:  And, Mr. Bradford, on behalf of the

14  United States Trustee, do we still have you on the phone?

15          MR. BRADFORD:  You do.  Good afternoon, Your Honor,

16  Eric Bradford for the U.S. Trustee.  Thank you for allowing me

17  to appear by phone today.

18          THE COURT:  You're welcome.

19          How's it going?

20          MR. GLOSBAND:   What did he say?

21          MS. MARTIN:  "How's it going?"

22          MR. GLOSBAND:  I'm about to find out, aren't I?  I

23  ask Your Honor first if you would like to proceed with the

24  modification motion first or with TCF and Citizens' motions

25  first?

Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 6 of 122

1        THE COURT:  I'll let you decide.

2        MR. GLOSBAND:  Pardon?

3        THE COURT:  I'll let you decide.

4        MR. GLOSBAND:  In that case, I will proceed with the

5    modification motion.

6        As I suspect you know, I thought that we were

7    substantially finished with plan related matters when we left

8    here on April 28th.  I am disappointed that we're back, but

9    with a case as complicated as this case has been, I'm not

10   totally surprised that we're back.

11       Understanding the complexity of the case, although

12   not necessarily different from other cases in this regard, we

13   provided in the plan that we could modify the plan, if

14   necessary, to correct a defect or any inconsistency.

15       The ability to modify a plan is also contemplated by

16   Section 1127 of the Bankruptcy Code.  So this is clearly not

17   the first time this has ever happened either to me or under

18   Chapter 11.

19       From the perspective of the context of this

20   modification, I think it's worth noting, although perhaps it's

21   self evident, that the debtor and the Creditors' Committee are

22   of like mind on the issues before the Court today.  And while

23   there are parties who are not of like mind, the general body

24   of creditors and the debtor are on the same side.

25       Before I go into a full but abbreviated exposition,

1    I would ask the Court if you wish to give us a preliminary

2    sense of whether you believe at the end of the day on April

3    28th we had a confirmed plan or the plan is still pending

4    confirmation.  I'm prepared to proceed in either event or in

5    the alternative.

6         THE COURT:  I certainly will listen to anyone who

7    wishes to argue differently.  But it's my strong inclination

8    that until I sign a confirmation order, there is no

9    confirmation.

10         MR. GLOSBAND:  Thank you.  I will proceed along

11    those lines, but I'll address briefly post-confirmation

12    modifications as well, because I think the way we've presented

13    this, we should be able to modify our plan either way.

14         We've pretty much flooded you with paper, and I

15    don't want to repeat all of that.  I'm going to try to do a

16    short version of the problem and our proposed solution to the

17    problem, and stay out of detailed factual contentions in

18    either direction if I can do that.  And if at the end of

19    today's hearing we need to get into factual details, you'll

20    tell us, and we will.

21         The plan proponents, being the debtor and the

22    Committee, understood when they presented the plan that there

23    was a limited universe of pre-petition defaulted loans and a

24    limited universe of cash that was going to go back to the

25    securitization trusts, and there was an alternative universe,

Case 18-90065-LT Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg. 8 of
122

1    if you will, that was going to be transferred to the plan

2    Trustee.

3            All of our arithmetic and analysis was premised on

4    our understanding of that universe.  And the universe in

5    respect of the pre-petition loans was confined to those loans

6    that had been purchased from collateral in pledge accounts

7    held by TERI, TERI's assets, TERI's collateral securing its

8    obligation to honor its guarantee in the event that a loan

9    defaulted.

10           When pledge account money ran out, TERI still had a

11   guarantee obligation, and prior to April 2008 had the money to

12   honor that obligation and did so from its general operating

13   account funds.

14           Under the documents between the parties, lenders and

15   the securitization trust in particular retained a security

16   interest in recoveries on defaulted loans that had been

17   purchased with pledge account collateral, subject to all of

18   the issues raised in the trust adversary proceeding, but at

19   least under the documents in the first instance they had that

20   security interest.  They had no security interest under the

21   documents in loans purchased with TERI's operating accounts.

22   So our focus was on their collateral and what of their

23   collateral they were to get back subject to the settlement of

24   the trust adversary proceedings.

25           The cash component of the issue -- and let me just

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 9 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 9 of 122

Page 7

1   digress in case it's not vividly apparent from the papers.

2   The loan component of this issue involves 34 million dollars

3   in face amount of loans that were purchased by TERI pre-

4   petition using its general operating account funds, out of a

5   larger universe of about 364 million dollars face amount of

6   loans that TERI had purchased in the aggregate.

7           In respect of cash, TERI and the plan proponents,

8   for different reasons it turns out, thought that about three

9   million dollars in recoveries collected just prior to the

10  bankruptcy date on account of loans purchased with collateral

11  pledge account proceeds was going to be returned to the

12  trusts.

13          TERI's position was based on the fact that it

14  thought that the trust had an arguable security interest in

15  those recoveries that lasted for 21 days before it lapsed

16  based on commingling.  And without getting into the details of

17  the argument, all recoveries went into a single account, that

18  account was swept every night, we think 21 days is the longest

19  that the security interest should last.  So we were counting

20  on turning over around three million dollars in that 21-day

21  category.

22          The Committee, and they can speak for themselves,

23  thought that, no, what we were doing was giving back about

24  three million dollars in recoveries, and recoveries includes

25  payments for what are called rehabilitative loans.  We turn

1 back a loan, they turn over cash, based on a questionnaire

2 that they had submitted to First Marblehead that First

3 Marblehead had answered, saying how much in pre-petition

4 rehabilitative loans and recoveries wasn't put into the pledge

5 accounts, how much was floating at the time we filed the case,

6 almost the same amount of money, around three million dollars.

7          So we came into the hearing on April 28th with a

8 plan premised on the economics that I've just described.

9          THE COURT:  That three million is separate from 34

10 million?

11          MR. GLOSBAND:  Correct.  Thirty-four million is the

12 face amount of loans.  There's arguments over how much the

13 present value of the collections on the loans -- the --

14          THE COURT:  That were purchased by TERI's operating

15 account, from funds in TERI's operating account.

16          MR. GLOSBAND:  Correct.

17          THE COURT:  Three million dollars is this amount

18 that is either subject to delayed perfection or on account of

19 float.

20          MR. GLOSBAND:  Correct.

21          THE COURT:  Okay.

22          MR. GLOSBAND:  But those are the two categories of

23 assets that are in dispute.

24          And as I said, our economic analyses, including the

25 best interest test, including Mr. Peko testimony and

1  affidavit, including Mr. Renzi's affidavit, and all of the

2  numbers in Schedule B to the plan which laid out what the

3  securitization trusts were getting by way of claim, what the

4  trust adversary proceeding settlement adjustment was, all of

5  those numbers were premised on the plan trust and not the

6  securitization trusts getting those 34 million dollars in

7  loans and what turns out to have been six million dollars in

8  cash.

9        And, frankly, I guess because we had internalized

10 that information, we thought the plan and the disclosure

11 statement provided for that, and we thought the parties

12 understood that; certainly the economics displayed that.

13       Subsequent to the April 28th confirmation hearing,

14 we discovered that at least some of the parties didn't read

15 things the way we did.  And it's become clearer as time has

16 gone on that Ambac, the Indenture Trustee, and First

17 Marblehead on behalf of someone, and I'll come to that issue

18 later, all take the view that no, no, those loans and that

19 money were to go to the securitization trusts.  And you can

20 tell from their objections that they feel strongly about the

21 issue.

22       I want to just digress for one second to explain the

23 6.2 million dollars in cash because it will come up in a

24 couple of respects.

25       As I said, we understood that there was three

1   million dollars in cash that was to go to the securitization

2   trusts.  The 6.2 million dollars emanates from what was

3   supposedly a reconciliation of historically inaccurate

4   remittances that turns out was reflected in an October e-mail

5   that's attached to one of the objections, but it really wasn't

6   in the front of anyone's mind and had nothing to do with

7   contemporaneous collections and frankly never surfaced as an

8   issue until this issue came up after the confirmation hearing.

9          You may hear from others that they asked about

10  whether we had set aside the money to be returned to the

11  securitization trusts, and my answer to that was Yes, but

12  those numbers were never fully reconciled, and we never sat

13  down until after the fact and discovered that they thought

14  there was 6.2 million dollars more in those numbers derived

15  from this reconciliation as opposed to the near term

16  collection.

17         So that's kind of the context of the issue, and I'm

18  sure others will have a different view of it, but I just

19  wanted to make sure that there was a bit of an explanation in

20  front of Your Honor.

21         So where we come down to is that the plan that was

22  presented for confirmation on April 28th, is subject to two

23  conflicting interpretations with respect to these issues.  And

24  if the plan were interpreted as suggested by the objecting

25  parties, then in our view it wouldn't be confirmable.  First

Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 13 of 122

1  of all, none of our evidence supported a plan with that

2  interpretation.  Second of all, that would be discrimination

3  among the treatment of the class of unsecured creditors

4  because some of them would have had their claims calculated on

5  different assumptions than others.

6  　　　　　　And most importantly, that plan as interpreted in

7  their way wouldn't be feasible because if TERI had to part

8  with an additional 6.2 million dollars in cash, under the

9  adjustment mechanisms in the plan it basically would have

10  negligible to no cash with which to operate.  Best case it

11  would be $200,000, I think,; worse case it would be a negative

12  number.

13  　　　　　　So the record on April 28th simply does not support

14  confirming a plan as interpreted by the objecting parties.  So

15  when we concluded that we had this problem, we decided that

16  our, you know, our one and only alternative was to modify the

17  plan.  Notwithstanding some of the tenor of the paperwork,

18  this was not anything surreptitious on our part.  It happened

19  because we discovered that there was a misinterpretation, or

20  at least disagreements in interpretation.  Without getting

21  into any of the background facts, the plan that we submitted

22  interpreted our way was perfectly confirmable, interpreted

23  their way is not confirmable.  And so to fix that, we proposed

24  the modifications that are described in our pleadings.

25  　　　　　　The reason we think the plan has to be modified,

Case 08-12540 LT Doc 1129 Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg 14 of
122
Case 08-12540 Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main
Document Page 14 of 122

Page 12

1 unless the Court were to interpret it to say -- interpret it

2 our way and I so rule -- and we don't want to put you in that

3 position -- is so that there's no ability to equivocate about

4 how it's to be interpreted, and to make very clear that in

5 respect to these two issues and a couple of minor ones that

6 I'll mention, the plan comes out the way that almost everybody

7 thought it did.

8        The way -- ways in which we would implement the

9 modifications are as follows:  We would fix the definition of

10 "securitization trust collateral" so that it's clear that it

11 only relates to a fixed amount of cash and to loans purchased

12 with pledge account collateral.

13        We would increase the unsecured claim of the

14 securitization trusts by 6.2 million dollars.  Let me explain

15 why.  At the time that the economic analysis of the plan was

16 being performed and the decoder was being developed and

17 applied, neither Grant Thornton nor FDI were aware of the fact

18 that there were supposedly 6.2 million dollars in loan

19 recoveries that had come in between sometime in 2006 and

20 thereafter, and so their understanding of the loans was that

21 there was that 6.2 million dollars along with other recoveries

22 still to be recovered.

23        So they basically didn't adjust the decoder to

24 reflect the fact that that money had already come in and

25 wasn't going to come in later.  Which meant that the claims of

Case 18-90065-LT Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg. 15 of
122

1   the affected securitization trusts were too low, because they

2   anticipated they'd be getting more money.

3           So we propose to fix that by basically adjusting

4   their claims to reflect the fact that they're not going to get

5   that money in cash.

6           So that's the second modification.  The first is fix

7   the definition, the second is correct the fact that we didn't

8   realize that the 6.2 million had been paid starting in 2006.

9           And those are really the modifications that address

10  the two significant issues.  There are some further

11  modifications that are of less significance, but I'd like to

12  talk about them briefly.

13          One is that we have been unable to fully and

14  accurately account for the allocation of funds in what's

15  called the segregated account.  At the time that the Court

16  authorized and directed TERI in June of 2008 to repurchase

17  loans from pledge accounts of securitization trusts that

18  wanted to submit them, as part of that order there was a

19  direction that recoveries on pre-petition defaulted loans

20  which were being collected by First Marblehead would be turned

21  over to TERI and held in a segregated account, and that

22  account then also became the location for recoveries on post-

23  petition defaulted loans, what we've been calling the Section

24  552 loans that are to go to the plan trust.

25          And First Marblehead has filed a -- let me back up.

1  In our initial modification, we weren't confident that the

2  allocation among trust issue was limited to just the

3  segregated account.  Between then and now we've become

4  confident of that.

5          First Marblehead filed a limited reply to our reply

6  dealing with the issue of that allocation, saying we had this

7  information, we had that information, we have loan level

8  details.  We agreed in October of 2008 that we received

9  everything we were supposed to get in the way of data from

10 First Marblehead, which is kind of beside the point because

11 we're talking about recoveries after that date and recoveries

12 on loans that they're still collecting.

13         The bottom line is we have pretty much everything

14 they said we have.  What we don't have is really a small item,

15 but it's big enough to prevent our allocating the segregated

16 account.  And that is we don't have an allocation of court

17 costs deducted from the remittances of the recoveries that go

18 into the segregated accounts.  And our personnel have sort of

19 asked for that, they've been temporized on the other side.  We

20 can't seem to get that information.  It's a roughly $500,000

21 item, but there's no way to know just how much money should go

22 back to a particular securitization trust if we don't know

23 what that trust has incurred by way of court costs.  We could

24 do it on a *pro rata* basis, but that --

25         THE COURT:  By court costs you mean  --

Case 18-90065-LT    Filed 07/08/20    Entered 07/08/20 23:33:24    Doc 68-3    Pg 17 of
122
Case 08-12540    Doc 1129    Filed 07/20/10    Entered 07/20/10 12:31:32    Desc Main
Document    Page 17 of 122

Page 15

1              MR. GLOSBAND:  -- that wouldn't be accurate.

2              THE COURT:   -- attorneys' fees?  By court costs,

3    you mean attorneys' fees?

4              MR. GLOSBAND:  Sorry, what?

5              THE COURT:  By court costs you mean attorneys' fees?

6              MR. GLOSBAND:  No, I don't think so.  The way that I

7    understand the collection process works, and it worked a

8    little differently before the petition date, attorneys' fees

9    are netted from recoveries.  And so that's kind of an

10   automatic.  When you get a recovery in respect to a particular

11   loan, you know it's net of the court costs, you don't need a

12   further adjustment -- excuse me, of the attorneys' fees.

13             Prior to the petition date, the collection agencies

14   would invoice TERI for court costs, and TERI would pay them.

15   So TERI would know how much in court costs related to a

16   particular loan.

17             When the petition was filed and First Marblehead

18   remained responsible for collections, it authorized the

19   collecting agencies to deduct the court costs, but they did it

20   on a bulk basis, and we are unable to allocate it.  But I

21   believe it's such things as filing fees and the like.  And in

22   the aggregate it's not a huge number, but as soon as we get an

23   allocation of that number, we can also pass out the segregated

24   account.  So that's the third modification.

25             There are a couple of other minor ones.  The first

Case 18-90065-LT   Doc 1129   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 18 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 18 of 122

Page 16

1    is that in light of at least the plan proponent's view of the

2    circumstances that led to these problems, they've decided that

3    with respect to First Marblehead related entities, there

4    should be two changes made in the plan.

5         The first is that First Marblehead Corporation or

6    FMER, and I'm not sure which it was, which was going to be on

7    the Plan Trust Advisory Committee should not be on the Plan

8    Trust Advisory Committee.  And secondly, FMDS, First

9    Marblehead Data Services, which was the trust administrator

10   which was to be exculpated under the original draft of the

11   plan, the Committee in particular has decided should no longer

12   be exculpated.  So those two changes have been made to remove

13   those provisions.

14        Next, to accommodate the modifications, the

15   deadlines in the plan for voting acceptance and for

16   confirmation have been extended out to the end of August

17   collectively.  And Mr. Sternklar may address this in more

18   detail.

19        And then finally the settlements that the Court

20   approved at the time of the last hearing with the PBGC and

21   MBIA, which were separate from the plan, have now been

22   incorporated in the plan, to just sort of neaten things up.

23        So a couple of more points and then I'll cede the

24   podium.

25        There's quite a lot of, you know, noise in the

1  objections about whether we have, whether the plan proponents

2  have the right to modify the plan. If Your Honor retains his

3  conclusion that the plan hasn't been confirmed yet, I believe

4  that absent some sort of egregious bad behavior we have the

5  ability to modify the plan as of right under Section 1127(a).

6  And even if we didn't, I believe the circumstances that I've

7  described would warrant our modifying it under Section

8  1127(b).

9           The issues raised in the objections about baiting

10  and switching, and, you know, reliance and the like, really

11  aren't the issues. We've determined that there's a defect,

12  and we need to correct that defect, and the cases would permit

13  us to do that, notwithstanding the peripheral issues raised by

14  the objecting parties.

15          In the context of the modification, we also have the

16  issue of disclosure and process and how that's to be

17  addressed. And we're very receptive to the Court's views on

18  disclosure and process, but let me at least suggest what ours

19  are.

20          We believe first that, as demonstrated in the

21  exhibits to our modification motion, the modifications really

22  only adversely affect three parties, and those are three

23  securitization trusts. They're the trusts that -- the master

24  trust that Ambac is the control party for, and they're trusts

25  2003 and -- 2003-1 and 2004-1. And they're affected if they

1 believed and relied on their interpretation of the plan, and

2 we change that interpretation, because they're the ones who

3 were getting among them the 34 million dollars in loans.

4       THE COURT:  First Marblehead is not adversely

5 impacted?

6       MR. GLOSBAND:  First Marblehead is a large but

7 unsecured creditor.  And if the modification is to either

8 enforce the plan as we interpreted it or to correct a

9 situation where substantial value would be going to other

10 parties, First Marblehead benefits from the modification,

11 because the return to creditors is better under the originally

12 interpreted/modified plan than it would be under the plan as

13 interpreted by those other parties.  So it's --

14       THE COURT:  It's a removal of the exculpation.  Is

15 that not a detriment?

16       MR. GLOSBAND:  That's First Marblehead Data

17 Services, and I suppose, yes, they could -- they're affected

18 by that and they have a right to argue that effect.  I

19 wouldn't dispute that.

20       In terms of the Plan Trust Advisory Committee, I

21 would think that's a neutral.  I don't think that's an adverse

22 effect.

23       So as to creditors other than these three trusts, if

24 you view the effect on them as just the allocation of this

25 additional 6.2 million dollars in claim, there is a dilution

1  of a per cent or so in what their estimated recovery would be

2  based on the numbers in the liquidation analysis.  If you view

3  the effect on them as avoiding the loss of these assets, it's

4  a plus to them.  So I don't think as to any creditor other

5  than those trusts there's any way to say that they are

6  materially and adversely affected.

