UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) | Case No. 08-12540 (HJB) |
| | ) | |
| Debtor. | ) | |
| | ) | |

NOTICE OF FILING THE MODIFIED FOURTH AMENDED
JOINT PLAN OF REORGANIZATION OF
THE EDUCATION RESOURCES INSTITUTE, INC. AND THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS AS OF AUGUST 26, 2010

Please take notice that attached hereto is the Modified Fourth Amended Joint Plan of
Reorganization of The Education Resources Institute, Inc. (the "Debtor") and the Official
Committee of Unsecured Creditors (the "Creditors Committee" and, together with the Debtor,
the "Plan Proponents") as of August 26, 2010 (the "August 2010 Plan") and accompanying
Supplemental Disclosure.[1]

Dated: August 30, 2010

Respectfully submitted,

THE EDUCATION RESOURCES
INSTITUTE, INC.

By their attorneys,

 s/Gina Lynn Martin
Gina Lynn Martin, Esq. (BBO# 643801)
Daniel M. Glosband, P.C. (BBO# 195620)
Goodwin Procter  LLP
Exchange Place
Boston, Massachusetts  02109
(617) 570-1000

---

[1]   On August 26, 2010, the Plan Proponents filed the Second Joint Motion to Modify Fourth Amended Joint Plan of Reorganization Pursuant
to 11 U.S.C. §1127 and Plan Section 14.4 and for Relief From July 12, 2010 Rulings (the "Second Modification Motion"); the August
2010 Plan was attached to the Second Modification Motion as its Exhibit B and the Supplemental Disclosure was attached as its Exhibit F.
The August 2010 Plan and Supplemental Disclosure filed herewith are identical to those filed as exhibits to the Second Modification
Motion.

EXHIBIT 2

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) Case No. 08-12540 (HJB) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |

## MODIFIED FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF THE EDUCATION RESOURCES INSTITUTE, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AS OF AUGUST 26, 2010

Dated: August 26, 2010

GOODWIN PROCTER LLP
Daniel M. Glosband
Gina Lynn Martin
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

DUANE MORRIS LLP
Jeffrey D. Sternklar
470 Atlantic Avenue
Boston, MA 02210
(857) 488-4216

LIBC/3875117.2

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS AND INTERPRETATION** ..................................................................... 1

| | | |
|---|---|---|
| 1.1 | **Accepting KeyCorp Trust** | 1 |
| 1.2 | **Accepting Make and Hold Lender** | 2 |
| 1.3 | **Accepting Make and Wait Lender** | 2 |
| 1.4 | **Accepting Securitization Trust** | 2 |
| 1.5 | **Additional Share** | 2 |
| 1.6 | **Administrative Expense Claim** | 2 |
| 1.7 | **Allowed** | 2 |
| 1.8 | **Approval Orders** | 2 |
| 1.9 | **Approved Make and Wait Settlement** | 2 |
| 1.10 | **Assumed Agreements** | 3 |
| 1.11 | **Available Cash** | 3 |
| 1.12 | **Ballot** | 3 |
| 1.13 | **Bankruptcy Code** | 3 |
| 1.14 | **Bankruptcy Court** | 3 |
| 1.15 | **Bankruptcy Rules** | 3 |
| 1.16 | **Business Day** | 3 |
| 1.17 | **Cash** | 3 |
| 1.18 | **Causes of Action** | 3 |
| 1.19 | **Chapter 11 Case** | 3 |
| 1.20 | **Claim** | 4 |
| 1.21 | **Claims Agent** | 4 |
| 1.22 | **Class** | 4 |
| 1.23 | **Collateral** | 4 |
| 1.24 | **Collateral Account** | 4 |
| 1.25 | **Collection Contract** | 4 |
| 1.26 | **Commencement Date** | 4 |
| 1.27 | **Confirmation Date** | 4 |
| 1.28 | **Confirmation Hearing** | 4 |
| 1.29 | **Confirmation Order** | 4 |
| 1.30 | **Convenience Class Claim** | 4 |
| 1.31 | **Creditor** | 4 |
| 1.32 | **Creditors' Committee** | 5 |
| 1.33 | **Cure Amount** | 5 |
| 1.34 | **Data** | 5 |
| 1.35 | **Debtor** | 5 |
| 1.36 | **Debtor Releasors** | 5 |
| 1.37 | **Decoder** | 5 |
| 1.38 | **Deficiency Claim** | 5 |
| 1.39 | **Disclosure Statement** | 5 |
| 1.40 | **Disputed** | 5 |

LIBC/3875117.2

| 1.41 | Disputed Claims Reserve | 6 |
| 1.42 | Effective Date | 6 |
| 1.43 | Effective Date Anniversary | 6 |
| 1.44 | Entity | 6 |
| 1.45 | ERISA | 6 |
| 1.46 | Estate | 6 |
| 1.47 | February 2010 Plan | 6 |
| 1.48 | Final Order | 6 |
| 1.49 | First Year Eligible Collections | 6 |
| 1.50 | General Unsecured Claim | 7 |
| 1.51 | General Unsecured Claim Distribution | 7 |
| 1.52 | Guaranty Fee | 7 |
| 1.53 | Impaired | 7 |
| 1.54 | IRC | 7 |
| 1.55 | IRS | 7 |
| 1.56 | Joint Pool Account | 7 |
| 1.57 | Joint Pool Account Lenders | 7 |
| 1.58 | Key Access Program Election | 7 |
| 1.59 | Key Access Program Settlement | 7 |
| 1.60 | Key Access Program Deficiency Claim | 7 |
| 1.61 | Key Corp Trust | 8 |
| 1.62 | Litigating Creditor | 8 |
| 1.63 | Litigation Claims Costs | 8 |
| 1.64 | Make and Hold Base Case | 8 |
| 1.65 | Make and Hold Claim | 8 |
| 1.66 | Make and Hold Lender | 8 |
| 1.67 | Make and Hold Settlement | 8 |
| 1.68 | Make and Wait Claim | 8 |
| 1.69 | Make and Wait Lender | 8 |
| 1.70 | Make and Wait Lender Settlement | 8 |
| 1.71 | Make and Wait Lien Dispute | 8 |
| 1.72 | Master Trust | 8 |
| 1.73 | Nellie Mae Adversary Proceeding | 8 |
| 1.74 | Other General Unsecured Claim | 8 |
| 1.75 | Other Trusts | 8 |
| 1.76 | Pension Plan | 9 |
| 1.77 | Person | 9 |
| 1.78 | Pipeline Loans | 9 |
| 1.79 | Plan | 9 |
| 1.80 | Plan Proponents | 9 |
| 1.81 | Plan Supplement | 9 |
| 1.82 | Plan Trust | 9 |
| 1.83 | Plan Trust Agreement | 9 |
| 1.84 | Plan Trust Assets | 9 |
| 1.85 | Plan Trustee | 9 |
| 1.86 | Plan Trustee Advisory Committee | 9 |

LIBC/3875117.2

| | | |
|---|---|---|
| 1.87 | Pledged Account | 10 |
| 1.88 | Pool Account | 10 |
| 1.89 | Postpetition Purchased Loans | 10 |
| 1.90 | Prepetition Recoveries Dispute | 10 |
| 1.91 | Prepetition Recoveries/Rehabs | 10 |
| 1.92 | Priority Claim | 10 |
| 1.93 | Priority Non-Tax Claim | 10 |
| 1.94 | Priority Tax Claim | 10 |
| 1.95 | Pro Rata | 10 |
| 1.96 | Pro Rata Distribution | 10 |
| 1.97 | Record Date | 10 |
| 1.98 | Rejection Bar Date | 10 |
| 1.99 | Released Party | 11 |
| 1.100 | Remaining Plan Trust Assets | 11 |
| 1.101 | Reorganized Articles of Incorporation | 11 |
| 1.102 | Reorganized By-laws | 11 |
| 1.103 | Reorganized TERI | 11 |
| 1.104 | Reorganized TERI Assets | 11 |
| 1.105 | Residual | 11 |
| 1.106 | Restricted Charitable Funds | 11 |
| 1.107 | Restricted Charitable Funds Carve-Out | 11 |
| 1.108 | Restricted Grant Funds | 12 |
| 1.109 | Revised Calculation | 12 |
| 1.110 | Retained Cash | 12 |
| 1.111 | Retained Contracts | 12 |
| 1.112 | Schedules | 12 |
| 1.113 | Second Modification Motion | 12 |
| 1.114 | Second Year Eligible Collections | 12 |
| 1.115 | Secured Claim | 12 |
| 1.116 | Secured Creditor | 12 |
| 1.117 | Securitization Trust | 12 |
| 1.118 | Securitization Trust Deficiency Claim | 12 |
| 1.119 | Securitization Trust Settlement | 12 |
| 1.120 | Securitization Trust Settlement Claim | 13 |
| 1.121 | Securitization Trust Settlement Claim Reduction | 13 |
| 1.122 | Segregated Recoveries Account | 13 |
| 1.123 | Solicitations Procedure Orders | 13 |
| 1.124 | Tax Claim | 13 |
| 1.125 | TERI First Year Share | 13 |
| 1.126 | TERI Loan Net Proceeds | 13 |
| 1.127 | TERI Loan Proceeds | 13 |
| 1.128 | TERI Net Recovery | 13 |
| 1.129 | TERI Owned Loan | 13 |
| 1.130 | TERI Second Year Share | 14 |
| 1.131 | Term | 14 |
| 1.132 | Transfer Taxes | 14 |

iii

1.133  **Treasury Regulations**......................................................... 14
1.134  **Trust Adversary Proceeding** ........................................... 14
1.135  **Trusts Order** ....................................................................... 14
1.136  **Unencumbered Loans Dispute** ......................................... 14
1.137  **Unencumbered Trust Loan** ............................................... 14
1.138  **Unimpaired** .......................................................................... 14
1.139  **United States Trustee** ....................................................... 14
1.140  **Unrestricted Cash** .............................................................. 14
1.141  **Victory Fund** ........................................................................ 15
1.142  **Voting Agent** ........................................................................ 15
1.143  **Voting Record Date**............................................................. 15
1.144  **Other Terms**.......................................................................... 15
1.145  **Construction Of Certain Terms**. ...................................... 15

**ARTICLE II** TREATMENT OF UNCLASSIFIED CLAIMS -- ADMINISTRATIVE
EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ...................................15

2.1  **Administrative Expense Claims**........................................ 15
2.2  **Pre-Effective Date Professional Fees and Expenses**. ..... 16
2.3  **United States Trustee Quarterly Fees and Other Statutory Fees**.................. 16
2.4  **Priority Tax Claims** ............................................................ 16

**ARTICLE III** CLASSIFICATION OF CLAIMS ..........................................16

3.1  **Class 1 – Priority Non-Tax Claims**.................................. 17
3.2  **Classes 2a – 2p – Secured Claims of Make and Wait Lenders** ........................ 17
3.3  **Classes 3a – 3q – Secured Claims of Securitization Trusts**. ................... 19
3.4  **Classes 4a – 4k – Secured Claims of the Keycorp Trusts and KeyBank
National Association (other than in its capacity as a Make and Wait
Lender** ................................................................................... 20
3.5  **Class 5 – General Unsecured Claims**. ............................... 21
3.6  **Class 6 – Convenience Class Claims**................................. 22

**ARTICLE IV** TREATMENT OF CLASSES 2 - 5 ......................................22

4.1  **Treatment of Class 2 Claims (Make and Wait Lender Claims)** .................... 22
4.2  **Treatment of Class 3 Claims (Securitization Trusts)**. ... 22
4.3  **Classes 4a – 4k**..................................................................... 24
4.4  **Class 5**. .................................................................................... 24

**ARTICLE V** VOTING AND DISTRIBUTION ............................................25

5.1  **Voting of Claims**................................................................... 25
5.2  **Acceptance by Impaired Class**.......................................... 25
5.3  **Presumed Acceptances of Plan**. ....................................... 26
5.4  **Nonconsensual Confirmation**. ........................................... 26
5.5  **Method of Distributions Under this Plan**......................... 26

iv

**ARTICLE VI** MEANS FOR IMPLEMENTATION AND EXECUTION OF THE
PLAN ......................................................................................29

| | | |
|---|---|---|
| **6.1** | **Reorganized TERI.** | 29 |
| **6.2** | **Compromise and Settlement.** | 29 |
| **6.3** | **Plan Trust.** | 36 |
| **6.4** | **Calculation of TERI Net Recovery.** | 41 |
| **6.5** | **Distribution to Secured Creditors.** | 41 |
| **6.6** | **Restricted Funds.** | 41 |
| **6.7** | **Operations of Reorganized TERI.** | 42 |
| **6.8** | **Closing of the Chapter 11 Case.** | 42 |
| **6.9** | **Section 1123(b)(3).** | 42 |
| **6.10** | **Establishment and Implementation of a Most Favored Nations Clause.** | 42 |
| **6.11** | **Disposition of Affected Property Pending Resolution of Nellie Mae Adversary Proceeding.** | 43 |

**ARTICLE VII** PROCEDURES FOR RESOLVING AND TREATING DISPUTED
CLAIMS ....................................................................................43

| | | |
|---|---|---|
| **7.1** | **No Distribution Pending Allowance.** | 43 |
| **7.2** | **Resolution of Disputed Claims.** | 44 |
| **7.3** | **Estimation.** | 44 |
| **7.4** | **Allowance of Disputed Claims.** | 44 |
| **7.5** | **Disallowance of Claims Without Further Order of the Bankruptcy Court.** | 44 |
| **7.6** | **No Distribution in Respect of Disallowed Claims.** | 44 |

**ARTICLE VIII** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ....................................................................................44

| | | |
|---|---|---|
| **8.1** | **Assumption or Rejection of Executory Contracts and Unexpired Leases.** | 44 |
| **8.2** | **Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.** | 45 |
| **8.3** | **Inclusiveness.** | 45 |
| **8.4** | **Return of Guaranty Fees.** | 46 |
| **8.5** | **Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Plan.** | 46 |
| **8.6** | **Insurance Policies.** | 46 |
| **8.7** | **Compensation and Benefit Programs.** | 46 |
| **8.8** | **Retiree Benefits.** | 46 |

**ARTICLE IX** CONDITIONS PRECEDENT TO ENTRY OF THE CONFIRMATION
ORDER .....................................................................................47

| | | |
|---|---|---|
| **9.1** | **Conditions Precedent to entry of the Confirmation Order.** | 47 |

LIBC/3875117.2

| | | |
|---|---|---|
| 9.2 | Waiver of Conditions | 47 |
| 9.3 | Effect of Failure of Condition to Entry of Confirmation Order | 47 |

**ARTICLE X EFFECTIVENESS OF THE PLAN** ........................................................47

| | | |
|---|---|---|
| 10.1 | Conditions Precedent to the Effective Date | 47 |
| 10.2 | Waiver of Conditions | 48 |
| 10.3 | Effect of Failure of Condition to Entry of Confirmation Order | 48 |

**ARTICLE XI CONSEQUENCES OF A FAILURE OF A CONDITION IN ARTICLES
IX AND X** ...........................................................................................48

**ARTICLE XII EFFECTS OF CONFIRMATION** ...................................................49

| | | |
|---|---|---|
| 12.1 | Vesting of Assets | 49 |
| 12.2 | Binding Effect | 49 |
| 12.3 | Discharge | 49 |
| 12.4 | Releases, Injunctions and Exculpation | 50 |
| 12.5 | Release of Assets | 51 |
| 12.6 | Claims Preserved | 51 |
| 12.7 | Residual | 52 |
| 12.8 | ERISA | 52 |

**ARTICLE XIII RETENTION OF JURISDICTION** ..................................................52

| | | |
|---|---|---|
| 13.1 | Jurisdiction of Bankruptcy Court | 52 |

**ARTICLE XIV MISCELLANEOUS PROVISIONS** ...................................................53

| | | |
|---|---|---|
| 14.1 | Effectuating Documents and Further Transactions | 53 |
| 14.2 | Exemption from Transfer Taxes | 54 |
| 14.3 | Post-Confirmation Date Fees and Expenses | 54 |
| 14.4 | Modification of Plan | 54 |
| 14.5 | Withdrawal or Revocation | 54 |
| 14.6 | Courts of Competent Jurisdiction | 55 |
| 14.7 | Notices | 55 |
| 14.8 | Severability | 56 |
| 14.9 | Governing Law | 56 |
| 14.10 | Headings | 56 |
| 14.11 | Exhibits | 56 |
| 14.12 | Successors and Assigns | 56 |
| 14.13 | Dissolution of the Creditors' Committee | 56 |
| 14.14 | Courts of Competent Jurisdiction | 57 |
| 14.15 | Plan Supplement | 57 |
| 14.16 | Plan Controls Disclosure Statement; Confirmation Order Controls Plan | 57 |
| 14.17 | Filing of Additional Documents | 57 |

vi

14.18  **Tax-Exempt Status**.................................................................................... 57
14.19  **Consent to Transfer of Residual**............................................................... 57

vii

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

</div>

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) Case No. 08-12540 (HJB) |
| | ) |
| Debtor. | ) |
| | ) |

<div align="center">

**MODIFIED FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF
THE EDUCATION RESOURCES INSTITUTE, INC. AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS AS OF AUGUST 26, 2010**

</div>

The Education Resources Institute, Inc., debtor and debtor in possession in the above-captioned Chapter 11 Case, and the Official Committee of Unsecured Creditors, as Plan Proponents, jointly propose the following Modified Fourth Amended Joint Amended Plan of Reorganization of the Education Resources Institute, Inc. and the Official Committee of Unsecured Creditors as of August 26, 2010 pursuant to section 1121(a) of the Bankruptcy Code. The Plan[1] contemplates the reorganization of the Debtor and the resolution of all outstanding claims against the Debtor.

If any Impaired Class of Claims against the Debtor entitled to vote on the Plan does not accept the Plan by the requisite statutory majority required by section 1126(c) of the Bankruptcy Code or as provided for in the Solicitations Procedures Order, then the Plan Proponents may take any of the actions specified herein, including proceeding to confirm the Plan under section 1129(b) of the Bankruptcy Code.

<div align="center">

**ARTICLE I**

**DEFINITIONS AND INTERPRETATION**

</div>

**Definitions**.  As used in the Plan, the following terms have the respective meanings specified below, unless the context otherwise requires:

**1.1**   **Accepting KeyCorp Trust** means a KeyCorp Trust that has accepted the Plan and thus has not elected the Key Access Program Election.

---

[1]   Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in Article I of this Plan.

**1.2**   **Accepting Make and Hold Lender** means a Make and Hold Lender that has accepted the Plan.

**1.3**   **Accepting Make and Wait Lender** means a Make and Wait Lender that has accepted the Plan.

**1.4**   **Accepting Securitization Trust** means a Securitization Trust that has accepted the Plan or that has been deemed to accept the Plan, and thereby, the Securitization Trust Settlement.

**1.5**   **Additional Share** means the amount, if any, by which $1,625,000 exceeds the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share.

**1.6**   **Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of the Chapter 11 Case under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the assets of the Debtor, any actual and necessary expenses of operating the business of the Debtor, all compensation and reimbursement of expenses Allowed by the Bankruptcy Court under sections 330 or 503 of the Bankruptcy Code, and any fees and charges assessed against the Debtor under section 1930 of chapter 123 of title 28 of the United States Code.

**1.7**   **Allowed** means, with reference to any Claim against the Debtor, (a) any Claim against the Debtor that has been listed by the Debtor in its Schedules (as such Schedules may be amended by the Debtor) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any timely filed proof of Claim as to which no objection has been or is interposed or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of such holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, and (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Plan Trustee pursuant to a Final Order of the Bankruptcy Court or under the Plan; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims." Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" will not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

**1.8**   **Approval Orders** means the Orders (a) approving the Disclosure Statement; (b) (to the extent not addressed in the Solicitations Procedure Orders) approving Solicitation Procedures; (c) approving Forms of Ballots and establishing procedures for voting on the Plan and for changing votes; and (d) scheduling hearings and establishing notice and objection procedures in respect of confirmation of the Plan.

**1.9**   **Approved Make and Wait Settlement** means the compromise and settlement agreements between the Debtor and (1) Bank of America, N.A. (2) JP Morgan Chase, N.A. and (3) Union Federal Savings Bank, previously approved by the Bankruptcy Court pursuant to a Final Order.

<div align="center">2</div>

**1.10** **Assumed Agreements** means the executory contracts and unexpired leases identified on Schedule 8.1(A) and Schedule 8.1(B) in the Plan Supplement.

**1.11** **Available Cash** means, as of the Effective Date, Unrestricted Cash _minus_ the Retained Cash.

**1.12** **Ballot** means the form ballot approved by the Bankruptcy Court to indicate acceptance or rejection of the Plan, to make any other elections or representations and to change votes as required or permitted pursuant to the Plan, the Solicitations Procedure Order or the Approval Order.

**1.13** **Bankruptcy Code** means Title 11 of the United States Code, 11 U.S.C. § 101, et seq, as amended from time to time, as applicable to the Chapter 11 Case.

**1.14** **Bankruptcy Court** means the United States Bankruptcy Court for the District of Massachusetts (Eastern Division), or any other court of the United States having jurisdiction over the Chapter 11 Case.

**1.15** **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, including the local rules of the Bankruptcy Court.

**1.16** **Business Day** means any day other than a Saturday, a Sunday, any other day on which commercial banks in Boston, Massachusetts are required or authorized to close by law or executive order.

**1.17** **Cash** means legal tender of the United States of America and equivalents thereof.

**1.18** **Causes of Action** means any and all rights, claims, causes of action, suits and proceedings that could have been brought or raised by or on behalf of the Debtor and/or the Estate arising before, on, or after the Commencement Date, including, without limitation, whether known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity, under any theory of law, and all actions that may be commenced before or after the Effective Date by or on behalf of the Debtor and/or the Estate, pursuant to Chapter 5, including, without limitation, (i) claims arising under or related to sections 105, 502(d), 510, 544, 545, 547, 548, 549, 550, 551 and 553(b) of the Bankruptcy Code or under similar provisions of applicable state law, (ii) all claims that have been or may be asserted by the plaintiff in the Trust Adversary Proceeding against any of Classes 3a-3q that is deemed to reject the Plan and/or opt out of the Securitization Trust Settlement, and (iii) any and all claims against First Marblehead Corporation, First Marblehead Educations Resources, Inc., First Marblehead Data Services, Inc. and their respective affiliates.

**1.19** **Chapter 11 Case** means the voluntary case under chapter 11 of the Bankruptcy Code, commenced by the Debtor in the Bankruptcy Court, styled "In re The Education Resources Institute, Inc.," Case Number 08-12540 (HJB).

3

**1.20**   **Claim** has the meaning assigned to such term in section 101(5) of the Bankruptcy Code.

**1.21**   **Claims Agent** means Epiq Systems, Inc., which is located at 757 Third Avenue, Third Floor, New York, NY 10017, and was retained as the Debtor's claim agent in the Chapter 11 Case.

**1.22**   **Class** means any Claim or group of substantially similar Claims classified by the Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

**1.23**   **Collateral** means any property or interest in property of the Estate of the Debtor subject to a lien to secure the payment or performance of a Claim, which lien is valid, perfected and enforceable under applicable law, and is not subject to avoidance under the Bankruptcy Code or other applicable law.

**1.24**   **Collateral Account** means a Pledged Account, Victory Fund, a Pool Account, or the Joint Pool Account, as applicable.

**1.25**   **Collection Contract** means the contract regarding the collection of TERI Loan Proceeds, substantially in the form set forth in the Plan Supplement, between Reorganized TERI and the Plan Trustee.

**1.26**   **Commencement Date** means April 7, 2008, the date on which the Debtor commenced the Chapter 11 Case.

**1.27**   **Confirmation Date** means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case.

**1.28**   **Confirmation Hearing** means the hearing(s) held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing(s) may be adjourned or continued from time to time.

**1.29**   **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance satisfactory to the Debtor and Creditors' Committee.

**1.30**   **Convenience Class Claim** means a Claim that would otherwise be an allowed General Unsecured Claim and that is greater than $0 and less than or equal to $1,500 in Allowed amounts or the Claim of any Creditor that elects to reduce its Allowed General Unsecured Claim to an amount equal to $1,500, *provided, however,* that in the event the aggregate amount of Convenience Class Claims exceeds $250,000, the Plan Proponents or after the Effective Date the Plan Trustee, in their sole discretion, can reject an election made by a Creditor to reduce its Allowed General Unsecured Claim to $1,500. In the event that the Plan Proponents or the Plan Trustee (as applicable) reject any such election, then such Creditor's Claim will be treated as a General Unsecured Claim classified in Class 5.

**1.31**   **Creditor** means any holder of a Claim.

4

**1.32**    **Creditors' Committee** means the official statutory committee of unsecured creditors appointed by the Office of the United States Trustee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code, as such committee has been amended from time to time.

**1.33**    **Cure Amount** means any amounts required to be paid to a counterparty to an executory contract or unexpired lease to assume such contract or lease pursuant to section 365 of the Bankruptcy Code.

**1.34**    **Data** means all books and records of the Debtor, including, but not limited to, computer generated or computer maintained books and records and computer data, and electronically generated or maintained books and records or data.

**1.35**    **Debtor** means The Education Resources Institute, Inc., including, where applicable, in its capacity as debtor in possession in the Chapter 11 Case pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

**1.36**    **Debtor Releasors** means the Debtor, Reorganized TERI and any Person or Entity seeking to exercise the rights of the Estate, including without limitation, any successor to the Debtor or any representative of the Estate appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (including, but not limited to, the Plan Trustee).

**1.37**    **Decoder** means the Claims estimation methodology included in the Plan Supplement.

**1.38**    **Deficiency Claim** means the amount by which the Claim of a Secured Creditor exceeds the value of the Collateral securing such Claim, which amount shall be treated as a General Unsecured Claim.

**1.39**    **Disclosure Statement** means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as such may be amended or supplemented and ultimately be approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as amended, modified or supplemented in accordance with applicable law.

**1.40**    **Disputed** means, with respect to an Administrative Expense Claim or other Claim, any such Administrative Expense Claim or other Claim (a) as to which no proof of Claim was timely and properly filed and that is scheduled by the Debtor as disputed, unliquidated or contingent; or (b) proof of which was timely and properly filed, and (i) which has been or is listed on the Schedules as unliquidated, disputed or contingent, and which has not been resolved by a Final Order or (ii) as to which the Debtor or any other party-in-interest, has interposed a timely objection or request for estimation for purposes of distribution in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation has not been withdrawn, compromised, resolved, settled or determined by a Final Order. Prior to (x) the filing of an objection to a Claim or (y) the expiration of the time within which to object to such Claim set forth in the Plan or otherwise established by order of the Bankruptcy Court, for purposes of the Plan, a Claim will be considered a Disputed Claim if (i) the amount of the Claim specified in the proof of Claim exceeds the amount of the Claim scheduled by the Debtor as other than disputed, contingent or unliquidated or (ii) the Claim is not listed on the Schedules.

