**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**White Plains Division**

**PJH 9510**
**Tax ID No. 11 3178696**

In re:

MICHAEL TODD SHILINSKI,

      Debtor.

Bankr. Case No.: 16-23191-RDD

Chapter 7

MICHAEL TODD SHILINSKI,

      Plaintiff,

v.

NAVIENT and EDUCATIONAL CREDIT
MANAGEMENT CORPORATION,

      Defendants.

Adv. Proc. No.: 16-08252-RDD

## AFFIDAVIT OF PETRA SHIPMAN

I, Petra Shipman, hereby affirm as follows:

    1.    I am a Litigation Analyst in the Bankruptcy Litigation Unit of Navient Solutions,

LLC ("Navient"), and I have personal knowledge of the facts set forth below, drawn from

Navient's records and, if called to testify, can attest to the following facts.

    2.    I am eighteen (18) years of age or older at all times relevant to this Affidavit.

    3.    Navient is the holder of a claim against Michael Todd Shilinski ("Plaintiff")

arising from three (3) LAW LOANS Law Student Loans, one (1) LAW LOANS Bar Study Loan

and one (1) EXCEL Custom Grad Loan disbursed between the dates of August 11, 2000, and

EXHIBIT 3
**EXHIBIT 1**

March 3, 2003, with a combined current outstanding balance, as of the date of the filing of this

adversary proceeding, including principal and interest, totaling approximately $45,070.45.

4.      To the extent the Navient loans at issue were made under the LAWLOANS

program, they were made under a program funded in part by a nonprofit institution.

5.      According to the terms of a "LAWLOANS MULTIPARTY AGREEMENT"

("Agreement") entered into between Higher Education Assistance Foundation ("HEAF"), Student

Loan Marketing Association ("Sallie Mae")[1], HEMAR Service Corporation of America

("HSCA"), HEMAR Insurance Corporation of America ("HICA"), and Norwest Bank South

Dakota, N.A. ("Norwest"), on July 31, 1989, nonprofit organizations were responsible for

meaningful contributions to the LAWLOANS program. *See*, LAWLOANS MULTIPARTY

AGREEMENT ("Agreement"), dated July 31, 1989, attached hereto as Exhibit "A".

Petra Shipman, Litigation Analyst
Bankruptcy Litigation Unit
Navient Solutions, LLC


State of Indiana
County of Hamilton

        On March 23 2018, before me, the undersigned, a notary public in and for said State,
personally appeared Petra Shipman, who properly identified herself to me and signed this
document in my presence.  My commission expires on  OCt 18 2012

                        Witness my hand and official seal.



                        Notary Public

[1] Navient's predecessor in interest, Sallie Mae, Inc. was a wholly owned subsidiary of Student Loan Marketing
Association.  Sallie Mae, Inc. then changed its name to Navient Solutions, Inc., who later reorganized into a Limited
Liability Company under the name Navient Solutions, LLC.

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
    6/30/89; 7/20/89; 8/4/89

137N

LAWLOANS
MULTIPARTY AGREEMENT

A. PARTIES

This Agreement is made and entered into as of this 31st day of July, 1989, by and between:

1) Higher Education Assistance Foundation, a nonprofit corporation organized under the laws of the State of Minnesota (herein "HEAF");

2) Student Loan Marketing Association, organized under the laws of the United States of America (herein "Sallie Mae");

3) HEMAR Service Corporation of America, a corporation organized under the laws of the State of Minnesota (herein "HSCA");

4) HEMAR Insurance Corporation of America, an insurance corporation organized under the laws of the State of South Dakota (herein "HICA"); and

5) Norwest Bank South Dakota, National Association, a national banking association (herein "Norwest S.D."),

for the purposes hereafter set forth to provide for loans to law students.

The parties hereto understand and agree that additional originating lenders may become parties to this Agreement in order to provide additional capital for the student loan program described below, but when and if added, such additional originating lenders shall be added only with consent of all parties to this Agreement which consent shall not be unreasonably withheld and only on substantially the same terms and conditions as the existing originating lender or lenders.

B. PURPOSE

In recognition of the costs and complexities associated with attendance at law schools, the above parties have developed a program, described in C below, herein designated "LAWLOANS program" or such other name as may be designated by HICA and does not infringe on existing usage of such designation. The LAWLOANS program is designed to promote student access to accredited law schools in the United States by making loans available to students at those law schools for the costs of their legal education.

