TENTATIVE RULING
ISSUED BY JUDGE LAURA S. TAYLOR

Adversary Case Name:    KRYSTAL ANNE MEDINA v. NATIONAL COLLEGIATE STUDENT LOAN TRUST 2

Adversary Number:    19-90065

Case Number:    17-05276-LT7

Hearing:    10:00 AM  Wednesday, August 5, 2020

Motion:    MOTION FOR SUMMARY JUDGMENT FILED ON BEHALF OF NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3

Hear.

    Given the current public health emergency, all hearings will be by VIDEO CONFERENCE.  Personal attendance at the August 5, 2020, hearing in this matter is therefore excused.  All interested parties are to appear by video.  The public may freely monitor by telephone.  Please contact the courtroom deputy at 619-557-5157 to make the necessary arrangements.

    In this adversary proceeding Plaintiff seeks a ruling that her indebtedness to National Collegiate Student Loan Trust 2006-3 ("Defendant") is discharged.  Plaintiff's very short Complaint provides in relevant part:

### FACTS

- On or about June 20, 2006, Plaintiff obtained a loan (the "Loan") to attend the San Diego Culinary Institute (the "School").
- Debtor graduated from the School in July of 2007.
- The School was a private, for-profit enterprise at the time the Plaintiff attended.
- The Loan was not made, insured, or guaranteed by a governmental unit; nor was it made under any program funded in whole or in part by a governmental unit or nonprofit institution.
- The Loan is not the result of an obligation to repay funds received as an educational benefit, scholarship, or stipend.
- At the time of Plaintiff's attendance, the School was not eligible to participate in a program under title IV of the Higher Education Act of 1965.
- The Plaintiff's Chapter 7 Discharge was entered on or about November 28, 2017.

### FIRST CAUSE OF ACTION

1

> The Plaintiff's indebtedness to Defendant was discharged in the Chapter 7 case as the facts and circumstances associated with the school, the law, the lender, and the indebtedness, do not support the application of the exceptions to discharge described under 11 USC 523(a)(8). The Loan was not made or guaranteed by a government or nonprofit institution, is not the result of an educational benefit or stipend, and is not a "qualified education loan" as defined in section 221(d)(1) of the Internal Revenue Code of 1986.

Dkt. No. 1.

Plaintiff does not argue that repayment of the debt would cause undue hardship.

In the answer Defendant asserts the affirmative defense that the "loan, at issue," is nondischargeable under § 523(a)(8)(A)(i) which, for the purposes of this case, excepts from discharge any debt for an educational loan made under any program funded in whole or in part by a nonprofit institution. As fleshed out in this and the prior Motion for Summary Judgment, Defendant explains that the Loan qualifies under § 523(a)(8)(A)(i), because it is made through a loan program which was guaranteed by a nonprofit, The Education Resources Institute, Inc., ("TERI").

Defendant seeks summary judgment on this affirmative defense. Between the filing of the original motion, Plaintiff's sur-reply, the amended motion, and this renewed Motion, the pleadings have ballooned into a multi-issue matter. As discussed in detail below, in order to succeed Defendant must establish, for purposes of summary judgment, all of the following:

1. TERI's guaranty of the loan program satisfies the requirement that the program was "funded" by a nonprofit for the purposes of § 523(a)(8);
2. The term "institution" in § 523(a)(8) need not be an "educational" institution; and
3. TERI was a "nonprofit" institution for the purposes of § 523(a)(8).

In her Opposition, Plaintiff argues that Defendant misinterprets section 523(a)(8), and that Defendant had failed to establish any of the above.

**Standard for Summary Judgment**

To prevail on a summary judgment motion, the moving party must establish that: (a) there are no genuine issues as to any material fact; and (b) the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) (made applicable by Fed. R. Bankr. P. 7056). A "material" fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A "genuine" issue of material fact exists when there is sufficient evidence favoring the party opposing the motion for a reasonable jury to return a verdict for that party. *Id.* In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and it is required to draw all inferences in a light most favorable to the non-moving party. *Id.*

**Burden**

Under § 523(a)(8), the lender has the initial burden to establish the existence of the debt and that the debt is an educational loan within the statute's parameters. *Kashikar v. Turnstile Capital Mtg., LLC (In re Kashikar)*, 567 B.R. 160, 168 (B.A.P. 9th Cir. 2017)(citing *Roth v. Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 916–17 (9th Cir. BAP 2013)); *Greer-Allen v. Nat'l Collegiate Student Loan Tr. 2005-1 (In re Greer-Allen)*, 602 B.R. 831, 834 (Bankr. D. Mass. 2019) (lender bears burden of showing that the loan is of a type excepted from discharge). Once this burden is met, the burden of production shifts to debtor. *Greer-Allen,* 602 B.R. at 834. But the ultimate burden of proof by the preponderance of the evidence is lender's. *Id.*

**Section 523(a)(8)(A)(i)**

Section 523(a)(8)(A)(i) provides in relevant part:

(a) A discharge under section 727…. of this title does not discharge an individual debtor from any debt—

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution…

As already noted, Plaintiff does not allege undue hardship. And Defendant does not claim that the Loan was funded by a governmental unit.

Thus, Defendant must meet its initial burden of establishing that the Loan was an educational loan "made under any program funded in whole or in part by a nonprofit institution." And it must do so keeping in mind the sub-issues discussed above.