7         The objecting parties pointed out that our initial

8  modification, where we propose to defer distribution of all

9  pledge account collateral, would be an adverse effect on all

10 of the trusts, and we would agree with that, but we've

11 eliminated that problem because we'll be passing out two

12 hundred and some odd million dollars and holding back, I think

13 it's 16 or so to get it allocated.  So it's hard to see that

14 that's a material adverse effect in that context.  So I think

15 we've remedied the only thing that I could see might have been

16 an adverse effect on, other than the three trusts.

17        Lastly, in terms of process, notwithstanding the

18 fact that the plan proponents think that only three creditors

19 can argue that they're suffering a material and adverse

20 effect, we are prepared to nonetheless allow all of the

21 securitization trusts an opportunity to reconsider their

22 votes, if they wish.  The objections have argued that all of

23 them are negatively affected.  We disagree with that.  But

24 rather than getting lost in a process fight, we simply propose

25 that we would give them all the opportunity to reconsider

1   their votes.

2           And the notice package that we initially proposed,

3   we would augment.  We initially proposed circulating the

4   modification motion modified black-line plan, and we would add

5   to that now a reply pleading and we would add an offer, if you

6   will, to the creditors if they want, for us to circulate the

7   objections, although there's a lot of paper there and if the

8   creditors don't want them, it seems like an unnecessary waste.

9           We would also propose that the process be generally

10  similar to that to which we agreed in the context of the

11  original plan with respect to the trust note holders.  In

12  other words, we would -- even though trust note holders are

13  not our creditors, instead the trusts are and the Trustee

14  perhaps as their emissary, in the initial process we

15  accommodated their request that we structure a voting process

16  for trust note holders, so that they could instruct the

17  intermediaries -- you never know who those people are, but

18  they are processed through intermediaries.  They send their

19  ballots to the intermediaries, and the intermediaries pass

20  along the voting information to the Indenture Trustee.

21          We would go through that same process and allow

22  trust note holders to change their votes, if they wish, by

23  basically conveying the vote change instruction to our claims

24  agent, Epic, with enough detail so that Epic can match it

25  against the intermediary vote and redo the arithmetic.  So

Case 18-90065-LT  Filed 07/08/20  Entered 07/08/20 23:33:24  Doc 68-3  Pg 23 of
122
Case 08-12540  Doc 1129  Filed 07/20/10  Entered 07/20/10 12:31:32  Desc Main
Document    Page 23 of 122

Page 21

1  that's the process that we would propose.

2        We think that in this context, the disclosure that

3  we're suggesting is, if not more than sufficient, certainly

4  sufficient.  The modifications are clearly delineated in the

5  black-lined plan.  The modifications are described, and maybe

6  over-described between our motion to modify and our reply, and

7  if anyone has any doubts we can also include the objections.

8        And I would note that we're not dealing with a

9  universe of unknown, faceless trade creditors.  For the most

10 part, we're dealing with sophisticated parties who have been

11 very actively involved in this case.  In particular, the three

12 trusts that are adversely affected are actively represented in

13 the room, and have been involved in this process since we

14 discovered the problem.  And it's hard to see how any more

15 disclosure would benefit their decision to accept or reject

16 the modified plan.

17       As to the note holders, as I've said, I think our

18 papers are clear.  And there's certainly no need to solicit

19 creditors outside the trust universe.  They're only affected

20 beneficially by the modifications.

21       Notwithstanding the protestations and the

22 objections, there is no requirement in this kind of a

23 situation for starting the whole process over, producing a new

24 plan and a new disclosure statement and having that heard and

25 approved and circulated.  The Court can determine that

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 24 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 24 of 122

Page 22

1  disclosure is sufficient in light of the audience, and the

2  audience is the one that I've described, not an

3  unsophisticated audience, an audience that's totally up to

4  speed on this -- this process already.  To the extent that

5  individual note holders aren't, they will be when they see our

6  modifications.  There seems very little need to address issues

7  that are beyond just the confines of the modifications

8  themselves.

9        The last topic I want to address is the standing of

10 First Marblehead with respect to most of its objections.  And

11 FMDS, the one party that's affected by the exculpation, joined

12 the indenture banks' objections as plan administrator, and in

13 that regard I don't dispute their standing.

14       But First Marblehead Corporation and First

15 Marblehead Education Resources filed a long, and I would say

16 quite outspoken objection, arguing only one issue that I think

17 could affect creditors generally, and that is the cost and

18 delay of the modification process might outweigh the benefit,

19 and that's not I think a relevant issue. We're stuck in a

20 situation where we have to modify.  We don't want to have any

21 more cost or any more delay than we possibly need.  But we do

22 have to go through the modification process.  We just don't

23 have an alternative.  So that I think is a non-issue.

24       Everything else they argue is an issue that they

25 argue on behalf of the securitization trusts for whom they do

Case 18-90065-LT    Filed 07/08/20    Entered 07/08/20 23:33:24    Doc 68-3    Pg 25 of
122
Case 08-12540    Doc 1129    Filed 07/20/10    Entered 07/20/10 12:31:32    Desc Main
Document    Page 25 of 122

Page 23

1  not speak.  Issues that affect the securitization trusts do

2  not affect them in their capacity as a creditor in this case,

3  and they don't purport to file the objection in any other

4  capacity.

5          And so from a prudential standing perspective, and

6  that's a perspective honored in Bankruptcy Courts, including

7  in this Court, including in the First Circuit, they're arguing

8  issues that aren't their issues.  They're arguing a third

9  party's issues, and they don't have standing to do that.

10          So that's pretty much my view of things, Your Honor.

11  As I say, I'm not -- happy as I am to see you, I'm not

12  thrilled to be here under these circumstances.  And, you know,

13  nonetheless, we are doing what we think is the necessary thing

14  and the right thing and the thing that comports with the

15  expectations of almost all of the parties in this case and

16  that remedies a defect that we discovered in our plan.

17          I'm going to cede to Mr. Sternklar, who I think may

18  have a few additional comments.

19          THE COURT:  Okay.

20          MR. STERNKLAR:  Thank you, Your Honor.  Jeffrey

21  Sternklar for the Creditors' Committee.

22          We join with the debtor in seeking to modify this

23  plan to carry out what has always been our sincerely held

24  intentions, and to remedy an obvious defect in that the, as

25  the objecting parties have so vociferously pointed out, the

1  plan doesn't mean what we intended, and it has to be fixed.

2  We're not changing the deal, we're simply trying to implement

3  it.

4        Mr. Glosband outlined the changes to the motion --

5  to the plan.  I obviously won't belabor it.  I just want to

6  highlight one point on the recoveries of the three million

7  dollar issue.

8        The bid ask, if you will, is really close to 9.2

9  million as opposed to three million.  And the way you get

10 there is, our view is it's three million dollars, based

11 roughly two and a half million dollars for proceeds of

12 recoveries and roughly half a million dollars for -- proceeds

13 of rehab, excuse me, and half a million dollars for recoveries

14 that TERI collected in the few weeks before bankruptcy.

15       The other side says, "Well, you're right on the two

16 and a half million for the rehabs, but you're wrong on the

17 half million recoveries; that's really another 6.2 million."

18 So 2.5 plus 6.2 they would say is 9.7 million.  So that's the

19 spread we're dealing with.  It's not just the difference

20 between three million or six million, it's that brackets where

21 the two sides are on that point.

22       With respect to the changing to the timing of

23 release of the segregated recoveries account, Mr. Glosband I

24 think correctly outlined the issue.  We're aware of that we

25 need additional information.  First Marblehead has made it

1    abundantly clear they don't intend to provide it.  We suspect

2    we'll be filing a motion for a 2004 exam shortly if we can't

3    resolve it, and we'll get the information that way.

4           With respect to First Marblehead and the removal of

5    FMDS from the exculpation provision and its participation on

6    the Plan Trust Advisory Committee, it's not punitive and it's

7    not simply spite.  What the facts that led up to this has

8    revealed is the inherent conflict that First Marblehead is in.

9    On the one hand, it's an unsecured creditor, the FMC.  On the

10   other hand, it's clearly looking out for the interest of the

11   securitization trust on their secured claims as well as their

12   unsecured claims, as administrator.

13          You know, there are potential claims that are

14   reserved through the plan against First Marblehead, things

15   like claims for alter-ego, claims that they breached their

16   fiduciary duty, claims for negligence, claims for contract

17   breach.  What they highlighted to us was that they couldn't

18   serve on this Committee given their conflicted position.  And

19   that was really -- when we saw all this, given how we got to

20   where we are, it was clear that --

21          THE COURT:  This wasn't -- it wasn't clear to you in

22   April?

23          MR. STERNKLAR:  No, it was not.  We thought we had

24   aligned the interests, and it became clear afterwards.

25          With respect to your question to Mr. Glosband about

1  whether First Marblehead is adversely affected by the plan,

2  to the extent that question was in the context of evaluating

3  whether First Marblehead should be entitled to change its vote

4  as an affected party, the short answer is First Marblehead

5  didn't vote.  So there's nothing for them to change.

6        So whether they're adversely affected or not, for

7  purposes of Rule 3019, and whether they should have a right to

8  change the vote is not at issue here.  This isn't a do-over

9  where we're just going to re-vote.  1127 says you talk about

10  changing a pre-existing vote, and the case law is clear.  If

11  you didn't vote, you don't now get a chance to submit a new

12  vote, or a first vote.

13        As I see the decision tree here, Your Honor, this is

14  the preliminary hearing.  I believe that we requested in a

15  motion, and the first issue is whether the plan has been

16  confirmed, and with Your Honor's permission I won't belabor

17  whether circumstances warrant under 1127(b), I view that more

18  as rebuttal to the contention that the plan has been

19  confirmed.  And with Your Honor's permission, I'll reserve

20  that if Your Honor wishes to hear it after hearing the

21  contrary argument.

22        If the plan has been confirmed, then the question is

23  who gets to change their vote.  As Mr. Glosband said, we will

24  accept for argument's sake the contention of the

25  securitization trusts that they're all adversely affected, and

Case 18-90065-LT    Filed 07/08/20    Entered 07/08/20 23:33:34    Doc 68-3    Pg. 29 of
122
Case 08-12540    Doc 1129    Filed 07/20/10    Entered 07/20/10 12:31:32    Desc Main
Document    Page 29 of 122

Page 27

 1  of the objecting parties those that voted would have an

 2  opportunity to change their vote, should they choose to do so.

 3       We don't believe changing the vote ultimately

 4  affects confirmability of the plan.  We will have impaired

 5  classes voting to accept.  We think that it really only goes

 6  to whether they opt in or opt out of the settlement.  So it

 7  affects what happens after confirmation.  But it doesn't, in

 8  our view, affect the confirmability of the plan.

 9       The Court would then need to decide if, as we

10  requested, the pleadings provide adequate disclosure.  Under

11  1125, **American Solar King**, the case we cited throughout our

12  materials, stated that 1127 does not require a brand new

13  disclosure statement, nor is that common practice in pre-

14  confirmation modifications that require brand new disclosure

15  statements, particularly as Mr. Glosband noted where as here

16  the only parties changing their votes and the only parties who

17  would need information to decide whether to change their votes

18  are the objecting parties who, if nothing else, clearly have

19  demonstrated they're sophisticated and have all the

20  information they could possibly need.  Indeed, it appears

21  they've already decided, but we'll see.

22       Your Honor will need to schedule a final hearing

23  after setting a deadline under Rule 2002(a)(5) for affected

24  parties to change their vote.  If the Court's calendar can

25  accommodate us, we would be grateful if we could have that

Case 08-12540-LT Doc 1129 Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg 30 of
Case 08-12540-LT Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main
Document Page 30 of 122

Page 28

1  hearing.  The deadline we put was August 15th, it turns out

2  that's a Sunday, so if sometime the week of the 16th is

3  available for the Court to have a final hearing to confirm the

4  modified plan, we'd be grateful.

5        Your Honor needs to -- may need to decide, or may

6  choose to decide what objections to confirmation Your Honor

7  will consider.  As we argued in our pleadings, there's -- to

8  the extent the modifications don't change something Your Honor

9  has already found, Your Honor need not, and we submit should

10  not, reconsider those findings, and that the objections at the

11  final hearing should be limited to matters that result from

12  the proposed modifications.

13        Your Honor, finally, the three objecting parties,

14  there's clearly a lot of overlap, but there are some

15  differences.  Ambac particularly makes a very strong,

16  passionate argument that it relied upon various things that

17  were in the plan and disclosure statement to reach the

18  conclusions it reached.  And I think for purposes of this

19  hearing, we would accept that at face value, that they relied.

20        This isn't a breach of contract action.  If they

21  relied on the plan, we similarly relied on Section 14.4 of the

22  plan, which was a critical part of what they voted to accept,

23  their -- the analysis of the objecting parties, the contract

24  type of analysis about you can't change things if there's no

25  ambiguity or almost like a parol evidence rule argument, would

Case 18-90065-LT Doc 1129 Filed 07/08/20 Entered 07/08/20 23:33:24 Desc Main Case 08-12540 Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main Document Page 31 of 122

Page 29

1  effectively read 1127(a) out of the Bankruptcy Code and would

2  certainly read Section 14.4 out of the plan.  It's not a

3  simple argument of contract interpretation.  1127 provides for

4  something else.

5          Finally, the standing argument that Mr. Glosband

6  made about First Marblehead speaks to a -- not only that

7  issue, but more broadly, who is it that speaks for the

8  securitization trusts?  We've heard throughout this case that

9  nobody speaks for the trusts, that the Indenture Trustee lacks

10 authority to agree to things, and that's why we had to do a

11 settlement, not by overt agreement but by an offer through the

12 plan.

13         First Marblehead says it doesn't really speak for

14 the trusts, it's just sort of looking out for their interests.

15 But they certainly seem to have enough authority to say no

16 when we seek to modify the plan.  They either speak for the

17 trusts or they don't.  If they do speak for the trusts, they

18 should say so, and they should say what their authority is to

19 speak for the trusts.  If they don't, then they don't have

20 standing to be asserting objections that are uniquely those of

21 the securitization trusts.

22         And it's put us, and I submit this whole process, in

23 an untenable position of having to negotiate with a cipher and

24 having to deal with a cipher.  They can't commit to things

25 except to say No when they don't like this.  And I think time

1  has come for them to clarify their authority, if they're

2  speaking for the trusts, or to sit down if they don't.

3           We'd ask you to approve the motion, Your Honor, sign

4  the preliminary order that we submitted.  Thank you.

5           THE COURT:  Thank you.

6           MR. KAPP:  Good afternoon, Your Honor.  Jay Kapp on

7  behalf of Ambac Insurance Corporation.

8           Before I begin, Your Honor, disclosure, I am the

9  proud owner of a one-year old and a three-year old living

10  Petri dish and they go to the park and play with other Petri

11  dishes and bring back these wonderful germs and viruses that

12  they're over with in about eight hours and Dad gets walloped

13  for a couple of weeks.  So I apologize in advance for my voice

14  and for my coughing and for the fact that one ear is plugged

15  up.  And so with that blatant plea for your sympathy, I will

16  begin.  But if I talk too loud or soft, please tell me because

17  I can't really hear what I'm saying, which sometimes, you

18  know, you may agree that's okay.

19          Once again, Your Honor, Ambac Insurance Corporation.

20  Mr. Sternklar talks about we have a cipher.  Well, Ambac is

21  not a cipher, Your Honor.  Ambac is the controlling party or

22  credit facility provider for three of the securitization

23  trusts, the master trust, the 2007-3 trust and the 2007-4

24  trust.  We vote essentially, Your Honor, for those trusts.

25          In addition, Your Honor, Ambac holds interest in ten

Case 08-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 33 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document    Page 33 of 122

Page 31

1   of the other securitization trusts, although we are not a

2   controlling party.  And we are a controlling party with one of

3   the key corp trusts.

4          So with respect to the securitization trusts, Ambac

5   has interests or is the controlling party of 13 of the 17

6   securitization trusts, and Ambac voted all of its interest in

7   support of the fourth amended plan.

8          You know, Your Honor, candidly, part of all this

9   spin, and we heard it here today, we're a little bit surprised

10  to get this motion and then find out that we have been painted

11  as the bad guy merely because we negotiated a term, believed

12  what it said, and voted in reliance of that provision.

13         We heard today, and it's a concept from Mr.

14  Sternklar, that they're not changing the plan, they're simply

15  trying to implement it.  I think we'll move along a lot faster

16  if we could all agree that, yes, they're doing quite a major

17  change.  With respect to the master trust, it's a change of

18  effectively reducing the face amount of defaulted loans that

19  will be transferred to the master trust of over 25 per cent.

20  I mean, that's a change, Your Honor.

21         And it's a change that seeks to modify a very simple

22  concept that is fundamental to the securitization trust

23  settlement that was negotiated over the last two years.  And

24  Your Honor, and that is set forth in Section 6.2(c) Romanette

25  (vi) which says, and I'll summarize,

```
 1              " -- on the effective date the debtor shall transfer
 2              to each accepting securitization trust all defaulted
 3              loans that were purchased by or on behalf of the
 4              debtor or its agent from the applicable
 5              securitization trust prior to the commencement date.
 6              All defaulted loans, Your Honor.  There's no
 7    contingency.  There's no qualification.  If a defaulted loan
 8    was purchased from the securitization trust by the debtor,
 9    then it was to be returned to the securitization trust.  "All"
10    means "all," Your Honor.
11              The simple concept that's set forth, as I said, in
12    Section 6.2(c) of the plan.  It's also set forth again in the
13    definition of securitization trust collateral.  It's also set
14    forth in three separate places in the disclosure statement.
15              THE COURT:  Has Ambac ever suggested that it had a
16    security interest in those particular, in those particular
17    loans?
18              MR. KAPP:  No, Your Honor.  But with that said, as
19    we set forth --
20              THE COURT:  And that was simply a resource that was
21    going to be used to settle with.
22              MR. KAPP:  I'm sorry?
23              THE COURT:  So that was simply going to be a
24    resource that the debtor was going to use to settle with
25    Ambac.
```

Case 18-90065-LT   Doc 1129   Filed 07/08/20   Entered 07/08/20 23:33:24   Desc Main
Document   Page 35 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 35 of 122

Page 33

1          MR. KAPP:  Yes.  The securitization trust settlement

2  was, and part as it's set forth in the pleadings, a

3  complicated negotiation about the arbitration and who gets

4  what.  And there's lot of -- for the concept, and we fully

5  acknowledge that there are some loans that we may not have a

6  security interest in.