5

**1.41** **Disputed Claims Reserve** means the portion of the Plan Trust Assets that would be allocable to, or retained on account of, Disputed General Unsecured Claims, as determined from time to time if such Claims were Allowed Claims, which assets must (to the extent practicable) be held separately from other assets of the Plan Trust, but shall be subject to an allocable share of all expenses and obligations of the Plan Trust.

**1.42** **Effective Date** means a Business Day selected by the Plan Proponents on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of this Plan specified in section 9.1 of this Plan will have been satisfied or waived as provided in section 9.2.

**1.43** **Effective Date Anniversary** means the annual anniversary of the Effective Date; *provided, however*, that if the anniversary of the Effective Date in any year is not a Business Day, then the Effective Date Anniversary will be the first Business Day after the anniversary of the Effective Date in such year.

**1.44** **Entity** has the meaning assigned to such term in section 101(15) of the Bankruptcy Code

**1.45** **ERISA** means Title IV of the Employee Retirement Income Security Act of 1974, as amended, codified as 29 U.S.C. §§ 1301-1461.

**1.46** **Estate** means the estate created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

**1.47** **February 2010 Plan** means the Fourth Amended Joint Plan of Reorganization dated February 25, 2010.

**1.48** **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rules 59 and 60 of the Federal Rules of Civil Procedure, 11 U.S.C. §1144 or any analogous rules under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

**1.49** **First Year Eligible Collections** means all TERI Loan Net Proceeds in excess of $1,250,000 collected pursuant to the Collection Contract during the first year of the Term.

6

**1.50** <u>General Unsecured Claim</u> means any Claim against the Debtor that is not a Secured Claim, Administrative Expense Claim, Priority Claim or Convenience Class Claim. For avoidance of doubt, any Deficiency Claim is a General Unsecured Claim.

**1.51** <u>General Unsecured Claim Distribution</u> means a distribution on account of an Allowed General Unsecured Claim of a beneficial interest in the Plan Trust determined on a Pro Rata basis with respect to all General Unsecured Claims.

**1.52** <u>Guaranty Fee</u> means a fee payable to the Debtor in consideration for the Debtor's guaranty of a student loan.

**1.53** <u>Impaired</u> means any Claim that is "impaired" under section 1124 of the Bankruptcy Code.

**1.54** <u>IRC</u> means the Internal Revenue Code of 1986, as amended.

**1.55** <u>IRS</u> means the United States Internal Revenue Service.

**1.56** <u>Joint Pool Account</u> means that certain account maintained at U.S. Bank, N.A. containing deposits of, among other things, Guaranty Fees, which deposits serve as Collateral in which each Joint Pool Account Lender has a *pari passu* interest.

**1.57** <u>Joint Pool Account Lenders</u> means the following lenders: (1) Comerica Bank, N.A., (2) Insurbanc, (3) KeyBank National Association, (4) M&T Bank, (5) PNC Bank, N.A., (6) Sovereign Bank, (7) TCF National Bank and (8) U.S. Bank, N.A.

**1.58** <u>Key Access Program Election</u> means the election of KeyBank National Association (excluding in its capacity as a Make and Wait Lender) or a KeyCorp Trust, pursuant to a timely Ballot completed and delivered in accordance with the Solicitations Procedure Order, to (i) reject this Plan and thereby forego receipt of the Key Access Program Settlement on account of its Claim, and (ii) request that the Allowed amount of such Claim be determined by the Bankruptcy Court after entry of the Confirmation Order.

**1.59** <u>Key Access Program Settlement</u> means the settlement described in section 6.2(d) of this Plan whereby each Accepting KeyCorp Trust and KeyBank National Association (excluding in its capacity as a Make and Wait Lender), agrees to accept in full settlement of all of its Claims, (i) its allocable share of the Victory Fund account as of the Commencement Date in accordance with Section 6.2(d) of this Plan, and (ii) an Allowed General Unsecured Claim as listed as the "Key Access Program Settlement Amount" on Schedule C attached hereto.

**1.60** <u>Key Access Program Deficiency Claim</u> means, with respect to each Accepting KeyCorp Trust and (if it accepts the Plan) KeyBank National Association (excluding in its capacity as a Make and Wait Lender), the amount of KeyBank National Association's and each KeyCorp Trust's Allowed Deficiency Claim set forth in the column labeled "Key Access Program Decoder Settlement Claim" on <u>Schedule C</u> attached hereto.

7

**1.61**   **Key Corp Trust** means collectively, each of KeyCorp Student Loan Trust ("KSLT") 1999-A, KSLT 1999-B, KSLT 2000-A, KSLT 2000-B, KSLT 2001-A, KSLT 2002-A, KSLT 2003-A, KSLT 2004-A, KSLT 2005-A and KSLT 2006-A.

**1.62**   **Litigating Creditor** has the meaning ascribed to such term in Section 6.10 of this Plan.

**1.63**   **Litigation Claims Costs** means any and all costs incurred by the Plan Trustee for prosecuting the Causes of Action, enforcing any judgment on the Causes of Action, and recovering proceeds on account of the Causes of Action, including reasonable professionals' fees, if any, incurred by this Plan Trust.

**1.64**   **Make and Hold Base Case** means, for each Make and Hold Claim classified in Class 4, the amount listed as the "Make and Hold Base Case" on Schedule D attached hereto.

**1.65**   **Make and Hold Claim** means the General Unsecured Claim of a Make and Hold Lender.

**1.66**   **Make and Hold Lender** means those entities that are listed on Schedule D attached hereto.

**1.67**   **Make and Hold Settlement** means the settlement described in section 6.2(b) below.

**1.68**   **Make and Wait Claim** means a Secured Claim held by a Make and Wait Lender in Class 2 and its respective subclasses.

**1.69**   **Make and Wait Lender** means those entities whose Claims are classified in Classes 2a through 2p of this Plan.

**1.70**   **Make and Wait Lender Settlement** means the settlement between the Debtor and an Accepting Make and Wait Lender described in section 6.2(a) below.

**1.71**   **Make and Wait Lien Dispute** means the potential challenge to the validity of liens and security interests of Insurbanc, M&T Bank, PNC Bank and RBS Citizens, N.A.

**1.72**   **Master Trust** means The National Collegiate Master Student Loan Trust I.

**1.73**   **Nellie Mae Adversary Proceeding** means Adversary Proceeding 10-01034, *Nellie Mae Education Foundation, Inc. v. The Education Resources Institute, Inc.*, in the United States Bankruptcy Court for the District of Massachusetts.

**1.74**   **Other General Unsecured Claim** means any General Unsecured Claim that is not otherwise defined in this Plan.

**1.75**   **Other Trusts** mean a portfolio of student loans securitized and guaranteed by TERI and owned by a trust, which trust has no Collateral Account and is not a Securitization Trust or a Key Corp Trust.

8

**1.76**   **Pension Plan** means the tax qualified defined benefit pension plan covered by ERISA, sponsored and maintained by the Debtor.

**1.77**   **Person** has the meaning assigned to such term in section 101(41) of the Bankruptcy Code.

**1.78**   **Pipeline Loans** means student loans funded by a lender pursuant to a loan program with the Debtor on or after the Commencement Date.

**1.79**   **Plan** means this chapter 11 plan and the Plan Supplement, including all exhibits and schedules annexed hereto, as all such documents, exhibits and schedules may be altered, amended or modified from time to time.

**1.80**   **Plan Proponents** means the Debtor and the Creditors' Committee.

**1.81**   **Plan Supplement** means the compilation of documents and forms of documents specified in this Plan and filed in connection with the February 2010 Plan, as the same may be modified or supplemented and filed prior to the Confirmation Hearing..  The Plan Supplement constitutes part of this Plan.

**1.82**   **Plan Trust** means the trust established under Section 6.3 of this Plan and the Plan Trust Agreement.

**1.83**   **Plan Trust Agreement** means the agreement, substantially in the form set forth in the Plan Supplement, between the Debtor and the Plan Trustee, governing the Plan Trust, which agreement shall be in form and substance acceptable to the Debtor and Creditors' Committee.

**1.84**   **Plan Trust Assets** means all assets of the Debtor, other than the Reorganized TERI Assets, including, without limitation, any proceeds or products of all such assets, including but not limited to (a) the Available Cash (including the Restricted Charitable Funds Carve-Out), (b) TERI Owned Loans, including Unencumbered Trust Loans, (c) the TERI Loan Proceeds, (subject to Reorganized TERI's right to receive payment of the TERI Net Recovery), (d) all Causes of Action, (e) property (including Cash) received in respect of a Make and Wait Settlement, (f) all other property of the Estate that is not included in Reorganized TERI Assets.

**1.85**   **Plan Trustee** means the Person appointed by the Creditors' Committee with the consent of the Debtor, which consent may not be unreasonably withheld, to administer the Plan Trust, as identified in the Plan Trust Agreement.

**1.86**   **Plan Trustee Advisory Committee** means a committee selected by the Creditors' Committee, the membership of which is disclosed in the Plan Supplement, created in furtherance of the Plan Trust Agreement, that will have the responsibility to review and advise the Plan Trustee with respect to the liquidation and distribution of Plan Trust Assets in accordance with the Plan Trust Agreement.

9

**1.87**   **Pledged Account** means any bank account in which each Securitization Trust, as applicable, holds a valid, perfected and unavoidable security interest and lien to secure an Allowed Secured Claim.

**1.88**   **Pool Account** means any bank account in which some or all of the Make and Wait Lenders, as applicable, assert a valid, perfected and unavoidable security interest and lien to secure an Allowed Secured Claim.

**1.89**   **Postpetition Purchased Loans** means those loans purchased by the Debtor pursuant to the Trusts Order after the Commencement Date with funds in the Pledged Accounts.

**1.90**   **Prepetition Recoveries Dispute** means a dispute under the February 2010 Plan concerning the disposition of approximately $6.2 million of Prepetition Recoveries on defaulted loans purchased from various Securitization Trusts, as discussed in the Second Modification Motion.

**1.91**   **Prepetition Recoveries/Rehabs** means those amounts collected by the Debtor prior to the Commencement Date in respect of loans purchased from the Securitization Trusts prior thereto with funds in the Pledged Accounts, but not deposited in the applicable Pledged Accounts, as set forth in Column E of Schedule B.

**1.92**   **Priority Claim** means a Priority Tax Claim or Priority Non-Tax Claim.

**1.93**   **Priority Non-Tax Claim** means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

**1.94**   **Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.95**   **Pro Rata** means the proportion that the amount of any Allowed Claim in a particular class bears to the aggregate amount of all Claims in such Class, including Disputed Claims.

**1.96**   **Pro Rata Distribution** means a distribution by the Plan Trustee to beneficiaries of the Plan Trust, made proportionately, so that with respect to a particular beneficial interest in the Plan Trust, the ratio of (a)(i) the value of property distributed on account of such beneficial interest to (ii) the amount of the Allowed Claim on account of which such beneficial interest was distributed, is the same as the ratio of (b)(i) the value of property distributed on account of all beneficial interests to (ii) the amount of all Allowed Claims on account of which all beneficial interests in the Plan Trust are distributed.

**1.97**   **Record Date** means February 26, 2010.

**1.98**   **Rejection Bar Date** means the deadline for filing proofs of Claim arising from the rejection of an executory contract or unexpired lease, which deadline will be 30 calendar

days after the entry of an order approving the rejection of such executory contract or unexpired lease and which order may be the Confirmation Order.

**1.99** **Released Party** means any current or former officer, director, member or employee of the Debtor; any attorney or financial advisor engaged by the Debtor in respect of Chapter 11 Case; and any attorney, accountant, financial advisor or other professional of the Creditors' Committee and the former, current and future members of the Creditors Committee in such capacity.

**1.100** **Remaining Plan Trust Assets** means assets remaining in the Plan Trust in the event that the Plan Trustee has distributed Plan Trust Assets to the holders of Allowed General Unsecured Claims equal to 100% of the aggregate amount of Allowed General Unsecured Claims, <u>plus</u> any statutory interest payable to holders of such Allowed General Unsecured Claims necessary to pay such Claims "in full."

**1.101** **Reorganized Articles of Incorporation** means the articles of incorporation or similar corporate organizational document of Reorganized TERI, as amended and restated, substantially in the forms to be filed with the Plan Supplement.

**1.102** **Reorganized By-laws** means the by-laws or similar corporate organizational document, to the extent applicable, of Reorganized TERI, as amended and restated, substantially in the forms to be filed with the Plan Supplement.

**1.103** **Reorganized TERI** means The Education Resources Institute, Inc. on and after the Effective Date.

**1.104** **Reorganized TERI Assets** means all of the Debtor's right, title and interest in and to (a) the Retained Cash; (b) the Restricted Charitable Funds; (c) the Restricted Grant Funds; (d) Reorganized TERI's right to receive payment of the TERI Net Recovery; (e) the Retained Contracts; (f) Reorganized TERI's rights under the Collection Contract; (g) the Remaining Plan Trust Assets, if any; (h) the Residual and (i) all furniture, fixtures, equipment, Data, and all other related assets necessary to support Reorganized TERI's business, all as determined substantially consistently with the Pro Forma Statement of Reorganized TERI Assets included in the Plan Supplement.

**1.105** **Residual** means the residual interest of the Debtor as partial owner of the Securitization Trusts identified in Class 3 and its subclasses.

**1.106** **Restricted Charitable Funds** means Cash or other assets held by the Debtor pursuant to a charitable deed of gift, the use of which is restricted by applicable state law or other non-bankruptcy law, which funds will be identified in the Plan Supplement <u>minus</u> the Restricted Charitable Funds Carve-Out.

**1.107** **Restricted Charitable Funds Carve-Out** means an amount equal to $6,000,000.

**1.108   Restricted Grant Funds** means Cash or other assets held by the Debtor pursuant to private or government grants, the use of which is restricted to specific activities by the terms of the grants, which funds will be identified in the Plan Supplement.

**1.109   Revised Calculation** has the meaning ascribed to such term in Section 6.10 of this Plan.

**1.110   Retained Cash** means $2,900,000, less amounts necessary to satisfy in full all priority claims under 11 U.S.C. §§507(a)(3) – (10), 507(b) – (d) to the extent such claims in the aggregate exceed $50,000, subject to further reduction as provided for in the Plan.

**1.111   Retained Contracts** means (i) any Assumed Agreement, (ii) any contract entered into during the pendency of this Chapter 11 Case and (iii) any Approved Make and Wait Settlement, and (iv) any other contract that is neither assumed nor rejected pursuant to 11 U.S.C. §365, in all cases to which the Debtor is a party, that is listed as a Retained Contract in the Plan Supplement.

**1.112   Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

**1.113   Second Modification Motion** means the Second Joint Motion of The Education Resources Institute, Inc. and the Official Committee of Unsecured Creditors to Modify Fourth Amended Joint Plan of reorganization Pursuant to 11 U.S.C §1127 and Plan Section 14.4 and for Relief from July 12, 2010 Rulings, including the proposed Ambac Compromise and Securitization Trust Modifications as defined therein.

**1.114   Second Year Eligible Collections** means all TERI Loan Net Proceeds in excess of $1,125,000 collected pursuant to the Collection Contract during the second year of the Term.

**1.115   Secured Claim** means an Allowed Claim held by any entity against the Debtor secured by Collateral, but only to the extent of the value, as set forth in this Plan, as agreed to by the holder of such Claim and the Debtor, or as determined by Final Order pursuant to section 506(a) of the Bankruptcy Code, of such entity's interest in the Estate's interest in such Collateral; *provided, however,* that a Secured Claim does not include a Deficiency Claim.

**1.116   Secured Creditor** means a Creditor that holds a Secured Claim.

**1.117   Securitization Trust** means collectively, each of the "National Collegiate Trusts" that are holders of Claims as more fully described in Classes 3a – 3q hereof.

**1.118   Securitization Trust Deficiency Claim** means a Deficiency Claim, classified in Class 5 and determined in accordance with section 4.2 of this Plan.

**1.119   Securitization Trust Settlement** means, with respect to a Securitization Trust that accepts this Plan or is deemed to accept the Plan and, thereby, the Securitization Trust

Settlement, the allowance of Claims and compromise and settlement of the Trust Adversary Proceeding as set forth in Section 6.2(c) of this Plan.

**1.120** **Securitization Trust Settlement Claim** means the amount of a General Unsecured Claim listed as "Securitization Trust Settlement Claim" on Schedule B attached hereto.

**1.121** **Securitization Trust Settlement Claim Reduction** means, with respect to the applicable Securitization Trust, the amount by which the Allowed Claim of a Securitization Trust is reduced as part of the Securitization Trust Settlement, as set forth in the "Securitization Trust Settlement Claim Reduction" column of Schedule B.

**1.122** **Segregated Recoveries Account** means the Segregated Recoveries Account established pursuant to the Trusts Order.

**1.123** **Solicitations Procedure Orders** means (a) the Order approving the Debtor's Motion (A) Approving the Disclosure Statement, (B) Temporarily Allowing Claims for Voting Purposes, (C) Establishing Procedures for Confirmation of the Plan, (D) Establishing Plan Solicitation and Voting Procedures and (E) Approving Forms of Notices and Ballots dated March 8, 2010 for the February 2010 Plan and (b) the Order Authorizing Plan Proponents To Proceed With Second Joint Motion of Plan Proponents to Modify Fourth Amended Joint Plan of Reorganization Pursuant to 11 U.S.C. § 1127 and Plan § 14.4, Approving Disclosure, Establishing Procedure to Permit Eligible Creditors to Change Their Votes and Scheduling Confirmation Hearing for the August 2010 Plan.

**1.124** **Tax Claim** means a (a) Priority Tax Claim or (b) an Administrative Expense Claim or Secured Claim to the extent such Administrative Expense Claim or Secured Claim is a Claim based on taxes due to a taxing authority.

**1.125** **TERI First Year Share** means the amount of TERI Loan Net Proceeds collected during the first year of the Term, payable to Reorganized TERI as calculated in Article VI, section 6.4(a) hereof.

**1.126** **TERI Loan Net Proceeds** means any TERI Loan Proceeds less any costs of collection of such TERI Loan Proceeds.

**1.127** **TERI Loan Proceeds** means any Cash or other property collected from an obligor of a TERI Owned Loan in respect of such obligor's obligations under the agreement establishing such TERI Owned Loan.

**1.128** **TERI Net Recovery** means the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share plus (iii) the Additional Share.

**1.129** **TERI Owned Loan** means a student loan owned by the Debtor as of the Effective Date, whether purchased by the Debtor or transferred to the Debtor pursuant to an Approved Make and Wait Settlement, a Securitization Trust Settlement or otherwise, other than

13

loans being transferred by the Debtor or its agents to other entities (other than the Plan Trustee) pursuant to this Plan.

1.130   **TERI Second Year Share** means the amount of TERI Loan Net Proceeds collected during the second year of the Term, payable to Reorganized TERI as calculated in Article VI, section 6.4(b) hereof.

1.131   **Term** means a period of two years beginning on the Effective Date.

1.132   **Transfer Taxes** means any sales, use, notorial, or other transfer taxes (including any interest, penalties or other additions thereto) of the Debtor that have been or may be assessed with respect to any transfer under this Plan.

1.133   **Treasury Regulations** means final, temporary and proposed regulations promulgated by the U.S. Treasury Department in respect of the IRC.

1.134   **Trust Adversary Proceeding** means that certain adversary proceeding, Case No. 09-1040, pending in the Bankruptcy Court against the Wilmington Trust Company, as owner-trustee of the Securitization Trusts, U.S. Bank National Association as indenture trustee and custodian and First Marblehead Data Services, Inc. as administrator for the Securitization Trusts.

1.135   **Trusts Order** means the Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the Benefit of the Trusts entered on the docket of the Bankruptcy Case on June 23, 2008.

1.136   **Unencumbered Loans Dispute** means a dispute under the February 2010 Plan concerning the disposition of approximately $34.4 million face amount at the time of default of Unencumbered Trust Loans, as discussed in the Second Modification Motion.

1.137   **Unencumbered Trust Loan** means (a) a defaulted loan that was purchased prior to the Commencement Date by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust to the extent the Debtor paid the purchase price for such defaulted loan from funds in the Debtor's general operating account, or otherwise from funds from any source other than the applicable Pledged Account and (b) is listed on a schedule of Unencumbered Trust Loans to be filed by the Plan Proponents prior to the conclusion of the Confirmation Hearing.

1.138   **Unimpaired** means not Impaired.

1.139   **United States Trustee** means the acting or appointed United States Trustee for the District of Massachusetts, as applicable.

1.140   **Unrestricted Cash** means all Cash (including, without limitation, the Restricted Charitable Funds Carve-Out) that is not Collateral, Restricted Charitable Funds or Restricted Grant Funds.

14

**1.141** **Victory Fund** means the Collateral Account the Debtor maintains at KeyBank National Association.

**1.142** **Voting Agent** means Epiq Bankruptcy Solutions, LLC.

**1.143** **Voting Record Date** means the date established by the Solicitation Procedures Order by which the Voting Agent must actually receive an otherwise valid vote or vote change on this Plan in order for such vote to count as a vote to accept or reject (or to change a prior vote to accept or reject) this Plan.

**1.144** **Other Terms**.  A term used in this Plan that is not defined will have the meaning ascribed to that term, if any, in the Bankruptcy Code.

**1.145** **Construction Of Certain Terms**.

*(a)* The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole, including, as applicable, the documents contained in the Plan Supplement, and not to any particular section, subsection or clause contained in this Plan or the Plan Supplement.

*(b)* Wherever from the context it appears appropriate, each term stated in either the singular or the plural includes the singular and the plural and pronouns stated in the masculine, feminine or neuter gender include the masculine, the feminine and the neuter.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS – ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

**2.1**   **Administrative Expense Claims**.  Except to the extent the holder of an Allowed Administrative Expense Claim agrees otherwise, each holder of an Allowed Administrative Expense Claim will be paid on account of such Allowed Administrative Expense Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms between the holder of such claim and the Debtor, or (b) such lesser amount as the holder of an Allowed Administrative Expense Claim and the Debtor and Plan Trustee  might otherwise agree; *provided, however* that expenses of operation accrued and unpaid as of the Effective Date arising in the ordinary course of the Debtor's business and payable in such ordinary course (including any and all Claims and Expenses directly or indirectly arising from or related to the Pension Plan) will be paid solely by Reorganized TERI from Reorganized TERI Assets in the ordinary course after the Effective Date.  For the avoidance of doubt, ordinary course expenses shall not include direct costs of collections or the recoveries or costs of recoveries (including litigation and other collection costs associated with recoveries on defaulted loans) that are payable from the proceeds of such collections pursuant to the Collection Contract.  Rather, ordinary course expenses to be paid from Reorganized TERI Assets pursuant to this section include rent, payroll, utility, other similar monthly expenses, pension costs, Claims and expenses directly or indirectly

15

arising from or related to the Pension Plan retiree benefits, employee benefits and other expenses attributable to the Debtor's or Reorganized TERI's business.

**2.2** **Pre-Effective Date Professional Fees and Expenses**.  All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for fees and/or expenses incurred prior to and including the Effective Date under section 330 or 503(b) of the Bankruptcy Code will file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court.  Objections to any such final application must be filed on or before a date to be set by the Bankruptcy Court in the Confirmation Order or, if no such date is set in the Confirmation Order or in any other Order, then by the date required by the Massachusetts Local Bankruptcy Rules.  Any entity granted such an award by the Bankruptcy Court must be paid in full by the Plan Trustee, in such amounts as are Allowed, within ten (10) days after the order granting such award is a Final Order.

**2.3** **United States Trustee Quarterly Fees and Other Statutory Fees** All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, will be paid on the Effective Date by the Debtor. Following the Effective Date the Plan Trustee shall file all post-confirmation reports and pay all fees (solely from and to the extent of available Plan Trust Assets) payable pursuant to 28 U.S.C. §1930(a)(6) until the Chapter 11 Case is closed pursuant to a Final Order.

**2.4** **Priority Tax Claims** Except to the extent the holder of an Allowed Priority Tax Claim agrees otherwise, each holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Claim either (a) the full amount thereof, without postpetition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or (b) such lesser amount as the holder of an Allowed Priority Tax Claim and the Debtor or the Plan Trustee agree.  **Any Allowed Priority Tax Claim paid after the Effective Date shall accrue interest at the rate calculated in accordance with 28 U.S.C. §1961 until such Allowed Priority Tax Claim is paid in full.**

<br>

### ARTICLE III

### CLASSIFICATION OF CLAIMS

The following table designates and summarizes the Classes of Claims, other than Administrative Expense Claims and Priority Tax Claims, and specifies which of those classes are (i) Impaired or Unimpaired by this Plan and (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code:

| CLASS | STATUS |
|---|---|
| Class 1 – Priority Non-Tax Claims | Unimpaired/Deemed to Accept |

16

| | |
|---|---|
| Classes 2a – 2p – Secured Claims of Make and Wait Lenders | Impaired/Entitled to Vote |
| Classes 3a – 3q – Secured Claims of Certain Securitization Trusts | Impaired/Entitled to Vote |
| Classes 4a – 4k – Secured Claims of Keycorp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) | Impaired/Entitled to Vote |
| Class 5 – General Unsecured Claims | Impaired/Entitled to Vote |
| Class 6 – Convenience Claims | Unimpaired/Deemed to Accept |

**3.1** **Class 1 – Priority Non-Tax Claims.Impairment and Voting**. Class 1 is Unimpaired by this Plan. For purposes of this Plan, each holder of an Allowed Claim in Class 1 is conclusively deemed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

> *(b)* **Distributions**. In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims, each holder of an Allowed Priority Non-Tax Claim against the Debtor will receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. Such Claims will be paid from Available Cash.

**3.2** **Classes 2a – 2p – Secured Claims of Make and Wait Lenders**. Class 2 consists of the Secured Claims of the Make and Wait Lenders. Each Allowed Secured Claim in Class 2 shall be considered to be a separate subclass within Class 2, and each such subclass shall be deemed to be a separate class for purposes of this Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129. Each subclass in class 2 is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

> *(a)* **Class 2a**. (Intentionally omitted).

> *(b)* **Class 2b - Comerica Bank**. Class 2b consists of all Comerica Bank's Claims that are Secured Claims. Class 2b is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

> *(c)* **Class 2c -** (Intentionally omitted).