The purpose of this Multiparty Agreement is to set forth the expectations and intentions of the parties, their relationships and

**Page 1**                    **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
6/30/89; 7/20/89; 8/4/89

agreements, with respect to the overall design of the LAWLOANS program and the various roles which the parties have and will undertake in connection therewith. This Multiparty Agreement is subject to the more detailed provisions of certain other agreements between and among the various parties hereto (referred to herein as the "Related Agreements") including, but not limited to, the following which are to be drafted and executed promptly after the execution of this Multiparty Agreement:

1) Stafford and SLS Related Agreements:

   a) Agreement for Origination of Stafford and SLS Loans, between HEAF and Norwest S.D. (the "Stafford and SLS Origination Agreement");

   b) Agreement for Stafford and SLS Loan Servicing, between HSCA and Norwest S.D. (the "Stafford and SLS Servicing Agreement");

   c) Lender Agreement for Guarantee of Student Loans with Federal Reinsurance, between HEAF and Norwest S.D. (the "Norwest S.D. Lender Agreement");

   d) Lender Agreement for Guarantee of Student Loans with Federal Reinsurance, between HEAF and Sallie Mae (the "Sallie Mae Lender Agreement");

   e) Lender Agreement for Guarantee of Consolidation Loans with Federal Reinsurance between HEAF and Sallie Mae and the Certificate of Insurance (together, the "Consolidation Loan Lender Agreement");

   f) Amendment to Agreement for Student Loan (including Stafford, SLS, and Law Student Loans) Servicing between HSCA and Sallie Mae (the "Sallie Mae Amendment to Servicing Agreement");

2) Law Student Loan Related Agreements:

   a) Agreement for Processing of Law Student Loan Applications, between HEAF and Norwest S.D. (the "LSL Processing Agreement");

   b) Agreement for Origination of Law Student Loans (hereinafter defined) between HSCA and Norwest S.D. (the "Law Student Loan Origination Agreement");

   c) Agreement for Servicing of Law Student Loans (hereinafter defined) between HSCA and Norwest S.D. (the "Law Student Loan Servicing Agreement");

   d) LAWLOANS Surety Bond (the "Surety Bond");

**EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

e) LAWLOANS Program Rules dated June 1, 1989 and with respect to loans made under a Memorandum of Agreement dated May 10, 1989, LAWLOANS Program Rules dated May 10, 1989 (the "Program Rules");

f) Rules and Regulations of the Surety applicable to all Insured Loans dated September 15, 1986 (the "Rules and Regulations of the Surety");

g) Letter Agreement regarding confidentiality between HICA and Sallie Mae.

3) Sale and Purchase Agreement between Norwest S.D. and Sallie Mae; and

4) Other agreements as may be necessary to effect electronic loan origination processing and school as holder arrangements.

This Multiparty Agreement is intended to set forth in general the agreements of the parties with respect to those subjects which concern all of the parties hereto. However, should there be any inconsistency between the provisions of this Multiparty Agreement and a Related Agreement, the provisions of the Related Agreement shall control. An agreement will be deemed a Related Agreement if so designated herein or if so designated in the agreement executed by the parties to the agreement.

It is understood and agreed by the parties hereto that since the withdrawal of Law School Admission Services, Inc., from the Law Plan Multiparty Agreement dated July 1, 1986, and consistent with that agreement, the parties have implemented substitute arrangements by this Agreement to continue to make loans available to law students for the costs of their legal education.

## C. COMPONENTS OF THE LAWLOANS PROGRAM

Eligible Borrowers: The LAWLOANS program is available to students enrolled in American Bar Association accredited laws schools in the United States and which have established their eligibility for the Stafford and SLS programs with the United States Department of Education or with respect to Law Student Loans such other law schools as individually approved by the parties.

Loans: The loans available to eligible borrowers are:

1) Stafford (formerly "Guaranteed") student loans (herein "Stafford loans"), Supplemental Loans to Students (herein "SLS loans"), Refinanced Loans, and Consolidation Loans under Title IV, Part B of the Higher Education Act of 1965, as amended, and the regulations promulgated thereunder (herein "the Act"). Stafford, SLS and Consolidation loans originated under the LAWLOANS program shall be guaranteed by HEAF and reinsured by the United States

3

**Page 3**                    **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
     6/30/89; 7/20/89; 8/4/89

Secretary of Education.  Stafford and SLS loans shall be available
only to students, not to parents.  PLUS loans (i.e., loans to
parents of law students pursuant to the Act) are not available
under the LAWLOANS program.

2)  Privately insured loans to students (herein "Law Student
Loans" or "LSL Loans") insured by HICA as provided in and pursuant
to the Surety Bond.  The Law Student Loans will also be available
to students prior to graduation in order to help students while
studying for their bar examination (these loans may also be refered
to as "Bar Study Loans").

Source of Funds:  Until otherwise agreed by the parties, all
of the loans described above except Refinanced and Consolidation
Loans will be funded by Norwest, S.D. and Refinanced and
Consolidation Loans will be funded by Sallie Mae, in accordance
with the terms of applicable Related Agreements and subject to such
agreements being satisfactory to Norwest S.D. and the other parties
to such Agreements.