**Analysis**

In analyzing the issues, the Court is aware that § 523(a) exceptions should be construed narrowly. *Greer-Allen*, 602 B.R. at 834.

**Whether a Program is "Funded" by an Institution that only Guarantees the Loans**

It is not disputed that the Loan was made under the Education One Continuing Education Loan Program (the "Program"), a part of the Education One© Loan Program. In this renewed Motion, Defendant has reverted to its original position and no longer makes the assertion that TERI[1] actually funded Plaintiff's Loan. Rather, Defendant asserts that TERI guaranteed loans made under the Program and argues that, as a result, TERI "funded" the Program as that term is used in the statute.

Defendant's position is supported by numerous cases which have held that student loans made by private for-profit banks were nondischargeable under § 523(a)(8) if they were made through a student loan program guaranteed, in whole or in part, by a

---

[1] Lender advanced the loan proceeds through TERI.

nonprofit institution. *See e.g.*, *O'Brien v. First Marblehead Educ. Resources, Inc. (In re O'Brien)*, 419 F.3d 104 (2d Cir. 2005).

*O'Brien* relied on *Hemar Serv. Corp. of Am. Inc. v. Pilcher (In re Pilcher)*, 149 B.R. 595, 600 (B.A.P. 9th Cir. 1993), in which the Panel also held:

> Notwithstanding Pilcher's contentions, the overall educational loan program received nonprofit funding. As we have stated in the preceding section, § 523(a)(8) does not require that the actual loan itself be funded by a nonprofit institution.

*Id.* at 600. See also fn. 3. The *Pilcher* Panel also ruled that that extent of the nonprofit's funding need not be "meaningful:"

> The plain language of § 523(a)(8) states that funding may be "in whole or in part." The addition of the meaningfulness requirement is purely a judicial creation. No qualifying language was included by Congress to establish minimum levels of participation. Therefore no inquiry into the meaningfulness of the participation is required.

*Id.* at 600 (deciding not to follow *The Education Resources Instit., Inc. v. Hammarstrom (In re Hammarstrom)*, 95 B.R. 160 (Bankr. N.D. Cal. 1989) on this point.)

Indeed, all courts which have considered the issue have agreed that directly funding the loans is not required. *See*, *Univ. v. Merchant (In re Merchant),* 958 F.2d 738, 740 (6th Cir. 1992); *Greer-Allen v. Nat'l Collegiate Student Loan Tr. 2005-1 (In re Greer-Allen)*, 602 B.R. 831 (Bankr. D. Mass. 2019); *Cleveland v. Educ. Credit Mgmt. Corp. (ECMC) (In re Cleveland)*, 559 B.R. 265 (Bankr. N.D. Ga. 2016); *Decker v. EduCap, Inc.*, 476 B.R. 463, 467-468 (W.D. Pa. 2012); *Drumm v. New England Loan Marketing Assoc., (In re Drumm)*, 329 B.R. 23, 35 (Bankr. W.D. Pa. 2005); *Educ. Res. Inst., Inc. v. Hammarstrom*, 95 B.R. at 165; *see also In re Duits*, 2020 WL 256770 (Bankr. S.D. Ind. Jan. 15, 2020) ("Based on the evidence presented, the loans here fit both the first and the third scenarios. They were initially funded by a private lender but were guaranteed by TERI, a nonprofit institution. Even if the debtor had shown that TERI did not fund the loans or even pay the initial lender on the guaranty is of no significance because TERI's guaranty 'helps fund a program because it encourages a lender to extend credit that may not be otherwise available.'")

Incredibly, in support of its most recent opposition, Plaintiff cites to *TERI v. Taratuska (In re Taratuska),* 374 B.R. 24 (Bankr. D. Mass. 2007) and provides this quoted language: "Notably, the statute employs both terms, plainly indicating that they have different meanings; otherwise, one or the other would be unnecessary. Hence, the giving of the Guaranty does not constitute the program funding contemplated by Section 523(a)(8) on account of the Loan." Dkt. No. 68. However, that case was overruled on that very ground in *TERI v. Taratuska (In re Taratuska*), 2008 WL 4826279, at *6 (D. Mass. Aug. 25, 2008) ("For the foregoing reasons, the bankruptcy court's order is REVERSED and the Court holds that TERI, a nonprofit institution,

4

funded the loan program under which Taratuska received her loan, within the meaning of § 523(a)(8).")

Plaintiff has provided no case, not later overruled, which has held to the contrary with respect to Bankruptcy Code § 523(a)(8). Rather, Plaintiff continues to argue that all of these cases are in error and cites the Court to cases and other sources interpreting statutes other than Bankruptcy Code § 523(a)(8). None of the cases cited by Plaintiff have addressed our specific issues. None of the cases have held that a requirement of "funded" could not be satisfied by "guaranteed."

While the Court will hear argument; it continues to find the § 523(a)(8) cases discussed above sound and persuasive. The Court is not persuaded by the non-section 523(a)(8) authorities cited by Defendant. Instead, its preliminary view is that, as a matter of law, an entity guaranteeing loans under a loan program satisfies the requirement that the program was funded by that entity for the purposes of § 523(a)(8). The analysis in other cases is persuasive; the guaranty provides a critical credit enhancement that makes loans from private lenders available. Without the agreement to make TERI's dollars available on default the loans would not be made.