7          However, we're also giving up a lot of things that

8  we think we do have a securitization -- we do have a security

9  interest in.  So the mere fact that you say, "Aha!  You don't

10 have a security interest in that; you must not have thought

11 you were entitled to,"  well, Your Honor, we're giving away a

12 lot of things that we have a security interest in that we

13 thought we're entitled to.  But it's a negotiation:  you take

14 some, we take some, we all hate the deal, and we go forward.

15         So, yes, we acknowledge -- well, we acknowledge that

16 they purport that some of these loans were purchased from the

17 general account.  There's no background information, by the

18 way.  There's nothing to support that, other than the comment

19 in the motion.  We would like some detail making that clear.

20         But, yes, Your Honor, we do acknowledge the point

21 that they do say that some of those were purchased with their

22 own funds.  And if it was purchased with their own funds, then

23 we do acknowledge that that may mean we don't have a security

24 interest in them.  We don't acknowledge it doesn't mean we

25 thought we had a deal and we understood what was going where.

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 36 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 36 of 122

Page 34

1            Does that make sense?

2            THE COURT:  Yes, thank you.

3            MR. KAPP:  You know, and, Your Honor, the plan

4    proponents never argue ever that the language in the plan

5    sections is not clear, and they also do not point to any

6    language in the plan that in any way contradicts those two

7    sections in the plan.  And that's because the plan contains no

8    such conflicting language.  The plan is clear, the

9    securitization trusts are to receive all the pre-petition

10   defaulted loans.

11           And, Your Honor, if I can just for a minute, I would

12   like to discuss a little bit of why -- of the negotiations,

13   because I am going to try to -- even though you've partly

14   rained on my parade, I am going to try to argue 1127(b).

15   Legitimate expectations of creditors is a factor, and so if I

16   may, I would like to discuss a little bit of the history.

17           But, you know, Your Honor, there's no reason why

18   impaired creditors voting on the plan could not rely on the

19   clear language of the plan.  And indeed, there's nothing

20   before this Court to suggest that creditors did not rely upon

21   that, or understand such clear language, when they

22   overwhelmingly voted in support of the plan.  I mean, that's

23   what we're missing, Your Honor.  The plan is clear, and all

24   the classes voted overwhelmingly in support of it.

25           Your Honor, the clarity and simplicity of this

1   concept was not by accident.  It's a result of intensive

2   detailed negotiations over an extended -- expanded period of

3   time.

4          All this back and forth, Your Honor, of the

5   pleadings between the plan proponents and First Marblehead

6   about who said what, and this "he said/she said," if you will,

7   Your Honor, to Ambac, none of that is relevant.  Because Ambac

8   negotiated directly and only with the plan proponents.

9          And as we set forth in our objection, Your Honor,

10  we've tried to -- we've been trying to get out of this case,

11  Your Honor, for over a year.  We've negotiated two

12  settlements, one with TERI and then one with both plan

13  proponents.  One was filed August 13th, the other one was

14  filed December 1st of last year.

15         The concept that all defaulted loans purchased pre-

16  petition, that was in both of those settlements.  As they

17  acknowledge, and we point out in our objection, that concept

18  was then rolled over into the first amended plan filed October

19  22nd, and it's been in every plan to date.  It's been there.

20  Same language.

21         And indeed, when it wasn't, Your Honor, Ambac

22  objected.

23         And I would point, Your Honor, we filed an objection

24  to the third amended disclosure statement on February 12.  And

25  in particular, Your Honor, when -- we said the following.

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 38 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 38 of 122

Page 36

```
 1              "The disclosure statement does not expressly

 2              identify the entity that will receive defaulted

 3              loans purchased by the debtor prior to the petition

 4              date.  Although it is Ambac's understanding based

 5              upon conversations with counsel of the plan

 6              proponents, that the securitization trusts will

 7              receive such defaulted loans purchased by the

 8              debtors prior to the petition date, the disclosure

 9              statement currently does not expressly provide for

10              such treatment or for any other treatment.  As a

11              result, such ambiguity should be addressed by the

12              securitization trusts, including the Ambac trust, to

13              be able to adequately assess the securitization

14              trust settlement."

15         Your Honor, in resolution of such objection, and

16 this is exactly the issue we're talking about now, the plan

17 proponents amended the Section 6.2(c) Romanette (vi), to read

18 exactly as it reads now, to provide for the clear language it

19 contains today, that all pre-petition defaulted loans will be

20 transferred to the securitization trusts.

21         This is a perfect time, Your Honor, if there was

22 going to be any other interpretation -- I mean, this was

23 basically our trying to get on the same page, have apples be

24 apples, and say what are we talking about.  And instead of

25 hearing different interpretation, we got -- the plan
```

Case 18-90065-LT    Filed 07/08/20    Entered 07/08/20 23:32:34    Doc 68-3    Pg. 39 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document     Page 39 of 122

Page 37

1  proponents revised the section to read as it currently reads

2  today, "all loans."

3          And, Your Honor, it goes deeper than that as well.

4  Ambac also objected on February 12th to the chart set forth in

5  the disclosure statement on Section 183(d)(6).  And that chart

6  purports to set forth all the defaulted loans purchased by the

7  debtor from every single securitization trust, both pre-

8  petition and post-petition defaulted loans.

9          And at that time, Your Honor, the chart didn't

10  provide that information for the Ambac trust.  It contained

11  the information for all the other securitization trusts, but

12  not for Ambac.  And so Ambac objected again, Your Honor, and I

13  read this, because once again it's exactly on the issue we're

14  talking about now.

15

16          "In order for Ambac to make an informed judgment as

17           to whether to accept the securitization trust

18           settlement, the debtor should be required to

19           disclose the face amount of defaulted loans

20           pertaining to the Ambac trust purchased by the

21           debtors both prior to and after the petition date.

22           Without such information it is difficult, if not

23           impossible, for Ambac to make an informed decision

24           as to whether to accept the proposed settlement."

25          And I quote, Your Honor,

1            "As it has no assurance that Ambac and the plan

2            proponents are contemplating the same or similar

3            amounts with respect to such defaulted loans."

4        So there we are, Your Honor, we're asking what are

5   we doing?

6        And I would note, Your Honor, from their response on

7   page 7, we've now learned that prior to February 6, that TERI

8   was aware that some of the defaulted loans purchased by the

9   debtor from the securitization trusts were purchased with

10  funds not from the securitization trusts.  They say that on

11  page 7, they're aware of it.  That was prior to February 6,

12  but there they are on February 25th negotiating to resolve the

13  Ambac objection.

14       And what did they do, Your Honor?  They updated the

15  defaulted loan chart to set forth the pre-petition defaulted

16  loans purchased from the debtor, by the debtor, from the

17  securitization trusts, and the Ambac trust, and such numbers

18  included all the defaulted loans purchased from the

19  securitization trusts by the debtor pre-petition.  All of

20  them.  All of them.  There wasn't any break-out, there wasn't

21  any contingency.  And they don't dispute that fact, Your

22  Honor, that the chart sets forth all the pre-petition

23  defaulted loans.

24       So, Your Honor, not only did Ambac rely on the clear

25  language of Section 6.2(c)(vi) that "all" means "all."  They

Case 08-12540-LT Doc 1129 Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg 41 of 122
Case 08-12540-LT Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main Document Page 41 of 122

Page 39

1  also relied upon their negotiations and the chart that sets

2  forth the exact dollar amount of the pre-petition defaulted

3  loans that were purchased from the master trust and the Ambac

4  trust, pre-petition.

5         And Your Honor, this is the only place in the

6  disclosure statement that breaks down individually how much

7  was purchased from each individual securitization trust.  So

8  of course they relied on it.

9         THE COURT:  So let's assume that everyone was

10 absolutely clear and that the plan proponents came back and

11 said, "All right, we'd like to clear this up because we

12 certainly don't want you to be confused in any way; we are

13 talking only about the loans that were purchased from the

14 pledged accounts."

15        So what is your -- what is Ambac's next move?

16        MR. KAPP:  As of today?

17        THE COURT:  As of then.

18        MR. KAPP:  Well, Your Honor, at that point

19 presumably we were still negotiating the plan.  I --

20        THE COURT:  So Ambac would have said, "We're not

21 gonna go along with that"?

22        MR. KAPP:  Those -- Your Honor, there's a lot to be

23 made that we're a financial institution and therefore

24 sophisticated.  But we believed what we thought we believed.

25 And that -- this interpretation --

1          THE COURT:  Well, I'm not suggesting bad faith on

2   anybody's part, nor am I suggesting that this is a problem

3   other than a failure to -- of minds to meet.

4          All I'm saying is, let's assume that this problem

5   had been completely identified with the same clarity which is

6   being sought today, and they said to Ambac, "Oh, no, no, you

7   thought we were talking about the loans that were purchased

8   out of the operating account?  No, no, no.  Just the ones out

9   of the pledged accounts."  So Ambac would have done what?

10         MR. KAPP:  I think Ambac would have done what Ambac

11  had done previously, which was negotiate with the plan

12  proponents, as that understanding was different than ours,

13  would change our valuation of the entire negotiated

14  settlement, which it does, and therefore we would have gone

15  back and readdressed the entire settlement.

16         THE COURT:  And if they had said to you, "You know,

17  we're going to stay with what we've got,"  and they had filed

18  a plan in the fashion and with the clarity that they've done

19  it now, does -- did Ambac have any leverage other than to

20  refuse to accept the plan?

21         MR. KAPP:  Your Honor, my answer probably is going

22  to be inadequate because I haven't completely thought through

23  it.  I would say that, and we set forth in our objection, that

24  they put forth in their pleadings a lot of different places

25  where there was value to having Ambac go along with them.  And

1   if Ambac did not go along, as I stated, Ambac has interests in

2   13 of the securitization trusts.

3        If 13 securitization trusts -- and I'm no way

4   suggesting that that would have happened, we never had to vote

5   on it because we thought we had a deal.  If 13 securitization

6   trusts opt out of this plan, I don't know how this plan is

7   workable.  I don't know how it's workable.  I don't believe

8   that there's enough money to sustain this, and I don't -- to

9   fight the fight that needs to be fought for as long as it will

10  take.  I'm not sure, I don't believe their statements that

11  that's no big deal.

12       Maybe one, but Your Honor, a couple?  Particularly

13  when they're all on board now; I don't know.  I think they

14  have shown they negotiated for a long period of time with

15  Ambac to get Ambac back on board and they were.  I don't

16  believe that they would have just willy-nilly flushed Ambac

17  down the toilet.

18            THE COURT:  So, so you say that it would have been--

19            MR. KAPP:  Well, maybe they would, I don't know.

20            THE COURT:  All right.

21            MR. KAPP:  And then we'd be where we are.  But I

22  think what would have happened is we would have continued as

23  we had done, and I thought we actually had a pretty good line

24  of communication up until we didn't, but I think we would have

25  gone back and readdressed that.  And I don't know where it

1   would have gone, but I'm pretty sure that's what would have

2   happened.

3         But instead, Your Honor, we thought we had a deal,

4   and we moved forward.

5         Your Honor, as I said, I bring that up because I

6   think that background's helpful when discussing the actual

7   legal arguments.  And if I can, I'd like to briefly run

8   through them and try my best, in my weakened condition, Your

9   Honor, to convince you about 1127(b), another shameful plug,

10  but here I go.

11        The standards of 1120(c) of the Bankruptcy Code we

12  believe should be applied to the motion.  Although 1127(b)

13  doesn't define when confirmation occurs, it doesn't have to,

14  Your Honor, because that's taken care of by 1129.

15        And Ambac in its objection cites a litany of cases,

16  Your Honor, for the proposition that the requirements of 11 --

17  if the Court finds that the requirements of 1129 have been

18  met, it must confirm.

19        The plan proponents don't dispute any of these

20  cases.  They don't bring it up in their response.  And it is

21  also undisputed, Your Honor, by all the parties, that this

22  Court at the confirmation hearing on April 28th, 2010, found

23  that the requirements of 1129 had been satisfied.

24        Now, Your Honor, therefore Ambac believes, after the

25  Court made this finding, the plan either confirmed, which we

Case 18-90065-LT  Filed 07/08/20  Entered 07/08/20 23:33:24  Doc 68-3  Pg. 45 of 122
Case 08-12540  Doc 1129  Filed 07/20/10  Entered 07/20/10 12:31:32  Desc Main
Document   Page 45 of 122

**Page 43**

1 actually don't think happened, but what we do think happened

2 is the Court is required to confirm that plan.

3       The procedural -- we understand that an order is

4 needed, but, Your Honor, that could be a one-word page that

5 says "confirmed," and it's done.  And the concept that that is

6 what is holding up confirmation, when all the requirements

7 have been found under 1129, we could find no case law for it,

8 neither could they.

9       And, Your Honor, that just doesn't jive with the

10 case law that interprets Congress's intent behind 1127(b).

11 And we cite a fair amount of cases with respect to that, Your

12 Honor, including **Antiquities**  which says, and I quote,

13           "Congress drafted Section 1127(b) to safeguard the

14           finality of plan confirmation.  If Congress had not

15           so drafted Section 1127(b), a proponent of a plan

16           could file an endless series of motions to modify

17           the plan, seriously jeopardizing the incentive for

18           creditors to vote in favor of the plan."

19       We also, another case we cite, Your Honor, is **Rickel**

20 **Association** which quote,

21           "Section 1127(b) reinforces the principle of

22           finality by preserving the rights bought and paid

23           for under a plan of reorganization."

24       And as previously described, Your Honor, this has

25 been negotiated and negotiated.  We thought we had a deal.  We

1 *do* think that's relevant, despite Mr. Sternklar's comments,

2 precisely for 1127(b) and what I read here.  And we have voted

3 on the basis of such negotiations.

4       And, Your Honor, we also note at some point it has

5 to stop.  They filed a plan, they amended the plan four times.

6 That plan had a confirmation hearing.  We found all the

7 requirements of 1129 were met.  They then modified the plan on

8 June 9th.  They modified the plan again on July 9th to undo

9 some of the changes they made on June 9th.  I mean, enough,

10 Your Honor.  It's time -- it's time to go forward.  And at

11 least if they're going to change the plan, they need to do it

12 by conforming with the heightened standards of 1127(b), to

13 protect the rights that were bought and paid for pursuant to

14 negotiations.

15       No one's disputing that occurred, Your Honor, and

16 the case law speaks directly to it, and to protect those

17 rights.  And they don't dispute in any way those cases.  And

18 there's no case laws that they cite that somehow throws the

19 cases I just read to you -- tries to distinguish that or is

20 contradictory to those cases.

21       And, Your Honor, if that's the case, if 1127(b)

22 applies, then we argue that they don't satisfy the standards

23 of 1127(b).  Under 1127(b), it is the plan proponents' burden

24 to demonstrate that circumstances warrant a modification to

25 the plan.

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 47 of
122

1    The cases are very clear, Your Honor, this is a very

2 hard standard to meet.  Indeed, as we cite the **Modern Steel**

3 case, that case held that an inability to fund the plan does

4 not justify modifications.

5    And even where the Court did find that in a workable

6 plan constituted a circumstance warranting modification, such

7 Courts first determine that the plan was unworkable through no

8 fault of the plan proponents.

9    And Your Honor, that touches the **Dunalot Dairy**

10 (phonetic -- Dunavant & Son Dairy?) case which both us and the

11 plan proponents cite.

12    Also Courts have refused to modify the plan where it

13 would impact the legitimate expectations of creditors.  The

14 plan proponents acknowledge this point in their response.

15 They also cite to **Envirodyne** as we do.  We also cite to **Best**

16 **Products** for that proposition.

17    Your Honor, the plan is workable here.  As the plan

18 proponents' counsel and advisors advised this Court on April

19 28th, the plan is essentially a pot plan.  Whatever's left

20 goes to unsecureds.  If the plan proponents are seriously

21 going to contest the plan isn't feasible, we think there

22 should be an evidentiary hearing to somehow demonstrate how

23 the plan is not a pot plan and how their comments made on

24 April 28th are somehow different.  They'd have to explain this

25 because it's directly contrary to the comments they made on

Case 18-90065-LT  Filed 07/08/20  Entered 07/08/20 23:33:24  Doc 68-3  Pg. 48 of
122
Case 08-12540  Doc 1129  Filed 07/20/10  Entered 07/26/10 12:31:32  Desc Main
Document    Page 48 of 122

Page 46

1  the 28th.

2          The plan proponents' response -- excuse me, Your

3  Honor.

4          Moreover, if the plan is currently unworkable, it

5  certainly hasn't been demonstrated that it is unworkable

6  through no fault of the plan proponents.  Indeed, Your Honor,

7  as they self acknowledge, they knew of this issue prior to

8  February 6th.  They negotiated clear language that runs

9  contrary to that understanding.  And it's quite clear that all

10 defaulted loans go to the securitization trusts.

11         So, Your Honor, that would have to be demonstrated

12 as well.

13         For their part, Your Honor, the plan proponents try

14 to suggest that 1127(b) is an easier standard, and that

15 modification is allowed in a multitude of contexts.  They say

16 that in paragraph 47 of their motion.

17         As we set forth in our objection however, Your

18 Honor, most of their cases deal with 1127(a), not 1127(b), and

19 so are not applicable.  They do cite to a **Beal Bank** case which

20 does refer to 1127, but it's not a 1127 case, Your Honor.

21 There the Court modified the plan itself, not pursuant to

22 1127, but through its own inherent powers.  And all they did

23 was not change treatment, they just extended a payment

24 deadline.

25         Now you've heard today, Your Honor, and they argue

```
 1    in their response, the plan proponents now try to lessen the

 2    standards of 1127(b) by merging the two standards in 1127(b),

 3    substantial consummation, and the plan -- circumstances must

 4    warrant.  They basically argue that if a plan hasn't

 5    substantially consummated, then circumstances warrant a change

 6    in the plan.

 7            They also argue in their response, Your Honor, that

 8    the creditors' expectations can't be upset if the plan hasn't

 9    substantially consummated.  They cite to no case law for that

10    proposition, Your Honor.

11            And, Your Honor, if I just may, there's no case law

12    to support this.  There's two separate requirements under

13    1127(b).  A plan may be only modified only if circumstances

14    warrant modification, but before substantial consummation.  As

15    Collier's says, and they quote Collier's,

16            "Substantial confirmation refers to whether a plan

17            is modifiable at all, while circumstances warrant

18            relates to whether a modifiable plan can be modified

19            under the facts."

20            Your Honor, we cite to four -- many cases, but four

21    in particular:  Price, Modern Steel, Mini Storage, and

22    Dunavant.  All evaluated whether the circumstances warrant

23    modification separate and apart from the question of

24    substantial consummation.  It's separate, Your Honor.  And

25    they just don't meet the standard.
```

1          And finally, with respect to 1127(d), Your Honor,

2    all they argue is that circumstances warrant so that they can

3    -- they can clean up ambiguity in the plan.  They cite to no

4    case law where this was sufficient.  We were unable to find

5    any case law where a Court, just to clarify the clear language

6    of a plan, allowed an 1127(b) modification.