17

(d) **Class 2d – GMAC Bank**. Class 2d consists of all GMAC Bank's Claims that are Secured Claims.  Class 2d is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(e) **Class 2e – HSBC Bank USA, N.A.**  Class 2e consists of all HSBC Bank USA, N.A.'s Claims that are Secured Claims.  Class 2e is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(f) **Class 2f – Huntington National Bank**. Class 2 consists of all Huntington National Bank's Claims that are Secured Claims.  Class 2f is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(g) **Class 2g – Insurbanc**. Class 2g consists of Insurbanc's Secured Claims. Class 2g is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(h) **Class 2h – KeyBank National Association**  Class 2h consists of all KeyBank National Association's Claims that are Secured Claims.  Class 2h is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(i) **Class 2i – Manufacturers and Traders Trust Company (including All First)**. Class 2i consists of Manufacturers and Traders Trust Company's Claims that are Secured Claims (including All First's Secured Claims).  Class 2i is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(j) **Class 2j – National City Bank**. Class 2j consists of all National City Bank's Claims that are Secured Claims.  Class 2j is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(k) **Class 2k – PNC Bank, N.A.**. Class 2k consists of all PNC Bank, N.A.'s Claims that are Secured Claims.  Class 2k is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(l) **Class 2l – RBS Citizens, N.A.**  Class 2l consists of all RBS Citizens, N.A.'s Claims that are Secured Claims.  Class 2l is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(m) **Class 2m – Sovereign Bank**. Class 2m consists of all Sovereign Bank's Secured Claims.  Class 2m is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(n) **Class 2n – SunTrust Bank**. Class 2n consists of all SunTrust Bank's Secured Claims.  Class 2n is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(o) **Class 2o – TCF National Bank**. Class 2o consists of all TCF National Bank's Secured Claims.  Class 2o is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

18

    *(p)* **Class 2p – U.S. Bank, N.A.** Class 2p consists of all U.S. Bank, N.A.'s Secured Claims (other than claims of U.S. Bank, N.A., if any, in its capacity as indenture trustee, trustee or other representative capacity with respect to the Securitization Trusts and Other Trusts or in its capacity as custodial or agent for a Make and Wait Lender). Class 2p is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

    **3.3**     **Classes 3a – 3q – Secured Claims of Securitization Trusts.** Class 3 consists of the Secured Claims of the Securitization Trusts. Each Allowed Secured Claim in Class 3 shall be considered to be a separate subclass within Class 3, and each such subclass shall be deemed to be a separate class for purposes of this Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129. Each subclass in Class 3 is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

    *(a)* **Class 3a – The National Collegiate Trust 2003-1**. Class 3a consists of all claims of The National Collegiate Student Loan Trust 2003-1 that are Secured Claims. Class 3a is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

    *(b)* **Class 3b – The National Collegiate Trust 2004-1**. Class 3b consists of all claims of The National Collegiate Student Loan Trust 2004-1 that are Secured Claims. Class 3b is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

    *(c)* **Class 3c – The National Collegiate Trust 2004-2**. Class 3c consists of all claims of The National Collegiate Student Loan Trust 2004-2 that are Secured Claims. Class 3c is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

    *(d)* **Class 3d – The National Collegiate Trust 2005-1**. Class 3d consists of all claims of The National Collegiate Student Loan Trust 2005-1 that are Secured Claims. Class 3d is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

    *(e)* **Class 3e – The National Collegiate Trust 2005-2**. Class 3e consists of all claims of The National Collegiate Student Loan Trust 2005-2 that are Secured Claims. Class 3e is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

    *(f)* **Class 3f – The National Collegiate Trust 2005-3**. Class 3f consists of all claims of The National Collegiate Student Loan Trust 2005-3 that are Secured Claims. Class 3f is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

    *(g)* **Class 3g – The National Collegiate Trust 2006-1**. Class 3g consists of all claims of The National Collegiate Student Loan Trust 2006-1 that are Secured Claims. Class 3g is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

    *(h)* **Class 3h – The National Collegiate Trust 2006-2**. Class 3h consists of all claims of The National Collegiate Student Loan Trust 2006-2 that are Secured Claims. Class 3h is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

LIBC/3875117.2

*(i)* **Class 3i – The National Collegiate Trust 2006-3**. Class 3i consists of all claims of The National Collegiate Student Loan Trust 2006-3 that are Secured Claims. Class 3i is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

*(j)* **Class 3j – The National Collegiate Trust 2006-4**. Class 3j consists of all claims of The National Collegiate Student Loan Trust 2006-4 that are Secured Claims. Class 3j is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

*(k)* **Class 3k – The National Collegiate Trust 2007-1**. Class 3k consists of all claims of The National Collegiate Student Loan Trust 2007-1 that are Secured Claims. Class 3k is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

*(l)* **Class 3l – The National Collegiate Trust 2007-2**. Class 3l consists of all claims of The National Collegiate Student Loan Trust 2007-2 that are Secured Claims. Class 3l is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

*(m)* **Class 3m – The National Collegiate Trust 2001-CP1**. Class 3m consists of all claims of The National Collegiate Trust 2001-CP1 that are Secured Claims. Class 3m is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

*(n)* **Class 3n – The National Collegiate Trust 2002-CP1**. Class 3n consists of all claims of The National Collegiate Trust 2002-CP1 that are Secured Claims. Class 3n is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

*(o)* **Class 3o – The National Collegiate Master Student Loan Trust I**. Class 3o consists of all claims of The National Collegiate Master Student Loan Trust I. Class 3o is Impaired by this Plan and is entitled to vote to accept or reject the Plan.

*(p)* **Class 3p – The National Collegiate Student Loan Trust 2007-3**. Class 3p consists of all claims of The National Collegiate Student Loan Trust 2007-3. Class 3p is Impaired by this Plan and is entitled to vote to accept or reject the Plan.

*(q)* **Class 3q – The National Collegiate Student Loan Trust 2007-4**. Class 3q consists of all claims of The National Collegiate Student Loan Trust 2007-4. Class 3q is Impaired by this Plan and is entitled to vote to accept or reject the Plan.

**3.4** **Classes 4a – 4k – Secured Claims of the Keycorp Trusts and KeyBank National Association (other than in its capacity as a Make and Wait Lender)**. Class 4 consists of the Secured Claims of the Keycorp Trusts and KeyBank National Association (other than in its capacity as a Make and Wait Lender). Each Allowed Secured Claim in Class 4 shall be considered to be a separate subclass within Class 4, and each such subclass shall be deemed to be a separate class for purposes of this Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129. Each subclass in Class 4 is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

20

LIBC/3875117.2

(a) **Class 4a – KSLT 1999-A**. Class 4a consists of all claims of KSLT 1999-A that are Secured Claims. Class 4a is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(b) **Class 4b – KSLT 1999-B**. Class 4b consists of all claims of KSLT 1999-B that are Secured Claims. Class 4b is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(c) **Class 4c – KSLT 2000-A**. Class 4c consists of all claims of KSLT 2000-A that are Secured Claims. Class 4c is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(d) **Class 4d – KSLT 2000-B**. Class 4d consists of all claims of KSLT 2000-B that are Secured Claims. Class 4d is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(e) **Class 4e – KSLT 2001-A**. Class 4e consists of all claims of KSLT 2001-A that are Secured Claims. Class 4e is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(f) **Class 4f – KSLT 2002-A**. Class 4f consists of all claims of KSLT 2002-A that are Secured Claims. Class 4f is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(g) **Class 4g – KSLT 2003-A**. Class 4g consists of all claims of KSLT 2003-A that are Secured Claims. Class 4g is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(h) **Class 4h – KSLT 2004-A**. Class 4h consists of all claims of KSLT 2004-A that are Secured Claims. Class 4h is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(i) **Class 4i – KSLT 2005-A**. Class 4i consists of all claims of KSLT 2005-A that are Secured Claims. Class 4i is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(j) **Class 4j – KSLT 2006-A**. Class 4j consists of all claims of KSLT 2006-A that are Secured Claims. Class 4j is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(k) **Class 4k – KeyBank National Association.** Class 4k consists of all Claims of KeyBank, National Association (other than in its capacity as a Make and Wait Lender). Class 4k is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

3.5 **Class 5 – General Unsecured Claims**. Class 5 consists of all General Unsecured Claims. Class 5 is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

LIBC/3875117.2

**3.6**     <u>Class 6 – Convenience Class Claims</u>. Class 6 consists of Convenience Class Claims.

   *(a)* <u>Impairment and Voting</u>. Class 6 is Unimpaired by this Plan. Each holder of an Allowed Claim in Class 6 is deemed to have accepted this Plan.

   *(b)* <u>Distributions</u>. In full and complete satisfaction, settlement and release of and in exchange for the Convenience Class Claims, each holder of an Allowed Convenience Class Claim will be paid in full from Available Cash, except to the extent such holder of an Allowed Convenience Class Claim agrees to less favorable treatment, on the later of the Effective Date and the date such Convenience Class Claim becomes an Allowed Convenience Class Claim.

## ARTICLE IV

## <u>TREATMENT OF CLASSES 2 - 5</u>

**4.1**     <u>Treatment of Class 2 Claims (Make and Wait Lender Claims)</u>

   *(a)* <u>Classes 2a – 2p that accept the Plan</u>. The holder of a Claim in each of classes 2a – 2p that accepts the Plan or that is deemed to accept the Plan shall be deemed to have accepted the Make and Wait Lender Settlement, and shall receive the distribution provided for and otherwise be treated in accordance with in the Make and Wait Lender Settlement, as described in Section 6.2(a) of this Plan.

   *(b)* <u>Classes 2a – 2p that reject the Plan</u>. The holder of a Claim in each of classes 2a – 2p that rejects the Plan or is deemed to reject the Plan shall be deemed to opt out of and reject the Make and Wait Lender Settlement, and as to Claims in such rejecting Classes (A) the Allowed amount of the Secured Claim (if any) in such rejecting Classes will be determined by the Bankruptcy Court pursuant to 11 U.S.C. §502, and the Plan Trustee will seek to have such Secured Claim, if any, determined on any appropriate basis as determined by the Plan Trustee, (B) the Collateral Accounts allegedly securing the Claims in such rejecting Classes will not be released to the applicable Make and Wait Lender in such rejecting Class unless the Court determines pursuant to one or more Final Orders that such holders hold Allowed Secured Claims, in which event such holder's Collateral Account, if any, shall be released to such holder to the extent of available funds and to the extent necessary to satisfy such Allowed Secured Claim, with the excess, if any, released to the Plan Trustee.

   *(c)* <u>Disposition of Collateral Accounts Pending Resolution for Classes 2a – 2p that reject the Plan</u>. On the Effective Date (or as soon thereafter as reasonably practicable) with respect to a Make and Wait Lender that rejects or is deemed to reject this Plan and is thereby deemed to opt out of the Make and Wait Lender Settlement, the funds in the Pledged Account (whether earned or accrued) as of the Effective Date shall be transferred to the Plan Trustee or its designee(s) in escrow pursuant to the terms of one or more escrow agreements.

**4.2**     <u>Treatment of Class 3 Claims (Securitization Trusts)</u>.

22

*(a)* **Classes 3a – 3q that accept the Plan**.  The holder of a Claim in each of classes 3a – 3q that accepts the Plan or that is deemed to accept the Plan pursuant to the Solicitations Procedure Order shall be deemed to have accepted the Securitization Trust Settlement, and shall receive the distribution provided for and otherwise be treated in accordance with in the Securitization Trust Settlement, as described in Section 6.2(c) of this Plan.

*(b)* **Classes 3a – 3q that reject the Plan**.  The holder of a Claim in each of classes 3a – 3q that rejects the Plan or is deemed to reject the Plan (including, without limitation, pursuant to the Solicitations Procedure Order) shall be deemed to opt out of and reject the Securitization Trust Settlement, and as to Claims in such rejecting Classes (A) the Allowed amount of the Secured Claim (if any) of the Claims in such rejecting Classes will be determined by the Bankruptcy Court pursuant to 11 U.S.C. §502, and the Plan Trustee will seek to have such Secured Claim, if any, determined on any appropriate basis as determined by the Plan Trustee, (B) the Trust Adversary Proceeding against the holders of Claims in such rejecting Classes will proceed in the Bankruptcy Court, (C) the Collateral Accounts allegedly securing the Claims in such rejecting Classes will not be released to the Indenture Trustee (or its servicer or any other representative) on behalf of the holder of such Claim in such rejecting Class (or such other party as the Indenture Trustee may designate) unless the Court determines pursuant to one or more Final Orders that such holders hold Allowed Secured Claims, in which event such holder's Collateral Account, if any, shall be released to such holder to the extent of available funds and to the extent necessary to satisfy such Allowed Secured Claim, with the excess, if any, released to the Plan Trustee, and (D) such Securitization Trust shall reserve the right in the Trust Adversary Proceeding to contest the Debtor's assertion that it acquired title to defaulted loans sold or transferred to the Debtor or its agent as a result of such sale or transfer.

*(c)* **Disposition of Affected Property Pending Resolution of Trust Adversary Proceeding for Classes 3a – 3q that reject the Plan**.  On the Effective Date (or as soon thereafter as reasonably practicable) with respect to a Securitization Trust that rejects or is deemed to reject this Plan and is hereby deemed to opt out of the Securitization Trust Settlement, all property of the Estate or any Securitization Trust which is the subject of the Trust Adversary Proceeding as designated in writing to the Plan Proponents by such rejecting Securitization Trust prior to the Confirmation Hearing (with any dispute concerning such designation to be addressed at the Confirmation Hearing) and all property allocable to such rejecting Securitization Trust on Schedule B, the Cash, any Unencumbered Trust Loans in which such Securitization Trust claims a security interest or other interest and any prepetition recoveries subject to the Prepetition Recoveries Dispute (to the extent that such Cash exceeds the amount set forth on Schedule B) and all the defaulted loans that were purchased prior to or after the Commencement Date, by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust and paid for by the Debtor with funds in the applicable Pledged Account shall, (i) in the case of Cash, be transferred to U.S. Bank National Association ("U.S. Bank") and held by U.S. Bank in escrow pursuant to the terms of one or more escrow agreements among U.S. Bank in its capacity as escrow agent for the applicable Securitization Trust, the administrator of the Securitization Trust and the Plan Trustee and (ii) in the case of defaulted loans that were purchased by the Debtor, be held by the Reorganized Debtor or the Plan Trustee subject to the Claim and rights asserted by such rejecting Securitization Trust, with any recoveries (net of costs of collection) on such defaulted loans received after the Effective

23

Date to be transferred to U.S. Bank as escrow agent to be held in escrow on the same terms as Cash transferred on the Effective Date. The escrow agreement(s) shall be mutually acceptable to U.S. Bank, the administrator of the Securitization Trust and the Plan Trustee. Such escrowed funds and defaulted loans (i) shall be held in the applicable escrow account, in the case of Cash, or by the Reorganized Debtor or the Plan Trustee, in the case of defaulted loans, to be released upon the earlier of (1) one or more Final Orders of the Bankruptcy Court (as applicable to such Trust), or (2) pursuant to joint written instruction of the Plan Trustee, the applicable Securitization Trust and/or indenture trustee for such Trust, (ii) shall, as to the funds, be invested by U.S. Bank as escrow agent in accordance with the written instructions of the Plan Trustee and the administrator of the Securitization Trusts, and investment earnings on such funds shall be added to the fund and released as provided above, and (iii) shall be subject to such other matters as shall be agreed to by the parties to such escrow agreement (including payment of customary fees and other bank charges). Notwithstanding such transfer of funds to the escrow account or accounts, or the retention of such defaulted loans subject to the rights and claims of the rejecting Securitization Trust, each of the Plan Trustee, rejecting Securitization Trust and indenture trustee of such rejecting Securitization Trust reserve all rights, and such transfer(s) to the escrow account or accounts are subject to the rights of the Plan Trustee, rejecting Securitization Trust and indenture trustee, with respect to recoveries and other funds transferred by the Debtor to the applicable Pledged Account on or after the Commencement Date, together with any interest or other earnings thereon, and with respect to such defaulted loans, including, without limitation, the rights of the parties with respect to the extent, priority, validity or existence of any alleged security interest in such defaulted loans, recoveries and funds.

### 4.3 Classes 4a – 4k.

*(a)* **Classes 4a – 4k that do not make the Key Access Program Election**. Each Accepting KeyCorp Trust within Classes 4a – 4j and (if it accepts the Plan) KeyBank National Association (other than in its capacity as a Make and Wait Lender), shall receive the distribution provided for in the Key Access Program Settlement, as described in Section 6.2(d) of this Plan, and shall have an Allowed Deficiency Claim in the amount listed in the "Key Access Program Decoder Settlement Claim" column of the attached Schedule C.

*(b)* **Classes 4a – 4k that make the Key Access Program Election**. Each of Classes 4a - 4k in which the holders of Claims in such Class reject the Plan, and thereby make the Key Access Program Election, shall be deemed to opt out of the Key Access Program Settlement. The Allowance or disallowance amounts of the Claims in such rejecting Classes shall be determined by the Bankruptcy Court after the Effective Date in accordance with 11 U.S.C. §502.

### 4.4 Class 5.

*(a)* **Make and Hold Claims**. Each Accepting Make and Hold Lender shall receive the treatment described in section 6.2(b). The Allowance or disallowance of a Class 5 Claim of a Make and Hold Lender that rejects the Plan shall be determined by the Bankruptcy Court after the Effective Date in accordance with 11 U.S.C. §502.

24

*(b)* __Make and Wait Deficiency Claims__. Each Accepting Make and Wait Lender shall receive the treatment described in section 6.2(a). The Allowance or disallowance of a Class 5 Deficiency Claim of a Make and Wait Lender that rejects the Plan, if any, shall have its Deficiency Claim (if any) determined in accordance with Section 4.1 of this Plan.

*(c)* __Securitization Trust Deficiency Claims__. Each Securitization Trust that accepts this Plan and, thereby, the Securitization Trust Settlement shall receive the treatment described in Section 6.2(c). The Allowance or disallowance of a Class 5 Deficiency Claim (if any) of a Securitization Trust that rejects the Plan, and thereby, the Securitization Trust Settlement, shall be determined by the Bankruptcy Court after the Effective Date in accordance with 11 U.S.C. §502.

*(d)* __Key Access Deficiency Claims__. Each Accepting KeyCorp Trust within Classes 4a – 4j and (if it accepts the Plan) KeyBank National Association (other than in its capacity as a Make and Wait Lender), shall receive the treatment described in section 6.2(d). The Allowance or disallowance of a Class 5 Deficiency Claim (if any) of a KeyCorp Trust within Classes 4a – 4j that rejects the Plan and (if it rejects the Plan) KeyBank National Association (other than in its capacity as a Make and Wait Lender), shall be determined by the Bankruptcy Court after the Effective Date in accordance with 11 U.S.C. §502.

*(e)* __Other General Unsecured Claims__. Unless otherwise provided in this Plan, the Allowed amount of Other General Unsecured Claims will be determined by the Bankruptcy Court in accordance with section 502 of the Bankruptcy Code.

## ARTICLE V

## VOTING AND DISTRIBUTION

**5.1** __Voting of Claims__. Each holder of an Allowed Claim as of the Voting Record Date in Classes 2a – 2p, Classes 3a – 3q, Class 4a-4k, Class 5 or the holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) pursuant to the Approval Order, the Solicitation Procedures Order or any subsequently entered order will be entitled to vote to accept or reject this Plan, which vote may be amended prior to the deadline for submitting votes. For voting purposes, and consistent with the provisions of the Solicitations Procedure Order, the amount of Claim that a holder of a Claim in Classes 2a-2p, Classes 3a-3q and Classes 4a-4k that is entitled to vote, may vote in respect of its General Unsecured Claim in Class 5 (if any) will be the amount asserted by such holder in its proof of Claim, or such amount as may be agreed upon pursuant to a stipulated order entered by the Court or as otherwise determined by the Court, less the amount held in the Collateral Account as of July 31, 2009. For voting purposes, and consistent with the provisions of the Approval Order or the Solicitations Procedure Order, the amount of Make and Hold Claims in Class 5 will be temporarily allowed and permitted to vote in the amount asserted by such Creditor in such Creditor's Proof of Claim, or such amount as may be agreed upon pursuant to a stipulated order entered by the Court or as otherwise determined by the Court,.

**5.2** __Acceptance by Impaired Class__. Consistent with section 1126(c) of the Bankruptcy Code, and except as provided for in section 1126(e) of the Bankruptcy Code, a Class

25

of creditors will have accepted this Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the holders of Allowed Claims of such Class or holders of Claims permitted to vote pursuant to the provisions of the Solicitations Procedure Order that have timely and properly voted to accept or reject this Plan. The Solicitations Procedure Order, to the extent and as applicable, shall govern the voting by the Securitization Trusts, the Other Trusts and the KeyCorp Trusts.

     **5.3**    <u>**Presumed Acceptances of Plan**</u>. Classes 1 and 6 are not Impaired under this Plan and, therefore, are conclusively presumed to have accepted this Plan.

     **5.4**    <u>**Nonconsensual Confirmation**</u>. If any Impaired Class of Claims entitled to vote will not accept this Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Plan Proponents may request that the Bankruptcy Court confirm this Plan pursuant to section 1129(b) of the Bankruptcy Code.

     **5.5**    <u>**Method of Distributions Under this Plan**</u>.

     *(a)* <u>**Distributions Generally**</u>.

         (i)    Reorganized TERI will make all distributions required by this Plan other than those to be made by the Plan Trustee.

         (ii)    The Plan Trustee will make all other distributions from the Plan Trust to holders of Claims in accordance with this Plan and the terms and conditions set forth in the Plan Trust Agreement.

     *(b)* <u>**Distributions of Cash**</u>. Any payment of Cash made by Reorganized TERI or the Plan Trustee pursuant to this Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank. Any Cash to be distributed from a Collateral Account or from the Segregated Recoveries Account pursuant to the Plan will be adjusted for recoveries, earnings net of losses, interest and bank fees or charges (including without limitation costs and fees arising out of liquidation of any investment) accrued to the date of distribution, and provisions of the Plan (including Schedules to the Plan) specifying the amount, nature or source of a distribution of Cash shall be deemed subject to any such adjustments.

     *(c)* <u>**Distributions Free and Clear**</u>. Except as otherwise provided herein, any distributions or transfers by or on behalf of the Debtor under this Plan, including, but not limited to, distributions to any holder of an Allowed Claim, will be free and clear of any liens, claims, and encumbrances, and no other entity will have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to this Plan. Notwithstanding the foregoing, all obligors of student loans transferred to the Plan Trustee may assert defenses (but not counterclaims or claims for affirmative relief) thereunder to the same extent, and with the same validity, as such defenses may be asserted against the Debtor as of the Effective Date.

     *(d)* <u>**Timing of Performance**</u>. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such

<div align="center">26</div>

payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date. To the extent that there are receipts, accruals or adjustments to Cash in a Collateral Account or the Segregated Recoveries Account or other assets to be distributed pursuant to the Plan that occur subsequent to the date specified for a distribution, then the Debtor, Reorganized Debtor or the Plan Trustee, as appropriate, will make subsequent distributions of such Cash or other assets, if any, as soon as practicable after receipt by the Debtor, Reorganized Debtor or Plan Trustee, as applicable.

(e) **Delivery of Distributions**. Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor. The holder must notify Reorganized TERI or the Plan Trustee, as applicable, in writing of a change of address, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different from the address of such holder as set forth in the Schedules. Neither Reorganized TERI nor the Plan Trustee will be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein. Notwithstanding the foregoing, with respect to each Securitization Trust, Other Trusts and the KeyCorp Trusts, distributions in respect of an Allowed Claim of such Trust including defaulted loans (if any), shall be made to the Trust, subject to the lien and security interest of the applicable indenture trustee for such Trust, and shall be delivered to the trustee or indenture trustee for such Trust (as appropriate) or to such other person as may be designated by the indenture trustee or trustee in writing delivered to Reorganized TERI or the Plan Trustee, as applicable, provided that loan documents, including the related student loan note in respect of a defaulted loan, shall be delivered by the entity that has possession of such loan documents, to the applicable servicer as custodian and agent for the indenture trustee or trustee , to be held under the applicable custody agreement among such servicer as custodian for the indenture trustee or trustee and the Trust.

(f) **Distributions to Holders as of Record Date**. As of the close of business on the Record Date, the claims register for the Debtor will be closed and there will be no further changes made to the identity of the record holder of any Claim. Neither Reorganized TERI nor the Plan Trustee will have any obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized TERI and the Plan Trustee will instead be authorized and entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the applicable claims register at the close of business on the Record Date.

(g) **Undeliverable and Unclaimed Distributions**. If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the holder notifies Reorganized TERI or the Plan Trustee, as appropriate, in writing of such holder's then-current address, at which time all missed distributions will, subject to the last sentence of this paragraph, be made as soon as is practicable to such holder, without interest. Checks issued by Reorganized TERI or the Plan Trustee in respect of Allowed Claims will be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for re-issuance of any check will be made in accordance with the notice provisions of this Plan to Reorganized TERI or the Plan Trustee, as appropriate, by the holder of the Allowed Claim to whom such check originally was issued. All claims for

27

undeliverable distributions or voided checks will be made on or before one hundred and twenty (120) days after the date such undeliverable distribution was initially made.  After such dates, all such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will become unencumbered Cash of Reorganized TERI, or the Plan Trust, as appropriate pursuant to this Plan.  The holder of any Claim for which any undeliverable distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy Code will not be entitled to any other or further distribution under this Plan on account of such Claim.

   *(h)* **Setoffs**.  Except with respect to an Allowed Claim that is Allowed as part of a compromise and settlement approved pursuant to a Final Order (including the settlements set forth in Section 6.2 hereof), to the extent permitted under the Bankruptcy Code or other applicable law, Reorganized TERI, or the Plan Trustee, as applicable, may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and Causes of Action of any nature that the Debtor has against the holder of such Allowed Claim.

   *(i)* **Application of Distributions**.  Distributions to any holder of an Allowed Claim will be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Allowed Claim and thereafter to the remaining portion of such Allowed Claim, if any, unless the application is governed by an indenture or other governing document in which case the terms of such documents shall govern.  No provision of this Plan or Confirmation Order shall modify any charging lien or other right of the indenture trustee, trustee or other entity in another representative capacity to reimburse itself for fees, expenses and disbursements against any distribution.

   *(j)* **Withholding and Reporting Requirements**.  In connection with this Plan and all instruments issued in connection therewith and distributed thereon, the Debtor or the Plan Trustee, as applicable, will comply with all applicable withholding and reporting requirements imposed by any federal, state or local  taxing authority, and all distributions under this Plan will be subject to any such withholding or reporting requirements. ***The Debtor and the Plan Trustee will have the right to withhold distributions to any holder of a Claim, and any such Claim shall not become an Allowed Claim, notwithstanding any other provision of this Plan, unless and until such holder of a Claim executes and delivers to the Plan Trustee an Internal Revenue Service Form W-9.***  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under this Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including income, withholding, and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under this Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

   *(k)* **Distribution**.  In full and complete satisfaction, settlement and release of and in exchange for the General Unsecured Claims, each holder of an Allowed General Unsecured Claim will receive the General Unsecured Claim Distribution.

<div align="center">28</div>

## ARTICLE VI

## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

6.1    **Reorganized TERI.**

*(a) Reorganized Articles of Incorporation and Reorganized By-laws*. Reorganized TERI will adopt Reorganized Articles of Incorporation and Reorganized By-laws prior to, but effective as of, the Effective Date, which will be included in this Plan Supplement. Prior to the closing of TERI's Chapter 11 Case, any amendments to Reorganized TERI's Articles of Incorporation and Reorganized By-laws will be filed with the Bankruptcy Court.

*(b) Boards of Directors and Officers*. The identities of the members of the initial Board of Directors and the initial officers of Reorganized TERI will be disclosed in the Plan Supplement and will be in effect as of the Effective Date.