Loan Holder Options:  In order to encourage the maximum
market penetration for the LAWLOANS program, the program will
introduce the school as a holder option.  In addition to Norwest
S.D. loans which are subsequently purchased by Sallie Mae, schools
which generate more than $1,000,000 in Stafford and SLS loan
combined volume per year will qualify for the school as holder
option.  The two holding options are:

1)  Norwest S.D. funded/Sallie Mae Purchased.  Under the
LAWLOANS program, Sallie Mae will purchase Stafford, LSL and SLS
loans originated by Norwest S.D. under the LAWLOANS program,
provided, however, that Sallie Mae will not be obligated to
purchase more than one dollar of LSL loan principal balance for
each two dollars of HEAF guaranteed original loan principal balance
purchased under either the LAWLOANS program or its predecessor, the
Law Plan and subject to the Sale and Purchase Agreement between
Norwest S.D. and Sallie Mae.  The timing of these sales will be
negotiated between Norwest S.D. and Sallie Mae as will the purchase
price of the loans.  However, the loans will be sold no later than
60 days prior to the commencement of the repayment period and at no
less than 100% of the outstanding balance plus accrued interest.
Sallie Mae will commit to purchase these loans through a forward
purchase commitment.  With the execution of this Agreement the
Investment Agreement dated September 30, 1986 by and between HEAF
and Norwest S.D. as amended is hereby terminated.

2)  Norwest S.D. Originated/School As Holder/Sallie Mae
Purchased.  The parties intend to offer certain schools a school as
holder option which will be subject to Related Agreements to be
drafted and executed as may be permitted by Act.  Subject to these
agreements it is expected that the option will include the
following terms.  Under the school as holder option the school will
obtain a loan from Sallie Mae or use its own resources.  If a loan

4

**Page 4**                                      **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
6/30/89; 7/20/89; 8/4/89

is used, the proceeds of the loan will be used to acquire Stafford
and SLS loans originated by Norwest, S.D. Sallie Mae will lend up
to 100% of the school's Stafford and SLS loans, which will be a
school's maximum allowable participation. Norwest S.D. will hold
the loans until final disbursement, then sell the loans to the
school upon final disbursement at the then current principal
balance plus accrued interest. No later than sixty days before the
borrower enters repayment, the school will sell the loans to Sallie
Mae. The financing offered by Sallie Mae will be offered at a rate
and upon terms mutually acceptable to Sallie Mae and the school.
Loans sold to Sallie Mae under the school as holder option will be
included in the HEAF guaranteed to HICA insured percentages
referenced in the Sale and Purchase Agreement.

Marketing: The marketing activities for the LAWLOANS program
will be coordinated by HICA. The marketing of the program will
have several aspects including, without limitation:

1) The development of a coordinated plan including the
development of an overall design and strategy against which all
efforts will be measured and tested. This coordinated plan will be
reviewed and approved by the participants to the LAWLOANS program.
From this overall design and strategy will flow a commonalty of
look to all printed materials. Additionally, the plan will be
designed to be shared with HEAF and HSCA personnel as well as
Norwest S.D. and Sallie Mae so that if deemed desirable, personnel
such as HEAF's regional directors can understand and support the
program within their regions and Sallie Mae and Norwest S.D.
marketing representatives can support the program in their
respective areas.

2) Marketing to financial aid officers will be the key
components of the marketing effort. These activities will be
similar to those currently undertaken by HEAF and HICA and may
include:

    a) Instructional and operational seminars in selected
areas of the country;

    b) Direct personal visitation to selected schools;

    c) Attendance at industry meetings;

    d) Program Newsletters and bulletin series.

3) Marketing directly to law school students will be
aggressive as it relates to repeat borrowers. Marketing directly
to potential new borrowers will be more limited.

In return for coordinating the marketing functions for the
LAWLOANS program, Sallie Mae will reimburse HICA for certain direct
expenses incurred in the marketing and promotion of the program as
described in Exhibit "A".

5

**Page 5**                                          **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

Customer Service:  HEAF will establish a customer service program which will include:

1)  An accessible toll free number available to schools and students to inquire about the status of their loans and to respond to programmatic questions and concerns.

2)  Coordinate a proactive status report to be produced by HSCA and provided to the schools identifying applications that are in process, including those which are rejected, denied and approved.  This report will include all three loan types on a single report.

3)  A centralized student and school problem area that deals specifically with post disbursement problems and their resolutions.

Loan Application Process and Materials:  HICA has produced application materials which include:

1)  an application form with which a borrower under the LAWLOANS program can apply for a Stafford, SLS or Law Student Loan together with any appropriate co-signer (accommodation maker) application;

2)  explanatory materials sufficient to fully inform eligible borrowers concerning the LAWLOANS program, the choices available to LAWLOANS program borrowers and the responsibilities imposed on such borrowers;

3)  appropriate promissory notes for Stafford, SLS, and Law Student Loans;

4)  a supplemental credit data form for use by Law Student Loan borrowers.