**Must Defendant also establish that TERI has performed on such a guaranty?**

That, however, gives rise to another unsettled issue: whether Defendant must provide evidence that TERI actually put dollars into the Program by performing on a guarantee under the Program. There is no clear answer in the case law. In *Greer-Allen*, the court granted summary judgment without such a showing:

> The final issue the Court must decide is whether TERI funded the Education One Undergraduate Loan Program. The defendants put forth evidence suggesting that TERI did fund the program. *Greer-Allen* argues that the evidence the defendants produced cannot satisfy their burden of production. The Court finds that the defendants have satisfied their initial burden of production. On the other hand, *Greer-Allen* has provided no evidentiary basis for her assertion that TERI did not fund the program. *Greer-Allen* has not shown a genuine issue of material fact relating to the issue.
>
> The defendants produced the loan documents for each of the three loans. The first loan states:
>
>> I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code. Specifically, I understand that [Bank One, N.A.] purchased a guaranty of this loan, and that this loan is guaranteed by The Education Resources Institute, Inc., a nonprofit institution.
>
> The second loan contains identical language, and the third loan contains substantially similar language. The language in the loan documents provide some evidence that the program was funded by TERI because they indicate that Bank One and JPMorgan Chase purchased guarantees from TERI. A guaranty helps fund a program because it encourages a lender to extend credit that may

5

not otherwise be available.  However, the language in the loan documents is not, standing alone, sufficient to prove the existence of the guarantees.  Another court in this circuit has denied summary judgment when a creditor sought to prove the existence of a guaranty based only upon similar language in a promissory note. *See In re Wiley*, 579 B.R. at 7.  Here, the defendants have produced substantially more evidence, including the relevant guaranty and the defendants' trust agreements.

The summary judgment record also contains the trust agreement of each defendant.  These agreements provide further evidence of the existence of the TERI guaranty agreement and TERI's funding of the Education One Program.  The agreements define "TERI Guaranty Agreements" as the "Guaranty Agreements entered into between each of the Loan Originators and TERI as set forth on Schedule D attached hereto."  The trust agreements define "TERI Guaranteed Loans" as "Student Loans originated under the Student Loan Programs owned by the Trust and guaranteed by TERI pursuant to the Guaranty Agreements."  Schedule D of each trust agreement lists a Guaranty Agreement between TERI and Bank One, N.A. "for loans that were originated under Bank One's ... Education One Loan Program."  (ECF #29 Ex. F, G, H).

The trust agreements and their attached schedules indicate that the Education One Loan Program was funded by TERI.  Each agreement lists the Program as one guaranteed by TERI.  Each defines loans made under the Program as TERI Guaranteed Loans.  The trust agreements bolster the position that TERI played a part in funding the Program by guaranteeing loans issued under the Program.

Most notably, the defendants produced a guaranty agreement, executed on April 18, 2002, between Bank One and TERI.  Under the agreement, TERI promised to guaranty all loans made under the Education One Undergraduate Loan Program.  Section 2.1 of the guaranty states that "TERI hereby guarantees to Bank One, unconditionally ... the payment of 100% of the principal of and accrued interest on every Loan as to which a Guaranty Event has occurred."  Loans are defined as disbursements of funds made by Bank One under the Program. Guaranty Events are triggered by the failure of a borrower to make timely monthly payments.  Thus, the agreement makes clear that TERI guaranteed all loans made under the Program, and that TERI was obligated to pay Bank One in the event of any default by a student loan borrower.  The sweeping breadth of the guaranty makes clear that TERI helped fund the Program. Bank One and JPMorgan Chase Bank, its successor in interest, knew that all loans issued under the Program would be guaranteed by TERI in the event of default.

Considering the guaranty between Bank One and TERI, along with the aforementioned evidence, the defendants have met their initial burden of production.  *While the record lacks direct evidence of payments from TERI to the program, TERI's guaranty of all loans made under the Program conclusively establishes that the Program was funded in part by TERI.*  The blanket guaranty

6

> allowed Bank One, and its successor JPMorgan Chase, to offer student loans to borrowers like *Greer-Allen*.

602 B.R. at 838–39 (emphasis added). Defendant produced evidence similar to that seen in *Greer-Allen*.

On the other hand the Court in *Holguin v. NCSL Trust 2006-2 (In re Holguin)*, required a showing that TERI parted with cash:

> The majority of courts to consider the issue conclude that a nonprofit institution's guarantee satisfies the statute's "funded" requirement. *O'Brien*, 419 F.3d at 106 ("While it may be true that TERI merely guaranteed, without funding, *O'Brien's* particular loan .... TERI was clearly devoting some of its financial resources to supporting the program."); *In re Taratuska*, No. CIV. A. 07-11938-RCL, 2008 WL 4826279, at *3 (D. Mass. Aug. 25, 2008) ("[T]he courts that have interpreted this clause of the statute ... have uniformly found that loans made under any program funded in whole or in part by a nonprofit institution does encompass the role that nonprofit guarantors play."); *Greer-Allen*, 602 B.R. at 836 ("A nonprofit institutions' guarantee of a loan made under a program serves as evidence that the program was funded by that nonprofit institution."). Some courts observe further that " 'Congress intended to include within § 523(a)(8) all loans made under a program in which a nonprofit institute plays any meaningful part in providing funds.' " *Taratuska,* 2008 WL 4826279, at *4 (quoting *Hammarstrom*, 95 B.R. at 165); Prouty, 2010 WL 3294337 at *7 ("An educational loan is made under a program funded in whole or in part by a nonprofit institution when a nonprofit corporation plays a meaningful role in the program by insuring the loans."). 14
>
> The facts not subject to genuine dispute now before the Court do not establish that TERI in fact paid any of its guaranty obligations to GMAC Bank under the Loan Program. The Luke Affidavit's self-serving statement that he has "personal knowledge" that TERI paid out on some of its guarantees, without any supporting documentation, is ineffective to establish on summary judgment that TERI committed any monetary resources to fund the Loan Program.