7          And indeed, Your Honor, the result flies in the face

8    of two well-established strings of case law.  One, the concept

9    that ambiguous terms are construed against the drafting party.

10   We don't think there are any ambiguous terms in the plan, Your

11   Honor, but if they are, they need to be construed against the

12   plan -- against the plan proponents.

13         Particularly, Your Honor, when the plan, as Section

14   1416, which says if there's any ambiguity between the plan and

15   the disclosure statement, the plan governs.  They cited to no

16   conflicting language in the plan.  They mere -- they cite to

17   no actual language in the disclosure statement.  But they say,

18   "Well, if you look at chart on this page, one number, and

19   compare it to the chart on that page on another number, then

20   you should realize they're inconsistent, and therefore what it

21   says on this chart on the third page shouldn't apply."  That's

22   basically what they argue, Your Honor.

23         But even if it is ambiguous, the plan Section 1416

24   says you don't pay attention to it if the languages in the

25   plan are clear.  They are clear, Your Honor.

1          And second, once again, Your Honor, 1127(b) is

2   clearly designed to protect the terms of the negotiated plan

3   once it is confirmed.  Congress understood, Your Honor, that a

4   plan can always be revised, a deal can always be re-cut, but

5   for 1127(b) Congress provided that once a deal was confirmed,

6   it can't be modified unless there is a distinct change in

7   circumstances.

8          There's no such change in circumstances here, Your

9   Honor.  They've never even tried to demonstrate it.  And

10  therefore, we would argue circumstances do not warrant

11  modification under 1127(b), and the motion should be denied.

12         Now in the alternative, Your Honor, deep breath, if

13  the Court determines that it is appropriate to modify the

14  plan, then unfortunately we believe the entire process must be

15  restarted.  Indeed, Your Honor, the case law is very clear

16  here.  That where a creditor class is adversely harmed, a new

17  disclosure is required, new solicitation is required, and

18  impaired classes should vote, and the new plan itself must

19  satisfy all the conditions of 1129.

20         The plan proponents acknowledge that three of the

21  securitization trusts are adversely impacted here, including

22  the master trust.

23         Your Honor, as I said, the modified plan would

24  decrease what the master trust receives face value of

25  defaulted loans by over 25 per cent.  We say "Ouch, Your

1    Honor, that's an adverse change."

2          And Ambac would argue also, Your Honor, that all the

3    securitization trusts are adversely harmed with respect to the

4    recoveries, Your Honor, the 6.2 million dollar issue.  The

5    securitization trusts are, under this modified plan, are

6    giving up the right to a hundred per cent of cash in exchange

7    for an unsecured claim of a mystery distribution, and we would

8    argue, Your Honor, that that is an adverse impact as well.

9          But the point, Your Honor, is, as long as there is

10   one class that is materially adversely harmed -- and here they

11   acknowledge there are three -- then you have to start over.

12   In particular, Your Honor, you must provide new disclosure.

13   Ambac in part cites to **Concrete Designers** and **Downtown**

14   **Investment Club**.  And in fact, Your Honor, **Downtown Investment**

15   **Club** specifically rejected what the plan proponents are

16   requesting here, is that their 1127 motion to modify the plan

17   suffice as a disclosure.  That was denied.

18          The plan proponents do not cite to any case

19   whatsoever, Your Honor, where an adverse change occurred and

20   new disclosure was not required.  You'll be the first if you

21   grant that motion.  In all their cases, there was no adverse

22   change.  The change was insignificant.  **Solar King**,

23   insignificant.  **Temple Zion**, in fact the creditor impacted

24   there was being paid in full.  You'll be the first, Your

25   Honor.

Case 18-90065-LT Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg. 53 of
122
Case 08-12540 Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main
Document Page 53 of 122

Page 51

```
 1              Indeed --

 2              THE COURT:  And that won't be the first time.

 3              MR. KAPP:  That won't be the first time?

 4              THE COURT:  That I was the first.

 5              MR. KAPP:  Well, you know, someone's got to go

 6  first, Your Honor.

 7              And, Your Honor, the plan proponents now argue, they

 8  don't dispute those cases, they now argue that additional

 9  disclosure is not necessary where the affected creditors have

10  been active in the case and are aware of the changes.  Both

11  Mr. Glosband and Mr. Sternklar made that point.

12              They cite to two cases for that proposition,

13  **Sherwood** and **Temple Zion**.  But again, Your Honor, both of

14  those cases deal with an insignificant, immaterial change.

15  They cite as much with respect to **Sherwood**, and **Temple Zion** as

16  I stated, Your Honor, the impacted party was being paid a

17  hundred per cent in full.

18              Once again, there are no cases where additional

19  disclosure was not required where a creditor was adversely

20  impacted.

21              And, Your Honor, disclosure is necessary.  The

22  disclosure statement was primarily prepared last winter and

23  January of this year.  It contemplated that the plan would be

24  confirmed by June 30.  Well, here we sit, Your Honor, in the

25  middle of July, and we're not confirmed.  Facts have changed
```

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 54 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 54 of 122

Page 52

1    and need to be updated.  Particularly, Your Honor, what about

2    the cash?  You know, I wanted my cute little quote.  I'm

3    basically, from Jerry McGuire, you know, "show me the money,"

4    Your Honor.  But we need to know what's going on with the

5    cash.

6            The disclosure statement contemplated that a

7    recovery of unsecureds between 40 and 60 per cent, and that at

8    least 36 million would be on hand at the effective date.

9    We're six to seven months later, Your Honor.  How is that

10   projection looking?  How much cash is still on hand?  How much

11   does the company have?  We need information, Your Honor.

12           The plan proponents' professionals have not filed

13   any fee applications in this case since last year.  Monthly

14   operating reports are not publicly available on the docket.

15   All creditors, Your Honor, are entitled to know how much has

16   been spent to date so they can reasonably assess whether to

17   believe the plan proponents' projections now, today, as we sit

18   in July, as to what recovery they will receive, Your Honor.

19   We're no longer in -- there won't be a plan effected by June.

20   We're not in last winter.  It's a new -- we've moved on, we

21   need to update the disclosure.

22           And, Your Honor, that is relevant.  We do want to

23   know what the recovery is.  We have no idea how much cash is

24   still on hand.  And as it is a pot plan, we realize that, all

25   right, it may be less than 40 per cent, but we should know.

1 We should reset it.  The information is stale and it's old.

2 And they don't dispute that.  They just don't want to tell

3 you.  But we want to know.  And we believe we're entitled to

4 know, Your Honor.  And we believe we're entitled to know under

5 1125.

6       Likewise, Your Honor, the **Proveaux** case makes clear

7 that if a material adverse change occurs, all impaired classes

8 should be re-solicited and have an opportunity to re-vote.

9 The only cases the plan proponents cite to, once again, Your

10 Honor, they only concern whether the proposed change is

11 immaterial.

12       So after a new disclosure statement and a hearing,

13 the plan must be solicited, and the impaired classes must have

14 a right to vote.

15       And, Your Honor, just with respect to that, as I

16 stated, Ambac has been trying to get out of this case for over

17 a year.  It really doesn't want to delay confirmation any more

18 than we have to.  We would love to get our hands on the

19 pledged accounts that the securitization trust settlement

20 provides.  However, Your Honor, and we would love not to have

21 to go through the cost of going through this again.  But there

22 are consequences to the actions.  And if the plan proponents

23 seek to modify, then they have to restart the disclosure

24 solicitation and confirmation process because here, classes

25 are adversely harmed.  And they cite to no case law to the

Case 08-12540    Doc 1129    Filed 07/20/10    Entered 07/20/10 12:31:32    Desc Main
Document    Page 56 of 122

1    contrary.

2         Finally, Your Honor, objections to the confirmation

3    of the modified plan can't be limited in scope as the plan

4    proponents suggest.  We cite *Temple Zion* and *Dean Hardwoods*

5    for that proposition.  The modified plan must satisfy 1129 on

6    its own merits, Your Honor.  The Court is of course free to do

7    what it wants to with those objections, but objections can't

8    be based on an old finding with respect to an old plan.  The

9    new plan must be held to the standards of 1129.  They cite to

10   no relevant cases in support of that contention, Your Honor.

11   They cite to three cases.  Two of them aren't even 1127 cases,

12   Your Honor.

13        The third case is *Attila Golf* (phonetic) which one

14   again, although it mentions 1127, it certainly doesn't stand

15   for the proposition that you can hold an impaired creditor to

16   old findings with respect to confirmation of a new plan.  All

17   it did, Your Honor, was in *Attila Golf*, the debtors' plan

18   wasn't confirmed.  A competing plan was confirmed.  The debtor

19   refused to comply and do actions under that plan, and instead

20   it filed an 1127 motion to amend the plan.  ]

21        The Court said, "Well, wait a minute, we're in a

22   gray area, 1127 was never meant to be a legislative tool," and

23   therefore they didn't quite know what to do.  They did allow

24   the 1127 motion to go forward, and at the same time they

25   compelled the debtor to act, and they noted that because they

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 57 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 57 of 122

Page 55

1  compelled the debtor to perform under the plan, their 1127(b)

2  motion would be substantially mooted.

3       But none of that stands for the proposition that the

4  plan proponents cite for in their brief, that somehow we

5  should be bound to prior findings, Your Honor.  And there is

6  no case law that says that.

7       So finally, Your Honor, in addition, we do believe

8  additional disclosure is needed.  Such info is set forth in

9  detail in our objection.  And we would ask, Your Honor, that

10  such disclosure be required, and that if it's not addressed,

11  that Ambac have a right to object in an 1125 hearing to such

12  disclosures.

13       The information set forth in four general

14  categories, Your Honor:  One is cash.  Two is maintenance of

15  the pre-petition defaulted loans if the securitization trusts

16  opt out.  Your Honor provides -- we argue that we have a

17  security interest.  They have obligations to assure and to

18  protect that security until we figure it out.  The plan

19  currently provides that the defaulted loans will perhaps be

20  maintained for 90 days, but nothing after that point.

21       We would like some disclosure to be assured that our

22  pre-petition defaulted loans are protected if a securitization

23  trust does opt out.  We think that's only reasonable.

24       And, Your Honor, given another category, given all

25  of the hoopla over who's getting what on the pre-petition

1  defaulted loans, we do think that chart in the disclosure

2  statement to avoid all doubt should be updated to set forth

3  and separate for every single securitization trust who's

4  getting what.  It's in bits and pieces in the motion.  It's

5  not set forth in one place.  Given all the confusion that

6  we've had in the last year and a half, we don't think it's

7  unreasonable or a waste of time to put it in one place so

8  everyone's on the same page.

9          And finally, Your Honor, there are several

10 unsupported contentions in their motion.  They state just off

11 the hand with no back-up that the unsecured claims aren't

12 impacted, maybe they're diluted by 1.1 per cent.  There's no

13 affidavit from their financial advisor, there's no underlying

14 support.  We don't think that's unreasonable.  We think it

15 should be required.

16         Similar, they talk about the pre-petition defaulted

17 loans that were purchased using another source other than

18 securitization funds.  It's very general, Your Honor.  We do

19 believe more detail to the extent that some can be provided,

20 we're happy to work with the plan proponents but we do believe

21 that some disclosure is needed for those areas.  And we don't

22 believe as Mr. Sternklar said that it's unduly burdensome.

23         And then finally, Your Honor, although ignored by

24 the plan proponents, we do have three problems with the

25 proposed order, and I do want to set them forth and I don't

1    want them to be ignored.

2         One, Your Honor, we believe that the requirement

3    that in order to change your vote, you have to have a copy of

4    your previous ballot is unduly burdensome.  That wasn't

5    required in the original procedures.  It shouldn't be required

6    now.  Moreover we note there's been lots -- there has been

7    trading on these bonds.  If you bought after the first go-

8    around, you wouldn't even have access to that ballot, the

9    original ballot.  So we believe that requirement should be

10   deleted.

11        We also note, Your Honor, that the proposed order in

12   paragraph 90 sets forth what, in order to change your vote,

13   the steps you have to meet.  If you meet those steps, Your

14   Honor, that should be enough.  The plan proponents contain the

15   right in their sole discretion to determine, in paragraph 6(c)

16   that even if you meet all those requirements in 9(d) somehow

17   your ballot can be ambiguous.  We think, Your Honor, at most,

18   at least that's duplicate and at most once again it's unduly

19   burdensome.  If you meet all the requirements of 9(d), there

20   shouldn't be any doubt as to whether you want to change your

21   vote or not.

22        And finally, Your Honor, paragraph 10 of the order.

23   We're not even sure what it means, but it seems to change the

24   contractual relationship between the Indenture Trustee and

25   Ambac under its indentures.  And we would seek that that is

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 60 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 60 of 122

Page 58

1    inappropriate and we would ask that that provision be deleted

2    too, Your Honor.

3          So thank you for your indulgence, Your Honor.  Just

4    to recap, we would request that the motion be denied, as it

5    does not -- circumstances do not warrant it under 1127(b).  If

6    this Court determines that the motion should go forward, we

7    would argue because there has been an adverse change, we have

8    to restart the process, new disclosure, a disclosure statement

9    hearing, solicitation with the right for all impaired

10   creditors to re-vote, and you can't be bound, Your Honor, by

11   prior -- by prior findings.  Objections against the new plan

12   should be able to be heard and shouldn't be limited in scope.

13         We also ask for a finding that the securitization

14   trusts are adversely harmed.  At least, Your Honor, the Ambac

15   trusts, and we would ask that the confirmation order be -- I'm

16   sorry, that the proposed order be revised as we request, and

17   we'd ask for the disclosure as we set forth.  Thank you, Your

18   Honor.

19         THE COURT:  I'm trying to figure out whether to take

20   a break now or a little bit later.  How many other counsel

21   expect to make remarks?

22         Okay.  So we'll take a five-minute break.

23              [Off the record at 2:39:29 p.m.]

24                  * * * * * * * *

25              [On the record at 2:47:34 p.m.]

```
 1              MR. REYNOLDS:   All rise.

 2              THE COURT:   Please be seated.    Go ahead.

 3              MR. PEDONE:   Good afternoon, Your Honor.  Richard

 4    Pedone on behalf of U.S. Bank as Indenture Trustee.  U. S.

 5    Bank is the Indenture Trustee for the series of

 6    securitization trusts identified in our objection.

 7              The Indenture Trustee's position that the order --

 8    that en order confirming the plan that this Court conducted a

 9    trial on should enter and bring the case to a resolution.

10    That plan as a pot plan is, in fact, confirmable.  You've

11    heard evidence concerning its feasibility, and that is --

12              THE COURT:   Your -- your brother says that if I

13    confirm the plan, then it must fail because he says that

14    1129(a)(11) can't be met because they're out of cash and that

15    -- and he bases that on what Mr. Glosband said.

16              MR. PEDONE:   Well, Your Honor, if we go back to

17    the testimony at that trial there were several pots of cash

18    for TERI to continue going forward as an operating concern.

19    There's a big pot of millions of dollars of charitable money

20    that would allow TERI to continue forward with it's

21    charitable mission.  Maybe it can't continue to pay the same

22    salaries to executives and do everything they would like in

23    support of their charitable mission, but there's testimony

24    that --

25              THE COURT:   Then on the date of -- well, but I
```

```
 1  took -- I, I, I apologize for interrupting you.

 2          MR. PEDONE:   That's okay.

 3          THE COURT:   I, I took testimony --

 4          MR. PEDONE:   Yes.

 5          THE COURT:   -- and the testimony was based on both

 6  the charitable admission and the fact that, if I'm

 7  remembering this correctly, that before TERI ended up in a

 8  situation in which it was going to be very, very badly hard

 9  pressed for cash, it was going to advertise itself as a

10  superior student loan collection group.

11          So are you -- are you saying that -- that I've got

12  enough testimony to lead me to believe that TERI can function

13  as a -- as a charitable -- charitable organization only?

14          MR. PEDONE:   I believe you can, Your Honor, and

15  we're in the realm, if you look at that transcript, we're in

16  the realm of a charity, and -- and what makes a charity

17  feasible, when we're talking about a few million dollars,

18  whether it's three or six or whatever our number is, it will

19  be left behind for the charity versus distributing millions

20  and millions, tens of millions, perhaps even over hundreds of

21  millions, if you consider the pledge accounts, to the secured

22  creditors.

23          The entire combination is what this plan is about.

24  It's distributing the assets and what makes it feasible.

25  Achieving a particular level of dream that the Board may have
```

1    for the level of charitable function for this charity in --

2    in good deeds, the Court can't look at their view of what

3    they want as what makes the charity going forward feasible.

4    If you look at what I believe you said you should look at,

5    which is, will the debtor at the hearing, will the debtor

6    return to the Court, and -- and I submit that there's

7    evidence in the record that, with its charitable funds to

8    perform a mission, TERI would not need to return to this

9    Court, and --

10           THE COURT:   But haven't I, if -- if you're going

11   to take the position that the words that I used are

12   themselves somehow deemed to be confirmation, and didn't

13   those words also include my reliance on other functions that

14   TERI was going to be able to perform in order to assure the

15   fact that 1129(a)(11) was going to be met?  So how do I --

16   how do I now cut that one out?

17           MR. PEDONE:   Yeah.  I guess, Your Honor, where I

18   would start is, I would take the black and white language of

19   the plan that you had before you, and if you read it where

20   things were going, it was crystal clear.  And I would say you

21   could even take the chart and the disclosure statement that

22   makes it clear where the defaulted loans go to my client, a

23   chart I -- not my clients, but go to the trust of which my

24   client is the Indenture Trustee that they issued.

25           If you look at that chart, it's clear where the

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 64 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 64 of 122

Page 62

1   money goes.  If you look at the -- this -- the plan, which is

2   really a contract that the creditors voted on and it's a

3   settlement the creditors voted on, it's clear what happens

4   here, and that's what you confirmed, was that plan, and

5   they're back here now trying to change that.  And on the

6   continuum of steps towards entry of the confirmation order,

7   which is a ministerial act, I would submit that all that

8   remains here is that ministerial act.

9        THE COURT:   Yeah, I wish it was a ministerial act,

10  but what's usually given to me is a, in cases of this size,

11  is a 40 to 50-page document that I then have to ask you send

12  to me in Word form so that I can take out those provisions

13  that I don't like, and -- and sometimes I've had to have

14  hearings with respect to particular provisions.  It doesn't

15  feel ministerial to me.