*(c) Reorganized TERI (Not-For-Profit)*. Reorganized TERI will, as of the Effective Date, remain a not-for-profit corporation.

*(d) Retention of Reorganized TERI Assets*. On and after the Effective Date, Reorganized TERI will retain all rights, title, and interests in the Reorganized TERI Assets.

6.2    **Compromise and Settlement.**

*(a) Make and Wait Lender Settlement*. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of this Plan by an Accepting Make and Wait Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting Make and Wait Lender, including the amounts, allowance, relative priority and treatment of the Secured Claim and the Deficiency Claim (if any) of such Accepting Make and Wait Lender.

(i)    **Claims of An Accepting Make and Wait Lender**. Each Make and Wait Lender in Classes 2a – 2p that accepts this Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement (1) will have an Allowed Secured Claim in the applicable subclass of Class 2 in the amount set forth in the column labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on attached Schedule A, and will have an Allowed Unsecured Claim that will be treated as a Class 5 Claim in the amount, if any, set forth in the "Make and Wait Lender Decoder Deficiency Claim (If Any)" column of the attached Schedule A.

(ii)    **Release of Make and Wait Lender Equity and Make and Wait Lien Dispute Amount to Plan Trustee by Accepting Make and Wait Lender**. Each Make and Wait Lender in Classes 2a – 2p that accepts this Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement, will release its interest in the amount, if any and as applicable, in the column labeled "Make and Wait Lender Payment Amount (If Any)" in the attached Schedule A

29

and shall be deemed to have authorized and instructed the Debtor to transfer such amount to the Plan Trustee on the Effective Date free and clear of any and all claims, interests, liens and encumbrances.

(iii)    **Disbursement of Remainder of Collateral Account to Accepting Make and Wait Lender.**  On the Effective Date, and subject to section 5.5 above, the Debtor shall be deemed to release from the applicable Collateral Account, and such amount shall be remitted, to each Accepting Make and Wait Lender, in full satisfaction of such Accepting Make and Wait Lender's Allowed Secured Class 2 Claim, the applicable amount for such Accepting Make and Wait Lender in the column labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on attached Schedule A, as adjusted pursuant to section 5.5 above..

(iv)    **Retention by Accepting Make and Wait Lender of Loans Not Purchased by the Debtor**.  Each Accepting Make and Wait Lender will retain all loans that were not purchased by the Debtor as of the Effective Date.

(vi)    **Bankruptcy Court Approval of Make and Wait Lender Settlement**. For each Accepting Make and Wait Lender, entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Wait Lender Settlement and the Bankruptcy Court's finding that such settlement is fair, equitable and reasonable and in the best interests of the Debtor, this Plan, Reorganized TERI and all Creditors.

(vii)    **Release of Claims against the Debtor and The Estate**. On the Effective Date, the Claims against the Debtor and the Estate of each Accepting Make and Wait Lender receiving the treatment provided by the Make and Wait Lender Settlement, subject to and upon implementation of the Make and Wait Lender Settlement, will be deemed satisfied and no further recovery shall be permitted in respect of such Claims.

(viii)    **Rejection of Executory Contracts**. On the Effective Date, all Guaranty Agreements executed in favor of the Make and Wait Lenders and the related Deposit and Security Agreements and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Wait Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Wait Lenders will be deemed waived.

*(b)* **Make and Hold Settlement**.  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of this Plan by an Accepting Make and Hold Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting Make and Hold Lender, including the amounts, allowance, relative priority and treatment of the Make and Hold Claims of such Accepting Make and Hold Lender.

LIBC/3875117.2

(i)  **Claims of An Accepting Make and Hold Lender.** An Accepting Make and Hold Lender shall have an Allowed Claim calculated as the larger of the Claim calculated by the Decoder and the Claim calculated by the Debtor's Base Case, as set forth in the column labeled "Make and Hold Lender Settlement Claim" on attached <u>Schedule D</u>. All such claims will be treated as Allowed Class 5 Claims.

(ii)  **Distributions to Accepting Make and Hold Lenders and Effectiveness of Make and Hold Settlement.** All distributions to Accepting Make and Hold Lenders pursuant to this Plan will be made on account of and in consideration of the Make and Hold Lender Settlement, which, upon the Effective Date, will be binding on all Accepting Make and Hold Lenders, the Plan Proponents, and Reorganized TERI. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Hold Lender Settlement and the Bankruptcy Court's finding that such Make and Hold Lender Settlement is fair, reasonable, equitable and in the best interests of the Accepting Make and Hold Lenders, the Plan Proponents and Reorganized TERI.

(iii)  **Rejection of Make and Hold Guaranty Agreements.** On the Effective Date, all Guaranty Agreements executed in favor of the Make and Hold Lenders and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Hold Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Hold Lenders will be deemed waived.

(c)  **Securitization Trust Settlement.** Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 the acceptance of this Plan by a Securitization Trust will constitute a good faith compromise and settlement of all Claims, Causes of Action and controversies between the Debtor and each Securitization Trust receiving the treatment provided by the Securitization Trust Settlement, including, without limitation, the amounts, allowance, relative priority and treatment of the Secured Claim and Deficiency Claim of each Securitization Trust and any other claim, whether a general unsecured claim, priority claim or administrative expenses claim that each such Securitization Trust, the Indenture Trustee under the Indenture for such Securitization Trust, or the administrator for such Securitization Trust (in such capacity) has asserted or might assert against the Debtor or its estate. The Securitization Trust Settlement includes the Ambac Compromise and the Securitization Trust Modifications as defined and described in the Second Modification Motion. Notwithstanding the foregoing, nothing in this Plan shall bar any entity from seeking Allowance of an Administrative Expense Claim arising under 11 U.S.C. §503(b)(3)(D) and (4) ("Substantial Contribution Claim"), and as to any such Substantial Contribution Claim, the parties reserve all their respective rights, claims and defenses.

31

(i)   **Claims of An Accepting Securitization Trust**.  Each Accepting Securitization Trust in Classes 3a – 3q that accepts this Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement  (A) will have an Allowed Secured Claim in (a) the amount set forth in the column captioned "Total Cash," as specified for each applicable subclass of Class 3, on attached Schedule B, all as adjusted pursuant section 5.5 above, and (b) the value of all defaulted loans that were purchased prior to the Commencement Date, by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust and paid for by the Debtor with funds in the applicable Pledged Account, (B) will have an Allowed Unsecured Claim that will be treated as a Class 5 Claim in the amount set forth in the column captioned "Adjusted Securitization Trust Settlement Claim," as specified for each applicable subclass of Class 3, on the attached Schedule B.[2]

(ii)   **Release of Securitization Trust Equity by Accepting Securitization Trust**.  Each Securitization Trust in Classes 3a – 3q that accepts this Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement, will release its interest in the amount, if any and as applicable, in the column labeled "Securitization Trust Decoder Equity (Rounded)" in the attached Schedule B and shall be deemed to have authorized and instructed the Debtor to transfer such amount to the Plan Trustee on the Effective Date free and clear of any and all claims, interests, liens and encumbrances.

(iii)   **Disbursement of Cash and Transfer of Defaulted Loans to Accepting Securitization Trust.**  On the Effective Date, or as soon thereafter as is practicable, and except with respect to Classes 3m and 3n, the Debtor shall (a) distribute the Total Cash in the amount described in section 6.2(c)(i) above and (b) shall transfer all of the Debtor's right, title and interest in the defaulted loans that were purchased prior to the Commencement Date, by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable

---

[2] Total Cash is the sum of the amounts listed in Columns C through G of Schedule B, which include the amounts in each Pledged Account (less any equity), each Securitization Trust's share of the Segregated Recoveries Account and Prepetition Recoveries/Rehabs amounts and the amounts to be paid in settlement of the Prepetition Recoveries Dispute and the Unencumbered Loans Dispute discussed in the Second Modification Motion.  The Adjusted Securitization Trust Settlement Claim is the sum of the amounts listed in Columns I through K of Schedule B and includes the Securitization Trust Settlement Claim and additional claim amounts to be Allowed in settlement of the Prepetition Recoveries Dispute and the Unencumbered Loans Dispute.  For the avoidance of doubt, the settlement of the Unencumbered Loans Dispute and Prepetition Recoveries Dispute with the Master Trust and NCSLT 2003-1 and NCSLT 2004-1 is reflected on Schedule B as follows:  the cash portion is in Column G, captioned "Unencumbered Loan Settlement (Cash)," the claim portion is in Column J, captioned "Prepetition Recoveries Dispute Settlement" and in Column K, captioned "Unencumbered Loan Settlement (Claims)."  The settlement of the Prepetition Recoveries Dispute with the other Securitization Trusts is reflected on Schedule B in Column F, captioned "Prepetition Recoveries Dispute Settlement."

32

Securitization Trust and paid for by the Debtor with funds in the applicable
Pledged Account to each Securitization Trust in Classes 3a – 3q that accepts this
Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust
Settlement, in full satisfaction of the Allowed Secured Claim of such Accepting
Securitization Trust.

(ii)     **Securitization Trusts Release With Respect to Postpetition
Defaulted Loans and Unencumbered Trust Loans**.  In full and final settlement
of the Trust Adversary Proceeding with respect to each Securitization Trust that
accepts this Plan or is deemed to accept this Plan, and, thereby, the Securitization
Trust Settlement, (A) each such Accepting Securitization Trust will have no claim
to Postpetition Purchased Loans or Unencumbered Trust Loans or to any
recoveries on such loans, including recoveries received prior to the date hereof,
(B), all such Unencumbered Trust Loans and Postpetition Purchased Loans and
postpetition recoveries on such loans shall be transferred by the Debtor free and
clear of all liens, claims, interests and encumbrances to the Plan Trust as soon as
practicable after the Effective Date, and (C) neither the applicable Securitization
Trusts nor their indenture trustees shall have any security interest in, or Claim to,
such defaulted loans or recoveries obtained in respect thereof (but otherwise
reserving rights under this Plan as the holder of a Claim in Class 5).  Any such
postpetition defaulted loan on account of which (i) the Debtor made payment , (ii)
payment was made from funds in a Pledged Account, or (iii) a Securitization
Trust received payment, shall be considered a defaulted loan purchased by the
Debtor, regardless of the source of funds for such purchase.

(iii)     **Retention by Accepting Securitization Trust of Loans Not
Purchased by the Debtor**.  Each Accepting Securitization Trust will retain all
loans that were not purchased by the Debtor as of the Effective Date.

(iv)     **Bankruptcy Court Approval of Securitization Trust
Settlement**.  For each Securitization Trust that accepts the Plan, and thereby the
Securitization Trust Settlement, entry of the Confirmation Order will constitute
the Bankruptcy Court's approval, as of the Effective Date, of the Securitization
Trust Settlement and the Bankruptcy Court's finding that such settlement is fair,
equitable and reasonable and in the best interests of the Debtor, this Plan,
Reorganized TERI and each Accepting Securitization Trust (including the
Indenture Trustee and other secured parties under the related Indenture pursuant
to which such Trust issued its notes), receiving the treatment provided by the
Securitization Trust Settlement.

(v)     **Dismissal of Trust Adversary Proceeding**.  On the Effective
Date, the Trust Adversary Proceeding will be deemed dismissed with prejudice,
and judgment of dismissal may enter pursuant to Fed.R.Civ.P. 54, made
applicable to the Trust Adversary Proceeding pursuant to Fed.R.Bankr.P. 7054, as
to (a) each Securitization Trust that accepts or is deemed to accept the Plan,
thereby receiving the treatment provided by the Securitization Trust Settlement,

33

(b) the administrator, in any capacity in which it was named as a defendant in the Trust Adversary Proceeding with respect to each such Securitization Trust accepting this Plan and the Securitization Trust Settlement, (c) the owner trustee of each such Securitization Trust accepting this Plan and the Securitization Trust Settlement, (d) U.S. Bank, National Association, in any capacity in which it was named as a defendant in the Trust Adversary Proceeding with respect to each such Securitization Trust accepting this Plan and the Securitization Trust Settlement, and (e) the indenture trustee under any indenture pursuant to which such Securitization Trust issued notes and accepted this Plan and Securitization Trust Settlement with respect to each such Securitization Trust accepting this Plan and the Securitization Trust Settlement, each of the foregoing administrators, owner trustees and indenture trustees, in their respective capacities, and not individually.

(vi)  **Release of Claims against the Debtor and The Estate**. On the Effective Date, the Claims against the Debtor and the Estate of the Securitization Trusts, the Indenture Trustees under the Indenture for such Securitization Trusts and the administrators for such Securitization Trust (in such capacity) receiving the treatment provided by the Securitization Trust Settlement, subject to and upon implementation of the Securitization Trusts Settlement, will be deemed satisfied and no further recovery shall be permitted in respect of such Claims.

(vii)  **Rejection of Executory Contracts**. On the Effective Date, all Guaranty Agreements executed in favor of the Securitization Trusts and the related Deposit and Security Agreements and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Securitization Trusts accepting the Plan or that are deemed to accept the Plan, thereby receiving the treatment provided by the Securitization Trust Settlement, all Debtor's claims or rights to set off any Guaranty fees, basis point fees and other interests in loans held by such Securitization Trusts will be deemed waived.

(viii)  **Estate's Retention of Rights With Respect to Residuals**. Nothing herein shall be deemed a waiver or release of the rights, if any, that the Debtor or any other party may have to receive a portion (if any) of the Residual with respect to any and all of the Securitization Trusts.

(ix)  **Special Provisions Regarding Classes 3m and 3n**. Notwithstanding anything to the contrary herein, the terms of the "Stipulation Regarding the Modification of the Fourth Amended Plan of Reorganization With Respect to Claims of Class 3m and 3n" shall control and supersede any and all inconsistent provisions of this Plan.

*(d)* **KeyBank National Association and KeyCorp Trusts Settlement**

(i)  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of this Plan by KeyBank National Association (excluding in its capacity as a Make and Wait Lender) and acceptance

34

of this Plan by each KeyCorp Trust will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and KeyBank National Association and each Accepting KeyCorp Trust, including the amounts, allowance, relative priority and treatment of the Claims of KeyBank National Association and each Accepting KeyCorp Trust.

(ii)     Unless KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) or a KeyCorp Trust rejects this Plan, KeyBank National Association and each KeyCorp Trust, as applicable, shall receive the following treatment on the Effective Date of this Plan or as soon thereafter as is practicable: (a) it shall be paid its allocable share in the Victory Fund as of the Commencement Date (as appears in column in Schedule C labeled "Allocation of Victory Fund"), (b) it shall have an Allowed Key Access Program Deficiency Claim as set forth in the column labeled "Key Access Program Decoder Settlement Claim" on Schedule C pursuant to Section 4.4 of this Plan; and (c) it shall cause to be paid to the Plan Trustee free and clear of all interests, liens, claims and encumbrances, its allocable share of all recoveries or other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon not previously transferred to the Debtor.

(iii)     Notwithstanding the preceding paragraph, if KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) or a KeyCorp Trust rejects this Plan and is thereby deemed to opt out of the Key Access Program Settlement, the following treatment shall be applied: (a) each KeyCorp Trust that rejects this Plan, and KeyBank National Association if it rejects this Plan, shall have the Allowed amount of its Claim determined by the Bankruptcy Court by Final Order, following appropriate notice and an opportunity to be heard, in accordance with the Key Access Program Election; (b) the funds in the Victory Fund as of the Commencement Date shall be paid to KeyBank National Association and held in escrow until the Bankruptcy Court has determined by Final Order, following appropriate notice and an opportunity to be heard, the proper method for distributing such funds; and (c) the parties reserve all rights with respect to recoveries and other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon, including, without limitation, the rights of the parties with respect to the extent, priority, validity or existence of any alleged security interest in such recoveries and funds.

(iv)     Any distributions to KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender), if it accepts this Plan, or to an Accepting KeyCorp Trust pursuant to this Plan will be made on account and in consideration of the Key Access Program Settlement, which, upon the Effective Date, will be binding on KeyBank National Association, the Accepting KeyCorp Trusts, the Debtor, and Reorganized TERI. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval,

LIBC/3875117.2

as of the Effective Date, of the Key Access Program Settlement and the Bankruptcy Court's finding that such Key Access Program Settlement is in the best interests of KeyBank National Association, the Accepting KeyCorp Trusts, the Debtor, and Reorganized TERI, and is fair, equitable and reasonable.

(v)   On the Effective Date, all Guaranty Agreements and the related Deposit and Security Agreements and other related documents executed in favor of KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) and the KeyCorp Trusts receiving the treatment provided in the Key Access Program Settlement will be deemed rejected.

### 6.3   Plan Trust.

(a) **General**.  On or before the Effective Date, the Plan Trust Agreement, in a form reasonably acceptable to the Plan Proponents, will be executed and all other necessary steps will be taken to establish the Plan Trust and the beneficial interests therein, which will be for the benefit of the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date.  In the event of any conflict or inconsistency between the terms of this Plan and the terms of the Plan Trust Agreement, then the terms of the Plan Trust Agreement will govern.  The Plan Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Plan Trust as a liquidating trust for United States federal income tax purposes, or otherwise have material adverse effect on the recovery of holders of Allowed General Unsecured Claims.  This Section 6.3 is qualified in its entirety by the terms of and is subject to the terms of the Plan Trust Agreement.

(b) **Purpose of Plan Trust**.  The Plan Trust will be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to achieve, and consistent with, the liquidating purpose of the Plan Trust.

(c) **Costs and Expenses of Plan Trust**.  The costs and expenses of the Plan Trust, including the fees and expenses of the Plan Trustee and its retained professionals, will be paid out of the Plan Trust Assets, and Reorganized TERI will not be responsible for any fees, expenses or costs of the Plan Trust.  The Litigation Claims Costs incurred by the Plan Trustee and the fees and expenses incurred in connection with the prosecution and settlement of any Claims are costs and expenses of the Plan Trust.

(d) **Plan Trust Assets**.  As of and as soon as practicable after the Effective Date, Debtor will assign and transfer to the Plan Trust all of its rights, title and interests in and to the Plan Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, whether such Claims are Allowed on or after the Effective Date.  Such transfers will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax and, subject to clause (c) of section 6.2(d)(iii) of the Plan, and except as otherwise may be set forth specifically herein, will be free and clear of any liens, claims and encumbrances and no other entity (other

36

than Creditors receiving rights under this plan), including the Debtor or Reorganized TERI, will have any interest, legal, beneficial, or otherwise, in the Plan Trust or the Plan Trust Assets upon their assignment and transfer to the Plan Trust (other than as provided herein or in the Plan Trust Agreement). Upon delivery of the Plan Trust Assets to the Plan Trust, Reorganized TERI will be released of all liability with respect to the delivery of distributions to holders of Allowed General Unsecured Claims, and, except as provided in the Collection Contract, will have no further monetary obligations to the Plan Trust or the Plan Trustee.

(e) **Governance of Plan Trust**. The Plan Trust will be governed by the Plan Trust Agreement and administered by the Plan Trustee.

(f) **Appointment of a Plan Trustee**. Prior to the Effective Date, the Creditors' Committee will select the Plan Trustee. The salient terms of the Plan Trustee's employment, including the Plan Trustee's duties and compensation, will be set forth in the Plan Trust Agreement. The Plan Trust Agreement will specify the procedures for replacing the Plan Trustee. The Plan Trustee will not be the Debtor, an affiliate of the Debtor or former agent of the Debtor. The Plan Trustee, in the reasonable discretion of the Creditors' Committee will have the qualifications and experience necessary to satisfy the responsibilities and obligations of the Plan Trustee as outlined in the Plan and the Plan Trust Agreement.

(g) **The Plan Trustee Advisory Committee**. The Plan Trustee Advisory Committee will advise the Plan Trustee with respect to the liquidation and distribution of Plan Trust Assets in accordance with the Plan Trust Agreement. The Plan Trust Agreement will specify the procedures for replacing any member of the Plan Trustee Advisory Committee.

(h) **Transferability of Plan Trust Interests**. The beneficial interests of the Plan Trust shall not be transferable, unless otherwise provided for in the Plan Trust Agreement. To the extent such beneficial interests are deemed securities under applicable non-bankruptcy law, then such securities shall be exempt from the requirements of applicable non-bankruptcy law to the maximum extent permitted by 11 U.S.C. §1145.

(i) **Investment of Cash**. The Plan Trustee may invest Cash (including any earnings thereon or proceeds there from) as permitted by section 345 of the Bankruptcy Code; *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities. The Plan Trustee shall be authorized to manage any transferred Collateral Accounts pending resolution of the disposition of such Collateral Account pursuant to the terms of the Plan or a Final Order.

(j) **Receipt or Retention of Cash**. The Plan Trust shall not be permitted to receive or retain Cash or Cash equivalents in excess of a reasonable amount to meet claims and contingent liabilities (including disputed claims) or to maintain the value of the Plan Trust Assets during liquidation and distribution.

(k) **Retention of Professionals by the Plan Trustee**. The Plan Trustee may retain and reasonably compensate counsel and other professionals, as applicable, to assist in its

37

duties as Plan Trustee on such terms as the Plan Trustee deems appropriate, without Bankruptcy Court approval; provided, however, that such counsel and other professionals shall be subject to the prior approval of the Plan Trustee Advisory Committee or, if such approval is not obtained, then such counsel and other professionals may be retained only upon Bankruptcy Court approval. All costs of compensation and expenses of professionals retained by the Plan Trustee are costs and expenses of the Plan Trust and will be paid out of the Plan Trust Assets.

        *(l)* **Compensation of the Plan Trustee**.  The Plan Trustee will be entitled to reasonable compensation (which will be negotiated by the Plan Trustee with the Creditors' Committee) in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

        *(m)* **Cooperation of Reorganized TERI**.  Reorganized TERI will provide information, including, Data needed for Claim administration and asset monetization, to the Plan Trustee.  Such information will include, but will not be limited to, information regarding the status and amount of General Unsecured Claims to enable the Plan Trustee to perform its duties. Reorganized TERI will cooperate with the reasonable requests of the Plan Trustee and its professionals in the administration of the Plan Trust, including, in providing Data, documentation, witness testimony, and other evidence in support of the prosecution of the Litigation Claims.  The Plan Trust will reasonably reimburse Reorganized TERI , pursuant to the terms of a reimbursement agreement to be negotiated, for any extraordinary costs incurred to comply with requests for cooperation made by the Plan Trustee.

        *(n)* **Distribution of Plan Trust Assets**.  Plan Trust Assets shall be distributed in accordance with the Plan Trust Agreement without the need for further order of the Bankruptcy Court or notice to any entities.  The aggregate of all distributions made on account of each beneficial interest in the Plan Trust shall be Pro Rata Distributions.  Each separate distribution made by the Plan Trustee shall, to the extent reasonably practicable, be Pro Rata Distributions, except the Plan Trustee may alter any particular distributions so that the aggregate of all distributions are Pro Rata Distributions.

        *(o)* **(Intentionally deleted)**.

        *(p)* **Federal Income Tax Treatment of Plan Trust**.

        (i)    **Plan Trust Assets Treated as Owned by Creditors**.  For all federal income tax purposes, all parties (including, without limitation, the Debtor, Reorganized TERI, the Plan Trustee, and the holders of Allowed General Unsecured Claims) will treat the transfer of this Plan Trust Assets to the Plan Trust including any amounts or other assets subsequently transferred to the Plan Trust (but only at such time as actually transferred) for the benefit of the holders of General Unsecured Claims, whether Allowed on or after the Effective Date, as (A) a transfer of the Plan Trust Assets directly to the holders of Allowed General Unsecured Claims, followed by (B) the transfer by such Persons to this Plan Trust of such Plan Trust Assets in exchange for beneficial interests in the Plan Trust. Accordingly, the holders of Allowed General Unsecured Claims will be treated

LIBC/3875117.2

for federal income tax purposes as the grantors and owners of their respective shares of the applicable Plan Trust Assets.

    (ii)   **Tax Reporting**.

    (A)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), all parties will treat the Plan Trust as a "liquidating trust" in accordance with Treasury Regulation section 301.7701-4(d), of which the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, are the grantors and beneficiaries. In the event an alternative treatment of the Plan Trust is required for federal income tax purposes, the Plan Trustee will promptly notify in writing (or by comparable means) all holders of beneficial interests in the Plan Trust, and anyone who subsequently becomes a holder, of such alternative treatment. The Plan Trustee will file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 6.3(p). The Plan Trustee also may send annually to each record holder of a beneficial interest in the Plan Trust a separate statement setting forth such holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Plan Trustee will also file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Trust that are required by any governmental unit.  Except as may otherwise be provided, the Plan Trust's taxable income, gain, loss, deduction or credit will be allocated by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Plan Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Plan Trust Agreement, up to the tax book value of the Plan Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.

    (B)    As soon as possible after the Effective Date, the Plan Trustee will make a good faith valuation of the value of the Plan Trust

<div align="center">39</div>

Assets. Such valuation will be made available from time to time, to the
extent relevant, and used consistently by all parties for all federal income
tax purposes.

(C)     Subject to definitive guidance from the Internal Revenue
Service or a court of competent jurisdiction to the contrary (including the
receipt by the Plan Trustee of a private letter ruling if the Plan Trustee
requests one, or the receipt of an adverse determination by the Internal
Revenue Service upon audit if not contested by the Plan Trustee), the Plan
Trustee will (1) make an election pursuant to Treasury Regulation
section 1.468B-9 to treat the Disputed Claims Reserve as a "disputed
ownership fund" within the meaning of that section; (2) treat as taxable
income or loss of the Disputed Claims Reserve, with respect to any given
taxable year, the portion of the taxable income or loss of the Plan Trust
that would have been allocated to the holders of Disputed General
Unsecured Claims had such Claims been Allowed on the Effective Date
(but only for the portion of the taxable year with respect to which such
Claims are unresolved), (3) treat as a distribution from the Disputed
Claims Reserve any assets previously allocated to or retained on account
of Disputed General Unsecured Claims as and when, and to the extent,
such claims are subsequently resolved (following which time such assets
will no longer be held in the Disputed Claims Reserve) and (4) to the
extent permitted by applicable law, report consistent with the foregoing
for state and local income tax purposes (including making any appropriate
elections). The holders of Allowed General Unsecured Claims, whether
Allowed on or after the Effective Date, will report, for tax purposes,
consistent with the foregoing.

(D)     The Plan Trustee will be responsible for payments, out of
and to the extent of available Plan Trust Assets, of any taxes imposed on
the Plan Trust or the Plan Trust Assets, including the Disputed Claims
Reserve.

(E)     The Plan Trustee may request an expedited determination
of taxes of the Plan Trust, including the Disputed Claims Reserve, under
section 505(b) of the Bankruptcy Code, for all returns filed for, or on
behalf of, the Plan Trust for all taxable periods through the dissolution of
the Plan Trust (including the Disputed Claims Reserve).

(q) **Dissolution of Plan Trust**. The Plan Trustee and the Plan Trust will be
discharged or dissolved, as the case may be, as set forth in the Plan Trust Agreement.