After the date of this Multiparty Agreement, revisions to the application booklet may be initiated by any party hereto but no such revisions shall be put into effect until approved in writing by all parties hereto.  In any case, the application materials shall always be designed to fulfill the disclosure requirements applicable to the LAWLOANS program loans under the Act and other applicable laws and regulations.  HEAF agrees to be responsible for review and approval of the application materials insofar as they describe Stafford or SLS loans, to provide or review and approve the Stafford and SLS promissory note forms and to undertake to secure the approval of the United States Secretary of Education to the application materials and promissory note forms as necessary. Sallie Mae agrees to be responsible for preparation of all Consolidation Loan Application materials and promissory note forms subject to the review and approval of all parties hereto.  HICA will provide the form of all application materials relating to Stafford and SLS Loans and any revisions from time to time made to

6

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
6/30/89; 7/20/89; 8/4/89

those materials to HEAF prior to the dissemination of any such
information in order to permit HEAF to verify the compliance of
such materials and revisions thereto with the Act.   HICA will
provide the form of all application materials relating to Law
Student Loans and any revisions from time to time made to those
materials to Norwest S.D. prior to the dissemination of any such
information in order to permit Norwest S.D. to verify the
compliance of such materials and revisions thereto with Truth in
Lending (Regulation Z), the Equal Credit Opportunity Act
(Regulation B) and other applicable federal and state consumer
lending laws.   It is expressly understood and agreed that HICA,
HSCA and HEAF shall have no responsibility for assuring that the
application materials or any revisions thereto comply with any
applicable consumer lending laws.   In addition, HICA will also
secure the approval in writing of HSCA to such materials and
revisions thereto prior to such dissemination to ensure that their
requirements as to such materials are met.   Norwest S.D., HEAF and
HSCA shall, however, advise HICA of their respective comments in
writing with respect to the application materials and revisions
thereof within thirty (30) days after receipt from HICA of such
items.   Norwest S.D. agrees to be responsible for review and
approval of the application materials insofar as it describes Law
Student Loans and to provide or review and approve Law Student Loan
promissory note forms with HICA's concurrence.   HICA shall be
responsible for securing sufficient copies of the application
materials and for the cost of producing and distributing the
application materials. \Sallie Mae shall reimburse HICA for such
cost up to the maximum amount defined in Exhibit A unless otherwise
agreed to in writing by Sallie Mae./

As more fully provided in the Related Agreements, and by way
of summary only, the following procedures shall be employed:

The application materials will instruct the eligible borrower
to submit completed applications to the financial aid office of the
participating law school.   The school will review the completed
application, verify enrollment status and provide the additional
information required by the application booklet, including
educational costs and other aid awarded to the student.   The school
will then forward the completed applications to HEAF.   Upon receipt
of the completed applications from participating schools, HEAF will
promptly review and process such applications.   Such review and
processing shall include:   review of all applications for
completeness and accuracy, return of a facsimile of the
applications to applicants at schools, as appropriate, and transfer
of information and the completed applications to an electronic
image.   HEAF shall transmit such electronic images and related
documents to HSCA with respect to all Law Student Loan
applications.   Such transmission of electronic images shall include
document and batch control information necessary to summarize and
identify the applications transmitted.   Upon receipt of the
Application, HEAF will process the Stafford and SLS loans for
guarantee and disbursement in accordance with the Stafford and SLS

7

**Page 7**                                      **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

Origination Agreement and the Lender Agreement. With respect to Law Student Loans, HICA will process the completed applications transmitted to it for insurance in accordance with the Surety Bond. HSCA will process the information for origination and disbursement of Law Student Loans in accordance with the Law Student Loan Origination Agreement and the Surety Bond.

The parties also agree that LAWLOANS program Stafford and SLS loan applications may be electronically transmitted by the schools directly to HEAF, in accordance with HEAF requirements for such electronic transmission, including execution of certain agreements by HEAF and the particular school.

Interest Rates: Stafford and SLS loans under the LAWLOANS program will carry the highest interest rate and maximum interest capitalization frequency available under the Act, except that for those SLS loans with loan periods beginning after May 15, 1989 and prior to July 1, 1990 interest accrued during the interim period will be capitalized only once, at the beginning of repayment. Otherwise interest may be capitalized as provided by the Act. Identification of the applicable interest rate will be the responsibility of HEAF.

Law Student Loans under the LAWLOANS program will carry a variable interest rate which will be fixed quarterly at a rate equal the preceding quarter's average bond equivalent rate of 91-day (thirteen week) Treasury Bills, plus three and fifty hundredths percent (3.50%). However, Law Student Loans with loan periods beginning after May 15, 1989 and prior to July 1, 1990 will carry a variable interest rate which will be fixed quarterly at a rate equal to the preceding quarter's bond equivalent rate of 91-day (thirteen week) Treasury Bills, plus three and twenty-five hundredths percent (3.25%) during the interim period and plus three and fifty hundredths percent (3.50%) during the repayment period. At the option of the borrower after termination of in-school law studies (whether as a consequence of withdrawal, graduation or otherwise) such loan will continue to bear interest at such variable rate, or will bear interest at a fixed rate equal to the rate on 10-year Treasury bonds, at the time borrower exercises such option, plus 4.5%. Provided, however, that all interest rates for Law Student Loans will be rounded to the nearest one eighth of one percent (0.125%).