609 B.R. 878, 886–87 (Bankr. D.N.M. 2019).

If the Court is convinced that the *Holguin* decision should be followed, then the statements in the loan and guaranty documents must be supplemented with evidence that TERI actually performed on a guaranty. In the prior tentative ruling, the Court explained: "Defendant should be prepared to point to specific evidence in the record that supports its assertion that TERI's guarantee is the factual and legal equivalent of funding…. Defendant is cautioned that a summary judgment in this case requires admissible evidence **in this case**. The conclusions of other courts on the record then before them is interesting, but not dispositive." Dkt. No. 44. Given the huge number of loans TERI ostensibly guaranteed, this should be a very simple task.[2]

---

[2] On reflection, the Court's assumption of simplicity may have been a bit off the mark.

> As to whether TERI actually performed on any guarantee, Defendant alleges:
>
> > TERI honored its Guaranty on at least one loan in Plaintiff's Loan Program, the Education One© Loan Program. See Declaration, ¶¶ 37 - 42 and Exhibit K.
> >
> > TERI purchased a loan made under the Education One Undergraduate Loan Program, one of the programs in the Education One© Loan Program. See Declaration, ¶s 37, 40 & 42; See Exhibit K, p. 4, upper left–hand corner; See also Ex. E and its Exhibit A "Basic Program Design"; See also Ex. G, Schedule A.

Dkt. No. 66. The Declaration referred to is the Declaration of Bradley Luke, ("Luke Declaration") Dkt. No. 64-1.[3] At first blush this reads as though TERI paid out on a guaranty and purchased another loan which was in default. However, when one reads the Luke Declaration, there is only one performance alleged: TERI performed on its guaranty of a loan by purchasing that loan. Thus, Defendant has provided "evidence" of performance.

Mr. Luke declares that he is employed by Transworld Systems Inc., ("TSI"), as the Director of Operations and that he is duly authorized by Defendant to make his declaration. He declares that he has knowledge of how TSI's records are maintained. Defendant's evidence that TERI honored the one guaranty is the declaration of Mr. Luke and an Exhibit K attached thereto. This is more than Defendant produced in *In re Holguin*:

> The facts not subject to genuine dispute now before the Court do not establish that TERI in fact paid any of its guaranty obligations to GMAC Bank under the Loan Program. The Luke Affidavit's self-serving statement that he has "personal knowledge" that TERI paid out on some of its guarantees, without any supporting documentation, is ineffective to establish on summary judgment that TERI committed any monetary resources to fund the Loan Program.

609 B.R. at 886–87.

Plaintiff provides evidence that TERI's guarantee was terminated in 2010 in TERI's bankruptcy case. Plaintiff should be prepared to explain how the 2010 termination which post-dated Plaintiff's 2006 Loan by four years is relevant to the issue of whether TERI funded the Loan Program under which her Loan was made. The Court is inclined to hold that it is not.

Plaintiff has argued that there is no evidence that TERI guaranteed her particular Loan. Again, as the Panel in *Pilcher* held, it is the *program*, as opposed to the individual loan, that had to be funded in part:

> The bankruptcy court erroneously focuses on whether Pilcher's loan was partially funded by a nonprofit institution. However, the plain language of § 523(a)(8) indicates that it is the program that need be funded by a nonprofit

---

[3] Plaintiff's evidentiary objections to the Luke Declaration are addressed in the companion tentative ruling.

8

> institution.  Section 523(a)(8) does not define "program," but the use of the modifier "any" suggests a broad definition.  Congress did not use language indicating that the loan itself must be funded by a nonprofit institution, but that the program pursuant to which the loan was made be funded in part by a nonprofit institution.
>
> Nothing in the legislative history surrounding this section evidences an intent to limit it solely to the funding of the loan itself.  On the contrary, the legislative history would suggest that Congress intended an inclusive reading.  This section was amended three times to expand the scope of coverage.

*Pilcher,* 149 B.R. at 598.  The Court agrees with *Pilcher* on this point.  After careful consideration, the Court is not inclined to follow the reasoning of *Holguin*.  But if it does, the Court is also inclined to find that Defendant's evidence provides the required support.  The Court will hear argument on this point.

### Whether "institution" is limited to an "educational institution"

Plaintiff renews her argument that the "institution" in "nonprofit institution" is limited to an "educational institution."  This argument is contrary to the language of the statute, and Plaintiff has provided no authority requiring the Court to read "educational" into the statute when Congress did not write it in (and in fact wrote it out).  Other courts have been asked to do so and have also declined.  *See Plumbers Joint Apprenticeship and Journeyman Training Committee v. Rosen (In re Rosen):*

> The debtor would basically have me read the term back into section 523(a)(8) by imposing a post-secondary or higher education requirement.  The language of the statute is not so limited.