16       MR. PEDONE:   I -- I appreciate that and I'll

17  concede that it was dozens of pages that were circulated and,

18  or more than a dozen pages where the form of order circulated

19  among the parties; but I think you have a black and white

20  plan before you that if you entered confirmed could be

21  enforced to achieve what was at least the intention on this

22  side of the room, what their intentions were, they -- they've

23  stated them, and I'll accept that that's what their

24  intentions were for this hearing.

25            So that's our position with the Indenture Trustee

1   request.  I realize that's not the direction the Court may be

2   leaning at the moment, but we do believe it could occur and

3   it is, in fact, a ministerial act because you've held the

4   confirmation hearing, you made the finding, and had you

5   written "confirmed" on the docket, we would have everything

6   we need for the case to be truly complete.  Perhaps not.  I

7   believe it would actually end up consummated, as that term

8   would be used, because it is primarily a pot plan with

9   distribution.

10          What I want to emphasize, Your Honor, after having

11  made that point is that this plan was settlement.  This plan

12  had provisions in it to settle a very, very -- a pair of very

13  complex disputes.  When you read the plan memorandum the

14  debtor's discussed submitted for the plan, the debtor's

15  discussed that the settlements form the foundation of the

16  plan.

17          Ms. Bizar's affidavit stated the same thing.  Mr.

18  Peko's affidavit goes on for pages about the settlement.  Mr.

19  Renzi's affidavit goes on for pages about the settlement.

20  You heard today that the debtor and the Committee described

21  the settlement.  You also heard from the debtor and the

22  Committee that the plan was an offer put out to the creditors

23  for acceptance.

24          And then what you've heard and what you've seen is

25  that a new settlement is being put out with no provision for

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 66 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 66 of 122

Page 64

1    acceptance of that new settlement by the parties.  What they

2    say is certain people can change their vote, but that isn't

3    actually going to result in an acceptance of the settlement.

4    It will end the litigation in this case.  So that we need to

5    step back and remind ourselves that the two important pieces

6    that we're actually settling.

7              First, there's the decoder in this case.  If you

8    recall the securitization trust and a lot of other creditors

9    had guarantee claims against TERI totaling billions and

10   billions of dollars that I would submit run up in terms of

11   complexity for calculating might compare with the most

12   complex asbestos cases, or -- or other complex cases.

13   Because to determine what the guarantee claim would be in

14   virtually all parties, I think all parties filing these

15   claims filed claims for the full amount of the outstanding

16   loans that they might someday call upon TERI to guarantee.

17   Well, those needed to be present valued and for the Court to

18   decide on a trust-by-trust basis, you actually have to look

19   at the loans and say, "Well, when were the loans made?  How

20   much is outstanding?  What's the payment history?  Who made

21   those loans?"  And to figure out on a deal-by-deal basis what

22   the actual claim should be for distribution purposes.  You

23   either need to hold a trial and estimate them, or you need a

24   compromise to settle them.

25              And the decoder that you've heard a lot about was

Case 18-90065-LT Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg. 67 of
122
Case 08-12540 Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main
Document Page 67 of 122

Page 65

1  rough justice that the parties had a lot of discussions about

2  that TERI and the Committee went back and forth on, FMDS

3  weighed in on it, the Indenture Trustee watched the process,

4  and out of it came a method for determining claims, and other

5  unsecured creditors participated.  Out of it came a decoder

6  that achieved a rough justice for taking billions of dollars

7  of claims, estimating them, arriving at claim numbers that

8  could be used to divide up the relatively small money that

9  TERI has -- TERI has available for distribution.

10        In the absence of a compromise accepted by

11  creditors, you're left with litigation that could take days

12  and days, if not weeks and weeks or months, and an extremely

13  high cost to resolve.

14        So what I most emphatically want to emphasize is

15  the procedure and process that comes out of this hearing has

16  to be a method for affirmative acceptance of the settlement

17  and the plan.  Perhaps 1127 allows the -- a plan to be

18  amended and sent back only to people the Court determines are

19  adversely affected, but I would say if you want an settlement

20  that would be enforceable, you actually have to go through a

21  re-solicitation process and that TERI and the Committee

22  should want the holders, and certainly the subsequent plan

23  Trustee should want the holders who can then direct each

24  trust to accept the settlement, or reject the settlement.

25  And if you get an accepted settlement and a process that

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 68 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 68 of 122

Page 66

1   works under each trust Indenture documents and of the

2   governing documents, which we believe the plan procedures --

3   solicitation procedures did, then you can bring finality to

4   the case.

5          Otherwise, if you don't have procedures for

6   settlement that work and acceptance of the settlement that

7   get built into this plan, we'll be left with litigation.  And

8   I think it's undisputable that if enough trusts do not accept

9   the plan, we won't have a confirmed plan.  We'll be back here

10  with the debtors saying that they can't afford ongoing

11  litigation, or the debtor -- Committee saying they can't

12  afford ongoing litigation, because this -- this case and the

13  consensual resolution and the reason that everybody voted for

14  it was that it was a settlement in principal, a settlement

15  that required some complex procedures to get acceptance by

16  the trust.

17         But you know what?  We got there.  And it could

18  happen again.  In the short-cut rough justice, it's

19  complicated, even with the concession that it go out to all

20  trusts, it can't do it in 30 days to get them all back and

21  have voting by August.  The Indenture Trustee would like

22  procedures substantially similar to those used for initial

23  voting be used again.

24         The other piece of the settlement here is the

25  settlement of the perfection litigation, and I believe the

Case 18-90065-LT  Filed 07/08/20  Entered 07/08/20 23:33:24  Doc 68-3  Pg. 69 of 122
Case 08-12540  Doc 1129  Filed 07/20/10  Entered 07/20/10 12:31:32  Desc Main
Document    Page 69 of 122

Page 67

1  pleadings that this Court has heard and the motion to dismiss

2  on that speak clearly that that in itself is complicated and

3  results in a complicated resolution.  I'd submit it's so

4  complicated that the plan drafters couldn't get it right the

5  first time that they drafted the plan to reflect their

6  intentions.  And that settlement of the perfection also needs

7  to be blessed by those who could be on the other side

8  settling, which is each trust.

9       Your Honor, Mr. Kapp described for Ambac the

10  reasons that the various pieces of the modifications are, in

11  fact, adverse to each trust, and I would like to echo that.

12  But what I'd like to emphasize is, they're adverse because

13  they changed the settlement.  They impact the timing of when

14  the cash may flow out on the pledge accounts, but they also

15  result in taking cash from each securitization trust and

16  substituting cash paid on the effective date, according to

17  the black letter terms of the plan, and replacing it with a

18  payment stream from a certain amount of defaulted loans based

19  upon an estimation that the plan proponents have come up

20  with.  Swapping cash for an uncertain payment stream is an

21  adverse change and that alone, it dictates that this is

22  effectively a new plan and a new settlement that needs to be

23  voted on by each securitization trust.

24       Your Honor, with regard to the procedures, I'd also

25  submit that the debtors recognize the complexity of obtaining

1  approval of the settlement and the plan from each

2  securitization trust when they filed their initial plan

3  solicitation procedures and motion for approval of the

4  disclosure statement.  They laid out in there the complexity.

5  They articulated the complexity of the confirmation hearing.

6  In connection with approval of the disclosure statement and

7  the plan solicitation procedure, this Court then entered an

8  order, an order directing that certain procedures be used.

9        I would argue that the debtors and the Committee

10  should be judicially estopped from now attempting to utilize

11  *different* procedures in connection with either this plan or

12  any subsequent plan, and that what should happen as a

13  practical matter if the Court is not inclined to confirm the

14  plan is they should be directed to sit down with the parties

15  in interest, take the old procedures, and adopt them to these

16  circumstances to provide sufficient due process.  And this

17  is, in effect, a -- a due process issue, Your Honor, not just

18  a judicial estoppel or practical issue.

19        TERI contracted with securitization trusts, and

20  that was a -- a large part of its business.  They knew when

21  they contracted with the securitization trusts that those

22  trusts would then go and pledge their interests and TERI's

23  guarantee any payment stream to the Indenture Trustee on

24  behalf of note holders.  TERI, as part of its business and as

25  part of a huge revenue stream that led to some of the money

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 71 of
122

1  that's to be divided up today, entered into contracts with a

2  party that was difficult to contract with, or change the

3  contract with at a later date, or as we are here settle with

4  at a later date.

5           Mr. Sternklar said, "Who speaks for the trusts?"  I

6  hope he was being facetious because he's at -- he's had

7  access to the trust documents and knows the complexity of the

8  situation, and we've sat through hours of meetings where it's

9  been explained.  We have a procedure in those earlier

10 procedures orders that will allow a settlement to become

11 enforceable and we should stick with those procedures.

12          Your Honor, it -- a point in the reply that debtors

13 made reference to, the cost of utilizing these procedures as

14 potentially being too high in -- in resoliciting, I'd submit

15 that the cost of not entering into a settlement and being

16 back here litigating either perfection issues, or the other

17 issues concerning the decoder in the fall would be far

18 greater, and if the Court isn't inclined to compel the

19 debtors to utilize procedures satisfactorily, or at least as

20 good as those used before, that they offer evidence on the

21 counter-balance and costs.

22          Your Honor, another point on the material -- excuse

23 me, on the adverse impact, is the withdrawal of the

24 exculpation with FMDS.  FMDS is a contractual party with each

25 of the securitization trusts.  To the extent that finality is

Case 08-12540-LT  Doc 1129  Filed 07/08/20  Entered 07/08/20 23:33:24  Doc 68-3  Pg. 72 of
122
Case 08-12540  Doc 1129  Filed 07/20/10  Entered 07/20/10 12:31:32  Desc Main
Document    Page 72 of 122

Page 70

1  not brought to the trust litigation, then the deal that the

2  securitization trusts voted on is not what was initially

3  offered in the plan, and so that exculpation is an important

4  -- the removal of that is an important material change, and

5  the Indenture Trustee's preference would be that it be put

6  back so that any settlement either, if it's enforcing the one

7  that has been reached, or it's in connection with a

8  resolicitation process, bring finality.

9          Your Honor, another material issue is the 6.2

10  million dollars.  In fact, there is a claim that that is

11  collateral of the various securitization trusts, and any plan

12  that goes out in order to meet the requirements of 1129 will

13  actually have to provide for the segregation of that fund,

14  those funds, until either the trust with a particular

15  interest in it accepts the -- a settlement, or litigation

16  with that trust has been determined.

17          So we may have an issue of TERI standing here today

18  saying that they need that money in connection with any plan,

19  or their modified plan, because those funds may, in fact, not

20  be available.  To meet 1129, that money will need to be

21  segregated.

22          Finally, Your Honor, I'd like to address the

23  disclosure issue.  I don't think that any ordinary investor,

24  or any even sophisticated investor could take the old

25  disclosure statement, to take TERI's motion to modify, to

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 73 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 73 of 122

Page 71

 1   take the objections and take the reply and quickly cut

 2   through and understand what -- what is going on here, what is

 3   the likelihood that TERI will survive and go forward and  the

 4   plan will be consummated, and exactly what they will be

 5   receiving.  We need a real disclosure statement in this case

 6   that should go out.

 7          And I would submit that, notwithstanding the

 8   discussion in some cases that you might not need a full

 9   disclosure statement, this is a statutory issue; and I'd

10   submit that none of the cases that have ever been decided on

11   a 1127 fit within the parameters of the facts that before

12   that you have -- that are before you, and that 1127(c) is

13   unequivocally clear when it says,

14              "The proponent of a modification shall comply with

15              Section 1125 of this Title with respect to the plan

16              as modified."

17          Any modified plan by the pure black letter language

18   in the Code needs a complete disclosure statement that, one,

19   explains what has gone on before touches on the issues that

20   Mr. Kapp raised and the issues in the other parties' papers.

21          Finally, Your Honor, in addition to giving each

22   securitization trust the opportunity to accept the settlement

23   and the plan, all parties in interest, including any note

24   holders, and they would be parties in interest in this case,

25   need the opportunity to come in and object on any modified

1   plan on all grounds.  And essentially what I'm saying, Your

2   Honor, is, this case with modifications, this material, I

3   believe, requires that essentially we start the process over

4   and get it right to bring finality to it.  Thank you.

5          THE COURT:   Thank you.

6          MR. JENKINS:   Thank you, Your Honor.  Dennis

7   Jenkins of Wilmer/Hale, again for the First Marblehead

8   Corporation and First Marblehead Education Resources, Inc.

9          Your Honor, I'd -- I'll start first by addressing

10  the standing issue raised by the plan proponents.  The -- to

11  be clear, First Marblehead has not filed an objection on

12  behalf of the securitization trusts.  Perhaps the plan

13  proponents misunderstood the objection, but the whole point

14  of the objection is that First Marblehead believes that this

15  modified plan is, in fact, worse for general unsecured

16  creditors than the existing plan.

17         In addition, Your Honor, with respect to the

18  standing issue, the plan proponents have made a number of

19  disclosures that are either false or inaccurate or misleading

20  that involve First Marble head.  So with respect to

21  disclosure issues, they actually invited us to comment on --

22  on those aspects of the disclosure.

23         But before I get precisely to how the economics of

24  this modified plan adversely affect the creditors, let me

25  address first a couple of other reasons why First Marblehead

1 | as an unsecured creditor remains interested in this case.

2 | First -- as -- as -- as counsel suggested, First

3 | Marblehead is an unsecured creditor in this case. It had a

4 | large unpaid balance due of roughly eleven million at the

5 | commencement of this case and has rejection damages and other

6 | damages that's asserted in excess of 80 million, making it

7 | one of the largest, if not the largest general unsecured

8 | trade creditor in this proceeding.

9 | But First Marblehead has also remained involved in

10 | this proceeding in part because TERI made a decision at the

11 | beginning of this case to bring in-house many of the services

12 | that it previously out-sourced, and at that time it -- in

13 | June 2008, First Marblehead rejected its agreements with --

14 | or TERI rejected its agreements with First Marblehead.

15 | And as -- as -- in connection with that rejection,

16 | First Marblehead entered into a transition services

17 | agreement, and pursuant to the order that approved that as

18 | well as related transactions, First Marblehead has remained

19 | as a manager of collections for approximately half a billion

20 | dollars of defaulted student loans in which the

21 | securitization trusts claim a security interest and which

22 | remains subject to the trust adversary proceeding.

23 | So First Marblehead's involvement in this has been

24 | somewhat unique because it is one of the largest creditors,

25 | and also because it has remained to maintain the -- and

1   maximize the value of those assets as a manager of the

2   collections on those loans.

3          First Marblehead is -- is not on the Committee.

4   It's not a plan proponent.  It didn't draft the plan, it

5   didn't draft the disclosure statement, and none of its claims

6   are settled in the plan, but it does have specialized

7   expertise and knowledge regarding the student loan industry

8   that it has -- that it has attempted to lend to this

9   proceeding from time to time to help expedite proceeding and

10  bring it to closure through a plan of reorganization.

11         Again, as I mentioned at the beginning of this

12  case, First Marblehead had agreed to a transaction services

13  agreement for 60 to 90 days as recent as the confirmation

14  hearing.  The debtor reminded the Court that that saved this

15  estate tens of millions of dollars.  It eliminated costs that

16  were running approximately eight to 16 million per month.

17  The debtor has continued to manage the collections of the

18  loans subject to the trust adversary proceeding.

19         In addition, there is a section of the plan,

20  Section 6.3®), pursuant to which First Marblehead has agreed

21  to continue managing those collections for 90 days after the

22  effective date of the plan.  When asked by the Committee to

23  sit on the trust, the Plan Trustee Advisory Committee, First

24  Marblehead agreed.  Now it seems they don't want First

25  Marblehead to sit on that Committee, which is fine, First

Case 18-90065-LT    Filed 07/08/20    Entered 07/08/20 23:33:34    Doc 68-3    Pg. 77 of
122
Case 08-12540    Doc 1129    Filed 07/20/10    Entered 07/20/10 12:31:32    Desc Main
Document    Page 77 of 122

Page 75

1   Marblehead does not object.  It does note that it is peculiar

2   that the conflict -- the conflicts that they mentioned are

3   conflicts with the trust, that that Committee should be

4   representing the securitization trusts.  In fact, to remind

5   Your Honor, the securitization trusts represent more than 60

6   per cent of the general unsecured claims in this proceeding.

7          First Marblehead had not objection to confirmation,

8   and as recent as last night again filed a limited reply in an

9   attempt to help this proceeding along, Your Honor.  And I

10  think it makes sense to stop here again and -- and review

11  what data First Marblehead agreed to provide in the past what

12  it agreed in this reply to provide again.

13         When the -- when First Marblehead agreed to the

14  trust -- to the transaction services agreement, that -- at

15  that time all the contracts with First Marblehead were

16  rejected.  First Marblehead agreed to provide data regarding

17  the recoveries, regarding the -- the defaulted loans to TERI.

18  In a letter from Amy Bizar, the Senior Vice President, and

19  she's General Counsel to TERI, they confirmed that they

20  received that data regarding those recoveries and the

21  defaulted loans.  Again, here today, Mr. Glosband confirm

22  they have that information.

23         First Marblehead also provides ongoing monthly

24  reporting details regarding the recoveries collected by the

25  various collection agencies during the prior month.  An

Case 18-90065-LT Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg. 78 of
122
Case 08-12540 Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main
Document Page 78 of 122

Page 76

1 important point here is, Your Honor, First Marblehead does

2 not collect cash and move it. All of the cash is sent

3 directly from the various collection agencies directly to

4 First Marblehead who then tracks that money through its

5 accounts, but each month it -- First Marblehead provides

6 updated reports.

7         In addition, as a part of the transaction services

8 agreement. First Marblehead provides to TERI access to its

9 recovery management system, which provides loan-level

10 information regarding all of these loans to TERI.

11         Today, it -- we heard for the first time -- Well, I

12 should back up. When -- when we saw the reply, I spoke with

13 First Marblehead and we had no idea what information they

14 still needed in order to allocate the recoveries. We talked

15 internally and said we think they have everything they need,

16 filed a reply last night, which is really an offer to provide

17 it yet again, and we heard today that all they lack is

18 information regarding the allocation of costs which amount to

19 approximately $500,000.

20         As recently as June 14th, Mike Meady (phonetic) of

21 First Marblehead provided that information to Eileen Morris,

22 of First Marblehead, and does provide it from time to time.

23 We believe they have all that information up through June

24 14th. We're not sure if they just haven't asked internally

25 the people who received it, but First Marblehead is -- is

Case 18-90065-LT Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg 79 of 122
Case 08-12540 Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main
Document Page 79 of 122

Page 77

1    willing to provide what it has.  Again, we were surprised to

2    hear that they believe they don't have something.  Again, we

3    believe it's been provide -- provided.