(r) **Transition of Servicing and Collections of Defaulted Loans.** For a period
of at least 30 days following the Effective Date, the Plan Trustee and First Marblehead Education
Resources, Inc. ("FMER") shall attempt in good faith to negotiate the terms of a mutually
acceptable transition agreement with respect to the servicing and collection of defaulted loans
subject to the Trust Adversary Proceeding or otherwise subject to any Securitization Trust

40

Settlement. For a period of no less than 90 days following the Effective Date, FMER shall continue to perform the services it has been providing during the Chapter 11 Case with respect to servicing and collecting defaulted loans subject to the Trust Adversary Proceeding pursuant to the Trusts Order, and FMER shall be entitled to payment from the Plan Trustee pursuant to such order; provided, however, FMER shall have no obligation to provide such services after the 90th day following the Effective Date.

**6.4** **Calculation of TERI Net Recovery.** The TERI Net Recovery will be calculated as follows:

*(a)* For the first year of the Term, the first $1,250,000 of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets. For the first year of the Term, the TERI First Year Share will comprise 20% of each dollar of TERI Loan Net Proceeds collected in excess of $1,250,000, but the TERI First Year Share will not exceed $750,000.

*(b)* For the second year of the Term, the first $1,125,000 of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets. For the Second Year of the Term, the TERI Second Year Share will comprise 20% of each dollar of TERI Loan Net Proceeds collected in excess of $1,125,000 but the TERI Second Year Share will not exceed $875,000.

*(c)* If, and only if, as of the end of the Term: (a) the Collection Contract has not been terminated for cause; (b) the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share is less than $1,625,000; (c) the sum of (i) the First Year Eligible Collections plus (ii) the Second Year Eligible Collections is at least $10,500,000 and (d) the Plan Trust has received $2,375,000 of TERI Loan Net Proceeds Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets during the Term, Reorganized TERI will be entitled to the Additional Share.

**6.5** **Distribution to Secured Creditors**. Secured Creditors will reasonably cooperate with Reorganized TERI or the Plan Trustee in connection with distribution of the funds in the Collateral Accounts, including executing any necessary documents or forms, including but not limited to a Form W-9.

**6.6** **Restricted Funds**. In TERI's sole discretion, the Restricted Charitable Funds may be applied to the payment of any Administrative Expense Claim or to the payment of any amount by which the Creditors Committee elects to reduce Retained Cash pursuant to section 10.3 of the Plan. Notwithstanding anything to the contrary herein, (i) the Restricted Charitable Funds and the Restricted Grant Funds will not be applied to satisfy any Allowed Claim (other than, in TERI's discretion, an Administrative Expense Claim) or distribution under the Plan; (ii) the Restricted Charitable Funds shall be administered from and after the Effective Date in accordance with all applicable deeds of gift and related stipulations; (iii) the Restricted Charitable Funds shall be used from and after the Effective Date solely for purposes of furthering higher education; (iv) the Restricted Charitable Funds subject to the Deed of Gift dated

41

September 30, 1986 in favor of the Debtor from Massachusetts Higher Education Assistance Corporation (the "Financial Aid Gift") shall be used from and after the Effective Date solely for paying the costs of, and general overhead expenses reasonably attributable to, Reorganized TERI's "College Access" outreach programs; and (v) the Financial Aid Gift shall not be used from and after the Effective Date for paying any costs of, or general overhead expenses attributable to, Reorganized TERI's portfolio management or collection management operations. The Debtor's Board of Directors has agreed to, and Reorganized TERI's board of directors will agree to, the restrictions set forth in the foregoing clauses (iv) and (v) of this Section 6.6.

**6.7    Operations of Reorganized TERI**.  On and after the Effective Date, Reorganized TERI may operate its business, may use, acquire and dispose of property other than Plan Trust Assets, may retain, compensate and pay any professionals or advisors, and compromise or settle any causes of action, claims or interests, other than Causes of Action that are Plan Trust Assets, without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code and the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order or other Orders of the Bankruptcy Court.

**6.8    Closing of the Chapter 11 Case**.  The Plan Trustee will seek authority from the Bankruptcy Court to close the Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**6.9    Section 1123(b)(3)**.  From and after the Effective Date, the Plan Trustee shall have the exclusive right and standing to take all actions identified in section 1123(b)(3) of the Bankruptcy Code, except as to any claims or interests that are retained by Reorganized TERI pursuant to this Plan.  For the avoidance of doubt, the Plan Trustee is authorized to pursue the Causes of Action (including the Trust Adversary Proceeding).

**6.10   Establishment and Implementation of a Most Favored Nations Clause**.  In the event that a Make and Wait Lender or make and Hold Lender rejects the Plan, or a representative of a Securitization Trust rejects this Plan and thereby the Securitization Trust Settlement, or KeyBank National Association (other than in its capacity as a Make and Wait Lender) or a Key Corp Trust rejects this Plan and thereby the Key Access Program Settlement (any of which is referred to herein as a "Litigating Creditor") and such Litigating Creditor, pursuant to a Final Order of the Bankruptcy Court, is found to have an Allowed Deficiency Claim or General Unsecured Claim that exceeds such Litigating Creditor's Class 5 Claim, by at least 10%, then the Plan Trustee shall be obligated to re-calculate the amount of the Deficiency Claims of all Creditors using the findings of the Bankruptcy Court regarding the proper calculation of such Claim (the "Revised Calculation").  The Plan Trustee may seek further or other orders of the Bankruptcy Court as the Plan Trustee desires to facilitate the proper determination of the Revised Calculation with respect to any and all Claims.  To the extent that there are multiple evidentiary hearings to determine the amount of Allowed Class 5 Claims, the Revised Calculation shall be completed using the Final Order of the Bankruptcy Court that would yield the greatest Claim amounts.  Notwithstanding anything in this section 6.10, however, (i) no Allowed Claim shall be reduced as a result of any Revised Calculation, and (ii) the Plan Trustee shall not use any

42

Revised Calculation as set forth in this section 6.10 without prior approval of the Bankruptcy Court after notice and a hearing within the meaning of 11 U.S.C. §102(1).

**6.11    Disposition of Affected Property Pending Resolution of Nellie Mae Adversary Proceeding.**  On the Effective Date (or as soon thereafter as reasonably practicable) all property of the Estate that the Nellie Mae Foundation, Inc. ("Nellie Mae") claims in the Nellie Mae Adversary Proceeding, comprised of certain defaulted loans that were transferred to the Debtor prior to the Commencement Date and identified by Nellie Mae in an exhibit to its complaint and certain recoveries on those loans received by the Debtor both before and after the Commencement Date, shall, (i) in the case of Cash, be transferred to U.S. Bank National Association ("U.S. Bank") and held by U.S. Bank in escrow pursuant to the terms of one or more escrow agreements among U.S. Bank in its capacity as escrow agent for Nellie Mae and the Plan Trustee and (ii) in the case of defaulted loans, be held by the Reorganized Debtor or the Plan Trustee subject to the Claims and rights asserted by Nellie Mae, with any recoveries (net of costs of collection) on such defaulted loans received after the Effective Date to be transferred to U.S. Bank as escrow agent to be held in escrow on the same terms as Cash transferred on the Effective Date.  The escrow agreement shall be mutually acceptable to U.S. Bank, Nellie Mae and the Plan Trustee.  Such escrowed funds and defaulted loans  (i) shall be held in the applicable escrow account, in the case of Cash, or by the Reorganized Debtor or the Plan Trustee, in the case of defaulted loans, to be released upon the earlier of (1) one or more Final Orders of the Bankruptcy Court or (2) pursuant to joint written instruction of the Plan Trustee and Nellie Mae; (ii) shall be invested by U.S. Bank as escrow agent in accordance with the written instructions of the Plan Trustee and Nellie Mae, and investment earnings on such funds shall be added to the fund and released as provided above, and (iii) shall be subject to such other matters as shall be agreed to by the parties to such escrow agreement (including payment of customary fees and other bank charges).  Notwithstanding such transfer of funds to the escrow account or accounts, or the retention of such defaulted loans subject to the rights and claims of Nellie Mae, each of the Plan Trustee and Nellie reserve all rights, and such transfer(s) to the escrow account or accounts are subject to the rights of the Plan Trustee and Nellie Mae including, without limitation, the rights of the parties with respect to the extent, priority, validity or existence of any alleged security interest in or ownership of such defaulted loans, recoveries and funds.

## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

**7.1    No Distribution Pending Allowance.**  Notwithstanding any other provision of this Plan the Plan Trustee will not be compelled or required to distribute any Cash or other property on account of any Disputed Claim or any portion thereof, unless and until such Claim becomes an Allowed Claim, and distribution on account of such Allowed Claim is required pursuant to the terms of the Plan.  In the event that a Make and Wait Lender or Make and Hold Lender purchased or sold loans guaranteed by the Debtor on the secondary market and the Debtor's records do not reflect such purchase or sale, the Plan Trustee shall be entitled to withhold distributions to such Creditors pending determination of the rightful owner of such loans.

43

**7.2** **Resolution of Disputed Claims.** Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtor, and following the Effective Date, only the Plan Trustee will have the right, to the exclusion of all others, to make, file, and prosecute objections to Claims, and will serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable. Objections to Claims must, subject to the Local Rules for the United States Bankruptcy Court—District of Massachusetts, be filed with the Bankruptcy Court and served upon each affected creditor. From and after the Confirmation Date, all objections will be litigated to a Final Order except to the extent that the Plan Trustee elects to withdraw any such objection or the Plan Trustee and the holder of the Disputed Claim elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim with approval of the Bankruptcy Court.

**7.3** **Estimation.** In the event that the Plan Proponents seek entry of an Order estimating claims, such estimation order shall not prejudice or otherwise affect the ability of the Plan Proponents or Plan Trustee, as the case may be, to object to the allowance of any such Claim on any basis and the Bankruptcy Court will retain jurisdiction with respect to all Claims, including any Claim estimated pursuant to an estimation order.

**7.4** **Allowance of Disputed Claims.** If, on or after the Effective Date, any Disputed Claim in a Class that is entitled to receive a distribution under the Plan becomes an Allowed Claim, the Debtor, Reorganized TERI, or the Plan Trustee, as applicable, must, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, distribute to the holder of such Allowed Claim an amount sufficient to pay to such holder of a Disputed Claim the amount that such holder would have been entitled to receive under this Plan if such Claim had been an Allowed Claim on the Effective Date.

**7.5** **Disallowance of Claims Without Further Order of the Bankruptcy Court.** As of the Confirmation Date, any Disputed Claim for which a proof of Claim has not been filed, will be deemed disallowed and expunged, without further act or deed.

**7.6** **No Distribution in Respect of Disallowed Claims.** To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim will not receive any distribution on account of the portion of such Claim that is disallowed.

## ARTICLE VIII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1** **Assumption or Rejection of Executory Contracts and Unexpired Leases.** Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity prior to the Commencement Date will be deemed rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (c) that is specifically designated as a contract or lease to be assumed on schedules 8.1(A)(executory contracts) or 8.1(B) (unexpired leases), which schedules will be

44

contained in the Plan Supplement or (d) those contracts not subject to assumption or rejection pursuant to Section 8.7 hereof and disclosed in the Plan Supplement; *provided, however*, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease there from or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, either rejected or assumed as of the Effective Date. The Debtor will provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on schedules 8.1(A) or (B) will not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

*(a)* Reorganized TERI will pay from Reorganized TERI Assets all Cure Amounts, if any, to the non-Debtor parties to the executory contracts and unexpired leases assumed pursuant to this Section 8.1 of this Plan by the earlier to occur of (i) the first Effective Date Anniversary or (ii) ten (10) days after resolution of the Cure Amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties.

*(b)* If a non-Debtor party to an executory contract or unexpired lease assumed pursuant to this Section 8.1 of this Plan timely objects to the assumption or the proposed Cure Amount for that agreement, the Debtor and the objecting party may settle, compromise, or otherwise resolve the proper Cure Amount without further order of the Court or, at the Debtor's sole discretion, may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount.

*(c)* Notwithstanding anything to the contrary in this Plan or in any other document, the amount of the Retained Cash shall be reduced by an amount equal to one-half of any Allowed General Unsecured Claims, minus $50,000, arising from the rejection by the Debtor of the aggregate of all executory contracts by this Plan, without reference to the Claims arising from (a) the Debtor's rejection by this Plan of guaranty agreements and other program documents between and among the Debtor and any of the Creditors holding Claims in Classes (including subclasses) 2 – 6, and (b) Claims filed prior to the filing of this Plan in the Bankruptcy Court by parties to executory contracts rejected by this Plan that are related to such executory contracts.

**8.2** **Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.** Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to Section 8.1 of this Plan and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of this Plan.

**8.3** **Inclusiveness.** Unless otherwise specified on Schedules 8.1(A) and 8.1(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.1(A) and 8.1(B) will include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects

45

such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.1(A) and 8.1(B).

**8.4    Return of Guaranty Fees**. As soon as practicable following the Effective Date, the Plan Trustee (or the Debtor in cooperation with the Plan Trustee) will return any Guaranty Fees received in respect of Pipeline Loans to holders of Make and Wait and Make and Hold Claims that accept the Make and Wait Lender Settlement or Make and Hold Settlement.

**8.5    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Plan**. Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 of this Plan must be filed with the Claims Agent on or before the Rejection Bar Date. All such Claims not filed within such time will be forever barred from assertion against the Debtor, its Estate or Reorganized TERI and its property.

**8.6    Insurance Policies**. All of the Debtor's insurance policies (which policies are maintained by the Debtor in the ordinary course of business and the premiums for which have been prepaid) will remain in full force and effect with regard to Reorganized TERI, and are not required to be assumed by the Debtor. Nothing contained herein shall constitute or be deemed a waiver of any cause of action that the Debtor may hold against any entity to the extent of available insurance, including, without limitation, the insurer under any of the Debtor's policies of insurance. Under all circumstances, Reorganized TERI, and not the Plan Trustee or the Plan Trust Assets, shall be responsible for and available to pay all premiums and other insurance related expenses and liabilities.

**8.7    Compensation and Benefit Programs**. From and after the Effective Date, Reorganized TERI shall make any and all payments due (for Cure Costs, contributions, Administrative Expense Claims, Claims or otherwise) solely from Reorganized TERI Assets for any and all savings plans, retirement plans (including without limitation the Pension Plan), health care plans, performance-based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability, other insurance plans and management contracts. Reorganized TERI's obligations under this section shall apply regardless whether the Debtor assumes, rejects or neither assumes nor rejects such plans and contracts as of the Effective Date.

**8.8    Retiree Benefits**. On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized TERI will continue to pay all retiree benefits of the Debtor (within the meaning of section 1114 of the Bankruptcy Code) and all amounts due or to become due in any way related to the Pension Plan, if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtor had obligated itself to provide such benefits, *provided, however*, nothing herein will alter Reorganized TERI's right to amend or modify retiree benefits in accordance with applicable law. Reorganized TERI will remain obligated (to the exclusion of the Plan Trustee or any Creditor) to contribute to the Pension Plan the amount necessary to satisfy ERISA's minimum funding standards, ERISA §302; Internal Revenue Code §412. The Pension Plan may be terminated only if the statutory requirements of either ERISA §4041, 29 U.S.C. §1341, or ERISA §4042, 29 U.S.C. §1342, are

46

met. If the Pension Plan terminates, Reorganized TERI and all members of its controlled group will be jointly and severally liable for unpaid minimum funding contributions, premiums, and unfunded benefit liabilities of the Pension Plan. See 29 U.S.C. §1362(a).

## ARTICLE IX

## CONDITIONS PRECEDENT TO ENTRY OF THE CONFIRMATION ORDER

**9.1**   **Conditions Precedent to entry of the Confirmation Order**. The following are conditions precedent to the entry of the Confirmation Order:

(a) The Bankruptcy Court has found and determined that all of the applicable requirements of 11 U.S.C. §1129 have been satisfied, have been performed or have occurred;

(b) The Creditors Committee does not reasonably determine that the Debtor and the Creditors Committee are unable or will be unable to agree upon the form and substance of any document included in the Plan Supplement;

(c) The Confirmation Order shall be entered no later than October 15, 2010;

(d) The Debtor has disbursed Cash prior to the Confirmation Hearing substantially in accordance with its Cash projections provided to the Creditors Committee and Final Orders of the Bankruptcy Court, and for no other purposes.

**9.2**   **Waiver of Conditions**. Each of the conditions precedent in sections 9.1 (b) – (d) hereof may be waived, in whole or in part, by the Plan Proponents. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court or any formal action.

**9.3**   **Effect of Failure of Condition to Entry of Confirmation Order**. The failure of a condition set forth in section 9.1 above shall be as described in Article XI below.

## ARTICLE X

## EFFECTIVENESS OF THE PLAN

**10.1**   **Conditions Precedent to the Effective Date**. The following are conditions precedent to the occurrence of the Effective Date of this Plan, which shall occur on or before October 31, 2010, unless the Creditors Committee consents to an extension of time beyond the such date:

(a) The Bankruptcy Court shall have entered the Confirmation Order, which shall approve this Plan on substantially the same terms and conditions set forth herein, which shall be in form and substance satisfactory to the Plan Proponents;

(b) No stay of the Confirmation Order shall then be in effect at the time the other conditions set forth in Section 9.1 or this Section 10.1 are satisfied or waived;

47

(c) The Available Cash transferred to the Plan Trustee on the Effective Date shall not be less than $36,000,000, calculated as set forth in the *pro forma* calculation of attached Schedule E. For purposes of calculating the Minimum Cash Threshold in Schedule E and compliance with this section 10.1 of the Plan, Available Cash will not be reduced by any amount paid to Nellie Mae Foundation, Inc. in satisfaction of any judgment entered in or pursuant to any settlement of the Nellie Mae Adversary proceeding.

(d) The Creditors Committee shall have filed with the Court a Notice establishing the date for the Effective Date, and

(e) All documents, instruments and agreements, in form and substance satisfactory to the Plan Proponents, provided for under or necessary to implement this Plan, including but not limited to the Plan Trust Agreement, shall have been executed and delivered by the parties thereto.

**10.2  Waiver of Conditions**. Each of the conditions precedent in section 10.1 hereof may be waived, in whole or in part, by the Plan Proponents. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court or any formal action.

**10.3  Effect of Failure of Condition to Entry of Confirmation Order**. The consequences or effect of the failure of a condition set forth in section 9.1 above shall be as described in Article XI below. However, if there is a failure of the condition described in section 10.1(c) above, then, at the election of the Creditors Committee in its sole discretion, the Effective Date may occur, and, at the election of the Creditors Committee in its sole discretion, the Retained Cash shall be reduced by an amount equal to the difference between $36,000,000 and the Available Cash.

## ARTICLE XI

## CONSEQUENCES OF A FAILURE OF A CONDITION IN ARTICLES IX AND X

Upon a failure of one or more conditions described in Articles IX and/or X above that the Plan Proponents jointly do not waive *as set forth in Sections 9.2 and 10.2 above*,

(a) Except for this Article XI, the Plan shall be null, void and of no effect;

(b) The Debtor shall not proceed with any hearing to confirm this Plan or any other plan not supported by the Committee unless and until a plan of reorganization or plan of liquidation, as applicable, supported by the Creditors Committee is considered by the Court for confirmation under 11 U.S.C. §1129, provided, however, that nothing shall prevent the simultaneous consideration of a plan presented by the Debtor; and

(c) Nothing in this Plan or in the Disclosure Statement shall be binding upon the Plan Proponents or impair their rights, claims and defenses with respect to any issue.

48

# ARTICLE XII

## EFFECTS OF CONFIRMATION

### 12.1   Vesting of Assets.

(a) As of the Effective Date, the property of the Estate, including all claims and Causes of Action against third parties that arose prior to or after the Commencement Date, will vest in Reorganized TERI or the Plan Trust as provided in this Plan.

(b) From and after the Effective Date, Reorganized TERI and the Plan Trust may dispose of its respective assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of this Plan.

(c) Pursuant to 11 U.S.C. §1141(c), as of the Effective Date, all assets of Reorganized TERI and the Plan Trust (including, without limitation, all funds in all Collateral Accounts established for the benefit of Entities who have not filed timely a proof of claim) will be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in this Plan or the Confirmation Order.

(d) Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in this Plan or in the Confirmation Order shall affect the terms of the Transition Services Agreement dated May 30, 2008, as approved by the order of the Bankruptcy Court dated June 23, 2008, or the parties' respective rights thereunder or with respect thereto.

### 12.2   Binding Effect.   Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of this Plan shall bind any holder of a Claim against the Debtor and its respective successors and assigns, whether or not the Claim of such holder is Impaired under this Plan and whether or not such holder has accepted this Plan. The rights, benefits and obligations of any entity named or referred to in this Plan whose actions may be required to effectuate the term of this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtor under chapters 7 or 11 of the Bankruptcy Code).

### 12.3   Discharge.   Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim and any affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtor and Reorganized TERI, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and liabilities that arose prior to the Confirmation Date. Upon the Effective Date, all such Persons or Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor or Reorganized TERI.

49

### 12.4    Releases, Injunctions and Exculpation.

(a) **Satisfaction of Claims Against the Debtor.**  Except as otherwise provided for in section 12.4(b) and (c) below, the treatment to be provided for respective Allowed Claims against the Debtor pursuant to this Plan shall be in full satisfaction, settlement and release of such respective Claims against the Debtor.

(b) *Releases by Debtor Releasors.  Except as otherwise specifically provided in this section 12.4(b) of this Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the implementation of this Plan, the Released Parties, on and after the Effective Date, are released by the Debtor Releasors from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, or any Person or Entity claiming derivatively through or on behalf of the Debtor would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date other than for claims based upon gross negligence or willful misconduct; provided, however, that for the avoidance of doubt, the foregoing release does not include a release of any objection or defense that the Debtor Releasors may have with respect to Allowance of any Claim; provided, further, that that nothing in this paragraph shall be deemed to be a release by any of the Debtor Releasors of any Person or Entity of any Causes of Action or of any obligations imposed on any of them pursuant to this Plan.*

(c) *Injunction.  As of the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Persons or Entities who, directly or indirectly, have held, hold or may hold Claims against the Debtor or, as to Claims which are derivative of the Debtor and released pursuant to Section 12.4(b), the Released Parties, are permanently enjoined from taking any of the following actions on account of any such Claims, debts, interests or liabilities, other than actions brought to enforce any rights or obligations under this Plan:  (i) commencing or continuing in any manner any action or other proceeding against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor, the Plan Trustee, the Released Parties or their respective properties, (v) commencing or continuing, in any manner or any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  For the avoidance of doubt, nothing in this Plan or the Confirmation Order shall be deemed to (a) be a release by any of the Debtor Releasors, or any Person or Entity other than Released Parties, of any Causes of Action; (b) enjoin the prosecution by the Plan Trustee of the Causes of Action (other than to the limited extent provided for in the Plan against the Released Parties), and (c) subject to section 5.5(h) above, enjoin any Person or Entity from asserting any defense or claims as a defense in any civil action, including, without limitation, in the Trust Adversary Proceeding.  Notwithstanding any language to the contrary herein or in any other document, as to any Entity (including the Released Parties), nothing*

50

*herein shall impair or enjoin the Plan Trustee from seeking to enforce, or to assert rights and recover damages with respect to any breach of the terms of this Plan.*

        *(d) Exculpation. The Debtor, the Released Parties, KeyBank National Association, as Administrator and Master Servicer of the KeyCorp Trusts, The Bank of New York Mellon Trust Co., N.A., as Eligible Lender Trustee and as Indenture Trustee for certain KeyCorp Trusts, The Bank of New York (Delaware), as Owner Trustee for certain KeyCorp Trusts, Deutsche Bank Trust Company Americas, as Indenture Trustee and Owner Trustee for certain KeyCorp Trusts, FMDS, solely in its capacity as Administrator to the Securitization Trusts, U.S. Bank National Association, solely in its capacity as Indenture Trustee, trustee and eligible lender trustee to the Securitization Trusts and Other Trusts, and in any capacity in which it was named as a defendant in the Trust Adversary Proceeding, and as bank or agent with respect to the Collateral Accounts, MBIA Insurance Corporation and AMBAC Assurance Corporation, and their respective members and professionals (acting in such capacity), shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, or any act taken or omitted to be taken in connection with, in contemplation of, during or in any way related to the Chapter 11 Case (all of the foregoing being collectively referred to as the "Exculpated Acts"), except for transactions, acts or omissions (i) as a result of willful misconduct or gross negligence, (ii) with respect to transactions occurring pursuant to the "Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the benefit of the Trusts" entered by the Bankruptcy Court on June 23, 2008, (iii) occurring pursuant to the Transition Services Agreement between FMER and the Debtor approved by the Bankruptcy Court on June 23, 2008, or (iv) pursuant to any contracts between or among the Debtor and any entity entered into prior to the commencement of this Bankruptcy Case. This provision does not exculpate the foregoing Persons, including the Debtor, from performing their duties under the Plan and effectuating the Plan. Nothing in this section 12.4 (i) exculpates the Debtor or Reorganized TERI from performing its obligations under any contract or agreement not rejected under this Plan pursuant to 11 U.S.C. §365, or (ii) exculpates any Person from obligations unrelated to the Exculpated Acts it may owe to any other Person under any contract.*

       **12.5**   **Release of Assets**.  Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtor, its assets and properties and the Estate.  Thereafter, jurisdiction of the Bankruptcy Court shall be limited as set forth in Article XI of this Plan.

       **12.6**   **Claims Preserved.** As of the Effective Date, subject to the releases and waivers granted pursuant to section 12.4 of this Plan, the Plan Trust shall succeed to the Debtor's interest in the Causes of Action, and the Plan Trustee shall have all requisite authorization, approval and standing to prosecute any Causes of Action in the name of, on behalf of, in the stead of, or as assignee of the Debtor and the Estate.

LIBC/3875117.2

12.7 **Residual**.

(a) **Reorganized TERI Deemed Owner of Residual**. Confirmation of the Plan constitutes a determination, binding on all Entities (including, without limitation, the United States Internal Revenue Service and all state taxing authorities) that as a result of the implementation of the transactions contemplated by this Plan, (i) the Plan Trustee is not and shall not become the owner of the Residual (or any portion thereof) for purposes of taxation under the laws of the United States or of any State, and (ii) none of the beneficiaries of the Plan Trust shall in any way be liable for any taxes attributable to or arising as a result of ownership of the Residual, or payable on account of income or accretion of value, if any, earned by, allocated to or attributable to the owner(s) of the Residual, to the United States or any State, including to any political subdivision or agency of any of them.

(b) **Post-confirmation Treatment of Residual**. The Plan Trustee and TERI shall in good faith attempt to reach agreement regarding the proper treatment of the Residual, in a manner that will not impose obligations upon the Plan Trustee or the beneficiaries of the Plan Trust to recognize and/or pay taxes relating to Reorganized TERI's ownership of the Residual.