Guarantee and Insurance Fees: Stafford and SLS borrowers will be charged a guarantee fee by HEAF within the limits prescribed by the Act and consistent with HEAF's current fee schedule at the time the loan is made. In addition, if permitted by the Act, such borrowers will be charged an origination fee by Norwest S.D. equal to a certain percentage of the loan principal amount as provided by the Act. Both the guarantee fee and the origination fee, if applicable, will be deducted from the first disbursement, if permitted by the Act or be prorated among multiple disbursements. Notwithstanding the foregoing, the fees charged

8

**EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
     6/30/89; 7/20/89; 8/4/89

for Stafford and SLS loans shall comply with applicable provisions
of the Act as it exists from time to time.  Sallie Mae will refund
the guarantee fee charged on Stafford Loans under the LAWLOANS
program if such loans are consolidated under the LAWLOANS program
and the student has made twelve consecutive monthly payments on the
Consolidation Loan.

Norwest S.D. or holder will be charged an insurance fee to be
remitted to HICA by Norwest S.D. for Law Student Loans equal to a
certain percentage of the loan principal amounts, as follows:

| | |
|---|---|
| A student borrower who chooses to pay interest as it accrues during the interim period and secures a cosigner. | 6.00% |
| A student borrower who chooses to capitalize the accruing interest during the interim period and secures a cosigner. | 7.50% |
| A student borrower who chooses to pay interest as it accrues during the interim period and does not secure a cosigner. | 8.875% |
| A student borrower who chooses to capitalize interest during the interim period and does not secure a cosigner. | 7.50% plus 3.25% of the then current principal balance at commencement of the repayment period. |
| A Bar Study Loan borrower who secures a cosigner | 6.5% |
| A Bar Study Loan borrower who does not secure a cosigner | 9.5% |

provided, however, that such fees may be changed if such change is
approved by the Director of Insurance of South Dakota or Minnesota
Department of Commerce, as appropriate and upon prior notification
to Sallie Mae and Norwest S.D.  Norwest S.D. or holder may assess
the Law Student Loan borrowers for the cost of the insurance
premium.

Repayment Terms:  Stafford and SLS loans will be repayable as
provided in the Act.  Under existing law, Stafford loans will
include deferral of both principal and interest payments during the
period the borrower is enrolled in law school and for a grace
period following graduation or withdrawal and SLS loans may include

9

**Page 9**                                                    **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
6/30/89; 7/20/89; 8/4/89

deferral of interest (with annual capitalization) and principal payments during the period the borrower is enrolled in law school. For LAWLOANS program SLS loans with loan periods beginning after May 15, 1989 and prior to July 1, 1990 deferred interim interest will be capitalized at the commencement of the repayment period.

Law Student Loans to students will be repayable on a graduated schedule as follows:

No principal payment will be due but interest will accrue during the period the borrower is enrolled in law school. Upon termination of law school, whether by graduation, withdrawal or otherwise, the borrower will have a grace period as described in the promissory note, during which the borrower will not be required to make principal payments but interest will continue to accrue. During the interim period (in-school and grace), the borrower may choose to pay the accruing interest or capitalize that interest and add it to the loan principal amount. Such capitalization shall be no more frequent than quarterly. After the interim period has elapsed, interest will again be capitalized. After the interim period has elapsed, borrowers will be required to make at least interest payments for a period of up to three(3) years. Thereafter, principal repayments will begin, on a repayment schedule which may be graduated (higher payments in later years) over a period of up to twelve (12) years to the extent that HSCA is able to offer such a graduated schedule and to the extent that such a schedule does not adversely affect the default and cash flow projections of HICA.

Forbearance: As provided in the Act and by existing provisions of the HEAF Administrative Guide, forbearance may be granted to Stafford and SLS borrowers, at the option of the Lender, for health or personal reasons and when a forbearance is believed likely to avoid a subsequent default. Interest during an authorized forebearance will continue to accrue and may be capitalized.

In the case of Law Student Loans, the holder will also, at its option, be able to grant forbearance, subject to the Rules and Regulations of the Surety generally of six (6) months each, during periods of temporary inability on the part of the borrower to make payments due. Interest during an authorized forebearance will continue to accrue and may be capitalized. During the in-school period, a borrower who has chosen to pay the accruing interest or has chosen to not secure a cosigner, may convert the Law Student Loan to one in which interest is capitalized during the in-school period and/or secure a cosigner, at the option of Norwest S.D., in order to avoid a default. In such circumstances and as a pre-condition to such conversion, Norwest S.D. or holder shall collect from the borrower or capitalize the additional insurance fee which would have been required at the origination of the loan, and such collecting party shall promptly pay over the same to HICA.

10

**Page 10**                                    **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

Loan Servicing:  All LAWLOANS program loans will be serviced for Norwest S.D. by HSCA in accordance with agreements described in Part B above.  All LAWLOANS program loans held by Sallie Mae will be serviced by HSCA until at least sixty (60) days prior to the beginning of the repayment period subject to the agreements described in Part B above.  It is expected that all Law Student Loans will be serviced by HSCA for the life of the loan subject to and in accordance with the agreements described in Part B above and that Sallie Mae and HSCA have mutually acceptable servicing agreement in place for such servicing.  All LAWLOANS program loans held by Schools will be serviced by HSCA pursuant to an agreement to be developed between HSCA and the School.