179 B.R. 935, 938 (Bankr. D. Or. 1995).  Another rejection of Plaintiff's argument can be found in *Greer-Allen*:

> Greer-Allen's counsel also argues that Congress understood "nonprofit institution," as the phrase is used in § 523(a)(8)(A)(i), to mean only nonprofit educational institutions.  In other words, Greer-Allen contends that only educational loans made under a program funded by a nonprofit college should be excepted from discharge.  Whether or not Congress intended such a meaning, this Court must give effect to the plain language Congress used. Section 523(a)(8)(A)(i) excepts loans made under programs funded by "nonprofit institutions" from discharge.  The plain text is unambiguous and offers no reason to suggest that only certain nonprofit institutions satisfy the exception.  Accordingly, the Court declines to adopt Greer-Allen's reading of § 523(a)(8)(A)(i).

602 B.R. at 838.

The Court is inclined to hold that as a matter of law it would be inappropriate to read "education" back into the statute when Congress specifically removed the limiting

9

language "institution of higher education," leaving only "institution" in the 1984 amendments:

> The subsection was again expanded by § 454(a)(2) of the Bankruptcy Amendment Act of 1984, removing the words "of higher education" to eliminate the inference that the section only applied to nonprofit institutions associated with higher education. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 454(a)(2), 98 Stat. 333 (Supp.1984) (amending 11 U.S.C. § 523(a)(8) (1982)).

*Pilcher*, 149 B.R. at 598. The Court is inclined to grant summary judgment to Defendant on the legal issue of whether TERI had to be an educational institution in order to satisfy § 523(a)(8).

**Whether TERI was a "nonprofit institution"**

Before digging into the parties' evidence, the Court must determine what "nonprofit" means for the purposes of § 523(a)(8). Many courts have considered the issue, and so far as the Court can tell there are no fully established standards. Nevertheless, the Court has gleaned from those cases it finds persuasive certain parameters.

First, the mere statement in a loan document that TERI is a nonprofit is not conclusive. *See Golden v. JP Morgan Chase Bank (In re Golden):*

> [M]ore is required to satisfy the requirements of Section 523(a)(8) than a statement in a loan document that "either or both" of certain exceptions from discharge may apply. If that language alone were sufficient, then it is hard to see what role would be left for Congress or the courts in drafting, interpreting, and applying these sections of the Bankruptcy Code.

596 B.R. 239, 267 (Bankr. E.D.N.Y. 2019). Such statements are a factor, but more is required. *See Greer-Allen*, 602 B.R. at 837-38.

Second, tax exempt status does not on its own establish nonprofit for the purposes of § 523(a)(8)(i). *In re Rosen*, 179 B.R. at 940. But again, it can be a factor in favor of finding that TERI is a nonprofit since the limitations imposed by the taxing authorities on disbursing profits to shareholders mirrors the common law restriction on paying dividends.

Third, the Court is not required to do an in-depth analysis of TERI's financial records; rather the test is the common law question of whether the entity was designed and operated to produce and distribute profits to shareholders. The in-depth approach was urged upon the court in *Rodriguez v. The Education Resources Institute, Inc, (In re Rodriguez),* 319 B.R. 894, 895–96 (Bankr. M.D. Fla. 2005) and rejected. In *Rodriquez,* the debtor "urg[ed] the Court to engage in an in-depth analysis beyond the simple record and look to other substantive matters, including TERI's corporate salaries, profits and businesses of its subsidiaries." *Id.* at 896. The court declined to do so, adopting a "plain everyday dictionary meaning," and looked to Blacks':

10

> According to Black's Law Dictionary, a "nonprofit corporation" is a "corporation organized for some purpose other than making a profit, and usually afforded special tax treatment." Black's Law Dictionary (10th ed.1999) at 367.

*Id.* at 897. The court found that TERI met the definition "precisely:"

> TERI fits the plain meaning of the term "nonprofit institution" precisely. That is, TERI is a corporation organized for some purpose other than making a profit—in this instance as a nonprofit corporation making educational loans—and has been accorded special tax treatment both by the Internal Revenue Service and the Massachusetts Department of Revenue.

*Id.* at 898. The court found this approach best served the intent of Congress which had systematically narrowed the scope of student loans that could be discharged:

> Congress, with each amendment to section 523(a)(8), limited the discharge of such loans, consistently making it more difficult to discharge such loans.
>
> As can be seen, the legislative history of the statute does not support the more narrow interpretation of the meaning of "nonprofit institution" as urged by Rodriguez. Moreover, this argument violates the cannon of statutory interpretation that the starting point is the plain language of the statute itself.

*Id.* at 897.

The court went on to point out the problem with the approach suggested by the debtor in that case and Plaintiff in this case:

> The use of an in-depth "totality of the circumstances" test would have this Court depart from the plain meaning of the words in the statute and venture into uncharted waters for which there is no case law support. In other words, if Rodriguez's view were to prevail, conceivably at every section 523(a)(8) trial there would be a need for the courts to look behind the tax-exempt status of the lender, which is facially classified as nonprofit—and try such complex issues as: corporate governance, subsidiary ownership, whether corporate salaries were reasonable at the time the loans were granted, and whether the salaries are currently reasonable.
>
> This Court does not believe that Congress contemplated such a review. To the contrary, Congress contemplated that if a debtor borrows money for educational purposes and that loan was funded by a nonprofit corporation, the debts are within the purview of section 523(a)(8).