4          So First Marblehead is here with a fairly unique

5    perspective because it is a creditor and has been watching

6    this case rather closely as continuing claims manager of all

7    the various defaulted loans subject to the trust litigation,

8    Your Honor.  But all that -- all that said and putting aside

9    what everyone thought the plan said, based on the information

10   provided by plan proponents regarding this modified plan,

11   after considering all the increased costs and the risks, the

12   modi -- First Marblehead believes the modified plan adversely

13   affects unsecured creditors.  If -- if this Court is going to

14   allow the modification to move forward, it believes that

15   there is much more disclosure that needs to be provided, and

16   that all parties should have the opportunity to object.

17         First, Your Honor, with respect to the economics,

18   the -- there's two pieces of this here, and the entire

19   modified plan is premised upon taking these disputed

20   recoveries and the disputed loans, putting them back into a

21   pot which the plan proponents then say will be returned as a

22   -- as part of *pro rata* distributions to creditors.  They

23   include, to be clear, the -- with respect to the 6.2 million

24   in cash, this 6.2 million in cash that they were talking

25   about represents recoveries on pre-petition defaulted loans.

1   As counsel has already explained today what the plan provided

2   was, there would be a split of these pre-petition and post-

3   petition defaulted loans.  The pre-petition defaulted loans

4   and the recoveries on them would go to -- to the

5   securitization trusts.

6          As Mr. Pedone just pointed out, the trusts do claim

7   a security interest in that 6.2 million in cash.  So if the

8   trusts are to opt out of this new settlement, presumably that

9   cash will need to be segregated, pending a resolution of the

10  litigation of their claims.

11         So the -- the plan proponents actually provide a

12  new disclosure that -- that we had not heard before, the

13  reply, and was a bit surprising that -- that the 6.2 million

14  dollars in cash is necessary to provide cash with the debtor

15  under its plan so it can perform it's non-college access

16  business.

17         What does this mean really?  The plan has condition

18  to its effective date that there be 36 million dollars of

19  available cash coming back to the plan trust.  What I think

20  we just heard is that they will not meet that 30 -- 36

21  million dollar threshold under the plan.  The way the plan

22  works is, if they don't meet that 36 million dollar

23  threshold, the Committee can nevertheless go forward and dip

24  in and take the 3.4 million of cash from the debtor under the

25  plan.

Case 18-90065-LT Doc 1129 Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg. 81 of
122
Case 08-12540 Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main
Document Page 81 of 122

Page 79

1      What I -- what it appear -- what they appear to be

2 saying is, they do not have enough cash now to hit that 36

3 million dollar threshold, and that this cash that they need

4 -- they are requiring now actually will go to TERI.  So up --

5 what -- up to 3.4 million dollars of the 6.2 that is not

6 coming back to creditors is, in fact, going to TERI to fund

7 this aspect of its business, not the college access non-

8 profit fees, but this new business that has been building

9 over the last two years.

10     This -- this was precisely the issue that concerned

11 counsel just before the petition date -- before the

12 confirmation hearing, Your Honor.  As we lay out in our

13 pleadings, in early April when we were reading the plan, we

14 could not tell from the disclosure statement how the

15 accounting for cash was being done, and we did not know how

16 the 6.2 million fit in.  Mr. Pedone, and I called Mr.

17 Glosband and said, "We read the plan to say that this 6.2

18 million comes back for the securitization trusts; we want to

19 make sure that you reserved that cash."  We wanted to avoid

20 precisely this issue where they came back and claimed that

21 they did not have all the cash that they thought they had.

22     In addition, Your Honor, it appears that almost 6.2

23 million of this additional benefit that they're seeking will

24 not go to creditors; it will, in part, go back to TERI, and

25 it looks like the -- the rest of any portion of the 6.2

1  million benefit to creditors they claim available will

2  actually be eaten up in the costs of going through this

3  process.

4        Why do I say that?  In part because it affects the

5  trusts, Your Honor, and I don't raise this to argue for the

6  trusts.  I raise it because I think this increases the

7  likelihood that trusts opt out of the settlement in the

8  modified plan and decide to litigate.  So if you go to their

9  Exhibit F, Your Honor, that they've included with their plan,

10  what this says, let's take the trust 2005-1, for example.

11  They say here that that trust will lose 812, roughly,

12  thousand of these recoveries.  In return, it will get

13  $812,000, plus an additional $100,000 over the next ten years

14  in back-end distributions.

15        On its face, what they are saying is you give up

16  cash now to take claims at the back end.  That seems pretty

17  clear.  What's not clear here though and what's not stated

18  is, of that 900,000 to be paid over the next ten years, about

19  460,000 of that comes from these defaulted loans to be paid

20  out over ten years, and a very small portion, the remaining

21  portion is what they claim would be the cash, the

22  proportionate share of the 6.2 million dollars coming back to

23  that trust.

24        Well, we've just heard that not all that cash is

25  coming back to the trust.  It can't possibly be, if of the

1 3.4 million is going to TERI, that all this money is coming

2 back to the trust. So this Exhibit F seems to be just wrong

3 if 3.4 million is going back to TERI and certainly misleading

4 as to what the trusts get. When the trusts realized this,

5 will they be more inclined to opt out? We don't know. But

6 we do know that of the 6.2 million in cash it's going to TERI

7 and will be eaten up in costs.

8 In terms of costs, Your Honor, this -- this process

9 is costing, based on the operating reports I've seen, about

10 1.6 million a month. We are now at a process where this will

11 take four months and will have eaten up through the benefit

12 of that 6.2 million dollars. So as an unsecured creditor,

13 obviously, First Marblehead is concerned that we are

14 following a process here that's going to eat up the benefit

15 of that cash entirely, or the benefit of that to general

16 unsecured creditors.

17 In addition, based on Exhibit F, about 2.9 million

18 of the disputed recoveries come from just three trusts. If

19 only those three trusts opt out of the proposed settlement

20 and their funds are then segregated pending a resolution of

21 litigation, where is the cash going to come that TERI needs?

22 Certainly, if the rest of the trusts opt out, that's the real

23 problem. But we have no idea going forward now how the

24 trusts will vote, or whether any of that cash that they're

25 claiming will come back will be there.

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 84 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 84 of 122

Page 82

1    So under the circumstances, it appears very likely

2   that the entire benefit of this additional cash will be

3   consumed by the modified plan process itself in the delay

4   inherent in obtaining confirmation.  So from the perspective

5   of the securitization trusts, I assume they will see this as

6   they give up cash to pay for the cost of this modified plan,

7   or to give it to TERI in exchange for larger unsecured

8   claims, unsecured creditors like First Marblehead will be

9   diluted by those increased claims and have no corresponding

10  benefit from that 6.2 million dollars.  That doesn't seem

11  like a great deal.

12    In addition, Your Honor, with respect to the other

13  piece of this on the disputed loans, this is really the

14  second piece of the puzzle.  Those disputed loans are loans

15  that have defaulted already will be meaning that students

16  have failed to make principal or interest payments for 180

17  consecutive days, that the borrower has filed bankruptcy, or

18  the student is dead.

19    The plan proponents put an estimate on this at 13.6

20  million dollars present value.  It is entirely unclear how

21  they come up with that estimate.  We believe that, based on

22  other estimates the Committee has been looking at, it's far

23  less than that.  As a consequence, we think that that value

24  is much less than they're saying, but for the sake of

25  argument, assume that, in fact, the value is at the high end

1 at 13.5 million, that assumes none of the additional costs

2 that could be incurred if trusts opt out of this litigate --

3 opt out of the settlements. It completely ignores the

4 litigation costs of -- of the trust and the delay associated

5 with this proceeding.

6          Mr. Kapp and Mr. Pedone have made compelling

7 arguments for why all of the trusts are adversely affected.

8 It's unclear whether they will opt out. If they do opt out,

9 there's -- it's -- it's a very complicated piece of

10 litigation. It's only in its initial phases before this

11 Court, but there's a few pieces of this litigation. There's

12 first the claim settlement portion that each trust will then

13 litigate both the amount of its claim. There could be

14 arguments whether the decoder that the Committee proposed is

15 right, whether there's a base case right, whether some other

16 valuation should be used. That only resolves the amount of

17 the claim. Then there's the separate trust adversary

18 proceeding that would have to be dealt with for each of these

19 trusts to litigate its rights to collectively 500 million in

20 loans.

21          So if those trusts opt out, what is the cost of

22 that? Will creditors see any benefit? In fact, will they be

23 worse off by going through this process and having trusts opt

24 out to litigate each of those things? We have the proverbial

25 bird in the hand. We have all of the trusts accepting

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:23:24   Doc 68-3   Pg. 86 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 86 of 122

Page 84

1   settlements of very complicated litigation, and we are

2   trading that for a very small amount of cash which appears to

3   already from a creditors' perspective to be gone, and for

4   defaulted loans that we don't know the -- the value of those,

5   but it could be entirely consumed by the -- the litigation

6   and the process of settling those claims.

7          To give you a sense of -- of magnitude, the

8   securitization trusts base claims, put aside the -- the --

9   the arguments on their collateral, the decoder that the

10  Committee has built actually values the securitization trusts

11  claims 36.5 per cent higher than they -- they're allowed

12  under the settlement under the plan.  If a trust -- if the

13  trusts were to opt out of the settlement and everything else

14  was going to be settled in exactly the same way, the trusts

15  would come in and say, "We already know that you -- your

16  decoder allows our claim 36.5 per cent higher."

17         If every trust did that and they came back and just

18  took the same settlement on the lien issues, took the amount

19  of their claim at 36.5 per cent higher, general unsecured

20  claim holders are going to be down by about 2.6 million in

21  estimated distributions to them.  So there is a significant

22  risk going forward on this as to how that litigation is

23  resolved and whether creditors, all creditors do

24  significantly worse.

25         So, Your Honor, today, First Marblehead is

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:32:24   Doc 68-3   Pg. 87 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 87 of 122

Page 85

1  objecting because it believes trading this bird in the hand

2  for the -- the risk going forward is not worth it for the

3  small amount of money that they are talking about, which we

4  believe is probably already used up during this process.

5  　　　　Now if Your Honor does decide that this

6  modification can move forward, then First Marblehead requests

7  that creditors be provided with adequate and meaningful

8  disclosure an opportunity to object.  We have laid out a

9  number of areas where disclosure is inadequate.  I'll just

10 touch on a couple of those here again.

11 　　　　First, Your Honor, is the issue of the cash.  We

12 have heard for the first time today that they may not hit

13 this 36 million number.  I think Mr. Glosband said that if

14 the current plan is approved, they would only have at best

15 case $200,000.  So it appears that we've come somewhere from

16 80 million dollars of unrestricted cash at the beginning of

17 this case all the way down to somewhere below 33 million.

18 We're not sure.  You -- you can't tell from the disclosure

19 either what's in the current disclosure statement or anything

20 here, where we're going to be at the end of the -- end of the

21 day with this cash.

22 　　　　In addition, as Mr. Kapp pointed out, the financial

23 projections are now quite old.  They assumed numbers and

24 estimates through April 30th and were built long before that.

25 They seem to be outdated by -- by a long shot.  In addition,

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 88 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 88 of 122

Page 86

1  none of the disclosure explains that there are significant

2  risks to unsecured creditors if the trusts opt out of this

3  litigation and that they could do materially worse if the

4  trusts opt out and litigate.

5          And there's no -- there has been no disclosure

6  since -- as to the exact costs that this process, this -- or

7  is taking upon the proceeding.  No fee applications have been

8  filed since November.  We don't know where -- we -- you can,

9  if you ask the debtor for operating reports get some sense of

10  how those fees are accruing, but no one has any insight into

11  -- to how much is being incurred.  And so the question is,

12  you know, if the debtor needed an extra three million of

13  cash, we may have just seen it fly out the door through this

14  process.  We should at least have disclosure telling us where

15  this cash is, where it's coming from, a detailed sources and

16  uses and of where all the cash is coming from, where it will

17  go on effective date.

18          Perhaps if that had been in the first disclosure

19  statement, they would have recognized that there was a 6.2

20  million missing somewhere.  But -- but it seems only

21  reasonable now if we're going to go down this process again,

22  that that level of disclosure be provided so that we don't

23  have to come back here again and find that something else was

24  missed, and that there's not enough money to get this done.

25          In addition, Your Honor, as I mentioned, there is a

Case 18-90065-LT Filed 07/08/20 Entered 07/08/20 23:33:24 Doc 68-3 Pg. 89 of 122
Case 08-12540 Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main
Document Page 89 of 122

Page 87

 1  number of just false and misleading disclosures made

 2  regarding my client, First Marblehead.  Regarding the data,

 3  we stand ready to produce everything that we've provided in

 4  the reply.  We believe they have everything they need.  We're

 5  at a loss.  We just don't know how else to help them.  They

 6  just need to call and -- and tell us.

 7          In -- in addition, Your Honor, with respect to the

 8  amounts of their disputed loans, the amounts of their

 9  recoveries, this is all data they have for some reason in

10  their disclosures they want First Marblehead's statements

11  regarding what First Marblehead thinks about needs be in

12  there.  First Marblehead has no position regarding the

13  amounts.  Those -- That's information in TERI's hands.

14          And with respect to the disputed recoveries,

15  there's some suggestion that First Marblehead provided

16  incorrect reporting.  This is not the case.  The reporting

17  with respect to that 6.2 million has been in TERI's hands

18  since 2006, and as we understand, pursuant to their trust

19  orders, should have been maintained throughout this

20  proceeding.  It just isn't an issue with First Marblehead,

21  and we're not sure why they continue to -- to make false

22  statements regarding First Marblehead's involvement with this

23  data.

24          And so, Your Honor, again, with respect to those

25  disclosures regarding data, we'd ask that those be corrected

Case 18-90065-LT    Filed 07/08/20    Entered 07/08/20 23:33:24    Doc 68-3    Pg. 90 of
122
Case 08-12540    Doc 1129    Filed 07/20/10    Entered 07/20/10 12:31:32    Desc Main
Document    Page 90 of 122

Page 88

1  as well.

2          In -- in conclusion, Your Honor, First Marblehead

3  does believe that this plan adversely affects all creditors.

4  We would request that -- that the order be entered confirming

5  the plan, that it go forward on the -- on the basis it was

6  confirmed by all the creditors, but if -- if this Court is

7  willing to move forward on modifying it, there is an enormous

8  amount of disclosure that should be provided so that we

9  aren't here again having missed something else that -- that

10 they may not know about now, and -- and we need disclosure to

11 ensure that.  And that's all I have, Your Honor.

12         THE COURT:  Thank you.  Mr. Martin did you want to

13 -- or,, Mr. Samson?

14         MR. SAMSON:   Thank you, Your Honor.  Thank you,

15 Your Honor.  Paul Samson of Riemer & Braunstein for RBS

16 Citizens, NA.

17         RBS Citizens is one of, I think, the second largest

18 lender in this case as contrasted to the trust which we agree

19 are also large.  We are holding approximately 1.33 billion of

20 student loans as of the petition date and the various

21 programs.  We also held a substantial amount of collateral,

22 approximately 45 million in the pledged accounts, and because

23 we were partially secured, although invited, we did not serve

24 on the Official Committee of Unsecured Creditors.

25         So we were not a plan proponent.  We had our own

1 issues.  We negotiated extensively with both TERI and the

2 Committee, as the Court knows, with the first stipulation

3 that was approved at the April 28th hearing.  We are here

4 today to support the Committee and TERI in its

5 motion to modify the fourth amended plan.

6       We note, for one thing, that we would agree with

7 the Court's suggestion that without a confirmation order,

8 there is not an official confirmation.  As the Court knows,

9 confirmation tends to be a final order, and you can't very

10 well appeal confirmation until there's a confirmation order

11 entered.

12       Also, the Court does have broad discretion to

13 modify, to change it's mind, to -- once it sees the draft 40-

14 page order -- to have additional hearings until such time as

15 the order is entered; and until the final order is entered

16 and the wording established, there's no confirmation *per se*,

17 although everyone was here on the 28th, and everyone heard the

18 evidence and -- and heard the Court, it's still not formally

19 confirmed until an order is entered, and it's more than a

20 mere formality.

21       Indeed, if the Court finds out that some basic

22 assumptions, which appears to be the case here, there's a

23 huge disagreement on, one, the assumptions as to what the

24 plan means, and, two, the proponents saying, "We made a big

25 mistake," that would be grounds for the Court to reconsider

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 92 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 92 of 122

Page 90

1  its statements on April 28th and say, "Wait a minute, we want

2  -- I want to hear some more evidence on some more points

3  before I finally make up my mind."

4        One thing that was telling in the discussion today

5  is that the objecting parties, although there was talk,

6  "Yeah, we had an agreement, and we always understood our

7  agreement to be this and that," what was telling is, none of

8  the objecting parties said, "And we specifically agreed with

9  the Committee and TERI that these monies were going to go to

10 the trusts."

11       And I infer from that that it never happened, and I

12 infer from that that -- and -- and we've, obviously, made

13 discussions with -- with TERI and the Committee, that TERI

14 and the Committee never ever intended that to happen, however

15 one may be able to interpret the wording today.  And, you

16 know, perhaps I was not as astute as I should have been in

17 advising my client, but I can tell the Court that when we saw

18 the definition, "securitization trusts collateral," we

19 assumed that it was implicit that this -- these were assets,

20 that the securitization trusts had a valid claim that they

21 were collateral.

22       I think it's very telling that Ambac's attorney

23 acknowledged that they never claimed that they had

24 collateral.  We had collateral, we're paying about 2.3

25 million dollars to settle a lien dispute that we've had with

1  the Committee and TERI, and we would have been very troubled

2  had we known that there was an argument based on the

3  definition of a securitization trust, that something that was

4  not their collateral was going to be paid to them in addition

5  to the collateral, and we may have reconsidered our vote, or

6  at least we would have had a discussion with the proponents

7  like, "What's going on here?  What's your justification for

8  doing this?"  Of course, they never intended to do it.  So we

9  never have had that discussion with them.

10         But, you know, the disclosure statement, if the

11  objecting creditors' arguments are correct, the disclosure

12  statement may have been deficient, too, because it should

13  have been disclosed then to people like my client that

14  they're getting collateral that they never had a claim to,

15  and I'm not even sure that would be appropriate, Your Honor.

16  Certainly it should have been fully disclosed and elaborated

17  on, and -- and, again, since we know there was a mistake,

18  there was nothing to disclose because the proponents thought

19  otherwise.