(c) **No Tax Liability For Plan Trust or Creditors Arising From Residual**. Notwithstanding anything in the Plan to the contrary, nothing in the Plan shall obligate the Plan Trustee, the Plan Trust, or the beneficiaries of the Plan Trust to assume any obligation or liability relating to the Residual, including any liability with respect to federal or state taxes in any way attributable to or arising as a result of ownership of the Residual, or payable on account of income or accretion of value earned by, allocated to or attributable to the owner(s) of the Residual. In the absence of any agreement to the contrary between the Plan Trustee and TERI pursuant to Section 12.7(b) of the Plan, Reorganized TERI shall retain all right, title, interest, obligations and liabilities related to or arising from the Residual.

12.8 **ERISA**. Nothing in this Plan will release or discharge any fiduciary of the Pension Plan, within the meaning of 29 U.S.C. §1002(21), from any liability arising as a result of such fiduciary's breach of fiduciary duty under ERISA with respect to the Pension Plan.

## ARTICLE XIII

## RETENTION OF JURISDICTION

13.1 **Jurisdiction of Bankruptcy Court**. The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of any Claims resulting there from;

(b) To determine any and all pending adversary proceedings, applications and contested matters relating to the Chapter 11 Case;

52

(c) To hear and determine any objection to any Claims;

(d) To hear and determine the Causes of Action;

(e) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f) To issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

(g) To consider any modifications of this Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h) To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(i) To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan, including, without limitation, any claim or issue arising under or in any way related to section 12.7 of this Plan;

(j) To hear and determine any actions brought against the Plan Trustee or Reorganized TERI;

(k) To recover all assets of the Debtor, property of the Estate and the assets of the Plan Trustee, wherever located;

(l) To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods ending after the Commencement Date through the closing of the Chapter 11 Case);

(m) To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

(n) To hear any other matter consistent with the provisions of the Bankruptcy Code; and

(o) To enter a final decree closing the Chapter 11 Case.

## ARTICLE XIV

### MISCELLANEOUS PROVISIONS

**14.1   Effectuating Documents and Further Transactions**.  Each of the officers of the Debtor and Reorganized TERI, and the Plan Trustee is authorized and directed to execute,

LIBC/3875117.2

deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**14.2** **Exemption from Transfer Taxes**. Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by this Plan, will not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

**14.3** **Post-Confirmation Date Fees and Expenses**. After the Effective Date, Reorganized TERI will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses, incurred after the Effective Date, of the professional persons employed by Reorganized TERI in connection with the implementation and consummation of this Plan and any other matters as to which such professionals may be engaged. The fees and expenses of such professionals will be paid within ten (10) Business Days after submission of a detailed invoice therefor. If Reorganized TERI disputes the reasonableness of any such invoice, Reorganized TERI will timely pay the undisputed portion of such invoice, and Reorganized TERI or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of such portion of the disputed invoice.

**14.4** **Modification of Plan**.

(a) The Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan at any time prior to the entry of the Confirmation Order, subject to the consent of the Creditors' Committee. After the entry of the Confirmation Order but prior to the Effective Date, the Plan Proponents may, upon order of the Bankruptcy Court, jointly amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan. A holder of an Allowed Claim that is deemed to have accepted this Plan will be deemed to have accepted this Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

(b) Prior to the Effective Date, the Creditors Committee, in its sole and absolute discretion, shall have the right not to accept any portion of the Plan Trust Assets. Any such Plan Trust Assets that the Creditors Committee declines to accept as Plan Trust Assets shall instead be deemed to be Reorganized TERI Assets under this Plan.

**14.5** **Withdrawal or Revocation**. The Plan Proponents may withdraw or revoke this Plan at any time prior to the Confirmation Date. If the Plan Proponents revoke or withdraw this Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then this Plan will be deemed null and void. In such event, nothing contained herein will be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other Person or Entity

54

or to prejudice in any manner the rights of the Debtor or any other Person or Entity in any further proceedings involving the Debtor.

**14.6** **Courts of Competent Jurisdiction**. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction will have no effect upon and will not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**14.7** **Notices**. Any notices to or requests of the Debtor by parties-in-interest under or in connection with the Plan must be in writing and served either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, all charges prepaid, and will be deemed to have been given when received by the following parties:

> To the Company/Debtor:
>
>> THE EDUCATION RESOURCES INSTITUTE, INC.
>> 31 St. James Ave., 9th Floor
>> Boston, MA 02116
>> Attn: Willis J. Hulings III
>
> *With copies to:*
>
>> GOODWIN PROCTER LLP
>> Attorneys for the Debtor
>> Exchange Place
>> 53 State Street
>> Boston, MA 02109-2881
>> (617) 570-1930
>> Attn: Daniel M. Glosband, Esq.
>>      Gina Lynn Martin, Esq.
>
> To the Creditors' Committee:
>
>> DUANE MORRIS, LLP
>> 470 Atlantic Avenue, Suite 500
>> Boston, MA 02210
>> (857) 488-4216
>> Attn: Jeffrey D. Sternklar

LIBC/3875117.2

To the Plan Trustee:

Stephen S. Gray
CRG Partners
2 Atlantic Avenue
Boston, MA 02110
(617) 482-4242

**14.8**   <u>**Severability**</u>.  In the event that the Bankruptcy Court determines, prior to the
Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the
Bankruptcy Court will have the power to alter and interpret such term or provision to make it
valid or enforceable to the maximum extent practicable, consistent with the original purpose of
the term or provision held to be invalid, void or unenforceable, and such term or provision will
then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or
interpretation, the remainder of the terms and provisions of the Plan will remain in full force and
effect and will in no way be affected, Impaired or invalidated by such holding, alteration or
interpretation.  The Confirmation Order will constitute a judicial determination and shall provide
that each term and provision of this Plan, as it may have been altered or interpreted in accordance
with the foregoing, is valid and enforceable pursuant to its terms.

**14.9**   <u>**Governing Law**</u>.  Except to the extent the Bankruptcy Code or Bankruptcy Rules
are applicable, the rights and obligations arising under this Plan will be governed by, and
construed and enforced in accordance with, the laws of the State of Massachusetts without giving
effect to the principles of conflicts of law thereof.

**14.10**   <u>**Headings**</u>.  Headings are used in this Plan for convenience and reference only,
and will not constitute a part of this Plan for any other purpose.

**14.11**   <u>**Exhibits**</u>.  All Exhibits and schedules to this Plan are incorporated into and are a
part of this Plan as if set forth in full herein.

**14.12**   <u>**Successors and Assigns**</u>.  All the rights, benefits and obligations of any Person or
Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, the
heirs, executors, administrators, successors and/or assigns of such Person or Entity.

**14.13**   <u>**Dissolution of the Creditors' Committee**</u>.  On the Effective Date, the Creditors'
Committee will be dissolved and the members thereof will be released and discharged of and
from all further authority, duties, responsibilities and obligations related to and arising from and
in connection with the Chapter 11 Case, and the retention or employment of the Creditors'
Committee's attorneys, accountants and other agents will terminate; *provided, however,* that
immediately prior to the dissolution of the Creditors' Committee, any and all analyses or work
product prepared by and/or information obtained by the Creditors' Committee or its attorneys,
accountants and other agents related to the Causes of Action must be transferred to the Plan Trust
and will be deemed an asset of the Plan Trust for purposes of the Plan; *provided further,*

56

*however*, the Creditors' Committee will continue to exist after such date solely with respect to all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any professional retained by the Creditors' Committee. On and after the Effective Date, the Plan Trustee Advisory Committee will have the same standing to participate in proceedings before the Bankruptcy Court as the Creditors' Committee had prior to the Effective Date.

14.14   **Courts of Competent Jurisdiction**.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal or failure of jurisdiction will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

14.15   **Plan Supplement**.  The documents comprising the Plan Supplement will be filed with the clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject this Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours. Holders of Claims may obtain a copy of the Plan Supplement upon written request to the Debtor's bankruptcy counsel or on the website of the Voting Agent (*www.epiqsystems.com*).  All exhibits and schedules contained in the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein.

14.16   **Plan Controls Disclosure Statement; Confirmation Order Controls Plan**.  To the extent this Plan is inconsistent with the Disclosure Statement, the provisions of this Plan will be controlling. To the extent the Confirmation Order is inconsistent with this Plan, the provisions of the Confirmation Order will be controlling.

14.17   **Filing of Additional Documents**.  On or before substantial consummation of this Plan, the Debtor will file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, including those contained in the Plan Supplement.

14.18   **Tax-Exempt Status**.  Nothing in this Plan will adversely affect, or be interpreted to be inconsistent with, the tax-exempt status of the Debtor, Reorganized TERI or any entity established pursuant to this Plan that is expressly intended to be tax-exempt.

14.19   **Consent to Transfer of Residual**.  The Debtor shall be deemed to have consented to the transfer of any residual interests in any Securitization Trust by any holder of a residual interest in any Securitization Trust that has provided the Debtor with written consent to transfer such interest.  Notwithstanding the foregoing, however, without the need for any further action by any entity, the Debtor shall be deemed to have all necessary consents from all entities and to have provided all necessary consents to permit the transfer of the Residual to the Plan Trustee notwithstanding that the Residual will not be transferred as of the Effective Date under this Plan.

Dated:     Boston, Massachusetts
           August 26, 2010

THE EDUCATION RESOURCES INSTITUTE, INC.

By: _____

Name: WILLIAM G. DAVIDSON

Title: SVP & CFO

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF THE
EDUCATION RESOURCES INSTITUTE, INC.

By: _____

    Name:
    Title:

Dated:    Boston, Massachusetts
           August 26, 2010

**THE EDUCATION RESOURCES INSTITUTE, INC.**

By:_____
    Name:
    Title:

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE EDUCATION RESOURCES INSTITUTE, INC.**

By:_____
    Name:  Thomas M. Cambern
    Title:  Chairman

# EXHIBIT A

Joint Plan of Reorganization
Schedule A

| Class | Make and Wait Collateral Account Funds (as of 12/31/08) | Make and Wait Lien Dispute Amount (5% of Collateral Account Funds) | Make and Wait Lender Base Case Equity (If Any) | Make and Wait Lender Decoder Equity (If Any) | Make and Wait Lender Payment Amount (If Any) [1] | Payment to Accepting Make and Wait Lender from Collateral Account [2] | Make and Wait Lender Decoder Deficiency Claim (If Any) [3] |
|---|---|---|---|---|---|---|---|
| | A | A*5%=B | C | D | B+D+E | A+C+F | G |
| Class 2a Intentionally Omitted | $0 | $0 | $0 | NA | NA | NA | NA |
| Class 2b Comerica Bank | $379,951 | $0 | $164,345 | $41,582 | $41,582 | $338,368 | $0 |
| Class 2c Intentionally Omitted | $790 | $0 | $0 | NA | NA | NA | NA |
| Class 2d GMAC Bank | $5,906,949 | $0 | $782,057 | $0 | $0 | $5,906,949 | $941,904 |
| Class 2e HSBC Bank USA, N.A. | $861,764 | $0 | $627,147 | $320,702 | $320,702 | $541,061 | $0 |
| Class 2f Huntington National Bank | $831,333 | $0 | $325,854 | $0 | $0 | $831,333 | $2,126 |
| Class 2g Insurbanc | $16,333 | $812 | $8,650 | $2,098 | $2,910 | $13,323 | $0 |
| Class 2h KeyBank National Association | $856,777 | $0 | $92,883 | $0 | $0 | $856,777 | $159,860 |
| Class 2i Manufacturers and Traders Trust Company | $678,383 | $33,919 | $524,891 | $215,499 | $249,418 | $428,965 | $0 |
| Class 2j National City Bank | $3,973,170 | $0 | $1,140,016 | $0 | $0 | $3,973,170 | $0 |
| Class 2k PNC Bank, N.A. | $8,025,823 | $401,291 | $3,026,789 | $0 | $401,291 | $7,624,532 | $448,989 |
| Class 2l RBS Citizens, N.A. [4] | $48,505,674 | $2,287,196 | $8,857,767 | $0 | $2,287,196 | $46,080,390 | $13,448,884 |
| Class 2m Sovereign Bank | $537,888 | $0 | $265,002 | $64,848 | $64,848 | $473,040 | $0 |
| Class 2n SunTrust Bank | $437,566 | $0 | $230,542 | $110,277 | $110,277 | $327,289 | $0 |
| Class 2o TCF National Bank | $129,172 | $0 | $76,941 | $23,996 | $23,996 | $105,177 | $0 |
| Class 2p U.S. Bank, N.A. | $2,795,334 | $0 | $1,143,599 | $88,198 | $88,198 | $2,707,136 | $0 |

(1) This is the sum of the "Make and Wait Lien Dispute Amount (5% of Collateral Account Funds)" and "Make and Wait Lender Decoder Equity (if any)". The balance of the funds in the Collateral Account, including accrued interest, shall be payable to the applicable Accepting Make and Wait Lender.

(2) For purposes of the Plan, payment to accepting Make and Wait Lender from collateral account is net of any equity calculated with the Decoder methodology described in the Plan Supplement. Amounts in the collateral account will be adjusted on the date of transfer. Amounts will be adjusted for recoveries, earnings net of losses, interest and bank fees or charges (including without limitation costs and fees arising out of liquidation of any investment) accrued to the date of distribution. To the extent that there are receipts, accruals or adjustments to Cash to be distributed from a Collateral Account pursuant to the Plan that occur subsequent to the date specified for a distribution, then the Debtor, the Reorganized Debtor or the Plan Trustee, as appropriate, will make subsequent distributions of such Cash or other assets, if any, as soon as practicable after receipt.

(3) Under the Base Case, no Make and Wait Lender holds a Deficiency Claim.

(4) The figures for RBS Citizens reflect the Citizens Settlement Order as entered on 4/28/10.

# EXHIBIT B

Schedule B
Joint Plan of Reorganization

| Class | Securitization Trust Pledged Acct (As of 6/30/10)[1] A | Securitization Trust Deoder Equity B | Pmt to Accepting Securitization Trust from Pledged Acct (As of 7/31/10)[2] C=A-B | Cash Payment to Accepting Securitization Trusts | | | | | Unsecured Claims to Accepting Securitization Trusts | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Segregated Account Allocations D | PrePetition Recov/Rehab on PrePetition Defaults E | PrePetition Recoveries Dispute Settlement F | Unencumbered Loan Settlement (Cash) G | Total H=Sum(C:G) | Securitization Trust Settlement Claim I | PrePetition Recoveries Dispute Settlement J | Unencumbered Loan Settlement (Claims) K | Adj. Securitization Trust Settlement Claim[3] L=Sum(I:K) |
| Class 3a — The National Collegiate Trust 2003-1 | $232 | - | $232 | $1,215,383 | $42,825 | - | $615,335 | $1,873,765 | $6,600,000 | $718,378 | $535,065 | $7,853,443 |
| Class 3b — The National Collegiate Trust 2004-1 | $659 | - | $659 | $1,166,585 | $1,090,904 | - | $233,764 | $2,491,913 | $5,600,000 | $839,599 | $203,273 | $6,642,872 |
| Class 3c — The National Collegiate Trust 2004-2 | $497 | - | $497 | $1,381,276 | $347,215 | $416,236 | - | $2,145,324 | $14,200,000 | - | - | $14,200,000 |
| Class 3d — The National Collegiate Master Trust 2004-1 | $1,026 | - | $1,026 | $1,227,692 | $322,441 | $406,609 | - | $1,957,368 | $8,700,000 | - | - | $8,700,000 |
| Class 3e — The National Collegiate Trust 2005-1 | $1,356 | - | $1,356 | $659,332 | $97,506 | $150,901 | - | $909,095 | $9,300,000 | - | - | $9,300,000 |
| Class 3f — The National Collegiate Trust 2005-2 | $2,244 | - | $2,244 | $1,054,521 | $248,436 | $303,556 | - | $1,608,756 | $27,600,000 | - | - | $27,600,000 |
| Class 3g — The National Collegiate Trust 2005-3 | $2,658 | - | $2,658 | $574,373 | $75,388 | $176,185 | - | $828,604 | $21,800,000 | - | - | $21,800,000 |
| Class 3h — The National Collegiate Trust 2006-1 | $125 | - | $125 | $315,096 | $74,622 | $84,844 | - | $474,687 | $22,900,000 | - | - | $22,900,000 |
| Class 3i — The National Collegiate Trust 2006-2 | $48,741,151 | - | $48,741,151 | $320,565 | $77,306 | $75,051 | - | $49,213,871 | $14,000,000 | - | - | $14,000,000 |
| Class 3j — The National Collegiate Trust 2006-3 | $19,567,290 | - | $19,567,290 | $186,831 | $2,463 | $25,889 | - | $19,782,472 | $21,100,000 | - | - | $21,100,000 |
| Class 3k — The National Collegiate Trust 2006-4 | $30,750,219 | - | $30,750,219 | $76,333 | $1,659 | $13,588 | - | $30,841,798 | $13,900,000 | - | - | $13,900,000 |
| Class 3l — The National Collegiate Trust 2007-1 | $37,004,520 | - | $37,004,520 | $72,843 | $521 | $211 | - | $37,078,095 | $10,200,000 | - | - | $10,200,000 |
| Class 3m — The National Collegiate Trust 2007-2 | $405 | $405 | - | - | - | - | - | - | $300,000 | - | - | $300,000 |
| Class 3n — The National Collegiate Trust 2002-CP1 | $451,547 | $752,347 | [shaded/illegible] | [shaded/illegible] | [shaded/illegible] | [shaded/illegible] | [shaded/illegible] | [shaded/illegible] | - | - | - | - |
| Class 3o — The National Collegiate Trust 2007-4 | $262 | - | $262 | $1,868,430 | $617,924 | - | $1,150,000 | $3,636,617 | $5,900,000 | $1,344,647 | $1,000,000 | $8,244,647 |
| Class 3p | $65,668,953 | $1,600,000 | $64,068,953 | $12,713 | - | - | - | $64,081,666 | - | - | - | - |
| Class 3q | $64,816,969 | $700,000 | $64,116,969 | $5,760 | - | - | - | $64,122,729 | - | - | - | - |
| Total | $367,010,114 | $3,052,751 | $364,258,162 | $10,137,433 | $2,999,210 | $1,652,846 | $1,999,089 | $381,046,740 | $182,100,000 | $2,902,624 | $1,738,339 | $186,740,963 |

(1) Amounts in column C are subject to reduction by Securitization Trust Deoder Equity traced in column B and (b) adjusted for recoveries, earnings net of losses, interest and bank fees or charges (including without limitation costs and fees arising out of liquidation of any investment) accrued on or distributed from a Pledged Account or the Segregated Recoveries Account pursuant to the Plan that occur subsequent to the date specified for a distribution, then the Debtor, the Reorganized Debtor or the Plan Trustee, as appropriate, will make subsequent distributions of such Cash (or other assets, if any, as soon as practicable after receipt.

(2) Amounts in columns C, D and G will be adjusted for recoveries, earnings net of losses, interest and bank fees or charges (including without limitation costs and fees arising out of liquidation of any investment) accrued on or distributed from a Pledged Account or the Segregated Recoveries Account pursuant to the Plan that occur subsequent to the date specified for a distribution, then the Debtor, the Reorganized Debtor or the Plan Trustee, as appropriate, will make subsequent distributions of each Cash (or other assets, if any, as soon as practicable after receipt.

(3) Allowed General Unsecured Claim for Accepting Securitization Trusts.

Total — Amounts for NCSLT 2001-CP1 and 2002-CP1 are subject to stipulation.

Note: Amounts herein assume Airduct Compromise and Securitization Trust Modifications as described in Supplemental Disclosure.

# EXHIBIT C

Joint Plan of Reorganization
Schedule C

| Keycorp Trust | Allocation of Victory Fund [1] | Key Access Program Base Case Claim [2] | Key Access Program Decoder Settlement Claim [3,4] |
|---|---|---|---|
| Key Bank National Association | $17,572 | $2,990,666 | $4,183,461 |
| KSLT 1999-A | $5,304 | $845,309 | $1,182,942 |
| KSLT 1999-B | $4,426 | $1,025,614 | $1,227,168 |
| KSLT 2000-A | $2,777 | $365,040 | $482,156 |
| KSLT 2000-B | $4,989 | $1,266,274 | $1,477,086 |
| KSLT 2001-A | $3,055 | $951,496 | $1,168,802 |
| KSLT 2002-A | $3,278 | $1,158,829 | $1,352,056 |
| KSLT 2003-A | $1,122 | $492,155 | $623,586 |
| KSLT 2004-A | $2,053 | $586,767 | $803,372 |
| KSLT 2005-A | $1,358 | $263,483 | $377,533 |
| KSLT 2006-A | $65 | $301,180 | $362,215 |

(1) Reflects allocation of the Victory Fund as of the Commencement Date based on the original principal balance. These amounts are to be returned to the respective trust as part of KeyCorp Trust Settlement.

(2) Base Case is provided for illustrative purposes. The Base Case Claim/Equity amounts were determined in accordance with the Debtor Base Case methodology described in the Disclosure Statement. If any Keycorp Trust rejects the Plan, the Plan Trustee reserves the right to seek to have the amount of the claim for such Keycorp Trust determined at any amount the Plan Trustee determines is reasonable, including the Debtor's Base Case.

(3) The Decoder Case Claim/Equity amounts were determined in accordance with the Decoder methodology described in the Plan Supplement.

(4) Decoder Case Claim reflects Allowed General Unsecured Claim for Accepting Keycorp Trusts.

# EXHIBIT D

Joint Plan of Reorganization
Schedule D

| Make and Hold Lender | Make and Hold [a] Lender Base Case Claim | Make and Hold [a] Lender Decoder Claim | Make and Hold [a] Lender Settlement Claim |
|---|---|---|---|
| Brazos Student Finance Corporation | See Star Bank Claim | See Star Bank Claim | See Star Bank Claim |
| California Bank & Trust | $ 864 | $ 866 | $ 866 |
| CHELA Financial USA, Inc. (n/k/a Nelnet) | $ 63,612 | $ 54,890 | $ 63,612 |
| Citibank | $ 48,946 | $ 42,538 | $ 48,946 |
| Comerica Bank | $ 407,313 | $ 430,720 | $ 430,720 |
| Corus Bank, N.A. | $ 9,207 | $ 9,509 | $ 9,509 |
| Deutsche Bank | $ 420,994 | $ 355,277 | $ 420,994 |
| HealthMarkets, Inc. (f/k/a UICI) | $ 2,526,339 | $ 2,404,978 | $ 2,526,339 |
| HSBC Bank USA | $ 1,079 | $ 1,824 | $ 1,824 |
| Keystone (Phcaa) | $ 1,148,081 | $ 1,052,911 | $ 1,148,081 |
| Maine Education Services (f/k/a MELA) | $ 6,466 | $ - | $ 6,466 |
| Manufacturers and Traders Trust Company | $ 98,304 | $ 117,110 | $ 117,110 |
| Members 1st Federal Credit Union | $ 134,120 | $ 166,089 | $ 166,089 |
| National City Bank | $ 101,766 | $ 256,320 | $ 256,320 |
| Nellie Mae Education Foundation | $ 191,419 | $ 193,249 | $ 193,249 |
| NelNet, Inc. | See CHELA Claim | See CHELA Claim | See CHELA Claim |
| Penn Security Bank and Trust | $ 171,099 | $ 212,035 | $ 212,035 |
| PNC Bank, N.A. | $ 235,207 | $ 289,677 | $ 289,677 |
| RBS Citizens, N.A. | $ 12,480,953 | $ 14,664,444 | $ 14,664,444 |
| Rhode Island Student Loan Authority | $ 167 | $ - | $ 167 |
| Richland State Bank | $ 3,463 | $ 2,471 | $ 3,463 |
| Sallie Mae - Academic Management Services | $ 348,074 | $ 338,416 | $ 348,074 |
| Sallie Mae - ECFC | $ 490,918 | $ 477,360 | $ 490,918 |
| Southwest Student Services Corp. | $ - | $ - | $ - |
| Star Bank | $ 1,375,236 | $ 1,851,476 | $ 1,851,476 |
| Student Loan Funding Corp (KnowledgeWorks) | $ 17,630 | $ 43,352 | $ 43,352 |
| TFSI | $ 80,067 | $ 116,805 | $ 116,805 |
| Wachovia Bank of Delaware, N.A. | $ 37,391,156 | $ 48,849,269 | $ 48,849,269 |
| Zions First National Bank | $ 714 | $ 750 | $ 750 |
| The National Collegiate Trust 2006-A | n/a | $ 468,871 | $ 468,871 |

[a] Base Case is provided for illustrative purposes. The Base Case Claim amounts were determined in accordance with the Debtor Base Case methodology described in the Disclosure Statement. If any Make and Hold Lender rejects the Plan, the Plan Trustee reserves the right to seek to have the amount of the claim for such Make and Hold Lender determined at any amount the Plan Trustee determines is reasonable, including the Debtor's Base Case.

[a] The Decoder Case Claim amounts were determined in accordance with the Decoder methodology described in the Plan Supplement. Decoder Case Claim reflects Allowed General Unsecured Claim for Accepting Make and Hold Lenders.

[a] Greater of Make and Hold Lender Base Case and Make and Hold Lender Decoder Claim.

# EXHIBIT E

**TERI**
**Minimum Cash Threshold**
*($ in 000s)*

| Per TERI's 8/24 Cash Flow Forecast | Minimum Cash Test |
|---|---:|
| **Projected Unrestricted Cash Balance as of 9/30/2010** | $ 48,730 |
| *Disbursements/ Reductions:* | |
| TERI Settlement | (2,450) |
| College Access | (6,000) |
| Grants/Endowments | (2,703) |
| Pre-petition recov transferred to trusts | (3,010) |
| G-fees on pipeline loans | (1,250) |
| Trust Cash Settlement for Disputed Recoveries | (3,652) |
| Reduction for BofA/ UFSB Settlements | (2,960) |
| *Receipts:* | |
| Victory Funds | 1,000 |
| St Matts | 2,078 |
| Recoveries from Seg Account (as of 7/31/2010) | 7,257 |
| Total Adjustments | (11,690) |
| **Adjusted Unrestricted Cash** | **$ 37,040** |
| Minimum Cash Threshold | $    36,000 |
| September Cushion / (Shortfall) | 1,040 |
| Teri Settlement | $    2,900 |
| Credit Calculation: | |
| Cash Year 1 Shared Recoveries Proceeds | 250 |
| Cash Year 2 Shared Recoveries Proceeds | 125 |
| Year 1 Shared Recoveries Threshold | 50 |
| Year 2 Shared Recoveries Threshold | 25 |
| Credit Against Earnout | 450 |
| Adjusted Teri Settlement Amount | $    2,450 |

Footnote:
The numbers used in this pro forma have been determined or estimated, as applicable,
as of August 25, 2010 and are for illustration purposes. All line items are subject to adjustment
as of the Effective Date. For purposes of calculating the Minimum Cash Threshold and
compliance with section 10.1 of the Plan, Available Cash will not be reduced by any amount
paid to Nellie Mae in satisfaction of any judgment entered in or pursuant to any settlement
of the Nellie Mae Adversary Proceeding.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) | Case No. 08-12540 (HJB) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

# SUPPLEMENTAL DISCLOSURE FOR THE MODIFIED FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF THE EDUCATION RESOURCES INSTITUTE, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AS OF AUGUST 26, 2010[*]

GOODWIN PROCTER  LLP
Daniel M. Glosband
Gina Lynn Martin
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

DUANE MORRIS LLP
Jeffrey D. Sternklar
470 Atlantic Avenue
Boston, MA 02210
(857) 488-4216

Dated: August 26, 2010
   Boston, Massachusetts

---

[*] This Supplemental Disclosure is being distributed for purposes of giving Creditors additional information so that all Creditors that previously voted to accept or reject the Plan can decide whether to cause such Creditor to change its vote pursuant to Section 1127(d) of the Bankruptcy Code.  As to contested matters, adversary proceedings and other actions or threatened actions, this Supplemental Disclosure will not constitute or be construed as an admission of any fact or liability, or as a stipulation or waiver but rather as a statement made in settlement negotiations.