Eligible Schools:  All law schools accredited by the American Bar Association located in the United States and which have established their eligibility for the Stafford and SLS programs with the United States Department of Education and such other schools as may be approved in writing by the parties will be eligible to participate in all aspects of the LAWLOANS program.

With respect to Law Student Loans, HICA will unless otherwise agreed to by Sallie Mae on the basis of actual default rates experienced by HICA or HEAF, terminate the school's eligibility for Law Student Loans if the school has a default rate in excess of 15% as determined by use of Section 2(a)(2)(iii) of the LAWLOANS Program Commitment and Loan Sale Agreement between Sallie Mae and Norwest, S.D. or require any such school to establish and maintain a depository balance in a reserve fund as described by use of Section 2(a)(2)(iii) of the LAWLOANS Program Commitment and Loan Sale Agreement between Sallie Mae and Norwest, S.D. as a condition of continued participation in the Law Student Loan program provided, however, that HICA may, in its sole discretion, condition continued participation of any school in the Law Student Loan program based upon the school's actual or projected default rate in any manner that is more restrictive than the criteria and reserve requirements outlined above.  Any reserve shall be established on terms and conditions acceptable to HICA.

Certain Notices to Sallie Mae:  HICA agrees to promptly provide Sallie Mae with the following:

1)  Notice that HICA has failed to contribute to a general insurance reserve at least the minimum amount required to be maintained based upon generally accepted actuarial standards and consistent with the financial analysis and related documentation provided by HICA to its state regulatory authority for insurance regulation.

2)  On a quarterly basis the HICA's financial analysis in the form provided by HICA to its state regulatory authority for insurance regulation.

11

**Page 11**                    **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

3) Notice of HICA's determination that a school has a default rate in excess of 15% as determined by use of Section 2(a)(2)(iii) of the LAWLOANS Program Commitment and Loan Sale Agreement between Sallie Mae and Norwest, S.D., and information regarding HICA's response to that determination.

4) Notice within two (2) business days of HICA's first notice to its state regulatory authority of any change in the type of insurance coverage, insurance product or service insured by HICA where such coverage is funded in whole or in part from HICA's general insurance reserves.

5) Notice of HICA changes of the insurance premium assessed for Law Student Loans.

6) Notice if the general credit criteria for Law Student Loans is changed in any material respect.

## D. GENERAL PROVISIONS

Confidentiality: All parties hereto shall protect the confidentiality of all information and materials relating to all parties hereto, including all agreements, business practices, financial data, procedures, policies, marketing philosophy, practices and objectives and default projections, if reasonably designated by a party as confidential or proprietary information (herein the "Confidential Information"). Each party hereto shall keep the Confidential Information in strictest confidence except as shall be necessary to communicate it to its officers, employees, counsel and subcontractors in connection with its role under this Multiparty Agreement and except as required by applicable law or regulation. Each party shall employ all reasonable and necessary means to safeguard the Confidential Information from unauthorized disclosure. Each party agrees not to give, sell, or in any way transfer, either directly or indirectly, the Confidential Information, or any part thereof, to any other person or organization for any purpose, and agrees to not allow any other person or organization to obtain, use or gain access to the Confidential Information, or any part thereof.

Best Efforts, Allocation of Resources: Each party hereto agrees that it will use its best efforts to ensure the success of the LAWLOANS program, including but not limited to allocation of sufficient material, personnel and financial resources to the LAWLOANS program and cooperation with all other parties in the marketing and promotion of the LAWLOANS program.

Effective Date, Withdrawal: This Multiparty Agreement shall be in full force and effect as of the date first above written and shall continue in full force and effect until terminated as herein provided.

12

**Page 12**                                    **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

Any party to this Multiparty Agreement may withdraw from the LAWLOANS program for cause upon written notice to all other parties mailed not less than thirty-five (35) days in advance of the date specified therein for the effective date of its withdrawal.

For purposes of this Multiparty Agreement, cause shall mean:

1) non-payment of any sums due the withdrawing party pursuant to the provisions of any Related Agreement for a period of more than sixty (60) days after billing,

2) the filing of a petition in bankruptcy by a party to this Multiparty Agreement or against a party hereto by someone other than a party to this Multiparty Agreement,

3) the failure or inability of any party to perform in whole or material part any of its obligations hereunder or under any Related Agreement to the withdrawing party for a period of more than thirty (30) consecutive days,

4) material breach of this Multiparty Agreement or any Related Agreement by a party of its obligations to the withdrawing party,

5) expiration or termination of a Related Agreement in accordance therewith to which the withdrawing party is a party, or

6) a party participating in any other program in direct competition with the LAWLOANS program which is marketed primarily to law students, including the commitment to purchase loans in such programs which are not yet originated at the time of the commitment, unless the participation and the extent of such participation is required by law provided, however, that Sallie Mae shall be allowed to purchase loans and commit to purchase loans which have been originated at the time that the commitment to purchase is given by Sallie Mae, and provided further that any party may participate in any other program in any way after the Guaranteed Commitment Amount (as defined in the LAWLOANS Program Commitment and Loan Sale Agreement between Sallie Mae and Norwest, S.D.) has been reduced to zero.