*Id.*

The cases Plaintiff relies upon for the proposition that the Court should conduct an investigation into the specific income and expenses of the institution are primarily tax cases wherein the IRS was challenging an entities' tax-exempt status. *See Est of Hawaii v. Comm'r of Internal Revenue*, 71 T.C. 1067 (1979), aff'd, 647 F.2d 170

11

(9th Cir. 1981); *P.L.L. Scholarship Fund v. Commissioner of Internal Revenue*, 82 T.C. 196, 200 (1984); and *Living Faith, Inc. v. C.I.R.*, 950 F.2d 365, 373 (7th Cir. 1991). They are not helpful.  Plaintiff has cited no case decided under § 523(a)(8) in which such an approach was taken.

In the opposition Plaintiff argues:

> Where a statute employs the word "nonprofit," courts conduct an independent inquiry into the entity's character to determine whether it "actually operates as a nonprofit, irrespective of its tax-exempt status." *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 475–76 (1st Cir. 2005).  To make this determination, courts analyze whether the entity was generating any private benefit or inurement, engaging in excessive commercial activity, or other types of "suspect transactions."

Dkt. No. 68.

*Zimmerman* is of limited value as it was not addressing § 523(a)(8), but rather 15 U.S.C. § 1679a(3)(B)(i), which prohibits certain lawsuits against "any nonprofit organization which is exempt from taxation under section 501(c)(3)" of the Internal Revenue Code.  The only issue in *Zimmerman* was "whether an Internal Revenue Service (IRS) determination that an entity is tax-exempt under section 501(c)(3) is sufficient to bring the entity within the statutory exclusion set forth in § 1679(a)(3)(B)(i)." *Id.* at 474.  The court held that because of the unique language of that statute, it was not:

> The most natural reading of the text is that it establishes two requirements.  The nonprofit language excludes some entities from eligibility (namely, profit making entities), and the "tax-exempt" language distills the excluded group to the kinds of organizations identified in section 501(c)(3) (e.g., charitable or educational organizations) which are, in fact, tax-exempt.  Read in this way, the Act does not define "nonprofit organization" as an entity with section 501(c)(3) status but rather establishes two independent criteria for the exclusion: nonprofit status and section 501(c)(3) status.

409 F.3d at 475.  Section 523(a)(8) only requires nonprofit. Furthermore, when determining nonprofit, the court in *Zimmerman* did not, as Plaintiff suggests, engage in an in-depth analysis of the entity's financial operations, but applied a more superficial review:

> Where Congress left "nonprofit" undefined in an exclusion from another statutory scheme, we concluded that "nonprofit" status depended primarily on proof that the entity did "not distribute profits to stockholders or others." *See Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981).  This is consistent with the standard definition of the term: a nonprofit corporation is "a corporation organized for some purpose other than making a profit." Black's Law Dictionary at 367 (8th ed.1999); see also Bruce Hopkins, The Law of Tax–Exempt Organizations 5 (8th ed. 2003) (A "nonprofit organization ... is not

12

> permitted to distribute its profits ... to those who control it...."). Here, we apply the standard definition.

409 F.3d 473, 478–79. This analysis is consistent with cases applying § 523(a)(8).

In *Rosen*, the court applied the "common-law test of whether the entity has shareholders and pays dividends." 179 B.R. at 940. The court went on:

> The Training Trust is exempt from taxation under 26 U.S.C. § 501(c)(3), which requires that no part of the net earnings of the entity inure to the benefit of any private shareholder or individual. Section 501(c)(1), the tax exemption provision relied upon by Delbonis and similar cases does not contain such a requirement. In addition, the Restated Agreement and Declaration of Trust does not provide the trustees of the Training Trust with authority to pay dividends. Rather, it requires the assets of the Trust to be held and applied for the exclusive purpose of providing apprenticeship and training instruction and for defraying reasonable expenses. The fact that the Training Trust may have accumulated assets does not mean that it is a for-profit enterprise under these circumstances. The uncontroverted evidence reflects that the Trust built up its cash reserves to build new facilities and purchase new equipment and that funds are not distributed to employees, stockholders or any entity affiliated with the Trust. Under these circumstances, the Training Trust is a nonprofit institution.

*Id.*

So, the Court's preliminary view is that; (1) statements in loan documents and the like that TERI is nonprofit are not conclusive but persuasive; (2) same is true as to TERI's tax-exempt status; and (3) the Court is not required to conduct an in-depth review of TERI's financial record but whether TERI refrained from distributing net earnings to shareholders is an important factor.

**Defendant's Evidence on its Nonprofit Status**

Defendant's Motion is supported by the Luke Declaration, discussed above, and the declaration of Holly Nolan, an associate with Defendant's counsel ("Nolan Declaration").

Attached as exhibits to the Nolan Declaration are TERI's corporate records from the Secretary of the Commonwealth of Massachusetts's website at http://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?sysvalue=o3fxJEn1qk52LvkE cwi30rXyq8ywfTWtfB4CHi.XP0c-. (The "Website".)