20         I -- we are a little troubled by some of the veiled

21  threats that we're hearing.  I mean, the -- the plan -- the

22  Code process for voting and confirming on a plan is to have

23  the proponents propose the plan, you vote, you object, and so

24  on.  To make an argument to a Court that, "We're going to

25  make it cost more to not agree with us than it will cost if

1   you *do* agree to us," is -- is not a jurisprudential argument,

2   Your Honor.  It's -- it sounds a little bit like a got-you

3   argument.

4        And, and I agree with the Court's suggestion

5   earlier that this thing can be totally analyzed, and I'm --

6   I'm not suggesting that anyone was acting in bad faith when

7   all this came up, but it -- it is getting down to a "Got you;

8   we're going to cause trouble if you rule against us," as

9   opposed to, "Yes, everyone made a mistake, it's very clear."

10  Our client made the same mistake, I can tell you, and I did,

11  too, that the Committee and TERI made, we interpreted that

12  differently.  So we would request the Court to allow the

13  motion to modify the plan.  Thank you.

14       THE COURT:    Thank you.

15       MR. MARTIN:   Good afternoon, Your Honor.  Ross

16  Martin, Ropes & Gray for The Nellie Mae Education Foundation.

17       Your Honor, Nellie Mae is not the largest creditor

18  in this case, but listening to the folks today here, I think

19  we might be the largest creditor who's here who hasn't been

20  involved in any of this, and I think that gives us an

21  interesting perspective.  We filed a very short objection

22  about a day before some of the larger ones were filed, which

23  essentially says we really don't quite understand what's

24  going on here, we don't understand the cost of benefits, and

25  I will -- based on the debtor's initial motion filed about a

1  month ago, and so we followed the back and forth of the

2  papers and the -- the numbers and -- and the statements today

3  with some interest.

4           And I'd like to -- I'll be relatively brief, but

5  I'd like to make some observations about on how we see some

6  of these arguments back and forth because I find myself

7  agreeing with some of the things my brother Mr. Glosband

8  says, and I also find myself quite sympathetic to some of the

9  things being said over here, but I also have a concrete

10 suggestions to move this process forward because it's -- it's

11 not necessarily in a great place where it stands today.

12          So, first of all, for whatever it's worth, I think

13 we completely concur that the plan is not confirmed.  I think

14 that's very straightforward.  I don't think any of us here

15 would advise clients to pay money to buy assets in a 363 sale

16 until an order is entered on the docket, I think that's very

17 clear as a matter of law.

18          On the other hand, I found Ambac's argument about

19 their position quite compelling.  As a matter of fact, they

20 negotiated a deal three times here, and they're being told

21 now at the last minute that they're going to have to give up

22 a lot.  And that doesn't mean necessarily the debtors don't

23 have the right to do it because I think they *do* have the

24 right to modify the plan.  But giving where we are, starting

25 with a fourth amended plan, I think the Court needs to

Case 18-90065-LT    Filed 07/08/20    Entered 07/08/20 23:33:24    Doc 68-3    Pg. 96 of
122
Case 08-12540    Doc 1129    Filed 07/20/10    Entered 07/20/10 12:31:32    Desc Main
Document    Page 96 of 122

Page 94

 1 │ seriously consider what the process is and the remedy isn't

 2 │ forcing the plan down the debtors' throats.  I just don't

 3 │ think the Court can do that.  But we need to think quite

 4 │ seriously in light of Ambac's quite valid concerns about

 5 │ where this is.

 6 │       Now the flip side of this a little bit is I hear

 7 │ Ambac saying, and frankly, First Marblehead, but I think --

 8 │ First Marblehead as well, but I think Ambac is a -- is a

 9 │ better example here -- that they need more information, that

10 │ there should be more disclosure.  The debtor is completely

11 │ right here.  No matter what they say at this table in the new

12 │ disclosure, these folks are going to check it.

13 │       It really doesn't matter from the disclosure

14 │ perspective what -- what gets said here now.  We should talk

15 │ separately about disclosure to everybody else in the world.

16 │ Frankly, people like my client, and people that -- the

17 │ disclosure that's going to be passed back to the note

18 │ holders, but for the principal to objectors here, more

19 │ disclosure is frankly not necessary at all.  If there's

20 │ something they don't know, they can ask and get it.

21 │       Now, I think that is critical.  It goes to

22 │ something that has not been observed here today that occurred

23 │ to me as I was sitting here.  There's something that's not --

24 │ that's implicit in the original disclosure statement that

25 │ maybe is the most important thing about that disclosure

1 statement, and that's that when the disclosure statement

2 before the fourth amended plan went out, everybody knew that

3 Ambac, the largest creditor, the one creditor who, if they

4 didn't like the deal, had the capability to actually litigate

5 the decoder issues and the trust adversary issues.  They've

6 got enough at stake, being in the 13 of the 17 things, okay.

7           The solicitation of a plan under these

8 circumstances, which is a huge settlement trying to get

9 everybody on board, is totally different with Ambac on board

10 to start with where they don't need to say anything, and if

11 they're starting in a place where Ambac is not on board

12 because all the other trusts are going to go along, they're

13 not going to want Ambac to get a better result than any of

14 them, and under this plan remember that there's a most

15 favored nations clause.  This was highlighted at the

16 confirmation hearing.  If Ambac litigates and wins,

17 everything changes.  All the numbers change.

18           Now when they originally sent this out, they knew

19 Ambac was on board.  And I suspect, it's not actually in the

20 disclosure statement as far as I could tell, I re-read it

21 quickly before the hearing, that they were highlighting that,

22 but they knew that, and I bet there were lots of discussions

23 behind the scenes with bondholders and everyone else that

24 there very likely was not going to be litigation of these big

25 issues.  That is a critical piece of disclosure, that if this

Case 18-90065-LT   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg 98 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 98 of 122

Page 96

 1  plan is going to be modified, frankly, creditors need to know

 2  whether it is likely that Ambac is going to litigate, because

 3  First Marblehead says there's going to be a lot more cost on

 4  both sides, there could be totally changed results, people

 5  could decide that they don't want to join because they want

 6  to go along.

 7          This Court directly asked, "What are the adverse

 8  changes?"  One of the adverse changes might be getting stuck,

 9  you know, having accepted, but with Ambac still litigating.

10  Nobody raised that here today, but that seemed to me to be a

11  very important potential adverse effect on all the creditors,

12  not just Ambac, not just First Marblehead, not just the

13  trusts.

14          So a suggest that we frankly have arising out of

15  this, Your Honor, is that we might be almost there, the

16  debtors certainly have the right to modify their plan, as I

17  said, and might be almost there; but frankly before this

18  process can go, we need to know whether Ambac's on board,

19  just like we did the first time.

20          Now that might, at first blush, when I realized

21  this a couple of days ago, seemed like Ambac has all the

22  cards.  I'm not so sure, Your Honor.  It's a lot of money,

23  but it's not that much money.  Ambac, itself, not a month

24  ago, two months ago, entered a rehabilitation proceeding in

25  the State of Wisconsin.  It's not clear to me that they're

1    going to approve the expenditure of millions and millions of

2    dollars to litigate all this.

3         I found very intriguing one sentence in their

4    objection, and I'd just like to point to it, if I can find

5    it, because I found it quite telling.  They've written a very

6    long objection.  What they say on page 30, and I -- and in

7    fairness to my brother, I'm picking one piece out of his

8    pleading, but I -- just using this as an example, he says at

9    the very bottom of the page,

10             "It is hard to dispute that such a significant

11             reduction in their recovery would not prompt the

12             master trust to at least reconsider its acceptance

13             of the modified plan."

14   That is a lot of words to say "maybe," but I'm not sure yet.

15   They can get all the information they need, they should talk

16   to the debtors, they can -- they're going to check it all

17   anyway, and we all need to know whether we're just going to

18   be back here at the end of August at a huge cost and expense

19   because Ambac's rejected the plan, when we can find that out

20   in advance, and we should find that out in advance.  We knew

21   last time in advance, and that was very critical.

22             Now the third observation that I have, Your Honor,

23   is as to this accounting and the segregated accounts which I

24   thought I understood, then I didn't think I understood when I

25   saw the reply brief of the debtor, and now I think I

Case 18-90965-T   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 100 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 100 of 122

Page 98

1   understand even less.  This is the -- now what is supposed

2   only $500,000 over something related to court costs, and I'll

3   be the first to confess, Your Honor, I don't fully understand

4   it.

5          What I do know, Your Honor, is that when they filed

6   the current modification a month ago, almost to the day,

7   whatever the problem was with the accounting under a prior

8   court order that they were supposed to do pursuant to an

9   order of this Court was going to cause a hold up of essent --

10  some huge amount of cash because both the objectors pointed

11  to that.  Now in the reply brief it's less, and since the

12  reply brief it's even worse.

13         I hope, and it's probably very likely, because I'm

14  sure the professionals here and -- and Mr. Renzi and Mr. Peko

15  have taken their look, that that's right, in which case it's

16  not a material change, but the notation that without any

17  other disclosure here, without any more report to this Court

18  that we've gone from a pleading that they filed, and a

19  modification that they filed a month ago that said they

20  needed to hold up all the hundreds of millions of dollars of

21  distributions, it's only $500,000 today, they actually

22  haven't changed the plan yet to reflect this latest, "we're

23  only holding back -- it's only -- it's only a half million

24  issue," whatever that is.  It's not fully changed as far as I

25  can tell.

```
 1              But it seems to me that this is an issue -- I'm not
 2     proposing that the process be blown up over this whatsoever.
 3     I'm simply saying that there needs to be some more disclosure
 4     and report to this Court before we go off.  I mean, what we
 5     have, Your Honor, is this.  This is the chart, this is the
 6     Exhibit F, this is what creditors is going to re -- they're
 7     proposing that this piece of paper is what creditors read,
 8     plus 200 pages of back and forth between these folks.  That's
 9     not disclosure.  Disclosure, I've been in cases, it may have
10     been in this court years ago, but they can do some kind of
11     supplemental five-page, ten-page, they can make it clear, the
12     -- the back and forth is not going to help anyone understand
13     what was going on.
14              And the last point I'd like to make, Your Honor, is
15     the cost and benefits really do have to be weighed here.  I
16     found it notable in the -- that in the debtor's reply brief
17     there was essentially no response to First Marblehead's
18     points that the valuation that they're using to justify the
19     benefits, that is, the valuation that produces these numbers
20     that they say makes it only adverse to three trusts, is not
21     the same as the decoder.  If -- look, if it's not the case,
22     it's not the case, but if they're using one set of valuations
23     to -- to justify the plan and all the findings this Court
24     previously made, but another to justify that the adversity,
25     that's a real problem.
```

1          Secondly, there is no response to the fee issue.

2    Whatever the fees are in the case today, we don't know what

3    they are from November to now, and we don't know what they're

4    going to be going forward if Ambac opts out and everybody

5    else opts out.  Those are very real issues.

6          So, Your Honor, in sum -- and, again, you know,

7    maybe -- maybe we're in a little bit of a unique position and

8    maybe the Court will just disregard us because we're not in

9    the midst of these negotiations, but I really do fear if

10   we're going to be back here again, either with a plan with

11   very large creditors who are *not* on board -- and we could

12   have known that in advance -- with the Court imposing some

13   kind of structure on this process; or as First Marblehead

14   suggests, it's just not clear to me at all that there's

15   really a net benefit at the end of the day.  If the valuation

16   is lower and the costs are higher and anybody opts out and

17   litigates, this cash is gone.

18          And they're right, one of the big places it's going

19   is to reorganize TERI.  It is what it is.  The Court has made

20   its findings on that.  I've been heard on that issue before.

21   But this is not, this one page and 200 pages back and forth

22   is not disclosure to anyone, I couldn't make heads or tails

23   with.

24          So my suggestion, Your Honor, is that we have some

25   kind of process that gets these folks together and gets it

Case 18-90985-T   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 103 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 103 of 122

Page 101

1  negotiated.  Ambac may say they're going to opt out and these

2  folks can say Ambac is never getting its money.  I mean, they

3  -- they need to get that worked out, just like they had it

4  worked out before.  Thank you, Your Honor.

5          THE COURT:   Thank you.  All right.  Mr. --

6          MR. GLOSBAND:  Yes.

7          THE COURT:   -- Glosband?

8          MR. GLOSBAND:   (unclear)

9          THE COURT:   Briefly.

10         MR. GLOSBAND:   Thank you, Your Honor.  I will try

11  to be brief.  I'll start by saying, and I'll do it in order

12  of the parties.

13          I agree with Mr. Kapp, that Ambac is not a bad guy,

14  but I would note that things aren't quite as clear in the

15  documents in addition to -- in today's presentation, as some

16  of our friends would pretend they are, and so, for example,

17  and I'll try to cut through this.

18          The -- the clarity with respect to the list of

19  loans on Mr. -- which Mr. Kapp relies is inconsistent with

20  Schedule B to the plan, which has the numbers in it, which

21  says what they're getting, and which says what they're

22  getting in terms of loans are those purchased at a pledge

23  account collateral.  So you have a yin and you have a yang on

24  that issue.

25          In addition -- and maybe I'd digress a bit what Mr.

Case 18-90965-T   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 104 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document   Page 104 of 122

Page 102

1 Martin just said, it wasn't said in the disclosure statement

2 that Ambac was accepting the plan, and so it's hard to see

3 how anyone could have relied on Ambac's acceptance, at least

4 if they were relying on the disclosure statement.  Ambac

5 wasn't in the plan on those terms at that time.  So it simply

6 wasn't there.

7         On some of the cases, without getting into the

8 case-by-case refutation, the two cases that Mr. Kapp relied

9 on to say the Court must confirm the plan, the *Rickle* case

10 and the *Antiquities* case, and it said the Court can't modify

11 the plan, both of those cases came up after the plan had

12 substantially consummated, in fact, years after when parties

13 had, in fact, changed their positions, as they do in

14 substantial consummations.  So those just aren't supportive

15 of his point.

16         As to whether or not the plan is workable, and

17 there's no fault of the plan proponents as a condition to

18 modify under 1127(b), first of all, I would say we're not

19 under 1127(b).  And second of all, I'll be darned if I can

20 find that in the case that he cited it at the page that he

21 cites, or anywhere, for that matter.  I mean, what we have

22 here are the circumstances that I've described earlier.

23         In terms of the cases that say we need to start

24 over with the disclosure process, and the rather assertive

25 statements that there are no cases ever where there was an

1   adverse effect found where a court didn't force a full

2   redisclosure, well, we did cite those cases and we discussed

3   them.  I would refer to the ***Simplot*** case in our material

4   because that's a convenient source of all the other cases

5   discussing that point in which the Court found that the

6   disclosure was tuned for the circumstance, and if the parties

7   affected by the adverse change were sophisticated and

8   involved, there was no further disclosure required, that

9   there's no further disclosure required to parties who aren't

10  adversely affected.

11          So there is authority that way, and with all due

12  respect, and I know you'll be disappointed, you won't be the

13  first if you -- if you go in that direction.

14          With respect to the U.S. Bank presentation, again,

15  we heard about how black and white and clear everything was

16  and, all of a sudden, now the plan might not be feasible, we

17  say, if it's confirmed as written -- as interpreted by them.

18  Well, there's more to it than just the cash component and

19  whether or not TERI gets cash for some new business, and

20  there are two points, and I might sort of blur with my

21  objections to try to save time.

22          One is that TERI is not only embarking on a new

23  business, TERI's got a two-year contract to collect loans for

24  the Committee, an issue made much of it at the last hearing

25  by Mr. Martin.  If TERI doesn't have any cash other than its

Case 18-90065-T   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 106 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 106 of 122

Page 104

1   restricted charitable funds, it can't do that collection

2   business.  In that regard alone, the plan is not feasible.

3   It's also not feasible from the perspective of TERI

4   attempting to -- to generate a new business.

5              In terms of, you know, the overview of things,

6   we've sort of heard from, except for Mr. Samson, one

7   perspective of how adversely this affects how many people,

8   and I would point to the plan itself and the fact that there

9   are approximately 44 classes in that plan; and as of today,

10  subject to the right of a couple of them to change their

11  votes, all of them accept it.

12             Based on the modifications that we've filed, we

13  believe three classes would be adversely affected and they

14  can change their votes, even if it's all 17,and we've said

15  we'd submit it to the 17 securitization trusts, there are 17

16  out of 44.  You still have by number of classes overwhelming

17  acceptance of this plan if they all change their minds, and

18  it's, (a), hard to see why they would; and, (b), we would

19  reserve the right even if we allowed them to vote to argue

20  that only the three that were adversely affected should have

21  votes that count if they change their votes.

22             Everybody is projecting on that side of the room on

23  *horribles* about all of these classes changing their votes,

24  and all of them choosing to litigate, and all of the costs

25  therefore escalating out of control, but I think that's

1  perhaps an unrealistic speculation, and I would only refer

2  the Court to the list that was Schedule B to the original

3  plan and the pledge account balances.  I mean, for example,

4  we've heard a lot of speculation about what Ambac might do.

5  Well, Ambac is the control party for three trusts.  Under the

6  original plan, one of those had a significant unsecured

7  claim, the Master Trust, and its claim as adjusted for the

8  settlements was 5.9 million dollars out of more than 300

9  million dollars in claims in the case.

10        The other two trusts didn't have claims because on

11  the decoder calculations, they had equity.  On the other

12  hand, those two trust have between them about 130 million

13  dollars in pledge account collateral.  It's rather hard for

14  me to see why they would change their vote and get into a

15  situation where they're going to litigate and delay the

16  ability to realize 130 odd million dollars of budget account

17  collateral.  So I can't say what they're going to do, but I'm

18  just thinking the logic as I heard it was not the logic as I

19  would certainly think about things.

20        The other point I'd make, and it sort of transcends

21  both the First Marblehead and the U.S. Bank objection, with

22  respect to the 6.2 million dollars in cash, it very deftly

23  presented, I thought, of Mr. Jenkins to make it sound like

24  we're taking that money out of their pockets; but it wasn't

25  exactly how it was structured, presented, how the plan was

Case 18-90965-T   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg 108 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 108 of 122

Page 106

1   negotiated, and how the evidence was presented to the Court.

2   Instead, what the Court had and what all the parties had was

3   the best interest to creditors test.  And in the best

4   interest to creditors test, it's a line item for restricted

5   cash of 364 odd million dollars that's going back to the plan

6   trust.

7           That line item has within it the three million or

8   so dollars that we thought was going back.  (unclear) a

9   separate line item.  And the remainder of the funds in the

10  segregated account.  So if anyone on that -- in that

11  constituency were to look at what was in the disclosure

12  materials, and no one objected to the disclosure materials on

13  that basis, they would have said, "All right, I'm getting my

14  share of 364 million dollars, and I know what my pledge

15  account balance is because I can see that on the list, the

16  rest of it is a number that's going to be allocated, I'm

17  going to get something more, I don't know how much more, I'll

18  find out, I guess, later."