*Introduction*

On February 25, 2010, The Education Resources Institute, Inc. (the "Debtor" or "TERI") and the Official Committee of Unsecured Creditors (the "Committee") filed the Fourth Amended Plan of Reorganization (the "February 2010 Plan") with the Bankruptcy Court.[1]  On March 8, 2010, the Bankruptcy Court approved the Disclosure Statement accompanying the February 2010 Plan (the "Disclosure Statement") and established procedures and deadlines for the solicitation of votes relating to the February 2010 Plan.  Specifically, the Bankruptcy Court established the following deadlines:

    a.  Solicitation packages to be distributed to Creditors and other voting parties by Monday, March 22, 2010;

    b.  Notice of the Confirmation Hearing to be published in the <u>Wall Street Journal</u> (national edition) on or before March 29, 2010;

    c.  a Plan Supplement to be filed on April 9, 2010 and April 23, 2010;[2]

    d.  a Voting Deadline of April 23, 2010,

    e.  April 23, 2010 as the deadline for objections to confirmation of the Plan; and

    f.  A Confirmation Hearing scheduled for April 28, 2010 at 10:00 a.m.

The February 2010 Plan was overwhelmingly accepted by all classes of creditors entitled to vote on the February 2010 Plan, with the exception of TCF National Bank (which did not vote) and KSLT 1999-B (which voted to reject the Plan).  At the hearing to consider confirmation of the February 2010 Plan, Nellie Mae Education Foundation, Inc. ("Nellie Mae"), a general unsecured creditor of the Debtor, objected to confirmation of the February 2010 Plan on the grounds that the February 2010 Plan failed to comply with Section 1129(a)(5)(B) concerning the terms of prospective employment of certain executives of the Bankruptcy Code and was not feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code.  At the conclusion of the Confirmation Hearing, the Bankruptcy Court overruled the objection of Nellie Mae and

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the August 2010 Plan (defined below).  A copy of the August 2010 Plan, marked against the February 2010 Plan that was filed with the Bankruptcy Court on or about February 25, 2010, is attached as Exhibit 1.

[2]    Pursuant to the Order on Motion for Emergency Determination of the Joint Emergency Motion of Debtor and Official Committee of Unsecured Creditors for Order Pursuant to Section 1123 of the Bankruptcy Code Extending the Time Period within which to File Certain Documents to be Included in the Plan Supplement, dated April 8, 2010 [Docket No. 1044], the deadline for the Plan Proponents to file (i) the Collection Contract, (ii) the Plan Trust Agreement and (iii) membership of the Plan Trust Advisory Committee was extended to April 16, 2010.  Pursuant to the Order Regarding the Joint Motion for Order Establishing Procedures for Filing Certain Documents to be Included in the Plan Supplement [Docket No. 1061] this deadline was extended to April 23, 2010.  As directed, on April 23, 2010 the Debtor filed the Notice of Filing Remaining Plan Supplement Documents to the Fourth Amended Joint Plan of Reorganization of the Education Resources Institute, Inc. [Docket No. 1075] which included (i) the Collection Contract, (ii) the Plan Trust Agreement and (iii) membership of the Plan Trust Advisory Committee.

LIBC/3844189.9

found that the February 2010 Plan complied with the applicable provisions of the Bankruptcy
Code and stated that it awaited receipt of a Confirmation Order.

This disclosure is provided to you in connection with certain modifications to the plan of
reorganization put forward by the Plan Proponents. As detailed below, no confirmation order
has entered in this case. Furthermore, as a result of certain disputes that have arisen, the Plan
Proponents believe that the modifications are necessary and advisable and urge you to support
them.

This Supplemental Disclosure is intended to be read as a supplement to and in
conjunction with the Disclosure Statement.[3]

### *The First Modification Motion*

After the Confirmation Hearing but prior to the submission of a Confirmation Order, the
Plan Proponents learned that Ambac Assurance Corporation ("Ambac"), as Controlling Party for
the Master Trust, U.S. Bank National Association as Indenture Trustee for the Securitization
Trusts ("Indenture Trustee") and First Marblehead Data Services ("FMDS") as administrator for
the Securitization Trusts (Indenture Trustee and FMDS collectively, the "Trust Parties") asserted
that the definition of "Securitization Trust Collateral" would (a) require the transfer to three of
the Securitization Trusts of approximately $34.4 million in face amount of loans that had been
purchased from such trusts with funds in TERI's operating account and not with funds in the
applicable Pledged Accounts (the "Unencumbered Loans" and the "Unencumbered Loans
Dispute") and (b) require the payment in cash of approximately $6.2 million in prepetition
recoveries on defaulted loans to thirteen of the Securitization Trusts (the "Prepetition Disputed
Recoveries" and the "Prepetition Recoveries Dispute").[4] In the Plan Proponents' view, the
Unencumbered Loans and the Prepetition Disputed Recoveries were to be transferred to the Plan
Trust and the evidence and economic analyses presented at the Confirmation Hearing on the
February 2010 Plan reflected this view.[5] The Plan Proponents thought that the transfer of these
assets to the Securitization Trusts would be inconsistent with the Plan terms negotiated and
proposed by the Plan Proponents or the economic results for the Securitization Trusts described
in the Plan and Disclosure Statement and, accordingly, sought to modify the Plan to reflect their
view more clearly.

On June 9, 2010, the Plan Proponents filed a Joint Motion to Modify Fourth Amended
Joint Plan of Reorganization Pursuant to §1127 and Plan Section 14.4 (the "First Modification

---

[3]   Available at the website maintained by Epiq Systems for the TERI case.
      http://chapter11.epiqsystems.com/TERI

[4]   Pursuant to the Securitization Trust Settlement, the Plan Proponents understood that approximately $3,000,000
      of Recoveries collected by TERI prior to the Commencement Date in respect of pre-petition defaulted loans
      would be returned to the applicable Securitization Trusts as part of the Securitization Trust Settlement. The
      $6.2 million claimed by Ambac (as Controlling Party for the Master Trust) and the Trust Parties would be in
      addition to the $3,000,000.

[5]   As set forth in the First Modification Motion, there was a chart on page 14 of the Disclosure Statement that
      included the "Unencumbered Loans" in the "Purchased Pre-Petition" column of that chart. To the extent that
      chart was construed by a Creditor as the Pre-Petition Loans that would be transferred to the applicable
      Securitization Trust in respect of the Securitization Trust Settlement, it should be disregarded.

Motion"). Pursuant to the First Modification Motion, the Plan Proponents sought to modify the February 2010 Plan to include (1) a correction to the definition of "Securitization Trust Collateral" to clarify that the Securitization Trust Collateral did not include the Unencumbered Loans (such that the Unencumbered Loans would be transferred to the Plan Trust on the Effective Date) and (2) an increase to the deficiency claims of the Securitization Trusts by the $6.2 million in Prepetition Disputed Recoveries.

The First Modification Motion also proposed various non-economic modifications to update the February 2010 Plan, including (i) incorporation into the schedules of the changes proposed by the First Modification Motion, (ii) incorporation of the Plan revisions previously approved by the Bankruptcy Court with respect to the objection to confirmation filed by the United States Pension Benefit Guaranty Corporation ("PBGC"), the stipulation between the Debtor and MBIA Insurance Company and the stipulation between the Debtor and RBS Citizens, N.A., (iii) changing the deadline for the Effective Date to occur from June 30, 2010 to August 31, 2010, and changing the deadline for entry of the Confirmation Order from June 15, 2010 to August 15, 2010 and (iv) modifications to address certain issues related to The First Marblehead Corporation and its affiliates (collectively, "FMC").

Objections to the First Modification Motion were filed by:

- FMC;

- Ambac Assurance Corporation ("Ambac"), as (i) "Controlling Party" in respect of (a) The National Collegiate Student Loan Trust 2007-3 ("NCSLT 2007-3") pursuant to the Indenture between NCSLT 2007-3 and U.S. Bank National Association as the Indenture Trustee ("Indenture Trustee"), and (b) The National Collegiate Student Loan Trust 2007-4 ("NCSLT 2007-4") pursuant to the Indenture between NCSLT 2007-4 and the Indenture Trustee and (ii) the "Credit Facility Provider" in respect of the National Collegiate Master Student Loan trust I (the "Master Trust" and, together with NCSLT 2007-3 and NCSLT 2007-4, the "Ambac Trusts");

- The Indenture Trustee of The National Collegiate Trusts and

- Nellie Mae Education Foundation, Inc.

In its Objection to the First Modification Motion, Ambac argued that the Securitization Trusts were entitled to receive all of the Unencumbered Loans pursuant to the terms of the February 2010 Plan and that it would not have voted to accept the February 2010 Plan if the Unencumbered Loans were not to be retained by the applicable Securitization Trust. Ambac and the Trust Parties also asserted that the additional $6.2 million in Prepetition Disputed Recoveries must be paid in cash to the Securitization Trusts under the terms of the February 2010 Plan.

The following chart illustrates TERI's calculations of (A) the allocable amounts of the Unencumbered Loans claimed by each of the Three Trusts, (B) the Prepetition Recoveries that the Plan Proponents proposed to pay to each of the Securitization Trusts and (C) the additional Prepetition Disputed Recoveries claimed by each Securitization Trust[6]:

|  | A<br>Unencumbered<br>Loans | B<br>Undisputed Pre-<br>petition Recoveries | C<br>Disputed Pre-<br>petition Recoveries |
|---|---|---|---|
| Trust |  |  |  |
| Master | $19,800,996 | $ 617,924 | $ 1,344,647 |
| NCSLT 2003-1 | 10,594,823 | 42,825 | 718,378 |
| NCSLT 2004-1 | 4,025,015 | 1,090,904 | 839,599 |
| NCSLT 2004-2 |  | 347,215 | 832,472 |
| NCSLT 2005-1 |  | 322,441 | 812,817 |
| NCSLT 2005-2 |  | 97,506 | 301,801 |
| NCSLT 2005-3 |  | 248,436 | 607,071 |
| NCSLT 2006-1 |  | 75,388 | 352,370 |
| NCSLT 2006-2 |  | 74,622 | 169,687 |
| NCSLT 2006-3 |  | 77,306 | 150,101 |
| NCSLT 2006-4 |  | 2,463 | 51,777 |
| NCSLT 2007-1 |  | 1,659 | 27,175 |
| NCSLT 2007-2 |  | 521 | 421 |
| Total | 34,420,834[7] | 2,999,211 | 6,208,316 |

A hearing to consider the First Modification Motion was held on July 12, 2010. At the conclusion of the First Modification Motion, the Bankruptcy Court denied the First Modification Motion. According to the Bankruptcy Court, the settlement with Ambac was "inextricably intertwined" with the material provisions of the February 2010 Plan and it would be inequitable to preserve some elements and change others. Accordingly, the Bankruptcy Court ordered the Debtor to file a fifth amended plan, a further amended disclosure statement and a motion to approve same on or before August 27, 2010 unless the parties could reach agreement regarding the modifications to be made to the February 2010 Plan.

### The Agreement With Ambac

Following the July 12th hearing, the Plan Proponents reached an agreement in principle with Ambac as Controlling Party of the Master Trust (the "Ambac Compromise") settling the Unencumbered Loans Dispute and the Prepetition Recoveries Dispute with the Master Trust and

---

[6]    The final list of Unencumbered Loans may be reconciled and submitted prior to the conclusion of the Confirmation Hearing. See also footnote 6.

[7]    The amount of Unencumbered Loans represents the face amount of such loans at time of default.

5

Ambac as Controlling Party of the Master Trust has agreed to support entry of an Order confirming the August 2010 Plan (defined below), consistent with the terms outlined below. Only three trusts claimed an entitlement to receive any portion of the Unencumbered Loans (the "Three Trusts") under the February 2010 Plan[8]. One of them, the Master Trust, claimed an entitlement to approximately 58% of the Unencumbered Loans (with approximately 31% allocable to NCSLT 2003-1 and approximately 11% allocable to NCSLT 2004-1).[9] As noted, Ambac is the "Controlling Party" with respect to the Master Trust. On information and belief, Ambac is a significant beneficiary of any amounts recovered by NCSLT 2003-1 (another of the Three Trusts).

The August 2010 Plan proposes to compromise and settle the Unencumbered Loans Dispute and the Prepetition Recoveries Dispute by (i) distributing, on the Effective Date, additional cash in a negotiated amount to the Master Trust and proportional amounts to NCSLT 2003-1 and NCSLT 2004-1 ($1,150,000 to the Master Trust, $615,325 to NCSLT 2003-1 and $233,764 to NCSLT 2004-1) and (ii) increasing the allowed unsecured claims of the Master Trust, NCSLT 2003-1 and NCSLT 2004-1 (the Master Trust by $2,344,647, NCSLT 2003-1 by $1,253,443 and NCSLT 2004-1 by $1,042,872 ), assuming that the Master Trust NCSLT 2003-1 and NCSLT 2004-1 are Accepting Securitization Trusts. The additional claim amounts proposed for the Three Trusts based on the Ambac Compromise include components attributable to the Unencumbered Loan Dispute and to the Prepetition Recoveries Dispute. Schedule B to the August 2010 Plan sets forth the entire treatment of the Master Trust, NCSLT 2003-1 and NCSLT 2004-1, inclusive of the Ambac Compromise under the August 2010 Plan.

Pursuant to the agreement with Ambac as Controlling Party of the Master Trust, (and assuming that NCSLT 2003-1 and NCSLT 2004-1 are Accepting Securitization Trusts) the Unencumbered Loans will not be transferred to the applicable Securitization Trusts. Rather, assuming that the August 2010 Plan is confirmed and each of the Master Trust, NCSLT 2003-1 and NCSLT 2004-1 are Accepting Securitization Trusts and the August 2010 Plan becomes Effective, then, in satisfaction of the Unencumbered Loan Dispute and the Prepetition Recoveries Dispute, the Master Trust and NCSLT 2003-1 and NCSLT 2004-1 will receive additional consideration as follows:

| Three Trusts | Additional Cash | Additional Claim |
|---|---|---|
| Master Trust | $1,150,000 | $2,344,647 |
| NCSLT 2003-1 | $615,325 | $1,253,443 |
| NCSLT 2004-1 | $233,764 | $1,042,872 |

---

[8]    The Master Trust, NCSLT 2003-1 and NCSLT 2004-1 are referred to herein as the "Three Trusts."

[9]    These percentages are based on preliminary estimates of the face amount of Unencumbered Loans allocated among the Three Trusts and have been applied for purposes of the Ambac Compromise and the August 2010 Plan. The definitive list of Unencumbered Loans, which may be reconciled between TERI and FMDS prior to the Confirmation Hearing, may vary from the preliminary estimates and will govern for purposes of the transfer of Unencumbered Loans to the Plan Trust pursuant the August 2010 Plan. The Ambac Compromise and the Securitization Trust Modifications will not change in the event that the definitive list of Unencumbered Loans varies from the preliminary estimates.

6

The additional claim amounts proposed for the Three Trusts based on the Ambac Compromise include components attributable to the Unencumbered Loan Dispute and to the Prepetition Recoveries Dispute. Schedule B to the August 2010 Plan sets forth details of all cash payments and of all Allowed Claims in respect of the of the Securitization Trusts, inclusive of the Ambac Compromise and the Securitization Trust Modifications.

### *The Securitization Trust Modifications*

To address the Prepetition Recoveries Dispute with the Trust Parties other than the Three Trusts, the Plan Proponents propose that the Securitization Trusts that asserted rights to a share of the Prepetition Disputed Recoveries, other than the Three Trusts, will receive cash on the Effective Date in an amount equal to fifty (50%) percent of the amount of the disputed prepetition Recoveries each Trust claimed in the Prepetition Recoveries Dispute. The Securitization Trust Modification will result in the payment to the Securitization Trusts other than the Three Trusts of the additional amounts set forth below, assuming that the Securitization Trusts are Accepting Securitization Trusts:

| | |
|---|---|
| NCSLT 2004-2 | $416,236 |
| NCSLT 2005-1 | $406,409 |
| NCSLT 2005-2 | $150,901 |
| NCSLT 2005-3 | $303,536 |
| NCSLT 2006-1 | $176,185 |
| NCSLT 2006-2 | $84,844 |
| NCSLT 2006-3 | $75,051 |
| NCSLT 2006-4 | $25,889 |
| NCSLT 2007-1 | $13,588 |
| NCSLT 2007-2 | $211 |

Schedule B to the August 2010 Plan sets forth details of all cash payments and of all Allowed Claims in respect of the Securitization Trusts, inclusive of the Ambac Compromise and the Securitization Trust Modifications.

The key economic components of the Ambac Compromise and the Securitization Trust Modifications are illustrated in the following chart:

7

| Cash Payment to Accepting Securitization Trusts[10] | | | | |
|---|---|---|---|---|
| Pmt to Accepting Securitization Trust from Pledged Acct. | Segregated Account Allocations (As of 7/31/10) | PrePetition Recov/Rehab on PrePetition Defaults | PrePetition Recoveries Dispute Settlement | Total Cash |
| C=A-B | D | E | F | G=Sum(C:F) |
| Class 3a The National Collegiate Trust 2003-1 | $ 232 | $ 1,211,696 | $ 42,825 | $ 615,325 | $ 1,870,078 |
| Class 3b The National Collegiate Trust 2004-1 | $ 659 | $ 1,163,072 | $ 1,090,904 | $ 233,764 | $ 2,488,400 |
| Class 3c The National Collegiate Trust 2004-2 | $ 497 | $ 1,371,973 | $ 347,215 | $ 416,236 | $ 2,135,922 |
| Class 3d The National Collegiate Trust 2005-1 | $ 1,026 | $ 1,202,892 | $ 322,441 | $ 406,409 | $ 1,932,768 |
| Class 3e The National Collegiate Trust 2005-2 | $ 1,356 | $ 650,010 | $ 97,506 | $ 150,901 | $ 899,772 |
| Class 3f The National Collegiate Trust 2005-3 | $ 2,244 | $ 1,034,900 | $ 248,436 | $ 303,536 | $ 1,589,115 |
| Class 3g The National Collegiate | $ 2,658 | $ 557,927 | $ 75,388 | $ 176,185 | $ 812,158 |


---

[10]    Any Cash to be distributed from a Pledged or the Segregated Recoveries Account pursuant the Plan will be adjusted for recoveries, earnings net of losses, interest and bank fees or charges (including without limitation costs and fees arising out of liquidation of any investment) accrued to the date of distribution and provisions of the Plan (including Schedules to the Plan) specifying the amount, nature or source of a distribution of Cash shall be deemed subject to any such adjustments. To the extent that there are receipts, accruals or adjustments to Cash or other assets to be distributed from a Pledged or the Segregated Recoveries Account pursuant to the Plan that occur subsequent to the date specified for a distribution, then the Debtor, the Reorganized Debtor or the Plan Trustee, as appropriate, will make subsequent distributions of such Cash or other assets, if any, as soon as practicable after receipt by the Debtor, Reorganized Debtor or Plan Trustee, as applicable.

8

| | | | | | |
|---|---|---|---|---|---|
| Trust 2006-1 | | | | | |
| Class 3h The National Collegiate Trust 2006-2 | $ 125 | $ 306,266 | $ 74,622 | $ 84,844 | $ 465,856 |
| Class 3i The National Collegiate Trust 2006-3 | $ 48,741,151 | $ 310,510 | $ 77,306 | $ 75,051 | $ 49,204,018 |
| Class 3j The National Collegiate Trust 2006-4 | $ 19,567,290 | $ 180,068 | $ 2,463 | $ 25,889 | $ 19,775,709 |
| Class 3k The National Collegiate Trust 2007-1 | $ 30,750,219 | $ 72,983 | $ 1,659 | $ 13,588 | $ 30,838,449 |
| Class 3l The National Collegiate Trust 2007-2 | $ 37,004,520 | $ 69,653 | $ 521 | $ 211 | $ 37,074,905 |
| Class 3m The National Collegiate Trust 2001-CP1 | Subject to the MBIA Settlement | | | | |
| Class 3n The National Collegiate Trust 2002-CP1 | Subject to the MBIA Settlement | | | | |
| Class 3o The National Collegiate Master Trust | $ 262 | $ 1,884,018 | $ 617,924 | $ 1,150,000 | $ 3,652,204 |
| Class 3p The National Collegiate Trust 2007-3 | $ 64,068,953 | $ 12,069 | - | - | $ 64,081,023 |
| Class 3q The National Collegiate Trust 2007-4 | $ 64,116,969 | $ 5,475 | - | - | $ 64,122,444 |
| **Total** | **$ 264,258,162** | **$ 10,033,513** | **$ 2,999,210** | **$ 3,651,935** | **$ 280,942,820** |

LIBC/3844189.9

### The TERI Adjustments

The circumstances that led to the First Modification Motion, the Second Modification Motion, the Ambac Compromise and the Securitization Trust Modifications also resulted in a delay in the originally-anticipated Effective Date of the Plan, an increase in expenses and a decrease in estimated proceeds available for unsecured creditors. The Creditors Committee asked TERI to reduce certain of the Reorganized TERI Assets to ameliorate the decrease in proceeds available for unsecured creditors (the "TERI Adjustments").

TERI and the Committee have agreed on the following changes:    Retained Cash will be reduced from $3,400,000 to $2,900,000 and the calculation of the TERI Net Recovery will be modified as follows:

(a)    For the first year of the Term, the first $1,250,000 (formerly $1,000,000) of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets. For the first year of the Term, the TERI First Year Share will comprise 20% of each dollar of TERI Loan Net Proceeds collected in excess of $1,250,000, but the TERI First Year Share will not exceed $750,000 (formerly $1,000,000).

(b)    For the second year of the Term, the first $1,125,000 (formerly $1,000,000) of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets. For the Second Year of the Term, the TERI Second Year Share will comprise 20% of each dollar of TERI Loan Net Proceeds collected in excess of $1,125,000 but the TERI Second Year Share will not exceed $875,000 (formerly $1,000,000).

(c)    If, and only if, as of the end of the Term: (a) the Collection Contract has not been terminated for cause; (b) the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share is less than $1,625,000(formerly $2,000,000)  ; (c) the sum of (i) the First Year Eligible Collections plus (ii) the Second Year Eligible Collections is at least $8,125,000 (formerly $10,000,000) and (d) the Plan Trust has received $2,375,000 (formerly $2,000,000) of TERI Loan Net Proceeds Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets during the Term, Reorganized TERI will be entitled to the Additional Share.

The aggregate possible cost to TERI of the TERI Adjustments is $950,000. Consequently, the $950,000 will be treated as a credit to the calculation of Available Cash to be transferred to the Plan Trust pursuant to section 10.1 of the Plan. To avoid risk to the ability of Reorganized TERI to be viable and satisfy the confirmation requirement that further financial reorganization will not be necessary, TERI will be permitted by the Plan to apply Restricted Charitable Funds to the payment of any Administrative Expense Claim or to the payment of any amount by which the Creditors Committee elects to reduce Retained Cash pursuant to section 10.3 of the Plan

LIBC/3844189.9

*The August 2010 Plan*

The Plan Proponents filed a <u>Second Joint Motion to Modify Fourth Amended Joint Plan of Reorganization Pursuant to 11 U.S.C. §1127 and Plan Section 14.4 and for Relief from July 12, 2010 Rulings</u> (the "Second Modification Motion") on or about August 26, 2010 and a hearing to consider the procedural and disclosure aspects of the Second Modification Motion was held on [August/September__, 2010]. At that hearing, the Bankruptcy Court entered the <u>Order Authorizing Plan Proponents to proceed with Second Joint Motion to Modify Fourth Amended Joint Plan of Reorganization Pursuant to 11 U.S.C. § 1127 and Plan §14.4, Approving Disclosure, Establishing Procedure to Permit Eligible Creditors to Change Their Votes and Scheduling Confirmation Hearing</u> (the "Procedures Order").

The August 2010 Plan incorporates the Ambac Compromise and the Securitization Trust Modifications. The August 2010 Plan also makes the following additional changes to the February 2010 Plan:

1. Clarifies the parameters and components of the Securitization Trust Settlement;

2. Revises Schedule B of the Plan to (a) update the schedule of Securitization Trust Collateral Balances to June 30, 2010; (b) increase the general unsecured claims of the Three Trusts to reflect the Ambac Compromise with respect to the Master Trust and the comparable treatment of NCSLT 2003-1 and NCSLT 2004-1 (c) add schedules of Cash to be paid to Securitization Trusts to reflect the Ambac Compromise and the Securitization Trust Modifications; (d) add a schedule of the allocation of the prepetition recoveries of approximately $3,000,000; and (e) add a schedule of the allocation of the Segregated Recoveries Account balances as of July 31, 2010;

3. Incorporates Plan revisions previously approved by the Court with respect to the objection to confirmation filed by the United States Pension Benefit Guaranty Corporation, the stipulation between the Debtor and MBIA Insurance Company and the stipulation between the Debtor and RBS Citizens, N.A.;

4. Provides that the Effective Date of the August 2010 Plan shall occur on or before October 31, 2010;

5. Provides that a Confirmation Order shall be entered on or before October 15, 2010 and

6. Removes The First Marblehead Corporation ("FMC") as a member of the Plan Advisory Committee.

**A copy of the August 2010 Plan, marked against the February 2010 Plan, is attached as Exhibit 1. The Plan Proponents urge you to review the August 2010 Plan in its entirety prior to casting the Ballot enclosed herein.**

LIBC/3844189.9

### Comparison of February 2010 Plan to August 2010 Plan

The treatment of the Securitization Trusts, reflecting the Ambac Compromise, the Securitization Trusts Modification and updated numbers in other cash distribution categories is detailed in Schedule B to the August 2010 Plan. The Ambac Compromise and the Securitization Trusts Modification result in a small dilution of the estimated recoveries to be received by creditors other than the Securitization Trusts, as demonstrated in the revised Best Interests of Creditors Analysis attached hereto as Exhibit 2.

The Plan Proponents believe that the August 2010 Plan is in the best interest of the Debtor, its estate and its Creditors and that the Ambac Compromise and the Securitization Trusts Modification are fair and reasonable settlements of the disputes with Ambac as Controlling Party of the Master Trust and the Trust Parties, which give each Securitization Trust incremental value without destroying the feasibility or confirmability of the Plan.