However, should the circumstance giving rise to the notice of withdrawal by a party be remedied before the date specified for the withdrawal by that party then the notice of withdrawal shall have no force or effect.

Notwithstanding the right of a party to withdraw as herein provided the parties hereto shall have the obligation following withdrawal of any party to make a good faith effort to implement substitute arrangements for the provision of activities theretofore provided by the withdrawing party.

13

**Page 13**                    **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

Any party to this Multiparty Agreement may withdraw from the LAWLOANS program on or after the Third Anniversary Date of this Multiparty Agreement without cause upon notice in writing to the other parties by mailing such written notice to the other parties one hundred and eighty (180) days before such Third Anniversary Date or such later date as the withdrawing party specifies as the effective date of its withdrawal.

Entire Agreement:  This Multiparty Agreement and the Related Agreements constitute all of the Agreements between the parties with respect to the LAWLOANS program and supersede all prior agreements between them with respect to the LAWLOANS program including without limitation the LAWLOANS Memorandum of Agreement dated May 10, 1989 between HEAF, HICA, HSCA and Norwest S.D., provided, however, that the Surety Bond issued and any loans made pursuant to the LAWLOANS Memorandum of Agreement shall remain in full force and effect as if issued or made pursuant to this Multiparty Agreement.

Assignability:  This Multiparty Agreement may not be assigned or delegated by any party without the written consent of all other parties hereto, which consent will not be unreasonably withheld, and any attempt to assign any rights arising under this Agreement shall be void, provided however, except as may be limited in the Related Agreements, that each party may subcontract any and all of the services to be provided under this Agreement or Related Agreement without the consent of any other party.

Representations:  Each party with respect to itself represents and warrants that the making and performance of this Agreement and the activities contemplated hereby (i) have been duly authorized by all necessary corporate action, and (ii) do not and will not

1)  violate any provision of law, or any regulation, order, decree, writ or injunction, or any provision of its charter or bylaws, or;

2)  violate or result in the breach of, or constitute a default or require any consent under, any agreement or instrument by which it or any of its property may be bound or affected;

and that this Multiparty Agreement is the legal, valid and binding obligation of such parties, enforceable in accordance with the terms hereof subject to the exercise of judicial discretion in accordance with general principles of equity, to the valid exercise of the police powers of the several states of the United States of America and of the constitutional powers of the United States of America and the bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

Governing Law:  This Multiparty Agreement shall be construed in accordance with and be governed by the laws of the State of Minnesota.

14

**Page 14**                    **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
6/30/89; 7/20/89; 8/4/89

**Change in Federal Law:** The parties hereto acknowledge that the Act is subject to change by Congress. The parties hereto further acknowledge that such changes and other federal laws and regulations and state law and regulations changes could seriously and detrimentally impact various parties legal and practical ability to participate in the LAWLOANS program. Notwithstanding provisions contained in the Related Agreements which may authorize the parties thereto to terminate such agreements because of changes in the Act or other federal or state laws or regulations each party hereto agrees to exercise its best efforts and to cooperate fully with all other parties to effect such reasonable changes and modifications in the LAWLOANS program and the Related Agreements which may be appropriate, necessary and feasible as a consequence of any such changes in the Act or other federal or state law or regulation, to the end that the LAWLOANS program continue for its anticipated initial term of three years; provided however that in no event will any party be required to accept less than the yield it has contracted to receive under applicable Related Agreements.

**Obligations Hereunder Limited:** The duties and obligations of the parties under this Multiparty Agreement are limited to those expressly set forth herein and no duty, obligation, undertaking or liability is to be inferred from the context hereof. The obligations under this Agreement of each of the parties are several and distinct, each party being responsible solely for its own performance pursuant to the terms and conditions of this Agreement and the Related Agreements to which each is a party. Each party agrees to indemnify and hold harmless each other party to this Agreement, its officers and employees and their respective successors and assigns from and against any and all liabilities, claims, costs, damages, expenses, losses, and attorney's fees resulting from or attributable to, any breach by such party of its obligations as set forth in this Agreement or any Related Agreement.

**Copyright, Service Marks, Etc.:** In recognition of the marketing and development responsibilities assumed by HICA in connection with the LAWLOANS program, HICA shall retain all ownership of, and except as provided herein, the sole and exclusive use of, all copyrightable materials and publications developed by HICA prior to and pursuant to this Agreement including the name, "LAWLOANS" or other name designated by HICA in connection with the LAWLOANS program, and all trademarks and service marks used by HICA in connection herewith.