Ms. Nolan declares that the website identifies TERI as a "Nonprofit Corporation."

TERI's Articles of Organization (Exhibit A) state TERI was organized under Mass. G.L. Ch. 180. The Articles of Organization state that TERI was to be "operated exclusively for charitable and educational purposes." The Articles of Organization state that '[n]otwithstanding any other provisions of these articles, the Corporation shall not participate in activities not permitted to be carried on (a) by a corporation exempt from

13

federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1954, as amended (or the corresponding provision of any future United States internal revenue law), or (b) by a corporation contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1954, as amended (or the corresponding provision of any future United States internal revenue law." The Articles of Organization in Article 2 state that "No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, its members, directors, officers or other private persons, except reasonable compensation for services rendered and distributions in furtherance of the purposes set forth in Article 2 hereof."

Article 2 of the Articles of Organization was amended on or about September 12, 1990 only to add a limitation on the personal liability of the Officers and Directors to the corporation for breach of fiduciary duty. (See Exhibit B).

The Articles of Organization were restated on or about November 19, 2010. (See Exhibit C).

Restated Article II (2) provides:

The Corporation is organized and at all times shall be operated exclusively for religious, charitable, scientific, literary or educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the Internal Revenue Code of 1986, as amended, and any such future law, the "Code"), and Section 4 of Chapter 180 of the Massachusetts General Laws, as amended ("Chapter 180"), including but not limited to assisting students in attaining an education and assisting educational and financial institutions in providing an education in an economical fashion.

Exhibit C, Sched. A.

Restated Article IV provides:

Notwithstanding any other provisions of these articles, the Corporation shall not participate in activities not permitted to be carried on (a) by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code or (b) by a corporation contributions to which are deductible by virtue of Section 170(c)(2) of the Code.

Exhibit C, Article 4, Sched. B, Art. IV-B.

Restated Article IV also provides:

No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to, its members, directors, officers or other private persons, except reasonable compensation for services rendered and distributions in furtherance if the purposes set froth in Article II hereof.

Exhibit C.

14

Exhibit D and E to the Nolan Declaration indicate that TERI merged with two other corporations during its corporate life, The Education Fund, Inc. and TERI Financial Services, Inc., Both of these corporations were nonprofit corporations and the mergers were done under Massachusetts' nonprofit statute, General Laws, Chapter 180.  The second merger specifically states that TERI shall remain a nonprofit corporation: "… [I]f any of the constituent corporations constitutes a public charity, then the resulting or surviving corporation shall be a public charity."  Ex. E.

Finally, Ms. Nolan declares that The Secretary of the Commonwealth of Massachusetts's website shows that TERI retained its nonprofit status throughout its corporate life and was never a for-profit corporation.

TERI is referred to as a nonprofit in Plaintiff's Credit Agreement.  See Luke Declaration, Ex. B.

TERI filed bankruptcy records indicating that when it filed it declared itself a nonprofit in its Equity Security Holder Statement.  TERI's Disclosure Statement identified it as a nonprofit with a mission to promote education and guarantee private student loans:

> Founded in 1985, The Education Resources Institute, Inc. is a nonprofit organization incorporated under Massachusetts General Laws, chapter 180, local in Boston, Massachusetts. TERI promotes access to education for students of all ages and incomes with two primary programs.  Through its College Access programs, TERI assists low income, first-generation-to college and other underserved students in pursuing higher education.  TERI is a nationally recognized leader in college access through support and promotion of research-based policies and practices.  Locally it provides innovative direct service programs in Massachusetts.  Through its loan guarantee programs, TERI has guaranteed more than two million private student loans.

Exhibit M.

The findings of fact and conclusions of law in the Order confirming TERI's Fourth Amended Plan find that the Reorganized TERI will maintain its nonprofit status.  Ex. N.  The Order also found that TERI "complied with all applicable state and federal restrictions on transfers by not for profit entities."  *Id.*

Defendant maintains that TERI did obtain tax-exempt status from the IRS, but provides no evidence.  Defendant explains that Defendant subpoenaed the IRS on June 10, 2020 for the letter granting it tax-exempt status and a Declaration authenticating that letter, but has yet to receive a response.  The Court is troubled that Defendant did not even seek this evidence until after it filed its original motion for summary judgment.  Defendant, on the other hand, has provided evidence that TERI was tax-exempt under Massachusetts law.

Other courts that examined TERI found it a nonprofit institution.  *See TERI v. Hammarstrom, (In re Hammarstrom),* 95 B.R. 160, 166 (Bankr. N.D. Cal. 1989).  ("…TERI [is a] private nonprofit organization… engaged in providing guaranteed

15

educational loans."; *O'Brien v. First Marblehead Educ. Res., Inc. (In re O'Brien),* 419 F.3d 104, 105 (2d Cir. 2005). ("The loan was guaranteed by defendant-appellee-creditor The Education Resources Institute ("TERI"), a not-for-profit corporation that conditionally guarantees loans extended by private lenders under TERI's student loan programs."); *Rodriguez v. Educ. Res. Inst., Inc. (In re Rodriguez),* 319 B.R. 894, 895 (Bankr. M.D. Fla. 2005). ("TERI is a private nonprofit institution organized under the laws of Massachusetts providing financial assistance to students enrolled in higher education programs throughout the United States."); *TERI v. Martin, (In re Martin)*, 119 B.R. 259, 260 (Bankr. E.D. Okla. 1990). ("[T]he Guaranty Agreement between TERI and The Bank of New England (attached as Exhibit B to the Plaintiff's Brief in Support of its Motion for Summary Judgment) indicates that TERI is in fact a non-profit corporation.")