19          But no one was intent enough about that particular

20  piece of accounting and it's unfortunate, but no one was

21  intent enough about that that we actually laid out line item

22  by line item that allocation.  In response to what I've

23  heard today, perhaps it *would* be a good idea to supplement

24  disclosure with that, and we're, you know, perfectly willing

25  to do it, but it's sort of not appropriate for there to be an

Case 18-90965-T  Filed 07/08/20  Entered 07/08/20 23:33:24  Doc 68-3  Pg 109 of
122
Case 08-12540  Doc 1129  Filed 07/20/10  Entered 07/20/10 12:31:32  Desc Main
Document      Page 109 of 122

Page 107

1  impression created that people were relying on getting that

2  particular amount of cash.  In fact, there was no basis for

3  understanding what amount of cash there was; and, in fact, we

4  thought the amount of cash being distributed in that category

5  was at that point in time around 11 million six.  It's now

6  grown to 16 million six because of additional collections.

7  But we also thought that it didn't include another 6 million

8  two that was retrospectively calculated, and if you'll pardon

9  the expression, was presented to us and what I would

10  characterize as -- as sort of a last minute sneak attack, but

11  I'm trying to stay out of recriminations and

12  characterizations; but we do feel a bit put upon by the

13  process.

14          And I -- I don't know that I need to respond to the

15  specific inquiries that I'm alleged with having received with

16  respect to the 6.2 million.  I was asked about whether money

17  had been set aside from the segregated account, and my answer

18  was, "Yes.  I don't know what the numbers are, we'll ask the

19  company."  By the time of the disclosure statement or the

20  confirmation hearing, that issue had not been definitively

21  resolved between the parties.  It was not a matter of anybody

22  affirming or denying anything.  It was a, we're still working

23  on allocating those numbers and the issue was not pressed

24  hard by anyone.

25          So I'm really trying to just respond to what I

1   thought were the key points and clear up a couple of possible

2   mis-perceptions from the way that matters were presented.

3           I guess I'd come back to saying, if only three

4   trusts are materially adversely affected, and I think that's

5   the case, then those three get to vote.  If they decide to

6   opt out, you know, the answer is the plan has a mechanism for

7   every trust to opt out, and that nowhere it says in the

8   disclosure statement that anybody has opted in or opted out

9   at that point in time.

10          If they opt out, what has to happen is that their

11  decoder claim gets determined by some other method.  That

12  method might be litigation, it might be truncated litigation

13  in the form of estimation, it might be negotiation, who

14  knows?  But they might not opt out either.  So -- so to wait

15  the decision in this case on the prospect that everybody is

16  going to opt out I think is unrealistic because they're not.

17  I really don't think anymore than three ought to have a

18  chance to opt out, but as I said before, we'd go through the

19  process and let the others vote, and reserve that issue for

20  -- for later.

21          The last point I'd make is that with respect to

22  some of the suggestions on disclosure -- and I, not that I

23  always just agree with Mr. Martin, but he is correct, he's

24  not someone who's been involved in this process.  If there

25  are some parts of this that would benefit from, you know, a

Case 18-90965-T-T  Filed 07/08/20  Entered 07/08/20 23:33:24  Doc 68-3  Pg. 111 of
122
Case 08-12540  Doc 1129  Filed 07/20/10  Entered 07/20/10 12:31:32  Desc Main
Document     Page 111 of 122

Page 109

1  condensed disclosure presentation, like an updated cash

2  number, like a statement of the fees that have accrued, and I

3  would on that point, by the way, say there aren't any secrets

4  here, everything is in the operating reports and the

5  operating reports are available to anybody who asks for them;

6  but in any event, we could put that into a single piece of

7  paper, if that would be -- would be helpful, and it really

8  depends where the audience is.  If the audience is the three

9  folks we're talking about, those three trusts, they either

10  have everything or are going to have it in a second.  If it's

11  broader than that, then sure, we can do, you know, a bit of a

12  supplemental disclosure.

13       But I see no reason in this situation that we

14  should start the process over, other than to defeat the

15  process, which I think is the reason that that suggestion has

16  been made.

17       So I will -- I'm going to close where I started,

18  and that is, I wasn't happy to have to come in with this

19  presentation at all today.  I'm not any happier than I was

20  when I started, but I do think that we have appropriately

21  made the point that we're entitled to modify the plan.  We

22  need to modify the plan.  There's no improper motive in our

23  seeking to modify the plan.

24       Modifying the plan affects really three classes of

25  securitization trusts creditors, at worse, 17 classes;

Case 18-90065-J-T   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 88-3   Pg. 112 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document     Page 112 of 122

Page 110

1  doesn't affect the other, whatever the difference is between

2  44 and 17, 27 -- you know, classes of creditors.

3          I guess the other things I could offer is if it

4  were -- if the parties thought it would be beneficial, we can

5  update the best interest trust and all of these things are

6  things that are done, we're just, you know, happy to put it

7  all in a little package and -- and include it.  We can update

8  the projections.  I mean, all of that is -- is relatively

9  straightforward.  We just didn't really it mattered to

10  anybody's decision.  If people think it does, we're happy to

11  accommodate.  Thank you very much.

12          THE COURT:   Thank you.

13          MR. SAMSON:   I'll be very brief, I promise.  I

14  just want to clear up one point.

15          There were suggestions made that we proposed a

16  process to go solicit changes of votes where we're requiring

17  people to do things that are either inconsistent with the

18  prior orders you entered, or inconsistent with their

19  contractual arrangements between themselves.

20          I just want to clear it up.  We're not requiring

21  anything.  We have proposed as an accommodation of process.

22  If they think that process is deficient, they're free on

23  notice to us to tell us, "Thank you, but no thank you, we'll

24  take care of that ourselves."  Just like when we go to

25  Citizens Bank, we don't go and solicit the Board of Directors

Case 18-90985-T   Doc 1129   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 113 of
122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document     Page 113 of 122

Page 111

1 and shareholders of Citizens Bank, we're not required to

2 solicit the bondholders of the trust.  If we're doing it in a

3 way which we think is cost effective and conforms with 1127,

4 but they don't like it, the answer isn't, "We'll go back to

5 the robust process we had before that cost a lot of money and

6 took a lot of time."   The answer is, "Fine, you -- you can

7 handle it yourself, we're not preventing it."

8        So it's not correct. we're not forcing anybody to

9 do anything.

10       With respect to disclosure, the real concern, Your

11 Honor, whatever process you order, it be one that's correct.

12 I think the one thing everyone agrees on here is we need to

13 get the plan confirmed quickly.  Certainly on the five

14 specific points that have been raised by Ambac, the cash, you

15 had an affidavit of Mr. Peko at the last confirmation

16 hearing, presumably you'll have another affidavit at another

17 confirmation hearing that will provide the same information,

18 if it -- that affidavit was sufficient form of disclosure

19 before, there's no reason to think it wouldn't be sufficient

20 now.

21       Second, Ambac wanted assurance its pre-petition

22 loans would be maintained, that -- that the plan says that,

23 they will be maintained; and if they've got specific details

24 on that, they -- we've asked them to let us know and we'll

25 trying to accommodate them.  We -- we haven't gotten a

Case 18-90985-T  Filed 07/08/20  Entered 07/08/20 23:33:24  Doc 68-3  Pg. 114 of 122
Case 08-12540  Doc 1129  Filed 07/20/10  Entered 07/20/10 12:31:32  Desc Main
Document  Page 114 of 122

Page 112

1  response yet about what the details about.  The mechanism of

2  maintenance is particularly troublesome, but we're agnostic.

3  If we can work something out that isn't over costly, I -- I

4  don't see that as an issue.

5         The chart on page 14 should be updated.  I suppose

6  we don't have an objection to updating the chart and

7  including an updated chart.  The contentions about First

8  Marblehead they say are unsupported.  Well, you know, they

9  are what they are.  They responded fully.

10        And five, understand the point of the exercise.

11 1127(d) talks about changing votes.  The people who get a

12 right to change the votes are the people who are objecting.

13 The disclosures measured against what might be required, if

14 we were going out for the first time with the whole body, we

15 might be doing something very different.  But for the purpose

16 -- fit -- it's fit for the particular purpose, Judge.  Those

17 that get to change their votes have sufficient disclosure.

18 Thank you, Your Honor.

19        MR. PEDONE:   Your Honor, if I may be heard

20 briefly?  The plan proponents have ignored their burden.

21 Their burden is to prove that they can come here with a

22 feasible plan that will go out.

23        Part of the burden with a plan that proposes a

24 settlement is that the counter-party to the settlement is

25 accepted.  Mr. Sternklar has just stated that plan proponents

Case 18-90965-T Filed 07/08/20 Entered 07/08/20 23:33:34 Doc 88-3 Pg. 115 of 122
Case 08-12540 Doc 1129 Filed 07/20/10 Entered 07/20/10 12:31:32 Desc Main
Document Page 115 of 122

Page 113

1 are not willing to use procedures that result in an

2 acceptance of the settlement. That's a concession that they

3 could end up with litigation with 17 trusts, and that's a

4 plan that won't be confirmed.

5 I would submit that, in effect, without committing

6 to the procedures with changes that are as material as they

7 are proposing, they are, in fact, under Section 14.5 of the

8 plan in withdrawing the old plan, and that we need procedures

9 that allow for the process to go forward -- go forward.

10 Finally, with regard to disclosure, 1127(c) without

11 regard to what any cases not similar to this say, is the

12 black letter law. Thank you.

13 MR. KAPP: (Approaching microphone; unclear) Your

14 Honor, just one (unclear). I asked him to make it and he

15 didn't. J. Kapp for AM -- Ambac Assurance Corporation.

16 The only point I wanted to make is, Mr. Glosband

17 changed the procedures on us again, and now I'm confused.

18 His -- his motion said -- his reply said that all the

19 securitization trusts would get to -- to re-vote. He's now

20 said that, "Well, we -- we'll reserve it for later." Well,

21 that's not the same thing. So I'm, once again, completely

22 confused. But I just note that he -- he's changed what he

23 said from the beginning, and I just wanted to point out that

24 inconsistency. Thank you, Your Honor.

25 THE COURT: Thank you. All right. I -- I find

Case 18-90965-T   Doc 1129   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 116 of
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document     Page 116 of 122

Page 114

1   and I rule that the settlement with Ambac in the

2   securitization trust it represents was a foundation and

3   extricably intertwined with the material provisions of the

4   fourth amended plan.

5          It's clear to me that with the interpretation that

6   is now being preferred by the plan proponents advanced or

7   understood during a negotiation between Ambac and the plan

8   proponents, the present settlement would likely not have been

9   agreed to, and either negotiations would have continued to

10  meet Ambac's concerns resulting in a different plan structure

11  or a different plan treatment, or the plan proponents would

12  have adopted a more litigious approach in their plan

13  presented to the Court as -- as to Ambac.

14         In any event, history cannot be rolled back, and it

15  is now too late and decidedly inequitable to preserve some

16  elements of what has been described as a settlement and

17  change others.

18         In any event, the Court rules, as it indicated it

19  was inclined to do at the outset, that the fourth amendment

20  -- fourth amended plan was not confirmed.

21         Furthermore, for the reasons that I've just set

22  forth, that plan is not modifiable.

23         Accordingly, to the extent necessary, I -- and I'm

24  not certain it is, I alter and vacate the conclusions I

25  reached on April 28, 2010 and now -- now find that the fourth

Case 18-90065-T   Doc 1129   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 117 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 117 of 122

**Page 115**

1    amended plan is not confirmable under 1129(a)(2) and/or

2    (a)(11).  The plan proponents' motion to modify the plan is

3    denied.

4              The debtor is ordered to file a fifth amended plan,

5    a further amended disclosure statement, and motion to approve

6    same on or before August 27, 2010.

7              Now the order I've just entered -- I just issued,

8    which will be entered, is itself alterable.  If the parties

9    within a relatively short period of time decide to sit down

10   and avoid the mutual -- the mutually assured destruction,

11   which is the path on which they're traveling, then maybe we

12   can get back to the fourth amended plan with some

13   modifications; but absent -- absent a resolution, I look

14   forward to seeing a fifth amended plan on or before August

15   27.  Thank you.

16             MR. SAMSON:   (unclear)

17             THE COURT:   Yes, sir.

18             MR. SAMSON:   (unclear) a matter of time?

19             THE COURT:   Oh, yes.  I apologize.  Well, are they

20   dependent -- They're not dependent on the -- on the confir --

21   on the viability of the plan?

22             MR. SAMSON:   I do not believe that ours is.

23             THE COURT:   All right.  Well, then I'll hear you.

24   Thank you.

25             MR. STERNKLAR:   Judge, can we (unclear) ten minutes

Case 18-90965-J-T  Filed 07/08/20  Entered 07/08/20 23:33:24  Doc 68-3  Pg. 118 of
122
Case 08-12540  Doc 1129  Filed 07/20/10  Entered 07/20/10 12:31:32  Desc Main
Document   Page 118 of 122

Page 116

1   to talk to (unclear) the issue you just raised is (unclear)

2   needs to be discussed.

3           THE COURT:   You think maybe -- maybe not so much?

4           MR. STERNKLAR:   Maybe not.

5           THE COURT:   All right.  I'll come back out in ten

6   minutes.

7           MS. MARTIN:  And, Your Honor, --

8           THE COURT:   Yes.

9           MS. MARTIN:   -- one other, I think that the TCF

10  stipulation was a motion to change a vote of the fourth

11  amended plan, so --

12          THE COURT:   Sounds moot to me.

13          MS. MARTIN:   Right.

14          THE COURT:   Okay.

15              [Off the record at 4:12:34 p.m.]

16                    * * * * * * * *

17              [On the record at 4:40:48 p.m.]

18          MR. REYNOLDS:   All rise.

19          THE COURT:   Please be seated.  So the question was

20  whether the settlement with Citizens was still alive, still

21  relevant?

22          MS. MARTIN:   Yes, Your Honor.  We don't believe

23  that the settlement was -- with Citizens is dependent on any

24  plan of reorganization.  Rather, it's like the other -- or

25  it's most -- it's more like the other sort of one off deals

Case 18-90065-T   Filed 07/08/20   Entered 07/08/20 23:33:24   Doc 68-3   Pg. 119 of 122
Case 08-12540   Doc 1129   Filed 07/20/10   Entered 07/20/10 12:31:32   Desc Main
Document      Page 119 of 122

Page 117

1   we have done with some of the other large lenders in this

2   case.

3          Although there was a provision regarding support of

4   the modified plan, and while we try and sort out what that

5   means, what we'd like is a very brief continuance, like a

6   one-week continuance, just to make sure that we modify that

7   provision of the stipulation appropriately.

8          MR. SAMSON:   Your Honor, we indicated that that's

9   agreeable with us, give them a slight continuance.

10         We -- we do also agree that it's independent of

11  what happens with the plan, but we did say we'd support A

12  fourth amended plan which no longer exists.  So there's no

13  need to talk about the fifth amended plan.  And there were

14  two pieces of this.  The -- getting back to the pledged

15  collateral that's been frozen for two and a half years, and

16  agreeing on the claim --

17         THE COURT:   Well, you can have -- (pause) -- hold

18  on a moment.  You can have this Thursday at two o'clock, or

19  August 5 at two o'clock, both in the video conference suite

20  in Boston.

21         MR. STERNKLAR:   (unclear, not near microphone) can

22  we work something out (unclear) this Thursday?

23         (Pause -- low-voiced conversations)

24         THE COURT:   Or I could go out further, if you'd

25  like.

```
 1              MS. MARTIN:   No.

 2              MR. SAMSON:   No, please don't.

 3              MR. STERNKLAR:   Our -- Your Honor, Jeffrey

 4  Sternklar for the Committee.  We'd prefer August if -- if

 5  it's acceptable to Citizens.

 6              MS. MARTIN:   Okay.

 7              THE COURT:   August 5, two o'clock, video

 8  conference suite in Boston.

 9              MR. SAMSON:   Your Honor?

10              THE COURT:   Yes.

11              MR. SAMSON:   There were no objections filed, if we

12  can -- ??

13              ATTORNEY:   I'd like to address that, Your Honor.

14              MR. SAMSON:   If we can all agree on the wording,

15  can we just submit it to the Court?

16              THE COURT:   Well, subject to what your brother is

17  about to --

18              ATTORNEY:   Well, Your Honor, I was about to --

19              MR. SAMSON:   (unclear) he had the stipulation and

20  the whole deal in front of him and so (unclear)

21              ATTORNEY:   Sir, I let you spoke on my motion and

22  you didn't object.

23              MR. SAMSON:   We both had --

24              ATTORNEY:   Would you offer me the same courtesy?

25              MR. SAMSON:   I'm not --
```

```
 1              ATTORNEY:   Thank you.  Given what we've just

 2    heard, I think we need to look at -- take a look at their

 3    settlement; and in light of the fact the plaintiffs are going

 4    forward, I would ask for is that (unclear) being kicked to

 5    August 5th, give us -- we would ask for an objection for --

 6    deadline for a week to take a look at it if there's a

 7    problem.

 8              I'm not anticipating there is, but to be quite

 9    honest with Your Honor, Your Honor, given everything that's

10    happened, I think it deserves a fresh look other than the 15

11    minutes for folks just talking to the Clerk.

12              THE COURT:  Well --

13              MR. SAMSON:   And, Your Honor, my response would

14    be, Ambac certainly is entitled to reserve all rights, but we

15    -- we filed the first stipulation on April 22, we filed the

16    second stip -- there's nothing hidden.

17              THE COURT:   Well, here's -- here's I think the

18    appropriate way to deal with that.  If the only change is

19    going to be the deletion of the agreement to support the

20    fourth amended plan, or the substitution of an agreement to

21    support whatever treatment is identical to the treatment that

22    was received in the fourth amended plan, if that's -- if it's

23    either of those, then as far as I'm concerned, Ambac has

24    waived its rights, and I'll allow that upon receipt of

25    action.
```

**Page 120**

1        If, on the other hand, there's something more than

2  when I -- when we get it, we'll set it for the -- for the 5th

3  at two o'clock.  Okay?

4        ATTORNEYS:   Thank you, Your Honor.

5  (End at 4:45:47 p.m.)

6           * * * * * * * * * * * *

7        I certify that the foregoing is a true and accurate

8  transcript from the digitally sound recorded record of the

9  proceedings.


/s/  *Gloria C. Irwin*              7/18/2010
Certified Transcriber NJ AOC200         Date
    Federal  CERT #122
GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
609-927-0299  1-800-471-0299
   FAX  609-927-9768
e-mail  irwingloria@comcast.net
✔SC-SG

**#08-12540**                      **7-12-2010**