The Plan Proponents have worked diligently and in good faith with the representatives of the Securitization Trusts, and in particular Ambac Assurance Corporation as Controlling Party of the Master Trust, to propose a compromise and settlement which provides the Three Trusts with additional value to settle the Unencumbered Loans Dispute and the Prepetition Recoveries Dispute and which provides the other Securitization Trusts with additional Cash to settle the Prepetition Recoveries Dispute. The Plan Proponents believe that the August 2010 Plan meets all of the applicable requirements of Section 1129 of the Bankruptcy Code and can be confirmed by the Bankruptcy Court. The Plan Proponents urge each of the Securitization Trusts to maintain its previous acceptance of the Plan and allow the August 2010 Plan to be confirmed without further litigation or delay.

### Best Interest Test

The effects of the Ambac Compromise and the Securitization Trusts Modification on creditors other than the Securitization Trusts are minimal. An updated version of the Best Interests Analysis (originally Exhibit C to the Disclosure Statement; updated version attached hereto as Exhibit 2) demonstrates a small dilution to the estimated recoveries of unsecured creditors. The Disclosure Statement estimated that General Unsecured Claims (Class 5) would ultimately receive recoveries under the February 2010 Plan of between 40% and 60% of the Allowed Amount of their claims (Disclosure Statement, p. 35). The Best Interests Analysis calculated a recovery value of approximately 55% as of March 10, 2010. The Updated Best Interests Analysis reflects adjustments due to the passage of time, the costs of the lengthier-than-predicted chapter 11 case and the Ambac Compromise and the Securitization Trusts Modification. The estimated recovery on unsecured claims is approximately 49%, still within the originally estimated range of 40% to 60%.

Specifically, the Updated Best Interest Analysis, (a) accounts for the Plan not becoming "Effective" until September 30, 2010, including changes in assets, liabilities, operating and professional expenses and (b) accounts for the Ambac Compromise and the Securitization Trusts Modification included in the August 2010 Plan, including the cash distributions and claim increases detailed above. The analysis still demonstrates that the results in TERI's chapter 11 reorganization are far superior to the likely results of a chapter 7 liquidation, with the latter

12

yielding recoveries to unsecured creditors of approximately 15% (without possible further reduction for any tax consequences associated with the Residual, as discussed in the Disclosure Statement). Consequently, the Plan Proponents urge that each claimant who may be eligible to change its vote NOT change a vote that accepted the February 2010 Plan since the August 2010 Plan is still very much in its best interests.

### *The Plan Proponents Expect to Satisfy All Conditions Precedent to the Effective Date*

Pursuant to Section 10.1 of the August 2010 Plan, there are several conditions precedent to the occurrence of the "Effective Date" of the Plan. Section 10.1(c) requires that there be at least $36,000,000 in "Available Cash" to be transferred to the Plan Trustee on the Effective Date. The Plan Proponents expect to satisfy this condition and project that Available Cash will be approximately $37,500,000 as of September 30, 2010.

As set forth in the updated Best Interest Test, the Debtor will transfer Cash to the Plan Trustee in addition to the Cash included in the Available Cash calculation. According to the Plan Proponents' current estimates, approximately $42.3 million of Cash (including Available Cash) will be transferred if the Plan becomes Effective on September 30, 2010.

### *The Procedures Order*

This Supplemental Disclosure is being provided to you pursuant to the Procedures Order.

YOU ARE ENCOURAGED TO READ THIS SUPPLEMENTAL DISCLOSURE AND THE AUGUST 2010 PLAN AS WELL AS THE DISCLOSURE STATEMENT THAT WAS PREVIOUSLY APPROVED BY THE BANKRUPTCY COURT. PLAN SUMMARIES AND STATEMENTS MADE IN THIS SUPPLEMENTAL DISCLOSURE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE AUGUST 2010 PLAN AND THE EXHIBITS ANNEXED TO THE AUGUST 2010 PLAN.

### *Creditors Are Being Given the Opportunity to Change Previous Acceptance or Rejection of the Plan*

Pursuant to Section 1127(d) of the Bankruptcy Code and the Procedures Order, only Creditors that actually voted to accept or reject the Plan are Eligible Voters who will be given the opportunity to change their votes to accept or reject the August 2010 Plan. With respect to each Securitization Trust, Other Trust or KeyCorp Trust, the vote of such Trust to maintain its current vote to accept or reject the Plan (as applicable) shall be determined by the Majority Vote (or, if applicable, by a Voting Control Party), of its own Securitization Trust Noteholders or KeyCorp Trust Noteholders or Other Trust Noteholders in accordance with the voting procedures set forth in the Procedures Order. For a Securitization Trust, Other Trust or KeyCorp Trust with a Voting Control Party, such Voting Control Party shall be the Eligible Voter for such Trust.

Pursuant to the Procedures Order, [          ] 2010, has been set as the deadline by which a ballot to change a vote to accept or reject the Plan must be received by the Plan Proponents' Voting Agent. That means any entity entitled to vote to accept or reject the August 2010 Plan **that actually voted** to accept or reject the Plan will have an opportunity to change its previous

13

vote. A Ballot which may be used to change such Creditor's vote for the acceptance or rejection of the August 2010 Plan has been sent to all entities that are entitled to vote to change their vote, or in the case of the Securitization Trusts, KeyCorp Trusts or Other Trusts to cause its Trust to change its vote to accept or reject the Plan.

If you are a holder of a Claim in Classes 2a-2p, 3a-3q, 4a-4k or Class 5 and you previously voted on the Plan pursuant to the Solicitation Procedures Order and you did not receive a Ballot with this Supplemental Disclosure, you received a damaged Ballot or lost your Ballot, or you have any questions concerning the August 2010 Plan or the procedures for voting on the Further Modified Plan, please contact Epiq Bankruptcy Solutions, LLC at (646) 282-2500.

If you are a Voting Control Party of a Trust or a Securitization Trust Noteholder, KeyCorp Noteholder, or Other Trust Noteholder as of July 18, 2010, then you may vote to cause your applicable Trust to change its previous vote to accept or reject the Plan.

### *Voting Instructions*

BALLOTS RECEIVED BY FACSIMILE, E-MAIL OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED.

TO BE COUNTED, YOUR BALLOT (OR A MASTER BALLOT) INDICATING WHETHER YOU WANT TO CHANGE YOUR VOTE TO ACCEPT OR REJECT THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME, ON [       ], 2010 (THE "VOTE CHANGE DEADLINE").

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim.

Ballots received after the Vote Change Deadline may not be counted. A Ballot will be deemed delivered only when the Voting Agent actually receives the original executed Ballot. Delivery of a Ballot to the Voting Agent by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to the Debtor, the Debtor's agents (other than the Voting Agent) or the Debtor's financial or legal advisors.

If multiple Ballots are received from the same holder with respect to the same Claim prior to the Vote Change Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.

Neither the Plan Proponents nor any other Person will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

The Plan Proponents will file the Voting Report with the Bankruptcy Court as soon as practicable after the Vote Change Deadline. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions above or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots

14

that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or damaged. The Voting Report also shall indicate the Plan Proponents intentions with regard to such Irregular Ballots.

### *Hearing to Consider Confirmation of the August 2010 Plan*

The Bankruptcy Court has scheduled a hearing to consider entry of an Order confirming the August 2010 Plan and whether any Creditors have changed their vote and if such Creditor is a Make and Wait Lender, Make and Hold Lender, Securitization Trust or KeyCorp Trust, whether such Creditor has decided to opt-out of the Make and Wait Settlement, Make and Hold Settlement, Securitization Trust Settlement or KeyCorp Trust Settlement (as applicable).

The Hearing is scheduled for [_____ __, 2010] at _:___.m. at [location of hearing] before the Honorable Henry J. Boroff, United States Bankruptcy Judge. The Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on all Persons who have requested notice in this Chapter 11 Case, and without further notice to the parties in interest.

### *Conclusion and Recommendation*

The Plan Proponents believe that confirmation and implementation of the August 2010 Plan is in the best interest of the Debtor, its estate and its Creditors. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. *ANY SECURITIZATION TRUST THAT CHANGES ITS VOTE AND REJECTS THE PLAN WILL BE DEEMED TO REJECT THE SECURITIZATION TRUST SETTLEMENT, AND THEREBY (1) WILL NOT RECEIVE ITS APPLICABLE SECURITIZATION TRUST COLLATERAL ON THE EFFECTIVE DATE AND (2) MUST CONTINUE TO DEFEND AT ITS COST THE TRUST ADVERSARY PROCEEDING WITH RESPECT TO SUCH REJECTING SECURITIZATION TRUST.* Accordingly, the Plan Proponents urge holders of Claims that are entitled to change their vote to not change their vote and accept the August 2010 Plan. Any ballots to cause a Creditor to change its vote must be returned in accordance with the instructions set forth in the Ballot so that they will be received no later than 4:00 p.m., Prevailing Eastern Time, on [         ], 2010.

LIBC/3844189.9

Respectfully submitted,

THE EDUCATION RESOURCES
INSTITUTE, INC.

By their attorneys,


s/ Daniel M. Glosband
Daniel M. Glosband, P.C. (BBO# 195620)
Gina Lynn Martin, Esq. (BBO# 643801)
Goodwin Procter  LLP
Exchange Place
Boston, Massachusetts  02109
(617) 570-1000


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS


s/ Jeffrey D. Sternklar
Jeffrey D. Sternklar (BBO# 549561)
Duane Morris LLP
470 Atlantic Avenue
Boston, Massachusetts  02110
(857) 488-4216

LIBC/3844189.9

# **EXHIBIT 1**

**Blackline of February 2010 Plan to August 2010 Plan**

**See Exhibit C of Second Modification Motion**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re ) | |
| ) | Chapter 11 |
| THE EDUCATION RESOURCES INSTITUTE, INC. ) | Case No. 08-12540 (HJB) |
| ) | |
| Debtor. ) | |
| ) | |

EXHIBIT 2 TO THE SUPPLEMENTAL DISCLOSURE FOR THE MODIFIED
FOURTH AMENDED JOINT PLAN OF REORGINZATION OF THE EDUCATION
RESOURCES INSTITUTE, INC. AND THE OFFICAL COMMITTEE OF UNSECURED
CREDITORS AS OF AUGUST 26, 2010
**BEST INTERESTS ANALYSIS**

## BEST INTERESTS ANALYSIS
## INTRODUCTION

Pursuant to Section 1129(a)(7) of the Bankruptcy Code[1], each Holder of an impaired Claim or Equity Interest must either (a) accept the August 2010 Plan or (b) receive or retain under the August 2010 Plan, property of a value, as of the Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code (often referred to as the "Best Interests Test"). In connection with these requirements, the following hypothetical liquidation analysis (the "Liquidation Analysis") has been prepared so that the Bankruptcy Court may determine that the August 2010 Plan is in the best interests of all classes impaired by the August 2010 Plan.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL LIQUIDATION OF THE ASSETS OF THE DEBTOR. UNDERLYING THE LIQUIDATION ANALYSIS ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF MANAGEMENT AND ITS ADVISORS. ADDITIONALLY, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTOR'S ASSETS WILL RESULT IN THE PROCEEDS WHICH WOULD BE REALIZED IN THE EVENT THE DEBTOR WAS TO UNDERGO AN ACTUAL LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. THIS ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AICPA.

## GENERAL ASSUMPTIONS

For purposes of this analysis, the Effective Date is assumed to be October 1, 2010. A summary of the assumptions used by management and its advisors in preparing the Liquidation Analysis follows.

### Asset Sale Methodology

The Liquidation Analysis assumes that the hypothetical Chapter 7 liquidation is effected via the orderly sale and realization of the Debtor's assets.

---

1   All capitalized terms used in this Liquidation Analysis that are not otherwise defined herein shall have the meanings ascribed to them in the August 2010Plan (as defined in the Second Modification).

**Estimates of Cost of Liquidation**

Conversion of the Chapter 11 Case to Chapter 7 would likely result in additional costs to the Debtor's estate. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee and other professionals retained by the trustee, including attorneys, financial advisors and consultants; asset disposition expenses; accounting and litigation costs related to claims determination and allowance or disallowance; possible litigation of section 552 and other lien-related issues; and the resolution of Claims; and all unpaid expenses incurred by the Debtor in the Chapter 11 Case that are allowed in the Chapter 7 case, including any accrued and unpaid expenses arising from the operations of the Debtor during the pendency of the Chapter 11 Case.

In addition, liquidation costs could be higher, and the value of any distributions could be lower, if the Chapter 7 case were not completed within the 12 month period assumed in the Liquidation Analysis.[2] Indeed, the recovery analysis changes significantly if the Chapter 7 case were not completed within 12 months due to a variety of significant factors. In the event that litigation were necessary to resolve claims asserted in the Chapter 7 case, any delay could be further prolonged and administrative expenses further increased. The effects of this potential delay on the value of distributions under the hypothetical liquidation have not been considered.

## DETAILED LIQUIDATION ANALYSIS

The tables below provide a comparison of the recoveries under hypothetical Chapter 7 liquidation and under the Chapter 11 reorganization in accordance with the provisions of the August 2010 Plan. The accompanying notes should be read in connection with information contained in the table.

**Proceeds from Orderly Sale of Assets**

The Liquidation Analysis assumes assets of the Debtor would be sold for cash in a single transaction. Adjustments have not been made to account for any time lag related to the realization of assets.

**Cash and Marketable Securities**

Unrestricted cash and marketable securities represent approximately $49.7 million projected to be available at October 1, 2010, which is net of the transfer of recoveries received prepetition of $3.0 million and transfer of post petition guarantee fees of $1.3 million. In addition, adjustments for the outflow of $8.0 million for Restricted Charitable Funds[3], $256 thousand for Restricted

---

2    As discussed below, there is a substantial risk that a Chapter 7 trustee would incur millions of dollars of priority tax liability for each year that the Chapter 7 case remained open. Accordingly, the Liquidation Analysis assumes the Trustee would attempt to liquidate the assets in a Chapter 7 case within a year to minimize potential adverse tax consequences.

3    As disclosed in the Disclosure Statement, the Debtor holds cash and other assets pursuant to a charitable deed of gift, the use of which is restricted by applicable state law and not available for disbursement to Creditors.

3

Grant Funds[4], $324 thousand in interest in the segregated endowment accounts, $1.8 million in respect to the Ambac Compromise, $1.9 million to settle the Prepetition Recoveries Dispute, and the inflow of $7.8 million for projected post petition Trust recoveries. As a result of these adjustments, the cash balance in the Chapter 7 scenario is projected at $45.2 million. Under a Chapter 11 scenario, $2.9 million representing cash payments to TERI as allowed by the August 2010 Plan would further decrease the Chapter 11 cash balance to $42.3 million. Excess cash flow generated from operations during the liquidation sale process is assumed to be reinvested into operations of the Debtor.

**Excess Collateral**

Excess collateral represents projected equity remaining after comparing the NPV of cash flows for both Make and Wait portfolios and Trust portfolios to their respective pledge account balances. Refer to narrative on contingent claims below.

**Residual Interests**

The Debtor is required to value its residuals at estimated fair value in its financial statements. The Debtor is a beneficial owner of the Residual. In consultation with its auditors, the Debtor concludes that whether it could ever realize value from the residual is uncertain and therefore as of June 30, 2009 has treated the value as $0. The Committee is uncertain whether the Residual has any value, and indeed, is concerned the Residual may impose unacceptable tax consequences to creditors under certain circumstances if the Residual was included in the Joint Plan Assets. The Residual generates reportable, taxable income based on performance of the underlying Securitization Trusts and does not generate near-term cash to the Residual Owner with which to pay tax on such income. In general a liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but rather is a grantor trust. Under applicable Internal Revenue Service Revenue Procedures, rules and regulations, a grantor trust is a pass-through entity. The Plan Trust is (and under applicable tax law must be) treated as a grantor trust. Holders of interests in the Plan Trust generally would be treated for U.S. federal income tax purposes as direct owners of the Plan Trust Assets, causing the beneficiaries of the Plan Trust to be liable for any taxes due on the non-cash income from the Securitization Trusts attributable to the owner of the Residual.

Accordingly, under the Plan, the Residual shall remain an asset of Reorganized TERI and will not be transferred to the Plan Trust. Confirmation of the August 2010 Plan further protects Creditors from unacceptable tax consequences resulting from ownership of the Residual. The August 2010 Plan provides that confirmation constitutes a determination, binding on all Entities (including, without limitation, the United States Internal Revenue Service and all state taxing authorities) that as a result of the implementation of the transactions contemplated by this August 2010 Plan, (i) the Plan Trustee is not and shall not become the owner of the Residual (or any portion thereof) for purposes of taxation under the laws of the United States or of any State, and

---

4    As disclosed in the Disclosure Statement, the Debtor holds certain cash or other assets pursuant to private or government grants, the use of which is restricted to specific activities by the terms of the grants and are not available for distribution to General Unsecured Creditors.

4

(ii) none of the beneficiaries of the Plan Trust shall in any way be liable for any taxes attributable to or arising as a result of ownership of the Residual, or payable on account of income, if any, earned by the owner(s) of the Residual, to the United States or any State.

These protections are not available if the Bankruptcy Case is converted to a Chapter 7 liquidation. In a chapter 7 liquidation, there is a risk that the Chapter 7 estate would incur priority tax liability resulting from the fact that the Residual would be property of the Chapter 7 bankruptcy estate pursuant to 11 U.S.C. §541. Moreover, since a Chapter 7 trustee would not operate the Debtor as not for profit entity in a manner that preserved the Debtor's tax exempt status under applicable non-bankruptcy law, there exists a substantial risk that the chapter 7 Debtor would incur tax liability flowing from the Residual as a priority tax claim, payable before any payments to general unsecured creditors. This is a result uniquely arising in a chapter 7 liquidation.

Any such taxable income would arise in a context where the Trustee would not receive cash with which to pay the tax on the income.

The effect on a chapter 7 trustee, assuming the Chapter 7 trustee was liable for taxes on this "phantom income" amount, likely would be in several millions of dollars, if not tens of millions of dollars, annually. The chapter 7 trustee would be required to exhaust the other assets, assets that under the Joint Plan are available to pay unsecured creditors, to pay the taxes when they are due.

Creditors do not confront these tax risks if the Joint Plan is confirmed. The Joint Plan is intended to protect Creditors from adverse tax consequences attributable to the Residuals in at least two ways.

The potential to avoid several millions of dollars of taxes to Creditors under the Joint Plan compared to the potentially catastrophic tax consequences to Creditors in a chapter 7, clearly means, at a minimum, that Creditors will "receive or retain under the [Joint] Plan, property of a value, as of the Effective Date, that is not less than the value [Creditors] would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code."

It is conceivable a Chapter 7 trustee could minimize or avoid tax liabilities by selling or abandoning to a third party the Residual but the timing of the income attribution relative to any abandonment or sale is not clear and the only way to avoid this risk is to assure that the Residual remains with the Debtor.

**Receivables Recoverable on Claim Payments**

Book value assigned to recoverable receivable at October 1, 2010 is projected at $216.6 million. An adjustment of $184.1 million representing the allocated portion related to loans held by Trusts was applied to arrive at a Chapter 11 value of $32.5 million. Liquidation recovery percentages of 15% - 20% are applied to the Chapter 11 value to calculate potential value realized from a Chapter 7 liquidation. The liquidation recovery percentages are representative of

market research performed by the Debtor prior to the petition date and recent comparable non-mortgage paper purchase / face value ratios released by Sallie Mae in SEC filings.

## Contingent Claims

Contingent claims represent claims in excess of pledge account collateral, if any. Contingent claims are estimated using the "Decoder" methodology adopted by the Official Committee of Unsecured Creditors.   As settlement and compromise of all claims, the Debtor has agreed to use the Decoder case to estimate claims for the claimants who elect to vote to accept the August 2010 Plan. For claimants that reject the August 2010 Plan, the Plan Proponents will seek to determine a lender's claims at its Base Case. While the Base Case results are not presented in this analysis, in general they would yield lower claims and result in higher amounts of excess collateral in both the Chapter 11 reorganization and Chapter 7 liquidation scenarios.

*[Remainder of Page Left Intentionally Blank]*

LIBC/3760786.1

**The Education Resources Institute, Inc.**

Preliminary Liquidation Analysis (Decoder) - SUBJECT TO REVISION

(Unaudited, $ in millions)

| | Projected 9/30/10 | | Adjustment | | Liquidation Recovery Percentage Low | High | Chapter 7 Liquidation Low | | High | Chapter 11 Reorganization Low | | High | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Asset Liquidation** | | | | | | | | | | | | | |
| Cash and unmarketable securities - unrestricted | $ | 49.7 | (4.5) | B | 100.0% | 100.0% | $ | 45.2 | $ 45.2 | $ | 42.3 | $ 42.3 | C |
| Cash and marketable securities - restricted | | 320.9 | (320.9) | D | 0.0% | 0.0% | | - | - | | - | - | |
| Excess collateral in trust | | 2.3 | | E | 100.0% | 100.0% | | 2.3 | 2.3 | | 2.3 | 2.3 | |
| Excess collateral make and wait | | 0.9 | | E | 100.0% | 100.0% | | 0.9 | 0.9 | | 0.9 | 0.9 | |
| Residual interest in securitized portfolios | | - | | F | 0.0% | 0.0% | | - | - | | - | - | |
| Receivables | | | | | | | | | | | | | |
| Fees | | 41.3 | (41.3) | G | 0.0% | 0.0% | | - | - | | - | - | |
| Accrued interest | | 1.3 | (1.3) | | 0.0% | 0.0% | | - | - | | - | - | |
| Other - grant A.R, student loan | | 0.3 | (0.3) | | 0.0% | 0.0% | | - | - | | - | - | |
| Notes receivable | | 3.1 | (3.1) | H | 0.0% | 0.0% | | - | - | | - | - | |
| Student loans | | | | | | | | | | | | | |
| Receivables recoverable on claim payments | | 216.6 | (184.1) | I | 15.0% | 20.0% | | 4.9 | 6.5 | | 32.5 | 32.5 | |
| Property and equipment | | 0.3 | (0.3) | | 0.0% | 10.0% | | - | 0.0 | | - | - | |
| Prepaid expense and other assets | | 0.2 | (0.2) | | 0.0% | 0.0% | | - | - | | - | - | |
| Estimated Proceeds from Assets | | 636.7 | (555.9) | | | | | 53.2 | 54.9 | | 77.9 | 77.9 | |
| | | | | | | | | | | | | | |
| Preference Actions | | - | | | 0.0% | 0.0% | | - | - | | - | - | |
| Pre-Petition Lien Actions | | 119.6 | | J | 0.0% | 0.0% | | - | - | | 0.4 | 0.4 | K |
| Post-Petition Lien Actions | | 83.8 | | L | 15.0% | 20.0% | | 12.6 | 16.8 | | 83.8 | 83.8 | |
| Intangible Assets - Other | | | | | 0.0% | 0.0% | | - | - | | - | - | |
| **Total Proceeds Available for Distribution** | | | | | | | $ | 65.8 | $ 71.6 | $ | 162.2 | $ 162.2 | |
| | | | | | | | | | | | | | |
| **Admin/ Priority Claims** | | | | | | | | Low | High | | Low | High | |
| Wind Down: Operating | | | | | | | | 2.5 | 1.6 | | - | - | |
| Professional Fees | | | | | | | | 2.5 | 1.6 | | - | - | |
| Accrued expenses | | | | | | | | - | - | | 2.3 | 1.0 | |
| Residual Tax Liability | | | | | | | | - | - | | - | - | |
| Liquidating Trustee (3% statutory maximum) | | | | | | | | 1.6 | 1.6 | | - | - | |
| Litigation Cost | | | | | | | | 2.3 | 1.8 | | 1.2 | 0.9 | |
| Post-Petition Trade: AP | | | | | | | | 2.5 | 2.5 | | 2.5 | 2.5 | |
| US Trustee Fees | | | | | | | | 0.0 | 0.0 | M | 0.0 | 0.0 | |
| **Total Admin/Priority Claims** | | | | | | | | 11.4 | 9.1 | | 6.0 | 4.4 | |
| | | | | | | | | | | | | | |
| **Proceeds Available for Unsecured Claims** | | | | | | | $ | 54.4 | $ 62.6 | $ | 156.2 | $ 157.8 | |
| | | | | | | | | | | | | | |
| **Estimated Allowed Claims** | | | | | | | | Low | High | | Low | High | |
| Contingent Claims | | | | | | | | | | | | | |
| Trust Deficiency | | | | | | | | 156.7 | 156.7 | N | 156.7 | 156.7 | |
| Make & Wait | | | | | | | | 15.2 | 15.2 | | 15.2 | 15.2 | |
| Make & Hold | | | | | | | | 56.0 | 56.0 | | 56.0 | 56.0 | |
| Trade & Other | | | | | | | | 56.8 | 56.8 | | 30.9 | 30.9 | |
| **Total Unsecured Claims** | | | | | | | $ | 374.7 | $ 374.7 | $ | 318.8 | $ 318.8 | |
| | | | | | | | | | | | | | |
| **Recovery on Total Unsecured Claims** | | | | | | | | 14.5% | 16.7% | | 49.0% | 49.5% | |

General Note - Analysis is based on the "Decoder and proposed settlements" for estimating contingent claims

A   Projected ending balance from weekly cash flow forecast presented to Unsecured Creditors Committee

B   Adjustment for unrestricted cash excludes outflows of $58.0 mil for Restricted Charitable Funds, $0.3 mil of Restricted Grant Funds, $0.3 mil of interest on endowment funds, $1.5 mil for Ambac settlement, $1.9 mil transfer to restricted for Trust settlement, and inflow of $7.6 mil for projected post petition Trust recoveries

C   Adjusted for $0.9 mil cash settlement amount paid to TERI

D   Restricted cash and marketable securities are adjusted for segregated trusts and/or pool accounts which are not available for distribution to Creditors

E   Excess collateral is based on projected equity remaining from NPV of cash flows related to lender or trust portfolio when compared to their respective pledge account and settlements

F   The value of the residual interest has been adjusted to $0. Reorganized TERI will retain its ownership interest

G   Fees receivable represent unpaid fees related to student loans and fees due at securitization. These fees have been used to mitigate Trust and lender claims

H   Adjustment represents $3.1 mil of FMC receivable and is setoff against FMC claim amount

I   Represents the value of defaulted loans that will be returned to the Trusts

J   Represents possible recovery value if disputed security interest is avoided

K   Represents remaining settlement amount related to possible lien issues with Make and Wait lenders. (Citizens settlement amount already in unrestricted cash)

L   Represents remaining possible recovery (net of actual cash recoveries received) of disputed application of Section 552 of the Bankruptcy Code to defaulted loans purchased with pledge account collateral during the pendency of the Chapter 11 Case

M   Assumes quarterly payments to US Trustee of $5 - $6 thousand under Chapter 7 scenario. Under Chapter 11 scenario, quarterly payments are reflected in unrestricted cash balance

N   Represents settlement of Trust lien issues, Ambac settlement and Trust settlement