Similarly, HEAF, HSCA, Norwest S.D. and Sallie Mae shall retain all ownership of and except as provided herein the sole and exclusive use of and right to use all copyrightable materials and publications, service marks and trademarks heretofore developed by them whether done in anticipation of this Agreement or otherwise together with all such materials developed pursuant to this Agreement and used in connection herewith.

15

**EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
6/30/89; 7/20/89; 8/4/89

Each of the parties to this Agreement hereby grants to each of the other parties to this Agreement and to the extent necessary and consistent to carry out the purposes of this Agreement, to each party to the Related Agreements a limited license to use and distribute all materials and publications produced by them or provided by them in connection with the marketing and promotion of the LAWLOANS program pursuant to this Agreement but only to the extent necessary to enable such party to fulfill such party's duties and obligations under the terms of this Agreement and the Related Agreements.

Counterparts:  This Agreement may be simultaneously executed in several counterparts each of which shall be an original and all of which shall constitute but one and the same instrument.

Notices:  Notices, requests, demands or other instruments which may or are required to be given by any party hereunder shall be in writing and shall be deemed to have been properly given when

1)  delivered personally to an officer of the entity to which such notice is to be given, or

2)  upon actual receipt by any party when mailed by Registered or Certified United States mail or upon the expiration of five (5) days after the date such notice is mailed to a party by Registered or Certified United States mail, whichever is earlier.

All such notice shall be addressed as follows:

If intended for HEAF:

> Higher Education Assistance Foundation
> Suite 500
> 85 East Seventh Place
> St. Paul, MN  55101
> Attention:  President

If intended for Norwest S.D.:

> Norwest Bank South Dakota, N.A.
> P.O. Box 1028
> 101 North Phillips Avenue
> Sioux Falls, SD  57117-1028
> Attention:  Student Loan Manager

If intended for HSCA:

> HEMAR Service Corporation of America
> Suite 600
> 6800 College Blvd.
> Overland Park, KS  66211
> Attention:  Chairman of the Board

16

**Page 16**                    **EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

If intended for HICA:

> HEMAR Insurance Corporation of America
> Suite 301
> 4009 West 49th Street
> Sioux Falls, SD  57106
> Attention:  President

If intended for SLMA:

> Student Loan Marketing Association
> 1050 Thomas Jefferson Street, N.W.
> Washington, D.C.  20007
> Attention:  Vice President, Education
>             Finance and Credit

Any party may change the address to which notices to such parties are to be sent by notice to the other parties given as aforesaid.

Binding Effect:  All covenants and agreements herein contained and all provisions hereof shall extend to, be binding upon, and inure to the benefit of the successors and assigns of the respective parties.

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

　　　IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

HIGHER EDUCATION ASSISTANCE FOUNDATION

By: _____

Its: _____ President _____

Printed Name: _____ Garry D. Hays _____

Signature Date: _____ August 24, 1989 _____


HEMAR SERVICE CORPORATION OF AMERICA

By: _____

Its: _____ President _____

Printed Name: _____ Melvin D. Orwig _____

Signature Date: __ 8/23/89 __


HEMAR INSURANCE CORPORATION OF AMERICA

By: _____

Its: __ President _____

Printed Name: __ Kevin F. Moehn _____

Signature Date: _____ August 18, 1989 _____


Approved as to Form:

By: _____
　　Jeffrey A. Redmon
BRIGGS AND MORGAN, P.A.
Date: 8/22/89

18

　　　　　　　　　　　　**EXHIBIT A**

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89;
     6/30/89; 7/20/89; 8/4/89

NORWEST BANK, SOUTH DAKOTA, NATIONAL
ASSOCIATION

By: _____

Its: ___Vice President_____

Printed Name: ___Jon A. Veenis_____

Signature Date: ___August 18, 1989_____


STUDENT LOAN MARKETING ASSOCIATION

By: _____

Its: _____Sheldon D. Repp_____
              Associate General Counsel
Printed Name: _____

Signature Date: _____

19

EXHIBIT A

jar: 03/23/89; 5/12/89; 5/15/89; 5/16/89; 5/18/89; 5/31/89; 6/30/89; 7/20/89; 8/4/89

EXHIBIT "A"
Promotional cost reimbursement from Sallie Mae to HICA

    a)  The printing and distribution of applications and various descriptive and promotional materials, estimated to be $163,000 per year;

    b)  The office expense associated with the marketing director and secretary estimated to be $20,000 a year;

    c)  The office expenses, supplies, postage, long distance phone, furniture, etc., used by the marketing director and secretary estimated at an additional $30,000 per year;

    d)  Other expenses such as newsletters and bulletin series, seminar handouts, displays for industry meetings and print media advertising.  The total for these miscellaneous expenses was $26,000.

The total compensation then, paid to the program by Sallie Mae for the direct promotion is estimated to be and unless otherwise agreed by SLMA shall not exceed $239,000 per calendar year, subsequent calendar year estimates will be provided by HICA and subject to approval by Sallie Mae.

EXHIBIT A