Plaintiff has provided no evidence or even allegation that TERI paid exorbitant salaries or otherwise allowed its owners to siphon off corporate assets. Plaintiff has provided no evidence that TERI was ever referred to as a for profit entity. Plaintiff has provided no evidence that TERI ever made distributions to shareholders.

In opposition to the Motion, Plaintiff argues that Defendant's partnership relationship with First Marble Head ("FMC"), a for-profit lender, transformed Defendant into a for-profit institution because FMC used the relationship to expand its loan program: "FMC promoted its ability to make non-dischargeable debt through TERI as a competitive advantage over Sallie Mae and Wells Fargo." Opp. at 23:4-7. However, this appears to have been the industry standard. As set forth above, a major issue in the early cases was whether the program was funded by the guarantor of the loans, because the actual loans were made by a for-profit entity. *See e.g., O'Brien* in which the loan was made by Key Bank and guaranteed by TERI. 419 F3d. at 105.

Plaintiff has made no allegation that TERI made profits that were up streamed to FMC or anyone. The fact that FMC may have benefited from the relationship does not render TERI a for-profit institution as a matter of law. Also, the fact that TERI may have generated a profit is not a problem so long as it was not paid out in dividends. *See Rosen*, 179 B.R. at 940 ("The fact that the Training Trust may have accumulated assets does not mean that it is a for-profit enterprise under these circumstances.") In short, even if the Court accepts Plaintiff's assertions of benefit to FMC, it does not see how this creates a triable issue of material fact.

Defendant has provided evidence that TERI was a "nonprofit" at the time it funded the Program through its guarantee. The burden shifts or will shift to Plaintiff to create a triable issue of material fact. Plaintiff has provided voluminous evidence in support of its assertion that TERI was used by FMC to generate profits. However, as noted above this is beyond the scope of the Court's proper investigation.

The Court is inclined to find that Defendant has established that TERI was a nonprofit when it guaranteed loans under the Program from which Plaintiff borrowed, and that there is no triable issue on this point.

The same conclusion on much the same record was reached by the court in *Rodriguez* which also found that TERI is a nonprofit institution:

> TERI is a private nonprofit institution organized under the laws of Massachusetts providing financial assistance to students enrolled in higher education programs throughout the United States. As set forth in TERI's articles of organization, TERI is operated exclusively for charitable and educational purposes through assisting students in attaining an education and through assisting educational institutions in providing an education in an economical fashion. No part of TERI's earnings may inure to the benefit of any director or employee. TERI is also treated as a tax-exempt nonprofit organization by the Internal Revenue Service and qualifies as such pursuant to sections 501(a) and 501(c)(3) of the Internal Revenue Code and has been provided tax exempt status by the Massachusetts Department of Revenue.

319 B.R. at 895–96 (citations to the record omitted).

On similar evidence the *Greer-Allen* court also found TERI to be a nonprofit on summary judgment:

> Further, the defendants submitted the affidavit of Bradley Luke, an employee of Transworld Systems, Inc. ("TSI"). Def.'s Mot. Summ. J. Ex. C. TSI is responsible for subservicing student loans held by the defendants. Luke testified that all three loans were made under a loan program…. Ample evidence in the record shows that TERI was a nonprofit entity. All three loan agreements reference TERI's status as a nonprofit institution. All three trust agreements submitted by the defendants define TERI as "a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws." Def.'s Mot Summ. J. Ex. F, G, H. Further, the Guaranty Agreement, submitted under seal, between TERI and Bank One, N.A. also describes TERI as "a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws."
>
> At oral argument, Greer-Allen's counsel insinuated that TERI may not have been operating as a nonprofit institution when these loans originated. However, Greer-Allen has not produced any evidence in furtherance of that claim. Summary judgment is appropriate where there is no genuine issue of material fact. Here, Greer-Allen has not put forth sufficient evidence to generate a genuine issue of material fact regarding TERI's nonprofit status.

602 B.R. at 837–38.

There is no evidence that this is a case such as *Zimmerman* in which the "nonprofit" was being used to directly enrich its principals:

> the plaintiffs' complaint sufficiently alleges that Cambridge was not, in fact, operating as a nonprofit organization. The complaint states that, while Cambridge claimed that its purpose was "to provide direct aid to financially distressed debtors," in reality "Cambridge's primary purpose was to make money for its owners and operators, John and Richard Puccio." The complaint further

17

> claims that the Puccios never intended to operate Cambridge as a nonprofit, but rather intended to use it "to enrich themselves and their key executives by permitting them to siphon off corporate assets of their business through huge compensation packages." In support of this allegation, the complaint alleges that the Puccios and their key executives have received exorbitant salaries from Cambridge. These allegations, if true, could support a finding that Cambridge was not actually operating as a nonprofit organization and is therefore subject to the CROA.

*Zimmerman,* 409 F.3d at 473, 478–79.

The Court is inclined to grant summary judgment that TERI was a nonprofit institution for the purposes of Bankruptcy Code § 523(a)(8).